# EXHIBIT 11

FILED

17 APR 25 AM 9:00

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 17-2-10605-4 KNT

**SUPERIOR COURT, IN AND FOR THE COUNTY OF KING**
**STATE OF WASHINGTON**

National Collegiate Student Loan Trust 2006-3 A Delaware Statutory Trust(s)
Plaintiff / Petitioner

vs.

SARAH K DOUGLASS, ET AL.
Defendant / Respondent

Cause #: 17-2-10605-4  KNT

Declaration of Service of:
SUMMONS AND COMPLAINT

Hearing Date:

Declaration:

The undersigned hereby declares: That s(he) is now and at all times herein mentioned, a citizen of the United States and a resident of the State of Washington, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, and competent to be a witness therein.

On the date and time of:        02/25/17 10:35 AM
At the address of:        7950 SEWARD PARK AVE S
                SEATTLE, WA 981184251
Within the County of: KING State of Washington
The declarant duly served the above-described documents upon:
                SARAH K DOUGLASS
by then and there personally delivering 2 true and correct copies thereof, by then presenting to and leaving the same with:        BRETT DOUGLASS , CO-RESIDENT, SPOUSE , WHITE MALE 36-50 YRS BROWN HAIR 5FT 9IN - 6FT 131-160 LBS

A person of suitable age and discretion residing at the defendant's/respondent's usual place of abode listed above.

No information was provided that indicates that the subjects served are members of the U. S. Military.

I hereby declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Date: 02/28/17 at Lynnwood WA 98036

By_____        Service Fee Total: $67.50
MARCO A. RUISLA SR  2012-35

        ORIGINAL        15-40570 ; 1322849
        PROOF OF SERVICE        Patenaude & Felix ,APC
                19401 40th Ave West, Suite 280
                Lynnwood, WA 98036
                1-800-832-7675

# EXHIBIT 12

FILED
17 APR 25 AM 9:00

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 17-2-10605-4 KNT

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2006-3, A DELAWARE
STATUTORY TRUST(S)

Plaintiff,

vs.

SARAH K DOUGLASS

Defendant.

Case No.: 17-2-10605-4 KNT

MOTION & DECLARATION FOR
DEFAULT AND JUDGMENT

## I. MOTION

The plaintiff, by and through its attorneys, Patenaude & Felix, A.P.C., respectfully moves the Court for an Order of Default and Judgment against the defendant, SARAH K DOUGLASS, in the principal sum of $1,931.11, together with costs, as requested in the judgment.

This Motion is based on the affidavits or declarations in support of entry of judgment submitted herewith and the subjoined declaration of counsel.

## II. DECLARATION

The undersigned declares under penalty of perjury under the laws of the State of Washington that the following is true and correct:

1.  I am the attorney of record for the plaintiff herein. I base this declaration on my review of the file maintained by this law firm with regard to this matter.

/ / /

-1-

MOTION & DECLARATION FOR DEFAULT JUDGMENT

PATENAUDE & FELIX, A.P.C.
19401 40th Avenue West, Suite 280, Lynnwood, WA 98036
Tel: (425) 361-1662  Toll Free: (800) 832-7675

WA_90A Mtn and Dec DJ                                          P&F File No. 15.40570

2.     That on 2/25/2017, in King County, Washington, the defendant, SARAH K. DOUGLASS, was served with a Summons and Complaint in the above referenced action. The Affidavit of such service is filed herein. More than 20 days have elapsed since the date of service.

3.     The defendants have failed to serve an appearance/answer or otherwise defend, in accordance with CR55 within the time permitted by law.

4.     Venue is appropriate under R.C.W. 4.28, because King County is the county in which the defendant resides.

5.     The defendant is not a person in the Military Service of the United States, as defined in the Soldier's and Sailor's Civil Relief Act of 1940 as amended by the The Service member's Civil Relief Act of 2003. The declarant's staff has checked the U.S. Department of Defense Manpower Date Center, and the report provided and attached states that the Department of Defense does not possess any information indicating the defendant is on Military Duty. Attached as an addendum is the information that the above statement if based upon. The declarant is unable to determine whether the defendant is a dependent of a service member.

I declare under penalty of perjury of the laws of the State of Washington that the foregoing is true and correct.

DATED: March 20, 2017, at Lynnwood, WA.

Presented by:

PATENAUDE & FELIX, A.P.C.

MATTHEW CHEUNG, WSBA #43067
Attorney for Plaintiff
Patenaude & Felix, A.P.C.
19401 40th Avenue West, Suite 280
Lynnwood, WA 98036
(425) 361-1662

-2-
MOTION & DECLARATION FOR DEFAULT JUDGMENT

PATENAUDE & FELIX, A.P.C.
19401 40th Avenue West, Suite 280, Lynnwood, WA 98036
Tel: (425) 361-1662  Toll Free: (800) 832-7675

WA_90A Mtn and Dec DJ                          P&F File No. 15-40570

# EXHIBIT 13

15- 40570
WA

| | |
|---|---|
| NATIONAL COLLEGIATE STUDENT<br>LOAN TRUST 2006-3, A Delaware<br>Statutory Trust | )<br>)<br>) |
| Plaintiff | )   Docket # |
| | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| SARAH K DOUGLASS | ) |
| | ) |
| | ) |
| | ) |
| Defendant(s) | ) |
| | ) |

AFFIDAVIT AND VERIFICATION OF ACCOUNT

| | |
|---|---|
| STATE OF GEORGIA | ) |
| | ) |
| COUNTY OF GWINNETT | ) |

BEFORE ME, the undersigned authority, personally appeared Affiant _____ **Brian Jackson** ,

who being first duly sworn, deposes and states:

      1.    I am employed by Transworld Systems Inc. (hereinafter TSI), the Subservicer for

Plaintiff pertaining to the educational loan forming the subject matter of this action.

      2.    TSI has been contracted to perform the duties of the Subservicer for Plaintiff by

U.S. Bank, National Association, the Special Servicer of Plaintiff. TSI, as the Subservicer of the

Plaintiff, is the designated custodian of records for the Defendant's educational loan.

Additionally, TSI maintains the dedicated system of record for electronic transactions pertaining

to the Defendant's educational loan, including, but not necessarily limited to, payments, credits,

interest accrual and any other transactions that could impact the Defendant's educational loan.

Attached hereto as Exhibit "A" is a true and correct copy of confirmation of TSI's capacity as Subservicer.

3. I am over the age of 18 and competent to testify to the matters stated herein. As an employee of TSI, I am duly authorized by Plaintiff and U.S. Bank, National Association to make the representations contained in this Affidavit.

4. I have access and training on the system of record utilized by TSI to enter and maintain loan account records and documentation concerning the Defendant's educational loan for the Plaintiff.

5. I am familiar with the process by which TSI receives prior account records, including origination records from the time the loan was requested and/or disbursed to the Defendant and/or the student's school on their behalf.

6. As custodian of records it is TSI's regularly-conducted business practice to incorporate prior loan records and/or documentation into TSI's business records.

7. I am further competent and authorized to testify regarding this educational loan through personal knowledge of the business records maintained by TSI as custodian of records, including electronic data provided to TSI related to the Defendant's educational loan, and the business records attached to this Affidavit.

8. This lawsuit concerns an unpaid loan owed by Defendant SARAH K DOUGLASS to Plaintiff. Specifically, Defendant entered into an educational loan agreement at Defendant's special instance and request. A loan was extended for Defendant to use pursuant to the terms of the loan agreements. Defendant has failed, refused, and/or neglected to pay the balance pursuant to the agreed terms.

9.      Educational loan records are created, compiled and recorded as part of regularly conducted business activity at or near the time of the event and from information transmitted from a person with personal knowledge of said event and a business duty to report it, or from information transmitted by a person with personal knowledge of the accounts or events described within the business record.  Such records are created, kept, maintained, and relied upon in the course of ordinary and regularly conducted business activity.

10.      I have reviewed the educational loan records described in this affidavit regarding account number xxxxx1325-001-PHEA.  No payment has been made since 04/12/2013.  After all payments, credits and offsets have been applied, Defendant SARAH K DOUGLASS owes the principal sum of $1,766.01, together with accrued interest in the amount of $ 165.10, totaling the sum of $1,931.11 as of 3/7/2017.  Attached hereto and incorporated as Exhibit "B" is a true copy of the underlying Credit Agreement/Promissory Note and Note Disclosure Statement.  In the event the Defendant(s) faxed the executed Credit Agreement/Promissory Note, per its terms they agreed their facsimile/electronic signature is deemed to be an original.

11.      The Defendant opened the educational loan described above and funds were first disbursed on 12/21/2005.  *See* Exhibit "B".  The Defendant's educational loan was then transferred, sold and assigned by the Lender directly to Plaintiff, NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3, or to an intermediary, National Collegiate Funding, LLC, who then immediately transferred, sold and assigned the Defendant's educational loan to Plaintiff, NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3.  The Defendant's educational loan was in good standing and not in default on the date the Plaintiff acquired the Defendant's educational loan.  Attached hereto and incorporated as Exhibit "C" is a true and correct copy of the assignment Agreement(s) described herein.

12.     Based on custodial records, the Defendant is not a minor or incompetent.   A reasonable inquiry has been made to determine if the Defendant is in the military service of the United States of America, and to the best of my knowledge, Defendant is not in such military service and is therefore not entitled to the rights and privileges provided under the Soldiers and Sailors Civil Relief Act of 1940, as amended.

13.     I declare under the penalty of perjury under the laws of the forum state that the foregoing is true and correct.

FURTHER AFFIANT SAYETH NAUGHT.

AFFIANT
Print Name: _____ Brian Jackson _____
Title: _____ Legal Case Manager _____

SWORN AND SUBSCRIBED to before me this ___8___ day of __March__, 20_17_

NOTARY PUBLIC
My Commission Expires on

Exhibit A

*National Collegiate Trust*

Date: 11/3/14

RE:

| | |
|---|---|
| National Collegiate Master Student Loan Trust-I | National Collegiate Student Loan Trust-2003-1 |
| National Collegiate Student Loan Trust-2004-1 | National Collegiate Student Loan Trust-2004-2 |
| National Collegiate Student Loan Trust-2005-1 | National Collegiate Student Loan Trust-2005-2 |
| National Collegiate Student Loan Trust-2005-3 | National Collegiate Student Loan Trust-2006-1 |
| National Collegiate Student Loan Trust-2006-2 | National Collegiate Student Loan Trust-2006-3 |
| National Collegiate Student Loan Trust-2006-4 | National Collegiate Student Loan Trust-2007-1 |
| National Collegiate Student Loan Trust-2007-2 | National Collegiate Student Loan Trust-2007-3 |
| National Collegiate Student Loan Trust-2007-4 | |

To whom it may concern:

U.S. Bank, as Special Servicer for the above referenced Trust(s), confirms that Transworld Systems Inc. is its Subservicer, authorized to file Proofs of Claim (POC) on behalf of the above Trust(s) with respect of student loans owned by the Trust(s). Transworld Systems Inc. is also the dedicated record custodian with respect to all student loan accounts owned by the Trust(s) and is fully authorized to execute affidavits regarding account documents, verify responses to discovery and provide testimony on behalf of the Trust(s).

Any questions regarding the above referenced processes should be directed to Transworld Systems Inc. at 1-800-209-9161

Sincerely,

U.S. Bank National Association
As Special Servicer to the National Collegiate Student Loan Trust(s)

By: _____
    Brian C Tri
    Vice President
Title

Acknowledged;
By: GSS Data Services, Inc.
Not in its individual capacity and solely as
administrator for and on behalf of the Trust(s)

By: Kenneth L. Ruggiero

President and CEO
Title

Exhibit B

From: unknown       Page: 2/4      Date: 12/12/2005 6:55:40 PM

*Page 1 of 2*

**\* Completed By Student \*     Loan Request/Credit Agreement -- Signature Page**

NON-NEGOTIABLE CREDIT AGREEMENT -- THIS IS A CONSUMER CREDIT TRANSACTION

**LOAN PROGRAM INFORMATION**

TERI Undergraduate Loan

Academic Period: 01/2006-03/2006

Lender: Bank of America, National Association     School: SEATTLE CENTRAL COMMUNITY COLLG

Loan Amount Requested: $2000.00     Repayment Option: Deferred Principal and Interest

Deferral Period Margin: 4.45     Repayment Period Margin: 4.45     Loan Origination Fee Percentage: 9.50

**STUDENT BORROWER INFORMATION (Must be at least 18 years of age)**

Borrower Name: Sarah K Douglass     Home Address: 5222 22nd Ave Ne Apt a     Seattle, WA 98105
Social Security #: [ ]-1325     Date of Birth: [ ]1984     Home Telephone: [ ]9529
Current Employer: CHUNDERED NAUTILUS BED AND BRE     Employer Telephone: [ ]
Current Position: Office staff     Years There: 1 Years 3 Months
Years at Previous Employment: 2 Years 6 Months

Alimony, child support, or separate maintenance incomes do not have to be revealed if you do not want them considered for repaying this obligation. If you are relying on such additional income, please provide details on a separate sheet of paper.

Student Citizenship (check one box):  ☒ U.S. Citizen     ☐ Eligible Non-Citizen (Attach front & back copy of CIS or student visa card)
Personal Reference Name: Keith W Douglass     Reference Home Tel #: [ ]     Work Tel #: [ ]
Reference Street Address: [ ]
Reference City/State/Zip: [ ]

By my signature, I certify that I have read, understand and agree to the terms of and undertake the obligations set forth on all five (5) pages of this Loan Request/Credit Agreement (BK.05-06.CRWO.10SC.0105 ("Credit Agreement"). I understand that any person who knowingly makes a false statement or misrepresentation on this form is subject to penalties, which may include fines or imprisonment. This Credit Agreement is signed under seal. I understand that I am not required to fax my signature on or to sign electronically this Credit Agreement and any related notices that require signature. If I choose to fax my signature on this Credit Agreement and any related notices that require signature, I intend: (i) my fax or electronic signature to be an electronic signature under applicable federal and state law, (ii) my fax printout or printout of Lender's electronic record of this Credit Agreement and related notices to be an original document, (iii) to conduct business with the Lender by electronic records and electronic signatures, and (iv) that this Credit Agreement will not be governed by Article 3 of the Uniform Commercial Code, and my obligations under this Credit Agreement will not be subject to, but any transfer of my obligations will be subject to, Article 9 of the Uniform Commercial Code.

FOR ALABAMA RESIDENTS: CAUTION -- IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.

FOR WISCONSIN RESIDENTS - NOTICE TO CUSTOMER:
(a)  DO NOT SIGN THIS CREDIT AGREEMENT BEFORE YOU READ THE WRITING ON THE FOLLOWING PAGES, EVEN IF OTHERWISE ADVISED.
(b)  DO NOT SIGN THIS CREDIT AGREEMENT IF IT CONTAINS ANY BLANK SPACES.
(c)  YOU ARE ENTITLED TO AN EXACT COPY OF ANY CREDIT AGREEMENT YOU SIGN.
(d)  YOU HAVE THE RIGHT AT ANY TIME TO PAY IN ADVANCE THE UNPAID BALANCE UNDER THIS CREDIT AGREEMENT AND YOU MAY BE ENTITLED TO A PARTIAL REFUND OF THE FINANCE CHARGE.

PLEASE SIGN BELOW -- RETURN This Page With Proof of Income and Other Information if applicable

Signature of Borrower: *Sarah Douglass*     Date: 12/8/05

BK.05-06.CRWO.10SC.0105     LENDER COPY
PN01_BK_05-06_CRWO_F_X_DOUGLASS_A103481283.pdf     BKSCDP

In this Credit Agreement, the words "I", "me", "my", and "mine" mean the person who signed this Credit Agreement as Borrower. The words "you", "your", "yours", and "Lender" mean Bank of America, National Association, its successors and assigns, and any other holder of this Credit Agreement. "School" means the school named at the top of the first page of this Credit Agreement. The "servicer" means the Lender or any entity it designates to service my loan.

**A. PROMISE TO PAY:** I promise to pay to you the Loan Amount Requested shown on the first page of this Credit Agreement, to the extent it is advanced to me or paid on my behalf, and any Loan Origination Fee added to my loan (see Paragraph F) (together, the "Principal Sum"), interest on such Principal Sum, interest on any unpaid interest added to the Principal Sum and late fees (see Paragraph E.6).

**B. IMPORTANT -- READ THIS CAREFULLY:**

1. When you receive my signed Credit Agreement, you are not agreeing to lend me money. If you decide to make a loan to me, you will electronically transfer the loan funds to the School for me, mail a loan check to the School for me, or mail a loan check directly to me. You have the right to not make a loan or to lend an amount less than the Loan Amount Requested. I agree to accept an amount less than the Loan Amount Requested and to repay that portion of the Loan Amount Requested that you actually lend to me. You have the right to disburse my loan through an agent. At your option, you may also make any loan check co-payable to me and the School. You may also increase or decrease the amount of any disbursement by one cent ($.01) to equalize the amount of disbursements.

