# EXHIBIT 4

177 Wash.App. 1017

NOTE: UNPUBLISHED OPINION, SEE WA R GEN GR 14.1

Court of Appeals of Washington, Division 3.

MONTECITO ESTATES, LLC, a Washington limited liability company and Priscilla Trullllo, a single woman, Appellants,

v.

Douglas J. HIMSL a single man, dba Himsl Real Estate Company, a Washington real estate company, Michael L. Everett and Jane Doe Everett # 1, husband and wife, and their marital community, Tyler C. Everett and Jane Doe Everett # 2, husband and wife, and their marital community, the Law Offices of Michael L. Everett, a Washington State business entity of presently-unknown form, Chicago Title Insurance Co., a foreign corporation, and James M. Curnutt and Judy Curnutt, husband and wife, and their marital community, Respondents.

Nos. 30140–I–III, 30483–3–III.
|
Oct. 22, 2013.

Appeal from Benton Superior Court; Honorable J. David Frazier, Judge.

**Attorneys and Law Firms**

John Cameron Bolliger, Bolliger Law Offices, William D. Edelblute, William Edelblute PLLC, Kennewick, WA, for Appellants.

Jeffrey Paul Downer, Daniel James Von Seggern, Melody Retallack, Lee Smart P.S., Inc., Seattle, WA, for Respondents.

UNPUBLISHED OPINION

KORSMO, C.J.

**\*1** "Two wrongs do not make a right." [1] This case proves the truth of that adage better than most. Respondent filed a meritless lien. Appellant retaliated with 27 causes of action ranging from breach of contract to civil conspiracy. The trial court imposed CR 11 sanctions in excess of $165,000 against appellant's counsel for filing a lengthy list of causes of action that lacked merit and were not withdrawn until two years of litigation had ensued. The court also dismissed the remaining counts on summary judgment and awarded additional attorney fees under the parties' contract. Although there was no litigation privilege applicable here, the trial court did properly grant summary judgment. We affirm the dismissal of the action and remand the CR 11 ruling for further findings that more clearly identify the amount of work performed on the sanctionable counts.

FACTS

The hopes of a residential real estate developer and her listing agent were dashed, perhaps by a failing economy. Each side blamed the other, and litigation ensued; the sordid details do not show either party in a good light. Unfortunately, attorneys aided and abetted the battle.

Montecito Estates LLC and its owner, Priscilla Trujillo (collectively, Montecito), attempted to develop a 35 lot residential subdivision in Prosser. They hired Douglas Himsl to market the estates via a listing agreement that ran from December 2, 2005 to December 31, 2006. The listing agreement gave Himsl exclusive marketing rights for one year. He was to receive commissions ranging from 3.5 percent to 5 percent of the sale price of any lots sold during that year, as well as for any lots sold due to his efforts within 180 days of the end of the listing agreement.

Montecito cancelled the listing agreement on May 8, 2006 for unsatisfactory performance; not one lot had been sold in the six months since the agreement had been signed. Acting through counsel, Mr. Himsl responded the following month by filing a lien in an amount representing 5 percent of the purchase price of the applicable "home package" for each lot in the development. The lien cited the commercial real estate broker lien act, chapter 60.42 RCW, and was directed to Montecito's proceeds and rents rather than the land itself.

Financiers declined to further finance Montecito and other real estate agents declined to attempt to sell the properties in light of the lien. In July 2007, despite the fact that no properties had been sold and the time period in which Mr. Himsl had the right to claim a commission

had expired, his attorneys sent a settlement demand to Montecito requesting $300,000 in exchange for releasing the lien. In subsequent pleadings, Montecito characterized this as a "ransom demand." Montecito lost the properties when it signed a deed in lieu of foreclosure on November 5, 2007 that granted all of the lots to a creditor, Special Services, Inc.

