# EX. A

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

The Hon. Thomas S. Zilly

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ESTHER HOFFMAN; SARAH DOUGLASS;
ANTHONY KIM; and IL KIM and DARIA
KIM, husband and wife and the marital
community comprised thereof, on behalf of
themselves and on behalf of others similarly
situated,

                Plaintiffs,

    vs.

TRANSWORLD SYSTEMS INCORPORATED;
PATENAUDE AND FELIX, A.P.C.;
MATTHEW CHEUNG, and the marital
community comprised of MATTHEW CHEUNG
and JANE DOE CHEUNG; National Collegiate
Student Loan Trust 2004-2; National Collegiate
Student Loan Trust 2005-2; National Collegiate
Student Loan Trust 2005-3; National Collegiate
Student Loan Trust 2006-1; National Collegiate
Student Loan Trust 2006-3; National Collegiate
Student Loan Trust 2007-4,

                Defendants.

Case No. C18-1132 TSZ

DEFENDANT TRANSWORLD
SYSTEMS INC.'S FIFTH
AMENDED AND SUPPLEMENTAL
RESPONSES TO PLAINTIFFS'
FIRST REQUEST FOR
PRODUCTION OF DOCUMENTS

TRANSWORLD SYSTEMS INC. FIFTH AMENDED
AND SUPPLEMENTAL RESPONSES TO PLAINTIFFS'
FIRST REQUEST FOR DOCUMENTS – 1
(Case No. C18-1132 TSZ)

Sessions, Israel & Shartle, LLC
3850 N. Causeway Blvd., Ste. 200
Metairie, LA 70002-7227
Phone: (504) 846-7931
Fax: (504) 828-3737

1  <u>SECOND AMENDED RESPONSE</u>:  See the following confidential documents, which

2  have been previously produced:

3      1.    05/20/16 Fair Credit Reporting Act ("FCRA") Policy Version 1;

4      2.    12/23/16 Fair Credit Reporting Act ("FCRA") Policy Version 2;

5      3.    08/16/17 Fair Credit Reporting Act ("FCRA") Policy Version 3;

6      4.    11/15/17 Fair Credit Reporting Act ("FCRA") Policy Version 4; and

7      5.    11/16/18 Fair Credit Reporting Act ("FCRA") Policy Version 5.

8  **THIRD AMENDED RESPONSE:  TSI's previous objections to this Request are**

9  **withdrawn.  All of the Fair Credit Reporting Act Policies that, to the best of TSI's present**

10  **knowledge, information and belief are responsive to this request, namely, listed items 1–5,**

11  **have been produced in response to this Request.**

12  <mark>REQUEST FOR PRODUCTION NO. 12:</mark>  Produce all contracts, formal or informal

13  agreements, memoranda, assignments, or other documents describing, referring or relating to

14  your relationship with any other defendant. Your response should include any documents relating

15  to your procedures for managing any debts referred to you by any of the other defendants,

16  including how you receive the debt information, what actions you take after receiving it, and how

17  you are compensated by any of the other defendants.

18  <u>RESPONSE</u>: TSI objects to the Request as overly broad in time and scope and

19  disproportionate to the needs of the case in that it seeks "contracts, formal or informal

20  agreements, memoranda, assignments, or other documents describing, referring or relating to

21  your relationship with any other defendant" regardless of whether the documents relate in any

22  way to the claims and defenses asserted.  TSI further objects in that the Requests calls for

23

24

TRANSWORLD SYSTEMS INC. FIFTH AMENDED
AND SUPPLEMENTAL RESPONSES TO PLAINTIFFS'
FIRST REQUEST FOR DOCUMENTS – 25
(Case No. C18-1132 TSZ)

Sessions, Israel & Shartle, LLC
3850 N. Causeway Blvd., Ste. 200
Metairie, LA 70002-7227
Phone: (504) 846-7931
Fax: (504) 828-3737

production of confidential and proprietary documents, the dissemination of which would be prejudicial to the business operations of the parties to those agreements.  Subject to said objections, the following documents will be produced (subject to the completion of an ongoing privilege review) upon entry of the appropriate protective order:

1. 03/01/09 Default Prevention and Collection Services Agreement;

2. 05/01/09 First Amendment to Default Prevention and Collection Services Agreement;

3. 06/15/12 Second Amendment to Default Prevention and Collection Services Agreement;

4. 06/21/12 Third Amendment to Default Prevention and Collection Services Agreement;

5. 09/07/12 Special Services Fee Agreement;

6. 02/27/13 Letter Agreement / Addendum to Third Amendment to Default Prevention and Collection Services Agreement;

7. 07/01/14 Fourth Amendment to Default Prevention and Collection Services Agreement;

8. 11/03/14 Memorandum;

9. 07/01/15 Fifth Amendment to Default Prevention and Collection Services Agreement;

10. 01/01/16 Sixth Amendment to Default Prevention and Collection Services Agreement;

11. 01/01/17 Seventh Amendment to Default Prevention and Collection Services

TRANSWORLD SYSTEMS INC. FIFTH AMENDED
AND SUPPLEMENTAL RESPONSES TO PLAINTIFFS'
FIRST REQUEST FOR DOCUMENTS – 26
(Case No. C18-1132 TSZ)

Sessions, Israel & Shartle, LLC
3850 N. Causeway Blvd., Ste. 200
Metairie, LA 70002-7227
Phone: (504) 846-7931
Fax: (504) 828-3737

1        Agreement;

2        12.    01/31/18 Eighth Amendment to Default Prevention and Collection Services

3        Agreement;

4        13.    01/31/19 Ninth Amendment to Default Prevention and Collection Services

5        Agreement;

6        14.    04/21/10 Attorney Network Services Agreement;

7        15.    11/05/2012 Amendment to Addendum A to Attorney Network Services

8        Agreement;

9        16.    12/04/14 consent to assignment of agreement

10        17.    06/22/15 Amendment to Addendum "A" to Attorney Network Services

11        Agreement;

12        18.    01/06/16 Amendment to Addendum A to Attorney Network Services Agreement;

13        19.    2020 (Undated) TSI's Attorney Network Services Agreement;

14        20.    12/31/20 TSI's Attorney Network Services Agreement;

15        21.    August 2014 NCO Financial Systems Attorney Network Standard Operating

16        Procedures Version 6.0.   TSI will produce any Appendices identified therein

17        upon specific identification and request and subject to a privilege review.

18        22.    January 2015 Transworld Systems Inc. Attorney Network Standard Operating

19        Procedures Version 6.1.  TSI will produce any Appendices identified therein upon

20        specific identification and request and subject to a privilege review.

21        23.    January 2016 Transworld Systems Inc. Attorney Network Standard Operating

22        Procedures Version 6.2.  TSI will produce any Appendices identified therein upon

23

24

TRANSWORLD SYSTEMS INC. FIFTH AMENDED
AND SUPPLEMENTAL RESPONSES TO PLAINTIFFS'
FIRST REQUEST FOR DOCUMENTS – 27
(Case No. C18-1132 TSZ)

Sessions, Israel & Shartle, LLC
3850 N. Causeway Blvd., Ste. 200
Metairie, LA 70002-7227
Phone: (504) 846-7931
Fax: (504) 828-3737

1          specific identification and request and subject to a privilege review.

2     24.   12/14/17 Standard Operating Procedure; Attorney Network Services– Law Firm

3          SOP Version 7.  TSI will produce any Appendices identified therein upon specific

4          identification and request and subject to a privilege review.

5     25.   08/20/18 Standard Operating Procedure; Attorney Network Services– Law Firm

6          SOP Version 7.1.  TSI will produce any Appendices identified therein upon

7          specific identification and request and subject to a privilege review.

8     26.   03/29/19 Standard Operating Procedure; Attorney Network Services– Law Firm

9          Version 7.2.  TSI will produce any Appendices identified therein upon specific

10         identification and request and subject to a privilege review.

11    27.   06/19/19 Standard Operating Procedure; Attorney Network Services– Law Firm

12         Version 7.3.  TSI will produce any Appendices identified therein upon specific

13         identification and request and subject to a privilege review.

14    28.   02/03/20 Standard Operating Procedure; Attorney Network Services– Law Firm

15         Version 7.4.  TSI will produce any Appendices identified therein upon specific

16         identification and request and subject to a privilege review.

17    29.   12/04/20 Standard Operating Procedure; Attorney Network Services– Law Firm

18         Version 7.5.  TSI will produce any Appendices identified therein upon specific

19         identification and request and subject to a privilege review.

20         FIRST AMENDED RESPONSE:: See the following confidential documents, which

21    have been previously produced:

22    1.   03/01/09 Default Prevention and Collection Services Agreement;

TRANSWORLD SYSTEMS INC. FIFTH AMENDED
AND SUPPLEMENTAL RESPONSES TO PLAINTIFFS'
FIRST REQUEST FOR DOCUMENTS – 28
(Case No. C18-1132 TSZ)

Sessions, Israel & Shartle, LLC
3850 N. Causeway Blvd., Ste. 200
Metairie, LA 70002-7227
Phone: (504) 846-7931
Fax: (504) 828-3737

1    2.    05/01/09 First Amendment to Default Prevention and Collection Services
2          Agreement;

3    3.    06/15/12 Second Amendment to Default Prevention and Collection Services
4          Agreement;

5    4.    06/21/12 Third Amendment to Default Prevention and Collection Services
6          Agreement;

7    5.    09/07/12 Special Services Fee Agreement;

8    6.    02/27/13 Letter Agreement / Addendum to Third Amendment to Default
9          Prevention and Collection Services Agreement;

10   7.    07/01/14 Fourth Amendment to Default Prevention and Collection Services
11         Agreement;

12   8.    11/03/14 Memorandum;

13   9.    07/01/15 Fifth Amendment to Default Prevention and Collection Services
14         Agreement;

15   10.   01/01/16 Sixth Amendment to Default Prevention and Collection Services
16         Agreement;

17   11.   01/01/17 Seventh Amendment to Default Prevention and Collection Services
18         Agreement;

19   12.   01/31/18 Eighth Amendment to Default Prevention and Collection Services
20         Agreement;

21   13.   01/31/19 Ninth Amendment to Default Prevention and Collection Services
22         Agreement;

23   TRANSWORLD SYSTEMS INC. FIFTH AMENDED
     AND SUPPLEMENTAL RESPONSES TO PLAINTIFFS'
24   FIRST REQUEST FOR DOCUMENTS – 29
     (Case No. C18-1132 TSZ)

Sessions, Israel & Shartle, LLC
3850 N. Causeway Blvd., Ste. 200
Metairie, LA 70002-7227
Phone: (504) 846-7931
Fax: (504) 828-3737

14.   04/21/10 Attorney Network Services Agreement;

15.   11/05/2012 Amendment to Addendum A to Attorney Network Services Agreement;

16.   12/04/14 consent to assignment of agreement

17.   06/22/15 Amendment to Addendum "A" to Attorney Network Services Agreement;

18.   01/06/16 Amendment to Addendum A to Attorney Network Services Agreement;

19.   2020 (Undated) TSI's Attorney Network Services Agreement;

20.   12/31/20 TSI's Attorney Network Services Agreement;

21.   August 2014 NCO Financial Systems Attorney Network Standard Operating Procedures Version 6.0.   TSI will produce any Appendices identified therein upon specific identification and request and subject to a privilege review.

22.   January 2015 Transworld Systems Inc. Attorney Network Standard Operating Procedures Version 6.1.  TSI will produce any Appendices identified therein upon specific identification and request and subject to a privilege review.

23.   January 2016 Transworld Systems Inc. Attorney Network Standard Operating Procedures Version 6.2.  TSI will produce any Appendices identified therein upon specific identification and request and subject to a privilege review.

24.   12/14/17 Standard Operating Procedure; Attorney Network Services– Law Firm SOP Version 7.  TSI will produce any Appendices identified therein upon specific identification and request and subject to a privilege review.

25.   08/20/18 Standard Operating Procedure; Attorney Network Services– Law Firm

TRANSWORLD SYSTEMS INC. FIFTH AMENDED
AND SUPPLEMENTAL RESPONSES TO PLAINTIFFS'
FIRST REQUEST FOR DOCUMENTS – 30
(Case No. C18-1132 TSZ)

Sessions, Israel & Shartle, LLC
3850 N. Causeway Blvd., Ste. 200
Metairie, LA 70002-7227
Phone: (504) 846-7931
Fax: (504) 828-3737

1    SOP Version 7.1.  TSI will produce any Appendices identified therein upon

2    specific identification and request and subject to a privilege review.

3    26.    03/29/19 Standard Operating Procedure; Attorney Network Services– Law Firm

4    Version 7.2.  TSI will produce any Appendices identified therein upon specific

5    identification and request and subject to a privilege review.

6    27.    06/19/19 Standard Operating Procedure; Attorney Network Services– Law Firm

7    Version 7.3.  TSI will produce any Appendices identified therein upon specific

8    identification and request and subject to a privilege review.

9    28.    02/03/20 Standard Operating Procedure; Attorney Network Services– Law Firm

10    Version 7.4.  TSI will produce any Appendices identified therein upon specific

11    identification and request and subject to a privilege review.

12    29.    12/04/20 Standard Operating Procedure; Attorney Network Services– Law Firm

13    Version 7.5.  TSI will produce any Appendices identified therein upon specific

14    identification and request and subject to a privilege review.

15    **SECOND AMENDED RESPONSE:  TSI's previous objections to this Request are**

16    **withdrawn.  All of the Default Prevention Collection Services Agreements, Attorney**

17    **Network Agreements, and Standard Operating Procedures that, to the best of TSI's present**

18    **knowledge, information and belief are responsive to this Request, namely, listed items 1–**

19    **29, have been produced in response to this Request.**

20    REQUEST FOR PRODUCTION NO. 13: Produce all documents you provided the

21    Consumer Financial Protection Bureau related to the findings included in the Consent Order

22    attached as Exhibit A to the complaint (Dkt. No. 61).

23    TRANSWORLD SYSTEMS INC. FIFTH AMENDED
     AND SUPPLEMENTAL RESPONSES TO PLAINTIFFS'
24    FIRST REQUEST FOR DOCUMENTS – 31
     (Case No. C18-1132 TSZ)

1    7.   MTG Military Scrub Process;

2    8.   09/08/17 MTG Military Scrub Process Job Aid Version 1;

3    9.   08/13/18 MTG Military Scrub Job Aid Affidavit Process Version 2.0;

4    10.  10/17/19 MTG Military Scrub Job Aid Affidavit Process Version 3.0;

5    11.  09/15/17 TSI Affidavit Processing – Process Job Aid Version 1

6    12.  02/06/19 TSI Affidavit Processing – Process Job Aid Version 2.0;

7    13.  06/28/19 TSI Affidavit Processing – Process Job Aid Version 2.1;

8    14.  03/04/21 TSI Affidavit Processing – Process Job Aid Version 3.0; and

9    15.  03/08/21 TSI Affidavit Processing – Process Job Aid Version [4.0].

10    **SECOND AMENDED RESPONSE**:  All Job Aids and processes that, to the best of

11 **TSI's present knowledge, information and belief are responsive to this Request, namely,**

12 **listed items 1-15, have been produced.**

13        By:  */s/ Justin H. Homes*
             Bryan C. Shartle, *Pro Hac Vice*
14           James K. Schultz *Pro Hac Vice*
             Justin H. Homes, *Pro Hac Vice*
15           Sᴇssɪᴏɴs, Isʀᴀᴇʟ & Sʜᴀʀᴛʟᴇ, LLC
             3850 North Causeway Blvd, Suite 200
16           Metairie, LA 70002-7227
             Telephone: (504) 828-3700
17           Facsimile: (504) 828-3737
             bshartle@sessions.legal
18           jschultz@sessions.legal
             jhomes@sessions.legal
19

20           Ryan W. Vollans, WSBA #45302
             601 Union Street, Suite 4100
21           Seattle, WA 98101-2380
             Phone: 206.628.6600
22           Fax: 206.628.6611
             Email: rvollans@williamskastner.com

23  TRANSWORLD SYSTEMS INC. FIFTH AMENDED   Sessions, Israel & Shartle, LLC
   AND SUPPLEMENTAL RESPONSES TO PLAINTIFFS'  3850 N. Causeway Blvd., Ste. 200
24  FIRST REQUEST FOR DOCUMENTS – 47     Metairie, LA 70002-7227
   (Case No. C18-1132 TSZ)         Phone: (504) 846-7931
                   Fax: (504) 828-3737

# EX. A12-21

# Filed Under Seal

# EX. A12-22

# Filed Under Seal

# EX. A12-23

# Filed Under Seal

EX. B

Page 1

```
 1              IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

 2                  IN AND FOR THE COUNTY OF SNOHOMISH

 3         ------------------------------------------------------

 4      NATIONAL COLLEGIATE STUDENT      )  No. 15-2-03146-3
        LOAN TRUST 2005-2, A Delaware    )
 5      Statutory Trust,                 )
                         Plaintiff,      )
 6              vs.                       )
        TONY KIM and DARIA KIM,          )
 7                       Defendants.     )
        _____  ) _____
 8      NATIONAL COLLEGIATE STUDENT      )  No. 15-2-03144-7
        LOAN TRUST 2005-2, A Delaware    )
 9      Statutory Trust,                 )
                         Plaintiff,      )
10              vs.                       )
        TONY KIM and DARIA KIM,          )
11                       Defendants.     )
        _____  ) _____
12      NATIONAL COLLEGIATE STUDENT      )  No. 15-2-04016-1
        LOAN TRUST, 2005-3, A Delaware   )
13      Statutory Trust,                 )
                         Plaintiff,      )
14              vs.                       )
        TONY KIM and IL KIM,             )
15                       Defendants.     )
        _____  ) _____
                                         )  No. 15-2-04015-2
16      NATIONAL COLLEGIATE STUDENT      )
        LOAN TRUST 2006-1, A Delaware    )
17      Statutory Trust,                 )
                         Plaintiff,      )
18              vs.                       )
        TONY KIM and IL KIM,             )
19                       Defendants.     )
        _____  ) _____
20      NATIONAL COLLEGIATE STUDENT      )  No. 15-2-04465-4
        LOAN TRUST 2006-3, A Delaware    )
21      Statutory Trust,                 )
                         Plaintiff,      )
22              vs.                       )
        TONY KIM and IL KIM,             )
23                       Defendants.     )
                                         )
24                                       )
                                         )
25                                       )
```

Bradley Luke                                          May 16, 2017

1     _____     _____
      NATIONAL COLLEGIATE STUDENT         No. 15-2-04014-4
2     LOAN TRUST 2007-4, A Delaware
      Statutory Trust,
3                     Plaintiff,
              vs.
4     TONY KIM and IL KIM,
                     Defendants.
5

6     ----------------------------------------------------------

7                Deposition Upon Oral Examination Of

8                          BRADLEY LUKE

9      ---------------------------------------------------------

10    May 16, 2017

11    1833 North 105th Street, Suite 203

12    Seattle, Washington

13

14

15

16

17

18

19

20

21

22

23

24    REPORTED BY:  PEGGY FRITSCHY HAMILTON, RPR, CSR, CLR

25    29906/No. 2704

Bradley Luke                                              May 16, 2017

Page 3

```
 1          APPEARANCES:

 2          For the Defendants:

 3                              CHRISTINA LATTA HENRY

 4                              Henry, DeGraaff & McCormick

 5                              1833 N. 105th Street

 6                              Suite 203

 7                              Seattle, Washington  98133-8973

 8                              (206) 330-0595

 9                              Chenry@HDM-legal.com

10          For the Plaintiffs:  MATTHEW CHEUNG

11                              Patenaude & Felix

12                              19401 40th Avenue West

13                              Suite 280

14                              Lynnwood, Washington  98036-5600

15                              (800) 832-7675

16                              Matthew.Cheung@pandf.us

17

18

19

20

21

22

23

24

25
```

Bradley Luke                                    May 16, 2017

```
                                              Page 4
    1      E X H I B I T S

    2      NO.     DESCRIPTION            MARKED   IDENTIFIED

    3      1       Notice of Deposition of    28       23

    4              Defendant National

    5              Collegiate Student Loan

    6              Trust 2007-4

    7      2       Notice of Deposition of    29       28

    8              Defendant National

    9              Collegiate Student Loan

   10              Trust 2006-1

   11      3       Notice of Deposition of    30       29

   12              Defendant National

   13              Collegiate Student Loan

   14              Trust 2006-3

   15      4       Notice of Deposition of    31       30

   16              Defendant National

   17              Collegiate Student Loan

   18              Trust 2005-3

   19      5       Notice of Deposition of    32       31

   20              Defendant National

   21              Collegiate Student Loan

   22              Trust 2005-2

   23

   24

   25
```

Bradley Luke                                           May 16, 2017

Page 5

| | NO. | DESCRIPTION | MARKED | IDENTIFIED |
|---|---|---|---|---|
| 1 | | E X H I B I T S CONT'D | | |
| 2 | NO. | DESCRIPTION | MARKED | IDENTIFIED |
| 3 | 6 | Notice of Deposition of | 33 | 32 |
| 4 | | Defendant National | | |
| 5 | | Collegiate Student Loan | | |
| 6 | | Trust 2005-2 | | |
| 7 | 7 | Plaintiff's Responses to | 50 | 50 |
| 8 | | Defendant's First Set of | | |
| 9 | | Requests for Admission | | |
| 10 | | 2007-4 | | |
| 11 | 8 | Summons 2007-4 | 142 | 142 |
| 12 | 9 | Order to Vacate Default | 146 | 146 |
| 13 | | Judgment and Quash Writ | | |
| 14 | | of Garnishment 2007-1 | | |
| 15 | 10 | Plaintiff's Responses to | 148 | 148 |
| 16 | | Defendant's First Set of | | |
| 17 | | Interrogatories and | | |
| 18 | | Requests for Production | | |
| 19 | | 2007-4 | | |
| 20 | 11 | Plaintiff's Responses to | 155 | 155 |
| 21 | | Defendant's First Set of | | |
| 22 | | Requests for Admission | | |
| 23 | | 2006-1 | | |
| 24 | 12 | Summons, 2006-1 | 184 | 184 |
| 25 | | | | |

Bradley Luke                                                    May 16, 2017

Page 6

```
 1        E X H I B I T S CONT'D

 2     NO.    DESCRIPTION              MARKED    IDENTIFIED

 3     13     Order to Vacate Default    186        186

 4            Judgment and Quash Writ

 5            of Garnishment 2006-1

 6     14     Order of Default and       187        187

 7            Default Judgment 2006-1

 8     15     Plaintiff's Responses to   189        189

 9            Defendant's First Set of

10            Interrogatories and

11            Requests for Production

12            2006-1

13     16     Plaintiff's Responses to   191        191

14            Defendant's First Set of

15            Requests for Admission

16            2005-3

17     17     Order to Vacate Default    193        193

18            Judgment and Quash Writ of

19            Garnishment 2005-3

20     18     Summons 2005-3             194        194

21     19     Plaintiff's Responses to   213        213

22            Defendant's First Set of

23            Interrogatories and

24            Requests for Production

25            2005-3
```

Bradley Luke                                          May 16, 2017

```
                                                        Page 7
 1          E X H I B I T S CONT'D

 2     NO.      DESCRIPTION              MARKED   IDENTIFIED

 3     20       Plaintiff's Responses to   216       216

 4              Defendant's First Set of

 5              Requests for Admission

 6              2006-3

 7     21       Complaint for Monies Due   229       229

 8              2006-3

 9     22       Plaintiff's Responses to   231       231

10              Defendant's First Set of

11              Interrogatories and

12              Requests for Production

13              2006-3

14     23       Plaintiff's Responses to   232       232

15              Defendant's First Set of

16              Requests for Admission

17              2005-2

18     24       Order to Vacate Default    233       233

19              Judgment and Quash Writ of

20              Garnishment 2005-2

21     25       Summons 2005-2             233       234

22     26       Order of Default and       257       257

23              Default Judgment 2005-2

24

25
```

Bradley Luke                                                    May 16, 2017

Page 8

```
 1         E X H I B I T S CONT'D

 2      NO.     DESCRIPTION              MARKED   IDENTIFIED

 3      27      Order to Vacate Default    258       258

 4              Judgment and Quash Writ of

 5              Garnishment 2005-2

 6      28      Plaintiff's Responses to   259       259

 7              Defendant's First Set of

 8              Interrogatories and Requests

 9              for Production 2005-2

10      29      Plaintiff's Responses to   261       261

11              Defendant's First Set of

12              Requests for Admission

13              2005-2

14      30      Order to Vacate Default    269       269

15              Judgment and Quash Writ of

16              Garnishment 2005-2

17      31      Summons 2005-2             270       270

18      32      Plaintiff's Responses to   271       271

19              Defendant's First Set of

20              Interrogatories and Requests

21              for Production 2005-2

22

23      *****  (*  Denotes phonetic spelling.)

24

25
```

Bradley Luke                                    May 16, 2017

Page 9

1                    E X A M I N A T I O N

2        BY                PAGES

3        MS. HENRY         10 - 289

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Bradley Luke                                           May 16, 2017

Page 1

```
 1            IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

 2                 IN AND FOR THE COUNTY OF SNOHOMISH

 3         -------------------------------------------------------

 4    NATIONAL COLLEGIATE STUDENT    )  No. 15-2-03146-3
      LOAN TRUST 2005-2, A Delaware  )
 5    Statutory Trust,               )
                          Plaintiff, )
 6              vs.                   )
      TONY KIM and DARIA KIM,        )
 7                      Defendants.  )
      _____)  _____
 8    NATIONAL COLLEGIATE STUDENT    )  No. 15-2-03144-7
      LOAN TRUST 2005-2, A Delaware  )
 9    Statutory Trust,               )
                          Plaintiff, )
10              vs.                   )
      TONY KIM and DARIA KIM,        )
11                      Defendants.  )
      _____)  _____
12    NATIONAL COLLEGIATE STUDENT    )  No. 15-2-04016-1
      LOAN TRUST, 2005-3, A Delaware )
13    Statutory Trust,               )
                          Plaintiff, )
14              vs.                   )
      TONY KIM and IL KIM,           )
15                      Defendants.  )
      _____)  _____
16    NATIONAL COLLEGIATE STUDENT    )  No. 15-2-04015-2
      LOAN TRUST 2006-1, A Delaware  )
17    Statutory Trust,               )
                          Plaintiff, )
18              vs.                   )
      TONY KIM and IL KIM,           )
19                      Defendants.  )
      _____)  _____
20    NATIONAL COLLEGIATE STUDENT    )  No. 15-2-04465-4
      LOAN TRUST 2006-3, A Delaware  )
21    Statutory Trust,               )
                          Plaintiff, )
22              vs.                   )
      TONY KIM and IL KIM,           )
23                      Defendants.  )
                                     )
24                                   )
                                     )
25                                   )
```

Bradley Luke                                    May 16, 2017

1    _____    _____
     NATIONAL COLLEGIATE STUDENT         No. 15-2-04014-4
2    LOAN TRUST 2007-4, A Delaware
     Statutory Trust,
3                     Plaintiff,
              vs.
4    TONY KIM and IL KIM,
                     Defendants.
5

6    ---------------------------------------------------------

7                 Deposition Upon Oral Examination Of

8                           BRADLEY LUKE

9     --------------------------------------------------------

10   May 16, 2017

11   1833 North 105th Street, Suite 203

12   Seattle, Washington

13

14

15

16

17

18

19

20

21

22

23

24   REPORTED BY:  PEGGY FRITSCHY HAMILTON, RPR, CSR, CLR

25   29906/No. 2704

Bradley Luke                                      May 16, 2017

                                                          Page 3

       1        APPEARANCES:

       2        For the Defendants:

       3                              CHRISTINA LATTA HENRY

       4                              Henry, DeGraaff & McCormick

       5                              1833 N. 105th Street

       6                              Suite 203

       7                              Seattle, Washington  98133-8973

       8                              (206) 330-0595

       9                              Chenry@HDM-legal.com

      10        For the Plaintiffs:  MATTHEW CHEUNG

      11                              Patenaude & Felix

      12                              19401 40th Avenue West

      13                              Suite 280

      14                              Lynnwood, Washington  98036-5600

      15                              (800) 832-7675

      16                              Matthew.Cheung@pandf.us

      17

      18

      19

      20

      21

      22

      23

      24

      25

Bradley Luke                                             May 16, 2017

Page 4

```
 1       E X H I B I T S

 2       NO.     DESCRIPTION              MARKED   IDENTIFIED

 3       1       Notice of Deposition of    28        23

 4               Defendant National

 5               Collegiate Student Loan

 6               Trust 2007-4

 7       2       Notice of Deposition of    29        28

 8               Defendant National

 9               Collegiate Student Loan

10               Trust 2006-1

11       3       Notice of Deposition of    30        29

12               Defendant National

13               Collegiate Student Loan

14               Trust 2006-3

15       4       Notice of Deposition of    31        30

16               Defendant National

17               Collegiate Student Loan

18               Trust 2005-3

19       5       Notice of Deposition of    32        31

20               Defendant National

21               Collegiate Student Loan

22               Trust 2005-2

23

24

25
```

Bradley Luke                                                    May 16, 2017

Page 5

```
 1        E X H I B I T S CONT'D

 2     NO.    DESCRIPTION                   MARKED   IDENTIFIED

 3     6      Notice of Deposition of         33        32

 4            Defendant National

 5            Collegiate Student Loan

 6            Trust 2005-2

 7     7      Plaintiff's Responses to        50        50

 8            Defendant's First Set of

 9            Requests for Admission

10            2007-4

11     8      Summons 2007-4                 142       142

12     9      Order to Vacate Default        146       146

13            Judgment and Quash Writ

14            of Garnishment 2007-1

15     10     Plaintiff's Responses to       148       148

16            Defendant's First Set of

17            Interrogatories and

18            Requests for Production

19            2007-4

20     11     Plaintiff's Responses to       155       155

21            Defendant's First Set of

22            Requests for Admission

23            2006-1

24     12     Summons, 2006-1                184       184

25
```

Bradley Luke                                                    May 16, 2017

Page 6

```
 1         E X H I B I T S  CONT'D

 2      NO.    DESCRIPTION              MARKED   IDENTIFIED

 3      13     Order to Vacate Default    186       186

 4             Judgment and Quash Writ

 5             of Garnishment 2006-1

 6      14     Order of Default and       187       187

 7             Default Judgment 2006-1

 8      15     Plaintiff's Responses to   189       189

 9             Defendant's First Set of

10             Interrogatories and

11             Requests for Production

12             2006-1

13      16     Plaintiff's Responses to   191       191

14             Defendant's First Set of

15             Requests for Admission

16             2005-3

17      17     Order to Vacate Default    193       193

18             Judgment and Quash Writ of

19             Garnishment 2005-3

20      18     Summons 2005-3             194       194

21      19     Plaintiff's Responses to   213       213

22             Defendant's First Set of

23             Interrogatories and

24             Requests for Production

25             2005-3
```

Bradley Luke                                      May 16, 2017

Page 7

1          E X H I B I T S CONT'D

2      NO.      DESCRIPTION              MARKED    IDENTIFIED

3      20       Plaintiff's Responses to    216        216

4               Defendant's First Set of

5               Requests for Admission

6               2006-3

7      21       Complaint for Monies Due    229        229

8               2006-3

9      22       Plaintiff's Responses to    231        231

10              Defendant's First Set of

11              Interrogatories and

12              Requests for Production

13              2006-3

14     23       Plaintiff's Responses to    232        232

15              Defendant's First Set of

16              Requests for Admission

17              2005-2

18     24       Order to Vacate Default     233        233

19              Judgment and Quash Writ of

20              Garnishment 2005-2

21     25       Summons 2005-2              233        234

22     26       Order of Default and        257        257

23              Default Judgment 2005-2

24

25

Bradley Luke                                                    May 16, 2017

Page 8

```
 1        E X H I B I T S CONT'D

 2     NO.    DESCRIPTION              MARKED   IDENTIFIED

 3     27     Order to Vacate Default   258       258

 4            Judgment and Quash Writ of

 5            Garnishment 2005-2

 6     28     Plaintiff's Responses to   259      259

 7            Defendant's First Set of

 8            Interrogatories and Requests

 9            for Production 2005-2

10     29     Plaintiff's Responses to   261      261

11            Defendant's First Set of

12            Requests for Admission

13            2005-2

14     30     Order to Vacate Default    269      269

15            Judgment and Quash Writ of

16            Garnishment 2005-2

17     31     Summons 2005-2             270      270

18     32     Plaintiff's Responses to   271      271

19            Defendant's First Set of

20            Interrogatories and Requests

21            for Production 2005-2

22

23     *****  (*  Denotes phonetic spelling.)

24

25
```

Bradley Luke                                          May 16, 2017

Page 9

```
 1                    E X A M I N A T I O N

 2        BY              PAGES

 3        MS. HENRY       10 - 289

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Bradley Luke                                              May 16, 2017

                                                           Page 10
        1                 Seattle, Washington; Tuesday, May 16, 2017
        2                         9:23 a.m.
        3                 --------------------------
        4       BRADLEY LUKE:        witness herein, having been
        5                            duly sworn by the Court Reporter
        6                            testified as follows:
        7
        8                    *       *       *
        9                 E-X-A-M-I-N-A-T-I-O-N
08:57:21 10     BY MS. HENRY:
        11          Q.   Good morning.
        12          A.   Good morning.
        13          Q.   Will you state your name for the record.
        14          A.   Bradley Luke.
09:23:47 15         Q.   Who is your employer?
        16          A.   Transworld Systems, Inc.
        17          Q.   Where do you work?
        18          A.   My office location is in Norcross, Georgia.
        19          Q.   Norcross, Georgia?
09:24:01 20         A.   Yes, ma'am.
        21          Q.   What type of business does Transworld Systems
        22     do?
        23          A.   They're in the accounts receivable business
        24     and student loan servicing.
09:24:12 25         Q.   Have you always worked for Transworld

Bradley Luke                                              May 16, 2017

```
                                                        Page 10
            1                Seattle, Washington; Tuesday, May 16, 2017

            2                          9:23 a.m.

