The Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

ESTHER HOFFMAN; SARAH DOUGLASS;
ANTHONY KIM; and IL KIM and DARIA KIM,
husband and wife and the marital community
comprised thereof, on behalf of themselves and on
behalf of others similarly situated,

Plaintiffs,

vs.

TRANSWORLD SYSTEMS INCORPORATED;
PATENAUDE AND FELIX, A.P.C.; MATTHEW
CHEUNG, and the marital community comprised
of MATTHEW CHEUNG and JANE DOE
CHEUNG; National Collegiate Student Loan
Trust 2004-2; National Collegiate Student Loan
Trust 2005-2; National Collegiate Student Loan
Trust 2005-3; National Collegiate Student Loan
Trust 2006-1; National Collegiate Student Loan
Trust 2006-3; National Collegiate Student Loan
Trust 2007-4,

Defendants.

Case No. C18-1132 TSZ

DECLARATION OF JAMES
CUMMINS

I, James Cummins, under penalty of perjury under the laws of the United States

hereby declare as follows:

DECLARATION OF JAMES CUMMINS - 1
(No. C18-1132 TSZ)

Leonard Law, PLLC
3614 California Ave. SW, #151
Seattle, Washington 98116
Phone: 206-486-1176
Fax: 206-458-6028

1.      My full name is James H. Cummins, I am over the age of 18 and I have the capacity to make this declaration, which is based upon my personal knowledge of the facts stated herein.

2.      I was employed by Transworld Systems Incorporated ("TSI") from February 2, 2015 until August 2, 2018. Prior to working at TSI, I worked as a litigation paralegal for twelve (12) years after earning a Paralegal Certificate from the University of Georgia in March 2003.

3.      Shortly after leaving TSI in August 2018, I wrote down my personal experiences while working there because I wanted to have a written record of what had occurred. I have been interviewed by the Consumer Financial Protection Bureau ("CFPB"). In January of 2020, I provided the CFPB an affidavit regarding what happened while I was working at TSI. A true and correct copy of that affidavit is attached hereto as **Exhibit A**. The statements contained therein are true and correct. The information contained in this declaration and the one attached hereto is based on my personal knowledge.

4.      TSI would receive student loan accounts in default from another student loan servicer and would attempt to collect on the account. If TSI was unable to get a consumer to pay on a student loan account, TSI would refer the loan account to collection agency law firms ("Network Firms"). The Network Firms would then file lawsuits and obtain judgments on those accounts. Patenaude and Felix, A.P.C. was one of the Network Firms. On at least one occasion, I spoke with Matthew Cheung, who was an attorney at Patenaude and Felix, A.P.C. It is my understanding that he filed lawsuits on behalf of the NCSLTs.

5.      During my employment, TSI had employees called "Performance Managers" who would work directly with the Network Firms. If the Network Firms were going to file

DECLARATION OF JAMES CUMMINS - 2
(No. C18-1132 TSZ)

Leonard Law, PLLC
3614 California Ave. SW, #151
Seattle, Washington 98116
Phone: 206-486-1176
Fax: 206-458-6028

suit to collect on a loan, a Performance Manager would make sure that TSI provided the Network Firm the required loan documents.

6.       My job title at TSI was Legal Case Manager/Legal Account Specialist ("LCM"). One of my job duties as a LCM was to sign form affidavits that were filed in lawsuits brought in the name of one of the National Collegiate Student Loan Trusts ("NCSLTs"), including the NCSLTs listed in the caption of this declaration. During my employment at TSI there were three to six people employed by TSI in the LCM position.

7.       The most common type of affidavit I would sign in my job was a generic form affidavit that TSI would provide to Network Firms that were filed in courts across the United States, including Washington state, to obtain default judgments ("Generic Affidavits"). Some states required information in the affidavits that was not in the Generic Affidavits, and the affidavits filed in those states were different from the Generic Affidavit.

8.       Prior to being sent to the Network Firms, the Generic Affidavits were created by TSI employees that would populate a template. Each day I and other TSI LCMs would be provided stacks of Generic Affidavits that were already filled out. I do not know who filled them out. We were required to review and sign each Generic Affidavit. I could review up to 40 affidavits a day comfortably.

9.       Attached to the Generic Affidavits that were provided to me and other LCMs were documents that included copies of pages titled "Deposit and Sale Agreement," "Pool Supplement," and "Loan Request/Credit Agreement."

10.       American Education Services ("AES") would provide TSI the documents attached to the Generic Affidavits when a loan would go into default. I do not have personal knowledge regarding how AES obtained copies of the documents in its system or how they were maintained in the AES system. TSI did not provide me or other LCMs

DECLARATION OF JAMES CUMMINS - 3
(No. C18-1132 TSZ)

Leonard Law, PLLC
3614 California Ave. SW, #151
Seattle, Washington 98116
Phone: 206-486-1176
Fax: 206-458-6028

1   training explaining where the records held by TSI and AES came from or how they were
2   kept.

3      11.     Prior to signing the Generic Affidavits, I and the other LCMs would compare
4   the information in the Generic Affidavits and the attachments with information in TSI's
5   computer system. We had a checklist we would go through for each Generic Affidavit and
6   would check a box if the data in an affidavit matched a data field in TSI's system. We
7   would compare various data fields in TSI's system against the information contained in
8   the Generic Affidavits and the attachments. I am not sure who loaded the information we
9   reviewed into TSI's system, and I am not sure how I would determine who did.

10     12.     LCMs did not review the schedule for the borrower's loan prior to executing
11  the Generic Affidavits, and Affiants lacked personal knowledge of the representations
12  made in the Generic Affidavits. There were many LCMs during the time that I worked at
13  TSI that did not even know what an affidavit was, or what it was used for.

14     13.     When an LCM complained to a supervisor that he or she did not have
15  personal knowledge of the representations in the Generic Affidavits, nothing was done,
16  and Affiants continued signing Generic Affidavits because we/they were afraid we/they
17  would lose our/their jobs if we/they refused to sign them.

18     14.     I complained to Bradley Luke regarding the issues with the Generic
19  Affidavits described herein and nothing was done.

20     15.     Deficiencies in the Affiant's knowledge regarding the information in the
21  Generic Affidavits created a hostile, frustrating, and toxic work environment. The training
22  was inadequate to accurately execute a Generic Affidavit or develop accurate trial
23  testimony. There was no reliable resource to answer questions regarding the language used
24  in the affidavits. There was a high turnover rate in the department in which I worked.

25
26
27
DECLARATION OF JAMES CUMMINS - 4
(No. C18-1132 TSZ)

Leonard Law, PLLC
3614 California Ave. SW, #151
Seattle, Washington 98116
Phone: 206-486-1176
Fax: 206-458-6028

16.     In addition to the Generic Affidavits, there were other affidavits that LCMs, including me, were required to sign. These affidavits were used in support of motions for summary judgment that were filed by Network Firms in courts across the United States ("MSJ Affidavits"). MSJ Affidavits had additional details regarding loans that were not in the Generic Affidavits. One difference was that the MSJ Affidavits often had a payment history report attached as an exhibit. The payment history reports, which resembled spreadsheets, were created by TSI. The information in the payment history reports was often inaccurate and it was hard, if not impossible, to get management to correct mistakes in the payment history reports. During my employment with TSI, Bradley Luke changed or caused to be changed the information contained in loan payment history reports, including dates, and he would add and subtract amounts in the reports all without notice to the LCM.

17.     In addition to signing affidavits, I was assigned to appear personally or telephonically to testify in over 140 trials.

18.     TSI's training was inadequate to teach LCMs to accurately execute an affidavit or develop accurate trial testimony. There was no reliable resource to answer questions regarding the language used in the affidavits or the terminology used in witness testimony. Typical responses from management were to "review your training", "you don't need to know that", or "I'll get back to you".

19.     The frustration created by TSI's management's responses and hostility led to the turnover of sixteen (16) LCMs while I was employed by TSI.

