UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ESTHER HOFFMAN; SARAH
DOUGLASS; ANTHONY KIM; and IL
KIM and DARIA KIM, husband and wife
and the marital community comprised
thereof, on behalf of themselves and all
others similarly situated,

                                    Plaintiffs,

        v.

TRANSWORLD SYSTEMS
INCORPORATED; PATENAUDE AND
FELIX, A.P.C.; MATTHEW CHEUNG, and
the marital community comprised of
MATTHEW CHEUNG and JANE DOE
CHEUNG; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2004-2;
NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2005-2; NATIONAL
COLLEGIATE STUDENT LOAN TRUST
2005-3; NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2006-1;
NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2006-3; NATIONAL
COLLEGIATE STUDENT LOAN TRUST
2007-4,

                                    Defendants.

Case No.:  C18-1132 TSZ

DECLARATION OF GUY W.
BECKETT IN SUPPORT OF
PLAINTIFFS' MOTION FOR
SANCTIONS AGAINST
TRANSWORLD SYSTEMS INC.

Guy W. Beckett declares:

1.    I am one of the Plaintiffs' attorneys. I make this declaration from my personal knowledge.

2.    Attached as Exhibit 1 is a true copy of the Stipulation entered into between the CFPB and TSI for entry of the Consent Order, which was filed on September 18, 2017 in CFPB Administrative Proceeding No. 2017-CFPB-0018.

3.    Attached as Exhibit 2 is a true copy of the Consent Order filed on September 18, 2017 in CFPB Administrative Proceeding No. 2017-CFPB-0018.

4.    On December 16, 2021, Plaintiffs attempted to depose Transworld Systems Inc.'s ("TSI's") Fed. R. Civ. P. 30(b)(6) Designated Representative, Bradley Luke, about, among other things, the actions TSI took to comply with the Consumer Financial Protection Bureau's ("CFPB's") September 18, 2017 Consent Order.

5.    Attached as Exhibit 3 are true copies of excerpted pages from the December 16, 2021 deposition of TSI's Fed. R. Civ. P. 30(b)(6) Designated Representative, Bradley Luke.

6.    Attached as Exhibit 4 is a true copy of the Rough Draft of the March 8, 2022 continued deposition of TSI's Fed. R. Civ. P. 30(b)(6) Designated Representative, Bradley Luke.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

SIGNED in Seattle, Washington, on March 17, 2022.

_/s/ Guy Beckett_____
Guy W. Beckett, WSBA #14939



1708 Bellevue Avenue
Seattle, WA  98122
(206) 441-5444 FAX (206) 838-6346

**EXHIBIT 1**

UNITED STATES OF AMERICA
## CONSUMER FINANCIAL PROTECTION BUREAU

**2017-CFPB-0018**

|  | **STIPULATION AND CONSENT TO THE ISSUANCE OF A CONSENT ORDER** |
|---|---|
| **In the matter of:** | |
| **TRANSWORLD SYSTEMS, INC.** | |

The Consumer Financial Protection Bureau (Bureau) intends to initiate an administrative proceeding against Transworld Systems, Inc. (Respondent), under 12 U.S.C. §§ 5563 and 5565, for its unfair and deceptive practices with regard to Collections Lawsuits in violation of the CFPA's prohibition on unfair and deceptive acts or practices, 12 U.S.C. §§ 5531, 5536.

Respondent, in the interest of compliance and resolution of the matter, and without admitting or denying any wrongdoing, consents to the issuance of a Consent Order substantially in the form of the one to which this Stipulation and Consent to the Issuance of a Consent Order is attached (Consent Order), which is incorporated by reference.

In consideration of the above premises, Respondent agrees to the following:

### Jurisdiction

1. The Bureau has jurisdiction over this matter under sections 1053 and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5563, 5565.

## Consent

2. Respondent agrees to the issuance of the Consent Order, without admitting or denying any of the findings of fact or conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

3. Respondent agrees that the Consent Order will be deemed an "order issued with the consent of the person concerned" under 12 U.S.C. § 5563(b)(4), and agrees that the Consent Order will become a final order, effective upon issuance, and will be fully enforceable by the Bureau under 12 U.S.C. §§ 5563(d)(1) and 5565.

4. Respondent voluntarily enters into this Stipulation and Consent to the Issuance of a Consent Order.

5. The Consent Order resolves only Respondent's potential liability for law violations that the Bureau asserted or might have asserted based on the practices described in Section V of the Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. Respondent acknowledges that no promise or representation has been made by the Bureau or any employee, agent, or representative of the Bureau, about any liability outside of this action that may have arisen or may arise from the facts underlying this action or immunity from any such liability.

6. Respondent agrees that the facts described in Section V of the Consent Order will be taken as true and be given collateral estoppel effect, without further proof, in any proceeding before the Bureau to enforce the Consent Order, or in any subsequent civil litigation by the Bureau to enforce the Consent Order or its rights to any payment or monetary judgment under the Consent Order.

7. The terms and provisions of this Stipulation and the Consent Order will be binding upon, and inure to the benefit of, the parties hereto and their successors in interest.

8. Respondent agrees that the Bureau may present the Consent Order to the Bureau Director for signature and entry without further notice.

## Waivers

9. Respondent, by consenting to this Stipulation, waives:

   a. Any right to service of the Consent Order, and agrees that issuance of the Consent Order will constitute notice to the Respondent of its terms and conditions;

   b. Any objection to the jurisdiction of the Bureau, including, without limitation, under section 1053 of the CFPA, 12 U.S.C. § 5563;

   c. The rights to all hearings under the statutory provisions under which the proceeding is to be or has been instituted; the filing of proposed findings of fact and conclusions of law; proceedings before, and a recommended decision by, a hearing officer; all post-hearing procedures; and any other procedural right available under section 1053 of the CFPA, 12 U.S.C. § 5563, or 12 C.F.R. pt. 1081;

   d. The right to seek any administrative or judicial review of the Consent Order;

   e. Any claim for fees, costs, or expenses against the Bureau, or any of its agents or employees, and any other governmental entity, related in any way to this enforcement matter or the Consent Order, whether arising under common law or under the terms of any statute, including, but not

3

limited to the Equal Access to Justice Act and the Small Business Regulatory Enforcement Fairness Act of 1996; for these purposes, Respondent agrees that Respondent is not the prevailing party in this action because the parties have reached a good-faith settlement;

f.  Any other right to challenge or contest the validity of the Consent Order;

g.  Such provisions of the Bureau's rules or other requirements of law as may be construed to prevent any Bureau employee from participating in the preparation of, or advising the Director as to, any order, opinion, finding of fact, or conclusion of law to be entered in connection with this Stipulation or the Consent Order; and

h.  Any right to claim bias or prejudgment by the Director based on the consideration of or discussions concerning settlement of all or any part of the proceeding.

TRANSWORLD SYSTEMS, INC.  BY:

_Joseph P. Laughlin_

_September 14, 2017_

_____
Joseph Laughlin
Chief Executive Officer

Date

4

**EXHIBIT 2**

# UNITED STATES OF AMERICA
# CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING File
2017-CFPB-0018

In the Matter of:

TRANSWORLD SYSTEMS, INC.

CONSENT ORDER

## I.
## Overview

The Consumer Financial Protection Bureau (Bureau) has reviewed the debt collections litigation practices of the Attorney Network business unit of Transworld Systems, Inc. ("TSI") ("Respondent"), the agent and Service Provider for fifteen (15) Delaware statutory trusts referred to as the National Collegiate Student Loan Trusts ("NCSLTs", or "the Trusts", which are the National Collegiate Master Student Loan Trust, NCSLT 2003-1, NCSLT 2004-1, NCSLT 2004-2, NCSLT 2005-1, NCSLT 2005-2, NCSLT 2005-3, NCSLT 2006-1, NCSLT 2006-2, NCSLT 2006-3, NCSLT 2006-4, NCSLT 2007-1, NCSLT 2007-2, NCSLT 2007-3, and NCSLT 2007-4), and has identified violations of sections 1031(a) and 1036(a)(1) of the Consumer Financial Protection Act of 2010 (CFPA). Under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, the Bureau issues this Consent Order (Consent Order).

To collect on defaulted private student loans, Law Firms engaged by Respondent's Attorney Network business unit filed debt Collections Lawsuits in state

1

courts across the country on behalf of the Trusts. In support of many of these lawsuits, Respondent executed affidavits that falsely claimed personal knowledge of the account records and the consumer's debt, and in many cases, personal knowledge of the chain of assignments establishing ownership of the loans. In addition, since November 1, 2014, Law Firms hired by Respondent filed hundreds of debt Collections Lawsuits without the documentation necessary to prove Trust ownership of the loans.

## II

## Jurisdiction

1.    The Bureau has jurisdiction over this matter under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565.

## III
## Stipulation

2.    Respondent has executed a "Stipulation and Consent to the Issuance of a Consent Order," dated September 14, 2017 (Stipulation), which is incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondent has consented to the issuance of this Consent Order by the Bureau under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, without admitting or denying any of the findings of fact or conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

## IV
## Definitions

2

3.    The following definitions apply to this Consent Order:

a.    "Affiant" means any signatory to an Affidavit, signing in his or her capacity as an employee or agent of Respondent, but excluding one signing solely as a notary or witness to the act of signing.

b.    "Affidavit" means any sworn statement filed with a court in connection with a Collections Lawsuit.

c.    "Board" means TSI's duly elected and acting Board of Directors.

d.    "Clearly and Prominently" means:

    i.    as to written information: written in a type size and location sufficient for an ordinary consumer to read and comprehend it, and disclosed in a manner that would be easily recognizable and understandable in language and syntax to an ordinary consumer; if the information is contained in a multi-page print document, the disclosure appears on the first page.

    ii.    as to information presented orally: spoken and disclosed in a volume, cadence, and syntax sufficient for an ordinary consumer to hear and comprehend.

e.    "Collections Lawsuits" means attempts by a Law Firm engaged by Respondent's Attorney Network business unit, for an account owned or alleged to be owned by a Trust, through judicial processes in the United States of America, to collect or establish a Consumer's liability for a Debt.

f.    "Consumer" means any natural person obligated or allegedly obligated to pay any Debt.

g. "Debt" means any obligation or alleged obligation of a Consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

h. "Effective Date" means the date on which the Consent Order is issued.

i. "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or his/her delegate.

j. "Law Firm" means a law firm engaged by Respondent's Attorney Network business unit to collect student loan Debt on behalf of the National Collegiate Student Loan Trusts.

k. "Regional Director" means the Regional Director for the Northeast Region for the Office of Supervision for the Consumer Financial Protection Bureau, or his/her delegate.

l. "Related Consumer Action" means a private action by or on behalf of one or more consumers or an enforcement action by another governmental agency brought against Respondent based on substantially the same facts as described in Section V of this Consent Order.

m. "Relevant Period" includes the period from November 1, 2014 to April 25, 2016.

n. "Respondent" means Transworld Systems, Inc., and its successors and assigns.

4

o. "Service Providers" means any service provider, as defined in section 1002(26) of the CFPA, 12 U.S.C. § 5481, that provides or provided services with respect to the servicing of the student loans owned by a NCSLT.

## V.

## Bureau Findings and Conclusions

The Bureau finds the following:

4. The National Collegiate Student Loan Trusts ("NCSLTs" or "the Trusts") comprise fifteen (15) Delaware statutory trusts created between 2001 and 2007. The basic purpose of each Trust is to acquire a pool of student loans, enter into the so-called trust-related agreements, and provide for the administration of the Trusts and the servicing of student loans.

5. The Trusts do not have any employees and all actions taken by the Trusts in connection with loan servicing and collecting Debt are carried out by third parties.

6. Debt-collection activities on behalf of the Trusts are carried out by the successor special servicer's sub-servicer pursuant to servicing agreements with the successor special servicer.

7. Sub-servicers that executed and notarized the deceptive affidavits did so as Service Providers and agents of the Trusts.

8. Law Firms that filed lawsuits on behalf of the Trusts did so as Service Providers and agents of the Trusts.

9.    Respondent Transworld Systems, Inc. (TSI) is incorporated under the laws of the State of California and maintains a principal place of business in Ft. Washington, Pennsylvania.

10.   TSI maintains an office in Peachtree Corners, Georgia, where its employees execute and notarize affidavits for Collections Lawsuits brought on behalf of the Trusts.

11.   A national network of Law Firms engaged by Respondent file and prosecute Collections Lawsuits on behalf of the Trusts in courts across the country.

12.   TSI has operated as the successor sub-servicer to the successor special servicer of the Trusts since November 1, 2014.

13.   TSI is a "covered person" under 12 U.S.C. § 5481(6) because it is engaged in the collection of debt and is a Service Provider. 12 U.S.C. § 5481(15)(A)(x), (26).

14.   TSI is an agent and Service Provider of the Trusts.

## FALSE AND MISLEADING AFFIDAVITS AND TESTIMONY

15.   In connection with collecting or attempting to collect Debt from Consumers, between November 1, 2014 and April 25, 2016, Law Firms hired by Respondent on behalf of the Trusts initiated 37,689 Collections Lawsuits in courts across the country on behalf of the Trusts.

16.   In support of the Collections Lawsuits, Law Firms submitted Affidavits executed by Respondent and documents in support of the Trusts' claims that Consumers owed Debts to a Trust.

17.   Respondent executed and notarized Affidavits–often with attached exhibits–that were used by Law Firms in many of the Collections Lawsuits

6

brought on behalf of the Trusts between November 1, 2014 and April 25, 2016.

