**EXHIBIT 1**

Hon. Thomas S. Zilly

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| ESTHER HOFFMAN; SARAH DOUGLASS; ANTHONY KIM; and IL KIM and DARIA KIM, husband and wife and the marital community comprised thereof, on behalf of themselves and on behalf of others similarly situated, | Case No.: 18-cv-1132-TSZ |
| Plaintiffs, | |
| v. | |
| TRANSWORLD SYSTEMS INCORPORATED; PATENAUDE AND FELIX, A.P.C.; MATTHEW CHEUNG, and the marital community comprised of MATTHEW CHEUNG and JANE DOE CHEUNG; National Collegiate Student Loan Trust 2004-2; National Collegiate Student Loan Trust 2005-2; National Collegiate Student Loan Trust 2005-3; National Collegiate Student Loan Trust 2006-1; National Collegiate Student Loan Trust 2006-3; National Collegiate Student Loan Trust 2007-4, | |
| Defendants. | |

# EXPERT REPORT OF ROGER W. SAYLOR

1

I.      **OVERVIEW**

1.      This report (the "Report") summarizes my review of the conclusions reached in the Declaration of Michael Andrew dated January 19, 2022. I was advised by counsel that Mr. Andrew's Declaration was submitted in support of Plaintiffs' motion for class certification in the above-referenced action. I was asked to prepare a report after reviewing the Declaration that would analyze the statements and conclusions provided by Mr. Andrew. After reviewing Mr. Andrew's Declaration and certain other materials identified herein, it is my opinion that the conclusions reached and opinions offered by Mr. Andrew reflect a lack of understanding of basic securitization structure, and more specifically, the securitization structure of the National Collegiate Student Loan Trusts at issue.

II.     **BACKGROUND AND QUALIFICATIONS**

2.      I am the retired Managing Director of the Education Finance group within the Citigroup Global Securitized Markets business where I led the market leading student loan finance business for the period 2001 through 2009, having structured and arranged financing for over $25 billion of student loan financings comprising federal and private student loans. Prior to this role, I served as Managing Director of Structured Products for PNC Capital Markets from 1997 through 2001, where I was responsible for all Education Finance related transactions.

3.       I did not lead, manage, or structure any of the trusts involved in this matter, National Collegiate Student Loan Trust 2004-2 (the "2004-2 Trust"), National Collegiate Student Loan Trust 2005-2 (the "2005-2 Trust"), National Collegiate Student Loan Trust 2005-3 (the "2005-3 Trust"), National Collegiate Student Loan Trust 2006-1 (the "2006-1 Trust"), National Collegiate Student Loan Trust 2006-3 (the "2006-3 Trust"), and National Collegiate Student Loan

2

Trust 2007-4  (the "2007-4 Trust") (collectively, the "Trusts" or the "NCSLTs"), during either of these periods. I did, however, lead the group serving as a Joint Book-Runner (also known as underwriter) for several of the NCSLTs while at Citigroup. As Joint Book-Runner, my group was responsible for placing the Trust Certificates (the securities that provided holders with a beneficial interest in Trust) with investors. This required me to review and become familiar with all the relevant agreements, Prospectuses and Supplements governing the securitization prior to the closing of the securitization.

4.      Additionally, while at Citigroup, I had initial credit authority for $5 billion of on-balance sheet student loan financings commencing in 2003 growing to an annual level of $18 billion from 2007 through my retirement in 2009. These on-balance sheet financings were mostly related to warehousing facilities in preparation for Capital Market Trust issuance on which we were typically the Lead Manager responsible for structuring the transaction including preparation of all transaction documents, rating agency process and preliminary pricing.

5.      As an important part of my credit authority for student loan assets and issuances, I personally undertook at least annual on-site due diligence meetings with each of the major Department of Education ("DOE") "eligible" servicers (excluding Sallie Mae with whom our group did limited work), including detailed reviews of both their federal loan and private loan serviced portfolios for customers financed by my team. I undertook this diligence because servicing of the student loans was the single most important risk factor in the student loan asset, and evidence of any secured interest in the student loans was evidenced on the respective servicing platform.

6.      My *curriculum vitae* is attached here as **Exhibit A**.

3

### III.    MANDATE

7.      I was retained by Locke Lord LLP, counsel for the NCSLTs to provide an opinion on behalf of the NCSLTs and Defendant Transworld Systems, Incorporated ("TSI") in the above-captioned litigation. Specifically, I was asked to:

    a.  Provide an overview of the process by which the NCSLTs were structured, documented, placed, and managed post-closing;

    b.  Address the timing of how the underlying student loan collateral was determined, reviewed, and transferred into each relevant Trust; and

    c.  Review the *Declaration of Michael Andrew*, dated January 19, 2022, and to determine whether the conclusion(s) reached and opinion(s) offered by Mr. Andrew therein reflect a lack of understanding of basic securitization structure, and more specifically, the securitization structure of the trusts administered by First Marblehead Corporation and its affiliates ("FMC") between 2001 and 2009, including the NCSLTs.

8.      In connection with this retention, I am being compensated at my standard hourly rate of $500 per hour for the time I spend working on this matter, with possible additional fees for testimony. Others working under my supervision and direction have assisted me in this assignment at their standard hourly rate. My compensation is not contingent upon my findings or the outcome of this litigation.

9.      To prepare this report, I have considered the following documents, which were provided to me by counsel for the NCSLTs:

    a.  The Prospectus for the 2005-2 Trust, dated May 20, 2005;
    b.  The Prospectus Supplement for the 2005-2 Trust, dated June 7, 2005;

4

  c. The True Sale Opinion of Thacher Proffitt, dated June 9, 2005;

  d. The Prospectus for the 2007-4 Trust, dated September 17, 2007;

  e. The Prospectus Supplement for the 2007-4 Trust, dated September 19, 2007;

  f. Amended and Restated Note Purchase Agreement by and between Bank of America, N.A., and The First Marblehead Corporation, dated April 1, 2006;

  g. A copy of "20074 Lender Report – Post Sale – BANK of AMERICA.xls";

  h. Plaintiffs' Second Amended Complaint (Dkt. 61);

  i. TSI's Motion for Summary Judgment and Exhibits 1, 2, and 3 thereto (Dkt. 161-1-4); and

  j. The Declaration of Michael Andrew with Supplemental Disclosure and Exhibits thereto (Dkt. 237).

10. The materials considered, including all documents, may be consulted as necessary and form part of the basis for the opinions expressed herein. I reserve the right to supplement my opinions and to prepare demonstrative exhibits for trial, as a visual basis to illustrate my opinions. This report may be amended after consideration of any new or previously undisclosed information or data.

## IV. REPORT

### A. Background On The NCSLT Securitization Process And Loan Servicing.

11. Student loans can consist of loans for undergraduate education, which includes short-term programs, certificate programs, community college (typically two-year programs) and the traditional college or university four or five-year programs, loans for graduate programs, and parental loans, which may be taken out by parents on behalf of their dependent children. For all of these types of loans, there are loans offered by the federal government as well as loans offered by private lenders.

12. Almost universally, private student loans are taken out by a student (or the student's parent(s)) in conjunction with federal student loan(s) to make up the difference between the

maximum loan amounts offered by the federal government and the total cost of the student's education.

13.     All student loans must be originated by an "Eligible Lender," typically a nationally or state chartered bank, credit union, or other financial institution granted "Eligible Lender" status by the DOE. For federal loans, this is required under the Higher Education Act of 1965, as amended. Because virtually all private student loans are originated as a "companion" loan to a federal loan by the same banking institution to meet the total cost of education for the student, private loans are also originated by Eligible Lenders.[1]

14.     Structurally, a student loan asset-backed securitization ("SLABS") differs little from an ABS note transaction for credit cards, auto loans, home equity loans, and other non-mortgage consumer loan transactions. An asset-backed securitization has a cash-flow generating consumer asset—in the case of a SLABS, a student loan—that is originated (in the case of SLABS, by an Eligible Lender as explained above) and then sold by the originator to a party typically defined as the "Depositor." The Depositor then sells the assets to the entity that ultimately owns the asset, typically a trust established for that purpose. Consideration for the sale is raised by the issuance of certificates, the proceeds from which are paid to the Depositor for the purchase of the underlying student loans. The Depositor than advances the respective sales proceeds to the originator(s) in consideration for the initial sale of the student loans. In securitization parlance, this is defined as a "two-step sale." Both steps happen simultaneously at closing of the securitization.

---

[1] During the time frame of the NCSLT loans at issue in this case, parents might take out a Home Equity Loan, or other personal loan to meet the gap in cost of education. However, in no instances would these have been included in a NCSLT issuance.

This sale process is legally deemed to be a "True Sale" meaning that all the underlying assets are legally sold as of the date of the sale.

15.    The NCSLTs all worked in this way. Eligible Lenders—between 2001 and 2007, 14 of the 20 largest banks in the United States—originated private student loans in accordance with the Program Guidelines of The Education Resources Institute ("TERI"). The loans were then pooled and sold, pursuant to Note Purchase Agreements or Loan Purchase Agreements and Pool Supplements, to the Depositor, National Collegiate Funding, LLC ("NCF"). Then, pursuant to Deposit & Sale Agreements, the pooled student loans were sold from NCF to the relevant purchasing NCSLT. A "True Sale Opinion" was issued by Thacher Proffitt, a highly experienced law firm, in conjunction with each NCSLT securitization. These True Sale Opinions opined on both steps of the simultaneous sales process: from the origination bank to the Depositor, and from the Depositor to the purchasing NCSLT. The True Sale Opinions state that, in Thacher Proffitt's opinion, the student loans were legally sold from the originators to the Depositor and then ultimately to the purchasing NCSLT.