2. **HOW I AGREE TO THE TERMS OF THIS LOAN.** By signing this Credit Agreement, and submitting it to the Lender, I am requesting that you make this loan to me in an amount equal to the Loan Amount Requested plus any Loan Origination Fee described in Paragraph F of this Credit Agreement. If you approve this request and agree to make this loan, you will notify me in writing and provide me, as required by law, with one Disclosure Statement at the time of the first disbursement or a Disclosure Statement at the time of each disbursement. Each Disclosure Statement is incorporated herein by reference and made a part hereof. Each Disclosure Statement will tell me the amount of the loan that you have approved, the amount of the Loan Origination Fee, and other important information. I will let you know that I agree to the terms of the loan as set forth in this Credit Agreement and in each Disclosure Statement by doing either of the following: (a) endorsing or depositing the check that disburses the loan proceeds; or (b) allowing the loan proceeds to be used by or on behalf of the Student without objection. Upon receipt of each Disclosure Statement, I will review it and notify you in writing if I have any questions. If I am not satisfied with the terms of my loan as disclosed in a Disclosure Statement that covers my entire loan amount, I may cancel my loan by giving you a written cancellation notice within ten (10) days after I receive the Disclosure Statement. If I am not satisfied with the terms of my loan as disclosed in a Disclosure Statement that covers only one of multiple disbursements of my loan, to cancel the disbursement covered by that Disclosure Statement, I will give you a written cancellation notice within ten (10) days after I receive the Disclosure Statement and I understand that unless I withdraw from the School or I or my School specifies otherwise, the cancellation of any disbursement will not cancel any future disbursements or any previous disbursements. I understand that I must repay, in accordance with the terms of this Credit Agreement, all amounts disbursed but not canceled. If loan proceeds have been disbursed, I agree that I will immediately return the canceled disbursement to you, will not endorse any check that disburses the loan proceeds to be canceled, and will instruct the School to return the canceled disbursement to you. If I give notice of cancellation but do not cause the return of the disbursement as stated above, the disbursement will not be canceled and I will be in default of this Credit Agreement. (See Paragraph I.)

**C. DEFINITIONS:**

1. "Disbursement Date" means the date or dates on which you lend money to me in consideration for my Credit Agreement and will be the date(s) shown on any loan check you prepare or the date(s) you initiate any electronic funds transfer.

2. The "Deferment Period" will begin on the first Disbursement Date and end on the Deferment End Date.

3. "Deferment End Date" means the date specified below for the applicable loan program (the applicable loan program is stated on the first page of this Credit Agreement).

(a) *Undergraduate Alternative Loan Program:* If I have elected the "Immediate Repayment" option (the applicable repayment option is stated on the first page of this Credit Agreement), there is no Deferment Period, and my first payment will be 30-60 days after the final disbursement of my loan. If I have elected the "Interest Only" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), then interest payments will begin 30-60 days after the first disbursement of my loan, the "Deferment End Date" will be the date the Student graduates or ceases to be enrolled at least half-time in the School (or another school participating in this loan program), and principal and interest payments will begin 30-60 days after that date. In any event, if I have elected the "Interest Only" repayment option, the Deferment End Date will be no more than 5 years after the first Disbursement Date. If I have elected the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), then the "Deferment End Date" will be 180 days after the Student graduates or ceases to be enrolled at least half-time in the School (or another school participating in this Loan Program). In any event, if I have elected the "Full Deferral" repayment option, the Deferment End Date will be no more than 5½ years after the first Disbursement Date.

(b) *Graduate Professional Education Loan Program:* 180 days after the Student graduates or ceases for any other reason to be enrolled at least half-time in the School (or another school participating in this Loan Program), but no more than 4½ years after the first Disbursement Date provided; however, that if the Student begins a medical residency or internship during the Deferment Period, then the Deferment Period will end 180 days after the day the residency or internship ends, but no more than 8½ years after the first Disbursement Date.

(c) *Health Professions Education Loan Program:* 270 days after the Student graduates or ceases for any other reason to be enrolled at least half-time in the School (or another school participating in this Loan Program), but no more than 6¾ years after the first Disbursement Date; provided, however, that if the Student begins a medical residency or internship during the Deferment Period, then the Deferment Period will end 270 days after the day the residency or internship ends, but no more than 10¾ years after the first Disbursement Date.

(d) *Residency Loan Program:* 270 days after the first Disbursement Date.

4. The "Repayment Period" begins the day after the Deferment Period ends. If there is no Deferment Period for my loan, the Repayment Period will begin when my loan is fully disbursed. The Repayment Period is 20 years (25 years for loans with a Principal Sum of $40,000 or more) unless monthly payments equal to the minimum monthly payment amount (see Paragraph E.2) will repay all amounts owed in less than 20 years, in which case the Repayment Period will be the number of months necessary to pay in full the amount I owe at the minimum payment.

**D. INTEREST:**

1. Accrual – Beginning on the first Disbursement Date, interest will be calculated at the Variable Rate (Paragraph D.2) and charged on the Principal Sum, and on any unpaid interest later added to the Principal Sum according to Paragraph D.3. During the Repayment Period, interest will be calculated at the Variable Rate and charged on the outstanding balance of this Credit Agreement until all amounts are paid in full. Interest will be calculated on a daily simple interest basis. The daily interest rate will be equal to the annual interest rate in effect on that day, divided by the number of days in that calendar year.

2. Variable Rate – The "Variable Rate" is equal to the Current Index plus a Margin. The Margins for both the Deferment Period and the Repayment Period are shown on the first page of this Credit Agreement. In no event will the Variable Rate exceed the maximum interest rate allowed by the laws of the State of California. The Variable Rate will change quarterly on the first day of each January, April, July and October (the "Change Date(s)") if the Current Index changes. The "Current Index" for any calendar quarter beginning on a Change Date (or for any shorter period beginning on any Disbursement Date and ending on the last day of a calendar quarter) is based on the one-month London Interbank Offered Rate ("LIBOR") as published in the "Money Rates" section of *The Wall Street Journal*. The Index for each calendar quarter (or for any shorter period beginning on a Disbursement Date and ending on the last day of a calendar quarter) will equal the average of the LIBOR rates published on the first business day of each of the three (3) immediately preceding calendar months, rounded to the nearest one-hundredth percent (0.01%). If *The Wall Street Journal* is not published or the Current Index is not given on that date, then the Current

index will be determined by using the immediately preceding published Current Index. If the Current Index is no longer available, you will choose a comparable Index.

3. Capitalization – If I have elected the "Full Deferral" repayment option, I understand that you will add all accrued and unpaid interest to the principal balance of my loan ("capitalize interest") as of the last day of the Deferment Period. In addition, if my loan will be disbursed in multiple disbursements and if I have elected the "Immediate Repayment" option, you will capitalize interest that accrues between the first disbursement of my loan and the final disbursement of my loan. I understand that regardless of the repayment option I chose, you will capitalize interest at the end of any forbearance period. In all cases, the sum is thereafter considered the principal, and interest will accrue on the new principal balance.

E.  TERMS OF REPAYMENT:

1. Deferment Period – If I have elected either the "Interest Only" repayment option or the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), you will send me statements during the Deferment Period (showing the total outstanding principal balance of my loan and the interest that has accrued on my loan). Statements will be sent to the address shown on your records. If I have elected the "Interest Only" repayment option, I agree to make payments each month during the Deferment Period equal to the accrued interest on the outstanding balance of this Credit Agreement. If I have elected the "Full Deferral" repayment option I may, but am not required to make payments during the Deferment Period. You will add any interest that I do not pay during the Deferment Period to the principal balance, as described in Paragraph D.3.

2. Repayment Period – The amount of my monthly payment ("Monthly Payment Amount") will be established based on the rules in this Credit Agreement when my Repayment Period begins. During the Repayment Period, you will send me monthly statements that show the Monthly Payment Amount and the payment due dates, and I will pay the Monthly Payment Amount shown on my monthly statement, which amount will in no event be less than $25 or the unpaid balance, whichever is less. I understand that the Monthly Payment Amount is due each month. I may pay more than my Monthly Payment Amount at any time without penalty or charge. If my loan is in paid-ahead status, I may, but will not be required to make monthly payments. Even if I do not receive monthly statements, I will make consecutive monthly payments in amounts at least equal to the Monthly Payment Amount by the applicable payment due dates until I have paid all of the principal and interest and any other charges I may owe under this Credit Agreement.

3. Repayment Terms – My Monthly Payment Amount will be calculated as of the day the Repayment Period begins ("Repayment Date"). It will be recalculated (a) once each year prior to the anniversary of the Repayment Date, (b) if the Variable Rate changes between anniversaries of the Repayment Date to the extent that the Monthly Payment Amount would not pay in full the accrued monthly interest on my loan, (c) following any subsequent deferment or forbearance period or (d) following any request by the Borrower to the servicer to change the monthly payment due date (each of which events is a new "Repayment Date"). As of any Repayment Date, my Monthly Payment Amount will be recalculated. My new Monthly Payment Amount will be disclosed to me by the servicer. The new Monthly Payment Amount will equal the amount necessary to pay in full, over the number of months remaining in the Repayment Period, the amount I owe in equal monthly installments of principal and interest at the Variable Rate in effect at the time of the calculation. I understand that this may result in a reduction or increase in my monthly payment as calculated as of each Repayment Date. I understand that during the Repayment Period (and, if I have elected the "Interest Only" repayment option, during the period of interest payments) the servicer may change the monthly payment due date of future payments to a later date for the convenience of the servicer in processing payments or in order to coordinate the due dates of all of my loans processed by the servicer.

4. Amounts Owing at the End of the Repayment Period – Since interest accrues daily upon the unpaid principal balance of my loan, if I make payments after my payment due dates, I may owe additional interest. If I have not paid my late fees, I will also owe additional amounts for those late fees. In such cases you will increase the amount of my last monthly payment to the amount necessary to repay my loan in full.

5.  Payments – Payments will be applied first to late fees, other fees and charges, accrued interest, and the remainder to principal.

6.  Other Charges - If any part of a monthly payment remains unpaid for a period of more than 15 days after the payment due date, I will pay a late fee not exceeding $5.00 or 5% of the overdue payment amount, whichever is less. To the extent permitted by law, I agree to pay you all amounts you incur in enforcing the terms of this Credit Agreement, including reasonable collection agency and attorney's fees and court costs and other collection costs.

F.  LOAN ORIGINATION FEE:  If you charge me, I will pay you a Loan Origination Fee at the time my loan is disbursed. The dollar amount of any Loan Origination Fee will be determined by multiplying the Principal Sum times the Loan Origination Fee Percentage shown on the first page of this Credit Agreement. The percentage would be higher if computed only on the amount advanced rather than on the entire Principal Sum (Loan Origination Fee plus the loan amount advanced). For example, a nominal Loan Origination Fee of 6.5% on the entire principal amount would equal 6.9519% of the amount advanced. The Loan Origination Fee I will pay, if any, will be shown on my Disclosure Statement and included with the Principal Sum. To the extent permitted by law, and unless I timely cancel this Credit Agreement (see Paragraph B.2), I will not be entitled to a refund of any Loan Origination Fee after my loan has been disbursed.

G.  RIGHT TO PREPAY:  I have the right to prepay all or any part of my loan at any time without penalty.

H.  FORBEARANCE:  If I am unable to repay my loan in accordance with the terms established under this Credit Agreement because of a hardship such as financial or medical difficulty, I may request that you modify these terms. I understand that such modification would be at your option. I understand that I will remain responsible for all interest accruing during any period of forbearance and that you will add any interest that I do not pay during any forbearance period to the principal balance, as described in Paragraph D.3.

I.  WHOLE LOAN DUE:  To the extent permitted by applicable law, I will be in default and you have the right to give me notice that the whole outstanding principal balance, accrued interest, and all other amounts payable to you under the terms of this Credit Agreement, are due and payable at once (subject to any applicable law which may give me a right to cure my default) if: (1) I fail to make any monthly payment to you when due, (2) I die, (3) I break any of my other promises in this Credit Agreement, (4) any bankruptcy proceeding is begun by or against me, or I assign any of my assets for the benefits of my creditors, or (5) I make any false written statement in applying for this loan or any other loan or at any time during the Deferment or Repayment Periods. If I default, I will be required to pay interest on this loan accruing after default. The interest rate after default will be subject to adjustment in the same manner as before default. Upon default, you may also capitalize any interest and fees (i.e., add accrued and unpaid interest and fees to the principal balance), and increase the Margin used to compute the Variable Rate by two percentage points (2%).

J.  NOTICES:

1.  I will send written notice to you, any subsequent holder of this Credit Agreement, and the servicer within ten days after any change in my name, address, or enrollment status (for example, if the Borrower withdraws from the School or transfers to another school participating in this loan program).

2.  Any notice required to be given to me by you will be effective when mailed by first class mail to the latest address you have for me.

K.  INFORMATION:

1.  I must update the information I provided to you whenever you ask me to do so.

2.  I authorize you from time to time to request and receive from others credit related information about me (and about my spouse if I live in a community property state).

3.  CREDIT BUREAU REPORTING

> You may report information about my account to credit bureaus. Late payments, missed payments, or other defaults in my account may be reflected in my credit report.

I understand that the reporting of information about my account to credit bureaus may adversely affect my credit rating and my ability to obtain other credit. You may also report the status of my loan and my payment history,

including information about a late payment, missed payment or other defaults in accordance with applicable law.

**L.  ADDITIONAL AGREEMENTS:**

1. I understand that you are located in California and that this Credit Agreement will be entered into in the same state. CONSEQUENTLY, THE PROVISIONS OF THIS CREDIT AGREEMENT WILL BE GOVERNED BY FEDERAL LAW AND THE LAWS OF THE STATE OF CALIFORNIA, WITHOUT REGARD TO CONFLICT OF LAW RULES.

2. The proceeds of this loan will be used only for my educational expenses at the School.

3. My responsibility for paying the loan evidenced by this Credit Agreement is unaffected by the liability of any other person to me or by your failure to notify me that a required payment has not been made. Without losing any of your rights under this Credit Agreement you may accept (a) late payments, (b) partial payments or (c) payments marked "paid in full" or with other restrictions. You may delay, fail to exercise, or waive any of your rights on any occasion without losing your entitlement to exercise the right at any future time, or on any future occasion. You will not be obligated to make any demand upon me, send me any notice, present this Credit Agreement to me for payment or make protest of non-payment to me before suing to collect on this Credit Agreement if I am in default, and to the extent permitted by applicable law, I hereby waive any right I might otherwise have to require such actions. I WILL NOT SEND YOU PAYMENTS MARKED "PAID IN FULL", "WITHOUT RECOURSE" OR WITH OTHER SIMILAR LANGUAGE UNLESS THOSE PAYMENTS ARE MARKED FOR SPECIAL HANDLING AND SENT TO THE ADDRESS IDENTIFIED FOR SUCH PAYMENTS ON MY BILLING STATEMENT, OR TO SUCH OTHER ADDRESS AS I MAY BE GIVEN IN THE FUTURE.

4. I may not assign this Credit Agreement or any of its benefits or obligations. You may assign this Credit Agreement at any time.

5. The terms and conditions set forth in this Credit Agreement and Instructions and the Disclosure Statement constitute the entire agreement between you and me.

6. If any provision of this Credit Agreement is held invalid or unenforceable, that provision shall be considered omitted from this Credit Agreement without affecting the validity or enforceability of the remainder of this Credit Agreement.

7. A provision of this Credit Agreement may only be modified if jointly agreed upon in writing by you and me. Any modification will not affect the validity or enforceability of the remainder of this Credit Agreement.

8. To the extent permitted by law, you have the right to apply money from any of my deposit account(s) with you to pay all or a portion of any amount overdue under this Credit Agreement. I hereby authorize you to obtain from the School all amounts which may be owed to me by the School, including any refund due to overpayment, early termination of enrollment, or otherwise.

9. All dollar amounts stated in this Credit Agreement are in United States dollars. I will make all payments in United States Dollars with no deduction for currency exchange.

10. If I fail to complete the education program paid for with this loan, I am not relieved of any obligation within or pursuant to this Credit Agreement.

11. **I acknowledge that the requested loan is subject to the limitations on dischargeability in bankruptcy contained in Section 523 (a) (8) of the United States Bankruptcy Code. Specifically, I understand that you have purchased a guaranty of this loan, and that this loan is guaranteed by The Education Resources Institute, Inc. ("TERI"), a non-profit institution.**

12. I authorize any school that I may attend to release to you, and any other persons designated by you, any requested information pertinent to this loan (e.g., enrollment status, prior loan history, and current address).

13. I authorize the Lender, any subsequent holder of this Credit Agreement, and their agents (including TERI) to: (1) advise the School of the status of my application and my loan, (2) respond to inquiries from prior or subsequent lenders or holders with respect to my Credit Agreement and related documents, (3) release information and make inquiries to the persons I have given you as references, for the purposes of learning my current address and telephone number, (4) check my credit and employment history and to answer questions about their credit experience with me, and (5) retain for use in any future transaction with the Borrower all information (including status information and non-public personal information) of the Borrower provided in connection with this Credit Agreement.

14. Waiver by Lender:  You waive (give up) any right to claim a security interest in any property to secure this Credit Agreement. This does not affect any right to offset as a matter of law.

15. If I fax my signature on the first page of this Credit Agreement back to you and keep the copy I signed, I understand that under federal law the fax you receive will be an original of the first page of this Credit Agreement. You and I agree that all copies of this Credit Agreement (including the fax you receive and the copy I retain), taken together, shall constitute a single original agreement.

16. If I elect to sign electronically an electronic record of this Credit Agreement, then the following will apply as between Lender and me:  (a) Lender will keep a non-modifiable electronic record of this document and provide a copy to me upon request, (b) I can and have downloaded and/or printed a copy of this document for my records or notified the Lender to mail me a copy of this document, and (c) the Lender's electronic record of this document and any printout from that record shall be an original for all purposes, including any lawsuit to collect amounts that I owe.