Montecito filed suit against Himsl on September 25, 2008. The action asserted 12 causes of action against Himsl personally. The complaint was amended July 31, 2009 to assert 25 causes of action; Himsl's attorneys were added as defendants. A second amended complaint was filed October 21, 2009; this document asserted 27 causes of action including contract and tort based claims. In addition to Himsl and his attorneys, the complaint added Chicago Title Insurance Co. (Montecito's former escrow agent) and the Curnutts, a couple who had cancelled a purchase agreement for a lot in the subdivision, as defendants.

**\*2** Himsl filed a counterclaim raising two breach of contract claims and asserting a CR 11 sanction claim for harassment. In response to a court order, Montecito on December 14, 2009 filed its first of several "more definite statements" attempting to define its theory of the case. Himsl was identified as a defendant on 26 of the 27 causes of action. A first amended more definite statement soon followed that clarified the causes of action asserted against the other defendants. A voluntary second amended more definite statement filed on June 14, 2010, dismissed 14 of the 26 claims against Mr. Himsl.

The trial court entered a ruling on December 10, 2010 that declared the lien filed by Himsl and his counsel was invalid. The court determined that chapter 60.42 RCW was inapplicable because the residential subdivision did not involve commercial real estate.

Montecito dismissed several more claims after Ms. Trujillo's deposition established that she had no factual bases for them. Meanwhile, the more definite statements continued. The third and fourth amended statements removed Chicago Title and most of the other claims in the case. Additional claims were dropped when Montecito answered Himsl's motion for summary judgment, resulting in five remaining causes of action: breach of contract, civil conspiracy, extortion/economic duress/business compulsion, principal liability for actions of his attorneys, and breach of statutory duties under chapter 18.86 RCW.

The trial court issued a memorandum decision on February 28, 2011 that granted summary judgment in favor of Himsl on the remaining five claims.[2] The trial court issued its ruling on alternative bases: (1) the remaining claims were all related to the lien action and protected by the litigation privilege; and (2) Montecito failed to present a prima facie case on each claim. An order of dismissal was entered on April 1, 2011.

Montecito moved for reconsideration. Meanwhile, the trial court considered Himsl's request for attorney fees. The trial court accepted Himsl's argument that 60 percent of the fees incurred related to the contract based claims and ordered Montecito to pay Himsl $131,011.58 under the listing agreement, a figure that represented 60 percent of the defense fees and costs incurred.

The court then turned to the CR 11 attorney fees request. Noting that 22 of the 27 causes were voluntarily dismissed two years into the litigation with no evidence of a factual basis for any of the claims, and three of the other claims were pursued despite Ms. Trujillo having no factual support for them, the trial court found that the majority of them were "filed vindictively and in bad faith, and were advanced for purposes of harassment, nuisance, and spite." Clerk's Papers (CP) at 853. Finding repeated violations of CR 11, the court awarded Himsl 75 percent of his requested attorney fees, a total of $164,264.48, to be paid by Montecito, Ms. Trujillo, and attorney John Bolliger. They timely appealed the attorney fee awards to this court.

**\*3** The trial court eventually denied the motion for reconsideration. With the entry of that order, Montecito appealed the summary judgment ruling and the denial of reconsideration. The two appeals were consolidated for argument and resolution.

### ANALYSIS

The appeals challenge on several grounds both the dismissal of the case and the attorney fee awards. We will address the arguments in that order.

*Dismissal*

Montecito argues both that the doctrine of litigation immunity did not apply to its remaining causes of action and that material questions of fact existed that precluded the summary judgment ruling. We agree in part that the broad assertion of litigation immunity was not justified on all causes of action, but we agree with the trial court that summary judgment was proper. Before addressing Montecito's arguments, we first note the standards governing this aspect of this appeal.