            3                --------------------------

            4      BRADLEY LUKE:          witness herein, having been

            5                             duly sworn by the Court Reporter

            6                             testified as follows:

            7

            8                   *       *       *

            9                      E-X-A-M-I-N-A-T-I-O-N

08:57:21   10      BY MS. HENRY:

           11           Q.   Good morning.

           12           A.   Good morning.

           13           Q.   Will you state your name for the record.

           14           A.   Bradley Luke.

09:23:47   15           Q.   Who is your employer?

           16           A.   Transworld Systems, Inc.

           17           Q.   Where do you work?

           18           A.   My office location is in Norcross, Georgia.

           19           Q.   Norcross, Georgia?

09:24:01   20           A.   Yes, ma'am.

           21           Q.   What type of business does Transworld Systems

           22      do?

           23           A.   They're in the accounts receivable business

           24      and student loan servicing.

09:24:12   25           Q.   Have you always worked for Transworld
```

Bradley Luke                                          May 16, 2017

Page 18

```
         1      working on NCT cases?

         2             A.    One second.  I believe there's six, maybe

         3      seven currently, and then their supervisor.

         4             Q.    And who is their supervisor?

09:34:48 5             A.    Colleen Morgan.

         6             Q.    Are they all based in Georgia?

         7             A.    Yes, ma'am.

         8             Q.    Who does Colleen report to?

         9             A.    Chris Thomas.

09:35:07 10            Q.    What is Chris Thomas's job?

         11            A.    He's the director of operations, so he

         12     oversees the client services and the legal case

         13     managers, and he also oversees the agency network,

         14     which is similar to our attorney network, but it's

09:35:24 15     just collection agencies as opposed to law firms.

         16            Q.    Okay.  So out of the six or seven case

         17     managers, how many states do they service?

         18            A.    They service the entire country.

         19            Q.    So to take April, perhaps, as an example, or

09:36:02 20     maybe you just want to tell me the average monthly, if

         21     you know, how many NCT cases did legal case managers

         22     handle?

         23            A.    Can you further clarify what "handle," what

         24     you mean by that?

09:36:19 25            Q.    Well, you testified that they review
```

Bradley Luke                                      May 16, 2017

Page 19

1          affidavits, discovery responses, trial testimony.  So

2          how many affidavits for lawsuits were reviewed by the

3          case managers on a monthly basis on average?  I just

4          said you could use April if you happen to know, or

09:36:46  5          otherwise an average works.

6              A.   I haven't reviewed their output lately.  I

7          can say that they review on average 20 to 40

8          affidavits a day, each individual, if they're working

9          on affidavits that day.  If they're working on

09:37:05 10         discovery, they're not going to do any affidavits or

11         less affidavits, depending on how long discovery

12         takes.  I would say for discovery, they may review two

13         a day, just depending on what's in the queue for

14         discovery, what's been assigned to them for discovery.

09:37:27 15             Q.   For the legal case managers, what does

16         reviewing an affidavit mean?

17             A.   They'll get the affidavit packaged together

18         with all documents that are referenced within the

19         affidavit.  They'll read through the affidavit and

09:37:45 20         pull up the account in our system, TSI's internal

21         system of record, along with AES, American Education

22         Services system of record.  They'll pull up the

23         account, review the affidavit, check for accuracy that

24         the affidavit is correct to the account records, such

09:38:02 25         as the balance, principal, interest, total, sum, late

Bradley Luke                                          May 16, 2017

Page 33

1          A.   Yes, ma'am.

2          Q.   I think that's probably the way we need to

3     clarify it.  Assuming that that clarification is done

4     for all of them, you are ready to testify about all

09:58:21  5     the documents that have been provided?

6          A.   Yes, ma'am.

7          Q.   Okay.  We'll mark this as Exhibit-6.

8               (Exhibit-6 marked.)

9          Q.   Have you ever been employed by National

09:58:41 10     Collegiate Student Loan Trust?

11          A.   No, ma'am.

12          Q.   Have you ever met anyone who worked for

13     National Collegiate Student Loan Trust?

14          A.   No, ma'am.

09:58:47 15          Q.   Does National Collegiate Student Loan Trust

16     have any employees?

17          A.   I don't know.

18          Q.   Tell me why you wouldn't know.

19          A.   I'm unfamiliar with the entity called

09:59:00 20     National Collegiate Student Loan Trust.

21          Q.   Got it.  Okay.  Well, let's start with the

22     first one, then.  Do you know anyone who worked at

23     National Collegiate Student Loan Trust 2007-4?

24          A.   No, ma'am.

09:59:13 25          Q.   Have you ever interacted with anyone who

Bradley Luke                                          May 16, 2017

Page 34

```
         1      worked at National Collegiate Student Loan Trust

         2      2007-4?

         3            A.   No, ma'am.

         4            Q.   Are you aware of whether or not that trust

09:59:26 5      has any employees?

         6            A.   They do not.

         7            Q.   So we have a number of trusts that we are

         8      talking about today.  We are also talking about

         9      National Collegiate Student Loan Trust 2006-1.  Do

09:59:50 10     they have any employees?

        11            A.   No, ma'am.

        12            Q.   And we're talking about National Collegiate

        13      Student Loan Trust 2005-3.  Do they have any

        14      employees?

10:00:02 15           A.   No, ma'am.

        16            Q.   And National Collegiate Student Loan Trust

        17      2006-3, do they have any employees?

        18            A.   No, ma'am.

        19            Q.    National Collegiate Student Loan Trust

10:00:14 20     2005-2, do they have any employees?

        21            A.   No, ma'am.

        22            Q.    And National Collegiate Student Loan Trust

        23      2005-3, do they have any employees?

        24            A.   No, ma'am.

10:00:25 25           Q.   Okay.  Do you know why the trusts are set up
```

Bradley Luke                                                    May 16, 2017

Page 65

          1      communications.

          2          Q.   It looks like this loan, the lender is Bank

          3      of America?

          4          A.   Yes, ma'am.

10:49:35  5          Q.   And did you have any daily communication or

          6      training with Bank of America?

          7          A.   Regarding these loan products, no, ma'am.

          8          Q.   So how do you know what Bank of America did?

          9          A.   Because First Marblehead was the party that

10:49:54 10      was contracted by Bank of America to fulfill the

         11      origination obligations, and then subcontracted part

         12      of those out to The Education Resource Institute.

         13          Q.   Have you been trained on Bank of America's

         14      origination processes and procedures for this loan?

10:50:13 15          A.   No, ma'am.

         16          Q.   By anybody at Bank of America?

         17          A.   No, ma'am.

         18          Q.   And when this loan was signed, where was it

         19      sent?

10:50:21 20          A.   It would have been sent -- this loan, it

         21      would have been sent to The Education Resource

         22      Institute.  At what address, I'm uncertain of.

         23          Q.   And who is The Education Resource Institute?

         24          A.   They're a company that, for purposes of what

10:50:42 25      we're speaking about, handled the origination process

Bradley Luke                                              May 16, 2017

Page 68

1          Q.    Does TERI still hold any documents for NCT?

2          A.    I don't know.

3          Q.    Does TERI hold the documents for these six

4     loan lawsuits that you are testifying about today?

10:53:22 5     A.    Not to my knowledge.

6          Q.    Why not?

7          A.    Why not what?

8          Q.    Why don't they hold documents?

9          A.    Because they're no longer part of these loans

10:53:31 10    or these trusts.

11         Q.    Okay.  Are you aware of the process of how

12    those documents went from TERI to another entity?

13         A.    Yes, ma'am.

14         Q.    What entity did they go to?

10:53:49 15    A.    For Mr. Kim's loans, they went to American

16    Education Services.

17         Q.    Do you know when?

18         A.    Right after disbursement.  I don't know the

19    exact dates.

10:53:59 20    Q.    So TERI holds them between the time of

21    signing through disbursement?

22         A.    Yes.

23         Q.    What else does TERI do during that time

24    between origination and disbursement?  Do you have any

10:54:22 25    knowledge?

Bradley Luke                                          May 16, 2017

Page 69

            1           A.   No, ma'am.

            2           Q.   How do you know at all about what they do?

            3           A.   From First Marblehead.

            4           Q.   Now, TERI went bankrupt in 2008; is that

10:54:39    5       true?

            6           A.   April of 2008, yes, ma'am.  They filed

            7       Chapter 11.

            8           Q.   And prior to that time, they were the

            9       guarantor of this loan; correct?

10:54:50   10           A.   Yes, ma'am.

           11           Q.   Can you tell me what a guarantor of an NCT

           12       loan does?

           13           A.   In the event a consumer defaults on the loan,

           14       fails to make payment, TERI would make payment on

10:55:03   15       behalf of the borrower for the full amount due and

           16       owing, principal and interest, and then thereafter

           17       take over ownership of that loan from the trust.

           18           Q.   Were any of these loans in default prior to

           19       2008?

10:55:16   20           A.   No, ma'am.

           21           Q.   So does a guaranty agreement still exist on

           22       any of these six loans?

           23           A.   The paper copy of the agreement exists, but

           24       it's no longer in effect based on TERI's filing of

10:55:33   25       bankruptcy.

Bradley Luke                                          May 16, 2017

                                                        Page 125

          1          A.   Yes.   It was verified by a TSI employee on

          2     April 12th.

          3          Q.   But AES is not servicing the loan anymore;

          4     right?

12:07:47  5          A.   Not any longer.

          6          Q.   Why are they printing it out April 11, 2016?

          7          A.   We printed it out, TSI.   Remember, we all

          8     have our logins.   We go into their system, and we are

          9     trained on their systems.   So we go into their system

12:08:02 10     and get this information to include the historical

         11     trail of what occurred on the loan.

         12          Q.   But nothing new is being created in the

         13     system; correct?

         14          A.   No, ma'am.

12:08:13 15          Q.   So why not?

         16          A.   Because AES isn't servicing the loan anymore.

         17          Q.   But you have a login to go get their stuff.

         18     Why wouldn't they just transfer the information to

         19     you?

12:08:24 20          A.   You'd have to ask them that.

         21          Q.   So you actually go in and get this?   AES

         22     doesn't produce this for you?

         23          A.   Yes, ma'am.

         24          Q.   But you are not an employee of AES?

12:08:31 25          A.   That's correct.

Bradley Luke                                                    May 16, 2017

                                                                  Page 141

              1          Q.   Okay.  I also want to -- you testified quite

              2     a bit about First Marblehead and calling them often

              3     and getting some information.  Have you been trained

              4     on their document-retention and -- their

13:25:50      5     document-retention policies?

              6          A.   No, ma'am.

              7          Q.   Have you been trained -- I think I asked

              8     this, but I'm just going to make sure that I have

              9     asked it.  Have you been trained on the

13:26:03     10     document-retention policies for Bank of America?

             11          A.   No, ma'am.

             12          Q.   Have you been trained on the

             13     document-retention policies for National Collegiate

             14     Funding, LLC?

13:26:12     15          A.   No, ma'am.

             16          Q.   Let's look at the last document here we

             17     didn't go over, dated December 8th, 2014.

             18          A.   Yes, ma'am.

             19          Q.   Can you tell me what that is?

13:27:14     20          A.   These are letters sent, one to Tony Kim and

             21     one to Il Kim by Patenaude & Felix concerning the

             22     loan.  This would be their initial demand letter.

             23          Q.   Does this demand letter include interest in

             24     the balance?

13:27:36     25          A.   Yes, ma'am.

Bradley Luke                                                May 16, 2017

Page 166

             1     SEC's website on the bottom.

             2          Q.   Do you have policies and procedures written

             3     that you can provide as to how documents should be

             4     supplied in an affidavit or in answers to discovery in

14:11:38     5     these various lawsuits?

             6          A.   Not in relation to discovery production.  We

             7     have documentation regarding how affidavits are

             8     assembled and documents attached thereto, but not in

             9     relation to discovery.

14:11:53    10          Q.   Would it be markedly different for discovery

            11     than it is for an affidavit to get a default judgment

            12     or otherwise?

            13          A.   Shouldn't be.

            14          Q.   Okay.  Can you supply those procedures?

14:12:06    15          A.   I can review with counsel.

            16          Q.   Because I think that goes back to the

            17     supplementation of the responses to request for

            18     production.  When we requested information about

            19     policies and procedures, we requested those documents.

14:12:23    20          A.   Okay.

            21          Q.   This document says, "Schedule 2."  Can you

            22     tell me what this is?  Appears to be blank.

            23          A.   Yeah.  For this one, the last loan referred

            24     to was -- had a Schedule 1 listing all the loans,

14:12:40    25     including the pool.  This document refers to it as a

Bradley Luke                                                    May 16, 2017

Page 290

     1                        S I G N A T U R E

     2

     3

     4

     5                    I declare under penalty of perjury

     6       under the laws of the State of Washington that I have

     7       read my within deposition, and the same is true and

     8       accurate, save and except for changes and/or

     9       corrections, if any, as indicated by me on the CHANGE

    10       SHEET flyleaf page hereof.  Signed in...............WA

    11       on the......day of................., 2017.

    12

    13

    14

    15                            ........................

    16                            BRADLEY LUKE

    17                            Taken: May 16, 2017

    18                            PEGGY FRITSCHY HAMILTON, RPR,

    19                            CSR, CLR

    20

    21

    22

    23

    24

    25

Bradley Luke                                                    May 16, 2017

                                                              Page 291

                            C E R T I F I C A T E

 1

 2      STATE OF WASHINGTON      )
                                 ) ss.
 3      COUNTY OF KING           )

 4

 5                     I, the undersigned Registered
        Professional Reporter and Washington Certified Court
 6      Reporter, hereby certify that the foregoing deposition
        upon oral examination of BRADLEY LUKE was taken before
        me on May 16, 2017 and transcribed under my direction;

 7                     That the witness was duly sworn by me
 8      pursuant to RCW 5.28.010 to testify truthfully; that
        the transcript of the deposition is a full, true, and
 9      correct transcript to the best of my ability; that I
        am neither attorney for, nor a relative or employee
10      of, any of the parties to the action or any attorney
        or counsel employed by the parties hereto, nor
11      financially interested in its outcome.
                       I further certify that in accordance
12      with CR 30(e), the witness was given the opportunity
        to examine, read, and sign the deposition, within 30
13      days, upon its completion and submission, unless
        waiver of signature was indicated in the record.

14

15                     IN WITNESS WHEREOF, I have hereunto set
        my hand and seal this date: June 1, 2017.

16

17

18

19      \S\ PEGGY FRITSCHY HAMILTON, RPR, CSR, CLR

20             Washington Certified Court Reporter No.

21      29906/No. 2704.   License expires 07-02-18.

22

23

24

25

EX. C

```
1              IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

2                   IN AND FOR THE COUNTY OF KING

3    _____

4    NATIONAL COLLEGIATE STUDENT LOAN         )

5    TRUST 2006-1, A DELAWARE                 )

6    STATUTORY TRUST,                         ) No. 18-2-08360-5 SEA

7         Plaintiff/Counterclaim Defendant,  )

8    v.                                       ) (Consolidated with

9    SHAUNA M. TACHIBANA,                     ) 18-2-08347-8 SEA)

10        Defendant/Counterclaim Plaintiff.   )

11   _____

12                    BENCH TRIAL, VOLUME V

13                      February 3, 2020

14            The Honorable Susan Amini Presiding

15   _____

16

17

18

19

20

21

22

23   Transcribed by:    Reed Jackson Watkins, LLC

24                      Court-Certified Transcription

25                      206.624.3005
```

```
 1                A P P E A R A N C E S

 2

 3

 4   On Behalf of Shauna Tachibana:

 5   R. BRUCE JOHNSTON

 6   NATHAN J. ARNOLD

 7   Cloutier Arnold Jacobowitz, PLLC

 8   2701 First Avenue, Suite 200

 9   Seattle, Washington 98121-1127

10

11   CHRISTINA LATTA HENRY

12   Henry & DeGraaff, P.S.

13   787 Maynard Avenue South

14   Seattle, Washington 98104-2987

15

16

17   On Behalf of National Student Loan Trusts:

18   BRYAN C. SHARTLE

19   Sessions Fishman Nathan & Israel

20   Metairie Office

21   Lakeway Two, Suite 200

22   Metairie, Louisiana 70002-7227

23

24

25
```

```
 1          A P P E A R A N C E S (Continued)

 2

 3   On Behalf of National Student Loan Trusts:

 4   EMILY J. HARRIS

 5   BENJAMIN CHARLES BYERS

 6   Corr Cronin LLP

 7   1001 Fourth Avenue, Suite 3900

 8   Seattle, Washington 98154-1051

 9

10   MATTHEW CHEUNG

11   Patenaude & Felix, A.P.C.

12   19401 40th Avenue West, Suite 280

13   Lynnwood, Washington 98036

14

15   On Behalf of U.S. Bank:

16   SHAWN LARSEN-BRIGHT

17   Dorsey & Whitney LLP

18   701 Fifth Avenue, Suite 6100

19   Seattle, Washington 98104

20

21   ALBERT J. ROTA

22   Jones Day

23   2727 North Harwood Street, Suite 500

24   Dallas, Texas 75201

25
```

1                I N D E X   O F   P R O C E E D I N G S

2

3    Introductions and preliminary matters...................... 680

4    Witness testimony.......................................... 693

5

6

7

8

9

10                E X A M I N A T I O N   I N D E X

11

12                                                              PAGE

13   SHAUNA MAGEE

14      Cross-Examination, Cont., by Ms. Harris................. 693

15      Redirect Examination by Mr. Arnold..................... 725

16      Recross Examination by Ms. Harris...................... 732

17   BRADLEY LUKE

18      Direct Examination Mr. Johnston........................ 734

19      Direct Examination, Cont., by Mr. Johnston............. 817

20      Recross Examination by Ms. Harris...................... 732

21

22

23

24

25

1                    E X H I B I T   I N D E X

2

3     NO.   DESCRIPTION                                      ADMITTED

4     1     Bradley Luke Deposition, 12/31/15, Amended........  742

5     125   List of Cases Filed in Washington.................  842

6     1005  Deposit and Sale Agreement........................  727

7     1038  AES File/Request for Verification of Creditor

8              7/28/2006......................................  708

9     1044  AES/Monthly Debit Statements......................  1044

10    1062  Tachibana correspondence with IRS, 3/10/2008......  716

11    1067  Kauai Government Employees Federal Credit Union

12             subpoena response documents 12/27/2019..........  725

13

14

15

16

17

18

19

20

21

22

23

24

25

CROSS BY HARRIS/S. MAGEE

1    BRADLEY LUKE,                    Witness herein, having first been

2                                     duly sworn on oath, was examined

3                                     and testified as follows:

4

5                    D I R E C T   E X A M I N A T I O N

6    BY MR. JOHNSTON:

7    Q.   Good morning, Mr. Luke.

8    A.   Good morning.

9    Q.   Would you tell the Court your full name and spell the last

10        name for the reporter of the record, please?

11   A.   Bradley Luke, L-U-K-E.

12   Q.   And, Mr. Luke, by whom are you currently employed?

13   A.   Transworld Systems, Incorporated.

14   Q.   And I believe we established that at least since 2012 or so

15        you have not been employed by anyone other than NCO and

16        Transworld Systems; is that correct?

17   A.   That is correct.

18   Q.   And we first met at your deposition; isn't that correct?

19   A.   Yes, sir.

20   Q.   And that was in October, I believe, of 2019.

21   A.   Sounds correct.

22   Q.   And have you had an opportunity to review the transcript of

23        your deposition?

24   A.   I have.

25   Q.   And you recall that in that deposition after I asked you

CROSS BY HARRIS/S. MAGEE

1        believe is the entirety of Binder No. 3 of the counterclaim
2        defendants (inaudible).
3    A.  Binder No. 3 and pulls into No. 4?
4    Q.  That's correct.  Thank you.  And the Exhibit 146, that's the
5        fullness of the 745 pages that were produced at the
6        deposition; is that correct?
7    A.  Exhibit 1046, yes, sir.
8    Q.  Now, would you tell us how it was -- are you the person that
9        either arranged for the production or produced those
10       documents?
11   A.  I arranged for the production.
12   Q.  And would you tell the Court how you did that?
13   A.  I made a request to an employee of American Education
14       Services to go through the notes and print them out.
15   Q.  And as I recall, you had access yourself to those documents
16       at the AES computer system; is that right?
17   A.  That is correct.
18   Q.  And have you had access to those documents since at least
19       the beginning of 2018?
20   A.  Yes, sir.
21   Q.  And did you know that that type of document existed at least
22       as early as January or February of 2018?
23   A.  Yes, sir.
24   Q.  Now, Mr. Luke, we went through -- and I'd like you to look
25       at a couple of exhibits very briefly.  If you look in the

CROSS BY HARRIS/S. MAGEE

1   A.   Not in the regular course of business.

2   Q.   There might be an exception, but those are the principal

3        people?

4   A.   Yes, sir.

5   Q.   Okay.  Now, do you have an understanding as to what

6        authority you have -- let me back up.

7        Have you also testified in depositions in cases which were

8        collection actions involving the NCSLT trusts?

9   A.   Yes, sir, I have.

10  Q.   Several times, correct?

11  A.   Several times, yes, sir.

12  Q.   And have you ever testified in a trial in a case where the

13       NCSLT trusts were a party?

14  A.   Yes, sir, I have.

15  Q.   And have you testified in deposition where NCSLT trusts were

16       a party but TSI was not a party?

17  A.   Yes, sir.

18  Q.   And have you testified in trials where the NCSLT trusts were

19       a party but TSI was not a party?

20  A.   Yes, sir.

21  Q.   And did you have any understanding, however formal or

22       informal, of what gave you authority to be testifying in a

23       case involving the NCSLT trusts?

24  A.   Yes, sir.

25  Q.   And what is that understanding?

CROSS BY HARRIS/S. MAGEE

1    A.    Our contract, the default prevention collection services

2          agreement.

3    Q.    And are there any other documents that you understand give

4          you that authority?

5    A.    The authority is contained within that agreement.  There's

6          other agreements that, I guess, succeed or precede the

7          agreement, namely the special servicing agreement.

8    Q.    And what about the master servicing agreement, does that

9          involve you in any way, that is TSI in any way?

10   A.    The master servicing agreement, not to my recollection.

11   Q.    Have you ever seen a document that's commonly referred to as

12         the master servicing agreement as it relates to the NCSLT

13         trusts?

14   A.    I have.

15   Q.    And what do you understand that document does?

16   A.    That lays out certain duties of the original servicer,

17         American Education Services, the duties that they perform on

18         behalf of the trust pertaining to the loans that are either

19         in repayment, current or deferment prior to default.

20   Q.    And American Education Services sometimes referred to as

21         PHEAA/AES; is that right?

22   A.    Yes.

23   Q.    What is the PHEAA stand for?

24   A.    Pennsylvania Higher Education --

25   Q.    I asked you because I can't remember.

CROSS BY HARRIS/S. MAGEE

1  A.   Assistance Agency maybe.

2  Q.   Okay.  And what is your understanding -- strike that.

3       And the information that is in 1046 that you testified to

4       earlier, that came from AES as you called it; is that

5       correct?

6  A.   Yes, that came from their internal system.

7  Q.   And what is your understanding of what AES does in regard to

8       these loans?

9  A.   So they manage the day-to-day interaction with consumers and

10      billing of loans prior to their default.  They begin

11      servicing a loan at time of origination and they manage and

12      arrange for any deferments, forbearances, send out monthly

13      billing statements, accept payments, any correspondence with

14      the consumer.  Basically all interaction on the loan prior

15      to its delinquency and ultimate default.

16 Q.   And the nature of the communications by AES with an alleged

17      borrower would be the type of thing we see in 1046; is that

18      correct?

19 A.   So 1046 is the electronic memorialization of those.  So it

20      would be typed out if there was a call.  There would be a

21      typed memorialization of what occurred on that call.

22      Likewise if a letter is sent out, there's a notation in the

23      system indicating that a letter went out, what type of

24      letter, when it went out.

25 Q.   And let me ask you this:  Did you review the documents or

CROSS BY HARRIS/S. MAGEE

1        any of them in 1046 at any time before you began to arrange

2        for their production in this case?

3  A.   I believe so.

4  Q.   And when and on what -- for what purpose did you do that?

5  A.   Typically, any time we get a counterclaim it's part of my

6        process to go through the account, read the notes,

7        familiarize myself with the history of the loans.

8  Q.   So am I clear that until the counterclaim was brought to

9        your attention, you had not looked at these notes in

10      connection with this account?

11  A.   Not that I recall.

12  Q.   Now, when you testified in depositions in these cases

13      involving NCSLT or in trials involving NCSLT, who are you

14      acting for?  Are you acting for TSI or NCSLT or someone

15      else?

16  A.   It's on behalf of NCSLT in my capacity as a special

17      sub-servicer.

18  Q.   As your capacity as an employee of the special sub-servicer;

19      is that correct?

20  A.   Correct.

21  Q.   Now, in connection with your work as an employee of the

22      special sub-servicer, right, TSI?

23  A.   That is correct.

24  Q.   Have you had occasion to have contacts with anyone from

25      the -- is it the special servicer, is that how you referred

DIRECT BY JOHNSTON/LUKE

1    misunderstood my -- yeah.

2        MR. ROTA:  I think my confusion just was whether as

3    to Exhibits 8, 10, and 27, whether you had moved under

4    803(a) and the associated statute previously or not.  I

5    think that was my misunderstanding.

6        MR. JOHNSTON:  Well, we had previously.  I mean,

7    we --

8        MR. ROTA:  Okay.  And we objected and it's all set.

9    We're not asking for any new rulings.

10       MR. JOHNSTON:  Okay.  Thank you.

11       THE CLERK:  So this exhibit is supplemented?

12       THE COURT:  Supplemented, yeah.  Added, added to

13   those numbers, yeah.

14       MR. JOHNSTON:  Okay.  And thank you for allowing that

15   administrative interruption, Your Honor.  And I'm

16    prepared to proceed now with Mr. Luke.

17        THE COURT:  All right.  So, yes.  The witness, please

18    come back to the stand.  You remain under oath as

19    before.

20

21       BRADLEY LUKE:       Witness herein, having previously

22                           been duly sworn on oath, was examined

23                           and testified as follows:

24   //

25   //

DIRECT BY JOHNSTON/LUKE

1       by AES -- or serviced by AES?

2   A.  I'm aware that an audit was begun, had begun of AES.

3   Q.  And do you know why it stopped?

4   A.  I do not.

5   Q.  Do you know whether or not there was ever an audit of

6       TSI and its performance dealing with NCSLT?

7   A.  Not that I'm aware of.

8   Q.  And are you aware of whether or not TSI ever sought an

9       audit of AES in terms of the chain of title and other

10      documents they may or may not possess?

11  A.  They did not to my knowledge.

12  Q.  Okay.  Now, you're familiar with what has been called

13      in a number of cases "Schedule 1" to the Pool

14      Supplement agreements?

15  A.  It depends on the Pool Supplement.  It could be either

16      Schedule 1 or 2.

17  Q.  Or 2.  The earlier ones were 2 and the later ones were

18      1; am I correct about that?

19  A.  It depends on time and bank and program.

20  Q.  Okay.  And are you aware that it was and has been

21      asserted in a number of cases that those schedules do

22      not exist?

23  A.  I'm aware of the allegation.

24  Q.  And have you ever seen an original Schedule 1 to -- or

25      Schedule 2 -- to the Pool Supplement agreements of

DIRECT BY JOHNSTON/LUKE

1      NCSLT?

2  A.  I have.

3  Q.  And where did you see that and when?

4  A.  They're currently housed on TSI servers, as custodian,

5      and they were received by First Marblehead

6      Corporation.

7  Q.  And have you ever produced an actual copy of the

8      original Schedule 1 in a case?

9  A.  Yes.

10 Q.  Which case?

11 A.  Names escape me at the moment.

12 Q.  Have you produced any of the original Schedule 1s in

13     this case?

14 A.  I can't recall with certainty.

15 Q.  Did you produce any document, because I haven't seen

16     one, that says it's a Schedule 1?

17 A.  I know we produced the redacted excerpt of that

18     schedule, but I'm not sure if we produced it in its

19     entirety or not.

20 Q.  Well, when you say "redacted excerpt," is that the

21     thing attached to -- the document attached to one of

22     your declarations that looks like a print from an Excel

23     spreadsheet?

24 A.  Yes, sir.

25 Q.  And isn't it, in fact, that document attached, an

DIRECT BY JOHNSTON/LUKE

1            excerpt of an Excel spreadsheet?

2    A.   It is.

3    Q.   And the original Schedule 1 was not an Excel

4            spreadsheet, was it?

5    A.   To my knowledge it was.

6    Q.   And have -- did you ever provide to the CFPB a copy of

7            a Schedule 1 to a Pool Supplement agreement?

8    A.   As I stated before, I don't recall what else was

9            provided.  So I can't state with certainty as I sit

10           here right now whether that was or not.

11   Q.   Are you aware of whether or not -- strike that.

12           And whose possession was the Schedule 1 in according

13           to your understanding?

14   A.   At what point in time?

15   Q.   At -- let's say at the beginning when it was first

16           delivered and created.

17   A.   First Marblehead Corporation.

18   Q.   And were you -- do you have any personal knowledge of

19           that?

20   A.   I've been trained by First Marblehead.

21   Q.   That wasn't my question.  Did you --

22           MR. SHARTLE:  Objection, Your Honor.  Let the witness

23           answer.

24           MR. JOHNSTON:  I asked him about personal knowledge.

25   Q.   (By Mr. Johnston)  Were you --

DIRECT BY JOHNSTON/LUKE

1      MR. SHARTLE:  And he was starting to explain the

2    basis of his --

3      MR. JOHNSTON:  I'll withdraw the question.

4      MR. SHARTLE:  -- personal knowledge.

5      MR. JOHNSTON:  I'll lay a foundation.

6  Q.  (By Mr. Johnston)  Were you present --

7      THE COURT:  All right.

8  Q.  (By Mr. Johnston)  -- and working --

9      THE COURT:  Yeah, go ahead.

10  Q.  (By Mr. Johnston)  -- for First Marblehead or any other

11    related entity to the NCSLT at the time those Pool

12    Supplements were submitted?

13  A.  I was not.

14  Q.  And the last one of those was created no later than

15    2007; is that correct?

16  A.  That is correct.

17  Q.  And I think you said you started with NCO in 2010?

18  A.  Correct.

19  Q.  Some three years later, correct?

20  A.  Roughly.

21  Q.  And have you ever obtained any sworn testimony from

22    someone who knows that that Schedule 1 was actually

23    attached to those documents at the time it was

24    delivered to First Marblehead?

25  A.  I don't believe I've received sworn testimony from

DIRECT BY JOHNSTON/LUKE

1      anyone specifically in that regard.

2  Q.  All right.  All right.  And are you aware of anyone who

3      has testified in any case who did have personal

4      knowledge of that?

5  A.  Maybe outside of myself and other TSI employees --

6  Q.  Well, you didn't have personal knowledge, so I'm asking

7      are you aware --

8      MR. SHARTLE:  Objection, Your Honor.  Calls for a

9      legal conclusion.

10  Q.  (By Mr. Johnston)  Are you aware --

11      THE COURT:  Well --

12      MR. JOHNSTON:  I'm sorry, Your Honor.

13      THE COURT:  I'm sorry.  What was --

14      MR. SHARTLE:  Well, he said, "You didn't have

15      personal knowledge," and so, I mean, I think that calls

16      for a legal conclusion.  It's really testimony and --

17      THE COURT:  It's based --

18      MR. SHARTLE:  -- so I object to the form, Your Honor.

19      THE COURT:  It's based on -- yes.  It's -- all

20      right.

21      MR. SHARTLE:  Mischaracterization of --

22      MR. JOHNSTON:  He had already testified that --

23      THE COURT:  All right.

24      MR. JOHNSTON:  -- he wasn't there.  He couldn't have

25      firsthand knowledge.

DIRECT BY JOHNSTON/LUKE

1    MR. SHARTLE:  That doesn't mean he doesn't have --

2    THE COURT:  And I --

3    MR. SHARTLE:  -- personal knowledge.

4    THE COURT:  I understood -- I understood that, but

5    you can rephrase it, yes.

6    MR. JOHNSTON:  Okay.

7  Q.  (By Mr. Johnston)  Are you aware of any person who had

8    actual personal knowledge, who was there at the signing

9    or there at the delivery, that can say that that

10    Schedule 1, that you later thought was Schedule 1,

11    anyone who had personal knowledge of that at that time?

12    MR. SHARTLE:  Object to form.

13    THE WITNESS:  Like I stated --

14    THE COURT:  Overruled.

15    THE WITNESS:  -- I believe -- I'm sorry, Your Honor.

16    THE COURT:  I'm sorry.  Overruled as to form.  I

17    think you can answer that.  It's been given to you

18    several times.

19    THE WITNESS:  As I stated, I believe I do have

20    personal knowledge based on my training.

21  Q.  (By Mr. Johnston)  I didn't -- I'm not asking about

22    your training.  I'm asking about do you know of the

23    existence of any individual who was there who had

24    eyes-on personal knowledge that that Schedule 1 was

25    attached when the document was delivered?

DIRECT BY JOHNSTON/LUKE

1      MR. SHARTLE:  Objection again.  This calls for a
2      legal conclusion.  He keeps using legal term of arts
3      like "personal knowledge."  And he cut the witness off
4      as the witness was trying to explain the basis of his
5      knowledge.
6      THE COURT:  The question was not to Mr. Luke's
7      knowledge.
8      MR. SHARTLE:  I understand.
9      THE COURT:  So as to that, it was nonresponsive.  The
10     question is for Mr. Luke as to any other person.
11     And as to that, I'm going to allow you to ask one
12     more time.
13     And, Mr. Luke, please pay attention and answer the
14     question, all right?
15     THE WITNESS:  I understand, Your Honor.
16     THE COURT:  All right.
17  Q.  (By Mr. Johnston)  My question is:  Do you have -- can
18      you identify any person who was present that has actual
19      eyes-on personal knowledge that the Schedule 1 was
20      attached to the Pool agreements at the time they were
21      delivered initially?
22  A.  I can't identify a person who was there at the time
23      that the Schedule 1 was delivered.
24  Q.  And you did not then and have never worked for Bank of
25      America; is that correct?

DIRECT BY JOHNSTON/LUKE