20.     Training provided in preparation for appearing as a trial witness was conducted by Bradley Luke. Several LCMs described this training as confusing, off the wall, and mean-spirited.

DECLARATION OF JAMES CUMMINS - 5
(No. C18-1132 TSZ)

Leonard Law, PLLC
3614 California Ave. SW, #151
Seattle, Washington 98116
Phone: 206-486-1176
Fax: 206-458-6028

21.     I was required to participate in the trial witness preparation training. During the training there was no instruction reflecting the statements made in the affidavits regarding the recordkeeping practices of the NCSLTs, the accuracy of the records, or how the pre-default servicer, AES, interacted with the borrowers. All the information required to instruct someone to properly testify at trial concerning the authenticity of the records TSI used to obtain judgments was left out of the training.

22.     During the time I worked at TSI, TSI entered into the CFPB Consent Order that is attached hereto as **Exhibit B**. The deficiencies described in paragraphs 21 through 24 of the Consent Order existed at TSI when I began working there on February 2, 2015 and still existed on August 2, 2018 when I was terminated.

23.     When the Consent Order was announced there were departmental meetings conducted by TSI Vice President Tanya McComb and Bradley Luke, who was promoted to Director of Operations during my tenure at TSI. The meetings were brief, and when asked what effect the Consent Order would have on TSI's operations, Bradley Luke would repeatedly say it was "business as usual." That statement caused confusion because it did not address the adverse findings contained in the Consent Order. TSI did not provide any direction to the LCM department regarding its role to help implement the corrective actions committed to in the Consent Order by TSI's management.

24.     TSI did not make substantive changes to its training after the Consent Order was entered. I did not witness any changes in the substantive training to correct the problems identified in the Consent Order. TSI did create an online affidavit training program, but as I discuss in my earlier affidavit attached hereto, the new training created more confusion, not less.

25.     Attached hereto as **Exhibit C** is a true and correct copy of an email exchange from August 2018 that I had with senior managers and an attorney at TSI regarding an

DECLARATION OF JAMES CUMMINS - 6
(No. C18-1132 TSZ)

Leonard Law, PLLC
3614 California Ave. SW, #151
Seattle, Washington 98116
Phone: 206-486-1176
Fax: 206-458-6028

incident where I felt that another LCM was being encouraged by TSI and its attorneys to give false testimony in a case brought on behalf of the NCSLTs. I also detail in that email chain an incident where I complained of inaccurate records to Bradley Luke and nothing was done to correct the error. Portions of the email have been highlighted for ease of reference.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed January 19, 2022, at Lawrenceville, Georgia.

*Jamwes H. Cummins*

James Cummins

DECLARATION OF JAMES CUMMINS - 7
(No. C18-1132 TSZ)

Leonard Law, PLLC
3614 California Ave. SW, #151
Seattle, Washington 98116
Phone: 206-486-1176
Fax: 206-458-6028

EX. A

UNITED STATES OF AMERICA

CONSUMER FINANCIAL PROTECTION BUREAU

ADMINSITRATIVE PROCEEDING File

2017-CFPB-0016

In the Matter of:                                CONSENT ORDER

TRANSWORLD SYSTEMS INC.

### AFFIDAVIT OF JAMES H. CUMMINS

1.  My name is James H. Cummins, I am over the age of 18 and I have
    the capacity to make this affidavit, which is based upon my
    personal knowledge of the facts stated herein.

2.  I was employed by Transworld Systems Inc. ("TSI") from February
    2, 2015 until August 2, 2018 as a Legal Case Manager/Legal
    Account Specialist ("LCM's"). My job duties included reviewing
    the records of the National Collegiate Student Loan Trusts (the
    "Trusts") in order to accurately execute affidavits, respond to
    Discovery requests, and prepare for Trial testimony as a
    custodian of records. During the course of my employment I was
    assigned to testify in approximately 140 Trials in person and
    telephonically.   I prevailed on behalf of the Trusts by
    obtaining a Judgment of the Court or by entering into a Consent
    Judgment with the Defendant(s) mutually agreeing to a fixed
    payment schedule. In fewer than ten (10) cases I did not prevail
    on behalf of the Trusts.

3.  Prior to my TSI employment I worked as a Litigation Paralegal
    for twelve (12) years after earning a Paralegal Certificate from
    the University of Georgia in March 2003. My duties included

drafting demand letters, complaints, preparing and responding to Discovery requests, researching, *Shepardizing*, and drafting dispositive pleadings in final draft form.  I was/am proficient in Civil Practice in State Courts, State Court of Appeals, State Supreme Court, and Federal Courts.

4.    When I arrived at TSI, the deficiencies described in paragraphs 21 through 24 of the Consent Order existed.  Those deficiencies still existed when I was fired on August 2, 2018, despite the new online affidavit training that was provided. The new online affidavit training was the same procedure and test that predated the Consent Order, except for a few terms that created additional confusion.  The affidavit training procedures were authored by Bradley Luke, who held several titles during my employment but, always had complete control or final approval of the hiring, training, work assignments, the Trial calendar, affidavit production, NCT records, disciplinary actions regarding the LCM's.

5.    The deficiencies described in paragraphs 21 through 24 of the Consent Order created a hostile, frustrating, and toxic work environment.  The training was inadequate to accurately execute an affidavit or develop accurate trial testimony.  There was no reliable resource to answer questions regarding the language used in the affidavits or the terminology used in witness testimony. Typical responses from management were to "review your training", "you don't need to know that", or "I'll get back to you".  The frustration created by management's responses and hostility led to the turnover of sixteen (16) LCM's during my employment.

6.    The training provided in preparation for appearing as a Trial witness was conducted by Bradley Luke.  Several LCM's described this training as confusing, off the wall, and mean-spirited. After Bradley Luke made comments to me "wait until it's your

turn" and "let's see if you can handle it", I objected to this training as a "hazing ritual" to Chris Thomas, the Director to whom I reported.   Chris Thomas later advised me that the training was required for all LCM's and that I would have to participate.

7. My previous comments were prescient – it was a hazing ritual. The Trial witness training went on for hours and there were an unlimited number of sessions. During the Trial witness training there were no questions asked reflecting the statements made in the affidavits regarding the recordkeeping practices of the Trusts, the accuracy of the records, how the pre-default servicer, American Education Services ("AES"), interacted with the borrowers, etc. All the essential information required to prevail at Trial was completely left out of Trial witness training.

8. When the Consent Order was announced there were departmental meetings conducted by VP Tanya McComb and Bradley Luke, now Director of Operations, was my reporting manager.  The meetings were very brief with Bradley Luke repeatedly stating that it was "business as usual" going forward.  That statement created an endless amount of confusion since it did not address the adverse findings contained in the Consent Order or provide any direction to the department of its role in the corrective actions committed to by TSI's management.

9. On or about the time that the Consent Order was announced, an email message was sent by TSI's CEO, Joseph Laughlin, stating that TSI had "Best in Class" processes that would enable to the company to move forward. I responded to that email message that TSI had no "Best in Class" processes and that the deficiencies described in the Consent Order still existed exposing the company to future sanctions.  Shortly thereafter I was called into a telephonic meeting with Chris Thomas, my reporting

Director, VP of HR Michelle Hauser, and Elizabeth Blanco, an attorney from Sessions, Fishman, Nathan & Israel.   After describing the lack of any effective affidavit training or "Best in Class" processes, I was asked to revise the affidavit training procedure to eliminate the deficiencies cited in the Consent Order and I agreed.   Attorney Elizabeth Blanco also advised me that TSI was forbidden by the FDCPA from retaliating against me for raising these issues.   I objected forcefully several times that she could not make that claim.  Over the next month, I revised the affidavit training procedure with the assistance of the most experienced and accurate LCM's, Dudley Turner and former LCM Jonathan Boyd.   The completed procedure was submitted for review and approval in approximately thirty (30) days.   I never received any feedback and none of the revisions were included in the post Consent Order procedure.