18.     In these Affidavits, the Affiants swore that they had personal knowledge of the education loan records evidencing the Debt. In fact, in numerous instances, Affiants lacked personal knowledge of the education loan records evidencing the Debt when they executed the Affidavits.

19.     The Affiants also asserted that they were authorized and competent to testify about the Consumers' Debts through review of and "personal knowledge" of the business records, including electronic data in their possession. In fact, in certain instances, Affiants lacked personal knowledge of the business records, including the electronic data, showing that Consumers owed Debts to the Trusts. Affiants were instructed to review certain data on a computer screen as part of an effort to verify some information in the Affidavits about the Debts. Affiants, however, did not always know the source of the data on that screen, how the data was obtained or maintained, whether it was accurate, or whether that data meant that the Debt was in fact owed to the Trusts.

20.     Each Affiant also swore that he/she had "personal knowledge of the record management practices and procedures of Plaintiff [the Trust] and the practices and procedures Plaintiff requires of its loan servicers and other agents." In fact, certain Affiants lacked personal knowledge of the record management practices and procedures of the Trusts and the practices and procedures the Trusts required of its loan servicers and other agents.

21.    In many Affidavits, the Affiants also stated that "I have reviewed the chain
       of title records as business records" regarding the relevant account. In some
       cases, Affiants did not possess the chain of title records but reviewed "chain
       of title" records that were found online on a government portal maintained
       by the Securities and Exchange Commission. In numerous instances,
       Affiants did not review the chain of title records prior to executing the
       Affidavits.

22.    In certain Affidavits, the Affiants asserted that they had personal knowledge
       that the loans were transferred, sold, and assigned to the plaintiff Trusts on
       dates certain. In fact, in numerous instances, Affiants lacked personal
       knowledge of the chain of assignment records necessary to prove that the
       relevant Trust owned the subject loans.

23.    In some instances, certain Affiants complained to supervisors that they did
       not have personal knowledge of the representations made in the Affidavits.
       These affiants continued to execute Affidavits, however, for fear of losing
       their jobs.

24.    Affiants also provided live testimony in court, purportedly based on
       personal knowledge, similar to the statements made in the Affidavits as
       described in Paragraphs 18-22.

### FILING LAWSUITS WITHOUT THE INTENT OR ABILITY TO PROVE THE CLAIMS, IF CONTESTED

25.    From November 1, 2014 to April 25, 2016, on behalf of the Trusts, Law
       Firms filed numerous Collections Lawsuits against Consumers even though

the complete documentation needed to prove that the Trusts owned the loans did not exist.

26. In these lawsuits, documentation of a complete chain of assignment evidencing that the subject loan was transferred to and owned by the Trust was lacking.

27. In addition, Law Firms hired by Respondent on behalf of the Trusts filed numerous Collections Lawsuits where the loans in question were disbursed to the Consumers after the loans allegedly were transferred to the Trusts according to the chain of assignment documents.

28. On numerous occasions, Law Firms hired by Respondent filed Collections Lawsuits even though the promissory note to prove that a Debt was owed did not exist.

29. For each Collections Lawsuit described in Paragraphs 25-28, Law Firms hired by Respondent could not prove that a Debt was owed to the Trusts, if contested.

## Violations of the Consumer Financial Protection Act

30. Covered persons are prohibited from engaging "in any unfair, deceptive, or abusive act or practice" in violation of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

31. An act or practice is deceptive under the CFPA if it involves a material representation or omission that misleads, or is likely to mislead, a consumer acting reasonably under the circumstances.

32. An act or practice is unfair if "(A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by

consumers; and (B) such substantial injury is not outweighed by countervailing benefits to consumers or competition." 12 U.S.C. § 5531(c)(1).

## FALSE AND MISLEADING COLLECTION AFFIDAVITS AND TESTIMONY

33.    In numerous instances, in connection with collecting or attempting to collect Debt from Consumers, Respondent executed Affidavits that were used by Law Firms with many of the Collections Lawsuits filed by Law Firms on behalf of the Trusts in courts across the country, and in live testimony, Respondent represented, directly or indirectly, expressly or by implication, that:

   a. Affiants had personal knowledge of the account records and the Debt;

   b. Affiants had personal knowledge of the chain of assignment records evidencing Trust ownership of the subject loan; and

   c. Affiants had personal knowledge of the record management practices and procedures of the Trusts and all prior servicers.

34.    In fact, as described in Paragraphs 18 to 24, in numerous instances, these representations were either false or the Affiant did not have a basis for making the representation.

35.    The representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to a Collections Lawsuit and are likely to mislead a Consumer acting reasonably under the circumstances.

36.  Thus, representations by Respondent, as described in Paragraphs 18-24, constitute deceptive acts or practices in violation of sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

## FILING LAWSUITS WITHOUT THE INTENT OR ABILITY TO PROVE THE CLAIMS, IF CONTESTED

37.  In numerous instances, in connection with collecting or attempting to collect Debt from Consumers, Respondent, acting through the Law Firms hired by Respondent on behalf of the Trusts, represented, directly or indirectly, expressly or by implication, that it could be proven in the Collections Lawsuits that the Trusts owned the loans in question and that the Consumers in question owed Debts to the Trusts, if contested.

38.  In fact, in numerous instances, Respondent lacked the complete chain of assignment documentation needed to prove Trust ownership of the subject loans and the promissory note needed to prove the existence of certain loans.

39.  The representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to a lawsuit and are likely to mislead a Consumer acting reasonably under the circumstances.

40.  Thus, Respondent's representations, as described in Paragraphs 25-29, constitute deceptive acts or practices in violation of sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

41.  In addition, Respondent's acts and practices, caused or were likely to cause substantial injuries to consumers.

42. The injuries to consumers included, but were not limited to, all payments made, including garnishments of wages and bank accounts, to settle Debts not enforceable.

43. The injuries to consumers were not reasonably avoidable by consumers and were not outweighed by any countervailing benefits to consumers or to competition.

44. Thus, Respondent's conduct, as described in Paragraph 25-29, constitutes unfair acts or practices in violation of sections 1031(c) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(c)(1), 5536(a)(1)(B).

## ORDER
## VI
## Conduct Provisions

**IT IS ORDERED**, under sections 1053 and 1055 of the CFPA, that:

45. Respondent and its officers, Service Providers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not violate sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536, and must take the following affirmative actions:

   a. Respondent shall take all actions necessary to comply with the terms of the Consent Order.

   b. Respondent must require that any Law Firm it retains in connection with the collection of student loans owned by the Trusts agree to abide by the terms and conditions of the Consent Order.

   c. Within ninety (90) days of the Effective Date, Respondent must identify all Collections Lawsuits that were filed between November 1,

12

2014 and the Effective Date and that are missing the documentation described in subsection (f)(i)and (ii) of this Paragraph.

d. Within ninety (90) days of the Effective Date, Respondent must identify all Collections Lawsuits that were filed seeking Debt outside the statute of limitations and provide this information to the successor special servicer or any other Service Provider of the Trusts.

e. Within one-hundred twenty (120) days of the Effective Date, Respondent must provide to the successor special servicer and to the Bureau for each Consumer named in the suits identified in Paragraph 45c and 45d: the Consumer's name, all available contact information for the Consumer (including information in the possession of the attorneys who filed the suit), and the total amount of all payments made by the Consumer on or after the date on which the suit was filed.

f. Respondent and its officers, agents, Service Providers, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not initiate a Collections Lawsuit to collect Debt unless Respondent possesses:

i. the documentation necessary to prove that a Trust owns the loan, including but not limited to, documentation reflecting the complete chain of assignment from the Debt's originator to the specific Trust claiming ownership; and

ii. a document signed by the Consumer, such as a promissory note, evidencing the agreement to pay the loan forming the basis of the Debt.

g. Respondent and its officers, agents, Service Providers, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not cause Law Firms hired by Respondent on behalf of the Trusts to initiate a Collections Lawsuit to collect on a loan for which the applicable statute of limitations has expired.

h. Respondent shall establish written policies requiring Law Firms to confirm that the applicable statute of limitations has not expired at the time of the filing of the Collections Lawsuit;

i. Respondent shall require Law Firms to provide a quarterly report to Respondent that includes, for each Collections Lawsuit, any data relevant to determining the applicable statute of limitations, such as date of lawsuit, date of default, and date of last payment, as well as identifies any lawsuits in which a consumer alleges in his pleadings that the lawsuit was filed outside the statute of limitations.

j. Respondent shall not collect any Debt through a Collections Lawsuit that Respondent knows or learns was filed outside the statute of limitations, and if any such cases are pending, Respondent shall seek the immediate withdrawal or dismissal of the lawsuit.

k. Respondent and its officers, agents, Service Providers, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not cause Law Firms hired by Respondent on behalf of the Trusts to collect any Debt through

Collections Lawsuits that Respondent or its agents have any reason to believe may be unenforceable.

l. Respondent, its officers, agents, Service Providers, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from, in connection with the collection of a Debt, executing any Affidavit containing any misrepresentations, including false statements that:

    i. the Affiant is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records;

    ii. the Affiant has personal knowledge of the Consumer's debt;

    iii. the Affiant has personal knowledge of the loan's chain of assignment or ownership;

    iv. the Affiant has personal knowledge of the documents relating to the loan's chain of assignment or ownership;

    v. the Affidavit has been properly notarized if the Affidavit was not executed in the presence of a notary or if the notarization was otherwise not compliant with applicable notary laws; or

    vi. certain documents or records concerning the Debt forming the basis of the Collections Lawsuit have been reviewed by the Affiant.

46. Respondent, its officers, agents, Service Providers, servants, employees, and attorneys, and all other persons in active concert or participation with any

15

of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from, in connection with the collection of a Debt, providing any testimony that contains any misrepresentations, including false statements that the witness:

    a. is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records;

    b. has personal knowledge of the Consumer's debt;

    c. has personal knowledge of the loan's chain of assignment or ownership; or

    d. has personal knowledge of the documents relating to the loan's chain of assignment or ownership.

47. If Respondent determines that it engages in any conduct prohibited by this Order, including but not limited to Paragraphs 45-46 of this Order, Respondent promptly will take the necessary steps to ensure that it ceases any and all practices that violate this Order.

48. Within ten (10) days of making the determination described in Paragraph 47 Respondent must submit to the Regional Director a report detailing (a) the practices that violate the Order, (b) the specific agents engaged in the practices in question, and (c) a plan to ensure that the practices cease and to remediate any harm resulting from the practices.

49. With regard to pending Collections Lawsuits filed by a Law Firm in which Respondent executed an Affidavit that was filed in support of the pending Collection Lawsuit and that contains any misrepresentations—including but

not limited to false statements that the Affiant: (1) is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records, (2) has personal knowledge of the consumer's indebtedness, (3) has personal knowledge of the loan's chain of assignment or ownership, (4) has personal knowledge about the maintenance of documents relating to the loan's chain of assignment or ownership, or (5) has attached as an exhibit a true and correct copy of a document—Respondent shall take the steps necessary, including getting permission from the successor special servicer, to direct Law Firms acting on behalf of the Trusts to withdraw such Affidavit unless the Trusts dismiss the suit in which the Affidavit was filed. Respondent shall take the steps necessary, including getting permission from the successor special servicer, to direct Law Firms acting on behalf of the Trusts to notify the court of the following in writing and must also simultaneously provide the court with a copy of the Consent Order entered into between the Bureau and the Respondent: "Plaintiff withdraws the affidavit of [insert name of Affiant] pursuant to Consent Order entered into by the Consumer Financial Protection Bureau and Transworld Systems, Inc."

50. With regard to Collections Lawsuits that were filed in which Respondent executed an Affidavit that was filed with a court or in arbitration, and a judgment was entered, that contained any misrepresentations—including but not limited to false statements that the Affiant: (1) is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records, (2) has personal knowledge of the

17

Consumer's indebtedness, (3) has personal knowledge of the loan's chain of assignment or ownership, (4) has personal knowledge about the maintenance of documents relating to the loan's chain of assignment or ownership, or (5) has attached as an exhibit a true and correct copy of a document—Respondent must instruct the Law Firms to cease post-judgment enforcement activities and Respondent will take the steps necessary, including getting permission from the successor special servicer, to instruct the Law Firms acting on behalf of the Trusts to seek to remove, withdraw, or terminate any active wage garnishment, bank levies, and similar means of enforcing those judgments or settlements as well as cease accepting settlement payments related to any such Collections Lawsuits.

51. Respondents must cooperate in all respects with any directive from the successor special servicer acting on behalf of the Trusts to:

    a. Make certain disclosures in connection with the collection of Debt owned by the Trusts;

    b. Withdraw any Affidavit or Collection Lawsuit; or

    c. Provide loan information or documents to the successor special servicer, including but not limited to, information and documents related to:

        i. Whether certain loans owned by the Trusts are no longer legally enforceable because the applicable statute of limitations has expired;

        ii. Whether Collections Lawsuits have been filed on any loans where sufficient documentation, including signed promissory notes and

18

documentation reflecting the complete chain of assignment from the Debt's originator to the Collection Lawsuit's named plaintiff, is not in the possession, custody or control of the Collection Lawsuit's named plaintiff to prove the existence of the Debt owed to the named plaintiff, or where the applicable statute of limitations has expired; and

iii.  Whether judgments were obtained in Collections Lawsuits described in Paragraph 51(c)(ii) and the identity of Consumers from whom the Trusts obtained payments in response to those Collections Lawsuits, and the specific amounts collected from these Consumers.