16.    It is important to note that many ABS transactions (including several of the NCSLTs) also provided for additional loans to be sold into the trust(s) for some defined period of time post-closing, all of which were still deemed to be owned by the trust(s) at the time of the sale transfer. This is called a "Pre-Funding," in securitization parlance. For deals that used Pre-Funding, a segregated pre-funding account was established at closing and then used to retain a portion of the initial proceeds raised at closing. As "Eligible Loans" (as defined in the Prospectus and Prospectus Supplement) became available for sale from the originating lender(s), funds were taken from the Pre-Funding Account and paid to the Depositor, and then on to the originating lender,

7

just as at the closing. Language specifically addressing this is found in, for example, the definitions

of the 2005-2 Trust Prospectus, which state:

> ADDITIONAL TRUST STUDENT LOANS. Additional student loans will be purchased by the trust from the depositor with proceeds on deposit in the pre-funding account. All of the additional trust student loans will be private student loans that have been newly or recently originated. The additional trust student loans will have generally have the same attributes applicable to the initial trust student loans, but the addition of the additional trust student loans will affect the aggregate statistical characteristics of the trust student loans. The additional trust student loans will have a weighted average annual percentage spread over LIBOR of at least 4.50%. The additional trust student loans may be purchased on different dates and may have different related cut off dates, but all purchases of additional trust student loans by the trust will occur on or before July 31, 2005. We expect to purchase substantially all of the additional trust student loans by June 29, 2005.[2]

2005-2 Trust Prospectus, p. S-8—S-9.

17.     In preparing this report, I reviewed relevant documents pertaining to the 2005-2

Trust and 2007-4 Trust. However, based on my experience detailed above, I know that the

securitizations for all of the NCSLTs worked in a virtually identical way to each other, and that

the agreements and related documents governing each NCSLT are virtually identical. Further, I

can conclude that the NCSLT securitizations were standard issuances and structured similarly in

most all respects to billions of dollars of other SLABS issuances in any given year.

18.     For each of the NCSLTs, Wilmington Trust Company (as successor to Delaware

Trust Company) served as the Owner Trustee to the Trusts (as it did on a sizeable number of other

ABS). First Marblehead Data Services, Inc. served as the Administrator, with responsibility for

---

[2] It should be noted that the closing date for the 2005-2 Trust was June 9, 2005 with an original Cut-Off Date of April 30, 2005, a Prospectus date of May 20, 2005 and a Prospectus Supplement date of June 7, 2005.

managing the monthly reporting from the servicer of the loans in the Trust and reporting to the various constituents, including investors, ratings agencies, TERI, the bond insurer(s) and other related parties.

19.     For each of the NCSLTs, at the point of origination, the servicer of the majority[3] of the loans was Pennsylvania Higher Education Assistance Agency ("PHEAA"). As explained above, the loans in the NCSLTs, like nearly all private student loans, were originated in conjunction with underlying federal student loan(s) for the same borrower and, as such, were boarded to the servicer's—for the majority of the loans for the NCSLTs, PHEAA's—platform at the same time as the borrower's federal student loan(s).

20.     While PHEAA was the initial servicer for the majority of the NCSLT loans, certain schools and school systems had preferred servicers with which they required originators of loans for student-borrowers at those schools work. For instance, the University of California ("UC") system required all originators of loans to UC-system students to use ACS Education Services, a California-based servicer. This is because the servicers of student loans, in addition to being responsible for maintaining all of the origination documents and collateral, were often required to interact with the schools attended by the student-borrowers whose loans were being serviced. Thus, a small percentage of the loans were serviced by other servicers from origination to closing. At closing, it was then typically necessary to "convert" those loans to PHEAA. Performing this conversion could take 30-60 additional days after closing.

---

[3] For instance, PHEAA was the "initial servicer" of 99.4% of the loans in the 2007-4 Trust. 2007-4 Trust Prospectus Supplement, p. S-1.

21.     During the time period that the loans in the NCSLTs were originated and securitized, PHEAA and the other eligible servicers, like all major servicers, received more than 90% of updates to the loans they were servicing from the National Student Clearinghouse ("NSC"). Other than monthly billing and collections information, the servicers would typically verify borrower repayment conversion dates, last date of attendance, borrower status (e.g., changes in repayment status, changes in attendance status, school changes, etc.) from the NSC. Servicers typically received weekly updates from the NSC and would make updates to their servicing systems as appropriate. Data was also provided to servicers by the National Student Loan Data System ("NSLDS") which is the DOE's central database for student aid. Updates from both of these systems were typically run as monthly batch file updates, known as "Batch Processing."

22.     In addition, PHEAA and the other eligible servicers, like all servicers of student loans, maintained on their servicing platforms a unique code by which to identify the lender and/or owner for each loan being serviced. For instance, for a student loan originated by Bank of America ("BoA"), upon origination, the servicer's platform would have a unique identifier (a "Legend") for BoA indicating that BoA was the lender and owner of the loan. Whenever the owner changed, such as pursuant to a True Sale to a third-party like the NCSLTs, the servicer would run a batch file update to the Legend on its platform to indicate that ownership had changed and to indicate the effective date of the change. This servicing data is where secured parties would look to monitor and receive reporting on their respective segregated collateral. The update on the servicing system to the ownership change would typically be run by the servicer within 24 hours of the closing date.

23.     It is important to emphasize that PHEAA, or the school-mandated eligible servicer, was the servicer of the NCSLT loans from inception. The servicer would service the loans on

behalf of the originating lender from the point of origination until the sale to the purchasing Trust. This is important because it allowed the loans to transfer ownership yet not transfer servicer and therefore to remain on the same servicing system. This allowed for respective servicers to continue to service the individual loans with no break in the process. The servicers took the schedule (roster) of loans sold to the purchasing Trust and updated their systems by amending the legend on their servicing systems, thus providing consistent servicing of the loan from one owner to the next.[4]

### B.     The Timing of the NCSLT Securitization Process.

24.     As explained above, because PHEAA or the eligible servicer remained the servicer for the significant majority of loans in the NCSLTs from origination through sale to the relevant Trust, the servicing record of the loans was not interrupted during the securitization process. However, due to the various processes involved in a securitization, certain static dates were used for analysis by the Structuring Agent, rating agencies, Preliminary and Supplemental Prospectus purposes, and True Sale analysis and opinions. For instance, in the case of the 2007-4 Trust, the documents indicate the closing of the securitization occurred on September 20, 2007, but all disclosures to the Rating Agencies, Bond Insurer, Investors and Documents were to be completed as of the operative cut-off date of August 31, 2007. *See* 2007-4 Trust Prospectus Supplement, page S-3.

25.     As discussed above, when a SLABS closes and a sale of the collateral (the loans) is confirmed (consideration is paid to the originator), the servicer must then update the Legend for the respective loans in its platform. In addition to changing each of the Legends, the servicer must

---

[4] As explained above, for the small number of loans sold to the Trusts which were being serviced by an eligible servicer other than PHEAA, a "conversion" was typically undertaken post-closing. Loan conversions were common in the student loan industry, and typically could take 30–60 days to complete.

ensure that, along with the change in ownership, all prior servicing data related to the loan and all of the related origination documents and collateral have also transferred to the servicer.[5] As indicated above, this does not happen with the "flip of a switch" and instead, is typically undertaken and validated prior to publishing the final list of the secured collateral (which is delivered to the Indenture Trustee and other required parties), typically within 48 to 72 hours after the closing date.

26.     Further, the Prospectus Supplement defines the "Collection Period" as:

> with respect to the first distribution date, the period beginning on Cut Off Date and ending on October 31, 2007, and with respect to each subsequent distribution date, the Collection Period means the calendar month immediately following the end of the previous Collection Period.

2007-4 Trust Prospectus Supplement, p. G-1.

27.     The calendar month collection period acknowledged in the Prospectus Supplement clearly demonstrates the parties' intent to provide for an extra approximately 30-day period from the first Distribution Date to permit the anticipated reconciliation of the pool of loans into the Trust.

28.     Depending on the number of loans, the availability of computing resources, and any changes discovered (such as a change in borrower status after the cut-off date, a student dropping out of school and due a refund under the terms of the loan document, etc.), the post-

---

[5] *See, e.g.*, 2007-4 Trust Prospectus, p. 46 ("Under each servicing agreement, each servicer as custodian will have custody of any promissory notes, credit agreements or other loan documents evidencing the trust student loans. Our records and the records of each seller and the servicers will be marked to indicate the sale and each seller, we will cause UCC financing statements to be filed with the appropriate authorities, and the trust student loans will be physically segregated, to the extent feasible, stamped or otherwise marked to indicate that the trust student loans have been sold to us or the trust, as applicable.").

closing reconciliation period could take from 48 hours to 30 days or more. It should be emphasized that during the final period leading up to the closing date and the period of reconciliation, collections, past due dates, and changes from the borrower (such as the borrower's status) are also continuing to occur. With any post-closing changes, the governing agreements also provide for a period of post-closing reconciliation of funds between the purchasing trust and the Depositor.

29.     Provisions in the governing agreements, such as Section 3.01(c)(2) of the Note Purchase Agreement between Bank of America and First Marblehead Corporation ("FMC"), also acknowledge the anticipated timing lag described above:

> Purchaser Trust shall have paid the Minimum Purchase Price to Program Lender … within 24 hours after the Purchase Date (such Minimum Purchase Price shall be based on the best information available from the Servicer as of the Purchase Date; no later than thirty (30) days following the Purchase Date, the Purchaser Trust shall recalculate the Minimum Purchase Price to reflect adjustments for transactions (including, without limitation, additional accrued interest and payments received), and whichever party is deemed to owe the other such adjustment shall deliver such adjustment to such other party, by wire transfer of immediately available funds).

30.     The post-closing reconciliation timing lag is not unique to the NCSLTs and could take even longer in federal student loan-backed securitizations because there are generally a greater number of loan conversions[6] necessary. It is clearly indicated in the documents governing the securitization and thus understood by all parties to these transactions that it may take 30 days or more from the closing date to fully reconcile the financed underlying student loans.

---

[6] As explained above, loan conversions or de-conversions were (and are) common in servicing student loans. They take place when student loans are transferred from one servicer to another. They often occur in order to "unite" under a single servicer a single borrower's loans, or to transfer a group of loans from one servicer to another, such as after a True Sale.

31.    As previously mentioned, because the servicer for these loans largely did not change throughout the securitization process, post-closing reconciliation would occur within the servicer's system. Thus, for purposes of repayment, deferment, pre-payment and/or collection activities, the records on the servicer's platform are the final, most reliable source of information.