**M. DISCLOSURE NOTICES**

ALL APPLICANTS:
IMPORTANT FEDERAL LAW NOTICE---

*Important information about procedures for opening a new account:*
To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

*What this means for you:*
When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

CALIFORNIA RESIDENTS: I have the right to prohibit the use of information contained in my credit file in connection with transactions not initiated by me. I may exercise this right by notifying the consumer credit reporting agency. A married applicant may apply for a separate account. If you take any adverse action as defined by Section 1785.3 of the California Civil Code and the adverse action is based, in whole or in part, on any information contained in a consumer credit report, I have the right to obtain within 60 days a free copy of my consumer credit report from the consumer reporting agency who furnished you my consumer credit report and from any other consumer credit reporting agency which compiles and maintains files on consumers on a nationwide basis. I have the right as described by Section 1785.16 of the California Civil Code to dispute the accuracy or completeness of any information in a consumer credit report furnished by the consumer credit reporting agency.

CALIFORNIA AND UTAH RESIDENTS: As required by California and Utah law, I am hereby notified that a negative credit report reflecting on my credit record may be submitted to a credit reporting agency if I fail to fulfill the terms of my credit obligations. IOWA, KANSAS AND NEBRASKA RESIDENTS (For purposes of the following notice, the word "you" refers to the Borrower, not the Lender): NOTICE TO CONSUMER. This is a consumer credit transaction. 1. DO NOT SIGN THIS CREDIT AGREEMENT BEFORE YOU READ THIS CREDIT AGREEMENT. 2. YOU ARE ENTITLED TO A COPY OF THIS CREDIT AGREEMENT. 3. YOU MAY PREPAY THE UNPAID BALANCE AT ANY TIME WITHOUT PENALTY AND MAY BE ENTITLED TO A REFUND OF UNEARNED CHARGES IN ACCORDANCE WITH LAW.

MARYLAND RESIDENTS: In Paragraph L.1, Lender and I have agreed that this Credit Agreement is governed by federal law and the laws of California, without regard to conflict of laws rules; if any court should nevertheless determine that this Credit Agreement is subject to Maryland laws concerning credit, then only to the extent that Maryland law applies, Lender and I agree and elect that this loan is made under and governed by Subtitle 10, Credit Grantor Closed End Credit Provisions, of Title 12 of the Commercial Law Article of the Annotated Code of Maryland, except as preempted by federal law.

**MISSOURI RESIDENTS:** Oral agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable. To protect me (borrower(s)) and you (creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.

**NEVADA RESIDENTS:** This is a loan for study.

**NEW JERSEY RESIDENTS:** The section headings of this Credit Agreement are a table of contents and not contract terms. Portions of this Credit Agreement with references to actions taken to the extent of applicable law apply to acts or practices that New Jersey law permits or requires. In this Credit Agreement, acts or practices (i) by you which are or may be permitted by "applicable law" are permitted by New Jersey law, and (ii) that may or will be taken by you unless prohibited by "applicable law" are permitted by New Jersey law.

**NEW YORK, RHODE ISLAND AND VERMONT RESIDENTS:** A consumer report (credit report) may be obtained from a consumer-reporting agency (credit bureau) in connection with this loan. If I request (1) I will be informed whether or not consumer reports were obtained, and (2) if reports were obtained, I will be informed of the names and addresses of the credit bureaus that furnished the reports. If you agree to make this loan to me, a consumer credit report may be requested or used in connection with renewals or extensions of any credit for which I have applied, reviewing my loan, taking collection action on my loan, or legitimate purposes associated with my loan. **OHIO RESIDENTS:** The Ohio laws against discrimination require that all creditors make credit equally available to all credit worthy customers, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

**WISCONSIN RESIDENTS:** For married Wisconsin residents, my signature on this Credit Agreement confirms that this loan obligation is being incurred in the interest of my marriage or family. No provision of any marital property agreement (pre-marital agreement), unilateral statement under Section 766.59 or court decree under Section 766.70 adversely affects the interest of the Lender unless the Lender, prior to the time that the loan is approved, is furnished with a copy of the agreement, statement, or decree or has actual knowledge of the adverse provision when the obligation to the Lender is incurred. If the loan for which I am applying is granted, my spouse will also receive notification that credit has been extended to me.

**N. BORROWER'S CERTIFICATION:** I declare under penalty of perjury under the laws of the United States of America that the following is true and correct. I certify that all information I provided to you in connection with this loan, including without limitation, the information contained in this Credit Agreement, is true, complete and correct to the best of my knowledge and belief and is made in good faith. I understand that I am responsible for repaying immediately any funds that I receive which are not to be used or are not used for educational expenses related to attendance at the School for the academic period stated. I certify that I am not now in default on a Federal Perkins Loan, a Federal Stafford Loan, a Federally Insured Student Loan, a Federal Supplemental Loan for Students (SLS), a Federal PLUS Loan, an Income Contingent Loan, a Federal Consolidation Loan, a Federal Ford Direct Loan, or any other education loan received for attendance at any school. The legal age for entering into contracts is 18 years of age in every state in the United States except the following: Alabama and Nebraska 19 years old, and Mississippi and Puerto Rico 21 years old. I certify that I meet these state age requirements.

## NOTE DISCLOSURE STATEMENT

$ ___2,209.94___

_03481283_

Loan No.

Borrower(s)   SARAH K DOUGLASS

Student:   SARAH K DOUGLASS

Date:   December 21, 2005

SARAH K DOUGLASS
5222 22ND AVE NE APT A
SEATTLE , WA  98105

Lender Name and Address:
BANK OF AMERICA, N.A.
600 WILSHIRE BLVD, 4TH FLOOR
LOS ANGELES, CA 90017

This disclosure statement relates to one or more advances on your Loan Note disbursed on   December 21, 2005
Because your Loan is either being disbursed in whole or in part, or is entering repayment, or the repayment terms are being modified, the
following information about your Loan is being given to you.

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments scheduled. |
| __8.781__ % | $ __2,903.92__ | $ __2,000.00__ | $ __4,903.92__ |

Your payment schedule will be:

| Number of Payments | Amount of Payments* | When Payments are due |
|---|---|---|
| 196 | $  25.02 | On the   20th day of each month beginning on   1/2009 |
| | | |
| | | |

**VARIABLE RATE:** The Annual Percentage Rate, which is based on an index plus a margin, may increase during the term of
the loan if the index rate increases. The index is (check one):

☐ **Prime Rate Index Adjusted Monthly** - The highest U.S. bank prime rate published in the "Money Rates" section of
The Wall Street Journal on the last business day of each calendar month. .

☐ **Prime Rate Index Adjusted Quarterly** - The highest U.S. bank prime rate published in the "Money Rates" section of
The Wall Street Journal on the last business day of each calendar quarter (if the Lender identified above is
Citibank ( New York State ), the index will be the highest U.S. Bank prime rate published in the "Money Rates" section of
The Wall Street Journal on the date which is 30 days prior to the first day of each quarter).

☒ **LIBOR Index Adjusted Quarterly** - The average of the one-month London Interbank Offered Rates published in the
"Money Rates" section of The Wall Street Journal on the first business day of each of the three (3) calendar months
immediately preceding the first day of each calendar quarter.

Any increase in the index and the Annual Percentage Rate which occurs while principal payments are deferred will increase
the amount of any current and all future payments. Any increase in the index and the Annual Percentage Rate which occurs while
principal and interest payments are deferred will increase the amount of all future payments. Any increase in the index and the
Annual Percentage Rate which occurs after you have begun to make principal and interest payments on your loan will increase the
amount of your future principal and interest payments beginning with your next annual payment adjustment date. For example,
assume you obtain a loan in your junior year, in the amount of $10,000 at an interest rate of 11%, and you defer principal and
interest payments until after your graduation, and the repayment term of the loan is 20 years. If the interest rate increased to 12%
on January 1st of your senior year, the interest which accrues while principal and interest payments are deferred will increase by
$75.11, and your monthly principal and interest payments would increase by $9.05.

**SECURITY:** You have given a security interest in all refunds or amounts owed to you at any time by the student's educational
institution. Collateral securing other loans with the Lender may also secure this Loan.
**LATE CHARGES:** If a payment is more than 15 days late, you may be charged $5.00 or 5% of the payment, whichever is less. If
you default, Lender (or subsequent holder of your Loan Note) may increase the margin used to compute the Annual Percentage
Rate by two percentage points (2%).
**PREPAYMENT:** If you pay off early, you will not have to pay a penalty.

See your contract documents for any additional information about non-payment, default, any required repayment in full before the
scheduled date, any security interest, and prepayment refunds and penalties.

**Estimates:** All numerical disclosures except the late payment disclosure are estimates.

Principal Amount of Note (Amount Financed plus Prepaid Finance Charge)                      $     2,209.94

Itemization of Amount Financed
Amount paid to   SEATTLE CENTRAL COMMUNTY COLLG   and   $ _____
Amount paid to   SARAH K DOUGLASS                                  $     2,000.00
Total Amount Financed                                                          $     2,000.00

Itemization of Prepaid Finance Charge
   Origination or Guarantee Fee                          $     209.94
   Other Fees Paid (see your contract)                 $ _____
   Total Prepaid Finance Charge(s)                                   $     209.94

*If your Loan is disbursed in multiple advances, the monthly payment amount disclosed in the payment schedule reflects only that monthly payment
necessary to repay this advance. The actual total monthly payment on your Loan will be based on the sum of all advances under your Loan Note and will
be disclosed to you before your enters repayment. Your minimum total monthly payment will be at least $25.00 each month or the entire loan
balance whichever is less.

TRAK 6403 0127  28                                    BKSCDP  TERI UNDERGRADUATE LOAN                      File Copy

Exhibit C

Unassociated Document

EX-99.22 19 p06-1554ex99_22.htm POOL SUPPLEMENT

---

CONFIDENTIAL MATERIALS OMITTED AND FILED SEPARATELY WITH THE SECURITIES AND EXCHANGE
COMMISSION.
ASTERISKS DENOTE OMISSIONS.

---

**Exhibit 99.22**

### 2006-3 POOL SUPPLEMENT (NON-DTC)
### Bank of America, N.A.

This Pool Supplement (the "Supplement") is entered into pursuant to and forms a part of that certain Note Purchase Agreement dated as of April 30, 2001, as amended or supplemented from the date of execution of the Agreement through the date of this Supplement (together, the "Agreement"), by and between The First Marblehead Corporation and Bank of America, N.A. (the "Program Lender"). This Supplement is dated as of September 28, 2006. Capitalized terms used in this Supplement without definitions have the meanings set forth in the Agreement.

Article 1: Purchase and Sale.

In consideration of the Minimum Purchase Price set forth below, the Program Lender hereby transfers, sells, sets over and assigns to The National Collegiate Funding LLC (the "Depositor"), upon the terms and conditions set forth in the Agreement (which are incorporated herein by reference with the same force and effect as if set forth in full herein), each student loan set forth on the attached Schedule 1 (the "Transferred Bank of America Loans") along with all of the Program Lender's rights under the Guaranty Agreement, and any agreement pursuant to which TERI granted collateral for its obligations under the Guaranty Agreement, relating to the Transferred Bank of America Loans. The Depositor in turn will sell the Transferred Bank of America Loans to The National Collegiate Student Loan Trust 2006-3 (the "Trust"). The Program Lender hereby transfers and delivers to the Depositor each Note evidencing such Transferred Bank of America Loan and all Origination Records relating thereto, in accordance with the terms of the Agreement. The Depositor hereby purchases said Notes on said terms and conditions.

Article 2: Price.

The amounts paid pursuant to this Supplement are the amounts set forth on Schedule 2 attached hereto.

Article 3: Representations and Warranties.

3.01. By Program Lender.

The Program Lender repeats the representations and warranties contained in Section 5.02 of the Agreement for the benefit of each of the Depositor and the Trust and confirms the same are true and correct as of the date hereof with respect to the Agreement and to this Supplement.

3.02. By Depositor.

The Depositor hereby represents and warrants to the Program Lender that at the date of execution and delivery of this Supplement by the Depositor:

(a) The Depositor is duly organized and validly existing as a limited liability company under the laws of the State of Delaware with the due power and authority to own its properties and to conduct its business as such properties are currently

Unassociated Document

owned and such business is presently conducted, and had at all relevant times, and has, the power, authority and legal right to acquire and own the Transferred Bank of America Loans.

(b) The Depositor is duly qualified to do business and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business shall require such qualifications.

(c) The Depositor has the power and authority to execute and deliver this Supplement and to carry out its respective terms; the Depositor has the power and authority to purchase the Transferred Bank of America Loans and rights relating thereto as provided herein from the Program Lender, and the Depositor has duly authorized such purchase from the Program Lender by all necessary action; and the execution, delivery and performance of this Supplement has been duly authorized by the Depositor by all necessary action on the part of the Depositor.

(d) This Supplement, together with the Agreement of which this Supplement forms a part, constitutes a legal, valid and binding obligation of the Depositor, enforceable in accordance with its terms.

(e) The consummation of the transactions contemplated by the Agreement and this Supplement and the fulfillment of the terms hereof do not conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time) a default under, the governing instruments of the Depositor or any indenture, agreement or other instrument to which the Depositor is a party or by which it is bound; or result in the creation or imposition of any lien upon any of its properties pursuant to the terms of any such indenture, agreement or other instrument; or violate any law or any order, rule or regulation applicable to the Depositor of any court or of any federal or state regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Depositor or its properties.

(f) There are no proceedings or investigations pending, or threatened, before any court, regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Depositor or its properties: (i) asserting the invalidity of the Agreement or this Supplement, (ii) seeking to prevent the consummation of any of the transactions contemplated by the Agreement or this Supplement, or (iii) seeking any determination or ruling that is likely to materially or adversely affect the performance by the Depositor of its obligations under, or the validity or enforceability of the Agreement or this Supplement.

Article 4: Cross Receipt.

The Program Lender hereby acknowledges receipt of the Minimum Purchase Price. The Depositor hereby acknowledges receipt of the Transferred Bank of America Loans.

Article 5: Assignment of Origination, Guaranty and Servicing Rights.

The Program Lender hereby assigns and sets over to the Depositor any claims it may now or hereafter have under the Guaranty Agreement, the Origination Agreement and the Servicing Agreement to the extent the same relate to the Transferred Bank of America Loans described in Schedule 1, other than any right to obtain servicing after the date hereof. It is the intent of this provision to vest in the Depositor any claim of the Program Lender relating to defects in origination, guaranty or servicing of the loans purchased hereunder in order to permit the Depositor to assert such claims directly and obviate any need to make the same claims against the Program Lender under this Supplement. The Program Lender also hereby assigns and sets over to the Depositor any claims it may now have or hereafter have to any collateral pledged by TERI to the Program Lender to secure its obligations under the Guaranty Agreement that relates to the Transferred Bank of America Loans, and the Program Lender hereby releases any security interest it may have in such collateral. The Program Lender hereby authorizes the Depositor, its successors and assigns, to file in any public filing office where a Uniform Commercial Code Filing with respect to collateral pledged by TERI is of record, any partial release or assignment that it deems necessary or appropriate to reflect in the public records the conveyance and assignment effected hereby.

[Remainder of page intentionally blank]

Unassociated Document

IN WITNESS WHEREOF, the parties have caused this Supplement to be executed as of the date set forth above.

THE FIRST MARBLEHEAD CORPORATION

By: /s/ Donald R. Peck
_____

Donald R. Peck
Executive Vice President

BANK OF AMERICA, N.A.

By: /s/ Elliott Lemon
_____

Name: Elliott Lemon
Title: Vice President

THE NATIONAL COLLEGIATE FUNDING LLC

By: GATE Holdings, Inc., Member

By: /s/ John A. Hupalo
_____

John A. Hupalo
Vice President

Schedule 1

[Transferred Bank of America Loans]

Schedule 2

BAGEL

For purposes of this Supplement the term "Minimum Purchase Price" shall mean the sum of the following amounts with respect to each of the Seasoned Loans to be purchased:

(a)     The unpaid principal amount of the Seasoned Loans in question [**]; plus

Unassociated Document

(b) All accrued and unpaid interest on such Seasoned Loans, [**]; plus

(c) [**], the amount of any guaranty fee paid by the Program Lender to The Education Resources Institute, Inc. ("TERI") (except that for [**]). If the terms of the Guaranty Agreement call for any Guaranty Fees to be paid to TERI [**]; plus

(d) A marketing fee and loan premium, [**]:

1. with respect to Bank of America BAGEL Generic & Preferred School Channel Creditworthy Undergraduate Loans, [**]%;

2. with respect to Bank of America BAGEL Generic & Preferred School Channel Creditworthy Graduate Loans, [**]%;

3. with respect to Bank of America BAGEL Generic & Preferred School Channel Creditworthy Law Loans, [**]%;

4. with respect to Bank of America BAGEL Generic & Preferred School Channel Creditworthy Business Loans, [**]%;

5. with respect to Bank of America BAGEL Generic & Preferred School Channel Creditworthy Medical Loans, [**]%;

6. with respect to Bank of America BAGEL Generic & Preferred School Channel Creditworthy Dental Loans, [**]%;

7. with respect to Bank of America BAGEL Generic & Preferred School Channel Credit-ready Graduate Loans, [**]%;

8. with respect to Bank of America BAGEL Generic & Preferred School Channel Credit-ready Law Loans, [**]%;

9. with respect to Bank of America BAGEL Generic & Preferred School Channel Credit-ready Business Loans, [**]%;

10. with respect to Bank of America BAGEL Generic & Preferred School Channel Credit-ready Medical Loans, [**]%;

11. with respect to Bank of America BAGEL Generic & Preferred School Channel Credit-ready Dental Loans, [**]%;

12. with respect to Bank of America BAGEL Generic & Preferred School Channel Credit-ready Bar Loans, [**]%;

13. with respect to Bank of America BAGEL Generic & Preferred School Channel Credit-ready Relocation & Residency Loans, [**]%;

14. with respect to Bank of America BAGEL William & Mary School Channel Creditworthy Graduate Loans, [**]%;

15. with respect to Bank of America BAGEL William & Mary School Channel Creditworthy Law Loans, [**]%;

.16. with respect to Bank of America BAGEL William & Mary School Channel Credit-ready Graduate Loans, [**]%;

17. with respect to Bank of America BAGEL William & Mary School Channel Credit-ready Law Loans, [**]%; and

18. with respect to Bank of America BAGEL William & Mary School Channel Credit-ready Business Loans, [**]%.