This court reviews a summary judgment de novo, performing the same inquiry as the trial court. *Lybbert v. Grant County,* 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). The facts, and all reasonable inferences to be drawn from them, are viewed in the light most favorable to the nonmoving party. *Id.* If there is no genuine issue of material fact, summary judgment will be granted if the moving party is entitled to judgment as a matter of law. *Id.*

The moving party bears the initial burden of establishing that it is entitled to judgment because there are no disputed issues of material fact. *Young v. Key Pharm., Inc.,* 112 Wn.2d 216, 225, 770 P.2d 182 (1989). If a defendant makes that initial showing, then the burden shifts to the plaintiff to establish there is a genuine issue for the trier of fact. *Id.* at 225–26. The plaintiff may not rely on speculation or having its own affidavits accepted at face value. *Seven Gables Corp. v. MGM/UA Entm't Co.,* 106 Wn.2d 1, 13, 721 P.2d 1 (1986). Instead, it must put forth evidence showing the existence of a triable issue. *Id.*

*Litigation Immunity.* Himsl argues that because all of the remaining actions revolved around the lien filed by his lawyers, he has immunity. We disagree. No court has construed litigation immunity so broadly. Tortious conduct is not immune from liability merely because a party hired a lawyer to engage in the behavior.

Washington recognizes that statements made by counsel in the course of litigation are immune from defamation actions. *E.g., McNeal v. Allen,* 95 Wn.2d 265, 621 P.2d 1285 (1980); *Gold Seal Chinchillas, Inc. v. State,* 69 Wn.2d 828, 420 P.2d 698 (1966). Similarly, a witness is immune from suit concerning his testimony at trial. *Bruce v. Byrne–Stevens & Assocs.,* 113 Wn.2d 123, 776 P.2d 666 (1989). This common law immunity is founded in the need of counsel to have "the utmost freedom in their efforts to secure justice for their clients." *McNeal,* 95 Wn.2d at 267.

This court has ruled that an attorney is immune from litigation by an opposing party for actions taken on behalf of a client against that party. *Jeckle v. Crotty,* 120 Wn.App. 374, 386, 85 P.2d 931 (2004). In *Jeckle,* this court relied upon the judicial action immunity recognized in the factually similar case of *Kittler v. Eckberg, Lammers, Briggs, Wolff & Vierling,* 535 N.W.2d 653, 657–58 (Minn.Ct.App.1995). *Jeckle,* 120 Wn.App. at 386. In *Kittler,* attorneys were sued for defamation over a letter written to solicit additional clients to sue the plaintiff. 535 N.W .2d at 654–55. Applying the *Restatement (Second) of Torts* § 586 (1977), the Minnesota court extended the absolute immunity for defamation granted attorneys to prelitigation good faith solicitation of clients for an anticipated lawsuit. *Kittler,* 535 N.W.2d at 655–57. In *Jeckle* this court agreed with *Kittler* that the attorney immunity applied outside of the courtroom and extended it to the attorney's actions in soliciting clients and deposing the opposing party using information found in his Medical Quality Assurance Commission file. *Jeckle,* 120 Wn.App. at 378, 386. The central core of the allegations addressed counsel's communication of information during litigation, the very reason that the defamation privilege exists. The attorney immunity for defamation based claims properly covered the conduct at issue in *Jeckle,* which essentially sounded in defamation.

**\*4** *Jeckle* did not recognize a broad litigation immunity privilege. Even if it had, however, it would not apply here for two reasons. First, the action of filing the lien occurred before the litigation and was not an early step in initiating an action. An action that causes litigation, whether it be an automobile accident, wrongful death, or a lien filing, simply is not an action taken to initiate or further litigation.

Second, Himsl's argument that he is entitled to the immunity enjoyed by his attorney is without foundation. He cites no authority suggesting that the attorney's immunity is shared with the client. Although we can foresee circumstances in which it would be necessary to extend the attorney's immunity to the client lest a party do indirectly what they cannot do directly, we leave consideration of such cases to the future. Here we face a broad assertion of a client's immunity in tort based on immunity for defamation held by the client's attorney.[3] This is essentially the converse of the infamous Nuremberg defense.[4] We do not believe that a client can

claim immunity for his agent's actions except in carefully delineated circumstances that are not present here.

A tortious action is not necessarily immune merely because it is taken by an attorney on behalf of a client. [5] Numerous causes of action, often raised as counterclaims, are routinely pleaded in response to actions taken by the opposing party's attorney. Some examples include malicious prosecution, [6] slander of title, [7] and anti-SLAPP [8] actions. Indeed, CR 11 would have a very narrow application if not applied to actions taken by attorneys on behalf of their clients.