```
 1   A.   That is correct.
 2   Q.   And you don't -- you didn't then and have never worked
 3        for the entity called TERI, I believe it's The
 4        Educational Resource Institute; is that correct?
 5   A.   I have never worked for TERI.
 6   Q.   And you didn't then and haven't since worked for First
 7        Marblehead Corporation; is that right?
 8   A.   That is correct.
 9   Q.   And you gave me the name of the transferee, it was
10        another First Marblehead entity I think, in the
11        deposition.  First Marblehead something.  Do you know
12        the entity that was the actual intermediate recipient
13        before the trusts of those documents?
14   A.   I believe you're referring to National Collegiate
15        Funding, LLC.
16   Q.   Okay.  Wasn't there an entity before them?
17   A.   Bank of America.
18   Q.   Okay.  So Bank of America to National Collegiate
19        Funding.  And was National Collegiate Funding, as you
20        understood it, a subsidiary of First Marblehead?
21   A.   Yes, sir.
22   Q.   And then the documents were transferred to the
23        individual trusts by First Marblehead -- or National
24        Collegiate Funding; is that right?
25   A.   The loans?
```

1          Whether or not they get to that part -- I haven't

2     heard any testimony yet.  Whether or not they get to

3     that part, we'll know.  I don't know that yet.

4          MR. SHARTLE:  Thank you, Your Honor.

5          THE COURT:  But I'm not limiting them at this point

6     if they can get to that.  I haven't heard the testimony

7     yet.

8          MR. JOHNSTON:  Thank you, Your Honor.  I've passed my

9     time.

10         THE COURT:  All right.  We are adjourned.  You may

11    step down.  We are adjourned on this matter.

12         THE CLERK:  All rise.

13    (February 3, 2020, Bench Trial proceedings concluded)

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        C E R T I F I C A T E

2

3      STATE OF WASHINGTON        )

4                                 ) ss

5      COUNTY OF KING             )

6

7                I, the undersigned, do hereby certify under

8          penalty of perjury that the foregoing court proceedings

9          were transcribed under my direction as a certified

10         transcriptionist; and that the transcript is true and

11         accurate to the best of my knowledge and ability,

12         including any changes made by the trial judge reviewing

13         the transcript; that I received the audio and/or video

14         files in the court format; that I am not a relative or

15         employee of any attorney or counsel employed by the

16         parties hereto, nor financially interested in its

17         outcome.

18

19

20               In WITNESS WHEREOF, I have hereunto set my

21         hand this 29th day of February, 2020.

22                 Bonnie Reed

23         ____              ____

24         Bonnie Reed, CET

25
```

EX. D

Washington Secretary of State, Kim Wyman

Contact Us | Connect:



# Washington State Archives - Digital Archives

| Home | Search | Collections | News | Services | About us | My Recent Searches | | View Cart 🛒 |

## Search

All branches of the Washington State Archives are now open to researchers by appointment only. For more information, please **visit our page regarding the closure**

**Record Series**
Superior Court Records
**County**
Snohomish
**Title**
Snohomish County Superior Court Cas

Enter at least one search field, then click the 'Search' button in the lower right.

┌─ **Case Number or Keywords** ─────────────
**Case Number** (with dashes: ##-#-######-#)
`15-2-03144-7`
**Keywords**

**Don't Know your case number?**
You can search for a case number by a person or business name at **Washington State Courts**
└───────────────────────────────────────

┌─ **Case Year** ──────────────
**Year From**   **Year To**
└──────────────────────────

Search

| | Order ☐ | Case Number | Date Y/M/D | Docket Code | Description | Case Title | Case Sub | County | Image Exists |
|---|---|---|---|---|---|---|---|---|---|
| | ☐ | 15-2-03144-7 | 2015/03/31 | CICS | CASE INFORMATION COVER SHEET | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 1 | Snohomish | 📄 |
| | ☐ | 15-2-03144-7 | 2015/03/31 | SMCMP | SUMMONS & COMPLAINT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 2 | Snohomish | 📄 |
| | ☐ | 15-2-03144-7 | 2015/04/02 | AFSR | AFFIDAVIT/DCLR/CERT OF SERVICE | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 3 | Snohomish | 📄 |
| | ☐ | 15-2-03144-7 | 2015/04/02 | MTDFL | MOTION FOR DEFAULT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 4 | Snohomish | 📄 |
| | ☐ | 15-2-03144-7 | 2015/04/02 | DFJG | DEFAULT JUDGMENT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 5 | Snohomish | 📄 |
| | ☐ | 15-2-03144-7 | 2015/04/02 | CB | COST BILL | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 6 | Snohomish | 📄 |
| | ☐ | 15-2-03144-7 | 2015/05/26 | AFGAR | AFFIDAVIT FOR GARNISHMENT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 7 | Snohomish | 📄 |

Add To Cart

Page 1 of 1, Records 1-47 of 47      Jump To Page: 1 ▾      Records Per Page: 50 ▾      Search Time 1.83 seconds

| Order ☐ | Case Number | Date Y/M/D | Docket Code | Description | Case Title | Case Sub | County | Image Exists |
|---|---|---|---|---|---|---|---|---|
| ☐ | 15-2-03144-7 | 2015/06/22 | ANW | ANSWER TO WRIT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 8 | Snohomish | |
| ☐ | 15-2-03144-7 | 2015/07/27 | DCLRM | DECLARATION OF MAILING | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 9 | Snohomish | |
| ☐ | 15-2-03144-7 | 2015/07/27 | MTAF | MOTION AND AFFIDAVIT/DECLARATION | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 10 | Snohomish | |
| ☐ | 15-2-03144-7 | 2015/07/27 | JDOAGD | JDGMT ON ANSWER OF GARN DEF | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 11 | Snohomish | |
| ☐ | 15-2-03144-7 | 2015/09/09 | AFGAR | AFFIDAVIT FOR GARNISHMENT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 12 | Snohomish | |
| ☐ | 15-2-03144-7 | 2015/09/25 | EXMPCL | EXEMPTION CLAIM | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 13 | Snohomish | |
| ☐ | 15-2-03144-7 | 2015/09/25 | ANAFDF | ANSWER & AFFIRMATIVE DEFENSES | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 14 | Snohomish | |
| ☐ | 15-2-03144-7 | 2015/10/13 | AFGAR | AFFIDAVIT FOR GARNISHMENT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 15 | Snohomish | |
| ☐ | 15-2-03144-7 | 2015/10/28 | NTAPR | NOTICE OF APPEARANCE | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 16 | Snohomish | |
| ☐ | 15-2-03144-7 | 2015/10/28 | MTSC | MOTION FOR ORDER TO SHOW CAUSE | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 17 | Snohomish | |
| ☐ | 15-2-03144-7 | 2015/10/28 | DCLR | DECLARATION OF DARIA KIM | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 18 | Snohomish | |
| ☐ | 15-2-03144-7 | 2015/10/28 | DCLR | DECLARATION OF TONY KIM | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 19 | Snohomish | |
| ☐ | 15-2-03144-7 | 2015/10/28 | DCLR | DECLARATION OF CHRISTINA L HENRY | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 20 | Snohomish | |

Add To Cart

Page 1 of 1, Records 1-47 of 47     Jump To Page: 1 ▾     Records Per Page: 50 ▾     Search Time 1.83 seconds

| Order ☐ | Case Number | Date Y/M/D | Docket Code | Description | Case Title | Case Sub | County | Image Exists |
|---|---|---|---|---|---|---|---|---|
| ☐ | 15-2-03144-7 | 2015/10/28 | NTC | NOTE FOR CALENDAR | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 21 | Snohomish | 🖼 |
| ☐ | 15-2-03144-7 | 2015/11/03 | DCLR | DECLARATION OF MARCO RUISLA | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 22 | Snohomish | 🖼 |
| ☐ | 15-2-03144-7 | 2015/11/03 | DCLR | DECLARATION OF MATTHEW CHEUNG | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 23 | Snohomish | 🖼 |
| ☐ | 15-2-03144-7 | 2015/11/03 | OB | OPPOSITION TO DFDT'S MOTION TO | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 24 | Snohomish | 🖼 |
| ☐ | 15-2-03144-7 | 2015/11/04 | NTC | NOTE FOR CALENDAR | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 25 | Snohomish | 🖼 |
| ☐ | 15-2-03144-7 | 2015/11/12 | ORTSC | ORDER TO SHOW CAUSE | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 26 | Snohomish | 🖼 |
| ☐ | 15-2-03144-7 | 2015/11/19 | NTC | NOTE FOR CALENDAR | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 27 | Snohomish | 🖼 |
| ☐ | 15-2-03144-7 | 2015/11/19 | ORTSC | ORDER TO SHOW CAUSE - 2ND | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 28 | Snohomish | 🖼 |
| ☐ | 15-2-03144-7 | 2015/11/30 | RPY | REPLY IN SUPPORT OF MOTION | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 29 | Snohomish | 🖼 |
| ☐ | 15-2-03144-7 | 2015/12/01 | VOID | VOID-SUB NUMBER VOIDED | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 30 | Snohomish | N / A |
| ☐ | 15-2-03144-7 | 2015/12/01 | MTHRG | MOTION HEARING | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 31 | Snohomish | 🖼 |
| ☐ | 15-2-03144-7 | 2015/12/01 | ORVCJG | ORDER VACATING DEFAULT JUDGMENT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 32 | Snohomish | 🖼 |
| ☐ | 15-2-03144-7 | 2015/12/17 | AN | ANSWER | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 33 | Snohomish | 🖼 |

Add To Cart

Page 1 of 1, Records 1-47 of 47     Jump To Page: 1 ▾     Records Per Page: 50 ▾     Search Time 1.83 seconds

| Order | Case Number | Date Y/M/D | Docket Code | Description | Case Title | Case Sub | County | Image Exists |
|---|---|---|---|---|---|---|---|---|
| ☐ | 15-2-03144-7 | 2018/04/25 | CMDWP | Clerks Notice for Dismissal for Want of Prosecution | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03144-7 34 | Snohomish | |
| ☐ | 15-2-03144-7 | 2018/07/10 | CLOD | Clerks Order of Dismissal | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL ***DISMISSED*** | 15-2-03144-7 35 | Snohomish | |
| ☐ | 15-2-03144-7 | 2018/08/06 | LTR | Letter | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL ***DISMISSED*** | 15-2-03144-7 36 | Snohomish | |
| ☐ | 15-2-03144-7 | 2018/08/06 | LTR | Letter | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL ***DISMISSED*** | 15-2-03144-7 37 | Snohomish | |
| ☐ | 15-2-03144-7 | 2018/08/17 | MT | Motion | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL ***DISMISSED*** | 15-2-03144-7 38 | Snohomish | |
| ☐ | 15-2-03144-7 | 2018/08/17 | DCLR | Declaration Affidavit | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL ***DISMISSED*** | 15-2-03144-7 39 | Snohomish | |
| ☐ | 15-2-03144-7 | 2018/08/17 | NTC | Note for Calendar | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL ***DISMISSED*** | 15-2-03144-7 40 | Snohomish | |
| ☐ | 15-2-03144-7 | 2018/08/24 | RTS | Return of Service | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL ***DISMISSED*** | 15-2-03144-7 41 | Snohomish | |
| ☐ | 15-2-03144-7 | 2018/08/24 | MTHRG | Motion Hearing | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL ***DISMISSED*** | 15-2-03144-7 42 | Snohomish | |
| ☐ | 15-2-03144-7 | 2018/08/24 | MT | Motion | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL ***DISMISSED*** | 15-2-03144-7 43 | Snohomish | |
| ☐ | 15-2-03144-7 | 2018/08/24 | DCLR | Declaration Affidavit | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL ***DISMISSED*** | 15-2-03144-7 44 | Snohomish | |

Add To Cart

Page 1 of 1, Records 1-47 of 47　　　Jump To Page:　1 ▾　　　Records Per Page:　50 ▾　　　Search Time 1.83 seconds

| Order ☐ | Case Number | Date Y/M/D | Docket Code | Description | Case Title | Case Sub | County | Image Exists |
|---|---|---|---|---|---|---|---|---|
| ☐ | 15-2-03144-7 | 2018/08/24 | NTC | Note for Calendar | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL ***DISMISSED*** | 15-2-03144-7 45 | Snohomish |  |
| ☐ | 15-2-03144-7 | 2018/09/06 | MTHRG | Motion Hearing | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL ***DISMISSED*** | 15-2-03144-7 46 | Snohomish | |
| ☐ | 15-2-03144-7 | 2018/09/06 | ORDF | Order to Disburse Funds | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL ***DISMISSED*** | 15-2-03144-7 47 | Snohomish | |

Add To Cart

Page 1 of 1, Records 1-47 of 47          Jump To Page: 1 ⌄     Records Per Page: 50 ⌄                    Search Time 1.83 seconds

Washington Secretary of State
Washington State Archives
Digital Archives
960 Washington Street
Cheney, WA 99004
(509) 235-7500
Phone Numbers

Privacy Policy
Accessibility

EX. D-1

FILED

2015 APR -2 PM 2:08

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH



CL17181178

## IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## FOR SNOHOMISH COUNTY

| | |
|---|---|
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2, A DELAWARE STATUTORY TRUST<br><br>Plaintiff,<br><br>vs.<br><br>TONY KIM and DARIA KIM,<br><br>Defendants. | Case No.: **15  2  03144  7**<br><br>**MOTION & DECLARATION FOR DEFAULT AND JUDGMENT** |

### I. MOTION

The plaintiff, by and through its attorneys, Patenaude & Felix, A.P.C., respectfully moves the Court for an Order of Default and Judgment against the defendant, TONY KIM and DARIA KIM, in the principal sum of $6,894.97, together with costs, as requested in the judgment.

This Motion is based on the affidavits or declarations in support of entry of judgment submitted herewith and the subjoined declaration of counsel.

### II. DECLARATION

The undersigned declares under penalty of perjury under the laws of the State of Washington that the following is true and correct:

1.    I am the attorney of record for the plaintiff herein. I base this declaration on my review of the file maintained by this law firm with regard to this matter.

/ / /

-1-

**MOTION & DECLARATION FOR DEFAULT JUDGMENT**

ORIGINAL

**PATENAUDE & FELIX, A.P.C.**
19401 40th Avenue West, Suite 280, Lynnwood, WA 98036
Tel: (425) 361-1662  Toll Free: (800) 832-7675

WA_90 Mtn and Dec DJ

P&F File No. 14-51604

4

2.      That on 1/23/2015, in Snohomish County, Washington, the defendant, TONY KIM and DARIA KIM, was served with a Summons and Complaint in the above referenced action. The Affidavit of such service is filed herein. More than 20 days have elapsed since the date of service.

3.      The defendants have failed to serve an appearance/answer or otherwise defend, in accordance with CR55 within the time permitted by law.

4.      Venue is appropriate under R.C.W. 4.28, because Snohomish County is the county in which the defendant resides.

5.      The defendant is not a person in the Military Service of the United States, as defined in the Soldier's and Sailor's Civil Relief Act of 1940 as amended by the The Service member's Civil Relief Act of 2003. The declarant's staff has checked the U.S. Department of Defense Manpower Date Center, and the report provided and attached states that the Department of Defense does not possess any information indicating the defendant is on Military Duty. Attached as an addendum is the information that the above statement if based upon. The declarant is unable to determine whether the defendant is a dependent of a service member.

I declare under penalty of perjury of the laws of the State of Washington that the foregoing is true and correct.

DATED: March 17, 2015, at Lynnwood, WA.

Presented by:

**PATENAUDE & FELIX, A.P.C.**

MATTHEW CHEUNG, WSBA #43067
Attorney for Plaintiff
Patenaude & Felix, A.P.C.
19401 40th Avenue West, Suite 280
Lynnwood, WA 98036
(425) 361-1662

-2-
**MOTION & DECLARATION FOR DEFAULT JUDGMENT**

PATENAUDE & FELIX, A.P.C.
19401 40th Avenue West, Suite 280, Lynnwood, WA 98036
Tel: (425) 361-1662  Toll Free: (800) 832-7675

WA_90 Mtn and Dec DJ                              P&F File No. 14-51604

Department of Defense Manpower Data Center

Results as of : Mar-16-2015 05 02:34 PM

SCRA 3.0



**Status Report**
**Pursuant to Servicemembers Civil Relief Act**

Last Name: KIM
First Name: TONY
Middle Name:
Active Duty Status As Of: Mar-16-2015

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

*Mary M. Snavely-Dixon*

Mary M. Snavely-Dixon, Director
Department of Defense - Manpower Data Center
4800 Mark Center Drive, Suite 04E25
Arlington, VA 22350

Department of Defense Manpower Data Center

Results as of : Mar-16-2015 05:00:20 PM

SCRA 3.0



**Status Report**
**Pursuant to Servicemembers Civil Relief Act**

Last Name: <u>KIM</u>
First Name: <u>DARIA</u>
Middle Name:
Active Duty Status As Of: <u>Mar-16-2015</u>

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

*Mary M. Snavely-Dixon*

Mary M. Snavely-Dixon, Director
Department of Defense - Manpower Data Center
4800 Mark Center Drive, Suite 04E25
Arlington, VA 22350

EX. D-2

14-51604 NT

NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2005-2
A Delaware Statutory Trust(s)                  )
                                               )
                                               )
Plaintiff                                      )        Docket #
                                               )
v.                                             )
                                               )
TONY KIM                                       )
DARIA KIM                                      )
                                               )
Defendant(s)                                   )


## AFFIDAVIT AND VERIFICATION OF ACCOUNT

STATE OF GEORGIA                    )
                                    )
COUNTY OF  GWINNETT                 )

BEFORE ME, the undersigned authority, personally appeared Affiant _____Dudley Turner_____,
who being first duly sworn, deposes and states:

1.      I am employed by Transworld Systems Inc. (hereinafter TSI), the designated
Custodian of Records for Plaintiff pertaining to the Defendants' education loan(s) forming the
subject matter of the above-captioned Complaint.  I am duly authorized by Plaintiff to make the
representations contained in this Affidavit and I am over the age of 18 and competent to testify to
the matters stated in this Affidavit.

2.      I am competent and authorized to testify relating to this action through personal
knowledge of the business records, including the electronic data, sent to TSI that detail the
education loan records.  I also have personal knowledge of the record management practices and

EX. E

Washington Secretary of State, Kim Wyman

Contact Us | Connect:



# Washington State Archives - Digital Archives

| Home | Search | Collections | News | Services | About us | My Recent Searches | | View Cart 🛒 |

## Search

All branches of the Washington State Archives are now open to researchers by appointment only. For more information, please **visit our page regarding the closure**

**Record Series**
Superior Court Records ⌄
**County**
Snohomish ⌄
**Title**
Snohomish County Superior Court Cas ⌄

Enter at least one search field, then click the 'Search' button in the lower right.

**Case Number or Keywords**
Case Number (with dashes: ##-#-######-#)
15-2-03146-3
Keywords

**Don't Know your case number?**
You can search for a case number by a person or business name at **Washington State Courts**

**Case Year**
Year From   Year To

[Search]

| Order ☐ | Case Number | Date Y/M/D | Docket Code | Description | Case Title | Case Sub | County | Image Exists |
|---|---|---|---|---|---|---|---|---|
| ☐ | 15-2-03146-3 | 2015/03/31 | CICS | CASE INFORMATION COVER SHEET | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 1 | Snohomish | 📄 |
| ☐ | 15-2-03146-3 | 2015/03/31 | SMCMP | SUMMONS & COMPLAINT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 2 | Snohomish | 📄 |
| ☐ | 15-2-03146-3 | 2015/04/02 | AFSR | AFFIDAVIT/DCLR/CERT OF SERVICE | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 3 | Snohomish | 📄 |
| ☐ | 15-2-03146-3 | 2015/04/02 | MTDFL | MOTION FOR DEFAULT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 4 | Snohomish | 📄 |
| ☐ | 15-2-03146-3 | 2015/04/02 | DFJG | DEFAULT JUDGMENT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 5 | Snohomish | 📄 |
| ☐ | 15-2-03146-3 | 2015/04/02 | CB | COST BILL | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 6 | Snohomish | 📄 |
| ☐ | 15-2-03146-3 | 2015/05/26 | AFGAR | AFFIDAVIT FOR GARNISHMENT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 7 | Snohomish | 📄 |

[Add To Cart]

Page 1 of 1, Records 1-27 of 27    Jump To Page: 1 ⌄    Records Per Page: 50 ⌄    Search Time 2.08 seconds

| Order ☐ | Case Number | Date Y/M/D | Docket Code | Description | Case Title | Case Sub | County | Image Exists |
|---|---|---|---|---|---|---|---|---|
| ☐ | 15-2-03146-3 | 2015/06/19 | ANW | ANSWER TO WRIT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 8 | Snohomish | |
| ☐ | 15-2-03146-3 | 2015/10/28 | NTAPR | NOTICE OF APPEARANCE | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 9 | Snohomish | |
| ☐ | 15-2-03146-3 | 2015/10/28 | MTSC | MOTION FOR ORDER TO SHOW CAUSE | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 10 | Snohomish | |
| ☐ | 15-2-03146-3 | 2015/10/28 | DCLR | DECLARATION OF TONY KIM | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 11 | Snohomish | |
| ☐ | 15-2-03146-3 | 2015/10/28 | DCLR | DECLARATION OF CHRISTINA L HENRY | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 12 | Snohomish | |
| ☐ | 15-2-03146-3 | 2015/10/28 | DCLR | DECLARATION OF DARIA KIM | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 13 | Snohomish | |
| ☐ | 15-2-03146-3 | 2015/10/28 | NTC | NOTE FOR CALENDAR | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 14 | Snohomish | |
| ☐ | 15-2-03146-3 | 2015/11/03 | DCLR | DECLARATION OF MARCO RUISLA | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 15 | Snohomish | |
| ☐ | 15-2-03146-3 | 2015/11/03 | DCLR | DECLARATION OF MATTHEW CHEUNG | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 16 | Snohomish | |
| ☐ | 15-2-03146-3 | 2015/11/03 | OB | OPPOSITION TO DFDT'S MOTION TO | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 17 | Snohomish | |
| ☐ | 15-2-03146-3 | 2015/11/04 | NTC | NOTE FOR CALENDAR | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 18 | Snohomish | |
| ☐ | 15-2-03146-3 | 2015/11/12 | ORTSC | ORDER TO SHOW CAUSE | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 19 | Snohomish | |
| ☐ | 15-2-03146-3 | 2015/11/19 | NTC | NOTE FOR CALENDAR | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 20 | Snohomish | |

Add To Cart

Page 1 of 1, Records 1-27 of 27    Jump To Page: 1 ▾    Records Per Page: 50 ▾    Search Time 2.08 seconds

Case 2:18-cv-01132-TSZ   Document 190-1   Filed 07/20/21   Page 86 of 160

| Order ☐ | Case Number | Date Y/M/D | Docket Code | Description | Case Title | Case Sub | County | Image Exists |
|---|---|---|---|---|---|---|---|---|
| ☐ | 15-2-03146-3 | 2015/11/19 | ORTSC | ORDER TO SHOW CAUSE - 2ND | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 21 | Snohomish | |
| ☐ | 15-2-03146-3 | 2015/11/30 | RPY | REPLY IN SUPPORT OF MOTION | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 22 | Snohomish | |
| ☐ | 15-2-03146-3 | 2015/12/01 | MTHRG | MOTION HEARING | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 23 | Snohomish | |
| ☐ | 15-2-03146-3 | 2015/12/01 | ORVCJG | ORDER VACATING JUDGMENT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 24 | Snohomish | |
| ☐ | 15-2-03146-3 | 2015/12/17 | ANAFDF | ANSWER & AFFIRMATIVE DEFENSE | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 25 | Snohomish | |
| ☐ | 15-2-03146-3 | 2018/05/29 | CMCWP | Clerks Motion for Closure | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL | 15-2-03146-3 26 | Snohomish | |
| ☐ | 15-2-03146-3 | 2018/07/10 | CLOD | Clerks Order of Dismissal | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 VS KIM ET AL ***DISMISSED*** | 15-2-03146-3 27 | Snohomish | |

Add To Cart

Page 1 of 1, Records 1-27 of 27        Jump To Page: 1 ▾     Records Per Page: 50 ▾                    Search Time 2.08 seconds

Washington Secretary of State
Washington State Archives
Digital Archives
960 Washington Street
Cheney, WA 99004
(509) 235-7500
Phone Numbers

Privacy Policy
Accessibility



EX. E-1

FILED

2015 APR -2 PM 2:06

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH



CL17181163

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR SNOHOMISH COUNTY

NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2005-2, A DELAWARE
STATUTORY TRUST

                                    Plaintiff,

vs.

TONY  KIM and
DARIA  KIM,

                                    Defendants.

Case No.: **15  2  03146  3**

**MOTION & DECLARATION FOR
DEFAULT AND JUDGMENT**

## I. MOTION

The plaintiff, by and through its attorneys, Patenaude & Felix, A.P.C., respectfully moves the Court for an Order of Default and Judgment against the defendant, TONY  KIM and DARIA  KIM, in the principal sum of $18,668.88, together with costs, as requested in the judgment.

This Motion is based on the affidavits or declarations in support of entry of judgment submitted herewith and the subjoined declaration of counsel.

## II. DECLARATION

The undersigned declares under penalty of perjury under the laws of the State of Washington that the following is true and correct:

1.      I am the attorney of record for the plaintiff herein. I base this declaration on my review of the file maintained by this law firm with regard to this matter.

/ / /

-1-

**MOTION & DECLARATION FOR DEFAULT JUDGMENT**

ORIGINAL

**PATENAUDE & FELIX, A.P.C.**
19310 40th Avenue West, Suite 280, Lynnwood, WA 98036
Tel: (425) 361-1662  Toll Free: (800) 832-7675
P&F File No. 14-51605

WA_90 Mtn and Dec DJ

4

2.      That on 1/23/2015, in Snohomish County, Washington, the defendant, TONY KIM and DARIA KIM, was served with a Summons and Complaint in the above referenced action. The Affidavit of such service is filed herein. More than 20 days have elapsed since the date of service.

3.      The defendants have failed to serve an appearance/answer or otherwise defend, in accordance with CR55 within the time permitted by law.

4.      Venue is appropriate under R.C.W. 4.28, because Snohomish County is the county in which the defendant resides.

5.      The defendant is not a person in the Military Service of the United States, as defined in the Soldier's and Sailor's Civil Relief Act of 1940 as amended by the The Service member's Civil Relief Act of 2003. The declarant's staff has checked the U.S. Department of Defense Manpower Date Center, and the report provided and attached states that the Department of Defense does not possess any information indicating the defendant is on Military Duty. Attached as an addendum is the information that the above statement if based upon. The declarant is unable to determine whether the defendant is a dependent of a service member.

I declare under penalty of perjury of the laws of the State of Washington that the foregoing is true and correct.

DATED: March 17, 2015, at Lynnwood, WA.

Presented by:

**PATENAUDE & FELIX, A.P.C.**

MATTHEW CHEUNG, WSBA #43067
Attorney for Plaintiff
Patenaude & Felix, A.P.C.
19401 40th Avenue West, Suite 280
Lynnwood, WA 98036
(425) 361-1662

-2-

**MOTION & DECLARATION FOR DEFAULT JUDGMENT**

PATENAUDE & FELIX, A.P.C.
19401 40th Avenue West, Suite 280, Lynnwood, WA 98036
Tel: (425) 361-1662  Toll Free: (800) 832-7675

WA_90 Mtn and Dec DJ                                    P&F File No. 14-51605

Department of Defense Manpower Data Center

Results as of : Mar-16-2015 03:02:34 PM

SCRA 3.0



**Status Report**
**Pursuant to Servicemembers Civil Relief Act**

Last Name: <u>KIM</u>
First Name: <u>TONY</u>
Middle Name:
Active Duty Status As Of: <u>Mar-16-2015</u>

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

*Mary M. Snavely-Dixon*

Mary M. Snavely-Dixon, Director
Department of Defense - Manpower Data Center
4800 Mark Center Drive, Suite 04E25
Arlington, VA 22350

Department of Defense Manpower Data Center

Results as of : Mar-16-2015 03:00:20 PM

SCRA 3.0



**Status Report**
**Pursuant to Servicemembers Civil Relief Act**

Last Name: <u>KIM</u>
First Name: <u>DARIA</u>
Middle Name:
Active Duty Status As Of: <u>Mar-16-2015</u>

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

*Mary M. Snavely-Dixon*

Mary M. Snavely-Dixon, Director
Department of Defense - Manpower Data Center
4800 Mark Center Drive, Suite 04E25
Arlington, VA 22350

EX. E-2

14-51605 NA

NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2005-2
A Delaware Statutory Trust(s)                    )
                                                 )
                                                 )
Plaintiff                                        )          Docket #
                                                 )
v.                                               )
                                                 )
TONY KIM                                         )
DARIA KIM                                        )
                                                 )
Defendant(s)                                     )


## AFFIDAVIT AND VERIFICATION OF ACCOUNT

STATE OF GEORGIA                     )
                                     )
COUNTY OF  GWINNETT                  )

BEFORE ME, the undersigned authority, personally appeared Affiant ___Dudley Turner___,

who being first duly sworn, deposes and states:

    1.    I am employed by Transworld Systems Inc. (hereinafter TSI), the designated

Custodian of Records for Plaintiff pertaining to the Defendants' education loan(s) forming the

subject matter of the above-captioned Complaint.  I am duly authorized by Plaintiff to make the

representations contained in this Affidavit and I am over the age of 18 and competent to testify to

the matters stated in this Affidavit.

    2.    I am competent and authorized to testify relating to this action through personal

knowledge of the business records, including the electronic data, sent to TSI that detail the

education loan records.  I also have personal knowledge of the record management practices and

procedures of Plaintiff and the practices and procedures Plaintiff requires of its loan servicers and other agents.

3.      This lawsuit arose out of an unpaid loan or loans owed by defendant TONY KIM and defendant DARIA KIM to Plaintiff. Specifically Defendants entered into an education loan agreement at Defendants' special instance and request. A loan was extended for Defendants' to use pursuant to the terms of the loan agreements. Defendants have failed, refused, and/or neglected to pay the balance or balances pursuant to the agreed repayment schedule or schedules.