10.   TSI management took no action for eight to ten months when new online affidavit training and testing were available for all LCM's.  The affidavit training was a version that pre-dated the Consent Order with the exception of some new terms, which created additional confusion.   The new terms for existing resources were not part of the commonly used language in the office or by the supporting law firms.  The test was a version that pre-dated the Consent Order.

11.   It is critical to note that, after reviewing hundreds of files during my employment, I did not find any errors or missing documents in the records of the Trusts, including American Educations Services ("AES").   The deficiencies cited in the Consent Order, regarding these issues, are due to TSI's inability/refusal to effectively train its staff and the resulting high rate of staff turnover.

12.   In January 2018 I telephonically received a Final Warning issued by Michelle Hauser VP of Human Resources, in VP Tanya McComb's

office with Ralph Lyons on the phone, though he didn't speak. Although Bradley Luke was my direct manager, he did not appear. Bradley Luke, my direct manager, had asked me to contact a California attorney representing the Trusts in a case set for Trial. I contacted the California attorney and advised that I was available to make the Trial appearance on behalf of the Trusts. The California attorney responded that only Bradley Luke could appear, since he provided deposition testimony on the case and opposing counsel intended to challenge Bradley Luke's deposition testimony. She further advised that she had attempted to contact Bradley Luke 12 - 13 times via email message and voicemail and that he had not responded. Since Bradley Luke was not in the office, I escalated the issue to SVP Ralph Lyons and General Counsel Jonathan Thompson because I believed they had the authority to answer on Bradley Luke's behalf and the request was urgent. I don't know if the issue was ever resolved. However, one or more people took offense to my message and Michelle Hauser VP of Human Resources said that it was unprofessional. Michelle Hauser VP of Human Resources also stated that any further violations would lead to my firing from the company.

13. In the weeks leading up to my firing on August 2, 2018, a discussion regarding the Loan Payment History Report ("LPHR") began. The LPHR is a TSI generated report that discloses the updated payment history and updated interest calculations up to the date that the report was run. It is attached to Summary Judgment affidavits, provided in Discovery, and used as a Trial exhibit. During my employment Bradley Luke had made changes to the report, or had someone make changes, without notice to the staff. I had received an email message from a law firm asking why the category Disbursement Amount on the LPHR was incorrect. The Disbursement Amount on the LPHR that was referenced was

incorrect – it was the disbursement amount plus the origination
fee.  When I raised the issue with Bradley Luke, he refused to
correct the field for the Disbursement Amount on the LPHR and
replied that "they will have to learn how to explain it".
Submitting false or incorrect documents with an affidavit or at
trial is a violation of the FDCPA and a breach of the Consent
Order.  I advised Bradley Luke, SVP Ralph Lyons, Chief Legal
Officer/Chief Compliance Officer Jonathan Thompson, and VP of
HR Michelle Hauser that I would not make any Trial appearances
until the LPHR was corrected.  Since I had already committed to
appear for two Trials in Phoenix, AZ the following week, I
declined to discuss any future Trial appearances with Bradley
Luke.  I  also  declined  to  discuss  the  LPHR  with  the
aforementioned managers since they could easily resolve the
issue by directing Bradley Luke to correct the field for the
Disbursement Amount on the LPHR.  On information and belief,
the  field  for  the  Disbursement  Amount  on  the  LPHR  remains
uncorrected as of the date of this affidavit.

14.   When I appeared for the first Trial in Phoenix, AZ the attorney
had a LPHR that I had not provided to her and the Disbursement
Amount on the LPHR was incorrect, but it was not challenged and
the  Trust  was  granted  Judgment.   In  the  second  Trial  the
Disbursement Amount on the LPHR was incorrect and was challenged
exhaustively by an opposing attorney.  The Court would not allow
the LPHR to be admitted into evidence because of the error, but
granted Judgment to the Trust on the strength of the evidence
that was admitted.  When I returned to the office, I was fired
by Michelle Hauser VP of Human Resources over the phone, with
SVP Ralph Lyons on the phone though he did not speak, with VP
Tanya McComb, and manager Jonathan Boyd present.  My direct
manager Bradley Luke was not present.  Though I was severely
jet-lagged after thirty hours (30) of flight and flight delays,

I remember Michelle Hauser VP of Human Resources arguing again that I was being fired for being unprofessional. But to me it was perfectly clear, I was fired for refusing to make Trial appearances with an incorrect document, the LPHR. Because I refused to violate the FDPA and the Consent Order that is the subject of this action, TSI retaliated against me by terminating my employment. Further TSI has continued to willfully submit this incorrect and false LPHR with affidavits and witness testimony to date.

15. These deficiencies and the persistent violations of the Consent Order indicate that TSI management cannot conduct any meaningful training given its entrenched culture of dishonesty and contempt for its staff, the interest of the Trusts, and the statutes and regulatory bodies that govern the industry.

16. These statements reflect that the deficiencies described in paragraphs 21 through 24 of the Consent Order still exist and that the lack of a competent management response ensure that they will persist.

17. These statements further reflect that the corrective action described in paragraphs 47 and 48 of this Consent Order has been repeatedly breached by TSI management on the business unit level as well as the corporate level.

JAMES H. CUMMINS

SWORN and SUBSCRIBED before me this 6ᵗʰ day of January 2020.

NOTARY                          (SEAL)

EX. B

## UNITED STATES OF AMERICA
## CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING File
2017-CFPB-0018

| | |
|---|---|
| In the Matter of:<br><br>**TRANSWORLD SYSTEMS, INC.** | **CONSENT ORDER** |

## I.
## Overview

The Consumer Financial Protection Bureau (Bureau) has reviewed the debt collections litigation practices of the Attorney Network business unit of Transworld Systems, Inc. ("TSI") ("Respondent"), the agent and Service Provider for fifteen (15) Delaware statutory trusts referred to as the National Collegiate Student Loan Trusts ("NCSLTs", or "the Trusts", which are the National Collegiate Master Student Loan Trust, NCSLT 2003-1, NCSLT 2004-1, NCSLT 2004-2, NCSLT 2005-1, NCSLT 2005-2, NCSLT 2005-3, NCSLT 2006-1, NCSLT 2006-2, NCSLT 2006-3, NCSLT 2006-4, NCSLT 2007-1, NCSLT 2007-2, NCSLT 2007-3, and NCSLT 2007-4), and has identified violations of sections 1031(a) and 1036(a)(1) of the Consumer Financial Protection Act of 2010 (CFPA). Under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, the Bureau issues this Consent Order (Consent Order).

To collect on defaulted private student loans, Law Firms engaged by Respondent's Attorney Network business unit filed debt Collections Lawsuits in state

1

courts across the country on behalf of the Trusts. In support of many of these lawsuits, Respondent executed affidavits that falsely claimed personal knowledge of the account records and the consumer's debt, and in many cases, personal knowledge of the chain of assignments establishing ownership of the loans. In addition, since November 1, 2014, Law Firms hired by Respondent filed hundreds of debt Collections Lawsuits without the documentation necessary to prove Trust ownership of the loans.

## II

## Jurisdiction

1.  The Bureau has jurisdiction over this matter under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565.

## III
## Stipulation

2.  Respondent has executed a "Stipulation and Consent to the Issuance of a Consent Order," dated September 14, 2017 (Stipulation), which is incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondent has consented to the issuance of this Consent Order by the Bureau under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, without admitting or denying any of the findings of fact or conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

## IV
## Definitions

2

3. The following definitions apply to this Consent Order:

a. "Affiant" means any signatory to an Affidavit, signing in his or her capacity as an employee or agent of Respondent, but excluding one signing solely as a notary or witness to the act of signing.

b. "Affidavit" means any sworn statement filed with a court in connection with a Collections Lawsuit.

c. "Board" means TSI's duly elected and acting Board of Directors.

d. "Clearly and Prominently" means:

    i. as to written information: written in a type size and location sufficient for an ordinary consumer to read and comprehend it, and disclosed in a manner that would be easily recognizable and understandable in language and syntax to an ordinary consumer; if the information is contained in a multi-page print document, the disclosure appears on the first page.

    ii. as to information presented orally: spoken and disclosed in a volume, cadence, and syntax sufficient for an ordinary consumer to hear and comprehend.

e. "Collections Lawsuits" means attempts by a Law Firm engaged by Respondent's Attorney Network business unit, for an account owned or alleged to be owned by a Trust, through judicial processes in the United States of America, to collect or establish a Consumer's liability for a Debt.

f. "Consumer" means any natural person obligated or allegedly obligated to pay any Debt.