# VII

## Compliance Plan

**IT IS FURTHER ORDERED** that:

52.  Within ninety (90) days of the Effective Date, Respondent must submit to the Regional Director for review and determination of non-objection a compliance plan designed to ensure that the Attorney Network business unit of Respondent complies with all applicable Federal consumer financial laws with respect to Collections Lawsuits and the terms of this Consent Order (Compliance Plan). The Compliance Plan must include, at a minimum:

a.  Detailed steps for addressing each action required by this Consent Order;

b. Comprehensive, written policies and procedures designed to prevent violations of Federal consumer financial laws and associated risks of harm to Consumers with respect to Collections Lawsuits;

c. An effective employee training program required for all employees with any involvement in Collections Lawsuits, including but not limited to Affiants, whose duties include reviewing, executing, preparing, processing, verifying, , or notarizing of Affidavits that includes regular, specific, comprehensive training in Federal consumer financial laws commensurate with individual job functions and duties;

d. Implementation of reasonable and appropriate written policies and procedures to ensure the proper notarization processes for Affidavits, including that notaries place the Affiants under oath and witness their signatures;

e. Implementation of reasonable and appropriate written policies and procedures to ensure that Affiants verify the accuracy of each statement made in an Affidavit before executing the Affidavit;

f. Comprehensive, written policies and procedures designed to ensure that any Law Firms engaged by Respondent to collect Debt do not violate any Federal consumer financial laws, which must include at a minimum:

    i. the Law Firm's duty to maintain adequate internal controls to ensure compliance with Federal consumer financial laws;

    ii. the Law Firm's duty to provide adequate training on compliance with all applicable Federal consumer financial laws and

20

        Respondent's policies and procedures related to Collections

        Lawsuits;

    iii.  Respondent's authority to conduct periodic onsite reviews of the

        Law Firm's controls, performance, and information systems related

        to Collections Lawsuits; and

    iv.  periodic review by Respondent of the Law Firm's controls,

        performance, and information systems related to Collections

        Lawsuits; and

  g.  Specific timeframes and deadlines for implementation of the steps

      described above.

53. The Regional Director will have the discretion to make a determination of

non-objection to the Compliance Plan or direct Respondent to revise it. If

the Regional Director directs Respondent to revise the Compliance Plan,

Respondent must make the revisions and resubmit the Compliance Plan to

the Regional Director within thirty (30) days.

54. After receiving notification that the Regional Director has made a

determination of non-objection to the Compliance Plan or any amendments

thereto, Respondent must implement and adhere to the steps,

recommendations, deadlines, and timeframes outlined in the Compliance

Plan.

## VIII

## Role of the Board

**IT IS FURTHER ORDERED** that:

55. Respondent's Board must review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order prior to submission to the Bureau.

56. Although this Consent Order requires Respondent to submit certain documents for the review or non-objection by the Regional Director, the Board will have the ultimate responsibility for proper and sound management of Respondent and for ensuring that Respondent complies with Federal consumer financial law and this Consent Order.

57. In each instance that this Consent Order requires the Board to ensure adherence to or perform certain obligations of Respondent, the Board must:

   a. Authorize whatever actions are necessary for Respondent to fully comply with the Consent Order;

   b. Require timely reporting by management to the Board on the status of compliance obligations; and

   c. Require timely and appropriate corrective action to remedy any material non-compliance with any failures to comply with Board directives related to this Section.

## IX

## Order to Pay Civil Money Penalties

IT IS FURTHER ORDERED that:

58. Under section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section V of this Consent Order, and taking

into account the factors in 12 U.S.C. § 5565(c)(3), Respondent must pay a
civil money penalty of $2.5 million to the Bureau.

59.    Within ten (10) days of the Effective Date, Respondent must pay $1.5
million of the civil money penalty by wire transfer to the Bureau or to the
Bureau's agent in compliance with the Bureau's wiring instructions. The
remainder of the civil money penalty shall be paid in one installment within
sixty (60) days of the Effective Date.

60.    The civil money penalty paid under this Consent Order will be deposited in
the Civil Penalty Fund of the Bureau as required by section 1017(d) of the
CFPA, 12 U.S.C. § 5497(d).

61.    Respondent must treat the civil money penalty paid under this Consent
Order as a penalty paid to the government for all purposes. Regardless of
how the Bureau ultimately uses those funds, Respondent may not:

a.    Claim, assert, or apply for a tax deduction, tax credit, or any other tax
benefit for any civil money penalty paid under this Consent Order; or

b.    Seek or accept, directly or indirectly, reimbursement or
indemnification from any source, including but not limited to payment
made under any insurance policy, with regard to any civil money
penalty paid under this Consent Order.

62.    To preserve the deterrent effect of the civil money penalty in any Related
Consumer Action, Respondent may not argue that Respondent is entitled
to, nor may Respondent benefit by, any offset or reduction of any
compensatory monetary remedies imposed in the Related Consumer Action
because of the civil money penalty paid in this action or because of any

23

payment that the Bureau makes from the Civil Penalty Fund (Penalty Offset). If the court in any Related Consumer Action grants such a Penalty Offset, Respondent must, within thirty (30) days after entry of a final order granting the Penalty Offset, notify the Bureau, and pay the amount of the Penalty Offset to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

## X

## Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

63. In the event of any default on Respondent's obligations to make payment under this Consent Order, interest, computed under 28 U.S.C. § 1961, as amended, will accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

64. Respondent must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law and no part of the funds may be returned to Respondent.

65. Under 31 U.S.C. § 7701, Respondent, unless it already has done so, must furnish to the Bureau its taxpayer identifying numbers, which may be used for purposes of collecting and reporting on any delinquent amount arising out of this Consent Order.

24

66.   Within thirty (30) days of the entry of a final judgment, consent order, or
      settlement in a Related Consumer Action, Respondent must notify the
      Regional Director of the final judgment, consent order, or settlement in
      writing. That notification must indicate the amount of redress, if any, that
      Respondent paid or is required to pay to Consumers and describe the
      Consumers or classes of Consumers to whom that redress has been or will
      be paid.

## XI

## Reporting Requirements

**IT IS FURTHER ORDERED** that:

67.   Respondent must notify the Bureau of any development that may affect
      compliance obligations arising under this Consent Order, including but not
      limited to a dissolution, assignment, sale, merger, or other action that
      would result in the emergence of a successor company; the creation or
      dissolution of a subsidiary, parent, or affiliate that engages in any acts or
      practices subject to this Consent Order; the filing of any bankruptcy or
      insolvency proceeding by or against Respondent; or a change in
      Respondent's name or address. Respondent must provide this notice, if
      practicable, at least thirty (30) days before the development, but in any case
      no later than fourteen (14) days after the development.

68.   Within ninety (90) days of the Effective Date, and again one year after the
      Effective Date, Respondent must submit to the Regional Director an

accurate written compliance progress report (Compliance Report) that has

been approved by the Board, which, at a minimum:

   a.  Describes in detail the manner and form in which Respondent has

       complied with this Consent Order; and

   b.  Attaches a copy of each Order Acknowledgment obtained under

       Section XII unless previously submitted to the Bureau.

## XII

## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that,

69.  Within thirty (30) days of the Effective Date, Respondent must deliver a

     copy of this Consent Order to each of its board members as well as to any

     managers, employees, Service Providers, or other agents and

     representatives who have responsibilities related to the subject matter of the

     Consent Order.

70.  For five (5) years from the Effective Date, Respondent must deliver a copy of

     this Consent Order to any business entity resulting from any change in

     structure referred to in Section XI, any future board members or executive

     officers, as well as to any managers, employees, Service Providers, or other

     agents and representatives who will have responsibilities related to the

     subject matter of the Consent Order before they assume their

     responsibilities.

71.  Respondent must secure a signed and dated statement acknowledging

     receipt of a copy of this Consent Order, ensuring that any electronic

signatures comply with the requirements of the E-Sign Act, 15 U.S.C.

§§ 7001-7031, within thirty (30) days of delivery, from all persons receiving

a copy of this Consent Order under this Section.

## XIII

## Recordkeeping

**IT IS FURTHER ORDERED** that

72.   Respondent must create, or if already created, must retain for at least five

(5) years from the Effective Date, the following business records:

a.   All documents and records necessary to demonstrate full compliance

with each provision of this Consent Order, including all submissions to

the Bureau.

73.   Respondent must retain the documents identified in Paragraph 72 for the

duration of the Consent Order.

74.   Respondent must make the documents identified in Paragraph 72 available

to the Bureau upon the Bureau's request.

## XIV

## Notices

**IT IS FURTHER ORDERED** that:

75.   Unless otherwise directed in writing by the Bureau, Respondent must

provide all submissions, requests, communications, or other documents

relating to this Consent Order in writing, with the subject line, "*In re

Transworld Systems, Inc.*, File No. Year-CFPB- 0018," and send them

either:

a.   By overnight courier (not the U.S. Postal Service), as follows:

Regional Director, Bureau Northeast Region
Consumer Financial Protection Bureau
140 East 45th Street, 4th Floor
New York, NY 10017]

or

b.  By first-class mail to the below address and contemporaneously by

email to Enforcement_Compliance@cfpb.gov:

Regional Director, Bureau Northeast Region
Consumer Financial Protection Bureau
140 East 45th Street, 4th Floor
New York, NY 10017

## XV

## Cooperation with the Bureau

**IT IS FURTHER ORDERED** that:

76.  Respondent must cooperate fully with the Bureau in this matter and in any

investigation related to or associated with the conduct described in Section

V. Respondent must provide truthful and complete information, evidence,

and testimony and Respondent must cause its officers, employees,

representatives, or agents to appear for interviews, discovery, hearings,

trials, and any other proceedings that the Bureau may reasonably request

upon ten (10) days written notice, or other reasonable notice, at such places

and times as the Bureau may designate, without the service of compulsory

process.

## XVI

## Compliance Monitoring

**IT IS FURTHER ORDERED** that, to monitor Respondent's compliance with this Consent Order:

77. Within fourteen (14) days of receipt of a written request from the Bureau, Respondent must submit additional Compliance Reports or other requested information, which must be made under penalty of perjury; provide sworn testimony; or produce documents.

78. Respondent must permit Bureau representatives to interview any employee or other person affiliated with Respondent who has agreed to such an interview. The person interviewed may have counsel present.

79. Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

## XVII
## Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

80. Respondent may seek a modification to non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Regional Director.

81. The Regional Director may, in his/her discretion, modify any non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) if he/she determines good cause justifies the modification. Any such modification by the Regional Director must be in writing.

29

## XVIII

### Administrative Provisions

82. The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau, or any other governmental agency, from taking any other action against Respondent, except as described in Paragraph 83.

83. The Bureau releases and discharges Respondent from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section V of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices described in this Consent Order in future enforcement actions against Respondent and its affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the Consent Order, or to seek penalties for any violations of the Consent Order.

84. This Consent Order is intended to be, and will be construed as, a final Consent Order issued under section 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

85. This Consent Order will terminate five (5) years from the Effective Date or five (5) years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Respondent. If such action is dismissed or the relevant adjudicative body rules that Respondent did not

violate any provision of the Consent Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Consent Order will terminate as though the action had never been filed. The Consent Order will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

86. Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

87. Should Respondent seek to transfer or assign all or part of its operations that are subject to this Consent Order, Respondent must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

88. The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under section 1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondent wherever Respondent may be found and Respondent may not contest that court's personal jurisdiction over Respondent.

89. This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises, representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the

accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

90.    Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing the Respondent, its Board, officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED**, this ⅄ᵗʰ day of September, 2017.

Richard Cordray
Director
Consumer Financial Protection Bureau

**EXHIBIT 3**

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

ESTHER HOFFMAN; SARAH          )
DOUGLASS; ANTHONY KIM; and     )
IL KIM and DARIA KIM,          )
husband and wife and the       )
marital community comprised    )   No. C18-1132 TSZ
thereof, on behalf of          )
themselves and on behalf of    )
others similarly situated,     )
                               )
            Plaintiffs,        )
                               )
        vs.                    )
                               )
TRANSWORLD SYSTEMS             )
INCORPORATED; PATENAUDE AND    )
FELIX, A.P.C.; MATTHEW         )
CHEUNG, and the marital        )
community comprised of         )
MATTHEW CHEUNG and JANE DOE    )
CHEUNG, et al.,                )
                               )
            Defendants.        )

VIDEOCONFERENCE VIDEOTAPED 30(b)(6) DEPOSITION
UPON ORAL EXAMINATION OF
TRANSWORLD SYSTEMS, INC.,
CORPORATE REPRESENTATIVE BRADLEY LUKE

(All parties participating via Zoom)

DATE TAKEN:   DECEMBER 16, 2021
REPORTED BY:  SHERRILYN SMITH, CCR# 2097

1    A    If I did I meant account management.

2    Q    Account management.

3    A    Yeah.  So, basically, sending out accounts to

4    agencies or firms to attempt to collect on behalf of

5    the trusts.

6    Q    So for those purposes you're -- they are paid

7    on some other contract basis that's not contingency?

8    A    Yes, ma'am.

9    Q    Okay.  And who pays -- who pays TSI for that

10   work?

11              MR. HOMES:  Same objections.

12   A    The special sub-servicing fee comes from

13   U.S. Bank, I believe.

14   BY MS. HENRY:

15   Q    Okay.  And you are aware that TSI signed a

16   consent order with the Consumer Financial Protection

17   Bureau?

18              MR. ROSENBERG:  Object to form.

19              MR. HOMES:  Join.

20   A    Yes, I'm aware of that.

21   BY MS. HENRY:

22   Q    Okay.  And do you recall any accounts from the

23   attorney networks that were pulled as a result of that

24   consent order with the CFPB?