### C.    Mr. Andrew's Conclusions Are Unsubstantiated And Incorrect.

32.    In reviewing the Declaration submitted by Mr. Andrew, it appears he has concluded that because the "Last Modified" dates of the electronic files containing the loan schedules he inspected are purportedly subsequent to the dates supplied to him by Plaintiffs' counsel that are reportedly "related to the associated" Pool Supplements, there can be no "direct association" between the two documents. He states that "the fact that the Excel spreadsheet was modified after the date related to the associated Pool Supplement file means there is no proof for any direct association between the two files." Andrew Decl., ¶¶ 8-14.

33.    Mr. Andrew fails to take into account, however, as explained above:

a.    The governing documents clearly identify the pool prior to the closing date, and also identify all the requisite processes and time frames to reconcile the actual closing date data prior to the first Distribution Date;

b.    It is possible and is customary to trace the individual loans on the servicing system from inception of the loan through the change in lender code Legend; and

c.    If any loan was transferred for purposes of collection activity, such note will also be noted and retained on the system.

34.    Based on my history with over 100 separate secured student loan facilities and in excess of $25 billion of SLABS issuances, it is my opinion that it is absolutely appropriate and

14

customary for an electronic schedule of loans pertaining to a particular securitization to post-date the closing of the securitization. The mere fact that the supposed last modification[7] of the loan schedules at issue here post-date the dates purportedly "related to the associated" Pool Supplements does *not* indicate the loan schedules are not associated with the closing documents as Mr. Andrew opines. To the contrary, a period of reconciliation was anticipated, provided for in the securitization documents, and expected as a matter of custom in the industry. Indeed, it would be highly unusual and inconsistent for the parties to such a securitization *not* to provide some extended period of time after the closing date of the securitization to allow for reconciliations.

35.      It is further my opinion, based upon my experience and my review of the documents in this case, that electronic loan schedules are the typical and expected method for industry participants to identify and document private student loans that are intended to be or that have been securitized, and that the electronic loan schedule in the format of the loan schedules at issue in this case was typical and customary for the industry at the time of the underlying securitizations.

36.      Further, it is my opinion, based upon my experience and my review of the documents in this case, that inclusion of each loan in the electronic loan schedule would have been expected by the parties to the securitization, as well as the general participants in the student loan industry at the time of the relevant NCSLT securitizations.

---

[7] This assumes, solely for purposes of rendering this opinion, that the loan schedules were substantively modified after the effective dates of the Pool Supplements. However, it is my understanding that the NCSLTs have retained an expert who has separately concluded that such an assumption cannot be made based on the analysis Mr. Andrew's Declaration indicates he conducted in this matter.

Dated: March 14, 2022
      Arden, North Carolina

Roger W. Saylor

# EXHIBIT 2

Hon. Thomas S. Zilly

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| ESTHER HOFFMAN; SARAH DOUGLASS; ANTHONY KIM; and IL KIM and DARIA KIM, husband and wife and the marital community comprised thereof, on behalf of themselves and on behalf of others similarly situated, | Case No.: 18-cv-1132-TSZ |
| Plaintiffs, | |
| v. | |
| TRANSWORLD SYSTEMS INCORPORATED; PATENAUDE AND FELIX, A.P.C.; MATTHEW CHEUNG, and the marital community comprised of MATTHEW CHEUNG and JANE DOE CHEUNG; National Collegiate Student Loan Trust 2004-2; National Collegiate Student Loan Trust 2005-2; National Collegiate Student Loan Trust 2005-3; National Collegiate Student Loan Trust 2006-1; National Collegiate Student Loan Trust 2006-3; National Collegiate Student Loan Trust 2007-4, | |
| Defendants. | |

## <u>REBUTTAL REPORT OF ROGER W. SAYLOR</u>

1.      This report summarizes my review of the conclusions reached in the Mach 14, 2022 expert report of Michael Andrew (the "Andrew Report"). After reviewing Mr. Andrew's Report, it is my opinion that the conclusions reached and opinions offered by Mr. Andrew once again reflect a lack of understanding of the process and timing of events leading up to and following the

closing of Student Loan Asset Backed Securitizations ("SLABS"), including the National Collegiate Student Loan Trusts at issue, for the reasons explained below.

2.      To prepare this rebuttal report, I have considered the following:

- The Andrew Report with Exhibits thereto;
- NCSLT_000396—NCSLT_000401;
- TSI_0007836;
- TSI_0007680;
- TSI_0013455;
- TSI_0013994;
- TSI_0014828; and
- TSI_0018894.

3.      The foregoing materials, including all documents, may be consulted as necessary and form part of the basis for the opinions expressed herein. I reserve the right to supplement my opinions and to prepare demonstrative exhibits for trial, as a visual basis to illustrate my opinions. This report may be amended after consideration of any new or previously undisclosed information or data.

4.      Mr. Andrew's ultimate conclusion is that "the Excel spreadsheets provided by TSI and the [NCSLTs] are not the 'Schedules' referenced in the Pool Supplement documents." Andrew Report, p. 5. It appears that Mr. Andrew's conclusion is based on his own presumption that there must have existed, on the closing date of the securitization, "original" Microsoft Excel spreadsheets or other type of static, self-contained "files" that constituted the schedule of loans and that are uniquely significant to the efficacy of the transaction. Mr. Andrew's assumption is not consistent with my experience in the industry.[1]

5.      First, as a preliminary matter, I do not know what Mr. Andrew believes to be the "original files." Mr. Andrew does not clearly explain—and I cannot ascertain—whether he

---

[1] My experience and qualifications, along with the terms of my engagement, are set forth in my March 14, 2022 Report ("Prior Report") at Paragraphs 2—7 and my *curriculum vitae* is attached to my Prior Report as Exhibit A.

believes that one of the three "copies" of the spreadsheets (those produced by TSI, those produced by the NCSLTs, or those offered for inspection) constitutes the "original," or if he is hypothesizing without explanation or support that there exists, or should exist, another Excel spreadsheet, or some other document altogether, that is the "original."

6.      Either way, his threshold assumption that there existed on the closing date of each securitization a Microsoft Excel spreadsheet or another similar document that either somehow affects the purchase of the loans by the relevant Trust or is the sole reliable "Schedule" of loans being purchased by the relevant Trust is inconsistent with my experience.

7.      Based on my more than 10 years of experience in structuring and closing SLABS, and serving a managing role as Joint Book Runner (also known as underwriter) for several NCSLT securitizations, I would not expect to see a Microsoft Excel spreadsheet containing a "Schedule" of the loans owned by a particular Trust until after the closing date and the completion of the post-closing reconciliation process described in my Prior Report. As I addressed in my Prior Report (at Paragraphs 19—30)  and as I explain again here, because the post-closing reconciliation process was done in the servicer's (for the NCLSTs, PHEAA's) system, I would not expect there to exist a Microsoft Excel spreadsheet, or any other similar document, prior to this process taking place. Once this process was completed and if a list of loans would have been compiled, I would expect it to accurately reflect, and in my experience such documents did accurately reflect, the underlying data from the servicer's system related to the loans owned by the relevant Trust.

8.      Finally, Mr. Andrew reiterates his conclusion that the Excel spreadsheets cannot have any "direct association" with the corresponding Pool Supplements because the dates "related to the associated" Pool Supplements precede in time the Modified Dates of the

Schedules. I believe that I sufficiently addressed this in my Prior Report and reiterate and affirm here the conclusions I made in that Prior Report.


Dated: Arden, North Carolina
        April 13, 2022

Roger W. Saylor

# EXHIBIT 3

Roger W. Saylor                                        May 10, 2022

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

--------------------------------------------------------

ESTHER HOFFMAN, et al.,        )

               Plaintiffs,    )   NO. 2:18-cv-1132-TSZ

    vs.                        )

TRANSWORLD SYSTEMS, INC.,      )

et al.,                        )

              Defendants.    )

--------------------------------------------------------

ZOOM VIDEO CONFERENCE DEPOSITION UPON ORAL EXAMINATION

OF

ROGER W. SAYLOR

--------------------------------------------------------

ATTENDANCE OF ALL PARTICIPANTS VIA

ZOOM VIDEO CONFERENCE

--------------------------------------------------------

9:47 a.m.

May 10, 2022

REPORTED BY:  Lauren G. Harty, RPR, CCR #2674

Roger W. Saylor                                        May 10, 2022

```
 1                    A P P E A R A N C E S

 2

 3   FOR PLAINTIFFS:

 4            CHRISTINA L. HENRY, ESQ.

 5            Henry & DeGraaff

 6            119 First Avenue South, Suite 500

 7            Seattle, WA  98104

 8            (206) 330-9595

 9            chenry@hdm-legal.com

10   SAM LEONARD, ESQ.

11            Leonard Law

12            3614 California Avenue SW, #151

13            Seattle, WA  98116

14            (206) 486-1176

15            sam@seattledebtdefense.com

16            GUY BECKETT, ESQ.

17            Berry & Beckett

18            1708 Bellevue Avenue

19            Seattle, Washington 98122

20            (206) 441-5444

21            gbeckett@beckettlaw.com

22

23

24

25
```

Roger W. Saylor                                      May 10, 2022

```
 1                    A P P E A R A N C E S

 2

 3   FOR DEFENDANT NATIONAL COLLEGIATE STUDENT LOAN TRUST:

 4            GREGORY T. CASAMENTO, ESQ.

 5            ANDREW BRAUNSTEIN, ESQ.

 6            R.J. DeROSE, ESQ.

 7            Locke Lord LLP

 8            Brookfield Place

 9            200 Vesey Street, 20th Floor

10            New York, NY  10281

11            (646) 217-7879

12            gcasamento@lockelord.com

13            andrew.braunstein@lockelord.com

14            rderose@lockelord.com

15

16   FOR DEFENDANT TRANSWORLD SYSTEMS, INC.:

17            JUSTIN HOMES, ESQ.

18            Sessions, Israel & Shartle

19            3850 North Causeway Boulevard, Suite 200

20            Metairie, LA  70002

21            (504) 828-3700

22            jhomes@sessions.legal

23

24

25
```

Roger W. Saylor                                    May 10, 2022

                                                        Page 4

 1                  A P P E A R A N C E S

 2

 3    FOR DEFENDANTS PATENAUDE & FELIX, A.P.C., MATTHEW

 4    CHEUNG, AND CHEUNG MARITAL COMMUNITY:

 5              MARC ROSENBERG

 6              Lee Smart, P.S., Inc.

 7              1800 One Convention Place

 8              701 Pike Street

 9              Seattle, WA  98101

10              (206) 624-7900

11              mr@leesmart.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Roger W. Saylor                                    May 10, 2022

Page 5

 1              E X A M I N A T I O N

 2   ATTORNEY                                        PAGE

 3   BY MS. HENRY:                                      6

 4

 5            E X H I B I T   I N D E X

 6   EX#              DESCRIPTION                    PAGE

 7   1   5/12/2022 "PLAINTIFFS' NOTICE OF              9

 8       DEPOSITION OF ROGER W. SAYLOR."

 9   2   3/14/2022 "TRUST DEFENDANTS' AND TSI'S        9

10       EXPERT WITNESS DISCLOSURE."

11   3   NCSLT_000401_CONFIDENTIAL Excel              50

12       spreadsheet.