**TERI ALTERNATIVE**

On the Purchase Date, Program Lender shall assign and convey all Seasoned Loans that are Bank of America TERI Program loans (other than Bank of America TERI ISLP Program loans) originated by Program Lender included in the Pool to FMC, or a Purchaser Trust, in consideration of receipt of the Minimum Purchase Price therefor. For purposes of this Agreement the term "Minimum Purchase Price" shall mean the sum of the following amounts with respect to each of the Seasoned Loans to be purchased that are Bank of America TERI Program loans (other than Bank of America TERI ISLP Program loans):

Unassociated Document

(a) The unpaid principal amount of the Seasoned Loans in question [°*]; plus

(b) All accrued and unpaid interest on such Seasoned Loans, [**]; plus

(c) [**], the amount of any guaranty fee paid by the Program Lender to The Education Resources Institute, Inc. ("TERI"). If the terms of the Guaranty Agreement call for any Guaranty Fees to be paid to TERI [**]; plus

(d) A marketing fee and loan premium, [**]:

1. with respect to Bank of America TERI School Channel Undergraduate Creditworthy Loans, [**]% for [**], and [**]; plus
2. with respect to Bank of America TERI School Channel Graduate Creditworthy Loans, [**]% for [**], and [**]; plus
3. with respect to Bank of America TERI School Channel Graduate Credit-ready Loans, [**]%; plus
4. with respect to Bank of America TERI School Channel Continuing Education Loans, [**]% for [**]& [**]; plus
5. with respect to Bank of America TERI School Channel Creditworthy Health Professions Loans (excluding [**]), [**]% for [**], & [**]; plus
6. with respect to Bank of America TERI School Channel Credit-ready Health Professions Loans and CVS Creditworthy and Credit-ready Health Professions Loans eligible for purchase under the [**], [**]%; plus
7. with respect to Bank of America prepGATE (AKA K-12) Loans, [**]%.

**ISLP**

For purposes of this Supplement the term "Minimum Purchase Price" shall mean the sum of the following amounts with respect to each of the Seasoned Loans to be purchased:

(a) The unpaid principal amount ([**]) of the Seasoned Loans in the Pool; plus

(b) All accrued and unpaid interest on such Seasoned Loans,[**]; plus

(c) A marketing fee and loan premium, [**]:

1. with respect to Bank of America Bank School Channel ISLP Undergraduate Creditworthy Loans, [**]% for [**]& [**];
2. with respect to Bank of America Bank School Channel ISLP Graduate Creditworthy Loans, [**]% for [**]&[**];
3. with respect to Bank of America Bank School Channel ISLP Graduate Credit-ready Loans, [**]%;
4. with respect to Bank of America Bank School Channel ISLP Medical Creditworthy Loans, [**]%;
5. with respect to Bank of America Bank School Channel ISLP Medical Credit-ready Loans, [**]%;
6. with respect to Bank of America Bank School Channel ISLP Medical Creditworthy Residency Loans, [**]%;
7. with respect to Bank of America Bank School Channel ISLP Medical Credit-ready Residency Loans, [**]%.

EX-99.6 8 p06-1554ex99_6.htm DEPOSIT AND SALE AGREEMENT

EXHIBIT 99.6

## DEPOSIT AND SALE AGREEMENT
## THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3

This DEPOSIT AND SALE AGREEMENT (the "Sale Agreement"), dated as of September 28, 2006, between The National Collegiate Funding LLC, in its capacity as seller (in such capacity, the "Seller"), and The National Collegiate Student Loan Trust 2006-3, as purchaser (the "Purchaser"), shall be effective upon execution by the parties hereto.

WHEREAS, the Seller is the owner of certain student loans; and

WHEREAS, the Seller desires to sell its interest in such student loans and the Purchaser desires to purchase such loans from the Seller.

NOW, THEREFORE, in connection with the mutual promises contained herein, the parties hereto agree as follows:

### ARTICLE I
### TERMS

This Sale Agreement sets forth the terms under which the Seller is selling and the Purchaser is purchasing the student loans listed on Schedule 2 to each of the Pool Supplements set forth on Schedule A attached hereto (the "Transferred Student Loans").

### ARTICLE II
### DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the definitions set forth in Appendix A of the Indenture dated as of September 1, 2006 between U.S. Bank National Association (the "Indenture Trustee") and the Purchaser.

### ARTICLE III
### SALE AND PURCHASE

Section 3.01.    Sale of Loans. The Seller hereby sells and the Purchaser hereby purchases the Transferred Student Loans.

Section 3.02.    Assignment of Rights. The Seller hereby assigns to the Purchaser and the Purchaser hereby accepts all of the Seller's rights and interests under each of the Pool Supplements listed on Schedule A attached hereto and the related Student Loan Purchase Agreements listed on Schedule B attached hereto.

Section 3.03.    Settlement of the Payment. The Purchaser shall pay the Seller the purchase price set forth in Schedule 1 of each of the Pool Supplements by wire transfer in immediately available funds to the account specified by the Seller.

Section 3.04.    Assistance by Seller. Following the execution of this Sale Agreement, the Seller shall provide any reasonable assistance requested by the Purchaser in determining that all required documentation on the Transferred Student Loans is present and correct.

### ARTICLE IV
### REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER

Section 4.01.    <u>General</u>. The Seller represents and warrants to the Purchaser that as of the date of this Sale Agreement:

(a)        The Seller is duly organized and existing under the laws of the State of Delaware; and

(b)        The Seller has all requisite power and authority to enter into and to perform the terms of this Sale Agreement.

Section 4.02.    <u>Loan Representations</u>. The Seller represents and warrants to the Purchaser that with respect to each Transferred Student Loan purchased by the Purchaser pursuant to this Sale Agreement, the Seller is making the same representations and warranties made by the respective program lender with respect to each Transferred Student Loan pursuant to the respective Student Loan Purchase Agreement listed on <u>Schedule B</u> attached hereto.

Section 4.03.    <u>Covenants</u>. The Seller, in its capacity as purchaser of the Transferred Student Loans pursuant to the Pool Supplements, hereby covenants that it will enforce the covenants and agreements of each program lender in the respective Student Loan Purchase Agreement and related Pool Supplement. The Seller further covenants that it will not waive, amend, modify, supplement or terminate any Student Loan Purchase Agreement or Pool Supplement or any provision thereof without the consent of the Purchaser, which consent the Purchaser hereby agrees not to provide without the prior written consent of the Indenture Trustee and the Interested Noteholders in accordance with the Purchaser's covenant in Section 3.07(c) of the Indenture.

**ARTICLE V**
**PURCHASE OF LOANS; REIMBURSEMENT**

Each party to this Sale Agreement shall give notice to the other such parties and to the Servicers, First Marblehead Data Services, Inc., the Indenture Trustee, and Wilmington Trust Company (the "<u>Owner Trustee</u>") promptly, in writing, upon the discovery of any breach of the Seller's representations and warranties made pursuant to this Sale Agreement which has a materially adverse effect on the interest of the Purchaser in any Transferred Student Loan. In the event of such a material breach, the Seller shall cure or repurchase the Transferred Student Loan in accordance with the remedies set forth in the respective Student Loan Purchase Agreement.

**ARTICLE VI**
**LIABILITY OF SELLER; INDEMNITIES**

The Seller shall be liable in accordance herewith only to the extent of the obligations specifically undertaken by the Seller under this Sale Agreement.

(a)        The Seller shall indemnify, defend and hold harmless the Purchaser and the Owner Trustee in its individual capacity and their officers, directors, employees and agents from and against any taxes that may at any time be asserted against any such Person with respect to the transactions contemplated herein and in the other Basic Documents (except any such income taxes arising out of fees paid to the Owner Trustee), including any sales, gross receipts, general corporation, tangible and intangible personal property, privilege or license taxes and costs and expenses in defending against the same.

(b)        The Seller shall indemnify, defend and hold harmless the Purchaser and the Owner Trustee in its individual capacity and their officers, directors, employees and agents from and against any and all costs, expenses, losses, claims, damages and liabilities arising out of, or imposed upon such Person through, the Seller's willful misfeasance, bad faith or gross negligence in the performance of its duties under this Sale Agreement, or by reason of reckless disregard of its obligations and duties under this Sale Agreement.

Indemnification under this Section shall survive the termination of this Sale Agreement and shall include reasonable fees and expenses of counsel and expenses of litigation. If the Seller shall have made any indemnity payments pursuant to this

Section and the Person to or for the benefit of whom such payments are made thereafter shall collect any of such amounts from others, such Person shall promptly repay such amounts to the Seller, without interest.

## ARTICLE VII
### MERGER OR CONSOLIDATION OF, OR ASSUMPTION
### OF THE OBLIGATIONS OF, SELLER

Any Person (a) into which the Seller may be merged or consolidated, (b) which may result from any merger or consolidation to which the Seller shall be a party or (c) which may succeed to the properties and assets of the Seller substantially as a whole, shall be the successor to the Seller without the execution or filing of any document or any further act by any of the parties to this Sale Agreement; provided, however, that the Seller hereby covenants that it will not consummate any of the foregoing transactions except upon satisfaction of the following: (i) the surviving Person, if other than the Seller, executes an agreement of assumption to perform every obligation of the Seller under this Sale Agreement, (ii) immediately after giving effect to such transaction, no representation or warranty made pursuant to this Sale Agreement shall have been breached, (iii) the surviving Person, if other than the Seller, shall have delivered an Officers' Certificate and an opinion of counsel each stating that such consolidation, merger or succession and such agreement of assumption comply with this Section and that all conditions precedent, if any, provided for in this Sale Agreement relating to such transaction have been complied with, and that the Rating Agency Condition shall have been satisfied with respect to such transaction, (iv) if the Seller is not the surviving entity, such transaction will not result in a material adverse federal or state tax consequence to the Purchaser or the Noteholders, and (v) if the Seller is not the surviving entity, the Seller shall have delivered an opinion of counsel either (A) stating that, in the opinion of such counsel, all financing statements and continuation statements and amendments thereto have been executed and filed that are necessary fully to preserve and protect the interest of the Purchaser in the Transferred Student Loans and reciting the details of such filings, or (B) stating that, in the opinion of such counsel, no such action shall be necessary to preserve and protect such interests.

## ARTICLE VIII
### LIMITATION ON LIABILITY OF SELLER AND OTHERS

The Seller and any director or officer or employee or agent thereof may rely in good faith on the advice of counsel or on any document of any kind, prima facie properly executed and submitted by any Person respecting any matters arising hereunder (provided that such reliance shall not limit in any way the Seller's obligations under this Sale Agreement). The Seller shall not be under any obligation to appear in, prosecute or defend any legal action that shall not be incidental to its obligations under this Sale Agreement or the Student Loan Purchase Agreements, and that in its opinion may involve it in any expense or liability.

## ARTICLE IX
### SURVIVAL OF COVENANTS

All covenants, agreements, representations and warranties made herein shall survive the consummation of the purchase of the Transferred Student Loans; provided, however, that to the extent any of the same relate to a corresponding covenant, agreement, representation or warranty contained in a Student Loan Purchase Agreement, the same shall survive to the extent that such corresponding covenant, agreement, representation or warranty survives the applicable Student Loan Purchase Agreement. All covenants, agreements, representations and warranties made or furnished pursuant hereto by or for the benefit of the Seller (including without limitation, under Article VI) shall bind and inure to the benefit of any successors or assigns of the Purchaser, including the Indenture Trustee. This Sale Agreement may be changed, modified or discharged, and any rights or obligations hereunder may be waived, only by a written instrument signed by a duly authorized officer of the party against whom enforcement of any such waiver, change, modification or discharge is sought. The waiver by the Indenture Trustee, at the direction of the Noteholders or otherwise pursuant to the Indenture, of any covenant, agreement, representation or warranty required to be made or furnished by the Seller or the waiver by the Indenture Trustee, at the direction of the Noteholders or otherwise pursuant to the Indenture, of any provision herein contained shall not be deemed to be a waiver of any breach of any other covenant, agreement, representation, warranty or provision herein contained, nor shall any waiver or any custom or practice which may evolve between the parties in the administration of the terms hereof, be construed to lessen the right of the Indenture Trustee, at the direction of the Noteholders pursuant to the Indenture, to insist upon the performance by the Seller in strict accordance with said terms.

ARTICLE X
COMMUNICATION AND NOTICE REQUIREMENTS

All communications, notices and approvals provided for hereunder shall be in writing and mailed or delivered to the Seller or the Purchaser, as the case may be. Notice given in any such communication, mailed to the Seller or the Purchaser by appropriately addressed registered mail, shall be deemed to have been given on the day following the date of such mailing and shall be addressed as follows:

If to the Purchaser, to:

> The National Collegiate Student Loan Trust 2006-3
> c/o Wilmington Trust Company, as Owner Trustee
> 100 North Market Street
> Wilmington, Delaware 19890-0001
> Attention: Corporate Trust Department

If to the Seller, to:

> The National Collegiate Funding LLC
> c/o First Marblehead Data Services, Inc.
> The Prudential Tower
> 800 Boylston Street - 34th Floor
> Boston, MA 02199-8157
> Attention: Ms. Rosalyn Bonaventure

with a copy to:

> First Marblehead Corporation
> The Prudential Tower
> 800 Boylston Street - 34th Floor
> Boston, MA 02199-8157
> Attention: Corporate Law Department

or to such other address as either party shall have provided to the other parties in writing. Any notice required to be in writing hereunder shall be deemed given if such notice is mailed by certified mail, postage prepaid, or hand delivered to the address of such party as provided above.

ARTICLE XI
AMENDMENT

, This Sale Agreement may be amended by the parties hereto without the consent of the Noteholders for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Sale Agreement or of modifying in any manner the rights of such Noteholders; provided that such action will not, in the opinion of counsel reasonably satisfactory to the Indenture Trustee, materially affect the interest of any such Noteholder.

In addition, this Sale Agreement may also be amended from time to time by the Seller and the Purchaser, with the consent of the Noteholders of the Notes evidencing a majority of the Outstanding Amount of the Notes and the consent of the Certificateholders of the Certificates evidencing a majority of the outstanding principal amount of the Certificates, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Sale Agreement or of modifying in any manner the rights of the Noteholders or the Certificateholders, respectively; provided, however, that no such amendment shall (a) increase or reduce in any manner the amount of, or accelerate or delay the time of, collections of payments with respect to Transferred Student Loans or distributions that shall be required to be made for the benefit of the Noteholders, or (b) reduce the aforesaid percentage of the Outstanding Amount of the Notes or the Certificates, the Noteholders or the Certificateholders of which are required to consent to any such amendment, without the consent of all

outstanding Noteholders or Certificateholders, respectively.

Promptly after the execution of any such amendment or consent (or, in the case of the Rating Agencies, five Business Days prior thereto), the Purchaser shall furnish written notification of the substance of such amendment or consent to the Indenture Trustee and each of the Rating Agencies.

It shall not be necessary for the consent of Noteholders pursuant to this Section to approve the particular form of any proposed amendment or consent, but it shall be sufficient if such consent shall approve the substance thereof.

Prior to the execution of any amendment to this Sale Agreement, the Owner Trustee shall be entitled to receive and rely upon an opinion of counsel stating that execution of such amendment is authorized or permitted by this Sale Agreement. The Owner Trustee may, but shall not be obligated to, enter into any such amendment which affects the Owner Trustee's own rights, duties or immunities under this Sale Agreement or otherwise.

ARTICLE XII

ASSIGNMENT

The Seller hereby assigns its entire right, title and interest as purchaser under this Sale Agreement and the Student Loan Purchase Agreement thereunder to the Purchaser as of the date hereof and acknowledges that the Purchaser will assign the same, together with the right, title and interest of the Purchaser hereunder, to the Indenture Trustee under the Indenture.

ARTICLE XIII

GOVERNING LAW

THIS SALE AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, BUT OTHERWISE WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

ARTICLE XIV

LIMITATION OF LIABILITY OF OWNER TRUSTEE

Notwithstanding anything contained herein to the contrary, this instrument has been executed by Wilmington Trust Company, not in its individual capacity but solely in its capacity as Owner Trustee of the Purchaser, and in no event shall Wilmington Trust Company in its individual capacity or any beneficial owner of the Purchaser have any liability for the representations, warranties, covenants, agreements or other obligations of the Purchaser hereunder, as to all of which recourse shall be had solely to the assets of the Purchaser. For all purposes of this Sale Agreement, in the performance of any duties or obligations of the Purchaser hereunder, the Owner Trustee shall be subject to, and entitled to the benefits of, the terms and provisions of Articles VIII, IX and X of the Trust Agreement.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Sale Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

THE NATIONAL COLLEGIATE FUNDING LLC,
as Seller

By:     GATE Holdings, Inc., Member

By:     /s/ John A. Hupalo
Name:   John A. Hupalo
Title:    Vice President


THE NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2006-3, as Purchaser

By:     Wilmington Trust Company, not in its
        individual capacity but solely as Owner
        Trustee

By:     /s/ J. Christopher Murphy
Name:   J. Christopher Murphy
Title:    Financial Services Officer

SCHEDULE A

*Pool Supplements*

Each of the following Pool Supplements was entered into by and among The First Marblehead Corporation, The National Collegiate Funding LLC and:

- Bank of America, N.A., dated September 28, 2006, for loans that were originated under Bank of America's BAGEL Loan Program, TERI Loan Program, Direct to Consumer Loan Program and ISLP Loan Program.