We conclude that there is no broad-based litigation immunity doctrine. Claims of immunity must be considered narrowly and in relation to the purpose of the immunity to allow counsel freedom to fully present a case.

Relief must be available for tort victims, but seldom will it be appropriate to sue an attorney for litigation activity. See Rains v. State, 100 Wn.2d 660, 668, 674 P.2d 165 (1983) (disapproving counterclaim that added plaintiff's attorney as third party defendant for malicious prosecution). Liens are not to be filed lightly or for nonessential purposes; indeed, people have been sent to prison for maliciously filing liens. E.g., State v. Knowles, 91 Wn.App. 367, 957 P.2d 797 (1998); State v. Stephens on, 89 Wn.App. 794, 950 P.2d 38 (1998). However, the remedy for wrongful filing of a lien normally is a declaratory action to remove the lien rather than to pursue multiple torts against the lien filer and his counsel.

The trial court erred to the extent it relied upon litigation immunity to dismiss *all* of the remaining counts. [9]

*Prima Facie Case.* Montecito argues that the trial court also erred in ruling that it had failed to establish a prima facie case on the five remaining causes of action. [10] On appeal, Montecito challenges only the dismissal of the claims involving breach of contract and breach of statutory duties under chapter 18.86 RCW. [11] We will briefly address both causes.

*5 Montecito first argues that the court erroneously dismissed the breach of contract claim, arguing that Himsl's inaction before the contract was terminated and his actions afterwards amounted to a breach of the contract. This claim founders on the language of the contract and the absence of any expert testimony establishing the duties Montecito claims were breached.

"A breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant." *Nw. Indep. Forest Mfrs. v. Dep't of Labor and Indus.,* 78 Wn.App. 707, 712, 899 P.2d 6 (1995). Montecito argues that Himsl, prior to the contract's termination, failed to timely advertise the property in accordance with Ms. Trujillo's directions, was rude to her, and failed to adequately staff the model home. Montecito does not cite to any language in the listing agreement that required Himsl to behave in any specific manner, let alone impose the noted duties that he allegedly failed to live up to.

Thus, this claim is only actionable if the contract implicitly required this behavior. The parties agree that every listing agreement carries with it the obligation to make a continuing and good faith effort to find a buyer. *Dixon v. Gustav,* 51 Wn.2d 378, 381, 318 P.2d 965 (1957). When the listing agent fails to make efforts to sell the property, the agreement properly can be terminated by the seller. *Id.* at 381–82.

Montecito has cited no case authority suggesting that the noted behavioral standards are components of the good faith effort required by the contract. It likewise did not present any expert testimony suggesting that being pleasant to the seller is part of the good faith duty or that industry standards set forth requirements for staffing or timeliness of advertising. Absent some evidence that Himsl had a duty to act in a specific manner, Montecito has not shown that Himsl breached his contractual obligations prior to the point the contract was terminated.

Montecito contends that Himsl also breached the contract after it was terminated by filing the lien. We do not understand how Montecito believes Himsl had any continuing obligations under the contract once Montecito cancelled it. Nonetheless, even if there were such obligations, Montecito has failed to establish them under either the terms of the agreement or under the duty of good faith.

For all of the noted reasons, Montecito failed to establish a prima facie case of breach of contract. The claim was properly dismissed.

Although Montecito argues to the contrary, the remaining claim of realtor misconduct sounds in tort. "The essential elements of actionable negligence are: (1) the existence of a duty owed to the complaining party; (2) a breach thereof; (3) a resulting injury; and (4) a proximate cause between the claimed breach and resulting injury." *Pedroza v. Bryant,* 101 Wn.2d 226, 228, 677 P.2d 166 (1984).