4.      Education loan account records are compiled and recorded as part of Plaintiff's regularly conducted business activity at or near the time of the event and from information transmitted from a person with knowledge of said event, by or from information transmitted by a person with knowledge of the accounts or events described within the business record. Such records are kept, maintained, and relied upon in the course of ordinary and regularly conducted business activity.

5.      I am familiar with the education loan records within my possession as custodian of records related to this matter. I have been authorized by Plaintiff to make this certification on behalf of Plaintiff for this case.

6.      I have reviewed the education loan records as business records described in this affidavit regarding account number xxxxx7207/002-001000. No payment has been made on this account. After all payments, credits and offsets have been applied, defendant TONY KIM and defendant DARIA KIM owe the principal sum of $16,051.91, together with accrued interest in the amount of $2,616.97, totaling the sum of $18,668.88 as of 2/18/2015. Attached hereto and incorporated as Exhibit "A" is a true copy of the underlying Credit Agreement/Promissory Note.

In the event the Defendant(s) faxed the executed Credit Agreement/Promissory Note, per its terms they agreed their facsimile/electronic signature is deemed to be an original. Under applicable federal and state law, all copies of signatures executed via facsimile or electronic email are considered to be legal, binding agreement.

7.      Based on records maintained by Plaintiff, the Defendants are not minors or incompetent. A reasonable inquiry has been made to determine if the Defendants are in the military service of the United States of America, and to the best of my knowledge, Defendants are not in such military services and are therefore not entitled to the rights and privileges provided under the Soldiers and Sailors Civil Relief Act of 1940, as amended.

8.      I declare under the penalty of perjury under the laws of the forum state that the foregoing is true and correct to the best of my knowledge, information and belief.

FURTHER AFFIANT SAYETH NAUGHT.

AFFIANT
Print Name:     Dudley Turner
Title:          Legal Case Manager

SWORN AND SUBSCRIBED to before me this ___19th___ day of ___February___, 2015.

NOTARY PUBLIC
My Commission Expires on   November 14, 2017

NOV
14
2017

# EXHIBIT A

## NOTE DISCLOSURE STATEMENT

$ __10,160.43__
__02863777__
Loan No.

Borrower(s)   TONY KIM
                       DARIA KIM

Student:   TONY KIM
Date:       April 21, 2005

TONY KIM
809 234TH ST SE
BOTHELL , WA  98021

Lender Name and Address:
BANK ONE (JP MORGAN CHASE BANK, N.A.)
100 EAST BROAD STREET
COLUMBUS, OH 43125

This disclosure statement relates to your Loan Note disbursed on          April 21, 2005
Because your Loan is either being disbursed or entering repayment, or the repayment terms are being modified, the following information about your Loan is being given to you.

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments scheduled. |
| 7.877  % | $   13,696.00 | $   9,500.00 | $   23,196.00 |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are due |
|---|---|---|
| 240 | $   96.65 | On the 1st day of each month beginning on  1/2008 |
|  |  |  |
|  |  |  |
|  |  |  |

**VARIABLE RATE:** The Annual Percentage Rate, which is based on an index plus a margin, may increase during the term of the loan if the index rate increases. The index is (check one):

☐ **Prime Rate Index Adjusted Monthly** - The highest U.S. bank prime rate published in the "Money Rates" section of The Wall Street Journal on the last business day of each calendar month.

☐ **Prime Rate Index Adjusted Quarterly** - The highest U.S. bank prime rate published in the "Money Rates" section of The Wall Street Journal on the last business day of each calendar quarter.

☒ **LIBOR Index Adjusted Quarterly** - The average of the one-month London Interbank Offered Rates published in the "Money Rates" section of The Wall Street Journal on the first business day of each of the three (3) calendar months immediately preceding the first day of each calendar quarter.

Any increase in the index and the Annual Percentage Rate which occurs while principal payments are deferred will increase the amount of any current and all future payments. Any increase in the index and the Annual Percentage Rate which occurs while principal and interest payments are deferred will increase the amount of all future payments. Any increase in the index and the Annual Percentage Rate which occurs after you have begun to make principal and interest payments on your loan will increase the amount of your future principal and interest payments beginning with your next annual payment adjustment date. For example, assume you obtain a loan in your junior year, in the amount of $10,000, at an interest rate of 11%, and you defer principal and interest payments until after your graduation, and the repayment term of the loan is 20 years. If the interest rate increased to 12% on January 1st of your senior year, the interest which accrues while principal and interest payments are deferred would increase by $ 91.01, and your monthly principal and interest payments would increase by $ 9.37.

**SECURITY:** You have given a security interest in all refunds or amounts owed to you at any time by the student's educational institution. Collateral securing other loans with the Lender may also secure this Loan.
**LATE CHARGES:** If a payment is more than 15 days late, you may be charged $5.00 or 5% of the payment, whichever is less. If you default, Lender (or any subsequent holder or any subsequent holder of your Loan Note) may increase the margin used to compute the Annual Percentage Rate by two percentage points (2%).
**PREPAYMENT:** If you pay off early, you will not have to pay a penalty.

See your contract documents for any additional information about non-payment, default, any required repayment in full before the scheduled date, any security interest and prepayment refunds and penalties.

**Estimates:** All numerical disclosures except the late payment disclosure are estimates.

Principal Amount of Note (Amount Financed plus Prepaid Finance Charge)          $          10,160.43

Itemization of Amount Financed
Amount paid to  TONY KIM  and                                    $ _____
Amount paid to  DARIA KIM                                          $          9,500.00
Total Amount Financed                                                                    $          9,500.00

Itemization of Prepaid Finance Charge
     Origination Fee                                                         $          660.43
     Total Prepaid Finance Charge(s)                                                $          660.43

FE205 050106

## * Cosigned *   Loan Request/Credit Agreement – Signature Page

**NON-NEGOTIABLE CREDIT AGREEMENT – THIS IS A CONSUMER CREDIT TRANSACTION**

### LOAN PROGRAM INFORMATION

Education One® Education One Undergraduate Loan               Academic Period: 09/2004-06/2005

Lender: Bank One (JP Morgan Chase Bank, N.A.)     School: EDMONDS COMMUNITY COLLEGE

Loan Amount Requested: $9500.00       Repayment Option: Deferred Principal and Interest

Deferral Period Margin: 4.65       Repayment Period Margin: 4.65       Loan Origination Fee Percentage: 8.50

### STUDENT BORROWER INFORMATION (Must be at least 18 years of age)

Borrower Name: Tony Kim                  Home Address: 809 234th St Se Bothell, WA 98021
Social Security #: [ ]7207          Date of Birth: [ ]/1984    Home Telephone: 4254889414
Student Citizenship (check one box):   ☒ U.S. Citizen   ☐ Eligible Non-Citizen (Attach front & back copy of INS or student visa card)
Note:  Personal reference name and address cannot match that of the Cosigner.
Personal Reference Name:  Jun Presto           Reference Home Tel #:  (425) 486-0554       Work Tel #:
Reference Street Address:   234th St Se
Reference City/State/Zip:    Bothell, WA 98021

### COSIGNER INFORMATION (Must be at least 18 years of age)

Cosigner Name: Daria Kim                 Home Address: 809 234th Se Bothell, WA 98021
Social Security #: [ ]3775          Date of Birth: [ ]1948    Home Telephone: 4254889414
Have you ever defaulted on a student loan or declared bankruptcy?   ☒ No   ☐ Yes
Current Employer: N SHORE SCHOOL DIST                           Employer Telephone: 4254026537
Current Position:  Other
Years at Previous Employment:
Alimony, child support, or separate maintenance incomes do not have to be revealed if you do not want them considered for repaying this obligation. If you are relying on such additional income, please provide details on a separate sheet of paper.

Cosigner Citizenship (check one box):   ☒ U.S. Citizen   ☐ Eligible Non-Citizen (Attach front & back copy of INS)
Note:  Personal reference name and address cannot match that of the Borrower.
Personal Reference Name:  Young Lee            Reference Home Tel #:  (425) 776-7311       Work Tel #:
Reference Street Address:  2300 55th Ave W 303
Reference City/State/Zip:   Mt Lake Terrace, WA 98043

By my signature, I certify that I have read, understand and agree to the terms of and undertake the obligations set forth on all four (4) pages of this Loan Request/Credit Agreement EO.04-05.CSX1.20.0904 ("Credit Agreement"). I understand that any person who knowingly makes a false statement or misrepresentation on this form is subject to penalties, which may include fines or imprisonment. This Credit Agreement is signed under seal. I understand that I am not required to fax my signature on this Credit Agreement and any related notices that require signature. If I choose to fax my signature on this Credit Agreement and any related notices that require signature, I intend: (i) my fax signature to be an electronic signature under applicable federal and state law, (ii) any fax printout of this Credit Agreement and related notices to be an original document, (iii) to conduct business with the Lender by electronic records and electronic signatures, and (iv) that this Credit Agreement will not be governed by Article 3 of the Uniform Commercial Code, and my obligations under this Credit Agreement will not be subject to, but any transfer of my obligations will be subject to. Article 9 of the Uniform Commercial Code. I, the Cosigner, have read the applicable cosigner notice(s).

**FOR ALABAMA RESIDENTS:** CAUTION – IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.
**FOR WISCONSIN RESIDENTS:** NOTICE TO CUSTOMER:
(a)  DO NOT SIGN THIS CREDIT AGREEMENT BEFORE YOU READ THE WRITING ON THE FOLLOWING PAGES, EVEN IF OTHERWISE ADVISED.
(b)  DO NOT SIGN THIS CREDIT AGREEMENT IF IT CONTAINS ANY BLANK SPACES.
(c)  YOU ARE ENTITLED TO AN EXACT COPY OF ANY AGREEMENT YOU SIGN.
(d)  YOU HAVE THE RIGHT AT ANY TIME TO PAY IN ADVANCE THE UNPAID BALANCE UNDER THIS AGREEMENT AND YOU MAY BE ENTITLED TO A PARTIAL REFUND OF THE FINANCE CHARGE.

PLEASE SIGN BELOW – RETURN This Page With Proof of Income and Other Information (if applicable) –
FAX TO: 800-704-9407

Signature of Borrower _____       Date  4/14/05

BY SIGNING THIS CREDIT AGREEMENT BELOW, I CERTIFY THAT I INTEND TO (i) APPLY FOR JOINT CREDIT AND (ii) BE JOINTLY LIABLE WITH THE BORROWER FOR THIS LOAN.

Signature of Cosigner _____       Date  4/14/05

EO.04-05.CSX1.20.0904
FN01_ED_04-05_CSX1_F_X_KIM_A102863777.pdf                 LENDER COPY                    EOTUDP

In this Credit Agreement, the words "I", "me", "my", and "mine" mean each and every Borrower and Cosigner, individually and collectively, who signed this Credit Agreement. The words "you", "your", "yours", and "Lender" mean the Lender named at the top of the first page of this Credit Agreement, its successors and assigns, and any other holder of this Credit Agreement. "School" means the school named at the top of the first page of this Credit Agreement.

**A. PROMISE TO PAY:** I promise to pay to your order, upon the terms and conditions of this Credit Agreement, all principal, interest and other charges set forth herein.

**B. LOAN; DISCLOSURE STATEMENT:**

1. By signing this Credit Agreement, and submitting it to you, I am requesting that you make this loan to me in an amount equal to the Loan Amount Requested plus any Loan Origination Fee described in Paragraph F of this Credit Agreement. When you receive my signed Application, you are not agreeing to lend me money. You have the right not to make a loan or to lend an amount less than I am requesting. I agree to accept an amount less than the Loan Amount Requested and to repay that portion of the Loan Amount Requested that you actually lend to me.

2. If you decide to make a loan to me, you will mail me the disbursement check (the "Disbursement Check") and a statement disclosing certain information about the loan in accordance with the federal Truth-in-Lending Act (the "Disclosure Statement"). You have the right to disburse my Disbursement Check through an agent. At your option, you may also make any Disbursement Check co-payable to me and the Cosigner or to me and the School. In addition to other information, the Disclosure Statement will tell me the amount of my disbursement and the amount of the Loan Origination Fee. The Disclosure Statement is part of this Credit Agreement. Upon receipt of the Disclosure Statement, I will review the Disclosure Statement and notify you in writing if I have any questions. My endorsement of the Disbursement Check or allowing the loan proceeds to be used by or on behalf of the Student without objection will acknowledge receipt of the Disclosure Statement and my agreement to be legally bound by this Credit Agreement.

3. If I am not satisfied with the terms of my loan as disclosed in the Disclosure Statement, I may cancel my loan. To cancel my loan, I will give you a written cancellation notice, together with my unused Disbursement Check or, if I have already endorsed and delivered the Disbursement Check to the School, a good check, payable to you, in the full amount of the Disbursement Check. In any event, I cannot cancel more than ten (10) days after I receive the Disclosure Statement. If I give notice of cancellation but do not comply with the requirements of this Paragraph B.3, this Credit Agreement will not be canceled and I will be in default of this Credit Agreement. (See Paragraph I.)

**C. DEFINITIONS:**

1. "Disbursement Date" means the date shown on any Disbursement Check you prepare for me (not the date I endorse or negotiate my check).

2. The "Deferment Period" will begin on the Disbursement Date and end on the Deferment End Date.

3. "Deferment End Date" means the date specified below for the applicable loan program (the applicable loan program is stated on the first page of this Credit Agreement).

(a) *Education One Undergraduate Alternative Loan Program:* If I have elected the "Immediate Repayment" option (the applicable repayment option is stated on the first page of this Credit Agreement), there is no Deferment Period, and my first payment will be 30-60 days after the disbursement of my loan. If I have elected the "Interest Only" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), then interest payments will begin 30-60 days after the disbursement of my loan, the "Deferment End Date" will be the date the Student graduates or ceases to be enrolled at least half-time in the School (or another school participating in this loan program), and principal and interest payments will begin 30-60 days after that date. In any event, if I have elected the "Interest Only" repayment option, the Deferment End Date will be no more than 5 years after the Disbursement Date. If I have elected the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), then the "Deferment End Date" will be 180 days after the Student graduates or ceases to be enrolled at least half-time in the School (or another school participating in this Loan Program). In any event, if I have elected the "Full Deferral" repayment option, the Deferment End Date will be no more than 5¼ years after the Disbursement Date.

(b) *Education One Graduate Professional Education Loan Program:* 180 days after the Student graduates or ceases for any other reason to be enrolled at least half-time in the School (or another school participating in this Loan Program), but no more than 4½ years after the Disbursement Date; provided, however, that if the Student begins a medical residency or internship during the Deferment Period, then the Deferment Period will end 180 days after the day the residency or internship ends, but no more than 8½ years after the Disbursement Date.

4. The "Repayment Period" begins the day after the Deferment Period ends, (or, if there is no Deferment Period, the day after the Disbursement Date). The Repayment Period is 20 years, unless monthly payments equal to the minimum monthly payment amount (See Paragraph E.4) will repay all amounts owed in less than 20 years, in which case the Repayment Period will be the number of months necessary to pay in full the amount I owe at the minimum payment.

**D. INTEREST:**

1. Accrual – Beginning on the Disbursement Date, interest on the outstanding balance of this Credit Agreement will accrue each day (including holidays and other days you

are closed) at the Variable Rate (Paragraph D.2) divided by the number of days in that calendar year.

2. Variable Rate – The "Variable Rate" is equal to the Current Index plus a Margin. The Margins for both the Deferment Period and the Repayment Period are shown on the first page of this Credit Agreement. In no event will the Variable Rate exceed the maximum interest rate allowed by the laws of the State of Ohio. The Variable Rate will change quarterly on the first day of each January, April, July and October (the "Change Date(s)") if the Current Index changes. The "Current Index" for any calendar quarter beginning on a Change Date (or for any shorter period beginning on the Disbursement Date and ending on the last day of a calendar quarter) is based on the London Interbank Offered Rate ("LIBOR") as published in the "Money Rates" section of *The Wall Street Journal*. Each calendar quarter, the index will equal the average of the LIBOR rates published on the first business day of each of the three (3) calendar months immediately preceding such calendar quarter, rounded to the nearest one-hundredth percent (0.01%). If *The Wall Street Journal* was not published or if the LIBOR rate was not published on any one or more of the first business days of each of the three calendar months immediately preceding the calendar quarter, then the Current Index will be determined by using the immediately preceding Current Index. If on any first business day of a calendar month more than one LIBOR rate is published, then the highest rate published will be used to calculate the Current Index. If the LIBOR rate is no longer available, you will choose a comparable index.

3. Capitalization – If I have elected the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement, I am not obligated to make any payments until the loan enters the Repayment Period. You will add unpaid accrued interest to the principal loan balance as of the last day of each calendar quarter (the last day of December, March, June and September) during the Deferment Period and at the end of my Deferment Period. Interest that is added to principal is called "Capitalized" interest. Capitalized interest will be treated as principal. In addition, if I am in default and the loan has been sold to TERI (see Section L.12), TERI may capitalize accrued and unpaid interest as of the date it purchases my loan. I understand that you will add all accrued and unpaid interest to the principal balance of my loan on the last day of the Deferment Period and at the end of any forbearance period.

**E. TERMS OF REPAYMENT:**

1. Deferment Period – If I have elected either the "Interest Only" repayment option or the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), I will send you statements during the Deferment Period (showing the total outstanding principal balance of my loan and the interest that has accrued on my loan). You reserve the right to send statements or notices to either the Borrower or the Cosigner. Statements will be sent to the address shown on your records. If I have elected the "Interest Only" repayment option, I agree to make payments each month during the Deferment Period equal to the accrued interest on the outstanding balance of this Credit Agreement. If I have elected the "Full Deferral" repayment option I may, but am not required to make payments during the Deferment Period. You will add any interest that I do not pay during the Deferment Period to the principal balance, as described in Paragraph D.3.

2. Repayment Period – During the Repayment Period, you will send me monthly statements that show the amounts of minimum monthly payments and the payment due dates. You reserve the right to send monthly statements or coupon books to either the Borrower or the Cosigner. I will make consecutive monthly payments in amounts at least equal to such minimum monthly payments by the applicable payment due dates until I have paid all of the principal and interest and any other charges I may owe under this Credit Agreement. If my loan is in paid-ahead status, I may, but will not be required to make monthly payments.

3. Repayment Terms – My monthly payment will be established based on the rules in this Credit Agreement when my Repayment Period begins. My monthly payment amount will be calculated as of the day the Repayment Period begins ("Repayment Date"). It will be recalculated (a) once each year prior to the anniversary of the Repayment Date, (b) if the Variable Rate changes between anniversaries of the Repayment Date to the extent that the amount of my monthly payment would not pay in full the accrued monthly interest on my loan, (c) following any subsequent deferment or forbearance period or (d) following any request by the Borrower to the servicer to change the monthly payment due date (each of which events is a new "Repayment Date"). As of any Repayment Date, my monthly payment will be recalculated. My new monthly payment amount will be disclosed to me by the servicer. The new monthly repayment amount will equal the amount necessary to pay in full, over the number of months remaining in the Repayment Period, the amount I owe in equal monthly installments of principal and interest at the Variable Rate in effect at the time of the calculation. I understand that this may result in a reduction or increase in my monthly payment as calculated as of each Repayment Date. I understand that during the Repayment Period (and, if I have elected the "Interest Only" repayment option, during the period of interest payments) the servicer may change the monthly payment due date of future payments to a later date for the convenience of the servicer in processing payments or in order to coordinate the due dates of all of my loans processed by the servicer. This change in monthly payment due date may result in the charging of additional interest in the month of the change, which I agree to pay.

4. Minimum Repayment – During the Repayment Period, my minimum payment will be at least $25 each month or the entire unpaid loan balance, whichever is less. I understand that I may pay more than my monthly payment at any time without penalty

or charge. If my loan is in paid-ahead status, I may, but will not be required to make monthly payments.

5. Amounts Owing at the End of the Repayment Period – Since interest accrues daily upon the unpaid principal balance of my loan, if I make payments after my payment due dates, I may owe additional principal, interest, and/or late fees at the end of the Repayment Period. If I have not paid my late fees, I will also owe additional amounts for those late fees. In such cases you will increase the amount of my last monthly payment to the amount necessary to repay my loan in full in a single payment.

6. Payments – Payments will be applied first to late fees and other fees and charges, then accrued interest, and the remainder to principal. If I have multiple loans processed by the servicer, and I submit a single payment that is not sufficient to pay all of the amounts I owe, such payment will be divided between or among the loans in accordance with applicable law and the servicer's customary procedures.

7. Other Charges - If any part of a monthly payment remains unpaid for a period of more than 15 days after the payment due date, I will pay a late fee not exceeding $5.00 or 5% of the overdue payment amount, whichever is less. I will pay only one late fee for any payment, regardless of the number of days it is late. To the extent permitted by law, I agree to pay you all amounts you incur in enforcing the terms of this Credit Agreement, including reasonable collection agency and attorney's fees and court costs and other collection costs.

F.  LOAN ORIGINATION FEE: You may charge me an Origination Fee. If you charge me, at the time you issue any disbursement to me, or on my behalf, you may add the Origination Fee to my loan amount. The dollar amount of any Loan Origination Fee will be determined by multiplying the sum of the Loan Origination Fee and the Loan Amount Requested, to the extent advanced to me, times the Loan Origination Fee Percentage shown on the first page of this Credit Agreement. The percentage would be higher if computed only on the amount advanced rather than the entire principal amount (Loan Origination Fee plus Loan Amount Requested). For example, a nominal Loan Origination Fee of 6.5% on the entire principal amount would equal 6.9519% of the amount advanced. The Loan Origination Fee I will pay, if any, will be shown on my Disclosure Statement and will be added to the principal amount of my loan. To the extent permitted by law, and unless I timely cancel this Credit Agreement (see Paragraph B.3), I will not be entitled to a refund of any Loan Origination Fee after my Disbursement Check has been negotiated.

G. RIGHT TO PREPAY: I have the right to prepay all or any part of my loan at any time without penalty or charge.

H. FORBEARANCE: If I am unable to repay my loan in accordance with the terms established under this Credit Agreement, I may request that you modify these terms. I understand that such modification would be at your option. I understand that I will remain responsible for all interest accruing during any period of forbearance and that you will add any interest that I do not pay during any forbearance period to the principal balance, as described in Paragraph D.3.

I.  WHOLE LOAN DUE: To the extent permitted by applicable law, I will be in default if: (1) I fail to make any monthly payment to you when due, (2) I die, (3) I break any of my other promises in this Credit Agreement, (4) Any bankruptcy proceeding is begun by or against me, or I assign any of my assets for the benefits of my creditors, or (5) I make any false written statement in applying for this loan or any other student or education loan or at any time during the Deferment or Repayment Periods. I understand that if I default on my loan, disclosure of my loan information to consumer reporting agencies may adversely affect my credit rating. If I default, I will be required to pay interest on this loan accruing after default. The interest rate after default will be subject to adjustment in the same manner as before default. To the extent permitted by law, upon default, you will have the right to give me notice that the whole outstanding principal balance, accrued interest, and all other amounts payable to you under the terms of under this Credit Agreement are due and payable at once. Upon default, you may also capitalize any interest and fees (i.e., add accrued and unpaid interest and fees to the principal balance), and increase the Margin used to compute the Variable Rate by two percentage points (2%).

J. NOTICES:

1. I will send written notice to the servicer authorized by you to service my loan account, or any subsequent holder of this Credit Agreement, within ten days after any change in my name, address, or enrollment status at the School (for example, if I withdraw from the School or transfer to another school participating in this loan program). I will send any notice that I give under this Credit Agreement to the servicer authorized by you (or authorized by any subsequent holder of this Credit Agreement) to service my loan account to the address the servicer provides.

2. Any notice required to be given to me by you will be effective when mailed by first class mail to the latest address you have for me. Unless required by applicable law, you need not give a separate notice to the Cosigner, if any.

K. INFORMATION:

1. I must update any and all information related to this Credit Agreement or my loan application whenever you ask me to do so.

2. I authorize you from time to time to request and receive from others credit related information about me (and about my spouse if I live in a community property state).

L. ADDITIONAL AGREEMENTS:

1. I understand that you are located in OHIO and that this Credit Agreement will be entered into in the same state. CONSEQUENTLY, THE PROVISIONS OF THIS CREDIT AGREEMENT WILL BE GOVERNED BY FEDERAL LAW AND THE LAWS OF THE STATE OF OHIO, WITHOUT REGARD TO CONFLICT OF LAW RULES.

2. The proceeds of this loan will be used only for my educational expenses at the School. The Cosigner will not receive any of the loan proceeds.

3. My responsibility for paying the loan evidenced by this Credit Agreement is unaffected by the liability of any other person to me or by your failure to notify me that a required payment has not been made. Without losing any of your rights under this Credit Agreement you may accept (a) late payments, (b) partial payments or (c) payments marked "paid in full" or with other restrictions. You may delay, fail to exercise, or waive any of your rights on any occasion without losing your entitlement to exercise the right at any future time, or on any future occasion. You will not be obligated to make any demand upon me, send me any notice, present this Credit Agreement to me for payment or make protest of non-payment to me before suing to collect on this Credit Agreement if I am in default, and to the extent permitted by applicable law, I hereby waive any right I might otherwise have to require such actions. I WILL NOT SEND YOU PAYMENTS MARKED "PAID IN FULL", "WITHOUT RECOURSE" OR WITH OTHER SIMILAR LANGUAGE UNLESS THOSE PAYMENTS ARE MARKED FOR SPECIAL HANDLING AND SENT TO THE ADDRESS IDENTIFIED FOR SUCH PAYMENTS ON MY BILLING STATEMENT, OR TO SUCH OTHER ADDRESS AS I MAY BE GIVEN IN THE FUTURE.

4. I may not assign this Credit Agreement or any of its benefits or obligations. You may assign this Credit Agreement at any time.

5. The terms and conditions set forth in this Credit Agreement and Instructions and the Disclosure Statement constitute the entire agreement between you and me.

6. If any provision of this Credit Agreement is held invalid or unenforceable, that provision shall be considered omitted from this Credit Agreement without affecting the validity or enforceability of the remainder of this Credit Agreement.

7. A provision of this Credit Agreement may only be modified if jointly agreed upon in writing by you and me. Any modification will not affect the validity or enforceability of the remainder of this Credit Agreement. If I fax my Credit Agreement, I have read and understand the prohibition regarding changes in Paragraph L.16.

8. To the extent permitted by law, you have the right to apply money from any of my deposit account(s) with you to pay all or a portion of any amount overdue under this Credit Agreement. If I am in default at any time (including but not limited to a situation where I give an improper cancellation notice), you may exercise on my behalf any right that I may have to receive a full or partial refund of payments made to the School. I authorize the School to pay any or all of such amounts directly to you upon receipt of notice from you that I am in default under this Credit Agreement.

9. The Borrower and the Cosigner each agrees that any communication between you and the Borrower or the Cosigner will be binding on the Borrower and the Cosigner. The Borrower and Cosigner intend to be treated as principals of this Credit Agreement and not as sureties. To the extent the Borrower or the Cosigner may be treated as a surety, the Borrower and the Cosigner waive all notices otherwise required or available by law, and all suretyship defenses that might be available (including, without limitation, contribution, subrogation and exoneration). The Cosigner agrees that the Borrower may agree to any forbearance or other modification of the repayment schedule and that such agreement will be binding on the Cosigner. It shall not be necessary for you to resort to or exhaust your remedies against the Borrower before calling upon the Cosigner to make repayment.

10. All dollar amounts stated in this Credit Agreement are in United States dollars. I will make all payments in United States Dollars with no deduction for currency exchange.

11. The Student's failure to complete the education program paid for with this loan will not relieve any Borrower of any obligation under this Credit Agreement.

12. I acknowledge that the requested loan is subject to the limitations on dischargeability in bankruptcy contained in Section 523 (a) (8) of the United States Bankruptcy Code. Specifically, I understand that you have purchased a guaranty of this loan, and that this loan is guaranteed by The Education Resources Institute, Inc. ("TERI"), a non-profit institution.

13. I authorize any School that I may attend to release to you, and any other persons designated by you, any requested information pertinent to this loan (e.g., enrollment status, prior loan history, and current address).

14. I authorize the Lender, any subsequent holder of this Credit Agreement, and their agents to: (1) advise the School of the status of my application and my loan, (2) respond to inquiries from prior or subsequent lenders or holders with respect to my Credit Agreement and related documents, (3) release information and make inquiries to the persons I have given you as references, for the purposes of learning my current address and telephone number, (4) check my credit and employment history and to answer questions about their credit experience with me, and (5) disclose to TERI, the Borrower, and/or the Cosigner either in connection with this transaction or any future transaction all information (including status information and non-public personal information) of the Borrower and/or the Cosigner provided in connection with this Credit Agreement.

15. Waiver by Lender: You waive (give up) any right to claim a security interest in any property to secure this Credit Agreement. This does not affect any right to offset as a matter of law.

16. If I fax my signature(s) on the first page of this Credit Agreement back to you and keep the copy I signed, I understand that under federal law the fax you receive will be an original of the first page of this Credit Agreement and I will refax the first page upon request by Lender. I may NOT amend the Credit Agreement by making changes to the Signature Page, which are then faxed to Lender. If the Borrower faxes the Signature Page, and the Lender approves the application, you and I agree that all copies of this

Credit Agreement (including the fax you receive and the copy I retain), taken together, shall constitute a single original agreement.

**M. DISCLOSURE NOTICES**

---

**ALL APPLICANTS:**
**IMPORTANT FEDERAL LAW NOTICE—**

*Important Information about procedures for opening a new account:*
To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

*What this means for you:*
When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

---

CALIFORNIA RESIDENTS ONLY: I have the right to prohibit the use of information contained in my credit file in connection with transactions not initiated by me. I may exercise this right by notifying the consumer credit reporting agency. A married applicant may apply for a separate account. If you take any adverse action as defined by Section 1785.3 of the California Civil Code and the adverse action is based, in whole or in part, on any information contained in a consumer credit report, I have the right to obtain within 60 days a free copy of my consumer credit report from the consumer reporting agency who furnished you my consumer credit report and from any other consumer credit reporting agency which compiles and maintains files on consumers on a nationwide basis. I have the right as described by Section 1785.16 of the California Civil Code to dispute the accuracy or completeness of any information in a consumer credit report furnished by the consumer credit reporting agency.

CALIFORNIA and UTAH RESIDENTS ONLY: As required by California and Utah law, I am hereby notified that a negative credit report reflecting on my credit record may be submitted to a credit reporting agency if I fail to fulfill the terms of my credit obligations. (For purposes of the following two notices, the word "you" refers to the Borrower and the Cosigner, not the Lender.)

IOWA RESIDENTS ONLY: If you are an Iowa resident and your amount financed is $25,000 or less, this is a consumer credit transaction.

IOWA, KANSAS and NEBRASKA RESIDENTS: (For purposes of the following notice, the word "you" refers to the Borrower and the Cosigner, not the Lender.) NOTICE TO CONSUMER 1. Do not sign this Credit Agreement before you read it. 2. You are entitled to a copy of this Credit Agreement. 3. You may prepay the unpaid balance at any time without penalty and may be entitled to receive a refund of unearned charges in accordance with law.

MARYLAND RESIDENTS ONLY: You elect to make this loan pursuant to Subtitle 10 (Credit Grantor Closed End Credit provisions) of Title 12 of the Maryland Commercial Law Article only to the extent that such provisions are not inconsistent with your authority under 12 U.S.C. §85 and related regulations and interpretations, which authority you expressly reserve.

MISSOURI RESIDENTS ONLY: ORAL AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR FORBEAR FROM ENFORCING REPAYMENT OF DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.

NEVADA RESIDENTS: This is a loan for study.

NEW YORK, RHODE ISLAND, and VERMONT RESIDENTS: I understand and agree that you may obtain a consumer credit report in connection with updates, renewals of extensions of any credit as a result of this application. If I ask, I will be informed whether or not such a report was obtained and, if so, the name and address of the agency that furnished the report. I also understand and agree that you may obtain a consumer credit report in connection with the review or collection of any loan made to me as a result of this application or for other legitimate purposes related to such loans.

NEW JERSEY RESIDENTS ONLY: The section headings of this Note are a table of contents and not contract terms. Portions of this Note with references to actions taken to the extent of applicable law apply to acts or practices that New Jersey law permits or requires. In this Note, acts or practices (i) by you which are or may be permitted by "applicable law" are permitted by New Jersey law, and (ii) that may or will be taken by you unless prohibited by "applicable law" are permitted by New Jersey law.