3

g. "Debt" means any obligation or alleged obligation of a Consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

h. "Effective Date" means the date on which the Consent Order is issued.

i. "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or his/her delegate.

j. "Law Firm" means a law firm engaged by Respondent's Attorney Network business unit to collect student loan Debt on behalf of the National Collegiate Student Loan Trusts.

k. "Regional Director" means the Regional Director for the Northeast Region for the Office of Supervision for the Consumer Financial Protection Bureau, or his/her delegate.

l. "Related Consumer Action" means a private action by or on behalf of one or more consumers or an enforcement action by another governmental agency brought against Respondent based on substantially the same facts as described in Section V of this Consent Order.

m. "Relevant Period" includes the period from November 1, 2014 to April 25, 2016.

n. "Respondent" means Transworld Systems, Inc., and its successors and assigns.

4

o.  "Service Providers" means any service provider, as defined in section

1002(26) of the CFPA, 12 U.S.C. § 5481, that provides or provided services

with respect to the servicing of the student loans owned by a NCSLT.

**V.**

**Bureau Findings and Conclusions**

The Bureau finds the following:

4.    The National Collegiate Student Loan Trusts ("NCSLTs" or "the Trusts")

comprise fifteen (15) Delaware statutory trusts created between 2001 and

2007. The basic purpose of each Trust is to acquire a pool of student loans,

enter into the so-called trust-related agreements, and provide for the

administration of the Trusts and the servicing of student loans.

5.    The Trusts do not have any employees and all actions taken by the Trusts in

connection with loan servicing and collecting Debt are carried out by third

parties.

6.    Debt-collection activities on behalf of the Trusts are carried out by the

successor special servicer's sub-servicer pursuant to servicing agreements

with the successor special servicer.

7.    Sub-servicers that executed and notarized the deceptive affidavits did so as

Service Providers and agents of the Trusts.

8.    Law Firms that filed lawsuits on behalf of the Trusts did so as Service

Providers and agents of the Trusts.

9.    Respondent Transworld Systems, Inc. (TSI) is incorporated under the laws of the State of California and maintains a principal place of business in Ft. Washington, Pennsylvania.

10.    TSI maintains an office in Peachtree Corners, Georgia, where its employees execute and notarize affidavits for Collections Lawsuits brought on behalf of the Trusts.

11.    A national network of Law Firms engaged by Respondent file and prosecute Collections Lawsuits on behalf of the Trusts in courts across the country.

12.    TSI has operated as the successor sub-servicer to the successor special servicer of the Trusts since November 1, 2014.

13.    TSI is a "covered person" under 12 U.S.C. § 5481(6) because it is engaged in the collection of debt and is a Service Provider. 12 U.S.C. § 5481(15)(A)(x), (26).

14.    TSI is an agent and Service Provider of the Trusts.

## FALSE AND MISLEADING AFFIDAVITS AND TESTIMONY

15.    In connection with collecting or attempting to collect Debt from Consumers, between November 1, 2014 and April 25, 2016, Law Firms hired by Respondent on behalf of the Trusts initiated 37,689 Collections Lawsuits in courts across the country on behalf of the Trusts.

16.    In support of the Collections Lawsuits, Law Firms submitted Affidavits executed by Respondent and documents in support of the Trusts' claims that Consumers owed Debts to a Trust.

17.    Respondent executed and notarized Affidavits—often with attached exhibits—that were used by Law Firms in many of the Collections Lawsuits

brought on behalf of the Trusts between November 1, 2014 and April 25, 2016.

18.    In these Affidavits, the Affiants swore that they had personal knowledge of the education loan records evidencing the Debt. In fact, in numerous instances, Affiants lacked personal knowledge of the education loan records evidencing the Debt when they executed the Affidavits.

19.    The Affiants also asserted that they were authorized and competent to testify about the Consumers' Debts through review of and "personal knowledge" of the business records, including electronic data in their possession. In fact, in certain instances, Affiants lacked personal knowledge of the business records, including the electronic data, showing that Consumers owed Debts to the Trusts. Affiants were instructed to review certain data on a computer screen as part of an effort to verify some information in the Affidavits about the Debts. Affiants, however, did not always know the source of the data on that screen, how the data was obtained or maintained, whether it was accurate, or whether that data meant that the Debt was in fact owed to the Trusts.

20.    Each Affiant also swore that he/she had "personal knowledge of the record management practices and procedures of Plaintiff [the Trust] and the practices and procedures Plaintiff requires of its loan servicers and other agents." In fact, certain Affiants lacked personal knowledge of the record management practices and procedures of the Trusts and the practices and procedures the Trusts required of its loan servicers and other agents.

7

21.   In many Affidavits, the Affiants also stated that "I have reviewed the chain of title records as business records" regarding the relevant account. In some cases, Affiants did not possess the chain of title records but reviewed "chain of title" records that were found online on a government portal maintained by the Securities and Exchange Commission. In numerous instances, Affiants did not review the chain of title records prior to executing the Affidavits.

22.   In certain Affidavits, the Affiants asserted that they had personal knowledge that the loans were transferred, sold, and assigned to the plaintiff Trusts on dates certain. In fact, in numerous instances, Affiants lacked personal knowledge of the chain of assignment records necessary to prove that the relevant Trust owned the subject loans.

23.   In some instances, certain Affiants complained to supervisors that they did not have personal knowledge of the representations made in the Affidavits. These affiants continued to execute Affidavits, however, for fear of losing their jobs.

24.   Affiants also provided live testimony in court, purportedly based on personal knowledge, similar to the statements made in the Affidavits as described in Paragraphs 18-22.

## FILING LAWSUITS WITHOUT THE INTENT OR ABILITY TO PROVE THE CLAIMS, IF CONTESTED

25.   From November 1, 2014 to April 25, 2016, on behalf of the Trusts, Law Firms filed numerous Collections Lawsuits against Consumers even though

the complete documentation needed to prove that the Trusts owned the loans did not exist.

26.  In these lawsuits, documentation of a complete chain of assignment evidencing that the subject loan was transferred to and owned by the Trust was lacking.

27.  In addition, Law Firms hired by Respondent on behalf of the Trusts filed numerous Collections Lawsuits where the loans in question were disbursed to the Consumers after the loans allegedly were transferred to the Trusts according to the chain of assignment documents.

28.  On numerous occasions, Law Firms hired by Respondent filed Collections Lawsuits even though the promissory note to prove that a Debt was owed did not exist.

29.  For each Collections Lawsuit described in Paragraphs 25-28, Law Firms hired by Respondent could not prove that a Debt was owed to the Trusts, if contested.

**Violations of the Consumer Financial Protection Act**

30.  Covered persons are prohibited from engaging "in any unfair, deceptive, or abusive act or practice" in violation of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

31.  An act or practice is deceptive under the CFPA if it involves a material representation or omission that misleads, or is likely to mislead, a consumer acting reasonably under the circumstances.

32.  An act or practice is unfair if "(A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by

consumers; and (B) such substantial injury is not outweighed by countervailing benefits to consumers or competition." 12 U.S.C. § 5531(c)(1).