25              MR. HOMES:  So I'm going to interject an

Page 216

1    objection here and assert a privilege regarding any

2    communications or any actions with -- that relate to

3    the consent order and what was done as a result of the

4    consent order.  I think that's within privileges that

5    we've asserted, investigatory and supervisory

6    privileges at issue, we've mentioned in our briefing

7    and in our responses to discovery.

8              MS. HENRY:  So just to clarify the

9    record, Justin, you are asserting the privilege on

10   behalf of what party?

11             MR. HOMES:  Well, I'm asserting it on

12   behalf of TSI, and to the extent that the privilege, I

13   think, extends to the trusts, we would assert it on

14   their behalf as well --

15             MS. HENRY:  And --

16             MR. HOMES:  Given --

17             MS. HENRY:  And what --

18             MR. HOMES:  Given -- given our role --

19   given our role as a special sub-servicer for the

20   trusts.

21             MS. HENRY:  And what's the basis of the

22   privilege, as to what type of privilege are you

23   asserting?

24             MR. HOMES:  Well, in this instance, it

25   sounds like you are -- you are invading upon an

Page 217

1    attorney-client privilege to the extent that attorneys

2    were involved in assisting TSI in -- with its

3    decisions regarding the handling of accounts.

4              MS. HENRY:  And who would those

5    attorneys be?

6              MR. ROSENBERG:  I think you also

7    mentioned investigatory privilege.

8              MR. HOMES:  I did.

9              MR. CASAMENTO:  Sherrilyn, can you read

10   the question back.

11             (The requested portion of the

12             transcript was read by the reporter.)

13             MR. CASAMENTO:  Prior to that.

14             MR. HOMES:  Well, he can answer the

15   question of who the attorneys are.

16             MR. CASAMENTO:  Right.

17          The question before that.

18             (The requested portion of the

19             transcript was read by the reporter.)

20             MR. CASAMENTO:  CFPB.

21             THE COURT REPORTER:  Thank you.

22             MR. CASAMENTO:  Okay.  All right.

23   Thank you.

24             MS. HENRY:  So let me clarify.  When I

25   say -- you asserted that there was an attorney-client

Page 218

1    privilege.  My question is who would the attorney be,

2    Justin?

3                    MR. HOMES:  Well, TSI's attorneys.

4                    MS. HENRY:  And who are TSI's attorneys?

5                    MR. HOMES:  That's a question I think

6    you -- you can ask the witness.

7                    MS. HENRY:  Well, okay.  You are

8    asserting the privilege, so for purposes of the

9    privilege, who are the attorneys?

10                   MR. HOMES:  But -- but I'm not asserting

11   it as to the attorneys, the identification of the

12   attorneys.

13   BY MS. HENRY:

14       Q    Well, who are the attorneys --

15                   MR. HOMES:  TS- --

16       Q    -- that would be -- that would be associated

17   with the CFPB consent order, Mr. Luke?

18                   MR. HOMES:  Attorneys that represent TSI

19   in connection with that.

20   BY MS. HENRY:

21       Q    Do you know who those attorneys are, Mr. Luke?

22       A    Yes, ma'am, I do.

23       Q    And who are they?

24       A    At that time it was the firm Venable LLP.

25   V-E-N-A-B-L-E.

Page 219

1    Q    Okay.  And I'm going to just quickly ask this

2  before I go on to this.  We talked for -- a minute ago

3  about contingency fees.

4         What is the percentage of the contingency fee

5  that TSI receives for their NCSLT work?

6              MR. HOMES:  Objection to form.  And

7  beyond the scope of the notice.

8    A    It depends, actually, on the -- what we call

9  the level of account.  Basically, the age of the

10  account.

11  BY MS. HENRY:

12    Q    So is the contingency fee higher if the age is

13  older?

14              MR. HOMES:  Same objections.

15    A    Not necessarily.  If you take legal out, yes.

16         Actually, hold on.  I've got to go back and

17  look at the -- look at the fee rates per level.  I --

18  I don't recall.  They -- they vary from -- from level

19  to level.

20  BY MS. HENRY:

21    Q    So what's the range of the lowest contingency

22  amount to the highest contingency amount?

23              MR. HOMES:  Same objections.

24    A    So TSI, I believe the lowest is 32 percent.

25  It goes up to maybe 40 percent.

Page 220

BY MS. HENRY:

Q    And that's a percentage of payments that come

in to -- that are paid directly to TSI; is that right?

A    Well, that's -- that's a percentage of

payments collected on behalf of the trusts

regardless --

Q    On behalf --

A    -- who it's paid to.

Q    Okay.  Thank you.

Okay.  Back to the consent order questions.

MR. HOMES:  So real quick, Christina,

let me just say that to the extent there was some

discussion about percentages and earnings and -- and

compensation, I ask that be marked confidential, at

least for now, until I can evaluate it, because I

don't believe that subject was one of the topics.

I'll revisit that.

MS. HENRY:  Okay.  We -- we can talk

about it afterwards.  I'm not agreeing to the

confidentiality.

BY MS. HENRY:

Q    So we had some discussions before about the

consent order and Mr. Homes has lodged an objection.

Are you not going to answer any questions about the

TSI consent order regarding the NCSLT trusts today?

Page 221

1           MR. HOMES:  I think you need to hear the

2    questions.

3    BY MS. HENRY:

4        Q   Well, the one question I asked is:  Did you

5    recall any accounts from attorney networks as a result

6    of the TSI consent order?

7           Are you going to answer that question?

8           MR. HOMES:  Right.  And so as to that

9    question, I'm instructing him that to the extent -- I

10   mean, I think that invades a privilege, an

11   attorney-client privilege communication, and also

12   might reveal, likely, attorneys' mental impressions

13   and strategies about those matters, and I think that

14   is within the privilege that TSI is asserting.

15       A   I don't believe I can answer that without

16   disclosing a privileged conversation.

17          MR. HOMES:  And -- and I would -- just

18   want to add that, you know, again, I still -- and

19   we've had this discussion and it's been expressed, I

20   think, in some of the correspondence back and forth

21   back in October.  But -- but to the extent you want to

22   ask the witness about accounts that were recalled, I'm

23   happy for him to have that dialogue with you and

24   get -- and get you that testimony.

25          But to the extent that you want that testimony

1    from their office, and they would mirror that code and

2    close the account from their side.

3    BY MS. HENRY:

4        Q    And how did you communicate which accounts to

5    recall to the attorney network that were supposed to

6    be recalled on behalf of the TSI consent order with

7    the CFPB?

8                    MR. ROSENBERG:  Object to form.

9                    MR. HOMES:  Objection to form.  Also,

10   invading the privilege for the reasons we've

11   previously discussed and tried to explain.  Again, if

12   you want to seek that information unrelated to the

13   consent order, the witness is able and happy to

14   provide it.

15                   MS. HENRY:  And just for purposes of the

16   record, Justin, are you instructing the witness not to

17   answer?

18                   MR. HOMES:  That particular question, in

19   the way that you have phrased it, yes, I am.

20   BY MS. HENRY:

21       Q    Mr. Luke, are you not answering the question?

22       A    I'm not going to answer based on advice of

23   counsel.

24       Q    And what did you communicate to Patenaude &

25   Felix regarding the TSI consent order with the CFPB?

1          MR. HOMES:  Same objection --

2          UNIDENTIFIED SPEAKER:  Object to form.

3          MR. HOMES:  -- to form.  Same privilege

4    assertions.  Same suggestion to you, that if you want

5    to ask that question unrelated to the consent order,

6    you can obtain the information that you seek in a

7    nonprivilege -- without violating the privilege.  I

8    encourage you to do so.

9          MS. HENRY:  And Mr. Homes --

10          MR. ROSENBERG:  Well --

11          MS. HENRY:  -- are you --

12          MR. ROSENBERG:  -- I --

13          MS. HENRY:  -- instructing the witness

14    not to answer?

15          MR. ROSENBERG:  Justin, also, you may

16    want to think about attorney-client privilege, in

17    addition to the CFPB, but that's your client's call to

18    assert.  They're asking about communications between

19    Patenaude and TSI.

20          MR. HOMES:  Yes, absolutely.  I think we

21    have been talking about the attorney-client privilege

22    here, but yes.

23    BY MS. HENRY:

24      Q   So in regards to attorney-client privilege,

25    is -- I'm going to ask Mr. Luke, is Patenaude & Felix

1    reread it.

2    BY MS. HENRY:

3    Q   Are the trusts bound by the consent order,

4    Mr. Hom- -- Mr. Luke?

5           MR. HOMES:  Same objections to form.

6    Calls for a legal conclusion.

7    A   Not that I'm aware of.

8    BY MS. HENRY:

9    Q   And what steps has TSI taken to comply with

10   the TSI consent order with the CFPB?

11          MR. HOMES:  Objection.  I think you are

12   invading on -- -al privileges, again, in addition to

13   the ones that we talked about, where actions may have

14   been taken at -- at -- on the advice of counsel, to

15   the extent that his -- he can testify outside of that.

16         I think the subject matter of your question

17   also implicates the supervisory privileges of the

18   CFPB, we've asserted those in briefing and in

19   discovery, written discovery in this case, and in

20   communications with you by letter.

21         MR. BECKETT:  Hold on.  Hold on, Justin.

22   The question wasn't what communications occurred, the

23   question was what did -- what -- how has TSI --

24         MR. HOMES:  So hang --

25         MR. BECKETT:  -- taken actions --

Page 230

1          MR. HOMES:  Wait.

2          MR. BECKETT:  -- to comply --

3          MR. HOMES:  Who's taking the deposition?

4          MR. BECKETT:  -- with the TSI consent

5    order.  So it's not --

6          MR. HOMES:  I'm not sure who is

7    taking --

8          MR. BECKETT:  -- asking for

9    communications, it's -- you've got to let me finish

10   talking because the court reporter can't take it both

11   down, and this will be put in the record if -- if we

12   don't get this resolved.

13        The question was what has TSI done to comply

14   with the court consent order, and it is not asking for

15   communications, it is asking for completed conduct or

16   partial conduct.  So there -- there is a large swath

17   of information that -- that Mr. Luke can testify to

18   without revealing commu- -- confidential

19   communications.

20        And if it's your suggestion that -- that TSI

21   doesn't have to reveal the steps it took to comply

22   with the consent order here because of -- because that

23   constitutes a communication, we're going to have to go

24   before Judge Zilly on that, and I'm sure he's not

25   going to appreciate that.

1          MR. HOMES:  First of all, again, I'm not

2     sure who is taking the deposition.  My understanding

3     was Christina Henry was.

4          MR. BECKETT:  Well, has that issue come

5     up before?  Because I've never heard you say that

6     before and I -- this is the first time I've

7     interjected this entire -- the entire time.  I -- I

8     came in late and this is the first time I've

9     interjected.

10          MR. ROSENBERG:  I think you jumped on me

11     when I interjected at one of the depositions one time.

12          MR. BECKETT:  So what does that have to

13     do with what's happening --

14          MR. HOMES:  I would just add that --

15          MR. BECKETT:  What --

16          MR. HOMES:  -- we're also talking --

17          MR. BECKETT:  -- does that have to do --

18          MR. HOMES:  -- about --

19          MR. BECKETT:  -- with what's happening

20     today?

21          MR. ROSENBERG:  Well, you're just doing

22     the same thing that you said --

23          MR. BECKETT:  Okay.  So you're --

24          MR. ROSENBERG:  -- shouldn't be done.

25          MR. LEONARD:  So you're employing

1  communications and the opinion work products that come

2  into play with that.

3       I am suggesting, and I'll do it again in a

4  different way, that you ask the questions regarding

5  the facts in a way unrelated to the consent order so

6  that you can gain those facts.

7       For example, you can ask, and I will not

8  object, what did TSI do after September 18, 2017,

9  what -- what accounts did TSI with- -- recall from a

10  collection attorney after September 18, 2017, or

11  within 90 days of that, or within half a year of that,

12  or within the lifetime of -- of TSI's sub-servicing.

13  And then you can decide if -- if the actions and

14  the -- and the facts of those matters are in

15  compliance with the consent order or not.

16            MS. HENRY:  All right.  Are we ready to

17  get back on -- ready to start questioning again?

18            MR. HOMES:  Yes.

19  BY MS. HENRY:

20       Q    Okay.  Mr. Luke, what did TSI do to comply

21  with the consent order, TSI consent order with the

22  CFPB?

23            MR. HOMES:  Same objections.

24            MR. ROSENBERG:  Object to form.

25            MR. HOMES:  Same objections.  Same

Page 236

1    assertions of privilege.  Same instruction.

2         A    I do not believe I --

3              MS. HENRY:  Are you instructing Mr. Luke

4    not to answer, Mr. Homes?

5              MR. HOMES:  I'm instructing him not to

6    answer that question.  Again, I -- I urge you to ask

7    the question in a way that does not invade upon the

8    privilege so you can gather the same very facts that

9    you are seeking.

10   BY MS. HENRY:

11        Q    Mr. Luke --

12        A    I'm going to follow advice of counsel and --

13   and not answer that question as asked.

14   BY MS. HENRY:

15        Q    Okay.  Now I'm going to ask you a few other

16   questions.

17             Do you know Brian Jackson?

18        A    Yes, ma'am, I do.

19        Q    And have you ever been to his house?

20        A    Yes, ma'am, I have.

21        Q    And when was the last time you were at his

22   house?