13   4   6/9/2005 Thacher Proffitt true sale         62

14       opinion letter.

15   5   4/13/2022 "REBUTTAL REPORT OF ROGER W.      100

16       SAYLOR."

17   6   6/10/2021 "DECLARATION OF BRADLEY LUKE IN   107

18       SUPPORT OF TRANSWORLD SYSTEMS INC.'S

19       MOTION FOR SUMMARY JUDGMENT."

20

21

22

23

24

25

Roger W. Saylor                                    May 10, 2022

 1   originated those loans on -- under the terms of the

 2   TERI/First Marblehead program.

 3        Q.    Okay.

 4              And what was your involvement directly in

 5   those particular transactions?

 6        A.    I had no direct involvement.  I --

 7   Citigroup -- my -- my -- my group within Citigroup did

 8   not serve as a structuring agent during my time on any

 9   of the First Marblehead transactions in question here.

10   Our desk, which was part of our larger group, did in

11   fact sell those.  And so it is possible on occasion I

12   would have answered an investor question about private

13   student loans, but the bulk of those questions would

14   have gone to the structuring agent on the deal.

15        Q.    So what was your role then?

16        A.    My role --

17        Q.    At --

18        A.    -- on the First Marb --

19        Q.    -- Citibank.  At Citicorp.

20        A.    My role was to run the -- the education

21   finance group and to make sure that any credit we

22   advanced against transactions was properly structured

23   and secured.

24        Q.    And how is that different than what you just

25   called this -- the -- the -- I'm sorry.  I can't read

Roger W. Saylor                                    May 10, 2022

```
 1   my own writing for a minute.  -- the structuring
 2   agent?
 3        A.    Well, we served as structuring agent for the
 4   bulk of student loan issuance from the period 1995 to
 5   2009.  First Marblehead was not one of our customers
 6   that we structured deals for.
 7        Q.    Okay.  Thank you.
 8              Okay.  I'm going to have you turn to your
 9   report and I'm going to have you turn to paragraph 9
10   of your report.  And this is the documents that you
11   reviewed to create this report, correct?
12        A.    Correct.
13        Q.    And those are documents a. through j.  And
14   are those all the documents that you reviewed for this
15   report?
16        A.    A. through j. is correct, and those are all
17   the documents that I reviewed, yes.
18        Q.    Okay.
19              MS. HENRY:  And, Sam, can I have you
20   upload a copy of the lender report, the 2007-4 lender
21   report --
22              MR. LEONARD:  Yep.  Give me --
23              MS. HENRY:  -- in the Chat?
24              MR. LEONARD:  -- a minute.
25              The Excel document?
```

Roger W. Saylor                                    May 10, 2022

Page 18

1            MS. HENRY:  Correct.

2            MR. LEONARD:  Okay.  It is uploaded.

3            Looks like maybe I only did it directly --

4    hold on -- someway.  And I will email it now as well.

5       Q.   (By Ms. Henry)  And, Mr. Saylor, let me know

6    when you have that document opened?

7            MR. LEONARD:  Okay.  It's uploaded in the

8    email.

9       A.   It's slow.

10           Yes, I have it.

11      Q.   (By Ms. Henry)  Okay.

12           Can I ask you, do you recognize this

13   document?

14      A.   I do.

15      Q.   And did you review this document prior to

16   writing your report?

17      A.   I did.

18      Q.   Okay.

19           I'm going to have you look at -- let me --

20   look at the tab titled "Roster" on the bottom on the

21   spreadsheet.

22      A.   Yes.

23      Q.   Okay.  Just a second here.

24           Do you see the column names on the row --

25      A.   Yes.

Roger W. Saylor                                    May 10, 2022

Page 19

1      Q.     -- 6?  And have you look at -- are you
2  familiar with those column names and can you tell us
3  what those different column names mean.
4      A.     The lender would have been the originating
5  bank.  The lender code would have been a code that was
6  assigned to the owner of the loan.  The marketer under
7  the First Marblehead/TERI program would have been
8  the -- the bank or the marketing agent who received a
9  marketing fee.  The loan product is the type of loan.
10  As you know, there are multiple different types of
11  student loans and program types, so that would have
12  been the definition of the loan product.
13          The BSSN, I am not sure what that is.
14  The -- I assume that that's the identity code for the
15  borrower, but I'm not privy to that.  The guaranty is
16  the -- the reference to the -- the TERI.  Guaranty
17  distribution date would have most probably been the
18  date that the promissory note was signed.  Tier is
19  credit tier.  The First Marblehead/TERI program priced
20  their loans according to credit underwriting, so that
21  would be the tier of the credit.
22          The repay type would have been when did the
23  loan go into repayment; was it an immediate repay, did
24  it have a deferral period.  Margin is obviously the
25  rate the borrower was charged.  The fee to borrower

Roger W. Saylor                                          May 10, 2022

                                                          Page 23

 1              MS. HENRY:  That -- that sounds good.

 2              MR. CASAMENTO:  Okay.  Thank you.

 3       Q.   (By Ms. Henry)  All right.  Mr. Saylor --

 4       A.   Yes.

 5       Q.   -- you just told us about the -- the meaning

 6   of the titles in that row 6 of the "Roster" tab of the

 7   document, correct?

 8       A.   Correct.

 9       Q.   And can you tell me, do you know who

10   assigned those titles to that row 6?

11       A.   I do not know.

12       Q.   Okay.

13              Can you also tell me, do you know who

14   created this document?

15       A.   I don't know that, no.

16       Q.   Okay.

17              And do you know where the information came

18   from?

19       A.   This information would have come from the

20   PHEAA report related to the Trust issuance of 2007-4.

21       Q.   (By Ms. Henry)  Okay.  Thank you.

22              (Inaudible.)

23              THE REPORTER:  I'm sorry.

24              THE WITNESS:  Yeah.

25              THE REPORTER:  Christina --

Roger W. Saylor                                    May 10, 2022

Page 24

```
 1              THE WITNESS:  I'm --
 2              THE REPORTER:  -- you're cutting out.
 3              THE WITNESS:  And am I the only one that
 4    can't hear her?
 5              MR. CASAMENTO:  Yeah.  It's --
 6              MS. HENRY:  I'm sorry.  Let me try again.
 7    Let me try again.
 8              Ms. Court Reporter, if you can hear me, if
 9    you can read it back.  If not, I'll try to say the
10    same question.
11              MR. BECKETT:  Hey, Christina, what -- how --
12    is your --
13              MS. HENRY:  Yes.
14              MR. BECKETT:  -- cell -- is your -- your --
15    this is an internet issue, right?
16              MS. HENRY:  It should be a cell phone
17    connection.
18              MR. BECKETT:  You're working off your cell
19    phone right --
20              MS. HENRY:  You --
21              MR. BECKETT:  -- now?
22              MS. HENRY:  -- still can't hear me?
23              MR. BECKETT:  No.  I can hear you great --
24              MS. HENRY:  Yes.  You --
25              MR. BECKETT:  -- yes.
```

Roger W. Saylor                                     May 10, 2022

1            MS. HENRY:  -- still cannot hear me?

2            MR. BECKETT:  No.  I can --

3            MR. CASAMENTO:  I --

4            MR. BECKETT:  -- hear you.

5            MR. CASAMENTO:  Yeah.  I don't think it's a

6    connection issue.  I think Christina either moved or

7    shuffled something in front of the phone.

8            Try again, Christina.

9            MS. HENRY:  Okay.  I think I hit a button

10   actually.

11           MR. BECKETT:  Okay.  Okay.

12           MS. HENRY:  Okay.

13           So my -- can you ask -- can you just repeat

14   the last question so I can remember what my last

15   question was, Lauren?

16               (The reporter read back as requested.)

17           MS. HENRY:  Perhaps you can tell me the

18   question just before that.

19               (The reporter read back as requested.)

20           MS. HENRY:  Okay.

21       Q.   (By Ms. Henry)  So my next question is how do

22   you know that this information came from the PHEAA

23   report?

24       A.    PHEAA was the servicer on the National

25   Collegiate Loan Trust 2000-4, and this information

Roger W. Saylor                                    May 10, 2022

Page 28

1    for these loans how data was transferred from PHEAA?

2         A.    I know how PHEAA transferred loans for

3    securitization purposes, not specifically for 2007-4.

4         Q.    Okay.

5               And what do you know about how PHEAA system

6    worked for securitization purposes?

7         A.    PHEAA kept the records of and all collateral

8    related thereto, and when you -- when you did a

9    securitization for any issuer a cutoff date was

10   established, and as of that cutoff date PHEAA would

11   download to a secure FTP site the data necessary for

12   analysis of that transaction and -- to ensure that you

13   had a sale of the assets and were secured in that

14   sale.

15        Q.    And have you ever worked for PHEAA?

16        A.    I have not worked for PHEAA, no.

17        Q.    Okay.

18              And so on what basis do you have the

19   authority to talk about what PHEAA did?

20        A.    In my role over the years in student lending

21   I visited PHEAA as well as the other major student

22   loan servicers at least annually, undertook due

23   diligence on their process, and worked closely with

24   senior management of PHEAA -- Great Lakes, ACS --

25   because of the -- the volume of transactions that our

Roger W. Saylor                                    May 10, 2022

Page 37

1           MR. CASAMENTO:   Objection.

2      A.    They included Brazos, the New Jersey Higher

3   Education Authority, the Montana Higher Education

4   Student -- Student Finance Corp., the State of

5   Montana, State of South Dakota, State of Missouri.

6   State of California, that -- that's CHELA.  Brazos,

7   State of Texas; Maine, Vermont, North Star,

8   Minneapolis.  Who else had private loans.  Florida.

9   What's his name.  Henry Harrod's group, Florida.  So

10  dozens.