- JPMorgan Chase Bank, N.A., dated September 28, 2006, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program, EDUCATION ONE Loan Program, and Campus One Loan Program.

- Charter One Bank, N.A., dated September 28, 2006, for loans that were originated under the following Charter One programs: AAA Southern New England Bank, AES EducationGAIN Loan Program, Asrtive Education Loan Program, AstriveAlliance Education Loan Program, Axiom Alternative Loan Program, CFS Direct to Consumer Loan Program, Citibank Education Assistance Loan Program, College Board Alternative Loan Program, College Loan Corporation Loan Program, Collegiate Solutions Alternative Loan Program, Custom Educredit Loan Program, EdFinancial Loan Program, Extra Credit II Loan Program (North Texas Higher Education), M&I Alternative Loan Program, National Education Loan Program, NextStudent Alternative Loan Program, NextStudent Private Consolidation Loan Program, UPromise Alternative Loan Program, and WAMU Alternative Student Loan Program..

- Citizens Bank of Rhode Island, dated September 28, 2006, for loans that were originated under Citizens Bank of Rhode Island's Compass Bank Loan Program, Alternative Loan Program, Navy Federal Referral Loan Program, Penn State Undergraduate Loan Program, FinanSure Alternative Loan Program, and Xanthus Loan Program.

- First National Bank Northeast, dated September 28, 2006, for loans that were originated under First National Bank Northeast's Nelnet Alternative Loan Program.

- HSBC Bank USA, National Association, dated September 28, 2006, for loans that were originated under the HSBC Loan Program.

- The Huntington National Bank, dated September 28, 2006, for loans that were originated under The Huntington National Bank's Huntington Bank Education Loan Program.

- KeyBank, dated September 28, 2006, for loans that were originated under KeyBank's Private Education Loan Program.

- Manufacturers and Traders Trust Company, dated September 28, 2006, for loans that were originated under Manufacturers and Traders Trust Company's M&T Alternative Loan Program.

- National City Bank, dated September 28, 2006, for loans that were originated under National City Bank's Alternative Loan Program.

- PNC Bank, N.A., dated September 28, 2006, for loans that were originated under PNC Bank's PNC Bank Alternative Loan Program, Brazos Alternative Loan Program, Edvisors Alternative Loan Program, GE Money Bank Alternative Loan Prorgam, Old National Bank Alternative Loan Program, and Regions Bank Alternative Loan Program.

- Sovereign Bank, dated September 28, 2006, for loans that were originated under Sovereign Bank's Alternative Loan Program.

- SunTrust Bank, dated September 28, 2006, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.

- TCF National Bank, dated September 28, 2006, for loans that were originated under TCF National Bank's Alternative Loan Program.

- U.S. Bank, N.A., dated September 28, 2006, for loans that were originated under U.S Bank's Alternative Loan Program.

SCHEDULE B

*Student Loan Purchase Agreements*

Each of the following Note Purchase Agreements, as amended or supplemented, was entered into by and between The First Marblehead Corporation and:

- Bank of America, N.A., dated April 30, 2001, for loans that were originated under Bank of America's BA GEL Loan Program, TERI Alternative Loan Program and ISLP Loan Program.

- Bank of America, N.A., dated June 30, 2006, for loans that were originated under Bank of America's BA GEL Loan Program, TERI Alternative Loan Program and ISLP Loan Program.

- Bank of America, N.A., dated June 30, 2003, for loans that were originated under Bank of America's Direct to Consumer Loan Program.

- Bank of America, N.A., dated April 1, 2006, for loans that were originated under Bank of America's Direct to Consumer Loan Program.

- Bank One, N.A., dated May 1, 2002, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program, EDUCATION ONE Loan Program, and Campus One Loan Program.

- Charter One Bank, N.A., dated as of December 29, 2003 for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.

- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's CFS Direct to Consumer Loan Program.

- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated under Charter One's Citibank Education Assistance Loan Program.

- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated under Charter One's College Loan Corporation Loan Program.

- Charter One Bank, N.A., dated December 1, 2003, for loans that were originated under Charter One's Custom Educredit Loan Program.

- Charter One Bank, N.A., dated May 10, 2004, for loans that were originated under Charter One's EdFinancial Loan Program.

- Charter One Bank, N.A., dated September 15, 2003, for loans that were originated under Charter One's Extra Credit II Loan Program (North Texas Higher Education).

- Charter One Bank, N.A., dated September 20, 2003, for loans that were originated under Charter One's M&I Alternative Loan Program.

- Charter One Bank, N.A., dated November 17, 2003, for loans that were originated under Charter One's National Education Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's NextStudent Alternative Loan Program.

- Charter One Bank, N.A., dated March 26, 2004, for loans that were originated under Charter One's NextStudent Private Consolidation Loan Program.

- Charter One Bank, N.A., dated March 25, 2004, for loans that were originated under Charter One's Astrive and AstriveAlliance Education Loan Programs.

- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's WAMU Alternative Student Loan Program.

- Charter One Bank, N.A., dated February 15, 2005, for loans that were originated under Charter One's Referral Loan Program (including loans in the UPromise Alternative Loan Program, Collegiate Solutions Alternative Loan Program, College Board Alternative Loan Program, and Axiom Alternative Loan Programs).

- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Alternative Loan Program, Compass Bank Alternative Loan Program, FinanSure Alternative Loan Program, Navy Federal Alternative Loan Program, and Xanthus Alternative Loan Program.

- Citizens Bank of Rhode Island, dated October 1, 2002, for loans that were originated under Citizens Bank of Rhode Island's Penn State Undergraduate Loan Program.

- First National Bank Northeast, dated August 1, 2001, for loans that were originated under First National Bank Northeast's CASL Undergraduate Alternative Loan Program.

- HSBC Bank USA, National Association, dated April 17, 2002, as amended on June 2, 2003 and August 1, 2003, for loans that were originated under the HSBC Loan Program.

- The Huntington National Bank, dated May 20, 2003, for loans that were originated under The Huntington National Bank's Huntington Bank Education Loan Program.

- KeyBank, dated May 12, 2006, for loans that were originated under KeyBank's Private Education Loan Program.

- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under Manufacturers and Traders Trust Company's Alternative Loan Program.

- National City Bank, dated November 13, 2002, for loans that were originated under National City Bank's National City Loan Program.

- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Alternative Conforming Loan Program, Brazos Alternative Loan Program, Edvisors Alternative Loan Program, GE Money Bank Alternative Loan Prorgam, Old National Bank Alternative Loan Program, and Regions Bank Alternative Loan Program.

- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Loan Program.

- SunTrust Bank, dated March 1, 2002, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.

- o TCF National Bank, dated July 22, 2005, for loans that were originated under TCF National Bank's Alternative Loan Program.

- o U.S. Bank, N.A., dated May 1, 2005, for loans that were originated under U.S Bank's Alternative Loan Program.

# EXHIBIT 14

FILED

17 APR 25 PM 1:19

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 17-2-10605-4 SEA

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY**

| | |
|---|---|
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3, A DELAWARE STATUTORY TRUST(S) | Case No.: 17-2-10605-4 KNT |
| Plaintiff, | **ORDER OF DEFAULT AND DEFAULT JUDGMENT** |
| vs. | **(CLERK'S ACTION REQUIRED)** |
| SARAH K DOUGLASS | |
| Defendant. | |

## I. JUDGMENT SUMMARY

Judgment Creditor:               NATIONAL COLLEGIATE STUDENT LOAN
                                         TRUST 2006-3, A DELAWARE STATUTORY
                                         TRUST(S)

Attorney for Judgment Creditor:   MATTHEW CHEUNG;
                                         PATENAUDE & FELIX, A.P.C.

Judgment Debtor:                 SARAH K DOUGLASS

    Principal Amount:               $1,766.01

    Interest to Date of Judgment:    $165.10

    Principal Total:                 $1,931.11

    Costs:                           $395.80

    Attorney's Fee:                  $0.00

    Less: Credit of                  $0.00

    TOTAL JUDGMENT:                  $2,326.91

For Post Judgment interest to run at the rate of 12% per annum from the date of judgment.

- 1 -

ORDER OF DEFAULT AND DEFAULT JUDGMENT

PATENAUDE & FELIX, A.P.C.
19401 40th Avenue West, Suite 280, Lynnwood, WA 98036
Tel: (425) 361-1662  Toll Free: (800) 832-7675

WA_91A Ord of Def Jg                    P&F File No. 15-40570

## II. ORDER AND JUDGMENT

The plaintiff's motion for an Order of Default and Default Judgment against the above
defendant came before the undersigned judge/court commissioner of this Court. The
, having found that: (1) the defendant was duly served with a Summons and Complaint
s failed to appear, answer, or otherwise defend within the time provided by law; (2) finds
e venue is proper; and (3) the defendant is justly indebted to the plaintiff, as evidence by
oof presented herewith, now, therefore, it is hereby ORDERED, ADJUDGED, AND
EED that the defendant, SARAH K DOUGLASS, is hereby in default.

T IS FURTHER ORDERED, ADJUDGED AND DECREED that the plaintiff shall have
ent against the defendant, SARAH K DOUGLASS, for the principal sum of $1,766.01,
er with the plaintiff's cost of $395.80 and interest in the amount of $165.10, and less
 of 0.00, for a total Judgment of $2,326.91, and said Judgment shall bear interest at the
t legal rate.

ENTERED this_____ day of _____, 20____.

_____
JUDGE/COURT COMMISSIONER

ted by:

NAUDE & FELIX, A.P.C.

_____
HEW CHEUNG, WSBA #43067
y for Plaintiff
40th Avenue West, Suite 280
ood, WA 98036
25) 361-1662

OF  DEFAULT AND DEFAULT JUDGMENT

PATENAUDE & FELIX, A.P.C.
19401 40th Avenue West, Suite 280, Lynnwood, WA 98036
Tel: (425) 361-1662  Toll Free: (800) 832-7675

, A.P.C.
A 98036
32-7675

P&F File No. 15-40570

King County Superior Court
Judicial Electronic Signature Page

Case Number:        17-2-10605-4
Case Title:         NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3, A
                    DELAWARE STATUTORY TRUST vs SARAH K DOUGLASS
Document Title:     ORDER OF DEFAULT

Signed by:          Catherine  Shaffer
Date:               4/25/2017 1:19:29 PM

Judge/Commissioner: Catherine  Shaffer

This document is signed in accordance with the provisions in GR 30.
Certificate Hash:          02A0B1FE28017BAC78E9BF6CE00C462718609D94
Certificate effective date: 7/29/2013 11:40:17 AM
Certificate expiry date:   7/29/2018 11:40:17 AM
Certificate Issued by:     C=US, E=kcscefiling@kingcounty.gov, OU=KCDJA,
                           O=KCDJA, CN="Catherine
                           Shaffer:PCh7R3n44hGZOTo3YYhwmw=="

Page 4 of 4

# EXHIBIT 15

**FILED**

17 JUL 13 AM 11:43

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 17-2-10605-4 KNT

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

| | |
|---|---|
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3, A DELAWARE STATUTORY TRUST(S), | Case No.: **17-2-10605-4 KNT** |
| PLAINTIFF, | **NOTICE OF APPEARANCE** |
| v. | |
| SARAH K DOUGLASS, | |
| DEFENDANT. | |

Please take notice that Defendant Sarah K Douglass hereby appears in the above-entitled

action through her attorney, Amanda N. Martin and Northwest Consumer Law Center, and

requests that all further papers and pleadings, except original process, be served upon her at the

address stated below.

Dated this 13th day of July, 2017.

_Amanda Martin_
_____
Amanda N. Martin, WSBA No. 49581
Attorney for Defendant

NOTICE OF APPEARANCE - 1

The Northwest
Consumer Law Center

214 E. Galer St. Ste. 100
Seattle, WA 98102
Tele: 206-805-0989
Fax: 206-805-1716

## CERTIFICATE OF SERVICE

I, Fernando Puga, am a legal intern at Northwest Consumer Law Center. I hereby certify that on the date set forth below I caused to be served true and correct copies of the foregoing to the parties listed below in the manner indicated:

| Name and Address of Party: | Method of Service: | |
|---|---|---|
| Matthew Cheung<br>Patenaude & Felix, A.P.C.<br>19401 40th Avenue West, Suite 280<br>Lynnwood, WA 98036 | ☐ | Electronic Mail |
| | ☐ | Facsimile |
| | ☒ | First Class U.S. Mail |
| | ☐ | Hand Delivery |
| | ☐ | Legal Messenger |

DATED this 13 day of July, 2017

Fernando Puga

NOTICE OF APPEARANCE - 2

**The Northwest**
**Consumer Law Center**

214 E. Galer St. Ste. 100
Seattle, WA 98102
Tele: 206-805-0989
Fax: 206-805-1716

# EXHIBIT 16

FILED
17 OCT 19 PM 2:51

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 17-2-10605-4 KNT

Chief Civil Judge
November 3, 2017
10:30 a.m.
With Oral Argument Requested

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

| | |
|---|---|
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3, A DELAWARE STATUTORY TRUST(S),<br><br>PLAINTIFF,<br><br>v.<br><br>SARAH K DOUGLASS,<br><br>DEFENDANT. | Case No.: **17-2-10605-4 KNT**<br><br>**DEFENDANT'S MOTION TO SET ASIDE DEFAULT ORDER AND JUDGMENT AND CONTROVERSION OF GARNISHMENT** |

## I.     RELIEF REQUESTED

Defendant Sarah K. Douglass ("Ms. Douglass" or "Defendant"), by and through her

attorney, Amanda N. Martin and Northwest Consumer Law Center, moves this Court for an

order setting aside the default judgment entered on April 25, 2017.  She was not properly served

and as such, this Court should vacate the default judgment as it is void. She also requests an

award of her attorneys' fees and costs.

//

DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND
JUDGMENT- 1

The Northwest
Consumer Law Center

214 E. Galer St. Ste. 100
Seattle, WA 98102
Tele: 206-805-0989
Fax: 206-805-1716

## II.   STATEMENT OF FACTS

**A.   <u>Plaintiff National Collegiate Student Loan Trust</u>**

The National Collegiate Student Loan Trusts are investment vehicles focusing on student loans.[1]  According to consumer advocates, the National Collegiate Student Loan Trusts are one of the most active in suing student loan borrowers.  *Id.*  Consumer advocates warn that student loan investment trusts echo the same robo-signing problems that occurred during the mortgage crisis.  *Id.*  Indeed, the Consumer Financial Protection Bureau ("CFPB") recently took action against the National Collegiate Student Loan Trusts by filing a complaint in federal court alleging that "[c]onsumers were sued for private student loan debt that the companies couldn't prove was owed or was too old to sue over."[2]  The CFPB also entered into a Consent Order with the Trusts' servicer, Transworld Systems Inc. ("TSI"), finding its employees signed deceptive affidavits falsely claiming to have personal knowledge about student loan records.[3]

On April 24, 2017, Plaintiff National Collegiate Student Loan Trust 2006-3 ("NCSLT") filed a summons and complaint for collection relating to a student loan alleged to be owed by Ms. Douglass.  Docket #1.  A Declaration of Service was filed on April 25, 2017.  Docket #5. That Declaration of Service states that Ms. Douglass was served by delivery of a Summons and Complaint presented and left with "Brett Douglass, Co-Resident, Spouse." Docket #5.  A

---

[1] Natalie Kitroeff, *The Lawsuit Machine Going After Student Debtors*, Bloomberg Businessweek (June 4, 2015), http://www.bloomberg.com/news/articles/2015-06-04/the-student-debt-collection-mess, Exhibit A to the Declaration of Amanda N. Martin ("Martin Declaration"), at ¶4
[2] *CFPB Takes Action Against National Collegiate Student Loan Trusts, Transworld Systems for Illegal Student Loan Debt Collection Lawsuit*, Consumer Financial Protection Bureau (Sept. 18, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-takes-action-against-national-collegiate-student-loan-trusts-transworld-systems-illegal-student-loan-debt-collection-lawsuits/, Exhibit B to Martin Declaration, at ¶5
[3] Consent Order, Sept. 18, 2017, 2017-CFPB-0018 http://files.consumerfinance.gov/f/documents/201709_cfpb_transworld-systems_consent-order.pdf, Exhibit C to Martin Declaration, at ¶6.

DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND
JUDGMENT- 2

The Northwest
Consumer Law Center

214 E. Galer St. Ste. 100
Seattle, WA 98102
Tele: 206-805-0989
Fax: 206-805-1716

Default Judgment was entered on April 25, 2017.  Docket #8.  An Affidavit for Garnishment was filed on July 7, 2017.  Docket #9.