Montecito argues that Himsl violated his obligations under RCW 18 .86.030, .040, and .060 to exercise reasonable skill and care, deal honestly and in good faith, and to continue to find buyers for the property. Br. of Appellant at 74. These allegations largely parallel those undergirding the breach of contract argument, but Montecito presents these claims separately under the belief that chapter 18.86 RCW creates an independent cause of action. Subsequent to the briefing in this case, the Washington Supreme Court decided the issue to the contrary in *Jackowski v. Borchelt,* 174 Wn.2d 720, 733–36, 278 P.3d 1100 (2012).

**\*6** There the court recognized that chapter 18.86 RCW imposes duties on real estate professionals that are in addition to any contractual obligations. In the absence of briefing on the test set forth in *Bennett v. Hardy,* 113 Wn.2d 912, 920–21, 784 P.2d 1258 (1990), the court declined to find that the statute created a cause of action:

> Chapter 18.86 RCW does not indicate the creation of a new statutory cause of action, but it does state that the common law continues to apply where it is not limited or inconsistent. See RCW 18.86.110. Therefore, common law tort causes of action remain the vehicle through which a party may recover for a breach of statutory duties set forth in chapter 18.86 RCW.

> *Jackowski,* 174 Wn.2d at 735.

Similarly here, Montecito has not presented briefing under the *Bennett* factors that suggest the legislature intended to create an independent cause of action. Thus, as in *Jackowski,* any claim here must be pursued as a tort. *Id.* Montecito did not plead this aspect of its case in that manner and thus presented no evidence that these duties were breached or that they were a proximate cause of injury. Accordingly, summary judgment again was proper.

The trial court did not err in dismissing the remaining causes at summary judgment.

*Attorney Fees*

The trial court granted attorney fees both under the contract and as CR 11 sanctions. Montecito challenges both awards, which we will address as separate arguments.

Common principles govern both of the bases for the fee awards. This court reviews a trial court's award of attorney fees for an abuse of discretion. *Mahler v. Szucs,* 135 Wn.2d 398, 435, 957 P.2d 632 (1998). Discretion is abused when it is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker,* 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

Attorney fees should be awarded only for services related to causes of action that allow for fees. *Absher Constr. Co. v. Kent Sch. Dist. No. 415,* 79 Wn.App. 841, 847, 917 P.2d 1086 (1995). If fees are authorized for only some of the claims, the fee award must properly reflect a segregation of time spent on issues for which fees are authorized from time spent on other issues. *Hume v.. Am. Disposal Co.,* 124 Wn.2d 656, 672, 880 P.2d 988 (1994). However, if the claims are so related that no reasonable segregation can be made, the court does not need to require segregation. *Id.* at 673.

In awarding attorney fees, Washington courts apply the lodestar method and the trial court must enter findings of fact and conclusions of law supporting its decision to award fees. *Mahler,* 135 Wn.2d at 434–35. The findings are necessary for an appellate court to review the award. *Bentzen v. Demmons,* 68 Wn.App. 339, 350, 842 P.2d 1015 (1993). Where a trial court fails to create the appropriate record, remand for entry of proper findings and conclusions is the appropriate remedy. *Mahler,* 135 Wn.2d at 435.

**\*7** *Contractual Fees.* The trial court concluded that Himsl's counsel spent 60 percent of their time defending three of the contract based causes of action. Finding that all of the requested fees were adequately documented and justified by the demands of the case, the court ordered that Montecito pay 60 percent of that figure as attorney fees under the listing agreement. Concluding that there was no abuse of discretion, we affirm this ruling.

The trial court determined both that the hours spent defending the case were reasonable and well documented in the billing records as well as finding that the hourly rates were reasonable, if perhaps lower than warranted. CP at 856, Conclusions of Law (CL) 19–20. The court also concluded that Himsl's estimate that his counsel spent 60 percent of their time on contract based claims was reasonable. CP at 854, CL 4. Montecito does not take issue with these conclusions in its argument. It instead argues that because its breach of contract claim is meritorious, the contractual attorney fee must be reversed and it should be awarded its attorney fees for the appeal. *See* Br. of Appellant at 42–43, 89–91.