OHIO RESIDENTS ONLY: The Ohio laws against discrimination require that all creditors make credit equally available to all credit-worthy customers, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

OKLAHOMA RESIDENTS ONLY: If I am in default and only if the total amount disbursed under this Note is greater than $3,600 (or any higher dollar amount established by law for the payment of such fees), I agree to pay the Lender's attorney's fees and court costs up to 15% of the unpaid debt.

WISCONSIN RESIDENTS ONLY: For married Wisconsin residents, my signature confirms that this loan obligation is being incurred in the interest of my marriage or family. No provision of any marital property agreement (pre-marital agreement), unilateral statement under Section 766.59 of the Wisconsin Statutes or court decree under Section 766.70 adversely affects my interest unless, prior to the time that the loan is approved, you are furnished with a copy of the marital property agreement, a statement or a decree or have actual knowledge of the adverse provision. If the loan for which I am applying is granted, I will notify you if I have a spouse who needs to receive notification that credit has been extended to me.

N. BORROWER'S CERTIFICATION: I declare under penalty of perjury under the laws of the United States of America that the following is true and correct. I certify that all information I provided to you in connection with this loan, including without limitation the information contained in this Credit Agreement, is true, complete and correct to the best of my knowledge and belief and is made in good faith. I understand that I am responsible for repaying immediately any funds that I receive which are not to be used or are not used for educational expenses related to attendance at the School for the academic period stated. I certify that I am not now in default on a Federal Perkins Loan, a Federal Stafford Loan, a Federally Insured Student Loan, a Federal Supplemental Loan for Students (SLS), a Federal PLUS Loan, an Income Contingent Loan, a Federal Consolidation Loan, a Federal Ford Direct Loan, or any other education loan received for attendance at any school.

O. STATE-SPECIFIC COSIGNER NOTICES: For the purposes of the following notices only, the words "you" and "your" refer to the Cosigner, where applicable, not to the Lender.

**FOR OBLIGORS COSIGNING IN VERMONT**: For purposes of the following notice, the words "you" and "your" refer to any Cosigner, not to the Lender. "Note" means this Credit Agreement.

*NOTICE TO COSIGNER:*
YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN. IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.

# Loan Payment History Report
## Date: 2014-12-09

| Account Number: | ████████1000 | | |
|---|---|---|---|
| Social Security Number: | ████7207 | Product: | EOU EDUCATION ONE UNDERGRAD |
| Name: | KIM, TONY | Officer Code: | 777052 |
| Birth Date: | 1984-05-██ | School: | EDMONDS COMMUNITY COLLEGE |
| Address 1: | 809 234TH ST SE | Program Year: | |
| Address 2: | | | |
| City: | BOTHELL | Variable Rate Code: | FU LIBOR |
| State: | WA | Interest Rate: | 4.81% |
| Zip Code: | 98021-6800 | Last Payment Date: | |
| Cosigner Name: | KIM, DARIA | | |
| Social Security Number: | ████8775 | | |
| Address 1: | 809 234TH ST SE | | |
| Address 2: | | | |
| City: | BOTHELL | | |
| State: | WA | | |
| Zip Code: | 98021-6800 | | |
| | | Last Payment Amount: | |
| | | Payment Due Date: | 2011-07-03 |
| Contract Date: | 2005-04-21 | Last Interest Date: | 2014-12-09 |
| Date Assigned: | 2014-12-04 | Accrued Interest: | $2,625.43 |
| Charge Off Date: | 2011-08-01 | Recovered Interest: | $0.00 |
| Charge Off Amount: | $16,051.91 | Net Interest: | $2,625.43 |
| Recovered Principal: | $0.00 | Associated Costs: | $0.00 |
| Net Charge Off: | $16,051.91 | Recovered Costs: | $0.00 |
| Disbursement Date: | 2005-04-21 | Net Costs: | $0.00 |
| Disbursement Amount: | $10,160.43 | | |

## Transaction History

| | | | | | |
|---|---|---|---|---|---|
| System | 2011-08-31 | 00:01 | 82 | $16,051.91 @ 4.860 / 08/01/2011 - 08/31/2011 | $64.12 |
| System | 2011-09-01 | 00:01 | 82 | $16,051.91 @ 4.860 / 08/31/2011 - 09/01/2011 | $2.14 |
| System | 2011-09-30 | 00:01 | 82 | $16,051.91 @ 4.860 / 09/01/2011 - 09/30/2011 | $61.98 |
| System | 2011-10-03 | 00:01 | 82 | $16,051.91 @ 4.860 / 09/30/2011 - 10/03/2011 | $6.41 |
| System | 2011-10-31 | 00:01 | 82 | $16,051.91 @ 4.850 / 10/03/2011 - 10/31/2011 | $59.72 |
| System | 2011-11-01 | 00:01 | 82 | $16,051.91 @ 4.850 / 10/31/2011 - 11/01/2011 | $2.13 |
| System | 2011-11-30 | 00:01 | 82 | $16,051.91 @ 4.850 / 11/01/2011 - 11/30/2011 | $61.85 |
| System | 2011-12-01 | 00:01 | 82 | $16,051.91 @ 4.850 / 11/30/2011 - 12/01/2011 | $2.13 |
| System | 2011-12-31 | 00:01 | 82 | $16,051.91 @ 4.850 / 12/01/2011 - 12/31/2011 | $63.99 |
| System | 2012-01-03 | 00:01 | 82 | $16,051.91 @ 4.900 / 12/31/2011 - 01/03/2012 | $6.45 |
| System | 2012-01-31 | 00:01 | 82 | $16,051.91 @ 4.900 / 01/03/2012 - 01/31/2012 | $60.17 |

| System | 2012-02-01 | 00:01 | 82 | $16,051.91 @ 4.900 / 01/31/2012 - 02/01/2012 | $2.15 |
|--------|------------|-------|----|-----------------------------------------------|-------|
| System | 2012-02-29 | 00:01 | 82 | $16,051.91 @ 4.900 / 02/01/2012 - 02/29/2012 | $60.17 |
| System | 2012-03-01 | 00:01 | 82 | $16,051.91 @ 4.900 / 02/29/2012 - 03/01/2012 | $2.15 |
| System | 2012-03-31 | 00:01 | 82 | $16,051.91 @ 4.900 / 03/01/2012 - 03/31/2012 | $64.47 |
| System | 2012-04-02 | 00:01 | 82 | $16,051.91 @ 4.900 / 03/31/2012 - 04/02/2012 | $4.30 |
| System | 2012-04-30 | 00:01 | 82 | $16,051.91 @ 4.920 / 04/02/2012 - 04/30/2012 | $60.42 |
| System | 2012-05-02 | 00:01 | 82 | $16,051.91 @ 4.920 / 04/30/2012 - 05/02/2012 | $4.32 |
| System | 2012-05-31 | 00:01 | 82 | $16,051.91 @ 4.920 / 05/02/2012 - 05/31/2012 | $62.58 |
| System | 2012-06-01 | 00:01 | 82 | $16,051.91 @ 4.920 / 05/31/2012 - 06/01/2012 | $2.16 |
| System | 2012-06-30 | 00:01 | 82 | $16,051.91 @ 4.920 / 06/01/2012 - 06/30/2012 | $62.58 |
| System | 2012-07-01 | 00:01 | 82 | $16,051.91 @ 4.920 / 06/30/2012 - 07/01/2012 | $2.16 |
| System | 2012-07-02 | 00:01 | 82 | $16,051.91 @ 4.890 / 07/01/2012 - 07/02/2012 | $2.14 |
| System | 2012-07-31 | 00:01 | 82 | $16,051.91 @ 4.890 / 07/02/2012 - 07/31/2012 | $62.19 |
| System | 2012-08-01 | 00:01 | 82 | $16,051.91 @ 4.890 / 07/31/2012 - 08/01/2012 | $2.14 |
| System | 2012-08-31 | 00:01 | 82 | $16,051.91 @ 4.890 / 08/01/2012 - 08/31/2012 | $64.34 |
| System | 2012-09-04 | 00:01 | 82 | $16,051.91 @ 4.890 / 08/31/2012 - 09/04/2012 | $8.58 |
| System | 2012-09-30 | 00:01 | 82 | $16,051.91 @ 4.890 / 09/04/2012 - 09/30/2012 | $55.76 |
| System | 2012-10-01 | 00:01 | 82 | $16,051.91 @ 4.890 / 09/30/2012 - 10/01/2012 | $2.14 |
| System | 2012-10-31 | 00:01 | 82 | $16,051.91 @ 4.890 / 10/01/2012 - 10/31/2012 | $64.34 |
| System | 2012-11-09 | 00:01 | 82 | $16,051.91 @ 4.890 / 10/31/2012 - 11/09/2012 | $19.30 |
| System | 2012-11-12 | 00:01 | 82 | $16,051.91 @ 4.890 / 11/09/2012 - 11/12/2012 | $6.43 |
| System | 2012-11-21 | 00:01 | 82 | $16,051.91 @ 4.890 / 11/12/2012 - 11/21/2012 | $19.30 |
| System | 2012-12-03 | 00:01 | 82 | $16,051.91 @ 4.890 / 11/21/2012 - 12/03/2012 | $25.74 |
| System | 2012-12-17 | 00:01 | 82 | $16,051.91 @ 4.890 / 12/03/2012 - 12/17/2012 | $30.02 |
| System | 2012-12-31 | 00:01 | 82 | $16,051.91 @ 4.890 / 12/17/2012 - 12/31/2012 | $30.02 |
| System | 2013-01-03 | 00:01 | 82 | $16,051.91 @ 4.890 / 12/31/2012 - 01/03/2013 | $6.45 |
| System | 2013-01-10 | 00:01 | 82 | $16,051.91 @ 4.860 / 01/03/2013 - 01/10/2013 | $14.96 |
| System | 2013-01-31 | 00:01 | 82 | $16,051.91 @ 4.860 / 01/10/2013 - 01/31/2013 | $44.88 |
| System | 2013-02-07 | 00:01 | 82 | $16,051.91 @ 4.860 / 01/31/2013 - 02/07/2013 | $14.96 |
| System | 2013-02-08 | 00:01 | 82 | $16,051.91 @ 4.860 / 02/07/2013 - 02/08/2013 | $2.14 |
| System | 2013-02-12 | 00:01 | 82 | $16,051.91 @ 4.860 / 02/08/2013 - 02/12/2013 | $8.55 |
| System | 2013-02-13 | 00:01 | 82 | $16,051.91 @ 4.860 / 02/12/2013 - 02/13/2013 | $2.14 |
| System | 2013-02-15 | 00:01 | 82 | $16,051.91 @ 4.860 / 02/13/2013 - 02/15/2013 | $4.27 |
| System | 2013-02-28 | 00:01 | 82 | $16,051.91 @ 4.860 / 02/15/2013 - 02/28/2013 | $27.79 |
| System | 2013-03-31 | 00:01 | 82 | $16,051.91 @ 4.860 / 02/28/2013 - 03/31/2013 | $66.26 |
| System | 2013-04-09 | 00:01 | 82 | $16,051.91 @ 4.860 / 03/31/2013 - 04/09/2013 | $19.24 |
| System | 2013-04-30 | 00:01 | 82 | $16,051.91 @ 4.850 / 04/09/2013 - 04/30/2013 | $44.79 |
| System | 2013-05-31 | 00:01 | 82 | $16,051.91 @ 4.850 / 04/30/2013 - 05/31/2013 | $66.12 |
| System | 2013-06-30 | 00:01 | 82 | $16,051.91 @ 4.850 / 05/31/2013 - 06/30/2013 | $63.99 |
| System | 2013-07-31 | 00:01 | 82 | $16,051.91 @ 4.850 / 06/30/2013 - 07/31/2013 | $66.12 |
| System | 2013-08-31 | 00:01 | 82 | $16,051.91 @ 4.850 / 07/31/2013 - 08/31/2013 | $66.12 |
| System | 2013-09-30 | 00:01 | 82 | $16,051.91 @ 4.850 / 08/31/2013 - 09/30/2013 | $63.99 |
| System | 2013-10-09 | 00:01 | 82 | $16,051.91 @ 4.850 / 09/30/2013 - 10/09/2013 | $19.20 |
| System | 2013-10-31 | 00:01 | 82 | $16,051.91 @ 4.840 / 10/09/2013 - 10/31/2013 | $46.83 |
| System | 2013-11-30 | 00:01 | 82 | $16,051.91 @ 4.840 / 10/31/2013 - 11/30/2013 | $63.86 |
| System | 2013-12-31 | 00:01 | 82 | $16,051.91 @ 4.840 / 11/30/2013 - 12/31/2013 | $65.98 |
| System | 2014-01-06 | 00:01 | 82 | $16,051.91 @ 4.840 / 12/31/2013 - 01/06/2014 | $12.77 |
| System | 2014-01-31 | 00:01 | 82 | $16,051.91 @ 4.820 / 01/06/2014 - 01/31/2014 | $52.99 |

| System | 2014-02-28 | 00:01 | 82 | $16,051.91 @ 4.820 / 01/31/2014 - 02/28/2014 | $59.35 |
|--------|------------|-------|----|----------------------------------------------|--------|
| System | 2014-04-03 | 00:01 | 82 | $16,051.91 @ 4.820 / 02/28/2014 - 04/03/2014 | $72.07 |
| System | 2014-05-21 | 00:01 | 82 | $16,051.91 @ 4.810 / 04/03/2014 - 05/21/2014 | $101.54 |
| System | 2014-06-05 | 00:01 | 82 | $16,051.91 @ 4.810 / 05/21/2014 - 06/05/2014 | $31.73 |
| System | 2014-07-03 | 00:01 | 82 | $16,051.91 @ 4.810 / 06/05/2014 - 07/03/2014 | $59.23 |
| System | 2014-07-31 | 00:01 | 82 | $16,051.91 @ 4.800 / 07/03/2014 - 07/31/2014 | $59.11 |
| System | 2014-08-01 | 00:01 | 82 | $16,051.91 @ 4.800 / 07/31/2014 - 08/01/2014 | $2.11 |
| System | 2014-08-31 | 00:01 | 82 | $16,051.91 @ 4.805 / 08/01/2014 - 08/31/2014 | $63.39 |
| System | 2014-09-02 | 00:01 | 82 | $16,051.91 @ 4.805 / 08/31/2014 - 09/02/2014 | $4.23 |
| System | 2014-09-30 | 00:01 | 82 | $16,051.91 @ 4.800 / 09/02/2014 - 09/30/2014 | $59.11 |
| System | 2014-10-31 | 00:01 | 82 | $16,051.91 @ 4.800 / 09/30/2014 - 10/31/2014 | $65.44 |
| System | 2014-11-04 | 00:01 | 82 | $16,051.91 @ 4.800 / 10/31/2014 - 11/04/2014 | $8.44 |
| System | 2014-11-30 | 00:01 | 82 | $16,051.91 @ 4.810 / 11/04/2014 - 11/30/2014 | $55.00 |
| System | 2014-12-04 | 00:01 | 82 | $16,051.91 @ 4.810 / 11/30/2014 - 12/04/2014 | $8.46 |
| System | 2014-12-09 | 00:01 | 82 | $16,051.91 @ 4.810 / 12/04/2014 - 12/09/2014 | $10.58 |

## DEPOSIT AND SALE AGREEMENT
## THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2

This Deposit and Sale Agreement (the "Sale Agreement"), dated as of June 9, 2005, between The National Collegiate Funding LLC, in its capacity as seller (in such capacity, the "Seller"), and The National Collegiate Student Loan Trust 2005-2, as purchaser (the "Purchaser"), shall be effective upon execution by the parties hereto.

WHEREAS, the Seller is the owner of certain student loans; and

WHEREAS, the Seller desires to sell its interest in such student loans and the Purchaser desires to purchase such loans from the Seller.

NOW, THEREFORE, in connection with the mutual promises contained herein, the parties hereto agree as follows:

## ARTICLE I
## TERMS

This Sale Agreement sets forth the terms under which the Seller is selling and the Purchaser is purchasing the student loans listed on Schedule 2 to each of the Pool Supplements set forth on Schedule A attached hereto (the "Transferred Student Loans").

## ARTICLE II
## DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the definitions set forth in Appendix A of the Indenture dated as of June 1, 2005 between U.S. Bank National Association (the "Indenture Trustee") and the Purchaser.

## ARTICLE III
## SALE AND PURCHASE

Section 3.01. Sale of Loans. The Seller hereby sells and the Purchaser hereby purchases the Transferred Student Loans.

Section 3.02. Assignment of Rights. The Seller hereby assigns to the Purchaser and the Purchaser hereby accepts all of the Seller's rights and interests under each of the Pool Supplements listed on Schedule A attached hereto and the related Student Loan Purchase Agreements listed on Schedule B attached hereto.

Section 3.03. Settlement of the Payment. The Purchaser shall pay the Seller the purchase price set forth in Schedule 1 of each of the Pool Supplements by wire transfer in immediately available funds to the account specified by the Seller. In addition, the Purchaser will also issue the Class A-5 Notes and Class A-IO Notes to the Seller pursuant to the Indenture.

Section 3.04.  Assistance by Seller.  Following the execution of this Sale Agreement, the Seller shall provide any reasonable assistance requested by the Purchaser in determining that all required documentation on the Transferred Student Loans is present and correct.

## ARTICLE IV
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER

Section 4.01.  General.  The Seller represents and warrants to the Purchaser that as of the date of this Sale Agreement:

(a)     The Seller is duly organized and existing under the laws of the State of Delaware; and

(b)     The Seller has all requisite power and authority to enter into and to perform the terms of this Sale Agreement.

Section 4.02.  Loan Representations.  The Seller represents and warrants to the Purchaser that with respect to each Transferred Student Loan purchased by the Purchaser pursuant to this Sale Agreement, the Seller is making the same representations and warranties made by the respective program lender with respect to each Transferred Student Loan pursuant to the respective Student Loan Purchase Agreement listed on Schedule B attached hereto.

Section 4.03.  Covenants.  The Seller, in its capacity as purchaser of the Transferred Student Loans pursuant to the Pool Supplements, hereby covenants that it will enforce the covenants and agreements of each program lender in the respective Student Loan Purchase Agreement and related Pool Supplement.  The Seller further covenants that it will not waive, amend, modify, supplement or terminate any Student Loan Purchase Agreement or Pool Supplement or any provision thereof without the consent of the Purchaser, which consent the Purchaser hereby agrees not to provide without the prior written consent of the Indenture Trustee and the Interested Noteholders in accordance with the Purchaser's covenant in Section 3.07(c) of the Indenture.

## ARTICLE V
## PURCHASE OF LOANS; REIMBURSEMENT

Each party to this Sale Agreement shall give notice to the other such parties and to the Servicers, First Marblehead Data Services, Inc. and Delaware Trust Company, National Association (the "Owner Trustee") promptly, in writing, upon the discovery of any breach of the Seller's representations and warranties made pursuant to this Sale Agreement which has a materially adverse effect on the interest of the Purchaser in any Transferred Student Loan.  In the event of such a material breach, the Seller shall cure or repurchase the Transferred Student Loan in accordance with the remedies set forth in the respective Student Loan Purchase Agreement.

## ARTICLE VI
## LIABILITY OF SELLER; INDEMNITIES

The Seller shall be liable in accordance herewith only to the extent of the obligations specifically undertaken by the Seller under this Sale Agreement.

2

(a)    The Seller shall indemnify, defend and hold harmless the Purchaser and the Owner Trustee in its individual capacity and their officers, directors, employees and agents from and against any taxes that may at any time be asserted against any such Person with respect to the transactions contemplated herein and in the other Basic Documents (except any such income taxes arising out of fees paid to the Owner Trustee), including any sales, gross receipts, general corporation, tangible and intangible personal property, privilege or license taxes and costs and expenses in defending against the same.

(b)    The Seller shall indemnify, defend and hold harmless the Purchaser and the Owner Trustee in its individual capacity and their officers, directors, employees and agents of the Purchaser and the Owner Trustee from and against any and all costs, expenses, losses, claims, damages and liabilities arising out of, or imposed upon such Person through, the Seller's willful misfeasance, bad faith or gross negligence in the performance of its duties under this Sale Agreement, or by reason of reckless disregard of its obligations and duties under this Sale Agreement.

Indemnification under this Section shall survive the termination of this Sale Agreement and shall include reasonable fees and expenses of counsel and expenses of litigation. If the Seller shall have made any indemnity payments pursuant to this Section and the Person to or for the benefit of whom such payments are made thereafter shall collect any of such amounts from others, such Person shall promptly repay such amounts to the Seller, without interest.

## ARTICLE VII
## MERGER OR CONSOLIDATION OF, OR ASSUMPTION
## OF THE OBLIGATIONS OF SELLER

Any Person (a) into which the Seller may be merged or consolidated, (b) which may result from any merger or consolidation to which the Seller shall be a party or (c) which may succeed to the properties and assets of the Seller substantially as a whole, shall be the successor to the Seller without the execution or filing of any document or any further act by any of the parties to this Sale Agreement; provided, however, that the Seller hereby covenants that it will not consummate any of the foregoing transactions except upon satisfaction of the following: (i) the surviving Person, if other than the Seller, executes an agreement of assumption to perform every obligation of the Seller under this Sale Agreement, (ii) immediately after giving effect to such transaction, no representation or warranty made pursuant to this Sale Agreement shall have been breached, (iii) the surviving Person, if other than the Seller, shall have delivered an Officers' Certificate and an opinion of counsel each stating that such consolidation, merger or succession and such agreement of assumption comply with this Section and that all conditions precedent, if any, provided for in this Sale Agreement relating to such transaction have been complied with, and that the Rating Agency Condition shall have been satisfied with respect to such transaction, (iv) if the Seller is not the surviving entity, such transaction will not result in a material adverse federal or state tax consequence to the Purchaser or the Noteholders and holders of the grantor trust certificates (the "Certificates") (the "Certificateholders", together with the Noteholders, the "Securityholders") and (v) if the Seller is not the surviving entity, the Seller shall have delivered an opinion of counsel either (A) stating that, in the opinion of such counsel, all financing statements and continuation statements and amendments thereto have been executed and filed that are necessary fully to preserve and protect the interest of the Purchaser in

3

the Transferred Student Loans and reciting the details of such filings, or (B) stating that, in the opinion of such counsel, no such action shall be necessary to preserve and protect such interests.

## ARTICLE VIII
## LIMITATION ON LIABILITY OF SELLER AND OTHERS

The Seller and any director or officer or employee or agent thereof may rely in good faith on the advice of counsel or on any document of any kind, prima facie properly executed and submitted by any Person respecting any matters arising hereunder (provided that such reliance shall not limit in any way the Seller's obligations under this Sale Agreement). The Seller shall not be under any obligation to appear in, prosecute or defend any legal action that shall not be incidental to its obligations under this Sale Agreement or the Student Loan Purchase Agreements, and that in its opinion may involve it in any expense or liability.

## ARTICLE IX
## SURVIVAL OF COVENANTS

All covenants, agreements, representations and warranties made herein shall survive the consummation of the purchase of the Transferred Student Loans; provided, however, that to the extent any of the same relate to a corresponding covenant, agreement, representation or warranty contained in a Student Loan Purchase Agreement, the same shall survive to the extent that such corresponding covenant, agreement, representation or warranty survives the applicable Student Loan Purchase Agreement. All covenants, agreements, representations and warranties made or furnished pursuant hereto by or for the benefit of the Seller shall bind and inure to the benefit of any successors or assigns of the Purchaser, including the Indenture Trustee and the Grantor Trustee. This Sale Agreement may be changed, modified or discharged, and any rights or obligations hereunder may be waived, only by a written instrument signed by a duly authorized officer of the party against whom enforcement of any such waiver, change, modification or discharge is sought. The waiver by the Indenture Trustee, at the direction of the Noteholders (pursuant to the Indenture), and the Grantor Trustee, at the direction of the Certificateholders (pursuant to the Grantor Trust Agreement), of any covenant, agreement, representation or warranty required to be made or furnished by the Seller or the waiver by the Indenture Trustee, at the direction of the Noteholders (pursuant to the Indenture), and the Grantor Trustee, at the direction of the Certificateholders (pursuant to the Grantor Trust Agreement), of any provision herein contained shall not be deemed to be a waiver of any breach of any other covenant, agreement, representation, warranty or provision herein contained, nor shall any waiver or any custom or practice which may evolve between the parties in the administration of the terms hereof, be construed to lessen the right of the Indenture Trustee, at the direction of the Noteholders (pursuant to the Indenture), and the Grantor Trustee, at the direction of the Certificateholders (pursuant to the Grantor Trust Agreement), to insist upon the performance by the Seller in strict accordance with said terms.

## ARTICLE X
## COMMUNICATION AND NOTICE REQUIREMENTS

All communications, notices and approvals provided for hereunder shall be in writing and mailed or delivered to the Seller or the Purchaser, as the case may be. Notice given in any such

4

communication, mailed to the Seller or the Purchaser by appropriately addressed registered mail, shall be deemed to have been given on the day following the date of such mailing and shall be addressed as follows:

If to the Purchaser, to:

> The National Collegiate Student Loan Trust 2005-2
> c/o Delaware Trust Company, National Association, as Owner Trustee
> 300 Delaware Avenue, 9th Floor
> Wilmington, Delaware 19801
> Attention: Mr. Sterling C. Correia

If to the Seller, to:

> The National Collegiate Funding LLC
> c/o First Marblehead Data Services, Inc.
> 230 Park Avenue, 10th Floor
> New York, NY 10169
> Attention: Mr. Rob Baron

with a copy to:

> First Marblehead Corporation
> The Prudential Tower
> 800 Boylston Street - 34th Floor
> Boston, MA 02199-8157
> Attention: Mr. Richard P. Zermani

or to such other address as either party shall have provided to the other parties in writing. Any notice required to be in writing hereunder shall be deemed given if such notice is mailed by certified mail, postage prepaid, or hand-delivered to the address of such party as provided above.

## ARTICLE XI
## AMENDMENT

This Sale Agreement may be amended by the parties hereto without the consent of the related Securityholders for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Sale Agreement or of modifying in any manner the rights of such Securityholders; provided that such action will not, in the opinion of counsel satisfactory to the Indenture Trustee and the Grantor Trustee, materially affect the interest of any such Securityholder.

In addition, this Sale Agreement may also be amended from time to time by the Seller and the Purchaser, with the consent of the Noteholders of the Notes evidencing a majority of the Outstanding Amount of the Notes and the consent of the Certificateholders of the Certificates evidencing a majority of the outstanding principal amount of the Certificates, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this

5

Sale Agreement or of modifying in any manner the rights of the Noteholders or the Certificateholders, respectively; provided, however, that no such amendment shall (a) increase or reduce in any manner the amount of, or accelerate or delay the time of, collections of payments with respect to Transferred Student Loans or distributions that shall be required to be made for the benefit of the Securityholders or (b) reduce the aforesaid percentage of the Outstanding Amount of the Notes or the Certificates, the Noteholders or the Certificateholders of which are required to consent to any such amendment, without the consent of all outstanding Noteholders or Certificateholders, respectively.

Promptly after the execution of any such amendment or consent (or, in the case of the Rating Agencies, five Business Days prior thereto), the Purchaser shall furnish written notification of the substance of such amendment or consent to the Indenture Trustee, the Grantor Trustee and each of the Rating Agencies.

It shall not be necessary for the consent of Securityholders pursuant to this Section to approve the particular form of any proposed amendment or consent, but it shall be sufficient if such consent shall approve the substance thereof.

Prior to the execution of any amendment to this Sale Agreement, the Owner Trustee shall be entitled to receive and rely upon an opinion of counsel stating that execution of such amendment is authorized or permitted by this Sale Agreement, the Owner Trustee may, but shall not be obligated to, enter into any such amendment which affects the Owner Trustee's own rights, duties or immunities under this Sale Agreement or otherwise.

## ARTICLE XII
## ASSIGNMENT

The Seller hereby assigns its entire right, title and interest as purchaser under this Sale Agreement and the Student Loan Purchase Agreement thereunder to the Purchaser as of the date hereof and acknowledges that the Purchaser will assign the same, together with the right, title and interest of the Purchaser hereunder, to the Indenture Trustee under the Indenture.

## ARTICLE XIII
## GOVERNING LAW

THIS SALE AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, BUT OTHERWISE WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES, HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

## ARTICLE XIV
## LIMITATION OF LIABILITY OF OWNER TRUSTEE

Notwithstanding anything contained herein to the contrary, this instrument has been executed by Delaware Trust Company, National Association, not in its individual capacity but solely in its capacity as Owner Trustee of the Purchaser, and in no event shall Delaware Trust

Company, National Association in its individual capacity or any beneficial owner of the Purchaser have any liability for the representations, warranties, covenants, agreements or other obligations of the Purchaser hereunder, as to all of which recourse shall be had solely to the assets of the Purchaser. For all purposes of this Sale Agreement, in the performance of any duties or obligations of the Purchaser hereunder, the Owner Trustee shall be subject to, and entitled to the benefits of, the terms and provisions of Articles VIII, IX and X of the Trust Agreement.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Sale Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

THE NATIONAL COLLEGIATE FUNDING LLC, as Seller

By: GATE Holdings, Inc., Member

By:_____
    Name: Stephen Anbinder
    Title: President

THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2, as Purchaser

By:   Delaware Trust Company, National Association, not in its individual capacity but solely as Owner Trustee

By:_____
    Name: Sterling C. Correia
    Title: Vice President

Deposit and Sale Agreement

IN WITNESS WHEREOF, the parties hereto have caused this Sale Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

THE NATIONAL COLLEGIATE FUNDING LLC, as Seller

By: GATE Holdings, Inc., Member

By:_____
    Name: Stephen Anbinder
    Title: President


THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2, as Purchaser

By:   Delaware Trust Company, National Association, not in its individual capacity but solely as Owner Trustee

By:_____
    Name: Sterling C. Correia
    Title: Vice President

Deposit and Sale Agreement

## SCHEDULE A
### Pool Supplements

Each of the following Pool Supplements was entered into by and among The First Marblehead Corporation, The National Collegiate Funding LLC and:

- Bank of America, N.A., dated June 9, 2005, for loans that were originated under Bank of America's BAGEL Loan Program, CEDU Loan Program, Direct to Consumer Loan Program and ISLP Loan Program.
- Bank One, N.A., dated June 9, 2005, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program, EDUCATION ONE Loan Program and M&T REFERRAL Loan Program.
- Charter One Bank, N.A., dated June 9, 2005, for loans that were originated under the following Charter One programs: AAA Southern New England Bank, AES EducationGAIN Loan Program, (AMS) TuitionPay Diploma Loan Program, Brazos Alternative Loan Program, CFS Direct to Consumer Loan Program, Citibank Flexible Education Loan Program, College Loan Corporation Loan Program, Comerica Alternative Loan Program, Custom Educredit Loan Program, Edfinancial Loan Program, Education Assistance Services Loan Program, ESF Alternative Loan Program, Extra Credit II Loan Program (North Texas Higher Education), M&I Alternative Loan Program, National Education Loan Program, Navy Federal Alternative Loan Program, NextStudent Alternative Loan Program, NextStudent Private Consolidation Loan Program, PNC Bank Resource Loan Program, SAF Alternative Loan Program, START Education Loan Program, Southwest Loan Program, WAMU Alternative Student Loan Program, Charter One Referral Loan Program and Axiom Alternative Loan Program.
- Chase Manhattan Bank USA, N.A., dated June 9 2005, for loans that were originated under Chase's Chase Extra Loan Program.
- Citizens Bank of Rhode Island, dated June 9, 2005, for loans that were originated under Citizens Bank of Rhode Island's Compass Bank Loan Program, DTC Loan Program, Navy Federal Referral Loan Program and Xanthus Loan Program.
- First National Bank Northeast, dated June 9, 2005, for loans that were originated under First National Bank Northeast's CASL Undergraduate Loan Program.
- GMAC Bank, dated June 9, 2005, for loans that were originated under GMAC Bank's GMAC Alternative Loan Program.
- HSBC Bank USA, National Association, dated June 9, 2005, for loans that were originated under the HSBC Loan Program.
- The Huntington National Bank, dated June 9, 2005, for loans that were originated under The Huntington National Bank's Huntington Bank Education Loan Program.
- Manufacturers and Traders Trust Company, dated June 9, 2005, for loans that were originated under Manufacturers and Traders Trust Company's M&T Alternative Loan Program.
- PNC Bank, N.A., dated June 9, 2005, for loans that were originated under PNC Bank's PNC Bank Alternative Loan Program.
- Sovereign Bank, dated June 9, 2005, for loans that were originated under Sovereign Bank's Alternative Loan Program.

- SunTrust Bank, dated June 9, 2005, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.