## FALSE AND MISLEADING COLLECTION AFFIDAVITS AND TESTIMONY

33.    In numerous instances, in connection with collecting or attempting to collect Debt from Consumers, Respondent executed Affidavits that were used by Law Firms with many of the Collections Lawsuits filed by Law Firms on behalf of the Trusts in courts across the country, and in live testimony, Respondent represented, directly or indirectly, expressly or by implication, that:

   a.  Affiants had personal knowledge of the account records and the Debt;

   b.  Affiants had personal knowledge of the chain of assignment records evidencing Trust ownership of the subject loan; and

   c.  Affiants had personal knowledge of the record management practices and procedures of the Trusts and all prior servicers.

34.    In fact, as described in Paragraphs 18 to 24, in numerous instances, these representations were either false or the Affiant did not have a basis for making the representation.

35.    The representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to a Collections Lawsuit and are likely to mislead a Consumer acting reasonably under the circumstances.

36.    Thus, representations by Respondent, as described in Paragraphs 18-24, constitute deceptive acts or practices in violation of sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

## FILING LAWSUITS WITHOUT THE INTENT OR ABILITY TO PROVE THE CLAIMS, IF CONTESTED

37.    In numerous instances, in connection with collecting or attempting to collect Debt from Consumers, Respondent, acting through the Law Firms hired by Respondent on behalf of the Trusts, represented, directly or indirectly, expressly or by implication, that it could be proven in the Collections Lawsuits that the Trusts owned the loans in question and that the Consumers in question owed Debts to the Trusts, if contested.

38.    In fact, in numerous instances, Respondent lacked the complete chain of assignment documentation needed to prove Trust ownership of the subject loans and the promissory note needed to prove the existence of certain loans.

39.    The representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to a lawsuit and are likely to mislead a Consumer acting reasonably under the circumstances.

40.    Thus, Respondent's representations, as described in Paragraphs 25-29, constitute deceptive acts or practices in violation of sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

41.    In addition, Respondent's acts and practices, caused or were likely to cause substantial injuries to consumers.

42. The injuries to consumers included, but were not limited to, all payments made, including garnishments of wages and bank accounts, to settle Debts not enforceable.

43. The injuries to consumers were not reasonably avoidable by consumers and were not outweighed by any countervailing benefits to consumers or to competition.

44. Thus, Respondent's conduct, as described in Paragraph 25-29, constitutes unfair acts or practices in violation of sections 1031(c) and 1036(a)(1)(B ) of the CFPA, 12 U.S.C. §§ 5531(c)(1), 5536(a)(1)(B).

## ORDER
## VI
## Conduct Provisions

**IT IS ORDERED**, under sections 1053 and 1055 of the CFPA, that:

45. Respondent and its officers, Service Providers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not violate sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536, and must take the following affirmative actions:

    a. Respondent shall take all actions necessary to comply with the terms of the Consent Order.

    b. Respondent must require that any Law Firm it retains in connection with the collection of student loans owned by the Trusts agree to abide by the terms and conditions of the Consent Order.

    c. Within ninety (90) days of the Effective Date, Respondent must identify all Collections Lawsuits that were filed between November 1,

2014 and the Effective Date and that are missing the documentation described in subsection (f)(i)and (ii) of this Paragraph.

d. Within ninety (90) days of the Effective Date, Respondent must identify all Collections Lawsuits that were filed seeking Debt outside the statute of limitations and provide this information to the successor special servicer or any other Service Provider of the Trusts.

e. Within one-hundred twenty (120) days of the Effective Date, Respondent must provide to the successor special servicer and to the Bureau for each Consumer named in the suits identified in Paragraph 45c and 45d: the Consumer's name, all available contact information for the Consumer (including information in the possession of the attorneys who filed the suit), and the total amount of all payments made by the Consumer on or after the date on which the suit was filed.

f. Respondent and its officers, agents, Service Providers, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not initiate a Collections Lawsuit to collect Debt unless Respondent possesses:

    i. the documentation necessary to prove that a Trust owns the loan, including but not limited to, documentation reflecting the complete chain of assignment from the Debt's originator to the specific Trust claiming ownership; and

    ii. a document signed by the Consumer, such as a promissory note, evidencing the agreement to pay the loan forming the basis of the Debt.

g. Respondent and its officers, agents, Service Providers, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not cause Law Firms hired by Respondent on behalf of the Trusts to initiate a Collections Lawsuit to collect on a loan for which the applicable statute of limitations has expired.

h. Respondent shall establish written policies requiring Law Firms to confirm that the applicable statute of limitations has not expired at the time of the filing of the Collections Lawsuit;

i. Respondent shall require Law Firms to provide a quarterly report to Respondent that includes, for each Collections Lawsuit, any data relevant to determining the applicable statute of limitations, such as date of lawsuit, date of default, and date of last payment, as well as identifies any lawsuits in which a consumer alleges in his pleadings that the lawsuit was filed outside the statute of limitations.

j. Respondent shall not collect any Debt through a Collections Lawsuit that Respondent knows or learns was filed outside the statute of limitations, and if any such cases are pending, Respondent shall seek the immediate withdrawal or dismissal of the lawsuit.

k. Respondent and its officers, agents, Service Providers, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not cause Law Firms hired by Respondent on behalf of the Trusts to collect any Debt through

14

Collections Lawsuits that Respondent or its agents have any reason to believe may be unenforceable.

l. Respondent, its officers, agents, Service Providers, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from, in connection with the collection of a Debt, executing any Affidavit containing any misrepresentations, including false statements that:

 i. the Affiant is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records;

 ii. the Affiant has personal knowledge of the Consumer's debt;

 iii. the Affiant has personal knowledge of the loan's chain of assignment or ownership;

 iv. the Affiant has personal knowledge of the documents relating to the loan's chain of assignment or ownership;

 v. the Affidavit has been properly notarized if the Affidavit was not executed in the presence of a notary or if the notarization was otherwise not compliant with applicable notary laws; or

 vi. certain documents or records concerning the Debt forming the basis of the Collections Lawsuit have been reviewed by the Affiant.

46. Respondent, its officers, agents, Service Providers, servants, employees, and attorneys, and all other persons in active concert or participation with any

of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from, in connection with the collection of a Debt, providing any testimony that contains any misrepresentations, including false statements that the witness:

    a.  is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records;

    b.  has personal knowledge of the Consumer's debt;

    c.  has personal knowledge of the loan's chain of assignment or ownership; or

    d.  has personal knowledge of the documents relating to the loan's chain of assignment or ownership.

47.    If Respondent determines that it engages in any conduct prohibited by this Order, including but not limited to Paragraphs 45-46 of this Order, Respondent promptly will take the necessary steps to ensure that it ceases any and all practices that violate this Order.

48.    Within ten (10) days of making the determination described in Paragraph 47 Respondent must submit to the Regional Director a report detailing (a) the practices that violate the Order, (b) the specific agents engaged in the practices in question, and (c) a plan to ensure that the practices cease and to remediate any harm resulting from the practices.

49.    With regard to pending Collections Lawsuits filed by a Law Firm in which Respondent executed an Affidavit that was filed in support of the pending Collection Lawsuit and that contains any misrepresentations—including but

not limited to false statements that the Affiant: (1) is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records, (2) has personal knowledge of the consumer's indebtedness, (3) has personal knowledge of the loan's chain of assignment or ownership, (4) has personal knowledge about the maintenance of documents relating to the loan's chain of assignment or ownership, or (5) has attached as an exhibit a true and correct copy of a document—Respondent shall take the steps necessary, including getting permission from the successor special servicer, to direct Law Firms acting on behalf of the Trusts to withdraw such Affidavit unless the Trusts dismiss the suit in which the Affidavit was filed. Respondent shall take the steps necessary, including getting permission from the successor special servicer, to direct Law Firms acting on behalf of the Trusts to notify the court of the following in writing and must also simultaneously provide the court with a copy of the Consent Order entered into between the Bureau and the Respondent: "Plaintiff withdraws the affidavit of [insert name of Affiant] pursuant to Consent Order entered into by the Consumer Financial Protection Bureau and Transworld Systems, Inc."