23             MR. HOMES:  Object to the form.  This is

24   beyond the scope of the notice, beyond the scope of

25   30(b)(6) deposition.  We'll let it -- we'll go a

**EXHIBIT 4**

# Rough Draft of 30(b)(6) Bradley Luke  - Vol. II

# March 8, 2022



**206.287.9066 I 800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



\* \* \* \* \*

COMPUTER UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

THIS REALTIME IS BEING PROVIDED AS A SERVICE TO THE
ATTORNEYS.  IT IS NOT A TRANSCRIPT.  IT IS MR. BECKETT
REPORTER'S UNEDITED NOTES.  YOU MAY NOT QUOTE FROM
THIS ROUGH DRAFT AS, AGAIN, THIS IS NOT A TRANSCRIPT.
THE PAGE AND LINE NUMBERS ON THE FINISHED TRANSCRIPT
WILL BE DIFFERENT THAN THEY ARE ON THE REALTIME SCREEN
OR ROUGH DRAFT.  IF YOU NEED TO QUOTE SOMETHING,
SERVICES FOR DAILY COPY ARE AVAILABLE.

\* \* \* \* \*

DRAFT COPY

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  – Vol. II

Page 2

1             THE VIDEOGRAPHER:  This is Volume 2 in

2    the continuation 30(b)(6) deposition of Bradley Luke

3    in the matter of Esther Hoffman, et al., versus

4    Transworld Systems Incorporated, Cause No. C18-1132

5    TSZ in the United States District Court, Western

6    District of Washington, and was noticed by Christina

7    L. Henry of Henry DeGraaff, P.S.  The time is now

8    approximately 9:34 a.m. on this 8th day of March 2022,

9    and we are convening via Zoom video teleconference.

10   My name is Michael Henry from Buell Realtime

11   Reporting, LLC, loacated at 1325 Fourth Avenue, Suite

12   1840, in Seattle, Washington.

13        Would counsel please identify yourselves for

14   the record.

15             MS. HENRY:  Christina Henry and --

16   attorney for the plaintiff.

17             MR. BECKETT:  I'm Guy Beckett.  I'm

18   going to be -- I'm cocounsel for the plaintiff and

19   will be observing.

20             MR. HOMES:  Justin Homes.  I'm here on

21   behalf of TSI, one of the defendants.

22             MR. CASAMENTO:  Greg Casamento on behalf

23   of the trust defendants.

24             MR. ROSENBERG:  Mark Rosenberg on behalf

25   of Patenaude & Felix, A.P.C., and Matthew Cheung.

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  - Vol. II

Page 3

1          MR. LEONARD:  This is Sam Leonard.  I'm

2    almo- -- also an attorney for the plaintiffs, but I

3    will just be observing today.

4          MR. ST. ANGELO:  And this is Bradley

5    St. Angelo, I'm also in the room with Justin, with

6    Sessions.  I will be also observing for TSI.

7          THE VIDEOGRAPHER:  Thank you.

8       Would the court reporter please administer the

9    oath to the witness.

10

11   BRADLEY LUKE - 30(b)(6), witness herein, having been

12                        first duly sworn on oath, was

13                        examined and testified as

14                        follows:

15

16          THE COURT REPORTER:  Thank you.

17          MR. HOMES:  Christina, just a real quick

18   question before you get started, really two.  One, I

19   think I know the answer to this, but the videographer

20   is no relation to -- to you, correct?

21          MS. HENRY:  No.

22             (Simultaneous talking.)

23          MS. HENRY:  The videographer has been

24   hired by the Buell court reporting --

25          MR. HOMES:  Got it.

Hoffman, et al. v. Transworld Systems Incorporated, et al.        Rough Draft of 30(b)(6) Bradley Luke  – Vol. II

Page 4

1          And then could I please have a current

2    duration of this deposition from the court reporter?

3          And if you're not prepared to give that at the

4    moment, on the next break let us know where we're at.

5                THE COURT REPORTER:  Will do.

6                MR. HOMES:  Thanks.

7          Thanks, Christina.

8                MS. HENRY:  I have sent an exhibit into

9    the chat.  And -- and I think I've also emailed it to

10   Marc Rosenberg and the court reporter.

11         Can you verify that you have received that,

12   Madam Court Reporter?

13               THE COURT REPORTER:  Give me one second.

14         Yes.

15               MS. HENRY:  Okay.  And, Mr. Luke, have

16   you also received the document?

17               THE WITNESS:  Yes, ma'am.  I received

18   it.  I'm just pulling it up.

19               MS. HENRY:  So, Madam Court Reporter, I

20   believe that the last exhibit was Exhibit 14, so I'm

21   going to ask that this be Exhibit 15.

22               THE COURT REPORTER:  Correct.

23                    (Exhibit No. 15 marked.)

24   BY MS. HENRY:

25     Q   So, Mr. Luke, I'm going to ask you if you have

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  – Vol. II

Page 5

1    seen the document that I'm sending, that I have

2    presented to you, that is now Exhibit 15, and can you

3    tell me if you recognize it and if you are prepared to

4    testify regarding the contents of that document today?

5        A    Yes, ma'am, I'm familiar with the document and

6    prepared to -- to testify regarding it.

7        Q    Okay.  And so that document is a consent order

8    that Transworld System, Inc. entered into with the

9    Consumer Financial Protection Board -- Bureau,

10   correct?

11       A    Yes, ma'am, that is a consent order that

12   Transworld Systems, Incorporated entered into with the

13   CFPB.

14       Q    And you were working at Transworld Systems,

15   Inc. at the time that the investigation was being done

16   by the CFPB, correct?

17                MR. HOMES:  Object to form.

18       A    Yes, ma'am, I was an employee of Transworld

19   Systems while the -- while the investigation was going

20   on.

21   BY MS. HENRY:

22       Q    And do you remember when that investigation

23   began?

24                MR. CASAMENTO:  Sorry.  I'm sorry to

25   interrupt.

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  – Vol. II

Page 6

1          Ms. Smith, can you note that on behalf of the

2     trusts, if any other defendant objects we'll join in

3     that objection without me having to say so on the

4     record, so I don't interfere with Ms. Henry's de- --

5     thank you.

6          MR. ROSENBERG:  And that is Marc

7     Rosenberg, and the same will go for Patenaude & Felix,

8     unless we indicate otherwise, that we also join the

9     objections of -- of any other party that objects, or

10    any other defendant that objects.

11         Thank you.

12         MR. HOMES:  The same goes for TSI.

13         Thanks.

14    A    Sorry, Ms. Henry.  Can you repeat your

15    question?

16    BY MS. HENRY:

17    Q    Can you tell me when the investigation from

18    the CFPB began?

19    A    I don't specifically recall.

20    Q    But you were working at TSI at the time,

21    correct?

22    A    Yes, ma'am.

23    Q    Okay.  And were you the one that coordinated

24    and supplied documents to the CFPB in response to

25    their investigation request?

Hoffman, et al. v. Transworld Systems Incorporated, et al.        Rough Draft of 30(b)(6) Bradley Luke  – Vol. II

Page 7

1          MR. HOMES:  Object to form.

2     A    I -- I assisted in providing various pieces of

3    documentation or information to my counsel in response

4    to any investigation request that TSI had received.

5    BY MS. HENRY:

6     Q    Okay.  And can you tell me, were any

7    Washington borrowers and their information supplied to

8    the CFPB as part of that information request?

9          MR. HOMES:  So I'm going -- give me a

10   moment here.  I'm going to make an objection.  I think

11   that the scope and content of any investigation

12   preceding the consent order that was marked as an

13   exhibit, I believe Exhibit 15 -- this deposition is

14   beyond the scope of what the Court instructed that we

15   appear and testify about.  I think the Court was

16   pretty clear that we were here to testify about what

17   the consent order required and what TSI may have done,

18   what actions it undertook to comply with those

19   mandates in the consent order.

20        I think your questions about the investigation

21   preceding the consent order are well outside the scope

22   of that and at the moment I'm going to instruct him

23   not to answer those questions.

24        MS. HENRY:  So, Justin, you are

25   instructing him not to answer, because we were shut

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  - Vol. II

Page 8

 1    down about all information concerning the Consumer

 2    Financial Protection Bureau consent order?  So you're

 3    instructing your client not to answer, correct?

 4                   MR. HOMES:  I think you -- I think you

 5    are allowed to talk about and ask questions about what

 6    TSI did to comply with the consent order.  If you can

 7    show me something in the Court's most recent ruling

 8    that -- that's different than that we'll listen and --

 9    have question about it.

10                   MS. HENRY:  Well, I'm actually going to

11    stop the proceedings for a moment and take a break

12    because I'm going to consult with my other attorneys,

13    because if we're going down the road I'm questioning

14    as to whether or not we need to ask the Court for

15    guidance.

16                   MR. HOMES:  Okay.  We'll do the same.

17          Do we have a breakout room?

18                   THE COURT REPORTER:  Would you like to

19    go off the record?

20                   MS. HENRY:  Yes, I was requesting that

21    we went off the record.

22                   THE VIDEOGRAPHER:  Off the record at

23    9:42 a.m.

24                        (A break was taken from

25                          9:42 a.m. to 10:02 a.m.)

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  — Vol. II

Page 9

1              THE VIDEOGRAPHER:  On the record at

2    10:02 a.m.

3              MS. HENRY:  Okay.  So I'm going to ask

4    you -- you've all had a chance to think, so what is it

5    that you want to do?

6              MR. HOMES:  Yeah.  So, you know, we're

7    going to -- we're going to stand on the objections and

8    the instruction.  I think the questions that are being

9    asked about investigation activities prior to the

10   consent order were topics that were not asked

11   previously, they were not topics that were the subject

12   of the -- of your motion to compel, and I think pretty

13   clearly are not topics that the Court instructed that

14   we -- an answer --

15             THE COURT REPORTER:  And, I'm sorry,

16   Mr. Homes, I'm having a hard time hearing you, you

17   drop off at the end.

18             MR. HOMES:  Okay.  Yeah.  And I'm sorry,

19   I'm talking into my computer instead of the phone.

20             THE COURT REPORTER:  That's better.

21             MR. HOMES:  So just -- just to -- to

22   reiterate, you know, I think the questions regarding

23   what investigation activities were undertaken prior to

24   the entry of the consent order are not something -- is

25   not a topic that was discussed or raised at the prior

Hoffman, et al. v. Transworld Systems Incorporated, et al.     Rough Draft of 30(b)(6) Bradley Luke  - Vol. II

Page 10

1    deposition of TSI, it was not a subject of any motion

2    to compel by the plaintiffs, and it is not what the

3    Court explained in its recent order or minute order

4    from February 8, 2022, and that that order didn't open

5    the door to this line of questioning.

6         The order is pretty specific and it's pretty

7    clear that we are going to appear, and we -- and we

8    presented a witness to appear to talk about what TSI

9    did, what actions it undertook to comply with the

10   mandates in the consent order, so that's our position.

11        MS. HENRY:  And -- and, Justin, we

12   respectfully disagree.  We -- it's our position that

13   you're ^ going to shut down entirely about questions

14   concerning the consent order ^ and ^ in CFPB and we

15   stand by the -- all topics in the notice of

16   deposition, which is Exhibit 1, and we are not waiving

17   our ability to deal with any question that's in

18   Exhibit 1 that was -- has not been answered.

19        And so at this point though, we're -- we would

20   have to ask the Court for additional guidance, we

21   believe, so we are going to ask other questions at

22   this time, but we are preserving the right to go to

23   the Court about those issues.

24        MR. HOMES:  I understand.

25        MS. HENRY:  And -- and that deals with,

Hoffman, et al. v. Transworld Systems Incorporated, et al.　　　　Rough Draft of 30(b)(6) Bradley Luke － Vol. II

Page 11

1　　you know -- okay.  Because there was a topic in the

2　　notice of deposition, a proper topic.

3　　BY MS. HENRY:

4　　　　Q　　Okay.  So, Mr. Luke, you have the consent

5　　order in front of you, correct?

6　　　　A　　Yes, ma'am.

7　　　　Q　　I'm going to have you go to Page 12 of that

8　　consent order.

9　　　　A　　Yes, ma'am.

10　　　　Q　　And do you see where it says "Order," and then

11　　"VI," and the "Conduct Provisions"?

12　　　　A　　Yes, ma'am, I see that.

13　　　　Q　　Okay.  So this is -- this is the -- the part

14　　of the consent order that deals with what the order

15　　actually did, and I'm going to take you through the

16　　provisions of Paragraph 45, I'm going to just

17　　highlight some.

18　　　　　　So in Paragraph 45 it said that TSI and

19　　others, their agents, service -- servants, employees,

20　　and attorneys who have actual notice of this consent

21　　order, acting directly or indirectly, must take the

22　　following affirmative actions.

23　　　　　　So can I confirm with you, did your attorneys

24　　in this case, Patenaude & Felix, do they have actual

25　　notice of consent order from the -- TSI?

Hoffman, et al. v. Transworld Systems Incorporated, et al.        Rough Draft of 30(b)(6) Bradley Luke — Vol. II

Page 12

1          MR. ROSENBERG:  Object to form.  Object

2    to the extended narrative at the commencement of that

3    question and the legal conclusions contained with

4    that.

5          A     (Inaudible.)

6                          (Simultaneous talking.)

7          MR. ROSENBERG:  And -- and I don't hold

8    the attorney-client privilege, but the judge did

9    indicate that the communications between TSI and

10   Patenaude & Felix were not a proper subject for

11   inquiry, and so I would leave that to TSI and the

12   Trusts to decide whether or not to object.

13   BY MS. HENRY:

14        Q    Mr. Luke, can I have your answer?

15        A    Yes, ma'am.  Patenaude was provided a copy of

16   the consent order.