11     Q.    (By Ms. Henry)  Okay.

12           So who were the originators for the student

13  loans in this lawsuit?

14     A.    The originators for 2007-4, which is what I

15  have in front of me here, are all Bank of America

16  originated loans.

17     Q.    Okay.

18           So for 2007-4 you have that information in

19  front of you.

20     A.    Yes, ma'am.

21     Q.    Now I'm going to ask you for 2004-2, who

22  were the originators of those loans?

23     A.    Can you show me the Excel file, please, for

24  two-thousand -- for that trust?

25     Q.    Well, let me ask you, did you review any

Roger W. Saylor                                    May 10, 2022

Page 38

1    information for 2004-2 for your expert report?

2         A.    I don't recall.

3         Q.    What about for 2005-2?  Who were --

4         A.    2005 --

5         Q.    -- the originators?

6               What's that?

7         A.    For 2005-2, I did review that, yes.

8         Q.    Okay.

9               And who were the originators --

10        A.    Oh.  I --

11        Q.    -- for those loans in this lawsuit?

12        A.    I think there were 14 different originators.

13   I'm not sure.  You'd have to show me the -- the Excel

14   file there.  It was listed there.  I -- I think it was

15   14 different originators, all --

16        Q.    And --

17        A.    -- banks.

18        Q.    -- for -- and for 2005-2 those originators

19   transferred their data directly to PHEAA; is that

20   correct?

21        A.    That's correct.

22        Q.    Okay.

23              And for 2005-3, who were the originators for

24   those loans in this lawsuit?

25        A.    I don't recall.

Roger W. Saylor                                May 10, 2022

Page 39

```
 1     Q.    Okay.
 2           And did you review any of the information
 3   for that trust in preparation for your expert report?
 4                (Telephonic interruption.)
 5     A.    I did not review in detail that, no.
 6           MS. HENRY:  Just one second.
 7     Q.    (By Ms. Henry)  Okay.
 8           And so you did not review anything for that
 9   trust for this report?
10     A.    I don't --
11           MR. CASAMENTO:  Objection to form.
12           You can answer.
13     A.    I don't recall.  That specific trust, I
14   think the bulk of my analysis, the bulk of the
15   information I had was 2005-2 and 2007-4.
16     Q.    (By Ms. Henry)  And so if I go back to
17   paragraph 9 of your report, and I'm going to have you
18   look at that again, a. through j., those are the only
19   documents that you reviewed for this report, correct?
20           MR. CASAMENTO:  Objection to form.
21           MR. ROSENBERG:  Marc Rosenberg.
22     Q.    (By Ms. Henry)  Mr. Saylor?
23     A.    I'm look -- I'm going back to look at this.
24           MR. ROSENBERG:  (Inaudible.)
25           THE REPORTER:  I'm sorry, Marc.  I -- you're
```

Roger W. Saylor                                      May 10, 2022

Page 40

1   really garbled.

2           MR. ROSENBERG:  Any objection to form that I

3   make -- any objection to form that Greg makes I would

4   join.

5       A.   Yes.  That's -- that's correct.  2005-2 and

6   2007-4, yes.

7       Q.   (By Ms. Henry)  Okay.

8            And can I ask you, why did you limit your

9   review to just the 2007-4 --

10              (Telephonic interruption.)

11      Q.   (By Ms. Henry)  -- and 2005-2?

12      A.   Those are the -- the documents I was

13  provided by legal counsel.

14      Q.   Okay.  Thank you.

15           Okay.  So I'm going to have you go now to

16  page -- paragraph 13 of your report.

17      A.   Yes.

18      Q.   And I'm going to have you review that

19  paragraph.

20      A.   Yes.

21      Q.   Okay.

22           So in that paragraph you state that, "All

23  student loans must be originated by an 'Eligible

24  Lender'..."  Can you tell us what is an eligible

25  lender.

Roger W. Saylor                                    May 10, 2022

Page 64

1    document.

2         A.    Yes, I am.

3         Q.    And can you tell us what it is.

4         A.    This would be the true sale opinion which

5    was issued by Thacher Proffitt in conjunction with the

6    issuance of the 2005-2 trust for National Collegiate

7    student loans.

8         Q.    Okay.

9               And can you tell me what is the purpose of

10   this document.

11        A.    This document confirms that the loans that

12   were originated by a bank and are being sold into the

13   Trust are being sold as a true sale so that they

14   are -- they are not a transference or a funding of

15   some sort.  They are a sale of the asset complete and

16   whole as of the date of the closing.

17        Q.    And is this issued for tax purposes?

18        A.    No.  It's issued for sale purposes to

19   confirm the sale.

20        Q.    The sale to the other entities that you --

21   that say here listed on Exhibit A -- or Schedule A.

22   I believe there it says that at the top.  Do you see

23   that, "To each party listed in Schedule A..."?

24        A.    Can you state your question again, please?

25        Q.    Okay.

Roger W. Saylor                                    May 10, 2022

Page 67

1        A.      The -- the -- for my purposes the true sale

2   opinion confirms that reputable counsel reviewed the

3   transaction and issued an opinion, which as lawyers

4   you understand is not easy to come by; that the loans

5   that were sold by the originating bank or banks were

6   in fact sold for consideration and are off the books

7   of the bank and sold to the purchasing entity, which

8   in this case was the 2005-2 trust.

9        Q.      (By Ms. Henry)  Okay.  Thank you.

10               I'm going to have you go to paragraph 15 of

11   your report and have you review that paragraph and let

12   me know when you're done.

13       A.      Yes.

14       Q.      And can you tell me which documents did you

15   rely on to form your opinions in paragraph 15 of your

16   report.

17       A.      I reviewed the true sale opinion that you

18   just provided me for 2005-2 and the -- the general

19   conclusion was my experience with First Marblehead and

20   all student loan trusts.  This is exactly how they all

21   worked and is consistent with any of the transactions

22   on which I worked during that time period.

23       Q.      And did you review a true sale report for

24   the other trusts in this lawsuit?

25       A.      I did not.

Roger W. Saylor                                    May 10, 2022

Page 69

1    rendering this opinion letter..."

2         A.    Yes.

3         Q.    I'm going to have you read that.  You can

4    read -- you can just stop at the end of the page even

5    though that's not the full paragraph.

6               MR. CASAMENTO:  I would ask the witness just

7    to read the whole paragraph if you're going to ask him

8    about a paragraph.

9               MS. HENRY:  Well, I'm only asking him about

10   the information that's in -- the information that's --

11   that starts in the word "In" and ends in

12   "enforceability" on that page.

13        A.    Yes.

14        Q.    (By Ms. Henry)  Okay.

15              So here's my question.  Did Thacher Proffitt

16   examine any documents that evidenced student loans to

17   render this report?

18        A.    I don't -- I don't know what Thacher

19   Proffitt looked at.  I didn't work with Thacher

20   Proffitt nor did I engage them.

21        Q.    Okay.

22              Based on the information you read that's in

23   your report, did they examine any documents evidencing

24   student loans?

25        A.    It says --

Roger W. Saylor                                    May 10, 2022

Page 70

1             MR. CASAMENTO:   Objection; asked and
2    answered.
3             You can answer.
4    A.    Yeah.  It says specifically they did not
5    examine any documents evidencing the student loans.
6    Q.    (By Ms. Henry)  Okay.
7             And -- thank you.
8             I'm going to go now to paragraph 16 of your
9    report and have you review that paragraph.
10   A.    Yes.
11   Q.    And can you tell me on -- what documents and
12   information did you rely on to form your opinion in
13   paragraph 16.
14            MR. ROSENBERG:   Objection.
15   A.    Paragraph 16 came from the Prospectus for
16   the 2005-2 Trusts.
17   Q.    (By Ms. Henry)  Okay.
18            And did you look at the Trust Prospectus for
19   the other trusts in this lawsuit?
20   A.    I looked at the Prospectus for the Trust
21   2007-4.
22   Q.    Okay.
23            I have one more question about the Thacher
24   Proffitt firm.  Do you know if they're still in
25   business?

Roger W. Saylor                                    May 10, 2022

Page 71

```
 1      A.    Thacher Proffitt?
 2      Q.    Yes.
 3      A.    I don't know.  They're -- not -- not -- I do
 4  not know, no.
 5      Q.    Okay.
 6            And did Citigroup have anything to do with
 7  Thacher Proffitt, to your knowledge?
 8      A.    We did not use Thacher Proffitt, no.
 9      Q.    Okay.
10            So you don't have any independent knowledge
11  from your time at Citigroup.
12      A.    Not of Thacher Proffitt, no.
13            MR. ROSENBERG:  Object to form.
14      Q.    (By Ms. Henry)  Okay.
15            I'm going to have you look at paragraph 17.
16      A.    Yes.
17      Q.    And can you tell me what information and
18  documents inform your opinion in paragraph 17.
19      A.    As I -- as I state, I reviewed the
20  Prospectus, the Prospectus Supplements for the Trust
21  2005-2, 2007-4 specifically to look for, you know,
22  what I've concluded here.
23            I also rely on my history at Citigroup
24  where we were on the bulk of those as a selling agent.
25  In other words, we had responsibility for both
```

Roger W. Saylor                                    May 10, 2022

Page 72

1    underwriting and distributing some portion of the

2    Trust notes to the ultimate end investor, so we were

3    familiar at least with the structure.  And I would

4    have reviewed at that time a summary review of any

5    prospectus on which we served as the -- the selling

6    agent for any portion of those bonds.

7        Q.    Okay.

8              And for paragraph 18, I'll have you review

9    that.

10       A.    Yes.

11       Q.    And for paragraph 18 what documents and

12   information did you rely on to inform your opinions in

13   that paragraph?

14             MR. ROSENBERG:   Objection.

15       A.    I did not review the Owner Trustee documents

16   for any of these specific.  I relied on my experience.

17   We used Wilmington Trust on a very large percentage of

18   our secur -- of securitizations on which Citigroup

19   served as the structuring agent, so I was well

20   familiar with Wilmington Trust and their processes.