**B.**   **Sarah Douglass Was Never Served**

In this case, Sarah Douglass was never served with a copy of the Summons and Complaint.  Declaration of Sarah K. Douglass ("Douglass Declaration"), at ¶4.  Ms. Douglass first learned of this action when she received a copy of the judgment in the mail from Plaintiff's attorney on or around June 2017.  *Id.* at ¶5.  Ms. Douglass immediately began seeking assistance from legal aid organizations as she cannot afford a private attorney.  *Id.* at ¶6.  After speaking with one legal aid organization, she obtained a copy of all pleadings filed in this matter and reviewed the Declaration of Service which states that "Brett Douglass," her spouse, was served.  *Id.* at ¶7.  Ms. Douglass, however, has never been married.  Douglass Declaration, at ¶8; Declaration of Keith Douglass, at ¶4.  She also does not have any roommate named "Brett" or with the surname "Douglass."  Douglass Declaration, at ¶9.

Around the time of service, Ms. Douglas was dating a man named Bishop Kelly, who frequented her home.  *Id.* at ¶10.  He did not live there and instead lived in Shoreline, Washington.  *Id.* at ¶11.  After discovering that a judgment had been taken against her and speaking with counsel, Ms. Douglass asked her roommate, Joseph Wilde ("Mr. Wilde") if he had been served.  Mr. Wilde told Ms. Douglass that he remembered her boyfriend at the time answering the door once and being handed papers, but he did not know what he was handed.  Declaration of Joseph Wilde ("Wilde Declaration"), at ¶4.  Mr. Wilde also said he thought it was odd but had not thought about it much since.  *Id.* at ¶5.

Based on Mr. Wilde's information and the description in the Declaration of Service, Ms. Douglass believes that the "Brett Douglass" listed on the Declaration of Service may be the man

DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND
JUDGMENT- 3

The Northwest
Consumer Law Center

214 E. Galer St. Ste. 100
Seattle, WA 98102
Tele: 206-805-0989
Fax: 206-805-1716

she was dating at the time of service—Bishop Kelly.  Douglass Declaration, at ¶12.  However, the man she was dating on or around February 2017 never lived at Ms. Douglass' residence nor stored any belongings there.  Douglass Declaration, at ¶11, 13.

On August 16, 2017, counsel for Ms. Douglass contacted counsel for NCSLT to explain the circumstances surrounding the lack of service and requested that NCSLT agree to vacate the default judgment.  Martin Declaration, at ¶7.  NCSLT declined to vacate the default judgment. *Id.*

### III.   STATEMENT OF ISSUES

1. Whether this Court should vacate the default judgment and quash the writ of garnishment obtained by Plaintiff when Defendant affirms that she was not served and the only person who may have been served at her residence did not reside there?

2. Whether the Court should award attorneys' fees and costs to Defendant for the costs and fees incurred in vacating the default judgment and quashing the writ of garnishment, when Plaintiff was made aware of the improper service and garnishment is ongoing pursuant to RCW 6.27.210?

### IV.   EVIDENCE RELIED UPON

This Motion relies upon the Declaration of Sarah K. Douglass, Declaration of Joseph Wilde, Declaration of Keith Douglass, and Declaration of Amanda N. Martin with exhibits attached thereto; and the files and records on file with this Court.

### V.   ARGUMENT

**A.   <u>Default Judgments Should Be Set Aside Liberally</u>**

Washington courts strongly disfavor default judgments.  CR 55(c) provides, "[f]or good cause shown... the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with rule 60(b)."  Pursuant to 60(b)(5), "on motion... the court may relieve a party... from a final judgment, order or proceeding" where the judgment is void.

DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND
JUDGMENT- 4

The Northwest
Consumer Law Center

214 E. Galer St. Ste. 100
Seattle, WA 98102
Tele: 206-805-0989
Fax: 206-805-1716

Washington courts have made clear that, "[d]efault judgments are not favored in the law." *Gage v. Boeing Co.*, 55 Wn. App. 157, 159, rev. denied, 113 Wn.2d 1028 (1989) (citation omitted). When faced with a motion to set aside a default, a court should "in passing upon an application which is not manifestly insufficient or groundless, [] exercise its authority liberally, as well as equitably, to the end that substantial rights be preserved and justice between the parties be fairly and judiciously done." *White v. Holm*, 73 Wn.2d 348, 351, 438 P.2d 581 (1968) (citation omitted).

In determining whether to set aside or vacate a default order and judgment pursuant to CR 55(c) and CR 60(b), courts consider the following factors: (1) whether there is substantial evidence to support a prima facie defense to plaintiff's claims; (2) the reason for the defendant's failure to appear, whether it was the result of a mistake, inadvertence, surprise or excusable neglect; (3) whether the defendant acted with due diligence after notice of entry of the default order and judgment; and (4) whether substantial hardship will result to plaintiff. *Hardsety v. Stenchever*, 82 Wn. App. 253, 263 (1996).

However, "[p]roper service of the summons and complaint is a prerequisite to the court obtaining jurisdiction over a party, and a judgment entered without such jurisdiction is void." *Woodruff v. Spence*, 76 Wn. App. 207, 209, 883 P.2d 936 (1994). Here, Ms. Douglass was not properly served, and as such, the default judgment was entered without jurisdiction and is therefore void.

**B.      The Court Lacks Jurisdiction and Must Vacate the Void Default Judgment When Service is Not Proper**

This Court should set aside the default judgment as the judgment is void when Ms. Douglass was never properly served. "Proper service of the summons and complaint is a prerequisite to the court obtaining jurisdiction over a party, and a judgment entered without

DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND
JUDGMENT- 5

The Northwest
Consumer Law Center

214 E. Galer St. Ste. 100
Seattle, WA 98102
Tele: 206-805-0989
Fax: 206-805-1716

such jurisdiction is void." *Woodruff*, 76 Wn. App. at 209.  Courts have a mandatory, nondiscretionary duty to vacate void judgments.  *Dobbins v. Mendoza*, 88 Wn. App. 862, 871, 947 P.2d 1229, 1233 (1997).  While a facially correct return of service is presumed valid, a person attacking the service can show by clear and convincing evidence that the service was irregular.  *See Woodruff*, 88 Wn. App. at 571 (addressing a motion to set aside judgment) (citing *Miebach v. Colasurdo*, 35 Wn. App. 803, 808, 670 P.2d 276 (1983) (addressed to [161 Wn. App. 429] vacating a default judgment and citing, as authority, *Allen v. Starr*, 104 Wash. 246, 247, 176 P. 2 (1918) aff'd in relevant part, 102 Wn.2d 170, 685 P.2d 1074 (1984)). ·

No meritorious defense is necessary to vacate a default judgment which is void for lack of personal jurisdiction.  *Mid-City Materials v. Custom Fireplaces*, 36 Wn. App. 480, 674 P.2d 1271 (1984).  Also, there is no time limit for vacating a void judgment under CR 60(b)(5). *Allstate Insurance v. Khani*, 75 Wn. App. 317, 877 P.2d 724 (1994) (vacating judgment five years after entry, even though defendant learned of judgment only a few months after it was entered).

Service is defective when it is made on a person who is present at the defendant's usual place of abode but is not a resident. *Salts v. Estes*, 133 Wn.2d 160, 943 P.2d 275 (1997).  RCW 4.28.080 "…generally requires personal service of a summons on the defendant, but also permits substitute personal service on the defendant 'by leaving a copy of the summons at the house of his or her usual abode with some person of suitable age and discretion *then resident therein*.'" *Id.* at 164 (emphasis added).  Substitute service requires that the person served be a resident of the defendant's home at the time of service.  *Id.*

The Washington Supreme Court has made clear that the residency requirement of substitute service is stringent.  In *Salts*, the Court found service defective where the summons

DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND
JUDGMENT- 6

The Northwest
Consumer Law Center

214 E. Galer St. Ste. 100
Seattle, WA 98102
Tele: 206-805-0989
Fax: 206-805-1716

1   was left with Mary TerHorst (hereinafter "TerHorst"). *Id.* at 163. TerHorst was at the

2   Defendant Cliff Estes' (hereinafter "Estes") home at the time of service because she was

3   watching Estes' home while he was out of town for a couple of weeks. *Id.* TerHorst stopped by

4   to feed Estes' dog, take in the mail, and handle other similar matters. *Id.* TerHorst never lived

5   at Estes' home nor did she keep any of her goods there. *Id.* On the day of the service, a process

6   server knocked on the door, which TerHorst answered. *Id.* The two had a brief conversation

7   and then the process server handed TerHorst a summons. *Id.* The Court rejected the argument

8   that service was proper. *Id.* It explained that the common theme in proper substitute service "is

9   not only whether the defendant is reasonably likely to receive the papers served, but whether the

10  person to whom they are handed is *a full-time resident of the defendant's dwelling house* or

11  usual place of abode." *Id.* at 169 (emphasis added).

12          Here, the default judgment is void because clear and convincing evidence shows that the

13  Summons and Complaint were not served on Ms. Douglass personally or through substitute

14  service. The Declaration of Service states that the Summons and Complaint were delivered to

15  "Brett Douglass, Co-Resident, Spouse." Docket #5. It clearly states that Ms. Douglass was not

16  served. *Id.* Ms. Douglass declares under penalty of perjury that she was not served with the

17  Summons and Complaint. Douglass Declaration, at ¶4.

18          Substitute service was not effectuated here because the person served was not a resident

19  of Ms. Douglass's home. "Brett Douglas" did not live at Ms. Douglass's home nor did he store

20  belongings there, similar to TerHorst in *Salts v. Estes.* Douglass Declaration, at ¶11.

21          The alleged personal service upon "Brett Douglass" was not sufficient for substitute

22  service on Ms. Douglass, because whoever the person alleged to be "Brett Douglass" was not a

23  resident therein. *See* RCW 4.28.080; *and Salts*, 133 Wn.2d at 164 (personal jurisdiction

DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND
JUDGMENT- 7

The Northwest
Consumer Law Center

214 E. Galer St. Ste. 100
Seattle, WA 98102
Tele: 206-805-0989
Fax: 206-805-1716

"generally requires personal service of a summons on the defendant, but also permits substitute

personal service on the defendant 'by leaving a copy of the summons at the house of his or her

usual abode with some person of suitable age and discretion then resident therein.'" *Id.* (quoting

RCW 4.28.080(15)).  Simply, because the person alleged to be served was not a resident of Ms.

Douglass's home, there was not proper substitute service.

Therefore, given the foregoing and Washington Courts' strong disfavor of default

judgments, Plaintiff's judgment should be vacated and the writ of garnishment should be

quashed.

C.     <u>Vacating the Default Judgment is Appropriate When Defendant Has Numerous
       Meritorious Defenses, Defendant's Failure to Appear Was Due to Improper
       Service, Defendant Acted Diligently After Learning of this Action, and No
       Substantial Hardship Will Result to Plaintiff</u>

In the alternative that this Court finds the judgment is not void, this Court should vacate

the default judgment under CR 60(b)(1) and CR 55 as good cause exists.  "For good cause

shown and upon such terms as the court deems just, the court may set aside an entry of default

and, if a judgment by default has been entered, may likewise set it aside in accordance with rule

60(b)."  CR 55.  Courts use the following factors to determine whether good cause exists: "(1)

[t]hat there is substantial evidence extant to support, at least prima facie, a defense to the claim

asserted by the opposing party; (2) that the moving party's failure to timely appear in the action,

and answer the opponent's claim, was occasioned by mistake, inadvertence, surprise or

excusable neglect; (3) that the moving party acted with due diligence after notice of entry of the

default judgment; and (4) that no substantial hardship will result to the opposing party."  *White

v. Holm*, 73 Wn.2d 348, 352, 438 P.2d 581, 584 (1968).  When considering if there is at least a

prime facie defense, courts should review the "the evidence, and the reasonable inferences

therefrom, in the light most favorable to the movant." *TMT Bear Creek Shopping Ctr., Inc. v.*

DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND
JUDGMENT- 8

The Northwest
Consumer Law Center

214 E. Galer St. Ste. 100
Seattle, WA 98102
Tele: 206-805-0989
Fax: 206-805-1716

*Petco Animal Supplies, Inc.*, 140 Wn. App. 191, 202, 165 P.3d 1271, 1279 (2007) (quoting *Pfaff v. State Farm Mutual Automobile Insurance Co.*, 103 Wn. App. 829, 14 P.3d 837 (2000)).

Here, Ms. Douglass has numerous meritorious defenses to this collection action. The Consumer Financial Protection Bureau recently entered a Consent Order against Transworld Systems Inc., servicer of Plaintiff in this matter, related to its illegal debt collection practices for lawsuits filed between November 1, 2014 and April 25, 2016.[4] Specifically, the Consent Order found that TSI employees "executed affidavits that falsely claimed personal knowledge of the account records and the consumer's debt, and in many cases, personal knowledge of the chain of assignments establishing ownership of the loans." *Id.* at 2. "Law Firms hired by [TSI] filed hundreds of debt Collections Lawsuits without the documentation necessary to prove Trust ownership of the loans." *Id.* The Consent Order requires TSI and the law firms hired to pursue these debts to halt collection, including lawsuits, for student loan debt that TSI or its agents "have any reason to believe may be unenforceable. *Id.* at 14-15.

Here, this matter was filed on April 24, 2017, within the period of review of the Consent Order. Plaintiff then filed a Motion for Default supported by an affidavit signed by a TSI employee alleging to have personal knowledge of student loan records for this alleged debt. Docket #7, Affidavit and Verification of Account of Brian Jackson ("Jackson Affidavit"). The Jackson Affidavit submitted by Plaintiff claims that the affiant has personal knowledge of the assignment records and student loan records of Defendant—the identical issues that were raised by the CFPB in the Consent Order. Based on the Consent Order, Plaintiff is required to halt collection this alleged debt as there is reason to believe it is unenforceable.

---

[4] Consent Order, Sept. 18, 2017, 2017-CFPB-0018
http://files.consumerfinance.gov/f/documents/201709_cfpb_transworld-systems_consent-order.pdf, Exhibit C to Martin Declaration, at ¶6.

DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND
JUDGMENT- 9

The Northwest
Consumer Law Center

214 E. Galer St. Ste. 100
Seattle, WA 98102
Tele: 206-805-0989
Fax: 206-805-1716

Additionally, based on documents submitted to this Court by Plaintiff, the statute of limitations has expired on this debt. The "Loan Request/Credit Agreement" attached to Plaintiff's Motion for Default states that the agreement shall be governed by the laws of the State of California. Docket #7, Exhibit B to the Jackson Affidavit. The State of California has a four year statute of limitations for written contracts. Cal. Civ. Proc. § 337. The date of the last payment on the loan was April 12, 2013, according to the Jackson Affidavit. Docket #7, Jackson Affidavit, at ¶10. As Ms. Douglass has never been properly served, the statute of limitations expired on April 12, 2017.

Plaintiff moreover failed to prove that it has standing to bring this action and failed to produce a written assignment instrument. None of the documents provided by Plaintiff that appear to assign debts contain any specific reference to Ms. Douglass or her alleged loan(s). Docket #7, Jackson Affidavit. Plaintiff has provided the two documents in an attempt to substantiate a chain of title for its ownership of the student loan. *See* Docket #7, Exhibit C to the Jackson Affidavit. One document is entitled "Pool Supplement," and reads that it is an agreement between Bank of America, N.A., and The First Marblehead Corporation where student loans were transferred to The National Collegiate Funding LLC. *See* Docket #7, Exhibit C to the Jackson Affidavit. The Pool Supplement states that it transferred, sold, and assigned "each student loan set forth on the attached Schedule 1," yet no Schedule 1 is attached to the Pool Supplement provided. *Id.* The other document is entitled "Deposit and Sale Agreement" and is an agreement between National Collegiate Funding LLC and Plaintiff, where student loans listed on a separate "Schedule 2 to each of the Pool Supplements" are transferred from National Collegiate Funding LLC to National Collegiate Student Loan Trust 2006-3, but once again no Schedule 2 to the Pool Supplements is provided. *Id.* Neither the Pool Supplement nor

DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND
JUDGMENT- 10

The Northwest
Consumer Law Center

214 E. Galer St. Ste. 100
Seattle, WA 98102
Tele: 206-805-0989
Fax: 206-805-1716

Deposit and Sale Agreement reference Defendant's name, account number, nor any other identifying information. These are the same issues raised by the Consumer Financial Protection Bureau in the Consent Order of lawsuits filed without sufficient evidence to prove assignment.

Next, Ms. Douglass's failure to appear was due to mistake or excusable neglect. She was not personally served with a copy of the summons and complaint, and the person alleged to be served was not a resident of her home. Douglass Declaration, at ¶4, 11. Ms. Douglass did not have notice of this lawsuit until she received a copy of the default judgment in the mail from Plaintiff's counsel. *Id.* at ¶5.

Then after receiving notice of this lawsuit, Ms. Douglass acted with due diligence by immediately seeking assistance from legal aid organizations. Douglass Declaration, at ¶6. She spoke with two other legal aid organizations prior to obtaining representation. *Id.* Once counsel was retained, Ms. Douglass requested, through counsel, that Plaintiff agree to vacate the default judgment due to lack of service. Martin Declaration, at ¶7. After Plaintiff declined to voluntarily vacate the void judgment, this Motion was filed with the Court.

Finally, no substantial hardship will result to National Collegiate Student Loan Trust if the default judgment is vacated. This Motion was filed less than seven months after the default judgment was entered. Plaintiff was told that service was improper yet did not agree to vacate the default judgment. As such, this Court should vacate the default judgment as good cause exists.