For several reasons, contract based fees were available. First, this court has upheld the summary judgment dismissal of the breach of contract allegation. Second, the breach of contract was not the only contract based allegation pleaded by Montecito. The trial court recognized that the conspiracy and extortion arguments also were based on the contract, as were some of the earlier dismissed theories. Third, Montecito itself claimed attorney fees under the contract in this appeal and in the trial court. Those actions provided strong evidence that these were contract based actions.

Given all, the trial court correctly determined that much of this litigation was contract based. The court had evidence from counsel that 60 percent of their evidence was directed toward the contract claims. This was a tenable ground to award the fees.

The attorney fee award of $131,011.58 against Montecito is affirmed.

CR 11 *Sanction.* The trial court also awarded $164,264.48 in attorney fees and costs as a CR 11 sanction against Montecito, Ms. Trujillo, and attorney John Bolliger. The appellants raise numerous challenges to this ruling. We will analyze, often briefly, the various claims in the context of a single issue. We remand for the trial court to revisit its findings and clarify the link between the award and the attorney fees expended on the claims meriting the sanction.[12]

"We review a trial court's CR 11 sanction decision for abuse of discretion." *In re Recall of Lindquist,* 172 Wn.2d 120, 141, 258 P.3d 9 (2011). In addition to the previously discussed bases for finding abuse of discretion, *Lindquist* noted that a trial court also can "abuse[ ] its discretion because its decision was reached by applying an incomplete legal standard." *Id.* at 142.

CR 11(a) provides that an attorney, or the party if not represented by counsel, must sign every pleading or motion. The rule then requires, in relevant part:

> *8 The signature ... constitutes a certificate ... that the party or attorney has read the pleading ... and that to the best of the party's or attorney's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (1) it is well grounded in fact; (2) it is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law or the establishment of new law; (3) it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and (4) the denials of factual contentions are warranted on the evidence.... If a pleading, motion, or legal memorandum is signed in violation of this rule, the court, upon motion or upon its own initiative, may impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or legal memorandum, including a reasonable attorney fee.

When CR 11 is violated, the court may impose sanctions and should only impose "the least severe sanction necessary to carry out the purpose of the rule." *Biggs v. Vail,* 124 Wn.2d 193, 197, 876 P .2d 448 (1994). The purpose of the rule is to deter frivolous filings rather than act as a fee shifting provision. *Id.* The moving party always bears the burden to justify the request for sanctions. *Id.* at

202. The court must identify the sanctionable conduct and identify how the filing violated the rule. *Id.* at 201.

CR 11 sanctions are available on any claim even after it has been voluntarily dismissed. *Escude v. King County Pub. Hosp. Dist. No. 2,* 117 Wn.App. 183, 193, 69 P.3d 895 (2003). Because "[t]he violation of Rule 11 is complete upon the filing of the offending paper" even a "voluntary dismissal of the suit, does not expunge the violation, although such corrective action should be used to mitigate the amount of sanction imposed." *Biggs,* 124 Wn.2d at 199–200.

With these guidelines in mind, we now turn to the various challenges appellants raise. Mr. Bolliger argues that he and Ms. Trujillo are not proper parties for a CR 11 sanction. The rule, however, says otherwise. Ms. Trujillo is a party as well as the owner of Montecito (the other party), and she also signed the complaint. For all of those reasons, the text of the rule includes her as a responsible party. Similarly, the rule expressly authorizes the court to sanction the attorney as the person who signs the pleading. The attorney can be sanctioned individually rather than through the attorney's firm, or vice versa, because the rule is to be broadly interpreted to most effectively deter violations. *Madden v. Foley,* 83 Wn.App. 385, 392, 922 P.2d 1364 (1996). For all of these reasons, we see no error in the trial court's assignment of responsibility for the CR 11 sanctions.