**SCHEDULE B**
*Student Loan Purchase Agreements*

Each of the Note Purchase Agreements, as amended or supplemented, was entered into by and between The First Marblehead Corporation and:

- Bank of America, N.A., dated April 30, 2001, for loans that were originated under Bank of America's BAGEL Loan Program, CEDU Loan Program and ISLP Loan Program.
- Bank of America, N.A., dated June 30, 2003, for loans that were originated under Bank of America's Direct to Consumer Loan Program.
- Bank One, N.A., dated May 1, 2002, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program and EDUCATION ONE Loan Program.
- Bank One, N.A., dated July 26, 2002, for loans that were originated under Bank One's M&T REFERRAL Loan Program
- Charter One Bank, N.A., dated as of December 29, 2003 for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.
- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's (AMS) TuitionPay Diploma Loan Program.
- Charter One Bank, N.A., dated July 15, 2003, for loans that were originated under Charter One's Brazos Alternative Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's CFS Direct to Consumer Loan Program.
- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated under Charter One's Citibank Flexible Education Loan Program.
- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated under Charter One's College Loan Corporation Loan Program.
- Charter One Bank, N.A., dated December 4, 2002, for loans that were originated under Charter One's Comerica Alternative Loan Program.
- Charter One Bank, N.A., dated December 1, 2003, for loans that were originated under Charter One's Custom Educredit Loan Program.
- Charter One Bank, N.A., dated May 10, 2004, for loans that were originated under Charter One's Edfinancial Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's Education Assistance Services Loan Program.
- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's ESF Alternative Loan Program.
- Charter One Bank, N.A., dated September 15, 2003, for loans that were originated under Charter One's Extra Credit II Loan Program (North Texas Higher Education).
- Charter One Bank, N.A., dated September 20, 2003, for loans that were originated under Charter One's M&I Alternative Loan Program.
- Charter One Bank, N.A., dated November 17, 2003, for loans that were originated under Charter One's National Education Loan Program.

Case 2:18-cv-01132-TSZ · Document 190-1 · Filed 07/20/21 · Page 117 of 160

- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's Navy Federal Alternative Loan Program.
- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's NextStudent Alternative Loan Program.
- Charter One Bank, N.A., dated March 26, 2004, for loans that were originated under Charter One's NextStudent Private Consolidation Loan Program.
- Charter One Bank, N.A., dated March 17, 2003, for loans that were originated under Charter One's PNC Bank Resource Loan Program.
- Charter One Bank, N.A., dated May 1, 2003, for loans that were originated under Charter One's SAF Alternative Loan Program.
- Charter One Bank, N.A., dated September 20, 2002, for loans that were originated under Charter One's Southwest Loan Program.
- Charter One Bank, N.A., dated March 25, 2004, for loans that were originated under Charter One's START Education Loan Program.
- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's WAMU Alternative Student Loan Program.
- Charter One Bank, N.A., dated February 15, 2005, for loans that were originated under Charter One's Referral Loan Program and Axiom Alternative Loan Program.
- Chase Manhattan Bank USA, N.A., dated September 30, 2003, as amended on March 1, 2004, September 8, 2004 and February 25, 2005, for loans that were originated under Chase's Chase Extra Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Compass Bank Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's DTC Alternative Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Navy Federal Referral Loan Program.
- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Xanthus Loan Program.
- First National Bank Northeast, dated August 1, 2001, for loans that were originated under First National Bank Northeast's CASL Undergraduate Loan Program.
- GMAC Bank, dated May 30, 2003, as amended on March 1, 2005, for loans that were originated under GMAC Bank's GMAC Alternative Loan Program.
- HSBC Bank USA, National Association, dated April 17, 2002, as amended on June 2, 2003 and August 1, 2003, for loans that were originated under the HSBC Loan Program.
- The Huntington National Bank, dated May 20, 2003, for loans that were originated under The Huntington National Bank's Huntington Bank Education Loan Program.
- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under Manufacturers and Traders Trust Company's Alternative Loan Program.
- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Alternative Conforming Loan Program.
- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Loan Program.
- SunTrust Bank, dated March 1, 2002, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.

EX-10.14 15 nationalcollegiate_ex10-14.htm POOL SUPPLEMENT
**POOL SUPPLEMENT**
**BANK ONE, N.A.**

This Pool Supplement (the "Supplement") is entered into pursuant to and forms a part of that certain (i) Amended and Restated Note Purchase Agreement dated as of May 1, 2002 and (ii) Amended and Restated Note Purchase Agreement dated as of July 26, 2002, each as amended or supplemented from the date of execution of the Agreement through the date of this Supplement (together, the "Agreement"), by and between The First Marblehead Corporation ("FMC") and Bank One, N.A. (Columbus, Ohio) by its successor by merger, JPMorgan Chase Bank, N.A. (the "Program Lender"). This Supplement is dated as of June 9, 2005. Capitalized terms used in this Supplement without definitions have the meanings set forth in the Agreement.

Article 1: Purchase and Sale.

In consideration of the Minimum Purchase Price set forth in Schedule 1 attached hereto, the Program Lender hereby transfers, sells, sets over and assigns to The National Collegiate Funding LLC (the "Depositor"), upon the terms and conditions set forth in the Agreement (which are incorporated herein by reference with the same force and effect as if set forth in full herein), each student loan set forth on the attached Schedule 2 (the "Transferred Bank One Loans") along with all of the Program Lender's rights under the Guaranty Agreement relating to the Transferred Bank One Loans. The Depositor in turn will sell the Transferred Bank One Loans to The National Collegiate Student Loan Trust 2005-2 (the "Trust"). The Program Lender hereby transfers and delivers to the Depositor each Note evidencing such Transferred Bank One Loan and all Origination Records relating thereto, in accordance with the terms of the Agreement. The Depositor hereby purchases said Notes on said terms and conditions.

Article 2: Price.

The amount paid pursuant to this Supplement is the Minimum Purchase Price, as that term is defined in Section 2.04 of the Agreement.

Article 3: Representations and Warranties.

3.01. By Program Lender.

The Program Lender repeats the representations and warranties contained in Section 5.02 of the Agreement for the benefit of each of the Depositor and the Trust and confirms the same are true and correct as of the date hereof with respect to the Agreement and to this Supplement.

3.02. By Depositor.

The Depositor hereby represents and warrants to the Program Lender that at the date of execution and delivery of this Supplement by the Depositor:

(a)   The Depositor is duly organized and validly existing as a limited liability company under the laws of the State of Delaware with the due power and authority to own its properties and to conduct its business as such properties are currently owned and such business is presently conducted, and had at all relevant times, and has, the power, authority and legal right to acquire and own the Transferred Bank One Loans.

(b)     The Depositor is duly qualified to do business and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business shall require such qualifications.

(c)     The Depositor has the power and authority to execute and deliver this Supplement and to carry out its respective terms; the Depositor has the power and authority to purchase the Transferred Bank One Loans and rights relating thereto as provided herein from the Program Lender, and the Depositor has duly authorized such purchase from the Program Lender by all necessary action; and the execution, delivery and performance of this Supplement has been duly authorized by the Depositor by all necessary action on the part of the Depositor.

(d)     This Supplement, together with the Agreement of which this Supplement forms a part, constitutes a legal, valid and binding obligation of the Depositor, enforceable in accordance with its terms.

(e)     The consummation of the transactions contemplated by the Agreement and this Supplement and the fulfillment of the terms hereof do not conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time) a default under, the governing instruments of the Depositor or any indenture, agreement or other instrument to which the Depositor is a party or by which it is bound; or result in the creation or imposition of any lien upon any of its properties pursuant to the terms of any such indenture, agreement or other instrument; or violate any law or any order, rule or regulation applicable to the Depositor of any court or of any federal or state regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Depositor or its properties.

(f)     There are no proceedings or investigations pending, or threatened, before any court, regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Depositor or its properties: (i) asserting the invalidity of the Agreement or this Supplement, (ii) seeking to prevent the consummation of any of the transactions contemplated by the Agreement or this Supplement, or (iii) seeking any determination or ruling that is likely to materially or adversely affect the performance by the Depositor of its obligations under, or the validity or enforceability of the Agreement or this Supplement.

Article 4: Cross Receipt.

The Program Lender hereby acknowledges receipt of the Minimum Purchase Price. The Depositor hereby acknowledges receipt of the Transferred Bank One Loans included in the Pool.

Article 5: Assignment of Origination, Guaranty and Servicing Rights.

The Program Lender hereby assigns and sets over to the Depositor any claims it may now or hereafter have under the Guaranty Agreement, the Origination Agreement and the Servicing Agreement to the extent the same relate to the Transferred Bank One Loans described in Schedule 2, other than any right to obtain servicing after the date hereof. It is the intent of this provision to vest in the Depositor any claim of the Program Lender relating to defects in origination, guaranty or servicing of the loans purchased hereunder in order to permit the Depositor to assert such claims directly and obviate any need to make the same claims against the Program Lender under this Supplement.

IN WITNESS WHEREOF, the parties have caused this Supplement to be executed as of the date set forth above.

THE FIRST MARBLEHEAD
CORPORATION

By:     /s/ John A. Hupalo
Name:   John A. Hupalo
Title:    Executive Vice President

BANK ONE, N.A. (Columbus, Ohio)
by its successor by merger, JPMorgan
Chase Bank, N.A

By:     /s/ Joseph F. Sergi
Name:   Joseph F. Sergi
Title:    First Vice President

THE NATIONAL COLLEGIATE
FUNDING LLC

By: GATE Holdings, Inc., Member

By:     /s/ Stephen Anbinder
Name:   Stephen Anbinder
Title:    President

EX. F

Washington Secretary of State, Kim Wyman

Contact Us | Connect:  

# Washington State Archives - Digital Archives

| Home | Search | Collections | News | Services | About us | My Recent Searches | | View Cart 🛒 |
|------|--------|-------------|------|----------|----------|--------------------|--|----------|

## Search

All branches of the Washington State Archives are now open to researchers by appointment only. For more information, please **visit our page regarding the closure**

**Record Series**
Superior Court Records
**County**
Snohomish
**Title**
Snohomish County Superior Court Ca...

> Enter at least one search field, then click the 'Search' button in the lower right.

**Case Number or Keywords**

Case Number (with dashes: ##-#-######-#)
15-2-04014-4

Keywords

**Don't Know your case number?**
You can search for a case number by a person or business name at **Washington State Courts**

**Case Year**
Year From    Year To

[Search]

| | Order ☐ | Case Number | Date Y/M/D | Docket Code | Description | Case Title | Case Sub | County | Image Exists |
|--|---------|-------------|------------|-------------|-------------|------------|----------|--------|--------------|
| | ☐ | 15-2-04014-4 | 2015/05/20 | CICS | CASE INFORMATION COVER SHEET | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 1 | Snohomish | 🖼️ |
| | ☐ | 15-2-04014-4 | 2015/05/20 | SMCMP | SUMMONS & COMPLAINT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 2 | Snohomish | 🖼️ |
| | ☐ | 15-2-04014-4 | 2015/05/28 | AFSR | AFFIDAVIT/DCLR/CERT OF SERVICE | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 3 | Snohomish | 🖼️ |
| | ☐ | 15-2-04014-4 | 2015/05/28 | MTDJ | MOTION FOR DEFAULT JUDGMENT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 4 | Snohomish | 🖼️ |
| | ☐ | 15-2-04014-4 | 2015/05/28 | DFJG | DEFAULT JUDGMENT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 5 | Snohomish | 🖼️ |
| | ☐ | 15-2-04014-4 | 2015/05/28 | CB | COST BILL | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 6 | Snohomish | 🖼️ |
| | ☐ | 15-2-04014-4 | 2015/07/14 | AFGAR | AFFIDAVIT FOR GARNISHMENT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 7 | Snohomish | 🖼️ |

[Add To Cart]

Page 1 of 1, Records 1-32 of 32     Jump To Page: 1 ▼     Records Per Page: 50 ▼       Search Time 1.88 seconds

| Order ☐ | Case Number | Date Y/M/D | Docket Code | Description | Case Title | Case Sub | County | Image Exists |
|---|---|---|---|---|---|---|---|---|
| ☐ | 15-2-04014-4 | 2015/08/05 | ANW | ANSWER TO WRIT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 8 | Snohomish | |
| ☐ | 15-2-04014-4 | 2015/08/21 | AFGAR | AFFIDAVIT FOR GARNISHMENT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 9 | Snohomish | |
| ☐ | 15-2-04014-4 | 2015/09/04 | ANW | ANSWER TO WRIT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 10 | Snohomish | |
| ☐ | 15-2-04014-4 | 2015/10/28 | NTAPR | NOTICE OF APPEARANCE | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 11 | Snohomish | |
| ☐ | 15-2-04014-4 | 2015/10/28 | MTSC | MOTION FOR ORDER TO SHOW CAUSE | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 12 | Snohomish | |
| ☐ | 15-2-04014-4 | 2015/10/28 | DCLR | DECLARATION OF TONY KIM | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 13 | Snohomish | |
| ☐ | 15-2-04014-4 | 2015/10/28 | DCLR | DECLARATION OF DARIA KIM | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 14 | Snohomish | |
| ☐ | 15-2-04014-4 | 2015/10/28 | DCLR | DECLARATION OF CHRISTINA L | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 15 | Snohomish | |
| ☐ | 15-2-04014-4 | 2015/10/28 | DCLR | DECLARATION OF IL KIM | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 16 | Snohomish | |
| ☐ | 15-2-04014-4 | 2015/10/28 | NTC | NOTE FOR CALENDAR | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 17 | Snohomish | |
| ☐ | 15-2-04014-4 | 2015/11/03 | DCLR | DECLARATION OF MARCO RUISLA | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 18 | Snohomish | |
| ☐ | 15-2-04014-4 | 2015/11/03 | DCLR | DECLARATION OF MATTHEW CHEUNG | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 19 | Snohomish | |
| ☐ | 15-2-04014-4 | 2015/11/03 | OB | OPPOSITION TO DFDT'S MOTION TO | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 20 | Snohomish | |

Add To Cart

Page 1 of 1, Records 1-32 of 32     Jump To Page: 1 ▾     Records Per Page: 50 ▾       Search Time 1.88 seconds

| Order ☐ | Case Number | Date Y/M/D | Docket Code | Description | Case Title | Case Sub | County | Image Exists |
|---|---|---|---|---|---|---|---|---|
| ☐ | 15-2-04014-4 | 2015/11/03 | PROR | PROPOSED ORDER/FINDINGS | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 21 | Snohomish | |
| ☐ | 15-2-04014-4 | 2015/11/04 | NTC | NOTE FOR CALENDAR | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 22 | Snohomish | |
| ☐ | 15-2-04014-4 | 2015/11/12 | ORTSC | ORDER TO SHOW CAUSE | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 23 | Snohomish | |
| ☐ | 15-2-04014-4 | 2015/11/19 | NTC | NOTE FOR CALENDAR | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 24 | Snohomish | |
| ☐ | 15-2-04014-4 | 2015/11/19 | ORTSC | ORDER TO SHOW CAUSE - 2ND | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 25 | Snohomish | |
| ☐ | 15-2-04014-4 | 2015/11/30 | RPY | REPLY IN SUPPORT OF MOTION | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 26 | Snohomish | |
| ☐ | 15-2-04014-4 | 2015/12/01 | MTHRG | MOTION HEARING | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 27 | Snohomish | |
| ☐ | 15-2-04014-4 | 2015/12/01 | ORVCJG | ORDER VACATING DEFAULT JUDGMENT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 28 | Snohomish | |
| ☐ | 15-2-04014-4 | 2015/12/03 | ANW | ANSWER TO WRIT | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 29 | Snohomish | |
| ☐ | 15-2-04014-4 | 2015/12/17 | AN | ANSWER | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 30 | Snohomish | |
| ☐ | 15-2-04014-4 | 2018/04/25 | CMCWP | Clerks Motion for Closure | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL | 15-2-04014-4 31 | Snohomish | |
| ☐ | 15-2-04014-4 | 2018/07/10 | CLOD | Clerks Order of Dismissal | NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 VS KIM ET AL ***DISMISSED*** | 15-2-04014-4 32 | Snohomish | |

Add To Cart

Page 1 of 1, Records 1-32 of 32     Jump To Page: 1 ▾     Records Per Page: 50 ▾       Search Time 1.88 seconds

Washington Secretary of State
Washington State Archives
Digital Archives
960 Washington Street
Cheney, WA 99004
(509) 235-7500
Phone Numbers

Privacy Policy
Accessibility



EX. F-1

FILED

2015 MAY 28  AM 9:55

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH

CL17223002

### IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
### FOR SNOHOMISH COUNTY

NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2007-4, A DELAWARE
STATUTORY TRUST

                              Plaintiff,

vs.

TONY KIM and
IL KIM,

                              Defendants.

Case No.:  **15 2 04014 4**

**MOTION & DECLARATION FOR
DEFAULT AND JUDGMENT**

#### I. MOTION

    The plaintiff, by and through its attorneys, Patenaude & Felix, A.P.C., respectfully moves the Court for an Order of Default and Judgment against the defendant, TONY KIM and IL KIM, in the principal sum of $45,293.46, together with costs, as requested in the judgment.

    This Motion is based on the affidavits or declarations in support of entry of judgment submitted herewith and the subjoined declaration of counsel.

#### II. DECLARATION

    The undersigned declares under penalty of perjury under the laws of the State of Washington that the following is true and correct:

    1.    I am the attorney of record for the plaintiff herein. I base this declaration on my review of the file maintained by this law firm with regard to this matter.

///

-1-

**MOTION & DECLARATION FOR DEFAULT JUDGMENT**

ORIGINAL

WA_90 Mtn and Dec DJ

2.      That on 1/23/2015, in Snohomish County, Washington, the defendant, TONY KIM and IL KIM, was served with a Summons and Complaint in the above referenced action. The Affidavit of such service is filed herein. More than 20 days have elapsed since the date of service.

3.      The defendants have failed to serve an appearance/answer or otherwise defend, in accordance with CR55 within the time permitted by law.

4.      Venue is appropriate under R.C.W. 4.28, because Snohomish County is the county in which the defendant resides.

5.      The defendant is not a person in the Military Service of the United States, as defined in the Soldier's and Sailor's Civil Relief Act of 1940 as amended by the The Service member's Civil Relief Act of 2003. The declarant's staff has checked the U.S. Department of Defense Manpower Date Center, and the report provided and attached states that the Department of Defense does not possess any information indicating the defendant is on Military Duty. Attached as an addendum is the information that the above statement if based upon. The declarant is unable to determine whether the defendant is a dependent of a service member.

I declare under penalty of perjury of the laws of the State of Washington that the foregoing is true and correct.

DATED: May 13, 2015, at Lynnwood, WA.

Presented by:

PATENAUDE & FELIX, A.P.C.

MATTHEW CHEUNG, WSBA #43067
Attorney for Plaintiff
Patenaude & Felix, A.P.C.
19401 40th Avenue West, Suite 280
Lynnwood, WA 98036
(425) 361-1662

-2-

MOTION & DECLARATION FOR DEFAULT JUDGMENT

PATENAUDE & FELIX, A.P.C.
19401 40th Avenue West, Suite 280, Lynnwood, WA 98036
Tel: (425) 361-1662   Toll Free: (800) 832-7675

WA_90 Mtn and Dec DJ                                      P&F File No. 14-51619

Department of Defense Manpower Data Center

Results as of : May-12-2015 04:40:25 PM

SCRA 3.0



**Status Report**
**Pursuant to Servicemembers Civil Relief Act**

Last Name: KIM
First Name: IL
Middle Name:
Active Duty Status As Of: May-12-2015

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

Mary M. Snavely-Dixon

Mary M. Snavely-Dixon, Director
Department of Defense - Manpower Data Center
4800 Mark Center Drive, Suite 04E25
Arlington, VA 22350

Department of Defense Manpower Data Center

Results as of : May-12-2015 04:43:23 PM

SCRA 3.0



**Status Report**
**Pursuant to Servicemembers Civil Relief Act**

Last Name: <u>KIM</u>
First Name: <u>TONY</u>
Middle Name:
Active Duty Status As Of: <u>May-12-2015</u>

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

*Mary M. Snavely-Dixon*

Mary M. Snavely-Dixon, Director
Department of Defense - Manpower Data Center
4800 Mark Center Drive, Suite 04E25
Arlington, VA 22350

EX. F-2

14-51619
NA

NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2007-4
A Delaware Statutory Trust(s)        )
                                     )
                                     )
Plaintiff                            )        Docket # _____
                                     )
v.                                   )
                                     )
TONY KIM                             )
KIM,IL                               )
                                     )
Defendant(s)                         )

AFFIDAVIT AND VERIFICATION OF ACCOUNT

STATE OF GEORGIA           )
                           )
COUNTY OF GWINNETT         )

BEFORE ME, the undersigned authority, personally appeared Affiant _____**Dudley Turner**_____,

who being first duly sworn, deposes and states:

1.      I am employed by Transworld Systems Inc. (hereinafter TSI), the designated

Custodian of Records for Plaintiff pertaining to the Defendants' education loan(s) forming the

subject matter of the above-captioned Complaint.   I am duly authorized by Plaintiff to make the

representations contained in this Affidavit and I am over the age of 18 and competent to testify to

the matters stated in this Affidavit.

2.      I am competent and authorized to testify relating to this action through personal

knowledge of the business records, including the electronic data, sent to TSI that detail the

education loan records.  I also have personal knowledge of the record management practices and

procedures of Plaintiff and the practices and procedures Plaintiff requires of its loan servicers and other agents.

3.      This lawsuit arose out of an unpaid loan or loans owed by defendant TONY KIM and defendant KIM,IL to Plaintiff.   Specifically Defendants entered into an education loan agreement at Defendants' special instance and request.  A loan was extended for Defendants' to use pursuant to the terms of the loan agreements.   Defendants have failed, refused, and/or neglected to pay the balance or balances pursuant to the agreed repayment schedule or schedules.

4.      Education loan account records are compiled and recorded as part of Plaintiff's regularly conducted business activity at or near the time of the event and from information transmitted from a person with knowledge of said event, by or from information transmitted by a person with knowledge of the accounts or events described within the business record.  Such records are kept, maintained, and relied upon in the course of ordinary and regularly conducted business activity.

5.      I am familiar with the education loan records within my possession as custodian of records related to this matter.  I have been authorized by Plaintiff to make this certification on behalf of Plaintiff for this case.

6.      I have reviewed the education loan records as business records described in this affidavit regarding account number xxxxx7207/006-001000.  No payment has been made on this account. After all payments, credits and offsets have been applied, defendant TONY KIM and defendant KIM,IL owe the principal sum of $41,508.81, together with accrued interest in the amount of $3,784.65, totaling the sum of $45,293.46 as of 4/21/2015.  Attached hereto and incorporated as Exhibit "A" is a true copy of the underlying Credit Agreement/Promissory Note.

In the event the Defendant(s) faxed the executed Credit Agreement/Promissory Note, per its terms they agreed their facsimile/electronic signature is deemed to be an original. Under applicable federal and state law, all copies of signatures executed via facsimile or electronic email are considered to be legal, binding agreement.

7.     Based on records maintained by Plaintiff, the Defendants are not minors or incompetent. A reasonable inquiry has been made to determine if the Defendants are in the military service of the United States of America, and to the best of my knowledge, Defendants are not in such military services and are therefore not entitled to the rights and privileges provided under the Soldiers and Sailors Civil Relief Act of 1940, as amended.

8.     I declare under the penalty of perjury under the laws of the forum state that the foregoing is true and correct to the best of my knowledge, information and belief.

FURTHER AFFIANT SAYETH NAUGHT.

AFFIANT
Print Name: _____ Dudley Turner _____
Title:     .     Legal Case Manager

SWORN AND SUBSCRIBED to before me this _27th_ day of _April_ _____, 20_15_.

NOTARY PUBLIC
My Commission Expires on ·    November 14,2017

# EXHIBIT A

## NOTE DISCLOSURE STATEMENT

$ 31,746.03
05548255
Loan No.

| | |
|---|---|
| Borrower(s) | TONY KIM |
| | IL S KIM |
| | |
| Student: | TONY KIM |
| Date: | August 7, 2007 |

TONY KIM
5841 2F WALDRON STREET
CORONA , NY 11368   USA

Lender Name and Address:
BANK OF AMERICA, N.A.
600 WILSHIRE BLVD, 4TH FLOOR
LOS ANGELES, CA 90017

This disclosure statement relates to your Loan Note disbursed on          August 7, 2007 .
Because your Loan is either being disbursed or entering repayment, or the repayment terms are being modified, the following information about your Loan is being given to you.

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments scheduled. |
|---|---|---|---|
| 9.927 % | $ 56,373.60 | $ 30,000.00 | $ 86,373.60 |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are due | |
|---|---|---|---|
| 240 | $ 359.89 | On the  8th  day of each month beginning | 12/2009 |
| | | | |
| | | | |
| | | | |

**VARIABLE RATE:** The Annual Percentage Rate, which is based on an index plus a margin, may increase during the term of the loan if the index rate increases. The index is (check one):

☐ Prime Rate Index Adjusted Monthly - The highest U.S. bank prime rate published in the "Money Rates" section of The Wall Street Journal (Eastern Edition) on the last business day of each calendar month.

☐ Prime Rate Index Adjusted Quarterly - The highest U.S. bank prime rate published in the "Money Rates" section of The Wall Street Journal (Eastern Edition) on the last business day of each calendar quarter.

☐ LIBOR Index Adjusted Quarterly - The average of the one-month London Interbank Offered Rates published in the "Money Rates" section of The Wall Street Journal (Eastern Edition) on the first business day of each of the three (3) calendar months immediately preceding the first day of each calendar quarter.

☒ LIBOR Index Adjusted Monthly - The one-month London Interbank Offered Rate published in the "Money Rates" section of The Wall Street Journal (Eastern Edition) on the first business day of the preceding calendar month.

Any increase in the index and the Annual Percentage Rate which occurs while principal payments are deferred will increase the amount of any current and all future payments. Any increase in the index and the Annual Percentage Rate which occurs while principal and interest payments are deferred will increase the amount of all future payments. Any increase in the index and the Annual Percentage Rate which occurs after you have begun to make principal and interest payments on your loan will increase the amount of your future principal and interest payments beginning with your next annual payment adjustment date. For example, assume you obtain a loan in your junior year, in the amount of $10,000, at an interest rate of 11%, and you defer principal and interest payments until after your graduation, and the repayment term of the loan is 20 years. If the interest rate increased to 12% on January 1st of your senior year, the interest which accrues while principal and interest payments are deferred will increase by $91.01, and your monthly principal and interest payments would increase by $9.37.

**LATE CHARGES:** If a payment is more than 15 days late, you may be charged $5.00 or 5% of the payment, whichever is less. If you default, Lender (or any subsequent holder of your Loan Note) may increase the margin used to compute the Annual Percentage Rate by two percentage points (2%).
**PREPAYMENT:** If you pay off early, you will not have to pay a penalty.

**Estimates:** All numerical disclosures except the late payment disclosure are estimates.

See your contract documents for any additional information about non-payment, default, any required repayment in full before the scheduled date, any security interest and prepayment refunds and penalties.

| | | |
|---|---|---|
| Principal Amount of Note (Amount Financed plus Prepaid Finance Charge) | | $          31,746.03 |
| | | |
| Itemization of Amount Financed | | |
| Amount paid to   TONY KIM   and | $ | |
| Amount paid to   IL S KIM | $          30,000.00 | |
| Total Amount Financed | | $          30,000.00 |
| | | |
| Itemization of Prepaid Finance Charge | | |
| Origination Fee | $          1,746.03 | |
| Total Prepaid Finance Charge(s) | | $          1,746.03 |

56207  086175

**\* Cosigned \*    Loan Request/Credit Agreement – Information Page**

**NON-NEGOTIABLE CREDIT AGREEMENT – THIS IS A CONSUMER CREDIT TRANSACTION**

---

**LOAN PROGRAM INFORMATION**

Education Maximizer Undergraduate Loan

Academic Period: 08/2007-05/2008

Lender: Bank of America, N.A.          School: SAINT JOHN'S UNIVERSITY

Loan Amount Requested: $30000.00      Repayment Option: Full Deferral

Deferral Period Margin: 4             Repayment Period Margin: 4          Loan Origination Fee Percentage: 5.50

---

**STUDENT BORROWER INFORMATION**

Borrower Name: Tony Kim          Home Address: 5841 2f Waldron Street Corona, NY 11368
Social Security #: ███-7207      Date of Birth: ██/1984    Home Telephone: (718) 606-0457
Mobile Telephone:               E-mail Address:
Borrower Citizenship (check one box):  ☒ U.S. Citizen   ☐ Eligible Non-Citizen (Attach front & back copy of CIS or student visa card)
Note: Personal reference name and address cannot match that of the Cosigner.
Personal Reference Name: Jun Presto _____    Reference Home Tel #: (425) 488-0554 ____ Work Tel #: ____

Reference Street Address: _817 234th Street Southeast_

Reference City/State/Zip: _Bothell, WA 98021_

---

**COSIGNER INFORMATION (Must be age of majority in state of residence)**

Cosigner Name: Il S Kim          Home Address: 809 234th Street Southeast Bothell, WA 98021
Social Security #: ███-1706      Date of Birth: ██/1947    Home Telephone: (425) 488-9414
Mobile Telephone:               E-mail Address:
Have you ever defaulted on a student loan or declared bankruptcy?  ☒ No   ☐ Yes
Current Employer: UNIVERSITY OF WASHINGTON                       Employer Telephone: (206) 543-7040
Current Position: Other          Years There: 9 Years
Years at Previous Employment: 0 Years

Alimony, child support, or separate maintenance incomes do not have to be revealed if you do not want them considered for repaying this
obligation. If you are relying on such additional income, please provide details on a separate sheet of paper.

Cosigner Citizenship (check one box):  ☒ U.S. Citizen   ☐ Eligible Non-Citizen (Attach front & back copy of CIS)
Note: Personal reference name and address cannot match that of the Borrower.

Personal Reference Name: Susan Gora _____    Reference Home Tel #: (425) 481-2027 ____ Work Tel #: ____

Reference Street Address: _808 234th street Southeast_

Reference City/State/Zip: _Bothell, WA 98021_

---

**Borrower and Cosigner: Read and, where indicated, sign and date the next page.**

BK.07-08.CSX1.10DC.0107          LENDER COPY
PN01_BD_07_08_CSX1_E_X_KIM_A105548255.pdf                    BKJUDR

56207 088175

---

**\* Cosigned \*   Loan Request/Credit Agreement – Signature Page**

---

By my signature, I certify that I have read, understand and agree to the terms of and undertake the obligations set forth on all seven (7) pages of this Loan Request/Credit Agreement BK.07-08.CSX1.10DC.0107 ("Credit Agreement"). I understand that any person who knowingly makes a false statement or misrepresentation on this form is subject to penalties, which may include fines or imprisonment. This Credit Agreement is signed under seal. I understand that I am not required to fax my signature on or to sign electronically this Credit Agreement and any related notices that require signature. If I choose to fax my signature on or to sign electronically this Credit Agreement and any related notices that require signature, I intend: (i) my fax or electronic signature to be an electronic signature under applicable federal and state law, (ii) any fax printout or printout of Lender's electronic record of this Credit Agreement and related notices to be an original document, (iii) to conduct business with the Lender by electronic records and electronic signatures, and (iv) that this Credit Agreement will not be governed by Article 3 of the Uniform Commercial Code, and my obligations under this Credit Agreement will not be subject to, but any transfer of my obligations will be subject to, Article 9 of the Uniform Commercial Code.

---

## FEDERAL AND CALIFORNIA COSIGNER NOTICES

For the purposes of these Notices, the words "you" and "your" refer to the Cosigner, not the Lender.

---

**NOTICE TO COSIGNER (Traducción en Inglés Se Requiere Por La Ley):**
You are being asked to guarantee this debt. Think carefully before you do. If the borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility.

You may have to pay up to the full amount of the debt if the borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount.

The holder of the loan can collect this debt from you without first trying to collect from the borrower. The holder of the loan can use the same collection methods against you that can be used against the borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become part of your credit record.

This notice is not the contract that makes you liable for the debt.

---

**AVISO PARA EL FIADOR (Spanish Translation Required by Law):**
Se le está pidiendo que garantice esta deuda. Piénselo con cuidado antes de ponerse de acuerdo. Si la persona que ha pedido este préstamo no paga la deuda, usted tendrá que pagarla. Esté seguro de que usted podrá pagar si sea obligado a pagarla y de que usted desea aceptar la responsabilidad.

Si la persona que ha pedido el préstamo no paga la deuda, es posible que usted tenga que pagar la suma total de la deuda, mas los cargos por tardarse en el pago o el costo de cobranza, lo cual aumenta el total de esta suma.

El acreedor (financiero) puede cobrarle a usted sin, primeramente, tratar de cobrarle al deudor. Los mismos metodos de cobranza que pueden usarse contra el deudor, podran usarse contra usted, tales como presentar una demanda en corte, quitar parte de su sueldo, etc. Si alguna vez no se cumpla con la obligación de pagar esta deuda, se puede incluir esa información en la historia de credito de usted.