50.   With regard to Collections Lawsuits that were filed in which Respondent executed an Affidavit that was filed with a court or in arbitration, and a judgment was entered, that contained any misrepresentations—including but not limited to false statements that the Affiant: (1) is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records, (2) has personal knowledge of the

Consumer's indebtedness, (3) has personal knowledge of the loan's chain of assignment or ownership, (4) has personal knowledge about the maintenance of documents relating to the loan's chain of assignment or ownership, or (5) has attached as an exhibit a true and correct copy of a document—Respondent must instruct the Law Firms to cease post-judgment enforcement activities and Respondent will take the steps necessary, including getting permission from the successor special servicer, to instruct the Law Firms acting on behalf of the Trusts to seek to remove, withdraw, or terminate any active wage garnishment, bank levies, and similar means of enforcing those judgments or settlements as well as cease accepting settlement payments related to any such Collections Lawsuits.

51.    Respondents must cooperate in all respects with any directive from the successor special servicer acting on behalf of the Trusts to:

    a.  Make certain disclosures in connection with the collection of Debt owned by the Trusts;

    b.  Withdraw any Affidavit or Collection Lawsuit; or

    c.  Provide loan information or documents to the successor special servicer, including but not limited to, information and documents related to:

        i.  Whether certain loans owned by the Trusts are no longer legally enforceable because the applicable statute of limitations has expired;

        ii.  Whether Collections Lawsuits have been filed on any loans where sufficient documentation, including signed promissory notes and

documentation reflecting the complete chain of assignment from the Debt's originator to the Collection Lawsuit's named plaintiff, is not in the possession, custody or control of the Collection Lawsuit's named plaintiff to prove the existence of the Debt owed to the named plaintiff, or where the applicable statute of limitations has expired; and

iii. Whether judgments were obtained in Collections Lawsuits described in Paragraph 51(c)(ii) and the identity of Consumers from whom the Trusts obtained payments in response to those Collections Lawsuits, and the specific amounts collected from these Consumers.

# VII

# Compliance Plan

IT IS FURTHER ORDERED that:

52.   Within ninety (90) days of the Effective Date, Respondent must submit to the Regional Director for review and determination of non-objection a compliance plan designed to ensure that the Attorney Network business unit of Respondent complies with all applicable Federal consumer financial laws with respect to Collections Lawsuits and the terms of this Consent Order (Compliance Plan). The Compliance Plan must include, at a minimum:

a. Detailed steps for addressing each action required by this Consent Order;

b. Comprehensive, written policies and procedures designed to prevent violations of Federal consumer financial laws and associated risks of harm to Consumers with respect to Collections Lawsuits;

c. An effective employee training program required for all employees with any involvement in Collections Lawsuits, including but not limited to Affiants, whose duties include reviewing, executing, preparing, processing, verifying, , or notarizing of Affidavits that includes regular, specific, comprehensive training in Federal consumer financial laws commensurate with individual job functions and duties;

d. Implementation of reasonable and appropriate written policies and procedures to ensure the proper notarization processes for Affidavits, including that notaries place the Affiants under oath and witness their signatures;

e. Implementation of reasonable and appropriate written policies and procedures to ensure that Affiants verify the accuracy of each statement made in an Affidavit before executing the Affidavit;

f. Comprehensive, written policies and procedures designed to ensure that any Law Firms engaged by Respondent to collect Debt do not violate any Federal consumer financial laws, which must include at a minimum:

    i. the Law Firm's duty to maintain adequate internal controls to ensure compliance with Federal consumer financial laws;

    ii. the Law Firm's duty to provide adequate training on compliance with all applicable Federal consumer financial laws and

Respondent's policies and procedures related to Collections Lawsuits;

iii.  Respondent's authority to conduct periodic onsite reviews of the Law Firm's controls, performance, and information systems related to Collections Lawsuits; and

iv.   periodic review by Respondent of the Law Firm's controls, performance, and information systems related to Collections Lawsuits; and

g.  Specific timeframes and deadlines for implementation of the steps described above.

53.   The Regional Director will have the discretion to make a determination of non-objection to the Compliance Plan or direct Respondent to revise it. If the Regional Director directs Respondent to revise the Compliance Plan, Respondent must make the revisions and resubmit the Compliance Plan to the Regional Director within thirty (30) days.

54.   After receiving notification that the Regional Director has made a determination of non-objection to the Compliance Plan or any amendments thereto, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan.

## VIII

## Role of the Board

**IT IS FURTHER ORDERED** that:

55. Respondent's Board must review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order prior to submission to the Bureau.

56. Although this Consent Order requires Respondent to submit certain documents for the review or non-objection by the Regional Director, the Board will have the ultimate responsibility for proper and sound management of Respondent and for ensuring that Respondent complies with Federal consumer financial law and this Consent Order.

57. In each instance that this Consent Order requires the Board to ensure adherence to or perform certain obligations of Respondent, the Board must:

   a. Authorize whatever actions are necessary for Respondent to fully comply with the Consent Order;

   b. Require timely reporting by management to the Board on the status of compliance obligations; and

   c. Require timely and appropriate corrective action to remedy any material non-compliance with any failures to comply with Board directives related to this Section.

## IX

## Order to Pay Civil Money Penalties

**IT IS FURTHER ORDERED** that:

58. Under section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section V of this Consent Order, and taking

into account the factors in 12 U.S.C. § 5565(c)(3), Respondent must pay a civil money penalty of $2.5 million to the Bureau.

59. Within ten (10) days of the Effective Date, Respondent must pay $1.5 million of the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions. The remainder of the civil money penalty shall be paid in one installment within sixty (60) days of the Effective Date.

60. The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau as required by section 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

61. Respondent must treat the civil money penalty paid under this Consent Order as a penalty paid to the government for all purposes. Regardless of how the Bureau ultimately uses those funds, Respondent may not:

    a. Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Consent Order; or

    b. Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any insurance policy, with regard to any civil money penalty paid under this Consent Order.

62. To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit by, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action or because of any

23

payment that the Bureau makes from the Civil Penalty Fund (Penalty Offset). If the court in any Related Consumer Action grants such a Penalty Offset, Respondent must, within thirty (30) days after entry of a final order granting the Penalty Offset, notify the Bureau, and pay the amount of the Penalty Offset to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

## X

## Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

63.  In the event of any default on Respondent's obligations to make payment under this Consent Order, interest, computed under 28 U.S.C. § 1961, as amended, will accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

64.  Respondent must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law and no part of the funds may be returned to Respondent.

65.  Under 31 U.S.C. § 7701, Respondent, unless it already has done so, must furnish to the Bureau its taxpayer identifying numbers, which may be used for purposes of collecting and reporting on any delinquent amount arising out of this Consent Order.

24

66.   Within thirty (30) days of the entry of a final judgment, consent order, or settlement in a Related Consumer Action, Respondent must notify the Regional Director of the final judgment, consent order, or settlement in writing. That notification must indicate the amount of redress, if any, that Respondent paid or is required to pay to Consumers and describe the Consumers or classes of Consumers to whom that redress has been or will be paid.

## XI

## Reporting Requirements

**IT IS FURTHER ORDERED** that:

67.   Respondent must notify the Bureau of any development that may affect compliance obligations arising under this Consent Order, including but not limited to a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Consent Order; the filing of any bankruptcy or insolvency proceeding by or against Respondent; or a change in Respondent's name or address. Respondent must provide this notice, if practicable, at least thirty (30) days before the development, but in any case no later than fourteen (14) days after the development.

68.   Within ninety (90) days of the Effective Date, and again one year after the Effective Date, Respondent must submit to the Regional Director an

25

accurate written compliance progress report (Compliance Report) that has been approved by the Board, which, at a minimum:

    a.  Describes in detail the manner and form in which Respondent has complied with this Consent Order; and

    b.  Attaches a copy of each Order Acknowledgment obtained under Section XII unless previously submitted to the Bureau.