17        Q    Okay.  And do you know -- so this order is

18   dated September 18th, 2017.  Was that notice given to

19   them on that date or prior to that date?

20             MR. HOMES:  Object to form.

21        A    To my recollection neither.  It was given

22   shortly after the entry of the order.

23   BY MS. HENRY:

24        Q    Okay.  And do you see 45.b?

25        A    Sorry, B as in boy.

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  - Vol. II

Page 13

1       Q     B as in boy.

2       A     Yes, ma'am.

3       Q     And go ahead and read that to yourself.

4                     (Pause in the proceedings.)

5       Q     So what instructions did TSI give Patenaude &

6    Felix to comply with the terms and conditions of the

7    consent order?

8                     MR. HOMES:  I'm -- I'm going to object.

9    What you are calling for, it necessarily implicates

10   attorney-client communications, so I'm going to object

11   on that basis, and communications and THE content of

12   those communications with counsel are privileged.  I'm

13   not sure how he can answer that question without --

14   without violating that -- that com- -- that

15   attorney-client communication, but with that --

16                    MS. HENRY:  And are you instructing him

17   not to answer, Justin?

18                    MR. HOMES:  I'm instructing him not to

19   reveal contents of communications with lawyers.  He

20   can answer the question without revealing the content

21   of that communication -- do so.

22   BY MS. HENRY:

23      Q     I -- go ahead.  I mean, I'm not going to tell

24   you to not -- are you going to answer, Mr. Luke?

25      A     I can confirm that TSI complied with

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  - Vol. II

Page 14

1    Paragraph 45, Subparagraph B, but as far as the

2    contents of -- of that communication, I'm going to

3    follow the advice of counsel and not reveal the

4    privileged nature of those communications.

5              MS. HENRY:  So just to confirm for the

6    record, you have instructed him not to answer about

7    instructions that were given to Patenaude & Felix

8    concerning Paragraph 45.b of the consent order --

9              MR. HOMES:  I'm --

10             MS. HENRY:  -- correct?

11             MR. HOMES:  I'm instructing the witness

12   not to answer questions that would reveal the

13   substance of communications between TSI and the

14   lawyers who were involved in NCSLT, or National

15   Collegiate Student Loan Trust accounts pertaining to

16   the consent order.

17             MR. ROSENBERG:  I think the Court was

18   clear, that it denied plaintiffs' requests to obtain

19   attorney-client communications in this regard.

20             MS. HENRY:  We -- we respectfully

21   disagree.  We think you were in violation of the

22   minute order, and I'm just saying that for the record.

23        At the moment, I'm moving on.

24             MR. ROSENBERG:  You might want to read

25   that minute order again.

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke - Vol. II

Page 15

1           MS. HENRY:  I'm --

2                (Simultaneous talking.)

3           MS. HENRY:  Looking right at it, Mr. --

4           MR. ROSENBERG:  -- attorney-client

5    communications.

6           MS. HENRY:  I'm looking right at it

7    Mr. Rosenberg.

8    BY MS. HENRY:

9       Q   So I'm also asking you to look at Paragraph

10   45.d, as in David.

11      A   And you would like for me to read that to

12   myself or aloud on the record?

13      Q   Actually, I'm going to strike that.  That's

14   not correct.

15          Look at 45.f, as in Frank.  So go ahead and

16   familiarize yourself with F1 and F2.  F1, little I,

17   and F2, little I.

18                (Pause in the proceedings.)

19      Q   So my questions to you are:  For collection

20   actions that were initiated after this consent order,

21   can you tell me what documentation did you supply to

22   make sure that you complied with F.i?

23          MR. HOMES:  Object to form.

24          MR. ROSENBERG:  Supply to who?

25      A   I'm sorry, Christina, I actually didn't catch

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  – Vol. II

Page 16

1   one of the words in the middle of your -- in the

2   middle of your question, between --

3       Q    What --

4       A    If you could --

5       Q    I'm going to strike it and start again.

6            Mr. Luke, how did -- what did TSI do to comply

7   about 45.f.i of the consent order?

8            MR. HOMES:   I'm going to -- I'm going to

9   object to the question at least as to form, but it

10  misstates Paragraph 45.f.   45.f includes a

11  prohibition, not a requirement to take action.   In the

12  Court's order, minute order from February 8th is

13  pretty clear, that we're going to answer questions --

14  or we could answer questions about actions that were

15  taken.   Paragraph 45.f speaks to prohibitions.

16      A    So TS- --

17  BY MS. HENRY:

18      Q    Mr. Luke?

19      A    -- TSI undertook a process and ensured that

20  for all placements of accounts -- following the

21  consent order, all placement of accounts to law firms

22  that would potentially have a collections lawsuit

23  initiated, those accounts had the chain of title

24  documents, a full supplement, the deposit and sale

25  agreement, if that document was applicable for that

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  – Vol. II

Page 17

1  loan, and the schedule excerpt available on the

2  account prior to it -- that account being placed to a

3  law firm for potential initiation of a collections

4  lawsuit.

5          And then for Roman two, little ii, similar to

6  what I just described about the -- the chain of title

7  documentation.  TSI only placed accounts to law firms

8  for the initiation or potential initiation of a

9  collections lawsuit in instances where the file had a

10  signed credit agreement, signed by the consumer and/or

11  coborrower, if there was a cosigned loan, prior to the

12  placement with the law firm.

13     Q   And what about for those loans -- and so for

14  those loans that were initiated, were -- those

15  accounts that were initiated as lawsuits, where did

16  you get the evidence from?  So for f.ii, where did you

17  receive that evidence from?

18                  MR. ROSENBERG:  Object to form.

19                  MR. HOMES:  Object to form.

20     A   So for -- for f.ii, the signed credit

21  agreement, TSI actually has a repository.  I believe

22  we discussed this in the -- in the first part of the

23  deposition, TSI's repository containing account level

24  documentation for each individual account, and TSI

25  reviewed those and has a field on our electronic

Hoffman, et al. v. Transworld Systems Incorporated, et al.    Rough Draft of 30(b)(6) Bradley Luke  – Vol. II

Page 18

1    system in CRS that indicates whether a signed credit

2    agreement has been stored in our account repository or

3    not.

4    BY MS. HENRY:

5        Q    And did you do anything to determine where

6    those documents initially came from in that account

7    repository, as part of any change in your processes

8    and procedures as a result of the consent order?

9                MR. HOMES:  Objection to form.

10               MR. ROSENBERG:  Form.

11       A    No, nothing to that extent was undertaken

12   pursuant to or in compliance with this consent order.

13   BY MS. HENRY:

14       Q    Okay.  And do you recall whether any accounts

15   from the attorney networks were pulled as a result of

16   the consent order --

17               MR. HOMES:  Objection.

18       Q    -- the CFPB?

19               MR. HOMES:  Objection to form.  Also, I

20   want to make sure I understand.  We are -- we're

21   talking about Washington accounts and Washington

22   consumers.  That's the subject of your deposition

23   notice and that's the subject of this case.  I want to

24   hear the question again, beyond that, for a comment

25   further.

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  – Vol. II

Page 19

 1              Can the court reporter repeat the question.

 2                    (The requested portion of the

 3                    transcript was read by the reporter.)

 4                         (Pause in the proceedings.)

 5    BY MS. HENRY:

 6       Q    Mr. Luke, are you going to answer that

 7    question?

 8       A    I was waiting for a moment -- my attorney was

 9    going to object or not, so I was jut giving an

10    opportunity for him to speak.

11                    MR. HOMES:   I made my objections

12    earlier.  He can answer.

13    BY MS. HENRY:

14       Q    Before you go forward, I'm just going to note

15    that your attorney actually sent this exact question

16    to me yesterday, before your deposition, and said that

17    you were prepared to answer it today.   So I'm asking,

18    are you going to be answering that question?

19                    MR. HOMES:   So let me respond to that.

20    I clarified just a moment ago that the scope of this

21    question is necessarily bound by your -- your

22    deposition notice which involves Washington consumers

23    and Washington lawsuits.   So that -- that was the

24    comment I made, that was part of my objection to form.

25    I haven't instructed him not to answer.   I'm not

Hoffman, et al. v. Transworld Systems Incorporated, et al.     Rough Draft of 30(b)(6) Bradley Luke  – Vol. II

Page 20

1   sure -- I'm not sure what your last comment was about.

2      A    So to -- to answer -- to answer the question,

3   the -- the consent order didn't require the recalling

4   any of the accounts, TSI recalling any accounts

5   from -- from its collection agencies or law firms.

6   BY MS. HENRY:

7      Q    And that's your position?

8      A    Yes, ma'am.

9      Q    Okay.  So no -- no accounts at all were

10  recalled?

11              MR. HOMES:  Objection to form.

12     A    No accounts were recalled to -- in order to

13  comply with this consent order is -- is what I just

14  testified to.

15  BY MS. HENRY:

16     Q    Okay.  And -- and why was that?  Why were no

17  accounts recalled as a result of the consent order?

18              MR. HOMES:  So I'm going to object to

19  the determination and the decision-making that was

20  involved in deciding how to comply with the consent

21  order.  I think it's clear we -- this continuation

22  deposition and the scope of it -- permitted as to the

23  actions that TSI took to comply with the consent

24  order, but the decision -- decision-making behind

25  those actions necessarily implicates, I think, the

Hoffman, et al. v. Transworld Systems Incorporated, et al.                    Rough Draft of 30(b)(6) Bradley Luke  - Vol. II

Page 21

 1    mental impressions of its counsel, and so unless he

 2    can answer that question without revealing the

 3    impressions of his attorneys he can answer, but

 4    subject to that -- that instruction, I have concerns

 5    that any information he may reveals will -- will

 6    necessarily disclose attorney -- any work product.

 7    BY MS. HENRY:

 8        Q    Mr. Luke?

 9        A    I'm not sure I could answer further than what

10    I previously testified to without disclosing any

11    potential privileged communications.

12             MS. HENRY:  So you are instructing him

13    not to answer?

14    BY MS. HENRY:

15        Q    And you are not answering; is that correct,

16    Mr. Luke?

17             MR. HOMES:  Hold on a second.  I didn't

18    instruct him not to answer.  I cautioned the witness

19    that the decision-making that is behind actions that

20    TSI took in response to the consent order are not

21    actions, these are decisions by TSI in consultation

22    with its counsel and counsel's advice.

23             If Mr. Luke can answer the question without --

24    without revealing the mental impressions of its

25    attorneys he can do so.  I'm not instructing him not

Hoffman, et al. v. Transworld Systems Incorporated, et al.    Rough Draft of 30(b)(6) Bradley Luke  - Vol. II

Page 22

1   to answer, I'm just trying to guide him and you on the

2   scope of what he can testify about.

3       A   I don't believe I can provide further

4   information than I already have without giving

5   attorney-client privilege.

6                MS. HENRY:  Okay.  I'm going to ask that

7   we -- the court reporter, that we actually take the

8   break and go off the record and go back into breakout

9   rooms.

10                THE VIDEOGRAPHER:  Off the record at

11   10:21 a.m.

12                    (A break was taken from

13                        10:21 a.m. to 10:30 a.m.)

14                THE VIDEOGRAPHER:  On the record at

15   10:30 a.m.

16                MS. HENRY:  I'm just going to state for

17   the record that it appears to us that the objections

18   are meant to just eat into the remaining time that's

19   left, so we are going to note objections.  It doesn't

20   mean that if we don't have a prolonged discussion

21   about them that we are consenting or -- or waiving our

22   right to disagree with your objections, we are just

23   going to go on from (sic) the record.

24   BY MS. HENRY:

25       Q   I'm going to have you look at, Mr. Luke -- I'm

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  – Vol. II

Page 23

1    going to go to Paragraph 49 of this consent order.

2    I'm going to come back to Paragraph 45 later, but for

3    now I'm at Paragraph 49 and...

4          Can you tell me what steps did TSI do to

5    comply with Paragraph 49 in the consent order?

6       A   One second.  I'm looking at it right now.

7                     (Pause in the proceedings.)

8    BY MS. HENRY:

9       Q   Can I get an answer, Mr. Luke?

10      A   Sorry, it's a long paragraph.  I'm just

11   reading the paragraph.

12                    (Pause in the proceedings.)

13      A   So in response to Paragraph 49, TSI requested

14   on behalf of the Trusts that any suit that had a --

15   any pending suit that had an affidavit that was

16   identified or subject to Paragraph 49 that that suit

17   be dismissed.

18      Q   And were any of those -- was anything done to

19   comply with Paragraph 49 in Washington state?

20                    MR. ROSENBERG:  Object to form.

21                    MR. HOMES:  Join.

22      A   I'm trying to remember if there was any

23   Washington state one.  I believe there -- there was.

24   I can't state with certainty.  I don't recall

25   specifically whether Washington was included or not or

Hoffman, et al. v. Transworld Systems Incorporated, et al.    Rough Draft of 30(b)(6) Bradley Luke — Vol. II

Page 24

1    whether any Washington accounts were identified

2    subject to Paragraph 49.

3    BY MS. HENRY:

4        Q    Well, if we -- if we took a break now could

5    you go and get that information, be able to come back

6    and testify to it on the record?

7        A    Subject to -- to counsel's -- my counsel's

8    advice.

9        Q    I think it's a pertinent issue that needs to

10   be -- you should be prepared for today. So at the

11   moment I'm -- I'm going to -- I'll come back to that,

12   but -- so you do not know, correct?