21       Q.    (By Ms. Henry)  Okay.  That's Wilmington

22   Trust, but what about the other entities you listed

23   here in this paragraph?

24       A.    First Marblehead Data Services, First

25   Marblehead?

Roger W. Saylor                                    May 10, 2022

Page 73

 1      Q.    Yes.

 2      A.    Yes.  I -- I knew the people at First

 3   Marblehead very well.  As I've indicated, we had other

 4   clients, large clients, who used the TERI/First

 5   Marblehead private loan and then securitized those

 6   loans into their own securitizations.  So, as I

 7   indicated, with our servicers I met with TERI -- yeah.

 8   TERI was easy.  -- at least twice a year.  I would

 9   visit Boston.  TERI/First Marblehead, they were in the

10   same place.

11      Q.    Okay.

12            But how do you know that that's how it

13   worked for the National Collegiate Student Trust?

14   What documents did you rely on for this opinion?

15      A.    I relied on the 2005-2 and the 2007-4

16   Prospectus in which these roles are clearly identified

17   and laid out and my history with all of the First

18   Marblehead interests issuances is what I relied on for

19   the -- the other trusts.

20      Q.    Okay.

21            And we've talked about paragraph 19.

22            I'm now going to have you review paragraph

23   20.

24      A.    Yes.

25      Q.    Can I ask you what information and documents

Roger W. Saylor                                    May 10, 2022

                                                        Page 74

1    did you rely on to inform your opinions in paragraph

2    20.

3         A.    Specific to the 2005-2 and the 2007-4 Trusts

4    the -- the servicing percentages for PHEAA were

5    disclosed in both the Prospectus and the Prospectus

6    Supplement.  For the broader characterization of why,

7    you know, a fractional percentage of the loans may not

8    have been originally at PHEAA, there -- there were

9    established relationships between schools that

10   required an originator to use their -- typically their

11   state-sponsored servicer.  California state schools,

12   some required ACS.  You know, if you went to the

13   University of Pennsylvania, you had to use PHEAA.  If

14   you went to the University of Wisconsin, you had to

15   use Great Lakes.  So -- so there were small numbers of

16   loans that may not have been at -- a PHEAA servicing

17   from origination, but in the case of First Marblehead

18   that was a fractional percentage.

19        Q.    Okay.

20              And is there any documentation that you

21   relied on to inform your opinion here in paragraph 20

22   about those other originators and servicers?

23        A.    No.  Again, my history, my -- my meetings

24   with the servicers and various schools over my 20-year

25   career.

Roger W. Saylor                                    May 10, 2022

Page 75

1      Q.    Okay.

2            And paragraph 21, I'll have you review that.

3      A.    Yes.

4      Q.    And can I ask you what information and

5      documentation did you rely on to form your opinion in

6      paragraph 21.

7      A.    Those were my due diligence meetings with

8      each of the various servicers, as I indicated, the

9      major servicers, at least annually.  And, you know,

10     one of -- one of those key due diligence issues you

11     looked at was, as -- as I've discussed earlier,

12     students did not pay interest while in school, during

13     the in-school period.  There was, depending on the

14     loan type, a three-year six- -- typically a three-year

15     six-month deferment period post graduation before they

16     went into repayment.

17           So one of the -- one of the very important

18     things in servicing student loans was when does the

19     student graduate and when do they enter repayment and,

20     also important, where did they move, because back in

21     the Dark Ages, like these trusts, you actually sent

22     out coupon books for people to repay.

23           So -- so that -- that had -- the servicer

24     had to be in touch with those borrowers, had to

25     know -- when they entered repayment had to know where

Roger W. Saylor                                    May 10, 2022

                                                            Page 76

1    they were moving.  And because students typically

2    didn't respond in a timely manner, the federal

3    government set up this national student clearinghouse

4    to -- that schools were to report for when each

5    individual student would enter that, would graduate,

6    and -- so servicers could calculate their repayment

7    period.

8         Q.    Okay.

9               So that was set up for the federal student

10   servicers, correct?

11        A.    Correct.

12        Q.    And was it set up for the private student

13   loan servicers?

14        A.    No.  It was set up for the federal student

15   loans.  As I indicated earlier, the First Marblehead/

16   TERI loans were a companion loan to a federal loan, so

17   for purposes of graduation, student graduated, and

18   that was for his federal loan and his private loan.

19   They didn't graduate on different dates.

20        Q.    And -- I believe you've already testified to

21   this, but again can you tell me how it is that you

22   know that information, what reliance -- what documents

23   and information you rely on for those First Marblehead

24   related loans that you just referred to as companion

25   loans?

Roger W. Saylor                                          May 10, 2022

Page 77

1      A.    I'm -- I'm sorry.  What -- specifically what
2    is your question?  I have -- you -- you -- you give me
3    your question.  I won't rephrase it.
4      Q.    Specifically my question is, can you give me
5    the documents and information you're relying on for
6    the statement you just made.  And I can have the court
7    reporter read back your --
8      A.    No.
9      Q.    -- statement.
10     A.    That -- okay.  If the -- my -- there are no
11   documents that I referred to in conjunction with this
12   lawsuit.  This is based on my meetings with servicers,
13   with originators, with the Department of Education.
14   This is my experience in the industry over 20 years.
15     Q.    Yes.  But you specifically made a statement
16   about First Marblehead, and that was where my question
17   was asking to you, where do you rely -- what reliance
18   do you have as to First Marblehead for your opinion.
19     A.    I don't believe I referred to a document for
20   First Marblehead.  What -- what specifically are you
21   asking?
22          MS. HENRY:  So, Lauren, maybe you can
23   have -- read back to him his statement before I tried
24   to rephrase it?  And -- and then I think he can answer
25   the question.

Roger W. Saylor                                     May 10, 2022

Page 79

 1              MR. ROSENBERG:  Form.

 2       A.    -- document, no.

 3              MR. ROSENBERG:  Are you getting my

 4   objections, by the way?

 5              THE REPORTER:  Yes, when your name appears.

 6              MR. ROSENBERG:  Okay.  Thank you.

 7              MR. CASAMENTO:  I'll join in that objection.

 8       Q.    (By Ms. Henry)  So let me clarify this,

 9   Mr. Saylor.  So there was no particular document that

10   you reviewed when you formed your opinion from the

11   report, correct?

12       A.    No.

13              MR. ROSENBERG:  Objection.

14              MR. CASAMENTO:  Objection.

15       Q.    (By Ms. Henry)  And was there a particular

16   document that you reviewed when you inform -- informed

17   your overall opinion of the process.

18              MR. ROSENBERG:  Objection.

19              MR. CASAMENTO:  Objection.

20       Q.    (By Ms. Henry)  Mr. Saylor?

21              MR. ROSENBERG:  Form.

22       A.    Multiple occasions 20 years ago I would

23   have -- I -- I know I reviewed the TERI/First

24   Marblehead private loan program.  I can picture the

25   manual.  I can picture myself sitting with Hollis

Roger W. Saylor                                    May 10, 2022

Page 80

1   Williams in -- in Massachusetts going through the
2   program.  So I knew the -- I knew -- and -- and know
3   the -- the First Marblehead private loan program.  But
4   I did not -- I do not have a copy of that program
5   guideline manual any longer nor did I review it in
6   conjunction with this undertaking.
7       Q.   (By Ms. Henry)  So -- but you had referred to
8   that document as a guideline manual for -- is that
9   correct?
10      A.    It would have been called a pro -- program
11  guidelines, the TERI program manual, but, again,
12  every -- every private loan issuer had -- had program
13  guidelines.
14      Q.    Okay.  Thank you.
15            I'm going to have you look now at paragraph
16  22 I believe and review that.
17      A.    Yes.
18      Q.    And can you tell me what information and
19  documentation you relied on to support that opinion.
20            MR. ROSENBERG:  Objection.
21      A.    This was part of our meet -- our due
22  diligence meetings with the major servicers, and when
23  we were structuring a transaction we would have
24  confirmed in the FTP site where the lender code column
25  that you referred to in your Excel file was located,

Roger W. Saylor                                    May 10, 2022

Page 87

1    would not find this lender code in any other

2    transaction.

3         Q.    All right.  Thank you.

4               Paragraph 23, I'll have you review that.

5               Wait.  Before -- I'm sorry.  Before I go

6    back to -- I want to -- there's one more question on

7    22.  22 in the first sentence you said, "In addition,

8    PHEAA and the other eligible servicers..."  Can you --

9    can I ask you, who are the other eligible servicers

10   you're referring to here?

11        A.    The other eligible servicers would have been

12   the other -- Great -- the -- the major servicers;

13   Great Lakes, Nelnet, ACS, Head South, Sallie Mae.

14        Q.    Okay.  Thank you.

15              Now go to number 23, if you can read

16   paragraph 23.

17        A.    Yes.

18        Q.    And can you tell me what information and

19   documents you relied on to inform your opinion in

20   paragraph 23 of your report.

21        A.    This was my annual meetings with each of the

22   servicers about how they process these student loans

23   and how we made -- made certain that the history

24   associated with the loans stayed consistent.  When a

25   sale occurred pretty -- pretty obvious you couldn't

Roger W. Saylor                                           May 10, 2022

                                                          Page 88

 1    transfer servicing without knowing what had gone on

 2    prior to the sale of the loan.

 3          Q.    Okay.

 4                And there's no other documents that you

 5    relied on; is that correct?

 6          A.    That's correct.

 7          Q.    And paragraph 24, can you review that?

 8                MR. ROSENBERG:  Objection to form on that

 9    last one, please.

10                MR. CASAMENTO:  Yeah.  I'll join in that.

11          A.    Yes.

12          Q.    (By Ms. Henry)  And can you tell me about

13    what information and documentation you relied on to

14    form your opinion in paragraph 24.

15          A.    This is -- this is how all -- all student

16    loan securitization trusts work.  So, again, my

17    experience with structuring and working on hundreds of

18    these transactions over the years.

19          Q.    Okay.

20                And do you have any reason to believe that

21    there could be any possibility that anyone did

22    anything differently?

23          A.    With --

24                MR. CASAMENTO:  Objection to form.

25                You can answer.

Roger W. Saylor                                        May 10, 2022

                                                            Page 89

1       A.    Yeah.   With -- with PHEAA or one of the

2   major student loan servicers, the answer to that is

3   unequivocally no.