**D.   Relief from Judgment Should be Entered Under CR 60(b)(11)**

This Court should grant relief from judgment under CR 60(b)(11). CR 60(b)(11) states that relief from judgment can be entered for any other reason justifying relief from the operation of the judgment. Identical to Federal Rule of Civil Procedure 60(6)(b), "[t]he United States

DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND
JUDGMENT- 11

The Northwest
Consumer Law Center

214 E. Galer St. Ste. 100
Seattle, WA 98102
Tele: 206-805-0989
Fax: 206-805-1716

Supreme Court has held that this rule "vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." *Flannagan v. Flannagan*, 42 Wn. App. 214, 221, 709 P.2d 1247, 1251 (1985) (quoting *Klapprott v. United States*, 335 U.S. 601, 615, 69 S. Ct. 384, 390, 93 L.Ed. 266, 277 (1949). Application of the rule is limited to situations that do not fit within the other subsections of CR 60(b) and must relate to "irregularities which are extraneous to the action of the court or go to the question of the regularity of its proceedings." *Id.* (quoting *State v. Keller,* 32 Wn. App. 135, 140, 647 P.2d 35 (1982)).

Here, Ms. Douglass was never personally served. The Declaration of Service states her spouse was served, but Ms. Douglass has never been married. Douglass Declaration, at ¶8. Based off the information of her roommate and the description contained in the Declaration of Service, Ms. Douglass is certain that if someone was in-fact served, that someone who was not a resident of her home. *Id.*

Additionally, in light of the recent actions by the Consumer Financial Protection Bureau against Plaintiff and Transworld Systems Inc., the Jackson Affidavit supporting the default judgment is not trustworthy as the Consent Order founds that many affidavits were signed by a TSI who did not have personal knowledge of the allegations it swears are true under penalty of perjury. Plaintiff has a duty under the Consent Order to review this affidavit prior to continuing collection on this debt. As such, equity requires that the default judgment and order be vacated.

E. **Because the Judgment is Void or Should Otherwise be Vacated, the Writ of Garnishment Should Be Quashed**

The default judgment is void for lack of service. Thus, the writ of garnishment should be quashed. A superior court may quash a garnishment through a motion to vacate where to quash the garnishment requires the judgment to be vacated. *See Lindgren v. Lindgren*, 58 Wn. App.

DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND
JUDGMENT- 12

The Northwest
Consumer Law Center

214 E. Galer St. Ste. 100
Seattle, WA 98102
Tele: 206-805-0989
Fax: 206-805-1716

588, 592, 794 P.2d 526, 530 (1990).  To preserve judicial resources and dispose of this matter

properly here, both the judgment should be vacated and the garnishment quashed.

**F.**     **Washington Law Requires that Defendant Be Awarded Attorneys' Fees and Costs**
           **Incurred to Vacate Plaintiff's Judgment and Quash the Writ of Garnishment**

Defendant respectfully requests the Court award her fees and costs related to the process

of vacating the default judgment.  Under RCW 6.27.230, a prevailing party in a controversion

of a garnishment is entitled to his or her reasonable attorneys' fees and costs.  Because the

Plaintiff filed a writ of garnishment and the vacation of the judgment is necessary to quash the

garnishment, the award of attorneys' fees and costs is proper under RCW 6.27.230.  *See*

*Lindgren,* 58 Wn. App. at 592.  In *Lindgren,* the superior court, on the motion of the defendant,

vacated a default judgment obtained by the plaintiff and quashed the plaintiff's writ of

garnishment.  *Id.*  The court also awarded the defendant her reasonable attorneys' fees and costs

incurred in vacating the judgment and quashing the writ of garnishment under RCW 6.27.230.

*Id.* at 17-18.  The appellate court affirmed the superior court's decision and explained that

because the vacation of the judgment was required to quash the garnishment an award of

attorneys' fees and costs to the Defendant was proper under RCW 6.27.230.  *Id.*  Here the same

facts exist; therefore, the same result is warranted.  Defendant cannot get the garnishment

quashed without the getting the judgment vacated.  Thus, Defendant should be awarded her

attorneys' fees and costs incurred in this proceeding and Plaintiff should be required to return

all amounts collected.

Even if the Court were to not award attorneys' fees and costs under RCW 6.27.230, an

award of fees and costs is proper under Washington common law.  A court may impose

reasonable terms as a condition of vacating a judgment.  *See Housing. Auth. Of Grant County v.*

*Newbigging,* 105 Wn. App. 178, 192, 19 P.3d 1081 (2001).  This policy is consistent with the

DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND
JUDGMENT- 13

The Northwest
Consumer Law Center

214 E. Galer St. Ste. 100
Seattle, WA 98102
Tele: 206-805-0989
Fax: 206-805-1716

notion that once a judgment has been vacated, the parties should be returned to the position they were in had the judgment never been entered. *See In re Marriage of Leslie*, 112 Wn.2d 612, 618, 772 P.2d 1013 (1989). Thus, an award of attorneys' fees and costs is warranted.

## VI.    CONCLUSION

This Court should enter an order vacating the default judgment and order, quash Plaintiff's garnishment, require Plaintiff return amounts collected, and award terms against Plaintiff, including, but not limited to, attorneys' fees and costs.

DATED this 19th day of October, 2017.

/s/ Amanda N. Martin
Amanda N. Martin, WSBA No. 49581
Attorney for Defendant

I certify this memorandum contains 4110 words, in compliance with Local Civil Rules.

DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND
JUDGMENT- 14

The Northwest
Consumer Law Center

214 E. Galer St. Ste. 100
Seattle, WA 98102
Tele: 206-805-0989
Fax: 206-805-1716

# EXHIBIT 17

FILED

17 OCT 19 PM 2:51

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 17-2-10605-4 KNT

Chief Civil Judge
November 3, 2017
10:30 a.m.
With Oral Argument Requested

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

| | |
|---|---|
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3, A DELAWARE STATUTORY TRUST(S) | No. 17-2-10605-4 KNT |
| PLAINTIFF, | DECLARATION OF SARAH K DOUGLASS |
| V. | |
| SARAH K DOUGLASS, | |
| DEFENDANT. | |

I, Sarah K. Douglass, make the following declaration under penalty of perjury:

1.      I am over the age of 18.

2.      If called to testify, I could and would testify.

3.      I am the Defendant in this case.

4.      I was never served with a copy of the summons and complaint in this case.

5.      I only became aware of this case after receiving a copy of the judgment in June 2017. I received a copy of the judgment via mail.

6.      I cannot afford an attorney, so I have been trying to get assistance from legal aid

The Northwest
Consumer Law Center

214 E. Galer St. Ste. 100
Seattle, WA 98102
Tele: 206-805-0989
Fax: 206-805-1716

organizations. I spoke with two other attorneys before obtaining representation through
Northwest Consumer Law Center. I started looking for an attorney right after receiving a copy
of the judgment in the mail.

7.      After speaking with one attorney, I got a copy of the file from the King County
Superior Court. I then saw the affidavit of service stating that "Brett Douglass" who was named
as my spouse was served.

8.      I am not currently married, and I have never been married.

9.      I do not have any roommates named "Brett" or with the surname "Douglass."'

10.     Around the time of service, I briefly dated a man named Bishop Kelly who
would visit my home.

11.     Bishop Kelly did not live there and instead lived in Shoreline, Washington.  He
did not store any belongings at my home.

12.     After looking at the affidavit of service, I showed my roommate, Joseph Wilde,
who told me that that he saw a man I had been dating around February 2017 answer the door
and was handed papers.

13.     Joseph Wilde did not tell me about this incident until I told him about the
affidavit of service.

14.     Based on this information, I believe that "Brett Douglass" may have been a
person I was dating at the time, but he never gave me a copy of the summons and complaint nor
mentioned this case to me.

15.     The man that Joseph Wilde referred to was not living at my residence in
February 2017, and he never lived at my residence. He did not store belongings at my home.

DATED this 30th day of September, 2017 in Seattle, Washington.

DECLARATION OF SARAH K
DOUGLASS - 2

The Northwest
Consumer Law Center

214 E. Galer St. Ste. 100
Seattle, WA 98102
Tele: 206-805-0989
Fax: 206-805-1716

/s/ Sarah K. Douglass
Sarah K. Douglass

The Northwest
Consumer Law Center

# EXHIBIT 18

FILED

17 NOV 01 AM 10:43

KING COUNTY
SUPERIOR COURT CLERK
Chief Civil Judge
Noted for hearing (without argument) 4 KNT
November 3, 2017

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2006-3, A DELAWARE
STATUTORY TRUST

            Plaintiff,

    vs.

SARAH K DOUGLASS

            Defendant.

No. 17-2-10605-4 KNT

DECLARATION OF MARCO RUISLA

I, Marco Ruisla, declare as follows:

1.    I am a process server licensed in the State of Washington. I own and operate A1 Recovery / Pro-Servers of Washington. I have worked as a process server for approximately seven years. I am a resident of the State of Washington, over the age of 18, not an employee of the plaintiff, and competent to make this Declaration. I am not a party to this action and have no personal interest in the outcome of this litigation.

2.    I was hired by the plaintiff's law firm to serve a Summons and Complaint on Sarah K. Douglass.

3.    On February 25, 2017, at approximately 10:35 AM, I went to 7950 Seward Park

DECLARATION OF MARCO RUISLA - 1

PATENAUDE & FELIX, A.P.C.
19401 40th Ave W, Ste. 280 Lynnwood, WA 98036
Tel: (425) 361-1662  Toll Free: (800) 832-7675

Ave S, Seattle, WA 98118. The person who answered the door was a white male, approximately 36-50 years of age, standing about 5'9" to 6' tall, weighing approximately 131 - 160 pounds, and with brown hair. The man identified himself as Brett Douglass, the spouse of Sarah K. Douglass, and who lived at the residence.

4.      I asked if Sarah K. Douglass lived at the address. The man stated that she did and that he was her husband. I then handed him two copies of the Summons and Complaint and told him that these were for Sarah K. Douglass.

5.      Attached as Exhibit A are my written notes taken at the time of service for this case.

I declare under the penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Dated this 31st day of October, 2017

Marco Ruisla Sr., WA Process Server Registration and License #2012-35

DECLARATION OF MARCO RUISLA - 2

PATENAUDE & FELIX, A.P.C.
19401 40th Ave W, Ste. 280 Lynnwood, WA 98036
Tel: (425) 361-1662  Toll Free: (800) 832-7675

# WIN-WIN ATTORNEY SERVICE

## PROCESS SERVICE REQUEST FORM

*X2*

| Firm Name (REQUIRED) | Phone (REQUIRED) | Email | Client # (REQUIRED) | Date |
|---|---|---|---|---|
| PATENAUDE & FELIX, APC | (425) 361-1662 | | | 2/10/2017 |

| Address | City | State | Attorney |
|---|---|---|---|
| 19401 40TH AVENUE WEST, SUITE 280 | LYNNWOOD | WA | MATTHEW CHEUNG |

| Case Name | Client Matter/Reference # | Support Staff (REQUIRED) |
|---|---|---|
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3, A DELAWARE STATUTORY TRUST(S) vs. SARAH K DOUGLASS, | 15-40570 | |

Documents to Serve: SUMMONS & COMPLAINT

Cause #

**FILING**

| Last Day For Filing | Statute Date | County | Court | File 1st Then Serve | Serve 1st Then File | Serve Only | Serve Civil Case Schedule | Return Conformed Document | File Original Proof With Court Yes (Default) | No |
|---|---|---|---|---|---|---|---|---|---|---|
| | | KING | KENT | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |

**PROCESS**

| Serve By Date | Number of Sets to Serve | # To Post | # To Mail | Govt Entity | Corp. | Individually Only Him | Only Her | Abode Service Co-Res OK | Hearing Date | Investigations |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2 | | | ☐ | ☐ | ☐ | ☐ | ☒ | | Locate: ☐ Person ☐ Assets ☐ Bank Account  ☐ Surveillance ☐ Background Report ☐ Information ☐ Other |

☐ EMAIL WHEN COMPLETED    ☐ CALL WHEN COMPLETED

RESIDENCE _____ *ASK MILLER GEORGIA FRENCEY*    RESIDENCE

**Defendant #1**
SARAH K DOUGLASS
Address
7950 SEWARD PARK AVE S
SEATTLE WA 98118-4251
Business Name/Employment Address
SEATTLE BIOMED RESEARCH INSTITUTE
3074 WESTLAKE AVE N STE 500
SEATTLE WA 98109

**Defendant #2**
Address

Business Name/Employment Address

Special Service Instructions   *Served 2/25 @ 10:35 A.M. on Cohabitant Spouse Brett Douglass. W/M 36-50 Y.o 5'9 Brn/Brn*

Rec. By:

| Date/Time | Note Codes | By | Age | Wt. | Ht. | Race/Sex | Color | Hair Color | Glasses | Other Ident. Marks | | Lic. Plate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | TP # | | |
| | | | | | | | | | | RTM | | |
| | | | | | | | | | | BA Fee | | |
| | | | | | | | | | | Trace $ | | |
| | | | | | | | | | | Misc $ | | |
| | | | | | | | | | | Misc $ For | | |
| | | | | | | | | | | Spec $ | | |
| | | | | | | | | | | Check # | | |
| | | | | | | | | Template Code | | Split | | |
| Date/Time | Reported Serve To | | ☐ Receptionist | | ☐ Voice Mail | | After Entered By | | | Amount This WO # | | |

022 (5/03)
1 = NO ANSWER AT THE DOOR, LIGHTS ON INSIDE
2 = NO ANSWER AT THE DOOR, DARK INSIDE
3 = VEHICLE PRESENT, NO ANSWER AND DARK INSIDE
4 = VEHICLE PRESENT, LIGHTS ON INSIDE, NO ANSWER

5 = PER MALE RESIDENT, HE HAS NEVER HEARD OF THE SUBJECT
6 = PER FEMALE RESIDENT, SHE HAS NEVER HEARD OF THE SUBJECT
7 = SUBJECT IS NOT WORKING TODAY
8 = VACANT

9 = NO SUCH ADDRESS
10 = SUBJECT RECEIVES MAIL, BUT DOES NOT RESIDE AT ADDRESS
11 = PER NON-RESIDENT, SUBJECT NOT AT HOME
12 = PER CO-RESIDENT, SUBJECT NOT AT HOME

WA_00 PR SVC FORM

# EXHIBIT 19

**FILED**

17 NOV 01 AM 10:43

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 17-2-10605-4 KNT

Chief UHF Judge
Noted for hearing (without oral argument)
November 3, 2017

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

| | |
|---|---|
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3, A DELAWARE STATUTORY TRUST | No. 17-2-10605-4 KNT |
| Plaintiff, | RESPONSE TO DEFENDANT'S MOTION TO SET ASIDE DEFAULT ORDER AND JUDGMENT AND CONTROVERSION OF GARNISHMENT |
| vs. | |
| SARAH K DOUGLASS | |
| Defendant. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

The plaintiff, NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3, A DELAWARE STATUTORY TRUST ("NCSLT"), by and through counsel, Patenaude & Felix, opposes the defendant's Motion to Set Aside Default Order and Judgment and Controversion of Garnishment.

## I. RELIEF REQUESTED

The defendant's Motion to Set Aside Default Order and Judgment and Controversion of Garnishment should be denied because: (1) this Motion has not been served in accordance with CR 60; (2) the defendant was properly served and failed to respond; and (3) the Motion fails to

RESPONSE TO DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND JUDGMENT AND
CONTROVERSION OF GARNISHMENT - 1

**PATENAUDE & FELIX, A.P.C.**
19401 40th Ave W, Ste. 280 Lynnwood, WA 98036
Tel: (425) 361-1662  Toll Free: (800) 832-7675

set forth facts that would constitute a defense to the underlying action. Further, if the Court vacates the judgment, the plaintiff should be entitled to attorney's fees as terms.

The plaintiff also requests that the hearing on the defendant's Motion be continued for the reasons set forth in the plaintiff's Motion for Continuance. The plaintiff's counsel has made numerous attempts to find a mutually agreeable hearing date, but the defendant's counsel has either refused or ignored all of the requests.

For the reasons set forth below, the plaintiff respectfully requests that this Court deny the defendant's Motion.

## II. FACTS

1.     The defendant, Sarah K. Douglass, was served with a Summons and Complaint at her home address at 7950 Seward Park Ave S on February 25, 2017, in accordance with RCW 4.28.080(16). The papers were given to a man who identified himself as Brett Douglass, a co-resident and spouse of the defendant. *See* Declaration of Marco Ruisla.

2.     The defendant, Sarah K. Douglass, does not allege that the address where the Summons and Complaint were served is not her correct address. She merely alleges that she was not married to the man who was handed the papers, that he did not reside there, and that this man did not give the papers to her. *See* Declaration of Sarah K. Douglass.[1]

3.     It is undisputed that the Summons and Complaint were actually received at the home where Sarah K. Douglass resided, which was witnessed by a resident of the home. *See* Declaration of Joseph Wilde.[2]

---

[1] The plaintiff relies on this Declaration if this Court does not strike it for non-compliance with GR 30.
[2] The plaintiff relies on this Declaration if this Court does not strike it for non-compliance with GR 30.

RESPONSE TO DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND JUDGMENT AND
CONTROVERSION OF GARNISHMENT - 2

PATENAUDE & FELIX, A.P.C.
19401 40th Ave W, Ste. 280 Lynnwood, WA 98036
Tel: (425) 361-1662  Toll Free: (800) 832-7675

4.      Having received neither an appearance nor an answer from the defendant, the plaintiff filed a Motion for Default and Default Judgment on April 25, 2017. *See* Motion for Default Judgment, Docket #7.