**\*9** Montecito also argues that Himsl did not properly mitigate his attorney fees. *Biggs* is dispositive against this argument. Noting there that a party cannot allow the opposing party to continually violate the rule before seeking CR 11 sanctions, the court required that the offending party must be put on notice before CR 11 sanctions can be imposed. *Biggs,* 124 Wn.2d at 198. The court concluded that the plaintiff was on notice after the defendant filed a motion under RCW 4.84.185, which authorizes attorney fees for frivolous litigation. *Biggs,* 124 Wn.2d at 199. Notice under that statute was sufficient to provide notice that CR 11 sanctions also could be sought. *Id.* at 199–200.

Even greater notice was given here because Himsl filed a counterclaim asserting CR 11. Montecito was thus on notice far earlier than in *Biggs* that sanctions were being sought under CR 11. Even at that, it took Montecito two years of litigation before it dropped most of its claims. On these facts, Himsl did not fail to mitigate his damages.

Montecito argues that the trial court lacked a factual basis for finding that the 22 dismissed counts were in violation of CR 11 because they were dropped before being subject to a CR 11 motion. The trial court determined that they were baseless and that counsel failed to properly investigate them. CP at 855, Finding of Fact 8. The trial court based its determinations in part on the fact that after Himsl presented his arguments in support of sanctions, Montecito never attempted to rebut them by showing its investigation or factual bases for the claims. CP at 888. Although no court appears to have yet addressed this issue, we agree with the trial court. It is difficult for a party to establish a negative and that party has no ability to establish what actions opposing counsel took to investigate a case. Thus, once a party alleges that a claim is baseless and presents its argument and evidence, the defending party needs to present any evidence it has in opposition to the motion. A party that fails to respond with its evidence runs the risk of the trial judge drawing the adverse inference that the party has no evidence and did, in fact, act as alleged. *Cf. Fiore v. PPG Indus., Inc.,* 169 Wn.App. 325, 353–54, 279 P.3d 972 (2012) (in challenge to reasonableness of hours expended by opposing counsel, judge was free to draw an adverse inference from challenging party's refusal to submit its hours).

The fact that it took almost two years for Montecito to begin withdrawing its claims is further support for the inference of insufficient investigation. If Montecito had withdrawn its claims early in the litigation, there may have been little or no basis for sanctions. After a lengthy period of litigation, however, it is entirely reasonable to conclude that voluntarily withdrawn claims lacked merit. We thus believe that Himsl's unrebutted argument supported the trial court's determination that the dismissed claims were filed in violation of CR 11.

**\*10** The trial court also indicated that two of the remaining five claims were not in violation of CR 11. However, the court only identified the breach of contract claim as one of the two nonsanctioned causes and did not specify the other. This falls far short of explaining why the other three causes were in violation of CR 11. For the reasons we discuss next, we remand for findings

that identify these causes and why they were subject to sanctions.

The last issue we address is the amount of fees awarded. *Biggs* is quite explicit on the topic of findings and their relationship to a fee award. The sanction is to be limited to the amount "reasonably expended in responding to the sanctionable filings." *Biggs,* 124 Wn.2d at 201. The court must thus identify the sanctionable conduct, explain how it violated CR 11, and then may require the payment of the "attorney fees incurred in responding specifically to the sanctionable conduct." *Id.* at 202. As applicable to this case, the findings must justify the fee award by expressly identifying the amount of time expended responding solely to the causes that were filed in violation of the rule. With respect to the three unidentified causes of action, the findings must also identify them and explain how they violated CR 11 in addition to identifying the time spent responding to them.[13]

Accordingly, we remand this case to the trial court with directions to revisit[14] the CR 11 ruling and enter revised findings in support of its award. Identification of the time spent responding solely to the sanctionable causes is critical in light of our decision to uphold the attorney fee award under the contract. As the court has already found that 60 percent of the fees were related to contract based claims, and the one identified claim that was not sanctioned was the breach of contract claim, it is especially important to distinguish between the time spent on that claim and the time spent on the sanctionable causes. Because the facts significantly overlap, the effect of this exercise may be to reduce (perhaps significantly) the amount of the CR 11 sanction. Or maybe not. We also note that the combined effect of the two awards was to reimburse Himsl 135 percent of the attorney fees expended by the defense. It is easily possible that a contract based claim also could be sanctionable under CR 11 and thus provide two bases for reimbursing the defense for the same work. However, the total amount *collected* by the defense cannot exceed 100 percent of the fees incurred. The court's order should reflect such a limitation.