Este aviso no es el contrato mismo en que se le echa a usted la responsabilidad de la deuda.

---

For purposes of the following notices, "you" means the Borrower and Cosigner, not the Lender.

**FOR ALABAMA RESIDENTS: CAUTION – IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.**

**FOR WISCONSIN RESIDENTS - NOTICE TO CUSTOMER:**
(a) DO NOT SIGN THIS CREDIT AGREEMENT BEFORE YOU READ THE WRITING ON THE FOLLOWING PAGES, EVEN IF OTHERWISE ADVISED.
(b) DO NOT SIGN THIS CREDIT AGREEMENT IF IT CONTAINS ANY BLANK SPACES.
(c) YOU ARE ENTITLED TO AN EXACT COPY OF ANY CREDIT AGREEMENT YOU SIGN.
(d) YOU HAVE THE RIGHT AT ANY TIME TO PAY IN ADVANCE THE UNPAID BALANCE UNDER THIS CREDIT AGREEMENT AND YOU MAY BE ENTITLED TO A PARTIAL REFUND OF THE FINANCE CHARGE.

---

PLEASE SIGN BELOW – RETURN This Page (and the Information Page) With Proof of Income and Other Information (if applicable)
FAX TO: 800-704-9406

Signature of Borrower _____     Date 8/1/07

**BY SIGNING THIS CREDIT AGREEMENT BELOW, I CERTIFY THAT I INTEND TO (i) APPLY FOR JOINT CREDIT AND (ii) BE JOINTLY LIABLE WITH THE BORROWER FOR THIS LOAN.**

Signature of Cosigner _____     Date 8/2/07

**BK.07-08.CSX1.10DC.0107**          LENDER COPY

In this Credit Agreement, the words "I", "me", "my", and "mine" mean the person(s) who signed this Credit Agreement as Borrower and Cosigner. The words "you", "your", "yours", and "Lender" mean Bank of America, National Association, its successors and assigns, and any other holder of this Credit Agreement. "School" means the school named at the top of the first page of this Credit Agreement. The "servicer" means the Lender or any entity it designates to service my loan.

**A. PROMISE TO PAY:** I promise to pay to you the Loan Amount Requested shown on the first page of this Credit Agreement, to the extent it is advanced to me or paid on my behalf, and any Loan Origination Fee added to my loan (see Paragraph F) (together, the "Principal Sum"), interest on such Principal Sum, interest on any unpaid interest added to the Principal Sum and late fees (see Paragraph E.6).

**B. IMPORTANT – READ THIS CAREFULLY:**

1. When you receive my signed Credit Agreement, you are not agreeing to lend me money. If you decide to make a loan to me, you will electronically transfer the loan funds to the School for me, mail a loan check to the School for me, or mail a loan check directly to me. You have the right to not make a loan or to lend an amount less than the Loan Amount Requested. I agree to accept an amount less than the Loan Amount Requested and to repay that portion of the Loan Amount Requested that you actually lend to me along with interest and all other amounts I owe (see Paragraph A). You have the right to disburse my loan through an agent. At your option, you may also make any loan check co-payable to me and the Cosigner or to me and the School.

2. **HOW I AGREE TO THE TERMS OF THIS LOAN.** By signing this Credit Agreement, and submitting it to the Lender, I am requesting that you make this loan to me in an amount equal to the Loan Amount Requested plus any Loan Origination Fee described in Paragraph F of this Credit Agreement. If you approve this request and agree to make this loan, you will notify me in writing and provide me with a Disclosure Statement, as required by law, at the time the loan proceeds are disbursed. The Disclosure Statement is incorporated herein by reference and made a part hereof. The Disclosure Statement will tell me the amount of the loan that you have approved, the amount of the Loan Origination Fee, and other important information. I will let you know that I agree to the terms of the loan as set forth in this Credit Agreement and in the Disclosure Statement by doing either of the following: (a) endorsing or depositing the check that disburses the loan proceeds; or (b) allowing the loan proceeds to be used by or on behalf of the student Borrower without objection. Upon receipt of the Disclosure Statement, I will review the Disclosure Statement and notify you in writing if I have any questions. If I am not satisfied with the terms of my loan as disclosed in the Disclosure Statement, I may cancel my loan. **To cancel my loan, I will give you a written cancellation notice within ten (10) days after I receive the Disclosure Statement.** If loan proceeds have been disbursed, I agree that I will immediately return the loan proceeds to you, will not endorse any check that disburses the loan proceeds and will instruct the School to return any loan proceeds to you. If I give notice of cancellation but do not comply with the requirements of this Paragraph B.2, this Credit Agreement will not be canceled and I will be in default of this Credit Agreement. (See Paragraph I.)

**C. DEFINITIONS:**

1. "Disbursement Date" means the date or dates on which you lend money to me in consideration for my Credit Agreement and will be the date(s) shown on any loan check you prepare or the date(s) you initiate any electronic funds transfer.

2. The "Deferment Period" will begin on the Disbursement Date and end on the Deferment End Date.

3. "Deferment End Date" means the date specified below for the applicable loan program (the applicable loan program is stated on the first page of this Credit Agreement).

(a) *Undergraduate Alternative Loan Program:* If I have elected the "Immediate Repayment" option (the applicable repayment option is stated on the first page of this Credit Agreement), there is no Deferment Period, and my first payment will be 30-60 days after the disbursement of my loan. If I have elected the "Interest Only" repayment option (the applicable repayment

option is stated on the first page of this Credit Agreement), then interest payments will begin 30-60 days after the disbursement of my loan, the "Deferment End Date" will be the date the student Borrower first graduates or ceases to be enrolled at least half-time in the School (or another school participating in this loan program), and principal and interest payments will begin 30-60 days after that date. In any event, if I have elected the "Interest Only" repayment option, the Deferment End Date will be no more than 5 years after the Disbursement Date. If I have elected the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), then the "Deferment End Date" will be 180 days after the date the student Borrower first graduates or ceases to be enrolled at least half-time in the School (or another school participating in this Loan Program). In any event, if I have elected the "Full Deferral" repayment option, the Deferment End Date will be no more than 5½ years after the Disbursement Date. For borrowers who chose the "Interest Only" or "Full Deferral" repayment options, joint and serial (associates to bachelors) degree recipients may continue in-school deferment while completing their second degree, up to the 5-year or 5 ½- year period.

(b) *Graduate Professional Education Loan Program:* The Deferment End Date will be 180 days after the student Borrower graduates or ceases for any other reason to be enrolled at least half-time in the School (or another school participating in this Loan Program), but no more than 4½ years after the Disbursement Date; provided, however, that if the student Borrower begins a medical residency or internship during the Deferment Period, then the Deferment Period will end 180 days after the day the residency or internship ends, but no more than 8½ years after the Disbursement Date.

4. The "Repayment Period" begins the day after the Deferment Period ends. If there is no Deferment Period for my loan, the Repayment Period will begin when my loan is fully disbursed. The Repayment Period is 20 years unless monthly payments equal to the minimum monthly payment amount (See Paragraph E.2) will repay all amounts owed in less than 20 years, in which case the Repayment Period will be the number of months necessary to pay in full the amount I owe at the minimum payment.

**D. INTEREST:**

1. Accrual – Beginning on the Disbursement Date, interest will be calculated at the Variable Rate (Paragraph D.2) and charged on the Principal Sum, and on any unpaid interest later added to the Principal Sum according to Paragraph D.3. During the Repayment Period, interest will be calculated at the Variable Rate and charged on the outstanding balance of this Credit Agreement until all amounts are paid in full. Interest will be calculated on a daily simple interest basis. The daily interest rate will be equal to the annual interest rate in effect on that day, divided by the number of days in that calendar year.

2. Variable Rate – The "Variable Rate" is equal to the Current Index plus a Margin. The Margins for both the Deferment Period and the Repayment Period are shown on the first page of this Credit Agreement. In no event will the Variable Rate exceed the maximum interest rate allowed by the laws of the State of California. The Variable Rate will change monthly on the first day of each calendar month (the "Change Date(s)") if the Current Index changes. The "Current Index" for any calendar month (or for any shorter period beginning on the Disbursement Date and ending on the last day of a calendar month) is based on the one-month London Interbank Offered Rate ("LIBOR") as published in the "Money Rates" section of *The Wall Street Journal* (Eastern Edition). The index for each calendar month (or for any shorter period beginning on a Disbursement Date and ending on the last day of a calendar month) will equal the LIBOR rate published on the first business day of the immediately preceding calendar month, rounded to the nearest one-hundredth of one percent (0.01%). If *The Wall Street Journal* (Eastern Edition) is not published or the Current Index is not given on that date, then the Current Index will be determined by using the immediately preceding published Current Index. If the Current Index is no longer available, you will choose a comparable index.

3. Capitalization – If I have elected the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), I am not obligated to make any payments until the loan enters the Repayment Period and you will add unpaid accrued interest to the

principal loan balance as of the last day of each calendar quarter (the last day of December, March, June and September) and during the Deferment Period and as of the last day of my Deferment Period. Interest that is added to principal is called "Capitalized" Interest. Capitalized interest will be treated as principal. In addition, if I am in default (see Paragraph I) and the loan has been sold to TERI (see Paragraph L.12), TERI may capitalize accrued and unpaid interest as of the date it purchases my loan. I understand that you will also add all accrued and unpaid interest to the principal balance of my loan at the end of any forbearance period (see Paragraph H).

**E.  TERMS OF REPAYMENT:**

1.  Deferment Period – If I have elected either the "Interest Only" repayment option or the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), you may, or, if required by applicable law, will send statements during the Deferment Period (showing the total outstanding principal balance of my loan and the interest that has accrued on my loan). You reserve the right to send statements or notices to either the Borrower or the Cosigner. Statements will be sent to the address shown on your records. If I have elected the "Interest Only" repayment option, I agree to make payments each month during the Deferment Period equal to the accrued interest on the outstanding balance of this Credit Agreement. If I have elected the "Full Deferral" repayment option I may, but am not required to make payments during the Deferment Period. You will add any interest that I do not pay during the Deferment Period to the principal balance, as described in Paragraph D.3.

2.  Repayment Period – The amount of my monthly payment ("Monthly Payment Amount") will be established based on the rules in this Credit Agreement when my Repayment Period begins. During the Repayment Period, you will send me monthly statements that show the Monthly Payment Amount and the payment due dates, and I will pay the Monthly Payment Amount shown on my monthly statement, which amount will in no event be less than $25 or the unpaid balance, whichever is less. I understand that the Monthly Payment Amount is due each month. I may pay more than my Monthly Payment Amount at any time without penalty or charge. If my loan is in paid-ahead status, I may, but will not be required to make monthly payments. You reserve the right to send monthly statements to the Borrower and/or the Cosigner. Even if I do not receive monthly statements, I will make consecutive monthly payments in amounts at least equal to the Monthly Payment Amount by the applicable payment due dates until I have paid all of the principal and interest and any other charges I may owe under this Credit Agreement.

3.  Repayment Terms – My Monthly Payment Amount will be calculated as of the day the Repayment Period begins ("Repayment Date"). It will be recalculated (a) once each year prior to the anniversary of the Repayment Date, (b) if the Variable Rate changes between anniversaries of the Repayment Date to the extent that the Monthly Payment Amount would not pay in full the accrued monthly interest on my loan, (c) following any subsequent deferment or forbearance period or (d) following any request by the Borrower to the servicer to change the monthly payment due date (each of which events is a new "Repayment Date"). As of any Repayment Date, my Monthly Payment Amount will be recalculated. My new Monthly Payment Amount will be disclosed to me by the servicer. The new Monthly Payment Amount will equal the amount necessary to pay in full, over the number of months remaining in the Repayment Period, the amount I owe in equal monthly installments of principal and interest at the Variable Rate in effect at the time of the calculation. I understand that this may result in a reduction or increase in my monthly payment as calculated as of each Repayment Date. I understand that during the Repayment Period (and, if I have elected the "Interest Only" repayment option, during the period of interest payments) the servicer may change the monthly payment due date of future payments to a later date for the convenience of the servicer in processing payments or in order to coordinate the due dates of all of my loans processed by the servicer.

4.  Amounts Owing at the End of the Repayment Period – Since interest accrues daily upon the unpaid principal balance of my loan, if I make payments after my payment due dates, I may owe additional interest. If I have not paid my late fees, I will also owe additional amounts for those late

fees. In such cases you will increase the amount of my last monthly payment to the amount necessary to repay my loan in full.

5.  Payments – Payments will be applied first to late fees, other fees and charges, accrued interest, and the remainder to principal.

6.  Other Charges - If any part of a monthly payment remains unpaid for a period of more than 15 days after the payment due date, I will pay a late fee not exceeding $5.00 or 5% of the overdue payment amount, whichever is less. To the extent permitted by law, I agree to pay you all amounts you incur in enforcing the terms of this Credit Agreement, including reasonable collection agency and attorney's fees and court costs and other collection costs.

**F.  LOAN ORIGINATION FEE:** If you charge me, I will pay you a Loan Origination Fee at the time my loan is disbursed. The dollar amount of any Loan Origination Fee will be determined by multiplying the Principal Sum times the Loan Origination Fee Percentage shown on the first page of this Credit Agreement. The percentage would be higher if computed only on the amount advanced rather than on the entire Principal Sum (Loan Origination Fee plus the loan amount advanced). For example, a nominal Loan Origination Fee of 6.5% on the entire principal amount would equal 6.9519% of the amount advanced. The Loan Origination Fee I will pay, if any, will be shown on my Disclosure Statement and included with the Principal Sum. To the extent permitted by law, and unless I timely cancel this Credit Agreement (see Paragraph B.2), I will not be entitled to a refund of any Loan Origination Fee after my loan has been disbursed.

**G.  RIGHT TO PREPAY:** I have the right to prepay all or any part of my loan at any time without penalty.

**H.  FORBEARANCE:** If I am unable to repay my loan in accordance with the terms established under this Credit Agreement because of a hardship such as financial or medical difficulty, I may request that you modify these terms. I understand that such modification would be at your option, and, to the extent not prohibited by applicable law, you may charge me a fee equal to two percent 2% of the outstanding principal balance if you agree to modify the terms of this Credit Agreement. I understand that I will remain responsible for all interest accruing during any period of forbearance and that you will add any 2% fee described in the previous sentence and all interest that I do not pay during any forbearance period to the principal balance, as described in Paragraph D.3.

**I.  WHOLE LOAN DUE:** To the extent permitted by applicable law, I will be in default and you have the right to give me notice that the whole outstanding principal balance, accrued interest, and all other amounts payable to you under the terms of this Credit Agreement, are due and payable at once (subject to any applicable law which may give me a right to cure any default) if: (1) I fail to make any monthly payment to you when due, (2) I die, (3) I break any of my other promises in this Credit Agreement, (4) any bankruptcy proceeding is begun by or against me, or I assign any of my assets for the benefit of my creditors, or (5) I make any false written statement in applying for this loan or any other loan or at any time during the Deferment or Repayment Periods. If I default, I will be required to pay interest on this loan accruing after default. The interest rate after default will be subject to adjustment in the same manner as before default. Upon default, you may also capitalize any interest and fees (i.e., add accrued and unpaid interest and fees to the principal balance), and increase the Margin used to compute the Variable Rate by two percentage points (2%).

**J.  NOTICES:**

1.  I will send written notice to you, any subsequent holder of this Credit Agreement, and the servicer within ten days after any change in my name, address, or enrollment status (for example, if the Borrower withdraws from the School or transfers to another school participating in this loan program).

2.  Any notice required to be given to me by you will be effective when mailed by first class mail to the latest address you have for me. Unless required by applicable law, you need not give a separate notice to the Cosigner, if any.

**K.  INFORMATION:**

1.  I must update the information I provided to you whenever you ask me to do so.

2. I authorize you from time to time to request and receive from others credit related information about me (and about my spouse if I live in a community property state).

3. CREDIT BUREAU REPORTING

You may report information about my account to credit bureaus. Late payments, missed payments, or other defaults in my account may be reflected in my credit report.

I understand that the reporting of information about my account to credit bureaus may adversely affect my credit rating and my ability to obtain other credit. You may also report the status of my loan and my payment history, including information about a late payment, missed payment or other defaults in accordance with applicable law.

L. ADDITIONAL AGREEMENTS:

1. I understand that you are located in California and that this Credit Agreement will be entered into in the same state. CONSEQUENTLY, THE PROVISIONS OF THIS CREDIT AGREEMENT WILL BE GOVERNED BY FEDERAL LAW AND THE LAWS OF THE STATE OF CALIFORNIA, WITHOUT REGARD TO CONFLICT OF LAW RULES.

2. The proceeds of this loan will be used only for my educational expenses at the School. The Cosigner, if any, will not receive any of the loan proceeds.

3. My responsibility for paying the loan evidenced by this Credit Agreement is unaffected by the liability of any other person to me or by your failure to notify me that a required payment has not been made. Without losing any of your rights under this Credit Agreement you may accept (a) late payments, (b) partial payments or (c) payments marked "paid in full" or with other restrictions. You may delay, fail to exercise, or waive any of your rights on any occasion without losing your entitlement to exercise the right at any future time, or on any future occasion. You will not be obligated to make any demand upon me, send me any notice, present this Credit Agreement to me for payment or make protest of non-payment to me before suing to collect on this Credit Agreement if I am in default, and to the extent permitted by applicable law, I hereby waive any right I might otherwise have to require such actions. I WILL NOT SEND YOU PAYMENTS MARKED "PAID IN FULL", "WITHOUT RECOURSE" OR WITH OTHER SIMILAR LANGUAGE UNLESS THOSE PAYMENTS ARE MARKED FOR SPECIAL HANDLING AND SENT TO THE ADDRESS IDENTIFIED FOR SUCH PAYMENTS ON MY BILLING STATEMENT, OR TO SUCH OTHER ADDRESS AS I MAY BE GIVEN IN THE FUTURE.

4. I may not assign this Credit Agreement or any of its benefits or obligations. You may assign this Credit Agreement at any time.

5. The terms and conditions set forth in this Credit Agreement and the Disclosure Statement constitute the entire agreement between you and me.

6. If any provision of this Credit Agreement is held invalid or unenforceable, that provision shall be considered omitted from this Credit Agreement without affecting the validity or enforceability of the remainder of this Credit Agreement.

7. A provision of this Credit Agreement may only be modified if jointly agreed upon in writing by you and me. Any modification will not affect the validity or enforceability of the remainder of this Credit Agreement.

8. To the extent permitted by law, you have the right to apply money from any of my deposit account(s) with you to pay all or a portion of any amount overdue under this Credit Agreement. I hereby authorize you to obtain from the School all amounts which may be owed to me by the School, including any refund due to overpayment, early termination of enrollment, or otherwise.

9. If this Credit Agreement is executed by more than one Borrower, each Borrower agrees that any communication between you and any of the Borrowers will be binding on all of the Borrowers. I intend to be treated as a principal of this Credit Agreement and not as a surety. To the extent I may be treated as a surety, I waive all notices to which I might otherwise be entitled as such by law, and all suretyship defenses that might be available to me (including, without limitation, contribution, subrogation and exoneration). I agree that the Borrower may agree to any forbearance or other modification of the repayment schedule and that such agreement will be binding on me. It shall not be necessary for you to resort to or exhaust your remedies against

the borrower before calling upon me to make repayment. For purposes of this paragraph only, "I" and "me" refer to the Cosigner only.

10. All dollar amounts stated in this Credit Agreement are in United States dollars. I will make all payments in United States Dollars with no deduction for currency exchange.

11. If the student Borrower fails to complete the education program paid for with this loan, the Cosigner and I are not relieved of any obligation within or pursuant to this Credit Agreement.

12. I understand and agree that this loan is an education loan and certify that it will be used only for costs of attendance at the School. I acknowledge that the requested loan is subject to the limitations on dischargeability in bankruptcy contained in Section 523 (a) (8) of the United States Bankruptcy Code because either or both of the following apply: (a) this loan was made pursuant to a program funded in whole or in part by The Education Resources Institute, Inc. ("TERI"), a non-profit institution, or (b) this is a qualified education loan as defined in the Internal Revenue Code. This means that if, in the event of bankruptcy, my other debts are discharged, I will probably still have to pay this loan in full.

13. I authorize any school that I may attend to release to you, and any other persons designated by you, any requested information pertinent to this loan (e.g., enrollment status, prior loan history, and current address).

14. I authorize the Lender, any subsequent holder of this Credit Agreement, and their agents (including TERI) to: (1) advise the School of the status of my application and my loan, (2) respond to inquiries from prior or subsequent lenders or holders with respect to my Credit Agreement and related documents, (3) release information and make inquiries to the persons I have given you as references, for the purposes of learning my current address and telephone number, (4) check my credit and employment history and to answer questions about their credit experience with me, and (5) disclose to the Borrower and/or the Cosigner either in connection with this transaction or any future transaction all information (including status information and non-public personal information) of the Borrower and/or the Cosigner provided in connection with this Credit Agreement.

15. Waiver by Lender: You waive (give up) any right to claim a security interest in any property to secure this Credit Agreement. This does not affect any right to offset as a matter of law.

16. If I fax my signature(s) on the first page of this Credit Agreement back to you and keep the copy I signed, I understand that under federal law the fax you receive will be an original of the first page of this Credit Agreement. You and I agree that all copies of this Credit Agreement (including the fax you receive and the copy I retain), taken together, shall constitute a single original agreement.

17. If any Borrower or Cosigner elects to sign electronically an electronic record of this Credit Agreement, then the following will apply as between Lender and such person: (a) Lender will keep a non-modifiable electronic record of this document and provide a copy to me upon request, (b) I can and have downloaded and/or printed a copy of this document for my records or notified the Lender to mail me a copy of this document, and (c) the Lender's electronic record of this document and any printout from that record shall be an original for all purposes, including any lawsuit to collect amounts that I owe. If I physically sign a copy of this document that has been electronically signed by any other Cosigner or Borrower, as between me and the Lender the copy I sign (and any fax of that copy I may send to Lender) will be an original. However, the electronic signature of another party to this Credit Agreement and the Lender's electronic record of this document containing that signature will be as valid against me as an original, physical document that is physically signed by all parties.

M. DISCLOSURE NOTICES

ALL APPLICANTS:
IMPORTANT FEDERAL LAW NOTICE—

Important information about procedures for opening a new account:

**To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.**

*What this means for you:*
**When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.**

CALIFORNIA RESIDENTS: I have the right to prohibit the use of information contained in my credit file in connection with transactions not initiated by me. I may exercise this right by notifying the consumer credit reporting agency. A married applicant may apply for a separate account. If you take any adverse action as defined by Section 1785.3 of the California Civil Code and the adverse action is based, in whole or in part, on any information contained in a consumer credit report, I have the right to obtain within 60 days a free copy of my consumer credit report from the consumer reporting agency who furnished you my consumer credit report and from any other consumer credit reporting agency which compiles and maintains files on consumers on a nationwide basis. I have the right as described by Section 1785.16 of the California Civil Code to dispute the accuracy or completeness of any information in a consumer credit report furnished by the consumer credit reporting agency.
CALIFORNIA AND UTAH RESIDENTS: As required by California and Utah law, I am hereby notified that a negative credit report reflecting on my credit record may be submitted to a credit reporting agency if I fail to fulfill the terms of my credit obligations.
IOWA, KANSAS AND NEBRASKA RESIDENTS (For purposes of the following notice, the word "you" refers to the Borrower and the Cosigner, not the Lender): NOTICE TO CONSUMER. This is a consumer credit transaction. 1. DO NOT SIGN THIS CREDIT AGREEMENT BEFORE YOU READ THIS CREDIT AGREEMENT. 2. YOU ARE ENTITLED TO A COPY OF THIS CREDIT AGREEMENT. 3. YOU MAY PREPAY THE UNPAID BALANCE AT ANY TIME WITHOUT PENALTY AND MAY BE ENTITLED TO A REFUND OF UNEARNED CHARGES IN ACCORDANCE WITH LAW.
MARYLAND RESIDENTS: In Paragraph L.1, Lender and I have agreed that this Credit Agreement is governed by federal law and the laws of CALIFORNIA, without regard to conflict of laws rules; if any court should nevertheless determine that this Credit Agreement is subject to Maryland laws concerning credit, then only to the extent that Maryland law applies, Lender and I agree and elect that this loan is made under and governed by Subtitle 10, Credit Grantor Closed End Credit Provisions, of Title 12 of the Commercial Law Article of the Annotated Code of Maryland, except as preempted by federal law.
MISSOURI RESIDENTS: Oral agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable. To protect me (borrower(s)) and you (creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.
NEVADA RESIDENTS: This is a loan for study.
NEW JERSEY RESIDENTS: The section headings of this Credit Agreement are a table of contents and not contract terms. Portions of this Credit Agreement with references to actions taken to the extent of applicable law apply to acts or practices that New Jersey law permits or requires. In this Credit Agreement, acts or practices (i) by you which are or may be permitted by "applicable law" are permitted by New Jersey law, and (ii) that may or will be taken by you unless prohibited by "applicable law" are permitted by New Jersey law.

NEW YORK, RHODE ISLAND AND VERMONT RESIDENTS: A consumer report (credit report) may be obtained from a consumer-reporting agency (credit bureau) in connection with this loan. If I request (1) I will be informed whether or not consumer reports were obtained, and (2) if reports were obtained, I will be informed of the names and addresses of the credit bureaus that furnished the reports. If you agree to make this loan to me, a consumer credit report may be requested or used in connection with renewals or extensions of any credit for which I have applied, reviewing my loan, taking collection action on my loan, or legitimate purposes associated with my loan.
OHIO RESIDENTS: The Ohio laws against discrimination require that all creditors make credit equally available to all credit worthy customers, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.
WISCONSIN RESIDENTS: For married Wisconsin residents, my signature on this Credit Agreement confirms that this loan obligation is being incurred in the interest of my marriage or family. No provision of any marital property agreement (pre-marital agreement), unilateral statement under Section 766.59 or court decree under Section 766.70 adversely affects the interest of the Lender unless the Lender, prior to the time that the loan is approved, is furnished with a copy of the agreement, statement, or decree or has actual knowledge of the adverse provision when the obligation to the Lender is incurred. If the loan for which I am applying is granted, my spouse will also receive notification that credit has been extended to me.
N. BORROWER'S CERTIFICATION: I declare under penalty of perjury under the laws of the United States of America that the following is true and correct. I certify that all information I provided to you in connection with this loan, including without limitation, the information contained in this Credit Agreement, is true, complete and correct to the best of my knowledge and belief and is made in good faith. I understand that I am responsible for repaying immediately any funds that I receive which are not to be used or are not used for educational expenses related to attendance at the School for the academic period stated. I certify that I am not now in default on a Federal Perkins Loan, a Federal Stafford Loan, a Federally Insured Student Loan, a Federal Supplemental Loan for student Borrowers (SLS), a Federal PLUS Loan, an Income Contingent Loan, a Federal Consolidation Loan, a Federal Ford Direct Loan, or any other education loan received for attendance at any school.
By signing this Credit Agreement, to the extent permitted by applicable law, I hereby ratify, confirm and acknowledge the validity of all prior credit agreements I have signed with the Lender for this loan program. I intend and agree that all such credit agreements shall be binding on me. The consideration for this affirmation is the new credit extended by the Lender to me under this Credit Agreement.
O. STATE-SPECIFIC COSIGNER NOTICES: For the purposes of the following notices only, the words "you" and "your" refer to the Cosigner, where applicable, not to the lender.
FOR OBLIGORS COSIGNING IN IOWA, NEW YORK AND SOUTH CAROLINA:
*NOTICE:* You agree to pay the debt identified below although you may not personally receive any property, goods, services, or money. You may be sued for payment although the person who receives the property, goods, services, or money is able to pay. You should know that the Total of Payments listed below does not include finance charges resulting from delinquency, late charges, repossession or foreclosure costs, court costs or attorney's fees, or other charges that may be stated in the Credit Agreement or contract. You will also have to pay some or all of these costs and charges if the Credit Agreement or contract, the payment of which you are guaranteeing requires the Borrower to pay such costs and charges. This notice is not the Credit Agreement or contract that obligates you to pay the debt. Read the Credit Agreement or contract for the exact terms of your obligation.

IDENTIFICATION OF DEBT (S) YOU MAY HAVE TO PAY
Name of Debtor: The Borrower and Cosigner identified on the first page of
this Credit Agreement.
Name of Creditor: Bank of America, National Association, and its successors
and assigns.
Date:  If the loan is disbursed by check, the date of the check.  If the loan is
disbursed electronically, the date the creditor transmits the funds to the
School.
Kind of Debt: Education loan.
Total of Payments: The Loan Amount Requested set forth on the first page of
this Credit Agreement (to the extent advanced), plus interest and the Loan
Origination Fee set forth in this Credit Agreement.
FOR OBLIGORS COSIGNING IN VERMONT:

*NOTICE TO COSIGNER*

YOUR SIGNATURE ON THIS CREDIT AGREEMENT MEANS THAT YOU
ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN.  IF THE
BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO
COLLECT FROM YOU.
FOR OBLIGORS COSIGNING IN WEST VIRGINIA:

**NOTICE TO COSIGNER**
You are being asked to guarantee this debt.  Think carefully before you do.
If the Borrower doesn't pay the debt, you will have to.  Be sure you can
afford to pay it if you have to, and that you want to accept this
responsibility. You may have to pay up to the full amount of the debt if the
Borrower does not pay.  You may also have to pay late fees or collection
costs, which increase this amount. The creditor can collect this debt from
you without first trying to collect from the Borrower.  The creditor can use
the same collection methods against you that can be used against the
Borrower, such as suing you, garnishing your wages, etc.  If this debt is
ever in default, that fact may become a part of your credit record. This
notice is not the contract that makes you liable for the debt.