## XII

## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that,

69.    Within thirty (30) days of the Effective Date, Respondent must deliver a copy of this Consent Order to each of its board members as well as to any managers, employees, Service Providers, or other agents and representatives who have responsibilities related to the subject matter of the Consent Order.

70.    For five (5) years from the Effective Date, Respondent must deliver a copy of this Consent Order to any business entity resulting from any change in structure referred to in Section XI, any future board members or executive officers, as well as to any managers, employees, Service Providers, or other agents and representatives who will have responsibilities related to the subject matter of the Consent Order before they assume their responsibilities.

71.    Respondent must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, ensuring that any electronic

signatures comply with the requirements of the E-Sign Act, 15 U.S.C.
§§ 7001-7031, within thirty (30) days of delivery, from all persons receiving
a copy of this Consent Order under this Section.

## XIII

### Recordkeeping

**IT IS FURTHER ORDERED** that

72.  Respondent must create, or if already created, must retain for at least five
     (5) years from the Effective Date, the following business records:

     a.  All documents and records necessary to demonstrate full compliance
         with each provision of this Consent Order, including all submissions to
         the Bureau.

73.  Respondent must retain the documents identified in Paragraph 72 for the
     duration of the Consent Order.

74.  Respondent must make the documents identified in Paragraph 72 available
     to the Bureau upon the Bureau's request.

## XIV

### Notices

**IT IS FURTHER ORDERED** that:

75.  Unless otherwise directed in writing by the Bureau, Respondent must
     provide all submissions, requests, communications, or other documents
     relating to this Consent Order in writing, with the subject line, "*In re
     Transworld Systems, Inc.,* File No. Year-CFPB- 0018," and send them
     either:

     a.  By overnight courier (not the U.S. Postal Service), as follows:

27

Regional Director, Bureau Northeast Region
Consumer Financial Protection Bureau
140 East 45th Street, 4th Floor
New York, NY 10017]

or

b.  By first-class mail to the below address and contemporaneously by

email to Enforcement_Compliance@cfpb.gov:

Regional Director, Bureau Northeast Region
Consumer Financial Protection Bureau
140 East 45th Street, 4th Floor
New York, NY 10017

## XV

## Cooperation with the Bureau

**IT IS FURTHER ORDERED** that:

76.     Respondent must cooperate fully with the Bureau in this matter and in any

investigation related to or associated with the conduct described in Section

V. Respondent must provide truthful and complete information, evidence,

and testimony and Respondent must cause its officers, employees,

representatives, or agents to appear for interviews, discovery, hearings,

trials, and any other proceedings that the Bureau may reasonably request

upon ten (10) days written notice, or other reasonable notice, at such places

and times as the Bureau may designate, without the service of compulsory

process.

## XVI

## Compliance Monitoring

**IT IS FURTHER ORDERED** that, to monitor Respondent's compliance with this Consent Order:

77. Within fourteen (14) days of receipt of a written request from the Bureau, Respondent must submit additional Compliance Reports or other requested information, which must be made under penalty of perjury; provide sworn testimony; or produce documents.

78. Respondent must permit Bureau representatives to interview any employee or other person affiliated with Respondent who has agreed to such an interview. The person interviewed may have counsel present.

79. Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

## XVII
## Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

80. Respondent may seek a modification to non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Regional Director.

81. The Regional Director may, in his/her discretion, modify any non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) if he/she determines good cause justifies the modification. Any such modification by the Regional Director must be in writing.

29

# XVIII

## Administrative Provisions

82. The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau, or any other governmental agency, from taking any other action against Respondent, except as described in Paragraph 83.

83. The Bureau releases and discharges Respondent from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section V of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices described in this Consent Order in future enforcement actions against Respondent and its affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the Consent Order, or to seek penalties for any violations of the Consent Order.

84. This Consent Order is intended to be, and will be construed as, a final Consent Order issued under section 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

85. This Consent Order will terminate five (5) years from the Effective Date or five (5) years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Respondent. If such action is dismissed or the relevant adjudicative body rules that Respondent did not

violate any provision of the Consent Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Consent Order will terminate as though the action had never been filed. The Consent Order will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

86.   Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

87.   Should Respondent seek to transfer or assign all or part of its operations that are subject to this Consent Order, Respondent must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

88.   The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under section 1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondent wherever Respondent may be found and Respondent may not contest that court's personal jurisdiction over Respondent.

89.   This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises, representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the

accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

90. Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing the Respondent, its Board, officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED**, this _____ day of September, 2017.

Richard Cordray
Director
Consumer Financial Protection Bureau

EX. C

M

**Importance:**    High

 **_Jim Cummins_ |** Legal Account Specialist
Transworld Systems Inc.
2 Sun Court, Suite 215
Peachtree Corners, GA 30092
Phone: 770-300-2745
Email:  james.cummins@tsico.com

**From:** Cummins, James
**Sent:** Friday, July 27, 2018 12:38 PM
**To:** Lyons, Ralph; Thompson, Jonathan
**Cc:** Hauser, Michelle; McComb, Tanya
**Subject:** RE: Draft -
**Importance:** High

Ralph –

Yes, I am traveling next week for two contested matters and I have set aside this afternoon for
some additional preparation. The total amounts are over $100K and I have spoken to our attorney,
who appears to be knowledgeable and willing to prosecute NCT's suit.  I reached out to Jonathan
regarding         o ensure that Brad would not be permitted to retaliate for my decision to
refuse to make an appearance with trial documents that he has refused to correct.   I knew that I
would not be supported by you or HR.

You're other statements are disingenuous and contradict the decision that you and Michelle made
in January regarding my employment. Michelle called it insubordination to criticize a manager's
conduct and asked me to quit.   You've effectively condoned Brad's chronic conduct which is
demeaning and calculated to humiliate the staff.

Brad's favorite target is Jackie, because she is vulnerable.  Currently she is schedule for a deposition
regarding NCT's affidavit processes and she is in tears.  **Brad and the Sessions attorney have told
her not to lie, but to answer this way……..which is a lie.  She was instructed to answer to a whole
series of questions and Brad will be at the deposition to make sure that she responds (lies) as
directed.** I have taken the liberty to raise the issues because the concern is **immediate. This depo
should be stopped and Jackie should be assured that Brad cannot retaliate against her.**

As for the depth of my concerns, it's your job to know already.  Isn't the chronic turnover telling?
 How can you have so much management for this tiny office and be unaware of the constant
conflict generated by Brad toward the staff and the firms?  I'd like to put my afternoon to good use
by preparing for the benefit of our client.

Jim



**Jim Cummins** | Legal Account Specialist
Transworld Systems Inc.
2 Sun Court, Suite 215
Peachtree Corners, GA 30092
Phone: 770-300-2745
Email: James.cummins@tsico.com

**From:** Lyons, Ralph
**Sent:** Friday, July 27, 2018 11:41 AM
**To:** Thompson, Jonathan; Cummins, James
**Cc:** Hauser, Michelle; McComb, Tanya
**Subject:** RE: Draft -

Jim

Given your travel schedule next week and upcoming travel for some of the folks on this email, can you please confirm a time today that you're available for a discussion?

As Jonathan stated, we take your concerns very seriously and would like to understand them in greater detail.

What time slot(s) work today?

Thanks in advance

Ralph

**From:** Thompson, Jonathan
**Sent:** Thursday, July 26, 2018 5:00 PM
**To:** Cummins, James
**Cc:** Lyons, Ralph; Hauser, Michelle; McComb, Tanya
**Subject:** RE: Draft -

Jim:

It's unfortunate that tomorrow won't work for you to meet and discuss your concerns. I understand that you've also declined a meeting tomorrow to meet with the collection law firm you referenced below and Bradley. We've already begun to review your concerns but don't understand them fully. It's important that you allow the company the opportunity to address the concerns you've raised.

When can you meet?

Again, you are not expected to go to trial for any file or documentation for which you feel uncomfortable.