13       A    I -- I don't recall off the top of my head

14   whether any Washington affidavits were -- were

15   identified subject to Paragraph 49.  No, I don't

16   recall right at this moment.

17       Q    Okay.  Now I'm going to go to -- back to

18   Paragraph 45.  I'm going to ask you to look at 45.k.

19            Can you tell me, what did TSI do to comply

20   with Paragraph 45.k of the consent order?

21            MR. ROSENBERG:  I'm going to object and

22   put on the record that my client, Patenaude & Felix,

23   is not a signatory to this consent order, so the

24   response may contain legal conclusions.

25       A    I think TSI updated their standard operating

Hoffman, et al. v. Transworld Systems Incorporated, et al.     Rough Draft of 30(b)(6) Bradley Luke — Vol. II

Page 25

1    procedures with the law firm to include provisions

2    that the law firm may not seek or initiate a

3    collections lawsuit that they have reason to believe

4    may be unenforceable.

5    BY MS. HENRY:

6        Q    And when were those procedures updated?

7                MR. ROSENBERG:  Object to form.

8        A    I believe in or around December of 2017.

9    BY MS. HENRY:

10       Q    December of 2017.

11            And have you provided those updated procedures

12   in this litigation?

13       A    Those specific ones I'm not sure.  I know we

14   produced SOPs, various versions, if I recall

15   correctly, but that specific version I'm not sure.  We

16   may have.

17       Q    Okay.  Is there -- and if you haven't, can you

18   provide that?

19       A    I don't foresee an issue with that, but

20   subject to consultation with -- with my counsel, to

21   the extent we haven't already provided it -- I -- I

22   don't personally see an issue, but my counsel has to

23   weigh in on that.

24       Q    I'm also going to have you look at 45.1, and L

25   has several subparts, and it asks you whether you --

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  - Vol. II

Page 26

1    to comply with this, asking whether you have -- are

2    executing affidavits containing any

3    misrepresentations.

4                MR. HOMES:  So I --

5        Q    Do you see that?

6                MR. HOMES:  -- I have to object.  I'm

7    going to object to form.  This is -- this is the

8    provision that imposes a permanent restriction on

9    activities, it does not call for certain activities to

10   be undertaken by TSI.

11               MS. HENRY:  You're correct, so let me --

12               MR. HOMES:  I object to.

13               MS. HENRY:  Let me --

14               MR. HOMES:  I object to the form.

15               MS. HENRY:  Let me an- -- ask the

16   question again.

17   BY MS. HENRY:

18       Q    So, Mr. Luke, what -- what steps did TSI take

19   to comply with 45.1 and it's subparts, 1.i, ii, iii,

20   iv, v, and vi?

21               MR. HOMES:  Same objection.

22   Paragraph 45.1, including all of its subparts, impose

23   what purport to be a permanent restriction or

24   restraint of activity and does not compel any

25   particular activity to be undertaken by TSI.  I object

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  – Vol. II

Page 27

1    to the form of the question to that extent.

2       A    So TSI is continually reviewing their

3    policies, procedures, job aids, and training, and in

4    light of this paragraph and the subparts, TSI -- I

5    don't recall whether it was prior to, in conjunction

6    with, or shortly after the entry of this consent

7    order, but TSI ensured that the job aid that the

8    affiants use to review and verify affidavits, as well

9    as the training program that is utilized to train the

10   affiants, was of such a standard to meet the

11   requirements of this, of 45.1.

12   BY MS. HENRY:

13      Q    Okay.  And when were those job aids updated?

14      A    Well, the -- the job aids are updated

15   generally annually, sometimes more frequently, and

16   they've -- they've ^ been enhanced over time.   In

17   regard to or in relation to the consent order, I don't

18   recall specifically when the next iteration of that

19   job aid was published in relation to the consent

20   order.

21      Q    Well, the order required TSI to comply with

22   this within 90 days, correct?

23               MR. HOMES:  Object to form.

24   BY MS. HENRY:

25      Q    Or was it 120 days?

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  - Vol. II

Page 28

1          MR. ROSENBERG:  Object to form.

2     A    I'm sorry, what -- what 120 day requirement?

3   What paragraph is that?

4   BY MS. HENRY:

5     Q    I'm going to have you look at 45.d and 45.e

6   and let me know, it's either 90 days or 120 days that

7   you had to comply with provisions of this consent

8   order, correct?

9     A    So Paragraph 45.d is a requirement that TSI

10   identify collections lawsuits that were filed outside

11   of the statute of limitations --

12     Q    Uh-huh.

13     A    -- not anything to do with -- with affidavits

14   and a forward-going limitation on execution --

15   executing of affidavits, and 45.e is 120 days in order

16   to provide a report or a listing of accounts that were

17   identified in Paragraph 45.c and d.  These -- these

18   two subparagraphs don't appear to put a time

19   constraint on Paragraph 45.l.

20          MR. HOMES:  And I'm going to interject a

21   belated objection.  You're calling for this gentleman

22   to make some legal conclusions about what the order

23   requires and what its terms are.  I mean, he can read

24   the order as a nonlawyer and -- and answer, and that's

25   what he's doing, but I want to make that objection

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke — Vol. II

Page 29

1    clear.   Your question here requires that he make some

2    legal conclusions about what this order means.

3    BY MS. HENRY:

4        Q    So let's go to Paragraph 52.  Mr. Luke.   So

5    that provision says within 90 days of the effective

6    date that the compliance plan must be complied with.

7    Are you saying that you didn't have 90 days to comply

8    with Provision -- with Paragraph 45 and all its

9    subparts?

10                MR. ROSENBERG:  Object to form.

11                MR. HOMES:  Object to the form.  Calls

12    for a legal conclusion.

13                MR. ROSENBERG:  It doesn't appear to be

14    quite an accurate statement of the provision either.

15    BY MS. HENRY:

16        Q   Can you explain to me what -- what

17    requirements TSI had under Paragraph 52 and what was

18    done to comply?

19                MR. HOMES:  Object to form.

20        A   My -- my understanding of Paragraph 52 is TSI

21    had 90 days to submit their compliance plan, which

22    included at a minimum the subparagraphs A through G.

23    BY MS. HENRY:

24        Q   And was that done, Mr. Luke?

25        A   Yes, ma'am, it was.

Hoffman, et al. v. Transworld Systems Incorporated, et al.                Rough Draft of 30(b)(6) Bradley Luke  – Vol. II

Page 30

1      Q   And were you involved in ^ promoting that

2   compliance plan?

3             MR. HOMES:  So I'm going to object to

4   this line of questions.  You are inquiring into

5   matters that involve TSI's compliance with what I

6   think is a supervisory portion of this consent order.

7             Now, the compliance plan here was provided to

8   the CFPB pursuant to that supervisory authority and

9   it's confidential supervisory information subject to,

10   I believe, for example, Section 1070.47, we've cited

11   that provision to you previously.  I think this is

12   subject to the bank examiner's privilege.  If you want

13   to obtain information regarding this compliance plan

14   or their -- content of any communications between TSI

15   and the CFPB, that is privileged information.  I think

16   if you want that information you need to subpoena it

17   from the CFPB.

18             As to this particular question about whether

19   or not Mr. Luke was personally involved, I think he

20   can answer that question, but anything beyond that

21   regarding the specifics of any compliance plan that

22   was submitted I think is within the privilege and I'm

23   instructing him not to provide that information.

24   BY MS. HENRY:

25      Q   Mr. Luke?

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  - Vol. II

Page 31

1       A    Yes, I was involved with the compliance plan.

2       Q    So then, Mr. Luke, you would know when or

3    whether TSI implemented job aids or other types of

4    training and procedures for employees so that they

5    could comply with 45.1, correct?

6       A    Yes, ma'am, I -- I would have known when we

7    first put the -- put together the compliance plan.

8    And as I've stated previously, I don't remember

9    exactly when in conjunction with the consent order the

10   job aids were specifically referring to was

11   implemented, whether it was prior to the consent order

12   or right after the consent order.  I just didn't

13   remember the date of those job aids being updated.

14      Q    So maybe I need to ask it again.  What was

15   done to comply with Paragraph 45.1 and its various

16   subparts, i, ii, iii, iv, v, vi, and when was it done?

17             MR. HOMES:  Once again, Paragraph 45.1

18   imposes some restrictions on activity, it does not

19   compel particular activity be undertaken, as mandated

20   by the consent order, so I object to form of the

21   question.

22             MR. ROSENBERG:  Also object to the form

23   in that the question is compound.

24      A    TSI reviewed its -- its policies and

25   procedures and job aids against this requirement,

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  – Vol. II

Page 32

1    and -- and I don't recall specifically at this time

2    whether the current job aid was determined to be

3    sufficient in light of this subparagraph or if

4    additional language or procedures or processes were

5    implemented in that job aid to further comply with

6    Paragraph 45.1.

7    BY MS. HENRY:

8        Q    So you don't know; is that correct?

9                MR. HOMES:  Object to form.

10       A    I mean, outside of what I just explained, I --

11   I don't recall specific date and contents of any

12   updates or enhancements to the job aid.

13   BY MS. HENRY:

14       Q    Well, my question is:  What was done to ensure

15   that the affidavits do not contain any

16   misrepresentations or false statements in compliance

17   with this consent order, and from what I heard from

18   you, you did not know whether anything was actually

19   done in order to comply with that.  Is that your

20   testimony?

21       A    No, ma'am, that's not what I stated.  What was

22   done is we reviewed the job aid and training to ensure

23   it met the requirement of Paragraph 45.1 of the

24   consent order, and what I don't recall is to the

25   extent something was -- was missing or an enhancement

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  – Vol. II

Page 33

1    was identified, I don't recall whether that --

2    anything was made or whether it was determined that

3    the existing job aids and training and policies and

4    procedures were sufficient and met the requirements of

5    Paragraph 45.1.  What was done is we reviewed the

6    training in place at that time and the job aids in

7    place at that time.

8        Q    So were the job aids and training in place at

9    the time of the consent order sufficient?

10                  MR. HOMES:  Objection.  That calls for a

11   legal conclusion.  I think it also broaches upon,

12   again, the same subject as -- as I mentioned

13   previously.  You're asking him to reveal what I think

14   are mental impressions of TSI's counsel.  If he can

15   answer the questions without revealing those mental

16   impressions he may do so.

17       A    As -- as I stated previously, just now, I

18   don't recall whether any revisions or additions were

19   made to those processes based on this consent order.

20   I don't -- I don't recall.

21   BY MS. HENRY:

22       Q    Let's look at Paragraph 46.  What was done to

23   comply with Paragraph 46 of the consent order?

24                  MR. HOMES:  Objection.  Paragraph 46,

25   like Paragraph 45, imposes certain restrictions, does

Hoffman, et al. v. Transworld Systems Incorporated, et al.        Rough Draft of 30(b)(6) Bradley Luke  – Vol. II

Page 34

1    not require particularized action by TSI for

2    compliance.   Object to form.

3        A    Similar to Paragraph 45.1, TSI reviewed its

4    training, training of witnesses, to ensure that

5    those -- that that training gave the witnesses the

6    ability to make factual statements and prohibited them

7    from making any misrepresentations or false statements

8    that are outlined in Paragraph 46, A through D.

9    BY MS. HENRY:

10       Q    And -- and what specifically was done?

11       A    Well --

12               MR. HOMES:   Object to form.

13       A    -- what was done was we reviewed the training

14   that was in place at that time.

15   BY MS. HENRY:

16       Q    And what changes to the training were made?

17               MR. HOMES:   Object to form.

18       A    I don't specifically recall.

19   BY MS. HENRY:

20       Q    What changes to procedures were made?

21               MR. HOMES:   Object to form.

22       A    I don't recall.

23   BY MS. HENRY:

24       Q    Do you recall if there was a need to have any

25   changes to procedures?

Hoffman, et al. v. Transworld Systems Incorporated, et al.        Rough Draft of 30(b)(6) Bradley Luke - Vol. II

Page 35

1              MR. HOMES:  Objection.  That calls for a

2    legal conclusion and interpretation of the consent

3    order, something that was done with the assistance and

4    advice of counsel.  So to the extent he can answer

5    without revealing the mental impressions of counsel he

6    may do so.

7        A    I don't recall whether there was a need or an

8    expressed need to make any changes to the training.

9    BY MS. HENRY:

10       Q    Okay.  Let's look at Paragraph 47.  Now,

11   you'll agree this provision, Paragraph 47, directly

12   tells TSI when to comply with Paragraph 45 and 46 of

13   the order, correct?

14             MR. HOMES:  Object to form.  Calls for a

15   legal conclusion.

16       A    Can you please repeat your question?

17             MS. HENRY:  Madam Court Reporter.

18             (The requested portion of the

19             transcript was read by the reporter.)

20             MR. HOMES:  Note my objections.

21       A    I'm not sure it tells them when to comply.  It

22   say that if they determine that they've engaged in

23   conduct prohibited by this order they'll probably take

24   necessary steps to ensure that it ceases any and all

25   practices that violate this order.

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  – Vol. II

Page 36

1    BY MS. HENRY:

2        Q    Okay.  So did TSI determine that its

3    conduct -- that it had engaged in any conduct that was

4    prohibited by the order?

5                MR. HOMES:  So objection.  You are

6    asking what TSI decided or determined, not what

7    actions it took to fulfill any particular requirement

8    of the consent order, so I think that's beyond the

9    scope of the Court's February 8th, 2022 minute entry.