4       Q.    (By Ms. Henry)  Okay.

5             And for paragraph 25, I'll have you review

6   that.

7       A.    Yes.

8       Q.    And can I ask you what information and

9   documents you relied on to support your opinion in

10  paragraph 25.

11      A.    Again, this is how student loan servicing

12  worked, the -- the transactions I worked on structured

13  over 20 years.

14      Q.    Okay.

15            And you also have a footnote in footnote 5.

16  So were there any -- so I'll ask you again were there

17  any documents or other information you relied on to

18  support your opinion in paragraph 25.

19      A.    This -- I would have confirmed this with --

20  in each of my due diligence meetings with the

21  respective servicer if they were servicing private

22  student loans that we were financing or structuring

23  into a transaction.

24      Q.    So is it your understanding that UCC

25  financing statements were filed --

Roger W. Saylor                                    May 10, 2022

 1              And then the next part of your report,

 2    paragraphs 32 through 36, falls conclusions you made

 3    to Mike Andrew's expert report, which is the expert

 4    report for the plaintiffs.  So I'm going to ask you to

 5    look at your paragraph 34, if you can review that.

 6         A.    Yes.

 7         Q.    Okay.

 8              So I'm going to ask you, do you have any

 9    expertise in metadata?

10         A.    I do not.

11         Q.    All right.

12              MS. HENRY:  Sam, can I have you also upload

13    the rebuttal report.  It was on 4/13/2022,

14    Mr. Saylor's --

15              MR. LEONARD:  Yeah.

16              MS. HENRY:  -- rebuttal report?

17              MR. LEONARD:  Now I got it.  One second.

18              Okay.  You guys should have it.

19         Q.    (By Ms. Henry)  And once you have that we're

20    going to mark that as Exhibit 5.  Then tell me when

21    you've been able to --

22                   (Inaudible.)

23              THE REPORTER:  Christina, you're cutting

24    out.

25              MS. HENRY:  Oh.  I'm sorry.  Is this better?

Roger W. Saylor                                              May 10, 2022

                                                            Page 109

 1                    C E R T I F I C A T E

 2    STATE OF WASHINGTON      )
                               )  ss.
 3    COUNTY OF KING           )

 4            I, the undersigned Washington Certified Court

 5    Reporter, hereby certify that the foregoing deposition

 6    upon oral examination of ROGER W. SAYLOR was taken

 7    before me on May 10, 2022, and transcribed under my

 8    direction;

 9            That the witness was duly sworn by me pursuant

10    to RCW 5.28.010 to testify truthfully; that the

11    transcript of the deposition is a full, true, and

12    correct transcript to the best of my ability; that I

13    am neither attorney for nor a relative or employee of

14    any of the parties to the action or any attorney or

15    counsel employed by the parties hereto, nor am I

16    financially interested in its outcome;

17            I further certify that in accordance with

18    CR 30(e), the witness was given the opportunity to

19    examine, read, and sign the deposition within 30 days

20    upon its completion and submission, unless waiver of

21    signature was indicated in the record.

22            IN WITNESS WHEREOF, I have hereunto set my hand

23    this 16th day of May, 2022.

24

25                              LAUREN G. HARTY, CCR #2674

# EXHIBIT 4



**CyberSecurity Institute**
**14751 N. Kelsey St.**
**Suite 105 / PMB 162**
**Monroe, WA. 98272-1353**

March 14, 2022

This document is to provide a record of my examination and conclusions relating to metadata values associated with multiple Excel Spreadsheets.  I have conducted a forensic process on two separate occasions to extract metadata directly from what was claimed to be original versions of Excel spreadsheets. The inspections were conducted remotely and the native spreadsheets were not examined – only the metadata from the presented spreadsheets was exported for examination. The first inspection was conducted to examine metadata associated with Excel spreadsheets produced by Transworld Systems Incorporated (TSI).  The second was conducted of Excel spreadsheets produced by the National Collegiate Student Loan Trusts (TRUST).    Over the course of our engagement my company has been paid total of $4,187.50 for analysis and consultation services.  A true and accurate copy of my CV is attached to this report as **EXHIBIT A.**  Copies of all documents I have reviewed are attached as **EXHIBIT B**.

In addition to the two remote inspections and metadata extractions performed, I have also been provided with documents which have presented context for the metadata values present in the examined spreadsheets. They are identified below.

In the course of my examination I have reviewed the following documents.  The hash values recorded for the named XLS spreadsheets which were provided for inspection are documented in the Table.  The file names and MD5 hash values in RED highlight the files examined during the two inspections which did not have hash values that matched; in other words, they represent multiple copies of files that have the same name but are not the original file.  The hash value of a file is the file's digital fingerprint; if the files are identical the hash values will match, no matter how many times the file has been copied from one location to another.  If the hashes don't match then the files are not the same regardless of having the same filename

| File Name  (X 2 inspections) | MD5 Hash | | BEGBATES / ENDBATES |
|---|---|---|---|
| | | Top =Remote inspection X 2 | |
| | | 2nd =  hash provided by TSI | |
| | | 3rd = hash provided by TRUST | |
| Bank of America Final Roster.xls | 5320519A33ADC71329718E2553D9CDEF | | Not Applicable (Direct Remote Inspection) |
| | 43EE7246CAF33BD2EA01994A2C65E376 | | |
| | 8FD9C13AB4FFE4EF69EBAD88D77AD3B9 | | |
| 2005-2 Lender Payout Summary - FMC Master.xls | 3A107A9A5402AE853E7D13A1370BCAAD | | Not Applicable (Direct Remote Inspection) |
| | 3A107A9A5402AE853E7D13A1370BCAAD | | |
| | 3A107A9A5402AE853E7D13A1370BCCAD | | |
| LENDER_ROSTERS_ALL IN.xls | 27F7C615BE31D5C98C771D30FC0D69A0 | | Not Applicable (Direct Remote Inspection) |
| | BBBFA74A0226D57190237AD94CA5A781 | | |
| | E07164E5530F8422A1603FDF2CFB7998 | | |
| BANK_ONE_RECON_SUMMARY - Revised.xls | 067FADD9F120F4665181CC78367C7FC4 | | Not Applicable (Direct Remote Inspection) |
| | D00D1851DE8BA8F40FB399AAE76624B8 | | |
| | 04A1E9DF731E4A74FC48FCB0191F186D | | |
| Bank_of_America_Post_Sale.xls | E7E636B5B759BED1F95F326C332D13A4 | | Not Applicable (Direct Remote Inspection) |
| | E7E636B5B759BED1F95F326C332D13A4 | | |
| | E7E636B5B759BED1F95F326C332D13A4 | | |
| 20074_Lender Report - Post Sale- BANK OF AMERICA.xls | F017F61DFA36163A004E1DF42135D32A | | Not Applicable (Direct Remote Inspection) |
| | F017F61DFA36163A004E1DF42135D32A | | |

CASE C18-1132 TSZ

| | F017F61DFA36163A004E1DF42135D32A | |
|---|---|---|
| TSI_0007680.pdf | Not Applicable | TSI_0007680 - TSI_0007835 |
| TSI_0007836.pdf | Not Applicable | TSI_0007836 - TSI_0013454 |
| TSI_0013455.pdf | Not Applicable | TSI_0013455 - TSI_0013993 |
| TSI_0013994.pdf | Not Applicable | TSI_0013994 - TSI_0014827 |
| TSI_0014828.pdf | Not Applicable | TSI_0014828 - TSI_0018893 |
| TSI_0018894.pdf | Not Applicable | TSI_0018894 - TSI_0022007 |
| First_Schedules metadata.xls | | Not Applicable |
| Second_Schedules metadata.xls | | Not Applicable |
| Douglass 15-40570 MFD and Affd.pdf | | Not Provided |
| Douglass 15-40571 MFD and Affd.pdf | | Not Provided |
| Hoffman 13-33591 MFD and Affd.pdf | | Not Provided |
| Kim 14-51604 MFD and Affd.pdf | | Not Provided |
| Kim 14-51605 MFD and Affd.pdf | | Not Provided |
| Kim 14-51606 MFD and Affd.pdf | | Not Provided |
| Kim 14-51607 MFD and Affd.pdf | | Not Provided |
| Kim 14-51619 MFD and Affd.pdf | | Not Provided |

## Table Summary:

The table above is somewhat complicated and has numerous entries.  To summarize and facilitate, the filenames listed in the table represent three distinct sources of information used in the analysis, as detailed below.  The middle column – titled MD5 hash – represents key evidence and is critical to understand what is represented there.  Each of the values tied to a filename (three rows per file) represents a hash value for the file.  The top row is the hash value recorded in the forensic inspection of the named spreadsheets, on two different occasions.  This value is in Black font.  The second and third rows represent the hash values for the files as provided by TSI and the TRUST, respectively.  If the hash value in the row is Red this means the hashes provided by TSI and the TRUST do not match the hash values of the actual files which were inspected.  To summarize:

- The first section – which is color coded green and red – represents the actual spreadsheets offered for inspection.  These spreadsheets were claimed by TSI / TRUST to represent original copies of the named files.  There are three entries, or rows, associated with each of these filenames.  The rows document a record of the file hashes.

- The second section contains only two files, which were provided to me by Sam Leonard.  These files are named, "*First_Schedules metadata.xls*", and "*Second_Schedules metadata.xls*."  These two files contain data which was provided by defendants.  Defendants claimed the records represent the actual metadata from original spreadsheets.  The sources of these claimed metadata values were TSI (*First_Schedules metadata*) and the TRUST (*Second_Schedules metadata*).  The 2nd and 3rd row digital fingerprint hash values in the first section of the table

_____

were taken from these files as provided by TSI and the TRUST.  As can be seen in the table entries, not only do some of the hashes provided not match the actual hash of the actual files inspected, in some cases the hashes from TSI do not even match the hashes from the TRUST for what are claimed to be the same (original) files.

To reiterate, there is a conflict even between both of the defendants; the TRUST claimed to have calculated hash values for the spreadsheets and they provided that data prior to the remote inspection.  Those hash values are different for half of the spreadsheets than the values provided prior by TSI.  That means that the files from TSI are not the same files as the files from the TRUST even though they are supposed to be copies of original spreadsheets.  At the time of inspection the TRUST provided the same files TSI had provided for metadata analysis, even on the same USB thumb drive.