5.      The Court awarded the plaintiff a Default Judgment on April 25, 2017. *See* Default Judgment, Docket #8.

### III.     STATEMENT OF ISSUES

1.      Whether this Motion should be denied because the defendant has failed to serve this Motion in accordance with CR 60(e)(3)?

2.      Whether this Motion should be denied because the defendant was properly served with the Summons and Complaint and she failed to respond?

3.      Whether this Motion should be denied because the defendants has not set forth facts that would constitute a defense to the underlying action, in accordance with CR 60(e)(1)?

### IV. EVIDENCE RELIED UPON

This Opposition is based on the Declaration of Marco Ruisla and the Court file and records contained therein.

### V. LEGAL ARGUMENT

**1.      The defendant's Motion should be denied because she failed to serve this Motion in accordance with CR 60(e)(3).**

According to CR 60(e)(3), "Service. The motion, affidavit, and the order to show cause shall be served upon all parties affected in the same manner as in the case of summons in a civil action at such time before the date fixed for the hearing as the order shall provide."

Here, the defendant has ignored the Court's rules. The rule is clear that the Motion and Order to Show Cause should have been served "in the same manner as in the case of summons

RESPONSE TO DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND JUDGMENT AND
CONTROVERSION OF GARNISHMENT - 3

PATENAUDE & FELIX, A.P.C.
19401 40th Ave W, Ste. 280 Lynnwood, WA 98036
Tel: (425) 361-1662  Toll Free: (800) 832-7675

in a civil action." Under CR 4(a)(2), a summons is served in a manner which allows a defendant 20 days to respond; this is the amount of time that should have been allowed for the plaintiff to respond to this Motion. Instead, the defendant has served the Motion on the plaintiff only eight court days before the hearing. For this reason alone, the defendant's Motion should be denied.

**2.     The Motion should be denied because the defendant was properly served with the Summons and Complaint and she failed to respond.**

The defendant was served with the Summons and Complaint on February 25, 2017. *See* Ruisla Declaration. Mr. Ruisla, a licensed process server who is an independent party to this matter, has provided testimony that he served the Summons and Complaint on a man who identified himself as Brett Douglass, a co-resident and spouse of the defendant, by leaving two copies of the documents with this man. Mr. Ruisla has also provided detailed notes regarding the service, including a description of Brett Douglass.

The defendant's position is that she was never served with the Summons and Complaint because the man who was handed the Summons and Complaint was actually just her boyfriend and who she alleges did not reside with her. It is also clear that her roommate, who is undeniably a resident of the house, witnessed the papers being served at the house and heard the boyfriend claim to be her husband. The defendant then claims that her boyfriend never gave her the Summons and Complaint, nor did he ever tell her about the lawsuit.

There are many suspicious irregularities about the defendant's story. If this Court were to believe the defendant claim that she was not served, the Court would have to overlook the fact that: (1) her boyfriend was present in her home when she was not there; (2) he had

RESPONSE TO DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND JUDGMENT AND
CONTROVERSION OF GARNISHMENT - 4

**PATENAUDE & FELIX, A.P.C.**
19401 40th Ave W, Ste. 280 Lynnwood, WA 98036
Tel: (425) 361-1662  Toll Free: (800) 832-7675

permission to open her door, rather than to simply tell the other roommate that someone was at the door; (3) he accepted papers on her behalf; (4) he identified himself as her husband and as a resident of the home; and (5) he supposedly never gave her the legal documents or ever speak about them. The defendant's account is simply not believable. Further, the defendant's claim that she never got the papers from her boyfriend is only supported by her self-serving statements. The declaration that is most noticeably missing is from the boyfriend. This Court should question why his declaration has not been provided when, as a non-interested party, he would be in the best position to either deny the details of the service or explain what he did with the Summons and Complaint.

The only legal authority that the defendant cites to argue why her boyfriend could not accept the legal papers is *Salts v. Estes*, 133 Wn.2d 160, 943 P.2d 275 (1997). That case is not applicable here because in that case the papers were received by a person who was only in the defendant's home to feed his dogs and to take in his mail. The case more on point is *Wichert v. Cardwell*, 117 Wn.2d 148, 812 P.2d 858 (1991). In that case the Court held that the defendant's adult child, who was an overnight guest, who lived in her own apartment, who had no personal possessions at the residence, and who infrequently stayed over at the defendant's residence, was capable of receiving substitute service. *Id.* at 150. The Court stated that, "We also note that the inquiry in any case is upon the method of attempted service. i.e., was it reasonably calculated to provide notice to the defendant? It is hornbook law that a constitutionally proper method of effecting substituted service need not guarantee that in all cases the defendant will in fact receive actual notice…" (citing *Bossuk v. Steinberg*, 58 N.Y.2d 916, 460 N.Y.S.2d 509, 447 N.E.2d 56 (1983). Therefore, the question before this Court is whether legal documents,

given to the defendant's boyfriend, who had permission to be in the house and who identified himself as the defendant's spouse, would reasonably have given the defendant notice of this lawsuit? In this case it should be a resounding yes. This is further supported by the fact that the defendant's roommate and fellow resident of the house was present for the service, and who the Court could also find received the substitute service as well.

There is no other evidence before this Court demonstrating that the original proof of service is invalid. In Washington, "a facially correct return of service is presumed valid and, after judgment is entered, the burden is on the person attacking the service to show by clear and convincing evidence that the service was irregular." *Woodruff v. Spence*, 88 Wn. App. 565, 571, 945 P.2d 745 (1997). Thus, the defendant has not met her burden of establishing that service was invalid.

The defendant does not claim to have sent an appearance or answer to the plaintiff for this matter, so the Motion for Default was appropriate. Under CR 55, a Motion for Default may be brought against a party who has "failed to appear, plead, or otherwise defend" as provided by the Civil Rules. *See* CR 55(a)(1). Since the defendant failed to plead or defend against this action, a Default Judgment was proper. Therefore, the defendant's Motion should be denied because she was served, she failed to respond, and the Default Judgment was properly awarded.

3. **The Motion should be denied because the defendant has not set forth facts that would constitute a defense.**

Washington CR 60 sets out the requirements for the Motion that the defendant has filed. The rule (emphasis added) states in pertinent part:

"(1) Motion. Application shall be made by motion filed in the cause stating the grounds upon which relief is asked, and supported by the affidavit of the

RESPONSE TO DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND JUDGMENT AND
CONTROVERSION OF GARNISHMENT - 6

PATENAUDE & FELIX, A.P.C.
19401 40th Ave W, Ste. 280 Lynnwood, WA 98036
Tel: (425) 361-1662   Toll Free: (800) 832-7675

applicant or his attorney setting forth a concise statement of the facts or errors upon which the motion is based, and *if the moving party be a defendant, the facts constituting a defense to the action or proceeding.*" CR 60(e)(1).

Here, the defendant's motion has not met the requirements mandated by CR 60(e)(1) by setting forth the facts constituting a defense to the action or proceeding. *See* CR 60(e)(1). The defendant in this case has not disputed the underlying loan; she simply want to present a legal argument which she believes allows her not to have to pay back the loan obligation. This is not an appropriate reason to seek relief from the judgment. Furthermore, Washington Courts have held that before a default judgment can be vacated, the defendant must be able to demonstrate that he or she has a valid defense on the merits, otherwise, vacating a default judgment would be pointless because a subsequent trial would simply result in another judgment in favor of the plaintiff. *Johnson v. Asotin County*, 3 Wash. App. 659, 664, 477 P.2d 297 (Div. 3 1970). One factor that a Court considers when determining whether a default judgment should be vacated is whether the defendant has a meritorious defense, but the defendant must at least present a prima facie defense. *Northwest Administrators, Inc. v. Roundy*, 42 Wash. App. 771, 774, 713 P.2d 1127 (Div. 1 1986). Here, the defendant's proposed defenses to the lawsuit are based on: (1) her belief that the affidavit is not made from personal knowledge; and (2) she does not believe the documents show that the plaintiff has the legal right to collect on the defendants' debt. Not withstanding the fact that the defendant does not dispute the underlying loan obligation, but the defendant's beliefs are misguided.

    A.    <u>The affidavit was made on personal knowledge and therefore the documents were properly admitted.</u>

The defendant relies on inadmissible hearsay to argue why she believes the plaintiff's

RESPONSE TO DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND JUDGMENT AND
CONTROVERSION OF GARNISHMENT - 7

PATENAUDE & FELIX, A.P.C.
19401 40th Ave W, Ste. 280 Lynnwood, WA 98036
Tel: (425) 361-1662  Toll Free: (800) 832-7675

affidavit was not made on personal knowledge. This entire line of argument should not be considered by this Court as she cites irrelevant matters that are unrelated to these proceedings. Moreover, the plaintiff's affidavit fully complied with RCW 5.45.020.

According to RCW 5.45.020:

> A record of an act, condition or event, shall in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and mode of preparation, and if it was made in the regular course of business, at or near the time of the act, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission. RCW 5.45.020.

Admission of business records under RCW 5.45.020 does not require examination of the person who actually made the record, the testimony of a person who has custody of the record as a regular part of his work or who has supervision of its creation is sufficient to introduce the record. *State v. Iverson*, 126 Wn. App. 329, 337-338, 108 P.3d 799 (2005). Therefore, "personal knowledge" concerns the general recordkeeping of the business, not the transaction or event.

Here, the affidavit in support of the default judgment is (1) from an employee of Transworld Systems, Inc., the designated Custodian of Records for the Plaintiff; (2) who has personal knowledge of the record management practices and procedures of the Plaintiff and is authorized testify on this action; (3) who is familiar with the education loan records at issue in this case; and (4) can attest that the education loan records were compiled and recorded in the regular course of business, at or near the time of the event, and from information transmitted from a person with knowledge of said event. This affidavit meets the requirements of RCW 5.45.020. Therefore, the Court properly considered this affidavit and the supporting documents

RESPONSE TO DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND JUDGMENT AND
CONTROVERSION OF GARNISHMENT - 8

PATENAUDE & FELIX, A.P.C.
19401 40th Ave W, Ste. 280 Lynnwood, WA 98036
Tel: (425) 361-1662   Toll Free: (800) 832-7675

1    in entering the default judgment.

2        B.    The plaintiff has already established the chain of assignment.

3        By entering judgment against the defendant, this Court has already ruled that the

4    plaintiff is the proper party to bring this suit and is the owner of the underlying debt. Moreover,

5    Washington law is clear that an assignee steps into the shoes of the assignor and has all the

6    rights of the assignor. *Estate of Jordan v. Hartford Accident & Indm. Co.*, 120 Wn.2d 490, 495,

7    844 P.2d 403 (1993) (citing *Morse Electro Rods. Corp., v. Beneficial Indus. Loan Co.*, 90

8    Wn.2d 195, 198, 579 P.2d 1341 (1978); *Federal Fin. Co. v. Gerard*, 90 Wn. App. 169, 177,

9    949 P.2d 412 (1998). Under RCW 4.08.080 an assignee who has received an assignment in

10   writing may sue and maintain an action against debtors of the assigned accounts. *Unifund CCR

11   Partners v. Sunde*, 163 Wn. App. 473, 481, 260 P.3d 915 (2011). Further, the Court in *Sunde*

12   found that a general bill of sale without the defendant's name and account number was

13   sufficient to establish the assignment, when accompanied by an affidavit of the plaintiff that

14   referenced the defendant by name and account number. *Sunde*, 163 Wn. App. at 482. Here,

15   NCSLT has provided the Pool Supplement Agreements, which shows the transfers of the loan

16   pools containing the defendants' educational loan, to National Collegiate Funding, LLC, as

17   Depositor in the securitization process.[3] The loan pools were then immediately transferred to

18   NCSLT for securitization under a Deposit and Sales Agreement, which is also provided.[4] The

19   plaintiff's affidavit further identifies the defendants by name and account number,[5] which,

20   under *Unifund CCR Partners*, is sufficient to establish that the defendants' loan was part of the

21
22
23
24

---

[3] Plaintiff's Affidavit ¶ 11 and Exhibit C.
[4] Plaintiff's Affidavit ¶ 11 and Exhibit C.
[5] Plaintiff's Affidavit ¶ 10

25

RESPONSE TO DEFENDANT'S MOTION TO SET          PATENAUDE & FELIX, A.P.C.
ASIDE DEFAULT ORDER AND JUDGMENT AND          19401 40ᵗʰ Ave W, Ste. 280 Lynnwood, WA 98036
CONTROVERSION OF GARNISHMENT - 9               Tel: (425) 361-1662   Toll Free: (800) 832-7675

securitized loan pool and properly assigned to the plaintiff. Therefore, NCSLT has established the unbroken chain of assignment and has standing as the plaintiff.

## VI. TERMS

Even if this Court is wiling to vacate the default judgment, if any terms are to be imposed, they should be that the defendant must pay the plaintiff's fees and costs. Under CR 60(b), a Court may set aside a final judgment "upon such terms as are just." In *Boss Logger, Inc., v. Aetna Cas. & Sur. Co.*, 93 Wn. App. 632, 690, 970 P.2d 755 (1998), where the Court vacated a default judgment, the Court awarded the plaintiff $2,750 in attorney's fees for their pursuit of the default motion and judgment. Here, since the Default Judgment was properly awarded as a result of the defendant's failure to respond, the plaintiff should be entitled to their attorney's fees in connection with the Motion for Default and Default Judgment. It should also be noted that all of the "irregularities" that the defendant alleges are of her own doing and cannot possibly be attributed to the plaintiff. If she apparently allows someone into her house, who then opens her door and lies to a process server, accepts papers on her behalf and does not give them to her, how can she turn around and blame this on the plaintiff? The defendant should be held responsible for her own residence.

## VII. CONCLUSION

The defendant's Motion should be denied because there was nothing improper with service. The defendant failed to answer or appear and the Default Judgment was entered properly. Lastly, the defendant has failed to present facts or arguments that would constitute a defense to the underlying action. For these reasons the defendant's Motion should be denied.

## CERTIFICATION OF COUNSEL

RESPONSE TO DEFENDANT'S MOTION TO SET
ASIDE DEFAULT ORDER AND JUDGMENT AND
CONTROVERSION OF GARNISHMENT - 10

PATENAUDE & FELIX, A.P.C.
19401 40th Ave W, Ste. 280 Lynnwood, WA 98036
Tel: (425) 361-1662  Toll Free: (800) 832-7675

1    I certify that this Response contains 2,787 words, in compliance with the Local Civil

2  Rules.

3        Dated this 1st day of November, 2017.

4                                    PATENAUDE & FELIX, A.P.C.

5

6

7                              /s/ Matthew Cheung

8                              _____
                              Matthew Cheung, WSBA #43067
9                              Attorney for Plaintiff
                              Patenaude & Felix, A.P.C.
10                             19401 40th Ave W, Ste. 280
                              Lynnwood, WA 98036
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 20



FILED
KING COUNTY, WASHINGTON

NOV 1 7 2017

SUPERIOR COURT CLERK
BY SOPHIE REED
DEPUTY

**Superior Court of Washington**
**County of King**

| | |
|---|---|
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3, A DELAWARE STATUTORY TRUST(S), | No. 17-2-10605-4 KNT |
| Plaintiff(s), | **Order Vacating Default Judgment and Reinstating Trial Date** |
| and | |
| SARAH K. DOUGLASS, | |
| Defendants(s). | **Clerk's Action Required** |

Defendant filed a Motion to Set Aside Default Order and Judgment (sub #14), which came before the undersigned judge while handling the Chief Civil calendar. The Court has considered the motion, all papers filed in support of and in opposition to the motion, and oral argument of counsel.

At this stage, Defendant has not carried her burden to "show by clear and convincing evidence that service [of process] was improper." <u>Northwick v. Long</u>, 192 Wn. App. 256, 261 (2015). But the Court finds that Defendant has carried her burden

Judge Chad Allred
King County Superior Court
MRJC 401 Fourth Ave N, Room 4B
Kent, WA 98032
206-477-1531

under CR 55(c), CR 60, and the factors under <u>White v. Holm</u>, 73 Wn.2d 348, 352 (1968), which the Court has carefully considered.

Plaintiff argues that Defendant did not properly serve her motion. But at Plaintiff's request, the Court rescheduled the motion hearing to a later date; Plaintiff had actual notice of the motion and hearing; Plaintiff provided a substantive response in writing and orally; and Plaintiff has not been prejudiced.

Plaintiff also filed a Motion to Strike declarations. This motion should be granted as to the Declaration of Amanda N. Martin.

Therefore, it is ORDERED that:

1.     Defendant's Motion to Set Aside Default Order and Judgment (sub #14) is granted to the extent that the Order of Default and Default Judgment (sub #8) are hereby vacated.

2.     Plaintiff's Motion to Strike (sub #27) is granted to the extent that the Declaration of Amanda N. Martin (sub #18) is hereby stricken and not considered.

3.     The relief requested regarding garnishment and attorney fees are denied without prejudice. If appropriate, a party may raise these issues by motion before the judge to which this case is assigned.

4.     The original trial date is reinstated and the parties shall comply with the original Order Setting Civil Case Schedule.

Judge Chad Allred<br>
King County Superior Court<br>
MRJC 401 Fourth Ave N, Room 4B<br>
Kent, WA 98032<br>
206-477-1531

In addition, the Court notes that a substantially identical order is being entered today in another lawsuit between the same parties (17-2-10604-6 KNT). The Court recommends that the parties move for consolidation of the two cases.

November 17, 2017                                    _____

                                                    Judge Chad Allred