The instigation of a lawsuit should not be undertaken lightly, even in the face of clear provocation as occurred here. When one party needlessly imposes costs on another, CR 11 may provide a remedy for the wasteful behavior, even if the effect is to financially ruin the party or its attorney. Such a tragic outcome is a cautionary tale for those who would misuse our justice system.

 ***11** Affirmed in part and remanded for entry of revised findings.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

WE CONCUR: BROWN, J., and KULIK, J.

**All Citations**

Not Reported in P.3d, 177 Wash.App. 1017, 2013 WL 5758860

---

Footnotes

1   This maxim originates in the Latin phrase "Injuria non excusat injuriam" ("injury does not excuse an injury"). *See* HERBERT BROOM, A SELECTION OF LEGAL MAXIMS, CLASSIFIED AND ILLUSTRATED, 394 (7th Amer. Ed. 1874).

2   The court dismissed the claims against Himsl's attorneys on April 1, 2011 pursuant to CR 12(b)(6). The court denied the attorneys' motion for CR 11 sanctions. The Curnutts also were released from the litigation by summary judgment on April 1, 2011.

3   Himsl's attorneys were released from the case on the basis of immunity, Montecito never appealed that ruling and we do not express any opinion about it.

4   *See United States v. Cortes–Caban,* 691 F.3d 1, 12 n. 13 (1st Cir.2012) ("[W]e reject the validity of a so-called Nuremberg defense ... 'the fact that any person acted pursuant to the order of his Government or of a superior does not free him from responsibility for a crime.' ") (quoting Judgment of the Tribunal, *Trial of Wilhelm von Leeb and Thirteen Others,* 12 Law Reports of Trials of War Criminals 1, 71–72 (United States War Crimes Commission 1949)). The same rule certainly applies to the person who gave the order or in whose name it was taken.

5   For instance, if Mr. Himsl had hired two large attorneys to assault Ms. Trujillo, we do not believe he could (or would) claim immunity to a tort of assault.

6   RCW 4.24.350; *Rains v. State,* 100 Wn.2d 660, 668, 674 P.2d 165 (1983).

| | |
|---|---|
| 7 | *Rorvig v. Douglas,* 123 Wn.2d 854, 873 P.2d 492 (1994). |
| 8 | Strategic Lawsuits Against Public Participation. RCW 4.24.510. |
| 9 | In light of our disposition of the case, we do not decide whether any of these claims were subject to immunity. |
| 10 | The trial court also ruled that the causes of action were barred by the operation of RCW 60.42.020, which limits relief under the commercial real estate lien act to release of the lien. We question how that section could be applied to these liens once the trial court ruled that the property was not commercial real estate, but also do not address this theory. |
| 11 | Montecito cited page limitations in briefing for its decision not to pursue the claims against Himsl that involved actions of his counsel. We note that the failure to appeal the order dismissing Himsl's attorneys from the case probably doomed any arguments related to Himsl's alleged connivance with counsel or for the actions of the attorneys. |
| 12 | Because we are sending the matter back to the trial court for further findings, we do not address arguments relating to the adequacy of the existing findings and instead address only those arguments that implicate the sufficiency of the evidence or theories of liability. |
| 13 | We reject Montecito's claim that the inadequacy of the findings on these causes precludes imposition of a sanction related to them. Since we believe the record could support the sanction decision, we cannot as a matter of law reverse the sanction as to those causes. Still, it is the trial court's role to decide what evidence it found persuasive and identify that evidence. While that has been done for the 22 withdrawn causes, it still needs to be done for the other three. |
| 14 | We use this verb advisedly. *See Deep Water Brewing, LLC v. Fairway Resources, LTD,* 170 Wn.App. 1, 8–9, 282 P.3d 146 (2012). |

---

**End of Document**  © 2018 Thomson Reuters. No claim to original U.S. Government Works.