# Loan Payment History Report
## Date: 2014-12-09

| | | | |
|---|---|---|---|
| Account Number: | 535177207/006-001000 | | |
| Social Security Number: | 535177207 | Product: | DFU DIRECT TO CONSUMER UNDERGRAD |
| Name: | KIM, TONY | Officer Code: | 777074 |
| Birth Date: | 1984-05-08 | School: | SAINT JOHN'S UNIVERSITY |
| Address 1: | 809 234TH ST SE | Program Year: | |
| Address 2: | | | |
| City: | BOTHELL | Variable Rate Code: | F3 MONTHLY LIBOR |
| State: | WA | Interest Rate: | 4.16% |
| Zip Code: | 98021-6800 | Last Payment Date: | |
| Cosigner Name: | KIM,IL, | | |
| Social Security Number: | 339601706 | | |
| Address 1: | 809 234TH ST SE | | |
| Address 2: | | | |
| City: | BOTHELL | | |
| State: | WA | | |
| Zip Code: | 98021-6800 | | |
| | | Last Payment Amount: | |
| | | Payment Due Date: | 2012-09-05 |
| Contract Date: | 2007-08-07 | Last Interest Date: | 2014-12-09 |
| Date Assigned: | 2014-12-04 | Accrued Interest: | $3,803.58 |
| Charge Off Date: | 2012-10-01 | Recovered Interest: | $0.00 |
| Charge Off Amount: | $41,508.81 | Net Interest: | $3,803.58 |
| Recovered Principal: | $0.00 | Associated Costs: | $0.00 |
| Net Charge Off: | $41,508.81 | Recovered Costs: | $0.00 |
| Disbursement Date: | 2007-08-07 | Net Costs: | $0.00 |
| Disbursement Amount: | $31,746.03 | | |

## Transaction History

| | | | | | |
|---|---|---|---|---|---|
| System | 2012-10-31 | 00:01 | 82 | $41,508.81 @ 4.230 / 10/01/2012 - 10/31/2012 | $143.92 |
| System | 2012-11-06 | 00:01 | 82 | $41,508.81 @ 4.230 / 10/31/2012 - 11/06/2012 | $28.78 |
| System | 2012-11-09 | 00:01 | 82 | $41,508.81 @ 4.210 / 11/06/2012 - 11/09/2012 | $14.32 |
| System | 2012-11-12 | 00:01 | 82 | $41,508.81 @ 4.210 / 11/09/2012 - 11/12/2012 | $14.32 |
| System | 2012-11-21 | 00:01 | 82 | $41,508.81 @ 4.210 / 11/12/2012 - 11/21/2012 | $42.97 |
| System | 2012-12-03 | 00:01 | 82 | $41,508.81 @ 4.210 / 11/21/2012 - 12/03/2012 | $57.30 |
| System | 2012-12-17 | 00:01 | 82 | $41,508.81 @ 4.210 / 12/03/2012 - 12/17/2012 | $66.85 |
| System | 2012-12-31 | 00:01 | 82 | $41,508.81 @ 4.210 / 12/17/2012 - 12/31/2012 | $66.85 |
| System | 2013-01-09 | 00:01 | 82 | $41,508.81 @ 4.210 / 12/31/2012 - 01/09/2013 | $43.09 |
| System | 2013-01-10 | 00:01 | 82 | $41,508.81 @ 4.210 / 01/09/2013 - 01/10/2013 | $4.79 |
| System | 2013-01-31 | 00:01 | 82 | $41,508.81 @ 4.210 / 01/10/2013 - 01/31/2013 | $100.54 |

| System | 2013-02-06 | 00:01 | 82 | $41,508.81 @ 4.210 / 01/31/2013 - 02/06/2013 | $28.73 |
| System | 2013-02-07 | 00:01 | 82 | $41,508.81 @ 4.210 / 02/06/2013 - 02/07/2013 | $4.79 |
| System | 2013-02-28 | 00:01 | 82 | $41,508.81 @ 4.210 / 02/07/2013 - 02/28/2013 | $100.54 |
| System | 2013-03-01 | 00:01 | 82 | $41,508.81 @ 4.210 / 02/28/2013 - 03/01/2013 | $4.79 |
| System | 2013-03-31 | 00:01 | 82 | $41,508.81 @ 4.200 / 03/01/2013 - 03/31/2013 | $143.29 |
| System | 2013-04-30 | 00:01 | 82 | $41,508.81 @ 4.200 / 03/31/2013 - 04/30/2013 | $143.29 |
| System | 2013-05-31 | 00:01 | 82 | $41,508.81 @ 4.200 / 04/30/2013 - 05/31/2013 | $148.07 |
| System | 2013-06-30 | 00:01 | 82 | $41,508.81 @ 4.200 / 05/31/2013 - 06/30/2013 | $143.29 |
| System | 2013-07-04 | 00:01 | 82 | $41,508.81 @ 4.200 / 06/30/2013 - 07/04/2013 | $19.11 |
| System | 2013-07-31 | 00:01 | 82 | $41,508.81 @ 4.190 / 07/04/2013 - 07/31/2013 | $128.65 |
| System | 2013-08-31 | 00:01 | 82 | $41,508.81 @ 4.190 / 07/31/2013 - 08/31/2013 | $147.71 |
| System | 2013-09-30 | 00:01 | 82 | $41,508.81 @ 4.190 / 08/31/2013 - 09/30/2013 | $142.95 |
| System | 2013-10-09 | 00:01 | 82 | $41,508.81 @ 4.190 / 09/30/2013 - 10/09/2013 | $42.88 |
| System | 2013-10-31 | 00:01 | 82 | $41,508.81 @ 4.180 / 10/09/2013 - 10/31/2013 | $104.58 |
| System | 2013-11-30 | 00:01 | 82 | $41,508.81 @ 4.180 / 10/31/2013 - 11/30/2013 | $142.61 |
| System | 2013-12-04 | 00:01 | 82 | $41,508.81 @ 4.180 / 11/30/2013 - 12/04/2013 | $19.01 |
| System | 2013-12-31 | 00:01 | 82 | $41,508.81 @ 4.170 / 12/04/2013 - 12/31/2013 | $128.04 |
| System | 2014-01-31 | 00:01 | 82 | $41,508.81 @ 4.170 / 12/31/2013 - 01/31/2014 | $147.01 |
| System | 2014-02-28 | 00:01 | 82 | $41,508.81 @ 4.170 / 01/31/2014 - 02/28/2014 | $132.78 |
| System | 2014-04-03 | 00:01 | 82 | $41,508.81 @ 4.170 / 02/28/2014 - 04/03/2014 | $161.24 |
| System | 2014-05-07 | 00:01 | 82 | $41,508.81 @ 4.160 / 04/03/2014 - 05/07/2014 | $160.85 |
| System | 2014-05-21 | 00:01 | 82 | $41,508.81 @ 4.150 / 05/07/2014 - 05/21/2014 | $66.07 |
| System | 2014-06-05 | 00:01 | 82 | $41,508.81 @ 4.150 / 05/21/2014 - 06/05/2014 | $70.79 |
| System | 2014-07-31 | 00:01 | 82 | $41,508.81 @ 4.150 / 06/05/2014 - 07/31/2014 | $264.29 |
| System | 2014-08-31 | 00:01 | 82 | $41,508.81 @ 4.150 / 07/31/2014 - 08/31/2014 | $146.30 |
| System | 2014-09-02 | 00:01 | 82 | $41,508.81 @ 4.150 / 08/31/2014 - 09/02/2014 | $9.44 |
| System | 2014-09-30 | 00:01 | 82 | $41,508.81 @ 4.160 / 09/02/2014 - 09/30/2014 | $132.46 |
| System | 2014-10-31 | 00:01 | 82 | $41,508.81 @ 4.160 / 09/30/2014 - 10/31/2014 | $146.66 |
| System | 2014-11-30 | 00:01 | 82 | $41,508.81 @ 4.160 / 10/31/2014 - 11/30/2014 | $141.93 |
| System | 2014-12-04 | 00:01 | 82 | $41,508.81 @ 4.160 / 11/30/2014 - 12/04/2014 | $18.92 |
| System | 2014-12-09 | 00:01 | 82 | $41,508.81 @ 4.160 / 12/04/2014 - 12/09/2014 | $23.65 |

EX-99.4 9 d719503.htm DEPOSIT AND SALE AGREEMENT

**EXHIBIT 99.4**

## DEPOSIT AND SALE AGREEMENT

### THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4

This DEPOSIT AND SALE AGREEMENT (the "Sale Agreement"), dated as of September 20, 2007, between The National Collegiate Funding LLC, as seller (in such capacity, the "Seller"), and The National Collegiate Student Loan Trust 2007-4, as purchaser (the "Purchaser"), shall be effective upon execution by the parties hereto.

WHEREAS, the Seller is the owner of certain student loans; and

WHEREAS, the Seller desires to sell its interest in such student loans and the Purchaser desires to purchase such loans from the Seller.

NOW, THEREFORE, in connection with the mutual promises contained herein, the parties hereto agree as follows:

### ARTICLE I
### TERMS

This Sale Agreement sets forth the terms under which the Seller is selling and the Purchaser is purchasing the student loans listed on Schedule 1 or Schedule 2 to each of the Pool Supplements set forth on Schedule A attached hereto (the "Transferred Student Loans").

### ARTICLE II
### DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the definitions set forth in Appendix A of the Indenture dated as of September 1, 2007 between U.S. Bank National Association (the "Indenture Trustee") and the Purchaser.

### ARTICLE III
### SALE AND PURCHASE

Section 3.01.     Sale of Loans.  The Seller hereby sells and the Purchaser hereby purchases the Transferred Student Loans.

Section 3.02.     Assignment of Rights.  The Seller hereby assigns to the Purchaser and the Purchaser hereby accepts all of the Seller's rights and interests under each of the Pool Supplements listed on Schedule A attached hereto and the related Student Loan Purchase Agreements listed on Schedule B attached hereto.

Section 3.03.     Settlement of the Payment.  The Purchaser shall pay the Seller the purchase price set forth in Article 2 of each of the Pool Supplements by wire transfer in immediately available funds to the account specified by the Seller.

Section 3.04.     Assistance by Seller.  Following the execution of this Sale Agreement, the Seller shall provide any reasonable assistance requested by the Purchaser in determining that all required documentation on the Transferred Student Loans is present and correct.

### ARTICLE IV
### REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER

Section 4.01.     General. The Seller represents and warrants to the Purchaser that as of the date of this Sale Agreement:

(a)     The Seller is duly organized and existing under the laws of the State of Delaware; and

(b)     The Seller has all requisite power and authority to enter into and to perform the terms of this Sale Agreement.

Section 4.02.     Loan Representations. The Seller represents and warrants to the Purchaser that with respect to each Transferred Student Loan purchased by the Purchaser pursuant to this Sale Agreement, the Seller is making the same representations and warranties made by the respective program lender with respect to each Transferred Student Loan pursuant to the respective Student Loan Purchase Agreement listed on Schedule B attached hereto.

Section 4.03.     Covenants. The Seller, in its capacity as purchaser of the Transferred Student Loans pursuant to the Pool Supplements, hereby covenants that it will enforce the covenants and agreements of each program lender in the respective Student Loan Purchase Agreement and related Pool Supplement. The Seller further covenants that it will not waive, amend, modify, supplement or terminate any Student Loan Purchase Agreement or Pool Supplement or any provision thereof without the consent of the Purchaser, which consent the Purchaser hereby agrees not to provide without the prior written consent of the Indenture Trustee and the Controlling Party in accordance with the Purchaser's covenant in Section 3.07(c) of the Indenture.

## ARTICLE V
## PURCHASE OF LOANS; REIMBURSEMENT

Each party to this Sale Agreement shall give notice to the other such parties and to the Servicers, First Marblehead Data Services, Inc., the Indenture Trustee and Wilmington Trust Company (the "Owner Trustee") promptly, in writing, upon the discovery of any breach of the Seller's representations and warranties made pursuant to this Sale Agreement which has a materially adverse effect on the interest of the Purchaser in any Transferred Student Loan. In the event of such a material breach, the Seller shall cure or repurchase the Transferred Student Loan in accordance with the remedies set forth in the respective Student Loan Purchase Agreement.

## ARTICLE VI
## LIABILITY OF SELLER; INDEMNITIES

The Seller shall be liable in accordance herewith only to the extent of the obligations specifically undertaken by the Seller under this Sale Agreement.

(a)     The Seller shall indemnify, defend and hold harmless the Purchaser and the Owner Trustee in its individual capacity and their officers, directors, employees and agents from and against any taxes that may at any time be asserted against any such Person with respect to the transactions contemplated herein and in the other Basic Documents (except any such income taxes arising out of fees paid to the Owner Trustee), including any sales, gross receipts, general corporation, tangible and intangible personal property, privilege or license taxes and costs and expenses in defending against the same.

(b)     The Seller shall indemnify, defend and hold harmless the Purchaser and the Owner Trustee in its individual capacity and their officers, directors, employees and agents from and against any and all costs, expenses, losses, claims, damages and liabilities arising out of, or imposed upon such Person through, the Seller's willful misfeasance, bad faith or gross negligence in the performance of its duties under this Sale Agreement, or by reason of reckless disregard of its obligations and duties under this Sale Agreement.

Indemnification under this Section shall survive the termination of this Sale Agreement and shall include reasonable fees and expenses of counsel and expenses of litigation. If the Seller shall have made any indemnity payments pursuant to this Section and the Person to or for the benefit of whom such payments are made thereafter shall collect any of such amounts from others, such Person shall promptly repay such amounts to the Seller, without interest.

### ARTICLE VII
### MERGER OR CONSOLIDATION OF, OR ASSUMPTION
### OF THE OBLIGATIONS OF, SELLER

Any Person (a) into which the Seller may be merged or consolidated, (b) which may result from any merger or consolidation to which the Seller shall be a party or (c) which may succeed to the properties and assets of the Seller substantially as a whole, shall be the successor to the Seller without the execution or filing of any document or any further act by any of the parties to this Sale Agreement; provided, however, that the Seller hereby covenants that it will not consummate any of the foregoing transactions except upon satisfaction of the following: (i) the surviving Person, if other than the Seller, executes an agreement of assumption to perform every obligation of the Seller under this Sale Agreement, (ii) immediately after giving effect to such transaction, no representation or warranty made pursuant to this Sale Agreement shall have been breached, (iii) the surviving Person, if other than the Seller, shall have delivered an Officers' Certificate and an opinion of counsel each stating that such consolidation, merger or succession and such agreement of assumption comply with this Section and that all conditions precedent, if any, provided for in this Sale Agreement relating to such transaction have been complied with, and that the Rating Agency Condition shall have been satisfied with respect to such transaction and, so long as any of the Notes are outstanding or any amounts are owed to the Note Insurer, the consent of the Note Insurer, (iv) if the Seller is not the surviving entity, such transaction will not result in a material adverse federal or state tax consequence to the Purchaser or the Noteholders, and (v) if the Seller is not the surviving entity, the Seller shall have delivered an opinion of counsel either (A) stating that, in the opinion of such counsel, all financing statements and continuation statements and amendments thereto have been executed and filed that are necessary fully to preserve and protect the interest of the Purchaser in the Transferred Student Loans and reciting the details of such filings, or (B) stating that, in the opinion of such counsel, no such action shall be necessary to preserve and protect such interests.

### ARTICLE VIII
### LIMITATION ON LIABILITY OF SELLER AND OTHERS

The Seller and any director or officer or employee or agent thereof may rely in good faith on the advice of counsel or on any document of any kind, prima facie properly executed and submitted by any Person respecting any matters arising hereunder (provided that such reliance shall not limit in any way the Seller's obligations under this Sale Agreement). The Seller shall not be under any obligation to appear in, prosecute or defend any legal action that shall not be incidental to its obligations under this Sale Agreement or the Student Loan Purchase Agreements, and that in its opinion may involve it in any expense or liability.

### ARTICLE IX
### SURVIVAL OF COVENANTS

All covenants, agreements, representations and warranties made herein shall survive the consummation of the purchase of the Transferred Student Loans; provided, however, that to the extent any of the same relate to a corresponding covenant, agreement, representation or warranty contained in a Student Loan Purchase Agreement, the same shall survive to the extent that such corresponding covenant, agreement, representation or warranty survives the applicable Student Loan Purchase Agreement. All covenants, agreements, representations and warranties made or furnished pursuant hereto by or for the benefit of the Seller (including without limitation, under Article VI) shall bind and inure to the benefit of any successors or assigns of the Purchaser, including the Indenture Trustee. This Sale Agreement may be changed, modified or discharged, and any rights or obligations hereunder may be waived, only by a written instrument signed by a duly authorized officer of the party against whom enforcement of any such waiver, change, modification or discharge is sought. The waiver by the Indenture Trustee, at the direction of the Controlling Party or otherwise pursuant to the Indenture, of any covenant, agreement, representation or warranty required to be made or furnished by the Seller or the waiver by the Indenture Trustee, at the direction of the Controlling Party or otherwise pursuant to the Indenture, of any provision herein contained shall not be deemed to be a waiver of any breach of any other covenant, agreement, representation, warranty or provision herein contained, nor shall any waiver or any custom or practice which may evolve between the parties in the administration of the terms hereof, be construed to lessen the right of the Indenture Trustee, at the direction of the Controlling Party pursuant to the Indenture, to insist upon the performance by the Seller in strict accordance with said terms.

### ARTICLE X

## COMMUNICATION AND NOTICE REQUIREMENTS

All communications, notices and approvals provided for hereunder shall be in writing and mailed or delivered to the Seller or the Purchaser, as the case may be. Notice given in any such communication, mailed to the Seller or the Purchaser by appropriately addressed registered mail, shall be deemed to have been given on the day following the date of such mailing and shall be addressed as follows:

If to the Purchaser, to:

> The National Collegiate Student Loan Trust 2007-4
> c/o Wilmington Trust Company, as Owner Trustee
> Rodney Square North
> 100 North Market Street
> Wilmington, Delaware 19890-0001
> Attention: Corporate Trust Department

If to the Seller, to:

> The National Collegiate Funding LLC
> c/o First Marblehead Data Services, Inc.
> The Prudential Tower
> 800 Boylston Street - 34th Floor
> Boston, MA 02199-8157
> Attention: Ms. Rosalyn Bonaventure

with a copy to:

> First Marblehead Corporation
> The Prudential Tower
> 800 Boylston Street - 34th Floor
> Boston, MA 02199-8157
> Attention: Corporate Law Department

or to such other address as either party shall have provided to the other parties in writing. Any notice required to be in writing hereunder shall be deemed given if such notice is mailed by certified mail, postage prepaid, or hand delivered to the address of such party as provided above.

## ARTICLE XI
## AMENDMENT

This Sale Agreement may be amended by the parties hereto with the consent of the Note Insurer, but without the consent of the Noteholders, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Sale Agreement or of modifying in any manner the rights of such Noteholders; provided that such action will not, in the opinion of counsel reasonably satisfactory to the Indenture Trustee, materially affect the interest of any such Noteholder.

In addition, this Sale Agreement may also be amended from time to time by the Seller and the Purchaser, with the consent of the Noteholders of the Notes evidencing a majority of the Outstanding Amount of the Notes and the consent of the Certificateholders of the Certificates evidencing a majority of the percentage interest in the Certificates and, so long as any of the Notes are outstanding or any amounts are owed to the Note Insurer, the consent of the Note Insurer, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Sale Agreement or of modifying in any manner the rights of the Noteholders or the Certificateholders, respectively; provided, however, that no such amendment shall (a) increase or reduce in any manner the amount of, or accelerate or delay the time of, collections of payments with respect to Transferred Student Loans or distributions that shall be required to be made for the benefit of the Noteholders,

or (b) reduce the aforesaid percentage of the Outstanding Amount of the Notes or the Certificates, the Noteholders or the Certificateholders of which are required to consent to any such amendment, without the consent of all outstanding Noteholders or Certificateholders, respectively.

Promptly after the execution of any such amendment or consent (or, in the case of the Rating Agencies, five Business Days prior thereto), the Purchaser shall furnish written notification of the substance of such amendment or consent to the Indenture Trustee, the Note Insurer and each of the Rating Agencies.

It shall not be necessary for the consent of Noteholders pursuant to this Section to approve the particular form of any proposed amendment or consent, but it shall be sufficient if such consent shall approve the substance thereof.

Prior to the execution of any amendment to this Sale Agreement, the Owner Trustee shall be entitled to receive and rely upon an opinion of counsel stating that execution of such amendment is authorized or permitted by this Sale Agreement. The Owner Trustee may, but shall not be obligated to, enter into any such amendment which affects the Owner Trustee's own rights, duties or immunities under this Sale Agreement or otherwise.

### ARTICLE XII
### ASSIGNMENT

The Seller hereby assigns its entire right, title and interest as purchaser under this Sale Agreement and each Student Loan Purchase Agreement to the Purchaser as of the date hereof and acknowledges that the Purchaser will assign the same, together with the right, title and interest of the Purchaser hereunder, to the Indenture Trustee under the Indenture.

### ARTICLE XIII
### THIRD PARTY BENEFICIARY

The Noteholders and the Note Insurer are third party beneficiaries hereof.

### ARTICLE XIV
### GOVERNING LAW

**THIS SALE AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, BUT OTHERWISE WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.**

### ARTICLE XV
### LIMITATION OF LIABILITY OF OWNER TRUSTEE

Notwithstanding anything contained herein to the contrary, this instrument has been executed by Wilmington Trust Company, not in its individual capacity but solely in its capacity as Owner Trustee of the Purchaser, and in no event shall Wilmington Trust Company in its individual capacity or any beneficial owner of the Purchaser have any liability for the representations, warranties, covenants, agreements or other obligations of the Purchaser hereunder, as to all of which recourse shall be had solely to the assets of the Purchaser. For all purposes of this Sale Agreement, in the performance of any duties or obligations of the Purchaser hereunder, the Owner Trustee shall be subject to, and entitled to the benefits of, the terms and provisions of Articles VIII, IX and X of the Trust Agreement.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Sale Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

THE NATIONAL COLLEGIATE FUNDING LLC,
as Seller

By: GATE Holdings, Inc., Member


By: /s/ John A. Foxgrover
    Name:   John A. Foxgrover
    Title:   Vice President

THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4, as Purchaser

By: Wilmington Trust Company, not in its
    individual capacity but solely as Owner
    Trustee

By: /s/ Patricia A. Evans
    Name:   Patricia A. Evans
    Title:   Vice President

## SCHEDULE A

### *Pool Supplements*

Each of the following Pool Supplements was entered into by and among The First Marblehead Corporation, The National Collegiate Funding LLC and:

- Bank of America, N.A., dated September 20, 2007, for loans that were originated under Bank of America's Direct to Consumer Loan Program.

- Bank of America, N.A., dated September 20, 2007, for loans that were originated under Bank of America's Private Loan Program, TERI (School Channel) Loan Program and TERI ISLP Loan Program.

- RBS Citizens, N.A., successor by merger to Charter One Bank, N.A., dated September 20, 2007, for loans that were originated under the following Charter One programs: AAA Southern New England Bank, AES EducationGAIN Loan Program, Citibank Education Assistance Loan Program, College Loan Corporation Loan Program, National Education Loan Program, NextStudent Alternative Loan Program, Astrive Education (f/k/a START) Loan Program, AstriveAlliance Education (f/k/a START) Loan Program, Alternative Loan Program, E-Loan Private Loan Program, UPromise Alternative Loan Program, Collegiate Solutions Alternative Loan Program, College Board Alternative Loan Program, Axiom Alternative Loan Program, American Student Loan Services Private Loan Program, nBuy Private Loan Program and ThinkFinancial Alternative Loan Program.

- RBS Citizens, N.A., successor by merger to Citizens Bank of Rhode Island, dated September 20, 2007, for loans that were originated under Citizens Bank of Rhode Island's Alternative Loan Program, ISLP Loan Program, Compass Bank Loan Program, Navy Federal Alternative Loan Program, FinanSure Alternative Loan Program, Xanthus Alternative Loan Program and Penn State Undergraduate Loan Program.

- Comerica Bank, dated September 20, 2007, for loans that were originated under Comerica Bank's Private Loan Program.

- HSBC Bank USA, National Association, dated September 20, 2007, for loans that were originated under the HSBC Loan Program.

- The Huntington National Bank, dated September 20, 2007, for loans that were originated under the Huntington Education Loan Program.

- InsurBanc, dated September 20, 2007, for loans that were originated under the InsurBanc Loan Program.

- JPMorgan Chase Bank, N.A. (successor to Bank One, N.A.) dated September 20, 2007, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program, EDUCATION ONE Loan Program, and Campus One Loan Program.

- KeyBank National Association, dated September 20, 2007, for loans that were originated under KeyBank's Private Education Loan Program.

- Manufacturers and Traders Trust Company, dated September 20, 2007, for loans that were originated under the M&T Alternative Loan Program.

- National City Bank, dated September 20, 2007, for loans that were originated under the National City Loan Program.

- National City Bank, dated September 20, 2007, for loans that were originated under the National City Bank Referral Loan Program, including the Astute Private Loan Program and Student Lending Works Private Loan Program.

- PNC Bank, N.A., dated September 20, 2007, for loans that were originated under PNC Bank's PNC Bank Alternative Loan Program, Brazos Alternative Loan Program, Edvisors Alternative Loan Program, Fondo Futuro Loan Program, GE Money Bank Student Loan Program, Old National Bank Private Loan Program, and Regions Bank Private Loan Program.

- Sovereign Bank, dated September 20, 2007, for loans that were originated under Sovereign Bank's Alternative Student Loan Program.

- SunTrust Bank, dated September 20, 2007, for loans that were originated under the SunTrust Loan Program.

- TCF National Bank, dated September 20, 2007, for loans that were originated under the TCF National Bank Alternative Loan Program.

- Union Federal Savings Bank, dated September 20, 2007, for loans that were originated under the UFSB Astrive Loan Program.

## SCHEDULE B

### *Note Purchase Agreements*

Each of the Note Purchase Agreements, as amended or supplemented, was entered into by and between The First Marblehead Corporation and:

- Bank of America, N.A., dated April 30, 2001, for loans that were originated under Bank of America's Private Loan Program, TERI School Channel Loan Program and ISLP Loan Program.

- Bank of America, N.A., dated June 30, 2006, for loans that were originated under Bank of America's Private Loan Program, TERI School Channel Loan Program and ISLP Loan Program.

- Bank of America, N.A., dated April 1, 2006, for loans that were originated under Bank of America's Direct to Consumer Loan Program.

- Charter One Bank, N.A., dated as of December 29, 2003 for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.

- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.

- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated under Charter One's Citibank Education Assistance Loan Program.

- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated under Charter One's College Loan Corporation Loan Program.

- Charter One Bank, N.A., dated November 17, 2003, for loans that were originated under Charter One's National Education Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's NextStudent Alternative Loan Program.

- Charter One Bank, N.A., dated March 25, 2004, for loans that were originated under Charter One's Astrive and AstriveAlliance Education (f/k/a START) Loan Programs.

- Charter One Bank, N.A., dated February 15, 2005, for loans that were originated under Charter One's Referral Loan Program (including loans in the Charter One Bank Alternative Loan Program, E-Loan Private Loan Program, UPromise Alternative Loan Program, Collegiate Solutions Alternative Loan Program, College Board Alternative Loan Program, Axiom Alternative Loan Program, American Student Loan Services Private Loan Program, nBuy Private Loan Program, and ThinkFinancial Alternative Loan Program).

- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Alternative Loan Program, ISLP Loan Program, Compass Bank Loan Program, FinanSure Alternative Loan Program, Navy Federal Alternative Loan Program, and Xanthus Alternative Loan Program.

- Citizens Bank of Rhode Island, dated October 1, 2002, for loans that were originated under Citizens Bank of Rhode Island's Penn State Undergraduate Loan Program.

- Comerica Bank, dated June 30, 2006, for loans that were originated under Comerica Bank's Private Loan Program.

- HSBC Bank USA, National Association, dated April 17, 2002, as amended on June 2, 2003 and August 1, 2003, for loans that were originated under the HSBC Loan Program.

- The Huntington National Bank, dated May 20, 2003, for loans that were originated under the Huntington Education Loan Program.

- InsurBanc, dated July 1, 2006, for loans that were originated under the InsurBanc Loan Program.

- JPMorgan Chase Bank, N.A., (successor to Bank One, N.A.), dated May 1, 2002, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program, EDUCATION ONE Loan Program, and Campus One Loan Program.

- KeyBank National Association, dated May 12, 2006, for loans that were originated under KeyBank's Private Education Loan Program.

- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under the M&T Alternative Loan Program.

- National City Bank, dated November 13, 2002, for loans that were originated under the National City Loan Program.

- National City Bank, dated July 21, 2006, for loans that were originated under the National City Referral Loan Program, including the Astute Private Loan Program and Student Lending Works Private Loan Program.

- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Alternative Loan Program, Brazos Alternative Loan Program, Edvisors Alternative Loan Program, Fondo Futuro Loan Program, GE Money Bank Student Loan Program, Old National Bank Private Loan Program, and Regions Bank Private Loan Program.

- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Student Loan

Program.

- SunTrust Bank, dated March 1, 2002, for loans that were originated under the SunTrust Loan Program.

- TCF National Bank, dated July 22, 2005, for loans that were originated under the TCF National Bank Alternative Loan Program.

- Union Federal Savings Bank, dated March 26, 2007, for loans that were originated under the UFSB Astrive Loan Program.

## POOL SUPPLEMENT (DTC ONLY)
## BANK OF AMERICA, N.A.

This Pool Supplement (the "Supplement") is entered into pursuant to and forms a part of that certain Amended and Restated Note Purchase Agreement dated as of April 1, 2006, as amended or supplemented from the date of execution of the Agreement through the date of this Supplement (together, the "Agreement"), by and between The First Marblehead Corporation and Bank of America, N.A. (the "Program Lender"). This Supplement is dated as of September 20, 2007. Capitalized terms used in this Supplement without definitions have the meanings set forth in the Agreement.

### Article 1: Purchase and Sale.

In consideration of the Minimum Purchase Price set forth below, the Program Lender hereby transfers, sells, sets over and assigns to The National Collegiate Funding LLC (the "Depositor"), upon the terms and conditions set forth in the Agreement (which are incorporated herein by reference with the same force and effect as if set forth in full herein), each student loan set forth on the attached Schedule 1 (the "Transferred Bank of America Loans") along with all of the Program Lender's rights under the Guaranty Agreement, and any agreement pursuant to which TERI granted collateral for its obligations under the Guaranty Agreement, relating to the Transferred Bank of America Loans. The Depositor in turn will sell the Transferred Bank of America Loans to a Purchaser Trust. The Program Lender hereby transfers and delivers to the Depositor each Note evidencing such Transferred Bank of America Loan and all Origination Records relating thereto, together with any additional information relating to the Transferred Bank of America Loans heretofore provided by TERI (as origination agent) to the Servicer or FMC in connection with the subject Securitization Transaction. The Depositor hereby purchases said Notes on said terms and conditions.

### Article 2: Price.

The amounts paid pursuant to this Supplement are the amounts set forth on Schedule 2 attached hereto.

### Article 3: Representations and Warranties.

3.01.   By Program Lender.

The Program Lender repeats the representations and warranties contained in Section 5.02 of the Agreement for the benefit of each of the Depositor and the Purchaser Trust and confirms the same are true and correct as of the date hereof with respect to the Agreement and to this Supplement.

3.02.   By Depositor.

The Depositor hereby represents and warrants to the Program Lender that at the date of execution and delivery of this Supplement by the Depositor:

{P0812443.1}

(a)     The Depositor is duly organized and validly existing as a limited liability company under the laws of the State of Delaware with the due power and authority to own its properties and to conduct its business as such properties are currently owned and such business is presently conducted, and had at all relevant times, and has, the power, authority and legal right to acquire and own the Transferred Bank of America Loans.

(b)     The Depositor is duly qualified to do business and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business shall require such qualifications.

(c)     The Depositor has the power and authority to execute and deliver this Supplement and to carry out its respective terms; the Depositor has the power and authority to purchase the Transferred Bank of America Loans and rights relating thereto as provided herein from the Program Lender, and the Depositor has duly authorized such purchase from the Program Lender by all necessary action; and the execution, delivery and performance of this Supplement has been duly authorized by the Depositor by all necessary action on the part of the Depositor.

(d)     This Supplement, together with the Agreement of which this Supplement forms a part, constitutes a legal, valid and binding obligation of the Depositor, enforceable in accordance with its terms.

(e)     The consummation of the transactions contemplated by the Agreement and this Supplement and the fulfillment of the terms hereof do not conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time) a default under, the governing instruments of the Depositor or any indenture, agreement or other instrument to which the Depositor is a party or by which it is bound; or result in the creation or imposition of any lien upon any of its properties pursuant to the terms of any such indenture, agreement or other instrument; or violate any law or any order, rule or regulation applicable to the Depositor of any court or of any federal or state regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Depositor or its properties.

(f)     There are no proceedings or investigations pending, or threatened, before any court, regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Depositor or its properties:  (i) asserting the invalidity of the Agreement or this Supplement, (ii) seeking to prevent the consummation of any of the transactions contemplated by the Agreement or this Supplement, or (iii) seeking any determination or ruling that is likely to materially or adversely affect the performance by the Depositor of its obligations under, or the validity or enforceability of the Agreement or this Supplement.

<u>Article 4:  Cross Receipt.</u>

The Program Lender hereby acknowledges receipt of the Minimum Purchase Price. The Depositor hereby acknowledges receipt of the Transferred Bank of America Loans.

[P0013443.1]

### Article 5: Assignment of Origination, Guaranty and Servicing Rights.

The Program Lender hereby assigns and sets over to the Depositor any claims it may now or hereafter have under the Guaranty Agreement, the Origination Agreement and the Servicing Agreement to the extent the same relate to the Transferred Bank of America Loans described in Schedule 1, other than any right to obtain servicing after the date hereof. It is the intent of this provision to vest in the Depositor any claim of the Program Lender relating to defects in origination, guaranty or servicing of the loans purchased hereunder in order to permit the Depositor to assert such claims directly and obviate any need to make the same claims against the Program Lender under this Supplement. The Program Lender also hereby assigns and sets over to the Depositor any claims it may now have or hereafter have to any collateral pledged by TERI to the Program Lender to secure its obligations under the Guaranty Agreement that relates to the Transferred Bank of America Loans, and the Program Lender hereby releases any security interest it may have in such collateral. The Program Lender hereby authorizes the Depositor, its successors and assigns, to file in any public filing office where a Uniform Commercial Code Filing with respect to collateral pledged by TERI is of record, any partial release or assignment that it deems necessary or appropriate to reflect in the public records the conveyance and assignment effected hereby.

[Remainder of page intentionally blank]

IN WITNESS WHEREOF, the parties have caused this Supplement to be executed as of the date set forth above.

THE FIRST MARBLEHEAD CORPORATION

By: _____
John A. Foxgrover
Senior Vice President

BANK OF AMERICA, N.A.

By: _____
   Name:
   Title:

THE NATIONAL COLLEGIATE FUNDING LLC

By:   GATE Holdings, Inc., Member

By: _____
John A. Foxgrover
Vice President

{F0013443.1 }

-4-

IN WITNESS WHEREOF, the parties have caused this Supplement to be executed as of the date set forth above.

THE FIRST MARBLEHEAD CORPORATION

By: _____
    John A. Foxgrover
    Senior Vice President

BANK OF AMERICA, N.A.

By: _____
    Name:  ANDREW  IRWIN
    Title:  SENIOR VICE PRESIDENT

THE NATIONAL COLLEGIATE FUNDING LLC

By:    GATE Holdings, Inc., Member

By: _____
    John A. Foxgrover
    Vice President

(FF0)1343.1 )

-4-