Thanks,



**Jonathan Thompson, Esq., CCCO, CRCP | Chief Legal & Compliance Officer**
150 N. Field Drive, Two Conway Park, Suite 200 | Lake Forest, IL 60045
Direct: +1.847.969.7939 |
Email: jonathan.thompson@tsico.com | Website:www.tsico.com

Notice of Confidentiality: The information included and/or attached in this electronic mail transmission contains confidential and proprietary information owned by Transworld Systems Inc. and/or its subsidiaries and is intended for the addressee only. Any unauthorized disclosure, reproduction, distribution, or the taking of action in reliance on the contents of the information in or attached to this correspondence is prohibited. If you are not the intended recipient, or believe that you have received the message in error, please notify the sender by reply transmission and delete the message and any attachments from your entire system without copying, printing, or disclosing them.

**From:** Cummins, James
**Sent:** Thursday, July 26, 2018 1:42 PM
**To:** Thompson, Jonathan
**Cc:** Lyons, Ralph; Hauser, Michelle; McComb, Tanya
**Subject:** RE: Draft -

Jonathan –

I've been down that path with Michelle and Ralph previously and lost the argument completely. I have no intention of rehashing these same type issues with the same people to arrive at the same result. If the document corrections can be made, that will benefit my trial testimony, everyone in the department, and NCT's document integrity. But someone Brad respects or fears will have to force him to do it. Reason is useless.

The Brad issues speak for themselves and there should be ample documentation to that effect. There has never been any meaningful effort to mitigate his hostile conduct toward the staff. If there had been, I would not have reached out to you, because we would be disagreeing on substance instead of receiving veiled threats of retaliation. I am not appearing for Trial with incorrect documents for a firm that has already indicated that they are poised to snatch defeat from the jaws of victory, instead of reviewing the binding legal precedents and forming the proper arguments. I have obtained summary judgment on hundreds of files with similar defenses prior to joining TSI – you just have to do the work.

Jim



**Jim Cummins** | Legal Account Specialist
Transworld Systems Inc
2 Sun Court, Suite 215
Peachtree Corners, GA 30092
Phone: 770-300-2745
Email: James.cummins@tsico.com

**From:** Thompson, Jonathan

**Sent:** Thursday, July 26, 2018 2:04 PM
**To:** Cummins, James
**Cc:** Lyons, Ralph; Hauser, Michelle; McComb, Tanya
**Subject:** RE: Draft -                         t

Jim:

I appreciate you've reached out to me. I've copied Ralph, Tanya, and Michelle for their reference. You should feel comfortable with the documents you work with and your knowledge of them to testify in any matter. I'd like to discuss the concerns you've raised in a call tomorrow morning with everyone copied on the email and will send a calendar invitation in that regard.

Thanks,



Jonathan Thompson, Esq., CCCO, CRCP | Chief Legal & Compliance Officer
150 N. Field Drive, Two Conway Park, Suite 200 | Lake Forest, IL 60045
Direct: +1.847.969.7939
Email: jonathan.thompson@tsico.com | Website:www.tsico.com

Notice of Confidentiality: The information included and/or attached in this electronic mail transmission contains confidential and proprietary information owned by Transworld Systems Inc. and/or its subsidiaries and is intended for the addressee only. Any unauthorized disclosure, reproduction, distribution, or the taking of action in reliance on the contents of the information in or attached to this correspondence is prohibited. If you are not the intended recipient, or believe that you have received the message in error, please notify the sender by reply transmission and delete the message and any attachments from your entire system without copying, printing, or disclosing them.

-----Original Message-----
From: Cummins, James
Sent: Thursday, July 26, 2018 9:18 AM
To: Thompson, Jonathan
Subject: FW: Draft -
Importance: High

Jonathan -

I need the assistance of an ethical person and the fact that you're an attorney will help in this situation. To date I have not found an ethical resource in this business unit. **I don't have correct Loan Payment History Reports (LPHR) for these four cases, so I have indicated to Brad that I will not appear (see below). I have long asked Brad to correct a field that contains the disbursement amount.** On the report the disbursement amount is actually the original principal (disbursement amount plus origination fee). **As recently as a month or so ago he refused.** My trial testimony lives and dies by the accuracy of documents submitted into evidence and I hate being forced to dance around an error that can be fixed.

The second issue with these LPHR's is that the principal amount is incorrect. A judgment was granted on the files and later set aside. When judgment is granted the principal amount changes

because the complaint interest is added. When I showed it to Brad a couple of weeks ago, he said that he could produce a correct LPHR, but to date he has not done so, and I can't complete the trial packets.

My remaining concerns are the legal issues that I have discussed in the previous message.

Lastly, when I explained my concerns with this firm and appearance counsel yesterday, Brad hinted that he would retaliate against me if I refused to appear. He has done so in the past. Authority without thought or knowledge is a prescription for conflict and that is the history of this office. So, even though I am fully capable of standing on my own principles, I'm asking for your assistance.

There is also another ethical issue currently boiling in the office that you may wish to defuse that does not involve me.

Thank you for any assistance that you can provide.

Jim


Jim Cummins | Legal Account Specialist

Transworld Systems Inc.
2 Sun Court, Suite 215
Peachtree Corners, GA 30092



Phone: 770-300-2745
Email: james.cummins@tsico.com



-----Original Message-----
From: Cummins, James
Sent: Thursday, July 26, 2018 9:43 AM
To: Luke, Bradley; Gunther, Tess
Cc: Damsky, Edward; ffabiano@fabianolaw.com
Subject: RE: Draft -

This does not match the exhibit list that I had set aside for these matters. I have not finalized the trial packets because I do not have corrected LPHR's. I will take any case to trial with incorrect documents.

Most importantly, as a custodian of records, I cannot be expected to overcome the legal issues raised by opposing counsel. I am greatly disturbed by the fact that appearance counsel and the firm are unaware and apparently unable to defend the position set forth in Tran. The decision is based upon one hundred years of case law, includes the consensus of numerous federal circuits, and borrows heavily from Ramadan, a case which originated in New York
(Second Circuit). The fact that the neither appearance counsel, attorneys practicing in the

Syracuse area, and the local Courts are unaware of the prevailing case law and continue to rule incorrectly is not salient.  Borrowers do not have standing to challenge assignments, and in Tran, the US Supreme Court has clearly established that this legal precedent will not be changed!

The Consent Order is a non-starter.  In the last two weeks in trials in Georgia, California, and Ohio the Courts have refused to take judicial notice of the Consent Order after my testimony. But, in every one of those cases our attorneys had to put me into a position where I could offer testimony.  I'm not confident that that will happen in this matter.

Similarly the chain of title is firmly established by the documents that are in our possession.  The amount of time to explain it varies, but no Court has ruled against NCT on this issue in the 140+ trials where I have appeared.  Further no Court has ruled against or excluded any NCT documents when I have appeared.   In the fewer than 10 case where I did not prevail it was because our attorney did not offer the evidence that I provided, failed to ask for testimony on the disputed issue, or I was in a hostile Court like Kings County, NY, Medina County, Ohio or Allen County, Indiana.  This case relies solely upon legal issues, so no amount of NCT documents or testimony will overcome the lack of vigorous well-founded legal arguments.  I have no confidence that those arguments will materialize in this matter.

Jim

Jim Cummins | Legal Account Specialist

Transworld Systems Inc.
2 Sun Court, Suite 215
Peachtree Corners, GA 30092

Phone: 770-300-2745
Email:  james.cummins@tsico.com

-----Original Message-----
From: Luke, Bradley
Sent: Thursday, July 26, 2018 5:21 AM
To: Gunther, Tess; Cummins, James; Dartania, Marisa
Cc: Damsky, Edward; ffabiano@fabianolaw.com
Subject: RE: Draft - (

Tess,

Please keep Jim copied on these emails too.  I have requested a few other documents from AES regarding the deferments and forbearances and hope to get them soon.

Jim, does this exhibit list match the exhibits that you have set aside for these cases thus far?

Marisa, this is a resetting from the February trial date.  Trial will occur on the 8th of August.  Can