10   The decisions that TSI made, it's informed by

11   communications and consultations with its attorneys

12   are privileged.  If he can answer this question

13   without revealing those privileges he can do so.

14   BY MS. HENRY:

15       Q    Mr. Luke?

16       A    I don't think I can answer that without

17   disclosing privileged information.

18       Q    Paragraph No. 48, within ten days TSI was to

19   make a determination concerning Paragraph 47 and

20   submit to the regional director a report.  That's

21   outlined in Paragraph 48.  Can you tell me, was that

22   done, Mr. Luke?

23                MR. HOMES:  Object to form.

24       A    TSI complied with this paragraph.  To the

25   extent such report was required, TSI would have

Hoffman, et al. v. Transworld Systems Incorporated, et al.        Rough Draft of 30(b)(6) Bradley Luke  - Vol. II

Page 37

1    provided that report to the regional director in

2    compliance with Paragraph 48.

3    BY MS. HENRY:

4        Q    And what plan was provided to cease and

5    remediate any harm that resulted from the actions as

6    described in Paragraph 48?

7                    MR. HOMES:  So hold on.  If you're

8    asking what the contents of that compliance plan

9    provides with respect to any particular topic or

10   subject, again -- and I mentioned this previously, you

11   know, that plan was submitted pursuant to the CFPB's

12   supervisory authority and is confidential information.

13   It's subject of the bank examiner's privilege.  If you

14   want that information, or the contents that you are

15   now seeking of that plan, that is privileged.  If you

16   want it you need to subpoena that from the CFPB to get

17   it.

18   BY MS. HENRY:

19       Q    Mr. Luke?

20                   MR. ROSENBERG:  Also objection in regard

21   to the speculation as to whether there was harm.

22                   MR. HOMES:  I'm instructing him not to

23   answer that question for the reasons I explained,

24   subject to privilege that the CFPB holds, their

25   supervisory review.

Hoffman, et al. v. Transworld Systems Incorporated, et al.        Rough Draft of 30(b)(6) Bradley Luke  - Vol. II

Page 38

1        A    I'll follow the advice of counsel.

2    BY MS. HENRY:

3        Q    And so you are not answering?

4        A    No, ma'am, subject to the advice of counsel.

5        Q    And so, Mr. Luke, also looking at

6    Paragraph 48, which practices were identified that

7    were in violation of the order?

8                    MR. HOMES:   Again, you are now -- you

9    are asking for the determination and the

10    decision-making involved.  You are not asking what the

11    Court allowed you and prescribed, which is

12    specifically the actions that TSI took to comply with

13    the consent order.  What you're asking is is beyond

14    the scope of your prior questions in this deposition,

15    it's beyond the scope of your motion to compel, and

16    it's beyond the scope of the Court's order.

17            To the extent Mr. Luke can answer these --

18    that question without revealing the mental impressions

19    of counsel he can do so.

20        A    I don't believe I can answer that question

21    without divulging privileged information.

22    BY MS. HENRY:

23        Q    Mr. Luke, were any practices identified that

24    were in violation of the order in Paragraph 48?

25                    MR. HOMES:   Same objection.  You're

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  - Vol. II

Page 39

1    asking him to make a determination, a legal one, about

2    whether or not particular practice violated the order

3    or not.  That's a -- that's a decision or

4    determination that TSI made in consultation with its

5    attorneys.

6    BY MS. HENRY:

7        Q   Mr. -- Mr. Luke?

8        A   I don't believe I can answer that without

9    divulging privileged information.

10            MS. HENRY:  Respectfully, Justin, I -- I

11    disagree with you.  The order is -- clearly

12    encompasses what did TSI do to comply with the CFPB

13    order.  This is specifically asking which practices

14    were identified that were in violation of the order.

15            MR. HOMES:  I agree --

16            MS. HENRY:  I don't understand why

17    you're -- that answer.

18            MR. HOMES:  I can --

19            MS. HENRY:  I'm not going to engage any

20    longer, I'm just putting that on the record.

21            MR. HOMES:  Let's -- let's go off the

22    record, in any case.  I would like to take a break, if

23    that's all right?

24            MS. HENRY:  We can go off the record.

25            THE VIDEOGRAPHER:  Off the record at

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  – Vol. II

Page 40

1    10:58 a.m.

2                      (A break was taken from

3                          10:58 a.m. to 11:08 a.m.)

4                THE VIDEOGRAPHER:  On the record at

5    11:08 a.m.

6    BY MS. HENRY:

7        Q    Okay.  I'm going to ask Mr. Luke, I believe

8    we're at Paragraph 50, and this is a provision of the

9    consent order dealing with collection lawsuits that

10   had already been filed.

11         Can you tell me, what did TSI do to comply

12   with Paragraph 50 of the consent order?

13       A    TSI ensured that any -- and -- and this is

14   about collection lawsuits that had been filed, but

15   specifically lawsuits that had reached a judgment, and

16   TSI ensured that postjudgment enforcement activity,

17   such as wage garnishments or bank ^ levies had been

18   ceased, and also ensure that going forward no new

19   postjudgment activities were to be initiated.

20       Q    And what accounts or judgments in Washington

21   were affected by Paragraph 50?

22                MR. HOMES:  Object to form.

23       A    I don't specifically recall right now whether

24   any Washington judgments were subject to Paragraph 50

25   or not.

Hoffman, et al. v. Transworld Systems Incorporated, et al.        Rough Draft of 30(b)(6) Bradley Luke  - Vol. II

Page 41

1    BY MS. HENRY:

2        Q    And I'm going to send you to Paragraph 51 of

3    the consent order, and I'm going to ask you what

4    compliance did TS- -- what did TSI do to comply with

5    Paragraph 51?

6        A    51 is prefaced on TSI receiving a directive

7    from its successor special servicer, and to the extent

8    that such directive was made as outline in the

9    subparagraphs of 51, TSI would have complied with it's

10   successor special servicer's directive.

11       Q    So did the special -- successor special

12   servicer give a directive to TSI to withdraw any

13   affidavit or collection lawsuit in compliance with

14   Paragraph 51?

15               MR. HOMES:  Object to form.  Speaking

16   about Washington consumers and Washington accounts

17   only?

18       A    I don't recall any directive from the

19   successor special servicer in regards to 51.b  related

20   to withdrawing of affidavits.

21   BY MS. HENRY:

22       Q    And -- and your answer, Mr. Luke, is that just

23   for Washington state or is that for the entire

24   country?

25               MR. HOMES:  Object to form.  This

Hoffman, et al. v. Transworld Systems Incorporated, et al.                    Rough Draft of 30(b)(6) Bradley Luke  - Vol. II

Page 42

1    deposition only concerns Washington state.

2                    MS. HENRY:  And -- and Justin, I would

3    appreciate it if you're not coaching him.  I asked him

4    a direct question.

5        A    I don't recall such directive regarding any

6    account period.

7    BY MS. HENRY:

8        Q    And just to clarify for the record, who is the

9    special servicer?

10                   MR. HOMES:  Object to form.

11   BY MS. HENRY:

12       Q    The successor special servicer, Mr. Luke?

13       A    The successor special servicer contemplated in

14   the consent order is U.S. Bank.

15       Q    Okay.  So I'm also going to go back, backtrack

16   a little bit, and I'm going to have you go to -- we

17   mentioned briefly 45.d and 45.e.  What was done to

18   comply with 45.d and 45.e in the consent order?

19                   MR. HOMES:  So object to form.  Asking D

20   and E together?

21                   MS. HENRY:  We can ask them separately.

22   BY MS. HENRY:

23       Q    What was done to comply with the consent order

24   45.d provision?

25                   MR. HOMES:  Right.  So I'm going to

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  - Vol. II

Page 43

1    object to that question.  I think that's outside the

2    scope of this case, it's not relevant to your lawsuit

3    or proportional to the needs of this case.  There is

4    no allegations that this -- these suits and the

5    underlying actions were filed beyond the statute of

6    limitations.  So, you know, this case was about

7    alleged missing documents.  Again, this is not a

8    question that you asked prior to -- in his prior --

9    Volume 1 of Mr. Luke's deposition, it's not a subject

10   that you moved to compel.  I don't think that this is

11   appropriate discovery from this witness.  I'm going to

12   instruct him not to answer this question.

13   BY MS. HENRY:

14       Q   Mr. Luke?

15       A   I'll follow advice of counsel and not provide

16   a response to this question.

17       Q   And what did TSI do to comply with

18   Paragraph 45.e of the consent order?

19              MR. HOMES:  And I'm going to object to

20   that question on different grounds.  This, of course,

21   involves communications with the CFPB in reporting to

22   the CFPB, and to that extent is subject to the CFPB's

23   supervisory privilege.  And I think I have stated

24   previously the grounds on which I believe that

25   information is confidential information subject to the

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  – Vol. II

Page 44

1   banking privilege, it's beyond to scope of discovery

2   in this case and it is not permissible.

3         I'm instructing him not to answer, to

4   revealing what is essentially and fundamentally

5   information within the CFPB's purview in its

6   supervisory capacity.  If you want that information

7   you need to subpoena it from the CFPB.

8      A    So for Paragraph 45.e, I can confirm that TSI

9   complied with this, subparagraph 45.e, and provided

10  the information required under this paragraph, but

11  subject and contents of that information, can't

12  provide further -- further answer on without

13  disclosing potentially privileged information.

14  BY MS. HENRY:

15     Q    Okay.  And what did you do to comply with

16  Paragraph 45.g, as in George?

17         MR. HOMES:  Same objections.  The

18  statute of limitations is not at issue in this case,

19  it's not a -- this case is about missing documents,

20  not a subject that you -- that you raised in your

21  subject, it's not a subject that you raised in the

22  prior deposition, it's not a subject that you raised

23  on your motion to compel, it's not a reasonable

24  follow-up to those questions.  I'm instructing him not

25  to answer.

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  - Vol. II

Page 45

1      A    I'll follow the advice of counsel and -- and

2  not answer this question.

3  BY MS. HENRY:

4      Q    And what did you do to comply with

5  Paragraph 45.h of the consent order?

6                    (Pause in the proceedings.)

7                MR. HOMES:  Again --

8  BY MS. HENRY:

9      Q    Mr. Luke?

10               MR. HOMES:  -- to -- to the extent he

11  can confirm that this in action was answer he can do

12  so.  The contents of this information I think is

13  subject to the same privileges and instruction that I

14  gave previously.

15     A    And I'll follow the advice and not answer the

16  question related to 45.h.

17  BY MS. HENRY:

18     Q    Okay.  And what did you do to comply with

19  Paragraph 45.i of the consent order?

20               MR. HOMES:  I'm going to to be the

21  question.  It doesn't impose requirement to take

22  action by TSI.  Object to the form.  To the extent he

23  can answer without revealing attorney-client

24  communications he can do so.

25     A    TSI did impose a requirement on its law firms

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  – Vol. II

Page 46

1    to provide such a report on a quarterly basis

2    including the information that's described in

3    Paragraph 45 I from its law firms.

4    BY MS. HENRY:

5        Q    And what was done to comply with Paragraph 45

6    J?

7                    MR. HOMES:  Again I'm going to object

8    that this is beyond the scope of the prior deposition,

9    beyond the scope of this case, beyond the scope of

10   your motion to compel and the Court's order.

11   BY MS. HENRY:

12       Q    Mr. Luke?

13       A    Sorry I'm just rereading the paragraph.

14                    (Pause in the proceedings.)

15       A    So the extent TSI either knew or learned

16   afterwards that a suit was filed beyond the statute of

17   limitations it worked with counsel to cease that

18   litigation and dismiss the lawsuit.

19       Q    And do you know if any lawsuits were dismissed

20   in the state of Washington in compliance with that

21   provision?

22                    MR. HOMES:  Same objections.  I'm

23   instructing him not to answer for the reasons stated.

24       A    On the advice of counsel I will not answer.

25   BY MS. HENRY:

Hoffman, et al. v. Transworld Systems Incorporated, et al.     Rough Draft of 30(b)(6) Bradley Luke – Vol. II

Page 47

1     Q   Okay.  I'm just going to take another quick

2     break to discuss with my counsel, my cocounsel,

3     Sherrilyn?

4                     THE VIDEOGRAPHER:  Off the record at

5     11:19 a.m.

6                     (A break was taken from

7                     11:19 a.m. to 11:26 a.m.)

8                     THE VIDEOGRAPHER:  On the record at

9     11:26 a.m.

10                    MS. HENRY:  So I just want to say on the

11    record that the plaintiffs disagree with the

12    objections that were made today and that we're not

13    waiving any arguments that we had over compliance with

14    the minute order that's been entered by the Court or

15    that the topics that were raised today were in

16    compliance with the notice of deposition and with that

17    we are asking that this deposition be continued.

18                    We have no further questions at this time.

19                    MR. ROSENBERG:  And can we ask how much

20    time has elapsed, please.

21                    THE VIDEOGRAPHER:  Six hours and 47

22    minutes.

23                    MR. HOMES:  I have no questions.

24                    THE VIDEOGRAPHER:  Anybody else?

25                    MR. CASAMENTO:  Nothing from Casamento.

Hoffman, et al. v. Transworld Systems Incorporated, et al.          Rough Draft of 30(b)(6) Bradley Luke  – Vol. II

Page 48

1              MR. ROSENBERG:  No questions.

2    Thank you.

3              MR. HOMES:  Thank you.

4              THE VIDEOGRAPHER:  This concludes the

5    deposition -- this concludes Volume 2 of the

6    deposition, we are off the record at 11:28 a.m.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25