- The third section of files in the table are also file copies provided to me by Sam Leonard.  These files contain information in reference to "Pool Supplement" files related to this matter.  These documents were reviewed as part of the examination to gain context about the matter in relation to the spreadsheet metadata analysis.

In addition to the summary and details referenced above this report is divided into the following sections: FINDINGS, and CONCLUSIONS AND OPINIONS.

## FINDINGS

The examination of various files and records in the matter was conducted over an extended period, as evidence was made available for analysis.  The process was conducted in two basic stages, first the metadata values claimed by TSI and the TRUST were analyzed from the provided files they made available, and second the remote inspections of actual spreadsheets was done on the two separate occasions. The Findings resulting from the first stage are specific to the claimed metadata values provided by TSI and the TRUST.  In the course of my examination I analyzed a number of metadata fields which are part of the format for Microsoft XLS spreadsheets such as those in question here.  The metadata fields maintain a record of key characteristics for the files, as recorded by the application and operating system.  These metadata include dates and times, as well as usernames which are recorded in fields such as, *Created Date*, *Last Author, Last Saved*, and *Last Printed*.  For the purposes of this report, the more notable observations and facts found in the metadata are documented as follows:

**No Created Date:** There is no Created Date recorded in the metadata for one of the files.  This is an impossible condition under normal operational circumstances.  The information provided by TSI shows the absence of a **Created** Date value for the spreadsheet named, "*Bank of America Final Roster.xls*." The spreadsheet obviously exists, has a last saved and last printed date, but no metadata record of when it was created.  The associated value filed in the metadata field, as provided by TSI, is completely blank.  Conversely, this same file metadata field provided by the TRUST for the exact same file shows a **Created** Date of July 9, 2021 at 1:07 pm.  A file that had no creation date as claimed by TSI suddenly has a recorded creation date approximately 15 years after it was saved and printed, according to the TRUST.  The absence of a created date for the TSI spreadsheet violates the rules of how an Excel .xls spreadsheet is constructed and designed and how the Operating system and application record internal metadata in an XLS file.

**Created Date Metadata:**  It cannot be overstated how unusual it is to have an older Excel spreadsheet such as these that has a blank metadata field.  It is common in some businesses to "strip out" metadata in newer Excel documents, but the format is different in newer Excel spreadsheets (.xlsx files) as opposed to the .xls files here.  The file construction mandates a field to record whatever metadata is designed to be written internally to the file based on the file type.  Each file type records different metadata field values according to the design.  An older Excel spreadsheet such as the ones in question here are designed to record the date and time from the computer system at the time it is created.  For a value to be missing from a field that is essential to the accurate and correct function of a commercial program like Excel is beyond unusual, it is inexplicable.

The equivalent analogy would be to take a calculator, enter 2 + 2, push ENTER, and have a blank screen as the result; not a Zero as a result, like it was a miscalculation, just simply blank.  You would rightfully think the calculator was broken if that happened.  A single Excel spreadsheet created by the Microsoft Office Excel program cannot realistically be simply "broken." If that were to happen then all spreadsheets created by that Excel program would also be broken, and therefore useless.  The idea that the empty Created Date field is purely a function of the computing processes involved is simply not credible.  This anomaly has yet to be explained for the document in question.

_____

CASE C18-1132 TSZ

_____

The 2021 creation date recorded for the TRUST's copy of the "*Bank of America Final Roster.xls.*" spreadsheet has also been ignored as to how the discrepancy happened.  It is important to understand that the spreadsheet files maintained by the TRUST have never been examined; the TRUST simply provided the same TSI files for inspection at the time it took place.

**Remote Inspection:**  During both of the inspections conducted to extract metadata from spreadsheets provided to plaintiff, the same USB drive was used by defendants, containing all the same files accessed during the first inspection. The process utilized by TSI and the TRUST involved presenting not only the exact same spreadsheets for examination, but also clearly used the exact same USB thumb drive to provide the files for access.  This is significant because this process prevented plaintiffs from examining whatever files were in use by the TRUST under the same filenames as the proposed Schedule files.  This frustrated the analysis and examination process.  Because the same files were used twice the hash values forensically extracted during the inspection are identical.  What is clear from a forensic standpoint is that whatever files were used to provide metadata prior to the inspection, these are not the same files as what was provided to inspect for half of the files.

**Significance of Hash Values:**  The MD5 Digest term deserves a brief explanation to understand its critical importance in identifying a file or body of data.  It is universally accepted in computing that to ensure integrity of data such as a file or document has been maintained, a calculation should be conducted on a file to create something known as a "Hash" of the data.  This hash value creates a unique identifier value for a file which can be used to ensure any copy made of an electronically stored document is exactly identical to the original, in every respect.  It is a matching hash value alone that makes an electronic copy of a file meet the "Best Evidence" mandate

Accordingly, a hash value for a file or document is considered to be a reliable "digital fingerprint" of the file and if any question arises about the matter then all that is needed for verification is to re-hash the data and compare the original and the copy; if the hash values are identical then the two files are identical.  Identical in every possible aspect, format, and content.  This concept is also universally accepted in legal proceedings as the only approved process available to ensure that a copy of ESI documents or data is identical to the original and admissible.  One of the accepted hash algorithm types used in the process described above is the "MD5 Digest" algorithm.  This MD5 hash algorithm was used by both defendants to validate the files, as it is the common method used when processing digital files.

The metadata provided by defendants included "MD5 Digest" hash values purportedly associated with each of the named original spreadsheets.  The provided hash values do not match the "picture" image substitute files produced by defendants.  Therefore it is presumed that the provided hash "digital fingerprint" values match the hash of the original files from which the image files were created.

**Pool Supplement File Dates:**  The last section of the files listed in the table at the beginning of this report list a number of pdf documents which were reviewed as part of the examination.  The purpose of this review was to gain an understanding of the dates and context recorded in these so called "Pool Supplement" documents, in relation to the available facts associated with the Excel spreadsheet evidence.   The relevant dates referenced in the language of the Pool Supplement documents was important as context.  Those dates are included in the table below.

| "Pool Supplement" Filename | Pool Supplement "effective" Date |
|---|---|
| Douglass 15-40570 MFD and Affd.pdf | September 28, 2006 |
| 2006-3 Pool Supplement - Bank of America | |
| Douglass 15-40571 MFD and Affd.pdf | September 28, 2006 |
| 2006-3 Pool Supplement - Bank of America | |
| Hoffman 13-33591 MFD and Affd.pdf | October 28, 2004 |
| Pool Supplement - Bank of America (2004-2) | |
| Kim 14-51604 MFD and Affd.pdf | June 09, 2005 |
| Pool Supplement - Bank One N.A. (2005-2) | |
| Kim 14-51605 MFD and Affd.pdf | June 09, 2005 |
| Pool Supplement - Bank One, N.A. (2005-2) - 6-9-2005 | |

_____

CASE C18-1132 TSZ

| | |
|---|---|
| Kim 14-51606 MFD and Affd.pdf | October 12, 2005 |
| Pool Supplement - Bank One N.A. (2005-3) | |
| Kim 14-51607 MFD and Affd.pdf | March 09, 2006 |
| Pool Supplement - Bank One N.A. (2006-1) | |
| Kim 14-51619 MFD and Affd.pdf | September 20, 2007 |
| Pool Supplement (DTC Only) - Bank of America (2007-4) | |

## CONCLUSIONS AND OPINIONS

Examination of the records and files provided by TSI and the TRUST pivots around several critical evidence facts.   The MD5 hash values provided by defendants prior to the remote inspection of the Excel spreadsheets were created and recorded by an automated process that is reliable and repeatable.  This automated process is clear from the output files provided by defendants, who claimed that the metadata values produced represented metadata from original Excel spreadsheets, or from identical copies of the original Excel spreadsheets.  If the copies were of an original file then the hash values would be identical no matter how many copies removed the file was from the original.

I can copy a file 100 times and the hash value for that file will never change if the file has not been changed by adding to it or deleting data from it.  I will have 100 identical copies of the file and I could hash it 100 times and the process would come out with the exact same hash value 100 times.  The fact that the hash values are not identical means that half of the spreadsheets have been modified from the original.  This can only happen when something is done to change the file.

The named spreadsheet files listed in the table which are color coded RED cannot be copies of the original file due to facts that are clearly supported by the evidence:

- The files provided for inspection do not share an identical hash digital fingerprint with whichever files defendants used to try and represent the Schedule spreadsheets.  The files have the same names as the originals but changes have been made, including some differences in how large the file is, compared to what was represented prior to the inspections.

- There are clearly attempts to hide or misrepresent the Created Date on at least one spreadsheet, with the field being completely blank according to TSI, and the Created Date being 2021 according to the TRUST.

- The metadata values for the spreadsheets overall are highly suspect in all regards due to the visible attempts to obfuscate metadata file values, along with the fact that neither TSI nor the TRUST have provided documents that match even each other's hash values for what are supposed to be identical copies of the same files much less the hash values that match the inspected documents.

- The TRUST did not provide the spreadsheets they have control over for inspection in response.

- The Pool Supplement documents have "effective" dates that are very specific and the proposed Schedule documents contain metadata dates that are clearly not what is claimed.  It was my understanding that the Excel spreadsheets were supposed to be the Schedules referenced in the Pool Supplement documents. I compared the dates of the Pool Supplement which referenced the Schedules with the Last Written dates in the Excel spreadsheets. Comparing those dates it is my opinion that the Excel spreadsheets are not the Schedules that were referenced in the Pool Supplements.

As a result of this evidence there is simply no way to trust that the provided Excel spreadsheets represent the original files in anything other than filename.  Based upon this evidence, and based upon my experience, knowledge, and training, it is my opinion that the Excel spreadsheets provided by TSI and the TRUST are not the "Schedules" referenced in the Pool Supplement documents.

The opinions expressed in this declaration are based on our training and experience and the analysis and information described in this report.   These opinions are held and expressed by me to a reasonable degree of professional certainty on a more probable than not basis.


Michael W. Andrew – Vice President
CyberSecurity Institute

Dated:   March 14th, 2022



Cases in which I have provided testimony within the preceding 4 years:
**West Star Industries v. Hackett: CV-18-1636**