Ex. 1



FILED
KING COUNTY, WASHINGTON

NOV 17 2017

SUPERIOR COURT CLERK
BY SOPHIE REED
DEPUTY

# Superior Court of Washington
# County of King

| | |
|---|---|
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3, A DELAWARE STATUTORY TRUST(S),<br><br>                                        Plaintiff(s),<br><br>and<br><br>SARAH K. DOUGLASS,<br><br>                                        Defendants(s). | **No. 17-2-10605-4 KNT**<br><br>**Order Vacating Default Judgment and Reinstating Trial Date**<br><br><br><br>**Clerk's Action Required** |

Defendant filed a Motion to Set Aside Default Order and Judgment (sub #14), which came before the undersigned judge while handling the Chief Civil calendar. The Court has considered the motion, all papers filed in support of and in opposition to the motion, and oral argument of counsel.

At this stage, Defendant has not carried her burden to "show by clear and convincing evidence that service [of process] was improper." <u>Northwick v. Long</u>, 192 Wn. App. 256, 261 (2015). But the Court finds that Defendant has carried her burden

Judge Chad Allred
King County Superior Court
MRJC 401 Fourth Ave N, Room 4B
Kent, WA 98032
206-477-1531

P&F 0204

under CR 55(c), CR 60, and the factors under <u>White v. Holm</u>, 73 Wn.2d 348, 352 (1968), which the Court has carefully considered.

Plaintiff argues that Defendant did not properly serve her motion. But at Plaintiff's request, the Court rescheduled the motion hearing to a later date; Plaintiff had actual notice of the motion and hearing; Plaintiff provided a substantive response in writing and orally; and Plaintiff has not been prejudiced.

Plaintiff also filed a Motion to Strike declarations. This motion should be granted as to the Declaration of Amanda N. Martin.

Therefore, it is ORDERED that:

1. Defendant's Motion to Set Aside Default Order and Judgment (sub #14) is granted to the extent that the Order of Default and Default Judgment (sub #8) are hereby vacated.

2. Plaintiff's Motion to Strike (sub #27) is granted to the extent that the Declaration of Amanda N. Martin (sub #18) is hereby stricken and not considered.

3. The relief requested regarding garnishment and attorney fees are denied without prejudice. If appropriate, a party may raise these issues by motion before the judge to which this case is assigned.

4. The original trial date is reinstated and the parties shall comply with the original Order Setting Civil Case Schedule.

Judge Chad Allred
King County Superior Court
MRJC 401 Fourth Ave N, Room 4B
Kent, WA 98032
206-477-1531

In addition, the Court notes that a substantially identical order is being entered today in another lawsuit between the same parties (17-2-10604-6 KNT). The Court recommends that the parties move for consolidation of the two cases.

November 17, 2017

Judge Chad Allred

P&F 0206

Ex. 2

FILED

18 AUG 01 PM 1:54

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 17-2-10604-6 KNT

## IN THE SUPERIOR COURT OF THE STATE OF
## WASHINGTON IN AND FOR THE COUNTY OF KING

NATIONAL COLLEGIATE STUDENT LOAN TRUST
2006 3

           Plaintiff/Petitioner,

   vs.

DOUGLASS

           Defendant/Respondent.

NO.  17-2-10604-6 KNT

**CLERK'S ORDER DISMISSING CASE**

(CLOD)

### I . BASIS

The Court may dismiss a case if the parties have not dismissed their case within 45 days after the scheduled trial date. Please refer to King County local civil rule 41(b)(2)(A) and RCW 4.56.120(4).

1. This case was set for trial on   04/23/2018

2. More than forty five (45) days have passed since the scheduled trial date and there is no final document(s) (judgment, decree or order) in this case.

### II. ORDER

It is ordered by the Court that this case is dismissed without prejudice. Any orders entered prior to this dismissal are still in effect.

**Within 30 days, you will receive an invoice from King County Office of Finance for failure to proceed or comply with local civil rules. Regardless of future steps, you must pay this invoice. FAQ's on non-compliance invoices may be found at: http://kingcounty.gov/courts/clerk/fees.aspx.**

Date:  8/1/2018

Presented By:
BARBARA MINER
KING COUNTY SUPERIOR COURT CLERK

Contact: Lauri Nelson ((206) 477-0808)

_____
Presiding Judge

Assigned to Department 46

**(NAMES AND ADDRESSES OF ALL PARTIES)**

CHEUNG, MATTHEW
19401 40TH AVE W STE 280
LYNNWOOD, WA 98036-5600


MARTIN, AMANDA NICOLE
214 E GALER ST STE 100
SEATTLE, WA 98102-3716

P&F 0247
222074

## Superior Court of Washington
## County of King

NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3, A DELAWARE STATUTORY TRUST(S),

Plaintiff(s),

and

SARAH K. DOUGLASS,

Defendants(s).

**No. 17-2-10604-6 KNT**

**Order Vacating Default Judgment and Reinstating Trial Date**

**Clerk's Action Required**

---

Defendant filed a Motion to Set Aside Default Order and Judgment (sub #15), which came before the undersigned judge while handling the Chief Civil calendar. The Court has considered the motion, all papers filed in support of and in opposition to the motion, and oral argument of counsel.

At this stage, Defendant has not carried her burden to "show by clear and convincing evidence that service [of process] was improper." Northwick v. Long, 192 Wn. App. 256, 261 (2015). But the Court finds that Defendant has carried her burden under CR 55(c), CR 60, and the factors under White v. Holm, 73 Wn.2d 348, 352 (1968), which the Court has carefully considered.

Judge Chad Allred
King County Superior Court
MRJC 401 Fourth Ave N, Room 4B
Kent, WA 98032
206-477-1531

Plaintiff argues that Defendant did not properly serve her motion. But at Plaintiff's request, the Court rescheduled the motion hearing to a later date; Plaintiff had actual notice of the motion and hearing; Plaintiff provided a substantive response in writing and orally; and Plaintiff has not been prejudiced.

Plaintiff also filed a Motion to Strike declarations. This motion should be granted as to the Declaration of Amanda N. Martin.

Therefore, it is ORDERED that:

1. Defendant's Motion to Set Aside Default Order and Judgment (sub #15) is granted to the extent that the Order of Default and Default Judgment (sub #8) are hereby vacated.

2. Plaintiff's Motion to Strike (sub #28) is granted to the extent that the Declaration of Amanda N. Martin (sub #19) is hereby stricken and not considered.

3. The relief requested regarding garnishment and attorney fees are denied without prejudice. If appropriate, a party may raise these issues by motion before the judge to which this case is assigned.

4. The original trial date is reinstated and the parties shall comply with the original Order Setting Civil Case Schedule.

Judge Chad Allred
King County Superior Court
MRJC 401 Fourth Ave N, Room 4B
Kent, WA 98032
206-477-1531

In addition, the Court notes that a substantially identical order is being entered today in another lawsuit between the same parties (17-2-10605-4 KNT). The Court recommends that the parties move for consolidation of the two cases.

November 17, 2017

Judge Chad Allred

Judge Chad Allred
King County Superior Court
MRJC 401 Fourth Ave N, Room 4B
Kent, WA 98032
206-477-1531

PLA000013

Ex. 3

Ex. 3.1

FILED

18 MAR 20 AM 11:01

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 17-2-10605-4 KNT

1
2
3
4
5
6
7

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

8

NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2006-3, A DELAWARE
STATUTORY TRUST

Plaintiff,

vs.

SARAH K DOUGLASS

Defendant.

No. 17-2-10605-4 KNT

PLAINTIFF NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2006-3
MOTION TO DISMISS

9
10
11
12
13
14
15
16

    The plaintiff, NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3, A

17

DELAWARE STATUTORY TRUST, by and through their attorney of record, Patenaude &

18

Felix, A.P.C., respectfully moves the court for an order dismissing this action without prejudice

19

pursuant to CR 41(a)(1)(B).

20

ARGUMENT OF LAW

21
22

    CR 41(a)(1)(B), states, "Any action shall be dismissed by the court: By plaintiff

23

before resting. Upon motion of the plaintiff at any time before plaintiff rests at the conclusion

24

of plaintiff's opening case." Where a motion for voluntary nonsuit is filed and called to the

25

attention of the trial court, the motion must be granted as a matter of right. *Greenlaw v. Renn*,

PLAINTIFF NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2006-3 MOTION TO DISMISS - 1

**PATENAUDE & FELIX, A.P.C.**
19401 40th Ave W, Ste. 280 Lynnwood, WA 98036
Tel: (425) 361-1662  Toll Free: (800) 832-7675

P&F 0186

64 Wn. App. 499, 503, 824 P.2d 1263 (1992). Additionally, prior written notice of the motion is not required. *Id*. at 504. In *Greenlaw*, the Court stated that "the fact that the motion can be made at any time before the plaintiff rests his or her case, and then must be granted by the court, indicates that prior written notice of the motion is not required." *Id*. Further, a dismissal without prejudice is not an adjudication on the merits. *Cork Insulation Sales Co. v. Torgeson*, 54 Wn. App. 702, 706, 775 P.2d 970 (1989). The Washington State Supreme Court has also held that under a voluntary dismissal, the defendant is not entitled to prevailing party attorney's fees. *Allianceone Receivables Management, Inc. v. Lewis*, 180 Wn.2d 389, 325 P.3d 904 (2014). Therefore, this Court should grant the plaintiff's Motion to Dismiss Without Prejudice pursuant to CR 41(a)(1)(B), and without an award of attorney's fees or costs to either party.

For these reasons, the plaintiff respectfully requests that this matter be dismissed without prejudice and without an award of attorney's fees or costs.

Dated this 14th day of March, 2018 at Lynnwood, WA

*/s/ Matthew Cheung*

Matthew Cheung, WSBA #43067
Attorney for Plaintiff
Patenaude & Felix, A.P.C.
19401 40th Ave W, Ste. 280
Lynnwood, WA 98036

PLAINTIFF NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2006-3 MOTION TO DISMISS - 2

**PATENAUDE & FELIX, A.P.C.**
19401 40th Ave W, Ste. 280 Lynnwood, WA 98036
Tel: (425) 361-1662  Toll Free: (800) 832-7675

P&F 0187

FILED

18 MAR 20 AM 11:41

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 17-2-10605-4 KNT

1

2

3

4

5

6

7  SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

8  NATIONAL COLLEGIATE STUDENT
   LOAN TRUST 2006-3, A DELAWARE
9  STATUTORY TRUST

No. 17-2-10605-4 KNT

10                              Plaintiff,

ORDER ON PLAINTIFF NATIONAL
COLLEGIATE STUDENT LOAN TRUST
2006-3 MOTION TO DISMISS

11        vs.

[PROPOSED]

12

13  SARAH K DOUGLASS

14                              Defendant.

15

16

17        THIS MATTER, having come before the Court, and the plaintiff National Collegiate

Student Loan Trust 2006-3, being represented by its attorney of record, Patenaude & Felix,

18  A.P.C., and requesting a voluntary dismissal without prejudice pursuant to CR 41(a)(1)(B), the

19  Court being fully advised, NOW, THEREFORE, it is hereby

20        ORDERED that this matter is dismissed without prejudice and without an award of

21  costs or attorney's fees to either party.

22        There being no just reason for delay, the Clerk is instructed to enter this order.

23  / / /

24  / / /

25

ORDER ON PLAINTIFF NATIONAL COLLEGIATE
STUDENT LOAN TRUST 2006-3 MOTION TO
DISMISS - 1

**PATENAUDE & FELIX, A.P.C.**
19401 40th Ave W, Ste. 280 Lynnwood, WA 98036
Tel: (425) 361-1662   Toll Free: (800) 832-7675

P&F 0198

ENTERED this _____ day of _____, 2018

_____
JUDGE

PATENAUDE & FELIX, A.P.C.


By: /s/ Matthew Cheung
    Matthew Cheung, WSBA #43067
    Attorney for Plaintiff

**PATENAUDE  &  FELIX,  A.P.C.**
19401  40th Ave W, Ste. 280 Lynnwood, WA 98036
Tel: (425)  361-1662   Toll Free: (800)  832-7675

P&F 0199

# King County Superior Court
## Judicial Electronic Signature Page

Case Number:    17-2-10605-4
Case Title:    NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006 3 VS DOUGLASS
Document Title:    Order

Signed by:    Julia Garratt
Date:    3/20/2018 11:41:26 AM



Judge/Commissioner: Julia Garratt

This document is signed in accordance with the provisions in GR 30.
Certificate Hash:    73E4EDB02B833CB13E2BE90DDA9A35D3969C76DA
Certificate effective date:  9/6/2013 3:33:55 PM
Certificate expiry date:  9/6/2018 3:33:55 PM
Certificate Issued by:    C=US, E=kcscefiling@kingcounty.gov, OU=KCDJA, O=KCDJA, CN="Julia Garratt:AN4IhXr44hGIFD84YYhwmw=="

Ex. 3.2

15-2-03144-7
CMDWP        34
Clerks Notice for Dismissal for Want of Prosecu
2987280

FILED

2018 APR 25 AM 7:33

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH

---

### SUPERIOR COURT OF THE STATE OF WASHINGTON
### COUNTY OF SNOHOMISH

| | |
|---|---|
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 | Case No. 15-2-03144-7 |
| VS | ☒ CLERK'S NOTICE FOR DISMISSAL FOR WANT OF PROSECUTION (CMDWP) |
| KIM ET AL | |
| | ☒ AFFIDAVIT OF MAILING |

1.   There has been no action on this case in the past twelve (12) months.

2.   Pursuant to Civil Rule 41(b)(2), this case will be closed by the Court for want of prosecution **unless within 30 days of the mailing of this notice**:

   a.   Action of record is made, or

   b.   Application is made to the court in writing and good cause shown why it should be continued as a pending Case.

3.   This notice was mailed on:

Dated:          APR 25 2018

SONYA KRASKI
Snohomish County Clerk

Dena Marley
Deputy Clerk

PLA_001980

Ex. 3.3

FILED

2018 APR 25 AM 7:38

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH

## SUPERIOR COURT OF THE STATE OF WASHINGTON
## COUNTY OF SNOHOMISH

NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2005-2

VS

KIM ET AL

Case No. 15-2-03146-3

☒ CLERK'S NOTICE FOR DISMISSAL
FOR WANT OF PROSECUTION
(CMDWP)

☒ AFFIDAVIT OF MAILING

1. There has been no action on this case in the past twelve (12) months.

2. Pursuant to Civil Rule 41(b)(2), this case will be closed by the Court for want of prosecution **unless within 30 days of the mailing of this notice**:

   a. Action of record is made, or

   b. Application is made to the court in writing and good cause shown why it should be continued as a pending Case.

3. This notice was mailed on:

Dated:

APR 2 5 2018

SONYA KRASKI,
Snohomish County Clerk

Dena Marley
Deputy Clerk

PLA_001982

Ex. 3.4

15-2-03144-7
CMDWP          34
Clerks Notice for Dismissal for Want of Prosecu
2987280

FILED

2018 APR 25 AM 7: 33

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH

## SUPERIOR COURT OF THE STATE OF WASHINGTON
## COUNTY OF SNOHOMISH

| | |
|---|---|
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 <br><br> VS <br><br> KIM ET AL | Case No. 15-2-03144-7 <br><br> ☒ CLERK'S NOTICE FOR DISMISSAL FOR WANT OF PROSECUTION (CMDWP) <br><br> ☒ AFFIDAVIT OF MAILING |

1.  There has been no action on this case in the past twelve (12) months.

2.  Pursuant to Civil Rule 41(b)(2), this case will be closed by the Court for want of prosecution **unless within 30 days of the mailing of this notice**:

    a.  Action of record is made, or

    b.  Application is made to the court in writing and good cause shown why it should be continued as a pending Case.

3.  This notice was mailed on:

Dated:          APR 25 2018

SONYA KRASKI
Snohomish County Clerk

Dena Marley
Deputy Clerk

PLA_001982

Ex. 3.5

FILED

2018 APR 25 AM 7: 38

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH

---

| SUPERIOR COURT OF THE STATE OF WASHINGTON |
|---|
| COUNTY OF SNOHOMISH |

| | |
|---|---|
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 | Case No. 15-2-03146-3 |
| VS | ☒ CLERK'S NOTICE FOR DISMISSAL FOR WANT OF PROSECUTION (CMDWP) |
| KIM ET AL | ☒ AFFIDAVIT OF MAILING |

1.  There has been no action on this case in the past twelve (12) months.

2.  Pursuant to Civil Rule 41(b)(2), this case will be closed by the Court for want of prosecution **unless within 30 days of the mailing of this notice**:

    a.  Action of record is made, or

    b.  Application is made to the court in writing and good cause shown why it should be continued as a pending Case.

3.  This notice was mailed on:

Dated:

APR 2 5 2018

SONYA KRASKI,
Snohomish County Clerk

Dena Marley
Deputy Clerk

PLA_001984

Ex. 3.6

15-2-03146-3
CLOD          27
Clerks Order of Dismissal
3410393

FILED

2018 JUL 10 AM 9: 37

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH

FILED

2018 JUN 29 AM 8: 16

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH

## SUPERIOR COURT OF THE STATE OF WASHINGTON
## COUNTY OF SNOHOMISH

| | |
|---|---|
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 | Case No. 15-2-03146-3 |
| VS | ORDER OF DISMISSAL FOR WANT OF PROSECUTION (CLOD) |
| KIM ET AL | |

### I. BASIS

Pursuant to Civil Rule 41(B)(2), no action of record has been taken on this case in the past twelve months.

### II. FINDINGS

The court finds:

2.1     Notice of Pending Clerk's Dismissal was mailed to the parties of record at their last known addresses not less than thirty days prior to the date of this order.

2.2     No good cause has been shown why a dismissal should not be entered.

### III. ORDER

IT IS ORDERED that this matter be dismissed without prejudice.

Dated: 7/10/18

DATED: _____JUN 29 2018_____

~~Jacalyn D Brudvik~~
COURT COMMISSIONER

ORIGINAL

PRESENTED BY: DENA MARLEY

received in Case Management 7/10

PLA_001984

PLA_001984

Ex. 3.7

15-2-04014-4
CMCWP          31
Clerks Motion for Closure
2987517

FILED

2018 APR 25 AM 7: 56

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH

## SUPERIOR COURT OF THE STATE OF WASHINGTON
## COUNTY OF SNOHOMISH

| | |
|---|---|
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4 | Case No. 15-2-04014-4 |
| VS | ☒ CLERK'S NOTICE FOR DISMISSAL FOR WANT OF PROSECUTION (CMDWP) |
| KIM ET AL | ☒ AFFIDAVIT OF MAILING |

1. There has been no action on this case in the past twelve (12) months.

2. Pursuant to Civil Rule 41(b)(2), this case will be closed by the Court for want of prosecution **unless within 30 days of the mailing of this notice**:

   a. Action of record is made, or

   b. Application is made to the court in writing and good cause shown why it should be continued as a pending Case.

3. This notice was mailed on:

Dated:          APR 2 5 2018

SONYA KRASKI,
Snohomish County Clerk

Dena Marley
Deputy Clerk

PLA_001985

PLA_001985

Ex. 3.8

FILED

2018 JUL 10 AM 9: 37

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH

FILED

2018 JUN 29 AM 8: 16

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH

15-2-03146-3
CLOD     27
Clerks Order of Dismissal
3410393

## SUPERIOR COURT OF THE STATE OF WASHINGTON
## COUNTY OF SNOHOMISH

| | |
|---|---|
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2 | Case No. 15-2-03146-3 |
| VS | ORDER OF DISMISSAL FOR WANT OF PROSECUTION (CLOD) |
| KIM ET AL | |

### I. BASIS

Pursuant to Civil Rule 41(B)(2), no action of record has been taken on this case in the past twelve months.

### II. FINDINGS

The court finds:

2.1     Notice of Pending Clerk's Dismissal was mailed to the parties of record at their last known addresses not less than thirty days prior to the date of this order.

2.2     No good cause has been shown why a dismissal should not be entered.

### III. ORDER

IT IS ORDERED that this matter be dismissed without prejudice.

Dated : 7/10/18

DATED: ___JUN 29 2018___

Jacalyn D Brudvik
COURT COMMISSIONER

ORIGINAL

PRESENTED BY: DENA MARLEY

Received in Case Management 7/10

PLA_001986

PLA_001984

Ex. 3.9

15-2-04015-2
CMDWP      25
Clerks Notice for Dismissal for Want of Prosecu
2987592

## SUPERIOR COURT OF THE STATE OF WASHINGTON
## COUNTY OF SNOHOMISH

NATIONAL COLLEGIATE STUDENT
LOAN TRUST 2006-1

VS

KIM ET AL

Case No. 15-2-04015-2

☒ CLERK'S NOTICE FOR DISMISSAL
FOR WANT OF PROSECUTION
(CMDWP)

☒ AFFIDAVIT OF MAILING

1. There has been no action on this case in the past twelve (12) months.

2. Pursuant to Civil Rule 41(b)(2), this case will be closed by the Court for want of prosecution **unless within 30 days of the mailing of this notice**:

   a. Action of record is made, or

   b. Application is made to the court in writing and good cause shown why it should be continued as a pending Case.

3. This notice was mailed on:

Dated:        APR 25 2018

SONYA KRASKI
Snohomish County Clerk

Dena Marley
Deputy Clerk

PLA_001987

PLA_001991

Ex. 3.10

15 – 2 – 04016 – 1
CMDWP          28
Clerks Notice for Dismissal for Want of Prosecu
2987683

FILED

2018 APR 25 AM 8:08

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH

---

## SUPERIOR COURT OF THE STATE OF WASHINGTON
## COUNTY OF SNOHOMISH

| | |
|---|---|
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-3 <br><br> VS <br><br> KIM ET AL | Case No. 15-2-04016-1 <br><br> ☒ CLERK'S NOTICE FOR DISMISSAL FOR WANT OF PROSECUTION (CMDWP) <br><br> ☒ AFFIDAVIT OF MAILING |

1.  There has been no action on this case in the past twelve (12) months.

2.  Pursuant to Civil Rule 41(b)(2), this case will be closed by the Court for want of prosecution **unless within 30 days of the mailing of this notice**:

    a.  Action of record is made, or

    b.  Application is made to the court in writing and good cause shown why it should be continued as a pending Case.

3.  This notice was mailed on:

Dated:
        APR 2 5 2018

SONYA KRASKI,
Snohomish County Clerk

Dena Marley
Deputy Clerk

PLA_001989

PLA_001993

Ex. 3.11

15-2-04465-4
CMDWP          8
Clerks Notice for Dismissal for Want of Prosecu
2987246

FILED

2018 APR 25 AM 7:22

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH

| SUPERIOR COURT OF THE STATE OF WASHINGTON<br>COUNTY OF SNOHOMISH |
|---|

| | |
|---|---|
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3 | Case No. 15-2-04465-4 |
| VS | ☒ CLERK'S NOTICE FOR DISMISSAL FOR WANT OF PROSECUTION (CMDWP) |
| KIM ET AL | ☒ AFFIDAVIT OF MAILING |

1.  There has been no action on this case in the past twelve (12) months.

2.  Pursuant to Civil Rule 41(b)(2), this case will be closed by the Court for want of prosecution **unless within 30 days of the mailing of this notice**:

    a.  Action of record is made, or

    b.  Application is made to the court in writing and good cause shown why it should be continued as a pending Case.

3.  This notice was mailed on:

Dated:

APR 2 5 2018

SONYA KRASKI,
Snohomish County Clerk

Dena Marley
Deputy Clerk

PLA_001991

PLA_001995

Ex. 4

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE NATIONAL COLLEGIATE STUDENT LOAN MASTER TRUST, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2003-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-3, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-2, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3, THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4,<br><br>                    Plaintiffs,<br><br>v.<br><br>PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY D/B/A AMERICAN EDUCATIONAL SERVICES,<br>                    Defendant. | : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : | C.A. No.  12111-VCS |

**PLAINTIFFS' OPENING BRIEF IN SUPPORT OF THEIR
EMERGENCY MOTION FOR AN ORDER COMPELLING DEFENDANT
TO FACILITATE THE CONTINUATION OF THE EMERGENCY AUDIT**

Dated: May 2, 2016                    McCARTER & ENGLISH, LLP
                                      Michael P. Kelly (#2295)
                                      Daniel M. Silver (#4758)
                                      Daniel M. Brown (#4688)
                                      Renaissance Centre
                                      405 N. King Street, 8th Floor
                                      Wilmington, Delaware 19801
                                      Tel.: (302) 984-6300
                                      Fax: (302) 984-6399

                                      *Attorneys for Plaintiffs*


*Of Counsel*:

*James A. Kosch*
McCARTER & ENGLISH, LLP
Four Gateway Center
Newark, New Jersey 07102
Tel.: (973) 622-4444
Fax: (973) 624-7070

**TABLE OF CONTENTS**

Page

INTRODUCTION AND NATURE AND STAGE OF THE
PROCEEDINGS ...................................................................................1

STATEMENT OF FACTS ....................................................................3

ARGUMENT .........................................................................................7

I.  LEGAL STANDARDS.................................................................7

II.  PLAINTIFFS ARE ENTITLED TO RELIEF ............................8

A.  PHEAA Breached the Agreements ....................................8

B.  PHEAA's Breaches Are Subjecting Plaintiffs To Ongoing,
Irreparable Harm Warranting Immediate Relief .................12

C.  The Balance of the Equities Favors Permitting The Trusts
To Resume The Emergency Audit ......................................16

D.  The Owners of Trusts Must Direct the Emergency Audit. .................17

CONCLUSION .....................................................................................18

ME1 22438636v.1

PLA_004304

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc.,*
 222 F.3d 132 (3d Cir. 2000) ..................................................................................12

**STATE CASES**

*Aviva Life & Annuity Co. v. Am. Gen. Life Ins. Co.*,
 2014 WL 1677798 (Del. Ch. Apr. 29, 2014).........................................................8

*C&J Energy Servs., Inc. v. City of Miami Gen. Employees*,
 107 A.3d 1049.........................................................................................................8

*Cantor Fitzgerald, L.P. v. Cantor*,
 724 A.2d 571 (Del. Ch. 1998) .............................................................................11

*Cty. of York Employees Ret. Plan v. Merrill Lynch & Co.*,
 2008 WL 4824053 (Del. Ch. Oct. 28, 2008) ..............................................12, 17

*Eastman Kodak Co. v. Cetus Corp.,*
 1991 WL 255936 (Del. Ch. Dec. 3, 1991)...........................................................14

*Equitable Trust Co. v. Gallagher*,
 102 A.2d 538 (1954)..............................................................................................13

*Harmony Mill Ltd. P'ship v. Magness*,
 1984 WL 21898 (Del. Ch. Feb. 14, 1984)............................................................17

*Horizon Pers. Commc'ns, Inc. v. Sprint Corp.,*
 2006 WL 2337592 (Del. Ch. Aug. 4, 2006) ........................................................15

*Lehman Bros. Holdings Inc. v. Spanish Broad Sys., Inc.*,
 2014 WL 718430 (Del. Ch. Feb. 25, 2014) ...........................................................7

*Monroe Park v. Metro. Life Ins. Co.*,
 457 A.2d 734 (Del. 1983) ......................................................................................7

*Reserves Dev. LLC v. Severn Sav. Bank, FSB*,
 961 A.2d 521 (Del. 2008) ......................................................................................7

ME1 22438636v.1

PLA_004305

*Rhone-Poulenc S.A. v. Morton-Norwich Products, Inc*,
    1982 WL 8787 (Del. Ch. Apr. 1, 1982)..............................................................17

*Szambelak v. Tsipouras*,
    2007 WL 4179315 (Del. Ch. Nov. 19, 2007) ....................................................16

*In re Topps Co. S'holders Litig.*,
    926 A.2d 58 (Del.Ch. 2007) ..............................................................................13

**RULES**

Ct. Ch. R. 56(c)....................................................................................................................7

ME1 22438636v.1

PLA_004306

## INTRODUCTION AND NATURE AND STAGE OF THE PROCEEDINGS[1]

Plaintiffs are fifteen (15) separate Delaware statutory trusts (the "Plaintiffs" or the "Trusts") which own student loans purchased from banks or other financial institutions. Pursuant to a series of "Governing Agreements," Defendant Pennsylvania Higher Education Assistance Agency ("PHEAA") is obligated to service those loans for the benefit of the Trusts by, *inter alia*, maintaining the loan documents, collecting payments, communicating directly with borrowers and taking other actions necessary to preserve the value of the loans. This case arises from PHEAA's systematic and repeated failures to service the student loans owned by the Trusts. As detailed in Plaintiffs' Verified Complaint (Dkt. No. 1), these failures – including the loss of the original loan documents necessary to collect on the delinquent loans – have already rendered as much as $5 billion in loans uncollectable. Further, PHEAA refuses to communicate with the Trusts' Owners, thereby preventing Plaintiffs from both determining the full scope of PHEAA's misconduct and staunching the bleeding.

Although PHEAA's list of misdeeds is long, the instant motion seeks two very narrow forms of relief on an expedited basis: (1) an Order directing PHEAA to permit the Trusts, through VCG Securities LLC ("Owner's Managing Agent"), to resume and complete the Accelerated and Emergency Audit referenced at ¶ 26

---

[1] Capitalized terms not defined herein shall have the same meaning set forth in the Verified Complaint.

ME1 22438636v.1

PLA_004307

of the Verified Complaint (the "Emergency Audit") – a contractually-mandated audit that PHEAA initially permitted but unilaterally shut down before completion; and (2) an Order directing PHEAA to recognize Owner's Managing Agent as a representative of the Trusts and to communicate to and with Owner's Managing Agent. As explained in more detail below, the Trusts are entitled to the relief sought herein, and PHEAA has no credible justification for thwarting the continuation of the Emergency Audit or refusing to recognize Owner's Managing Agent as a representative of the Trusts.

Thus far, PHEAA's sole excuse for refusing to communicate with the Owner's Managing Agent is its stated belief that the Managing Agent lacks the authority to speak for the Trusts and that only the Owner Trustee has that authority. That begs the question of why PHEAA routinely spoke with the Managing Agent on Trust affairs before the audit revealed PHEAA's misconduct. But it is a question that need not be answered. Wilmington Trust Company ("Wilmington Trust"), as the Owner Trustee for each of the Trusts, and in its capacity as Owner Trustee, specifically instructed PHEAA that it is "permitted to communicate directly with and to [Owner's Managing Agent] . . . concerning any and all matters applicable to the Trusts." Uderitz Aff., Exhibit A.[2] Nonetheless, as recently as

---

[2] The Affidavit of Donald Uderitz (the "Underitz Aff.") was filed contemporaneously herewith.

ME1 22438636v.1

PLA_004308

April 28, 2016, PHEAA has refused to communicate directly with Owner's Managing Agent.

Likewise, it is now clear that PHEAA will not permit the Trusts to complete the Emergency Audit. Because Plaintiffs have an unequivocal right to resume the audit of PHEAA's books and records under Article 7.10 of the Agreements, and because Plaintiffs need to complete the Emergency Audit to get their arms around the current status of PHEAA's "servicing" of Plaintiffs' student loan portfolio to determine the best path forward, they respectfully request the Court's assistance in enforcing this contractual right.

## STATEMENT OF FACTS

Plaintiffs are each Delaware statutory trusts with Wilmington Trust as their Owner Trustee. Verified Complaint ¶ 3. PHEAA is a public corporation, which describes itself as a governmental instrumentality, organized under the laws of the Commonwealth of Pennsylvania. *Id*. at ¶ 4.

Plaintiffs and PHEAA are parties to the Governing Agreements, which include: (a) an Amended And Restated Private Student Loan Servicing Agreement Between Pennsylvania Higher Education Assistance-Agency And The First Marblehead Corporation ("FMC") dated as of September 28, 2006, as purportedly amended from time to time (collectively, with all purported amendments, the "Master Servicing Agreement" or "MSA"), to which Plaintiffs are the assignees of

ME1 22438636v.1

PLA_004309

the First Marblehead Corporation pursuant to a series of Servicer Consent Letters (the "Servicer Consent Letters") between FMC, Plaintiffs and Defendant; and (b) a series of Custodial Agreements entered into among Plaintiffs, U.S. Bank National Association, in its capacity as an indenture trustee, and PHEAA. *Id*. at ¶ 1.

Section 7 of the MSA requires PHEAA to allow for and participate in various audits at the request of the Trusts to assure compliance with the MSA. *Id*. at ¶ 21. In particular, under Section 7.10 of the MSA, in the event that Plaintiffs have the right to terminate under Section 14 of the MSA, "[Plaintiffs] shall have the right to perform or cause to be performed any audit, examination or inspection" described in the MSA "without any limitations or requirements as to notice, frequency, duration, business interruption, or other such limitation or requirement for the benefit of [PHEAA]." Plaintiffs' Emergency Audit right under Section 7 became especially relevant when Plaintiffs discovered that PHEAA was unable to collect on the loans due to its failure to maintain custody of loan documents. *See* Uderitz Aff. ¶ 2.

After PHEAA repeatedly failed to cooperate with the Trusts by providing requested information and defaulted on various reporting obligations, the Trusts invoked the Emergency Audit provision of the MSA. Verified Complaint at ¶ 26; Uderitz Aff. ¶¶ 14-15. PHEAA, however, did not fully cooperate and terminated

ME1 22438636v.1

PLA_004310

the on-site Emergency Audit after less than two days.[3]  Verified Complaint at ¶ 27.

The preliminary results of the Emergency Audit showed pervasive and material

breaches of the servicing requirements of the Governing Agreements.  *Id*. at ¶ 29;

*see also id*. at ¶¶ 30-42.  Among other breaches, the partial audit confirmed that

PHEAA failed to: obtain and/or maintain custody of necessary loan documents and

proof of transfer of the loans from the loan originator to the Trusts; provide secure

and private access to electronic systems services student loans; and notify the

Trusts of borrower and government complaints about improper servicing of student

loans and take corrective action.  Uderitz Aff. ¶ 2.  After Plaintiffs confirmed that

PHEAA did not possess the original student loans and assignments, Verified

Complaint at ¶ 2, and were unable to secure a meeting with PHEAA, *id*. at ¶¶ 30-

42, they commenced this action, hopeful that the specter of litigation would bring

PHEAA to its senses.

It appeared briefly that the Trusts' hope would be realized, but Plaintiffs

ultimately had no choice but to commence this action.  Just days before PHEAA

filed its partial Motion to Dismiss, PHEAA sent notice to Wilmington Trust that

PHEAA wished to conduct a quarterly operational review meeting pursuant to

Article 4.09 of the Agreements.  Uderitz Aff. ¶ 22-23, Exhibit B.  The Notice was

---

[3] Tellingly, PHEAA allowed – in recognition of Owner's Managing Agent's
authority to act on behalf of Plainitffs – Owner's Managing Agent personnel to
participate in the Emergency Audit.  Uderitz Aff ¶ 19.

PLA_004311

signed by Kenneth Shutter, PHEAA's Vice President of Client Relations and Enterprise Quality Assurance. *Id*. at Exhibit B. Wilmington Trust responded by email on April 19, 2016, advising PHEAA that it had forwarded the invitation to the Owners and that the Owners would respond directly. *Id*. at ¶ 23, Exhibit C.[4] On the same date, Don Uteritz responded to Mr. Shutter's email, accepted the invitation for a meeting, suggested that the operational teams meet on April 28 and 29, and proposed an agenda that included resumption of the audit. *Id*. at ¶ 25, Exhibit D. Mr. Uderitz specifically asked PHEAA to confirm the dates of the meeting. *Id*.

Having received no response from Mr. Shutter or anyone else at PHEAA, Mr. Uderitz sent a follow-up email to Mr. Shutter on April 21, one week before their proposed meeting date, asking him again to confirm the meeting. *Id*. at ¶ 26, Exhibit D. PHEAA did not reply to the April 21 email. *Id*. at ¶ 27. On April 26, 2016, PHEAA sent a letter to Wilmington Trust asking it, once again, to confirm Uderitz's authority to act for the Trusts. *Id*. at ¶ 28, Exhibit G. Uderitz immediately sent a reply email to PHEAA confirming his authority and attaching

---

[4] PHEAA had previously dealt with Don Uderitz and others at VGC directly, and in fact, had been specifically instructed by Wilmington Trust that it could do so. *See* Uderitz Aff at Exhibit A ("PHEAA is hereby permitted to communicate directly with and to [Owner's Managing Agent], the sole agent for NC Residuals Owners Trust, the sole member of the Owner, by whatever means designated by the Owner's, Member's Agent from time to time, concerning any and all matters applicable to the Trusts, the PHEAA Agreement or any other related document or agreement.").

ME1 22438636v.1

PLA_004312

prior correspondence on the issue. *Id*. at ¶ 29, Exhibit H. In parallel, on April 28, 2016, counsel for PHEAA confirmed to counsel for the Trusts that PHEAA was not willing to discuss resuming the Emergency Audit.

As more fully forth below, Plaintiffs respectfully submit that they are entitled to an order compelling PHEAA to recognize Owner's Managing Agent's authority to act on behalf of the Trusts and compelling PHEAA to facilitate the resumption and completion of the Emergency Audit.

## ARGUMENT

## I.    LEGAL STANDARDS

"The Court of Chancery has broad discretion to fashion equitable relief." *Reserves Dev. LLC v. Severn Sav. Bank, FSB*, 961 A.2d 521, 525 (Del. 2008). Here, although Plaintiffs frame this motion as one for partial summary judgment, or alternatively a preliminary injunction, those frameworks are not to the exclusion of the exercise of this Court's equitable powers; indeed, "equity regards substance rather than form." *Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 737 (Del. 1983).

Court of Chancery Rule 56(c) provides the standard of review for summary judgment motions. Under the Rule, "[a] motion for summary judgment will be granted where there exist no genuine issues of material fact and the moving party has demonstrated entitlement to judgment as a matter of law." *Lehman Bros.*

ME1 22438636v.1

PLA_004313

*Holdings Inc. v. Spanish Broad Sys., Inc.*, 2014 WL 718430, at *6 (Del. Ch. Feb. 25, 2014).

"To obtain a preliminary injunction, the plaintiffs must demonstrate: (1) a reasonable probability of success on the merits; (2) that they will suffer irreparable injury without an injunction; and (3) that their harm without an injunction outweighs the harm to the defendants that will result from the injunction." *C&J Energy Servs., Inc. v. City of Miami Gen. Employees*, 107 A.3d 1049, 1066 (Del. 2014).

## II.    PLAINTIFFS ARE ENTITLED TO RELIEF

Plaintiffs face irreparable harm in the wake of PHEAA's has breach of the Agreements.  Regardless of the procedural posture, Plaintiffs are entitled to an order compelling PHEAA to acknowledge the Trusts' Owners and allowing the Trusts to resume the Emergency Audit.

### A.    PHEAA Breached The Agreements.

"Under Delaware law, to establish a claim for breach of contract, a plaintiff must demonstrate three elements: 'first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff.'" *Aviva Life & Annuity Co. v. Am. Gen. Life Ins. Co.*, 2014 WL 1677798, at *13 n.112 (Del. Ch. Apr. 29, 2014)

ME1 22438636v.1

PLA_004314

(quoting *Univ. Enter. Group, L.P. v. Duncan Petroleum Corp.*, 2013 WL 3353743, at *17 (Del. Ch. July 1, 2013)).

The undisputed facts establish these three elements. First, the Governing Agreements constitute enforceable agreements under which PHEAA had contractual obligations to provide specified services as both servicer and custodian. *See generally* Verified Complaint. PHEAA cannot dispute this fact.

Second, as detailed in the Verified Complaint and Uderitz Affidavit, PHEAA has defaulted on numerous obligations. First, after conceding Plaintiffs' right to conduct the Emergency Audit, PHEAA abruptly terminated the audit when unfavorable facts began to be uncovered. Section 7.10 of the MSA provides Plaintiffs with a right to conduct an Emergency Audit "without any limitations or requirements as to notice, frequency, [or] duration . . . ." PHEAA breached the MSA the moment it refused to proceed with the Emergency Audit, and it has remained in breach to this day as a result of its continued failure to cooperate with Plaintiffs.

Moreover, the findings of the partial audit establish that PHEAA also violated, *inter alia*, (a) Section 4.04 of the MSA by not possessing assignments of student loans to the Trusts by the originating lender, Verified Complaint, ¶ 31; (b) Section 4.01 of the MSA (which incorporates by reference the Servicing Guidelines) by using an inadequate system for monitoring payments, loan

-9-

PLA_004315

delinquencies and cure payments, *id. at* ¶ 32; (c) Section 13 of the MSA by failing to notify borrowers that their student loans had been assigned to the Trusts, *id.* at ¶ 34; and (d) Section 4.04 of the MSA by transferring the student loans to third parties without prior approval of the Trusts despite representations that it had not done so, *id.* at ¶ 36. Additional material breaches of the MSA by PHEAA are set forth at length in the Verified Complaint. *See id.* ¶¶ 37-42.

Third, Plaintiffs have been, and continue to be, substantially damaged by PHEAA's conduct. Plaintiffs face irreparable harm. *See infra* Argument, § II.B. PHEAA's breach of the Emergency Audit provision prevents Plaintiffs from learning the full extent of the damages caused thus far, and from enforcing any of their rights under the Governing Agreements. Additionally, damages to Plaintiffs resulting from PHEAA's breach of any other provision of the Governing Agreement are closely tied to PHEAA's termination of the Emergency Audit. By denying Plaintiffs access to critical information regarding PHEAA's performance, PHEAA's underlying breaches are perpetuated, resulting in additional damages to Plaintiffs.

PHEAA's other material breaches of the MSA adversely affect the value and collectability of each student loan and the value of the Trusts. *Id.* at ¶ 43. Based on information obtained from the Emergency Audit that PHEAA prematurely terminated, Plaintiffs believe that between $1 billion and $5 billion in loan value

ME1 22438636v.1

PLA_004316

has been impaired as a result of PHEAA's inadequate servicing of the student loans. Uderitz Aff. ¶ 8. Moreover, by failing to maintain control of the persons and entities having access to its system, not obtaining the Trusts' approval before providing access to those persons and entities, and using its unsecure system to transfer student loans to third parties not approved by the Trusts, PHEAA has risked disclosure, if not improperly disclosed, the Trusts' confidential information. *See* Verified Complaint ¶¶ 47-48. Finally, if the improper collection methods associated with PHEAA's breaches are systemic, this will irreparably tarnish the Trusts' reputation in the marketplace.

Thus, Plaintiffs have established a *prima facie* breach of the Governing Agreements. However, even if PHEAA disputes it is in breach, Plaintiffs have at least made a sufficient showing to obtain preliminary relief, particularly with respect to the Emergency Audit. "The applicable standard on a motion for preliminary injunction falls well short of that which would be required to secure final relief following trial, since it explicitly requires only that the record establish a reasonable probability that this greater showing will ultimately be made." *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998) (quotations and citation omitted).

ME1 22438636v.1

PLA_004317

### B. PHEAA's Breaches Are Subjecting Plaintiffs To Ongoing, Irreparable Harm Warranting Immediate Relief

The damages described above – primarily those caused by PHEAA's termination of the Emergency Audit, but also including the substantial impairment in the value and collectability of the loans that PHEAA is "servicing," the disclosure of confidential information, and the Trusts' loss of goodwill – constitute irreparable harm to the Plaintiffs and entitle them to preliminary injunctive relief.

To establish irreparable harm, "[a] party must plead facts suggesting that an award of money damages could not fully and adequately compensate the alleged harms. *Cty. of York Employees Ret. Plan v. Merrill Lynch & Co.*, 2008 WL 4824053, at *7 (Del. Ch. Oct. 28, 2008). Critically, Delaware courts will find irreparable harm when damages are difficult to calculate and other uncertainties, *such as collectability*, exist. *Id.* at *8; *see also Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc.,* 222 F.3d 132, 140-41 (3d Cir. 2000) ("[W]e note that Appellants suffered irreparable injury when the trust was depleted and payment was not readily forthcoming or available.").

As discussed above, Plaintiffs have suffered immediate damages due to PHEAA's termination of the Emergency Audit and its continued refusal to cooperate. The Emergency Audit right, which was triggered by PHEAA's default, was intended to give Plaintiffs an opportunity to collect information to protect their substantial investment. By disallowing Plaintiffs from exercising that right,

ME1 22438636v.1

PLA_004318

PHEAA is precluding Plaintiffs' ability to make any informed decision with regard to its investment. Therefore, irreparable harm exists. *See, e.g., In re Topps Co. S'holders Litig.*, 926 A.2d 58 (Del.Ch. 2007) ("The injunction that issues is warranted to ensure that the Topps stockholders are not irreparably injured by the loss of an opportunity to make an informed decision and to avail themselves of a higher-priced offer that they might find more attractive.").

Injunctive relief is also warranted at this juncture because of irreparable harm suffered by Plaintiffs as a result of PHEAA's other breaches. A review of current, publically-available financial statements published by PHEAA suggests that PHEAA does not have the financial ability to pay money damages for the losses in value its breaches have caused. Uderitz Aff. ¶ 9. Plaintiffs' findings of substantial loss in value of the student loans during the two-day Emergency Audit support this conclusion. *See id.* at ¶ 8. Given the magnitude of PHEAA's *ongoing* breaches and the collective effect of the same in impairing the value of billions of dollars in of student loans, an award of money damages at the conclusion of this litigation will be inadequate to compensate Plaintiffs. *See Equitable Trust Co. v. Gallagher*, 102 A.2d 538, 546 (1954) ("[T]he remedy of specific performance is designed to take care of situations where the assessment of money damages is impracticable or somehow fails to do justice.").

ME1 22438636v.1

PLA_004319

Notwithstanding the potential inadequacy of a money judgment, PHEAA's breaches have caused, and continue to cause, Plaintiffs irreparable harm for two additional reasons. First, as noted above, PHEAA's failure to maintain strict control of the persons and entities having access to its system has compromised the Trusts' confidential information. *See* Verified Complaint ¶ 47. It is well settled that "disclosure of . . . confidential information will, in appropriate cases, support a finding of irreparable harm." *Eastman Kodak Co. v. Cetus Corp.,* 1991 WL 255936, at *6 (Del. Ch. Dec. 3, 1991). Considering the sensitive nature of the confidential information at issue, a finding of irreparable harm is "appropriate" in this case. Such confidential information includes, but is not limited to, countless individuals' personal and financial information. While Plaintiffs are unaware of the full extent of improper disclosures, Plaintiffs confirmed during the Emergency Audit that PHEAA transferred student loans to third parties without prior approval of the Trusts in violation of Section 4.04 of the MSA. Certainly, these improper disclosures have the potential to expose Plaintiffs to liability for associated claims made by borrowers relating to unauthorized use of such information. Resuming the Emergency Audit is necessary here to evaluate the extent of confidential information disclosed to date, and determine any steps necessary to prevent additional improper disclosures going forward.

PLA_004320

Second, the potential decline in Plaintiffs' goodwill in the marketplace due to PHEAA's breaches provides an independent basis for emergent relief. *See Horizon Pers. Commc'ns, Inc. v. Sprint Corp.,* 2006 WL 2337592, at *24 (Del. Ch. Aug. 4, 2006) ("The loss of control of reputation, loss of trade, and loss of goodwill constitute irreparable injury.") (internal quotations omitted). PHEAA's lack of compliance with the Servicing Guidelines by, *inter alia*, failing to send delinquency notifications to borrowers and co-borrowers has resulted in a decline in Plaintiffs' reputation for excellent customer service. *See, e.g.,* Verified Complaint ¶¶ 32, 36, and 41. Immediate intervention by this Court is respectfully requested to prevent PHEAA from subjecting Plaintiffs to further, irreversible reputational damage.

In view of the foregoing, Plaintiffs have established sufficient ongoing, irreparable harm to warrant partial summary judgment or preliminary equitable relief.[5]

---

[5] It bears noting here that completion of the Emergency Audit will help streamline and shape this litigation. Rather than shooting from the hip and seeking more complete preliminary or expedited relief, Plaintiffs first seek to use the "tools at hand" to better understand the extent and depths of PHEAA's breaches. Plaintiffs will then use this information to decide on a logical path forward (*e.g.*, replacing PHEAA as their loan servicer altogether, restructuring their relationship with PHEAA, seeking additional relief in the form of a preliminary injunction, and/or seeking the appointment of a custodian). In any event, completion of the Emergency Audit will only help pave the way for the efficient resolution of this matter.

ME1 22438636v.1

PLA_004321

### C. The Balance of the Equities Favors Permitting The Trusts To Resume The Emergency Audit

"In order to be entitled to [specific performance], the party seeking specific performance of a contract must establish, by clear and convincing evidence, (1) that a valid and specifically enforceable contract exists between the parties [established above]; (2) that the party seeking specific performance was ready, willing, and able to perform under the terms of the contract [the Trusts have performed and continue to this day to perform under the Governing Agreements]; and (3) that the balance of the equities favors an order of specific performance." *Szambelak v. Tsipouras*, 2007 WL 4179315, at *4 (Del. Ch. Nov. 19, 2007) (citations omitted). Whether in the form of partial summary judgment and specific performance or preliminary equitable relief, the balance of equities and harms clearly favor granting Plaintiffs the requested relief.

As an initial matter, there is no harm to PHEAA in allowing the Trusts to resume and complete the Emergency Audit – absolutely none. If PHEAA wants its own appointed auditors to conduct a comparable audit in parallel, it is free to do so. Conversely, the Trusts will continue to suffer ongoing harm if they are unable to fully understand the current *status quo* and make decisions with a complete understanding (*e.g.,* whether move to a different servicer; reform their relationship with PHEAA, seek further injunctive relief and/or the appointment of a receiver, etc.).

-16-

PLA_004322

Thus, a balancing of the equities heavily favors permitting the Trusts to resume the Emergency Audit. *Cf. Merrill Lynch*, 2008 WL 4824053 at *13 (ordering expedited discovery in the context of the plaintiff's request for emergent relief); *Rhone-Poulenc S.A. v. Morton-Norwich Products, Inc*, No. 6742, 1982 WL 8787, at *3 (Del. Ch. Apr. 1, 1982) (same); *Harmony Mill Ltd. P'ship v. Magness*, No. CIV. A. 7463, 1984 WL 21898, at *2 (Del. Ch. Feb. 14, 1984) (same).

## D. The Owners of Trusts Must Direct the Emergency Audit

As indisputably demonstrated in the Uderitz Affidavit, the Emergency Audit was commenced by and conducted through the Owners and their Managing Agent. *See* Uderitz Aff. ¶¶ 9-11, Exhibit B. The Owners take a direct and active role in the management of the trusts pursuant to the respective Trust Agreements.

PHEAA has sought to evade its contractual obligation to cooperate in the Emergency Audit by pretending that some other entity speaks for the Trusts when in fact the Trusts (a) are the counterparty to the MSA; (b) own the student loans being serviced; and (c) have directed Wilmington Trust, the Owners' Trustee, to inform PHEAA to communicate as to all matters relating to the Trusts with VCG. Wilmington Trust issued that notice on August 28, 2015, and PHEAA received and acted upon it until PHEAA terminated the Emergency Audit in an effort to evade investigation. *See* Uderitz Aff. ¶¶ 9-10.

ME1 22438636v.1

PLA_004323

Only the Owners manage the Trusts. Uderitz Aff. ¶¶ 7-8. Wilmington Trust merely carries out the Owners' direction, such as notifying PHEAA whom to deal with on the Emergency Audit. Uderitz Aff. ¶ 9. Wilmington Trust has no authority to act for the Trusts or interact with third parties like PHEAA except as directed by the Owners. In fact, Wilmington Trust has a specific disclaimer in its correspondence about its limited authority. *See* Uderitz Aff at Exhibit A ("This letter is executed and delivered on behalf of the Issuer by Wilmington Trust Company, not in its individual capacity but solely as Owner Trustee of the Issuer, and the statements contained herein are those of the Issuer and not Wilmington Trust Company."). Neither Wilmington Trust nor any other entity has management rights as to the Trusts, and PHEAA's pretense otherwise is ultimately proof of the need for emergent action by way of the Emergency Audit.

## CONCLUSION

The Trusts have an explicit and unequivocal right to resume and complete the Emergency Audit, PHEAA has no cognizable objection or defense and there is no reason to delay this relief. For the reasons stated herein, there are no genuine issues of material fact and Plaintiffs respectfully submit that they have demonstrated entitlement to an order permitting them to resume the Emergency Audit.

ME1 22438636v.1

PLA_004324

Dated: May 2, 2016                    McCARTER & ENGLISH, LLP


By:   Daniel M. Silver                   
        Michael P. Kelly (#2295)
        Daniel M. Silver (#4758)
        Daniel M. Brown (#4688)
        Renaissance Centre
        405 N. King Street, 8th Floor
        Wilmington, Delaware 19801
        Tel.: (302) 984-6300
        Fax: (302) 984-6399

        *Attorneys for Plaintiffs*

ME1 22438636v.1

PLA_004325

Ex. 5

## BUSINESS RECORDS AFFIDAVIT

I, *Thomas Glanfield* being duly sworn, state the following to be true and correct:

1.    I am an officer of Boston Portfolio Advisors, Inc., and I am authorized to speak on behalf of Boston Portfolio Advisors, Inc.

2.    I make this declaration based on my personal knowledge.

3.    If called to testify on the statements herein and the attached records, I am qualified to do so.

4.    Attached hereto as Exhibit A is a true and correct copy of the Servicing Performance Review Of Pennsylvania Higher Education Assistance Agency dated 12/30/2015.

5.    Exhibit A was created at or around the time of the audit completed by Boston Portfolio Advisors, Inc., and was made in the normal course of Boston Portfolio Advisors, Inc.'s business.

DATED this _25th_ day of _Oct_, 2021, in _Boca Raton_, _FL_.

              [Day]          [Month]          [City]      [State]

                                    [Signature]

SIGNED and sworn to before me, the undersigned Notary Public in and for the jurisdiction aforesaid, by

_Thomas Glanfield_ on this day, _October 26th_.

Notary Public

Registration #: _GG 367457_

BUSINESS RECORDS AFFIDAVIT - 1



Notary Public State of Florida
Veronica Calhoun
My Commission GG 367457
Expires 12/13/2023

My Commission Expires: 10/13/2023

# EXHIBIT A

# Servicing Performance Review of Pennsylvania Higher Education Assistance Agency

12/30/2015

**Prepared By:**

**BOSTON PORTFOLIO ADVISORS, INC.**

# Contents

Appendices .................................................................................................................................... 2

Executive Summary ......................................................................................................................... 3

    Objective ................................................................................................................................... 3

    Management Meetings ............................................................................................................... 5

Background ...................................................................................................................................... 6

Operations/Systems ...................................................................................................................... 11

    Delinquency and Default Due Diligence ................................................................................... 11

    Loan Conversion ...................................................................................................................... 12

    Complaints .............................................................................................................................. 12

    Vendor Oversight .................................................................................................................... 14

    Disaster Recovery ................................................................................................................... 14

    Business Continuity ................................................................................................................. 15

Loan and Collateral Review ........................................................................................................... 16

    Sampling Methodology ............................................................................................................ 16

    Overall Observations .............................................................................................................. 17

    Collateral Review .................................................................................................................... 18

    Servicing Review ..................................................................................................................... 20

Servicing Contract Compliance Review .......................................................................................... 24

    Servicing Contract Compliance Review Result Table ............................................................... 25

    Servicing Contract Compliance Review Result Details .............................................................. 26

# Appendices

Appendix A    Grant Thornton Auditors' Report of Independent Service Auditors for the period of October 1, 2013 to September 30, 2014

Appendix B    Annual Report of the CFPB Student Loan Ombudsman dated October 2015

Appendix C    PHEAA's System Access Narrative Letter dated September 25, 2015

# Executive Summary

On behalf of Wilmington Trust Company ("The Trust"), Boston Portfolio Advisors, Inc. ("BPA") conducted an emergency audit of the student loans serviced by the Pennsylvania Higher Education Assistance Agency ("PHEAA") via its student loan servicer American Educational Services ("AES"). The loan portfolio consists of approximately 800,000 loans with original balances totaling approximately $12 billion within 15 NCSLT securitization trusts.

The on-site review team consisted of Thomas Glanfield, Desiree Daly, Mark Mousseau, Kathy Palmer, Jacob Brier and William Steadman of BPA. Jorge Rodriguez-Lugo and Tad Cook from VCG Acquisitions, Inc. ("VCG") also participated in the on-site meetings. The review was conducted in PHEAA's Harrisburg, PA offices on September 9, 10 and 11, 2015. A loan level review of the securitizations was conducted on site and then continued remotely at BPA's offices accessing PHEAA's information.

## Objective

The objective of the servicing review was to:

- Assess the quality of loan servicing functions performed by PHEAA.

- Evaluate the quality of the loan documentation.

- Assess the effectiveness of the servicing operation as it impacts the value of the loans in the trusts and its requirements under the Servicing and Custodial Agreements and any other agreement governing PHEAA's servicing of NCSLT Trusts.

- Conduct a review of 379 accounts from the servicing system to examine adherence to servicing requirements, policies and procedures.

- Assess servicing contract requirement and determine next steps.

The overall approach was divided into three major efforts: (1) review servicing process, policies, procedures, vendor oversight, compliance, payment processing, and document management for accounts pre- and post-charge-off; and (2) review student loan notes, document availability, balance amounts, transaction activities and correspondence at the individual loan level; and (3) Review PHEAA servicing contracts to understand PHEAA's responsibilities and determine further testing needs.

BPA conducted a Servicing Review of Policies, Procedures including a review of the Servicing and Custodial Agreements including the Servicing Guidelines and Service Level Agreement to determine PHEAA's/AES's responsibility for maintaining servicing records.

1. BPA conducted a loan level review, including:

- Selected a sample of loans from PHEAA's servicing system, including loans that were paid-off, charged-off or otherwise brought to a zero balance on the AES servicing system, and a sample of loans that are still being serviced by PHEAA.

- Reviewed collection servicing notes, activities and correspondence to assess if collection efforts were consistent with the Servicing Guidelines referenced in the Servicing Agreement and/or AES Servicing Policies and Procedures.

- Conducted an audit of selected documents to determine whether PHEAA custodial requirements were met and appropriate maintenance of electronic records has been followed.

2. BPA received the following to complete the review:

- PHEAA/AES Servicing and Custodial Agreements and any amendments and addendums.

- Account and transaction histories with pre-charge-off and post-charge-off data.

- Access using the AES web portal to AES's loan servicing system and imaged servicing files, including the following documents:

  o Existence of and signature for the Student Loan Note.
  o Existence of and signature for the Student Loan Application.
  o Existence of and signature for the Loan Disclosure Statement.
  o Notification letter to borrowers informing them of servicing transfer.

- AES MR50 and MR53 files for various selected months

- AES vendor Policies and Procedures for vendor and subcontractor selection and vendor audit.

- Copies of servicing policies and procedures applicable to the NCSLT portfolio.

## Management Meetings

VCG and BPA interviewed the following people:

Jason Swartley     SVP, Chief Legal and Compliance Officer

Deb Callahan       Senior Counsel

Vicky Roganish     Vice President, Client Relations

Kenneth Shutter    Assistant Vice President, Client Relations

Sarah Parish       Client Relations

Stephanie Foltz    SVP of Client Relations, Loan Operations and Client Contractual
                   Testing

Todd Mosko         SVP of Loan Assets Management

Tyler Baer         Assistant Vice President

# Background

The following background information was gathered through conversations with PHEAA management and is helpful in understanding how and why certain policies and procedures existed as they did. PHEAA's initial relationship was with First Marblehead Corporation ("FMC"). PHEAA, as a loan servicer, did not originate any loans and stated that the process of how FMC originated was convoluted. A timeline is outlined below:

Initial Relationship (2001):

- In 2001, FMC created an alliance with The Education Resource Institute ("TERI"), a non-profit loan guarantor, wherein FMC acquired TERI's loan processing operations, forming the basis of FMC's new subsidiary, First Marblehead Education Resources ("FMER"). As part of this agreement, FMC was to provide the loan origination and processing services related to TERI education loans as part of a master servicing agreement.

- FMC had two subsidiary companies, both of which played a role in the portfolios:
    - FMER, acted as a special servicer and performed other functions which included marketing and sales for FMC;
    - First Marblehead Data Services, Inc. ("FMDS") acted as administrator and performed tasks that included trust administration services and investor reporting.

- Also in 2001 the first servicing contract between FMC and PHEAA was created. The agreement stated that PHEAA would service fully disbursed loans that would become part of the trusts. Most of the originating banks at the time used TERI as the guarantor but those that did not later added the TERI guaranty. PHEAA began servicing loans after they were originated by the banks or by FMC (most were originated by FMC). The loans were serviced under separate guidelines prior to securitization.

- While loan data was sent to PHEAA electronically, FMC sent loan documents in paper form. The documents included the collateral documents supporting each loan, namely the promissory notes, and disclosure statements. PHEAA indicated there was no consistent order or system of filing for the documents. PHEAA sorted the documents, organized and imaged the files onto their system. Original signature documents were kept in storage and copies of original signatures were retained for one year then destroyed. Although there was a process to check the data, PHEAA did not create a list of missing documents as the loans were delivered.

- In instances where claims had to be processed through the TERI guaranty, PHEAA was instructed and authorized by FMC to use Affidavits of Lost Note. PHEAA was advised by FMC that because the loans ultimately come back to FMC at the time the claim is filed, it did not matter if PHEAA was missing any collateral documents and that it was acceptable for PHEAA to send an affidavit of missing noted to FMC at the

time the claim was filed if, in fact, a note was missing. This became a standard process as it was a less costly option. PHEAA stated that FMC was more interested in how a loan was serviced and not the presence of a note that was held by FMC, therefore PHEAA did not have to prove that the loan origination documentation existed as FMC theoretically had possession of the documentation.

- Certain documents were held by TERI as guarantor. PHEAA did not consistently receive all of the documents for each loan and according to PHEAA the contract did not require that TERI send every single document to PHEAA.

Amended and Restated Servicing Agreement (2006):

- The Servicing Agreement was amended and restated in 2006 to accommodate the dual role in creating an SPE and committed loans, added regulatory language, as well as service level requirements for securitization filings since the NCSLT trusts were now securitized. Per PHEAA, the agreement needed to be "market approved" to sell to investors, rating agencies, etc.

- PHEAA and FMC held quarterly meetings to review issues. FMC would inform PHEAA of pending changes to servicing guidelines requiring TERI's approval. Changes were made by FMC on behalf of and signed off by TERI.

- Per PHEAA, there was high turnover at FMC during the 2006-2008 time period resulting in inconsistencies and many changes. The people at FMC that drafted the 2006 agreement were only at FMC for a short period of time.

- PHEAA is not aware of the criteria FMC used for assigning a batch of loans to any given trust except the general knowledge that FMC was able to package loans to appeal to investors. PHEAA would change the owner on its system upon notification from FMC. Loans were not bundled by disbursement year or period (i.e. the 2007 trust does not contain all loans originated in the 2006-2007 academic year) and the criteria that FMC used to formulate the trusts was never disclosed to PHEAA. The first trust (National Collegiate Master Student Loan Trust) was replenished with 6 independent securitizations from 2001 to 2006, while the other 14 trusts were one and done transactions. The early disbursements were all direct to consumer and mainly with Chase Bank and Bank One.

- PHEAA has custodial responsibilities for the loan documents but indicated it did not receive nor have all of the documents for each loan. PHEAA wrote to FMC on numerous occasions to send orderly documents which continued for more than two years. PHEAA requested an imaging solution to eliminate the need for paper documents. It was an ongoing struggle to obtain the documents from FMC/FMER.

- As the trust performance deteriorated, TERI mandated that PHEAA develop a process to get borrowers to perform better resulting in constant changes to

payment plans. PHEAA stated that bondholders accused them of putting "band aids" on the loans. In an effort to cure delinquencies, FMC started outsourcing collections to approximately 5 independent collection agencies (Zwicker, DCS, Windham, CCS, Simms). The outsourcing occurred when a loan was between 31 and 179 days delinquent prior to being paid by TERI's guaranty.

Portfolio Bond Performance Issues and TERI's Bankruptcy (2008):

- By 2008, there were numerous bondholder lawsuits alleging that FMC was trying to hide portfolio underperformance. Charge off temporarily changed to 90 days instead of 180.

- In April 2008, TERI filed a petition in the United States Bankruptcy Court for relief under Chapter 11 of the United States Bankruptcy Code.

- Also in April 2008, the servicing agreement between FMC and PHEAA received its third amendment, adding NCO Financial Systems, Inc. ("NCO") as an outsourcing party to receive loans for collections. According to the agreement:
  - NCO was added as the 31-60 day default prevention collector. PHEAA would send daily files to NCO containing all loans that were between 31-60 days delinquent and NCO performed collection services to bring the accounts to less than 31 days delinquent. Formal recall files, separate from the daily update files, were not sent to NCO and PHEAA assumed that NCO knew not to continue to collect when loans were either less than 31 days or more than 60 days delinquent.
  - At day 61, default prevention services were performed by FMER. PHEAA sent daily files to FMER containing all loans that were between 61 and 179 days delinquent.
  - PHEAA was only responsible for default prevention services for loans that were between 1 and 30 days delinquent, and for sending the final demand letter to the borrower which at the time occurred at 120 days delinquent.

- In November 2008, TERI made FMER its agent, which permitted FMER to make changes to the servicing guidelines and processes without prior approval from TERI. FMER was introduced to PHEAA as its direct contact and PHEAA began taking direction from FMER. According to PHEAA, it is likely that FMER became TERI's agent to avoid the required sign-off process when changes to the guidelines were needed.

- In November 2009, the pre-claim process changed and PHEAA was instructed to submit claims to FMER on the 30th day of delinquency. FMER assumed all delinquency servicing activity from day 30 until the time the loan was charged off.

- In certain instances, FMC sent loans back to PHEAA for default prevention activities as part of a Champion-Challenger program.

<u>FMER Resignation (2012)</u>:

- In April 2012 FMER resigned as special servicer, causing US Bank as the backup special servicer, to take over special servicing.

- Also in 2012, GOAL purchased FMDS rendering GOAL the new administrator of the portfolio.

- On July 20, 2012 PHEAA received an email from GOAL explaining that "NCO will need the borrower data that was previously provided to FMER" and that FMDS, as administrator for each of the NCSLT trusts, will provide a direction letter to AES (PHEAA) to document this transaction. Per PHEAA, it never received this direction letter.

- On October 26, 2012 and October 30, 2012, PHEAA received a directive from FMC to send all charged off loans directly to NCO. The email also advised PHEAA that if it sends the charged off loans to FMC, FMC would send them to NCO.

- At the direction of FMC, PHEAA has been sending communications and claim packages to NCO since this time. PHEAA noted that NCSLT is the most complained upon portfolio to the CFPB, however PHEAA does not have authority to make decisions and GOAL and NCO typically do not make exceptions and are non-responsive.

<u>PHEAA Servicing Process Today (September 2015)</u>:

- PHEAA provides default prevention services for loans between 1 and 60 days delinquent. At day 61, the loans are outsourced to NCO.

- At the time a loan is charged off, PHEAA sends it to NCO pursuant to the direction PHEAA was given by FMC in 2012.

- All questions, inquiries, documents, and claim packages that were previously sent to FMER pursuant to the 2008 directive, are now sent to NCO. PHEAA stated that NCO rarely responds to any questions or inquiries and when a response is provided, it typically takes 30 to 60 days.

- PHEAA had to update SCRA guidelines on its own because it received no direction or response from either GOAL or US Bank despite numbers requests from PHEAA.

- PHEAA has recently received communication from NCO requesting that PHEAA stop sending NCO all questions and inquiries concerning non-charged off loans.

- PHEAA noted that NCSLT is the most complained about portfolio that PHEAA services. Unresolved complaints are sent to NCO, whose responses commonly tell PHEAA to follow the servicing guidelines. This does not provide PHEAA with

adequate direction it needs to resolve the issue. PHEAA has sent these complaints to GOAL, however there is no evidence of replies from GOAL.

- PHEAA has attempted to preserve consistency with the consumer to maintain regulatory compliance and have had to resort to involving US Bank. There is no evidence of any communication with US Bank.

- PHEAA indicated that throughout all of the transition and to this day, US Bank has never talked to or visited PHEAA.

- GOAL has never issued any letters to change servicing guidelines. Per PHEAA, GOAL said they do not have the authority to change guidelines.

# Operations/Systems

BPA performed a review of a Report of Independent Service Auditors (the "Auditors' Report") for the period October 1, 2013 through September 30, 2014 prepared by Grant Thornton LLP (See Appendix A attached). The purpose of the report was to examine PHEAA's internal controls "likely or relevant to user entities' internal controls over financial reporting" and therefore does not encompass all aspects of PHEAA's operations. The auditors examined PHEAA's computer applications for processing student loan transactions and its design suitability with respect to operating effectiveness and controls. BPA reviewed and extracted content from the Auditors' Report pertinent to this review.

## Delinquency and Default Due Diligence

PHEAA's due diligence processing activities include emails, delinquency letters, telephone attempts/contacts, as well as skip tracing and delinquency claims. PHEAA's COMPASS servicing system uses various applications to queue its system for calls, emails and letter production at the specified dates.

PHEAA provided a servicing due diligence schedule reflecting their current servicing practices pertaining to delinquencies. The table below outlines AES's current servicing practices:

### AES SERVICING CURRENT DUE DILIGENCE SCHEDULE

| Days Delinquent | Action |
|---|---|
| 1 | Email borrower only |
| 5 | Email borrower only |
| 8 | Email co-borrower only |
| 10 | Letter to borrower and co-borrower |
| 11 | Email borrower and co-borrower; begin calling borrower and co-borrower and continue until contact is made. *Contact includes leaving a message* |
| 26 | Email borrower and co-borrower |
| 150 | Final demand letter is sent. *Prior to 2/7/2012 and beginning 11/11/2009, a final demand letter was sent at 165 days* |

## Loan Conversion

The Auditors' Report notes that the majority of loans converted onto PHEAA's COMPASS SYSTEM are done so electronically. A batch process is utilized to develop a validation error report identifying potential discrepancies based on pre-set program parameters. Validation errors are addressed individually and resolved by the conversions staff. No mention is made with respect to PHEAA's process for the intake of collateral documentation.

As noted in the Background section of this report PHEAA originally received paper documents in boxes which were sent to imaging. Originals were stored in a vault. Once the documents were scanned, PHEAA performed a review to confirm that the promissory notes were present, signed and dated with proper terms. Missing promissory notes were included on a list and PHEAA would follow up for six months. With respect to missing notes:

- If the notes were not delivered within the six month timeframe, PHEAA made a "liability" notation on the account.

- PHEAA indicated that it does not have all promissory notes because it was never required to obtain them as collateral was kept and maintained by FMC and TERI as originator and guarantor.

- PHEAA asserted that although the 2006 Agreement appoints PHEAA as custodian of the required documents, the Agreement does not place responsibility on PHEAA to ensure that all notes are present.

- PHEAA was authorized by TERI to use affidavits in claim packages, and there was a point when TERI intentionally did not send promissory notes so they would not have to request them back if a claim was filed.

## Complaints

BPA reviewed the Annual Report of the CFPB Student Loan Ombudsman (the "Report") (see Appendix B) dated October 2015. The report analyzes student loan complaints submitted by borrowers and provides a discussion and commentary on issues faced by student loan borrowers including:

- Student loans made by private lenders *"have a higher concentration of borrowers in default or delinquency than the student loan market at-large."*

- Student loan borrowers *"continue to submit complaints describing servicing and debt collection practices that create barriers to enroll in alternative repayment plans."*

- The subjects of the majority of complaints included:

  - Locating information on repayment options
  - Paperwork processing delays on repayment plans
  - Inconsistent or confusing instructions from servicers
  - Overall difficulty in enrolling in a repayment plan.

The Report ranks companies with the most private student loan complaints and shows that PHEAA complaints have increased from 378 for the period October 2013 through August 2014 to 401 for the period October 2014 to August 2015. The table below was taken from the Report detailing the above information:

**TABLE 1:** COMPANIES WITH THE MOST PRIVATE STUDENT LOAN COMPLAINTS RANKED BY VOLUME[4]

| Company | Oct. 2013 – Aug. 2014 | Oct. 2014 – Aug. 2015 |
| --- | --- | --- |
| Navient | 1,854 | 1,724 |
| AES/PHEAA | 378 | 401 |
| Genesis Lending | 24 | 374 |
| Wells Fargo | 229 | 244 |
| Sallie Mae | 231 | 240 |

The Report also notes that 61% of PHEAA complaint reasons included: *"Dealing with my lender or servicer"*; and 38% of complaints referenced *"Can't repay my loan"* demonstrating that borrowers are not receiving appropriate relief indicating potentially inadequate loss mitigation processes.  This point had been presented by PHEAA.

The Report noted PHEAA as one of the top recipients of student loan debt collections complaints and shows that PHEAA received 401 complaints for the period October 1, 2014 through August 31, 2015 indicating that neither GOAL nor NCO provide proper or timely responses, if at all, to borrower inquiries.

## Vendor Oversight

Although the Auditors' Report indicates PHEAA's reliance upon vendors to perform certain tasks throughout the report, there is no description of or review of PHEAA's vendor oversight process.

Since NCO is not technically a PHEAA vendor as the relationship is between US Bank and NCO, PHEAA did not discuss its vendor oversight process during the site visit or subsequently.

## Disaster Recovery

PHEAA operates a large technology center supporting data processing for its servicing and guaranty systems. PHEAA has a large data network delivering these services and its IT group is the custodian of these applications. PHEAA's Disaster Recovery Plan ("DRP") is outlined in the Auditors' Report attached as Appendix A:

The DRP encompasses the production applications and data supported on PHEAA platforms, including:

- Servers
- Web sites
- Local area networks
- Wide area networks
- Distributed systems
- Mainframe systems
- Telecommunication systems

The DRP was developed based upon defined critical response timeframes, potential time-associated tangible losses, and application recovery priorities.

To assist with recovery efforts, PHEAA has entered into a business recovery agreement with an off-site recovery provider. PHEAA's contract with the off-site recovery provider includes provisions for both hot-site and cold-site recovery support. The off-site recovery provider facility contains equipment comparable to that currently installed at PHEAA, which gives PHEAA the capability of providing business units and user entities with the priority services they would receive on a normal business day.

PHEAA maintains inventories of data processing equipment and software to aid in acquiring and installing the portion of the PHEAA environment that would be recovered in the cold-site facilities. PHEAA performs at least one complete exercise of its DRP annually. The exercise includes the restoration of its operating systems, system utility programs, file definitions and datasets, batch processing, and communications testing. To ensure consistency, test scripts detailing the actions and activities required to conduct the technical elements of the test are used. After the exercise, a report is submitted to Executive Management that outlines the results of the exercise. The most recent Disaster Recovery exercise was completed in June 2014.

In the event of a disaster, current information on data files may be lost or damaged. PHEAA's DRP restores data maintained at an off-site location.

## Business Continuity

PHEAA's Business Continuity Plan is designed to provide immediate response and recovery from any business interruption ensuring that critical business processes are restored by providing a framework for an unplanned event and minimizing loss of vital resources. The Business Continuity Plan is described in further detail in the excerpt below as taken from the Auditors' Report:

Components of the EBCP include the recovery strategy, continuity steps, outage levels, the alternate facilities plan, the conceptual recovery timeline, business unit continuity plans, evacuation procedures, communication plan, identification of critical business processes, key personnel listing, and critical vendor contact information.

ESO is accountable for leading, managing, and providing ongoing life cycle management for the development, implementation, and validation of the EBCP. ESO works closely with IT infrastructure and application teams, business units, and external vendors to recover mission critical production systems pertaining to the EBCP.

PHEAA also contracts with communication carriers to provide a backup data communication network that is in place and held in reserve. In the event of a disaster and the subsequent move to the alternate processing site, the entire PHEAA data communication network would be re-routed with service provided to the user entity base as if operations were coming from PHEAA's local Data Center. In addition, hardware and software components of the data transmission environment are replicated at the alternative recovery site and procedures exist to expediently restore data transmissions following an outage due to physical or technical failure or damage.

Individuals in the organization have been assigned responsibility for updating the DRP and EBCP every quarter, or more frequently, as required.

# Loan and Collateral Review

## Sampling Methodology

BPA selected a total of 379 student loan accounts for review, 50 of which were reviewed on site at PHEAA with the remainder reviewed remotely at BPA's offices.

**First 50 Loan Sample:**

The first 50 accounts consisted of defaulted loans that were reviewed on site:

- The accounts were selected from the September 4, 2015 MR50 file sent to VCG from GOAL and provided to PHEAA on September 4, 2015 (two days prior to the site visit).

- PHEAA was unable to match the borrower identification information in the data file; therefore, BPA did not have a sample to work with when it arrived at PHEAA's office on September 8, 2015.

- To expedite productivity while on site, BPA selected 50 accounts from the November 3, 2014 charge-off file as the charged-off loans were a primary concern for the review.

**Remaining 329 Loan Sample:**

The remaining sample was selected from the August 2015 MR50 data file using 329 unique borrowers.  From this group 329 individual accounts were randomly selected to represent an accurate distribution across the entire NCSLT portfolio based on five main categories: original lender, trust, days delinquent (if not charged-off), disbursement date, and charge-off date (if charged-off).  The sample considered a mix of accounts including:

- Original Lender – As the NCSLT portfolio consists of accounts that were originated by many different lenders, accounts were selected on a basis that represents the makeup of the overall portfolio.  Over 50 different lenders are represented in the sample.

- Trust – Accounts were selected to be evenly distributed among the 15 Trusts represented in the NCSLT portfolio.

- Number of Days Delinquent – 100 of the 379 sample were not charged-off as of the time of the review.  Among the 100 non charged-off loans, 50 accounts were in some stage of delinquency which ranged from 3 days to 138 days delinquent.  The remaining 50 non charged-off accounts were zero days delinquent or "current".

- Disbursement Date – The disbursement dates represented in the sample ranged from September 2001 to August 2007 and accounts were selected to be evenly distributed relative to the overall NCSLT portfolio.

- Charge-Off Date – The charge-off dates represented in the sample ranged from September 2004 to July 2015 and accounts were selected to be fairly evenly distributed relative to the default experience of the overall NCSLT portfolio.

The review was conducted to:

- Validate servicing due diligence; and

- Assess loan collateral documentation integrity.

Servicing due diligence was tested against the schedule provided in the Due Diligence section of this report.


## Overall Observations

From the review of collateral files provided by PHEAA, as well as PHEAA servicing activity as observed in its servicing system, BPA notes the following concerns:

1. There were 35 instances where there was no evidence that borrowers were notified that their accounts had been transferred to PHEAA.

2. Assignments were not present in any of the collateral files provided and PHEAA did not indicate if an Assignment existed elsewhere. Based on representations made by PHEAA, it is likely that the Assignments do not exist. Without appropriately issued Assignments, collection efforts are more challenging and costly to defend in Court.

3. PHEAA's servicing system does not provide a schedule of delinquencies. As borrowers make payments, delinquencies are either fully or partially cured and this activity causes delinquency information to be updated to the current status. The servicing system does not clearly demonstrate whether a borrower payment cured a prior delinquency in part or in full as once a prior delinquency is cured, there is no clear record to track. The above issues are significant concerns as customer service agents have limited information from which to discuss options with borrowers as they only see the most recent delinquency. This suggests that borrowers are offered or are not offered forbearance or deferment without consideration of delinquency history.

4. There were accounts where PHEAA did not perform follow up on initial unsuccessful contact efforts for delinquent borrowers. This is a significant concern as it is essential that borrowers and co-borrowers are contacted upon becoming delinquent to remedy delinquency and in these instances, PHEAA did not engage in an effort to comply with servicing compliance requirements.

   During the early stages of delinquency, establishing trust and confidence with borrowers assists in the repayment process. Borrowers are more successfully assisted in the default management process when the servicer makes early contact, obtains important information, assesses workout options and sets clear expectations for borrowers. This method of mitigating loss by educating borrowers on expectations enables quicker delinquency resolution thereby decreasing the risk that a borrower will default.

## Collateral Review

Subsequent to the site visit PHEAA delivered to BPA imaged collateral files in groups of 20 with the last group delivered on October 1, 2015. BPA reviewed 379 imaged files to validate the following information:

- The student loan Promissory Note was signed by all borrowers.

- The loan program code in the PHEAA servicing system matched the sample file to validate the data.

- If there was a co-borrower on the account.

- To determine whether terms and conditions were affixed to the Note.

- Whether or not PHEAA sent a letter to the borrower(s) notifying them that PHEAA was servicing the account and whether NCSLT was listed as the owner of the loan on the letter.

- Whether a Disclosure Statement was provided under the appropriate loan program (as noted in the AES servicing system).

- The presence of an Assignment.

**Collateral Review Results:**

1. 100% of the accounts did not contain an Assignment. It is unknown whether Assignments were appropriately issued. Based on representations made by PHEAA, it is likely that the Assignments do not exist.

2. 1 Note or .3% of the sample was not signed which renders the account uncollectable.

3. 336 or 88.7% of the PHEAA letters to borrowers did not have a statement that NCSLT was the owner of the loan.

4. 358 or 94.5% of the sample did not have terms and conditions affixed to the Note. Per the Note borrowers acknowledged receipt of the terms and conditions and PHEAA's servicing contract states that borrowers are only required to return the signature page with PHEAA responsible for maintaining the signed first and second (if applicable) page.

5. 35 or 9.2% did not contain PHEAA notification letters to the borrowers.

6. All Disclosure Statements were provided under the appropriate loan program.

The collateral review results are illustrated in the table below:

## COLLATERAL REVIEW CHARACTERISTICS

|  | Promissory Note in File | Promissory Note Signed | Promissory Note Terms & Conditions Included | Disclosure in File | PHEAA Notification Letter to Borrower in File | NCSLT Notification Included | Assignment in File |
|---|---|---|---|---|---|---|---|
| **Count** |  |  |  |  |  |  |  |
| Fail: | 1 | 1 | 358 | 0 | 35 | 336 | 379 |
| Pass: | 378 | 378 | 21 | 379 | 344 | 43 | 0 |
|  |  |  |  |  |  |  |  |
| **Percentage** |  |  |  |  |  |  |  |
| Fail: | 0.3% | 0.3% | 94.5% | 0.0% | 9.2% | 88.7% | 100.0% |
| Pass: | 99.7% | 99.7% | 5.5% | 100.0% | 90.8% | 11.3% | 0.0% |



**Collateral Review Results by Percentage Pass/Fail**

| | |
|---|---|
| Promissory Note in File | |
| Promissory Note Signed | |
| Promissory Note Terms & Conditions Included | |
| Disclosure in File | |
| PHEAA Notification Letter to Borrower in File | |
| NCSLT Notification Included | |
| Assignment in File | |

0%  10%  20%  30%  40%  50%  60%  70%  80%  90%  100%

■ Fail:   ■ Pass:

### Servicing Review

BPA selected 379 accounts for review.  BPA tested the accounts on the servicing system to validate whether or not PHEAA adhered to its servicing responsibilities (PHEAA refers to this as the "due diligence schedule").  There were limitations to the review which are described below:

1. BPA tested PHEAA's compliance with its servicing responsibilities from the most recent delinquency date.  However, if the prior delinquency was not fully cured BPA had to track back to the date when due diligence started and match that with the correct delinquency date:

   - The servicing system does not provide a schedule of delinquencies that could be easily reconciled.  As borrowers make payments, delinquencies are either fully or partially cured, as such delinquency information is essentially updated (partially or fully) by a payment event.

   - The servicing system does not demonstrate whether a borrower payment cured the prior delinquency in part or in full due to the system functionality described above.

   - Once a prior delinquency is fully cured, there is no clear record to track delinquency history.

   The above issues are significant concerns as customer service agents have limited information from which to discuss options with borrowers as they only see the most recent delinquency date as prior delinquencies are cured partially or wholly by payment events.  This suggests that borrowers are offered forbearance or deferment without consideration of delinquency history.

2. PHEAA's servicing system does not have a specific field for email addresses; however it does capture emails voluntarily provided by borrowers. Therefore, BPA tested email servicing compliance using the following rules:

- If an email was sent for any first due diligence event, then it was evident that PHEAA had an email address and all email due diligence events were tested.

- If emails were in the system, then emails were tested to eliminate the potential for false negative results. PHEAA's responsibility to collect emails is strictly voluntary; therefore if borrowers did not provide an email address, PHEAA was not penalized for this during the test.

**Loan Review Results:**

BPA selected 379 accounts for review, however 2 loan records were missing and therefore, 377 loan records were reviewed.

A total of 105 or 28.1% of the 377 loans tested were deemed unacceptable having failed without recourse one or more of the tests administered in accordance with PHEAA's due diligence compliance schedule. The most problematic events within the 105 accounts found to be unacceptable demonstrate that PHEAA did not adhere to the specified due diligence schedule include:

1. PHEAA's servicing due diligence compliance schedule requires that it send delinquency notifications to borrowers and co-borrowers via email at certain delinquency dates if it has been provided with such emails. BPA tested PHEAA's compliance with its email notification requirements by capturing the dates that emails were sent, comparing the captured date to the delinquency date, noting whether payments that may have partially or fully cured delinquency and determining whether the emails complied with the due diligence schedule. Below are the email due diligence findings of the 105 unacceptable accounts:

- Day 1 Borrower Email – 6 or 5.7% of the emails did not adhere to PHEAA's delinquency notification due diligence schedule.

- Day 5 Borrower Email – 2 or 1.9% of the emails did not adhere to PHEAA's delinquency notification due diligence schedule.

- Day 8 Co-Borrower Email – 2 or 1.9% of the emails did not adhere to PHEAA's delinquency notification due diligence schedule.

- Day 11 Borrower Email – 2 or 1.9% of the emails did not adhere to PHEAA's delinquency notification due diligence schedule.

- Day 11 Co-Borrower Email – 1 or 1% of the emails did not adhere to PHEAA's delinquency notification due diligence schedule.

- Day 26 Borrower Email – 1 or 1% of the emails did not adhere to PHEAA's delinquency notification due diligence schedule.

- Day 26 Co-Borrower Email – 1 or 1% of the emails did not adhere to PHEAA's delinquency notification due diligence schedule.

2. PHEAA's servicing due diligence compliance schedule requires that it send delinquency notifications letters to borrowers and co-borrowers on specified delinquency dates. BPA tested PHEAA's compliance with this requirement by capturing the dates that letters were sent, comparing the captured date to the initial delinquency date, noting whether there were any payments that partially cured delinquency and determining whether the letter complied with the due diligence schedule. Below are the letter due diligence findings of the 105 unacceptable accounts:

- Day 10 Borrower Letter – 8 or 7.6% of the delinquency notification letters did not adhere to PHEAA's delinquency notification due diligence schedule.

- Day 10 Co-Borrower Letter– 6 or 5.7% of the delinquency notification letters did not adhere to PHEAA's delinquency notification due diligence schedule.

3. PHEAA's servicing due diligence compliance schedule requires that PHEAA call and make contact with borrowers and co-borrowers on specified delinquency dates with continuous follow-up until contact is made. BPA tested PHEAA's compliance with this requirement by capturing the dates that calls were made, comparing the captured date to the initial delinquency date, noting whether there were any payments that partially cured delinquency, and determining whether calls complied with the due diligence schedule. Below are the call due diligence findings of the 105 unacceptable accounts:

- Day 11 Borrower Call – 7 or 6.7% of the borrowers were not called:

   o Of this group initial contact with the borrower was not successful on 93 or 88.6% of the accounts
   o Where there was no initial borrower contact, no further calls were attempted on 6 or 6.5% of the accounts. This is a significant concern as it is imperative that borrowers are contacted to remedy delinquency and in these instances, PHEAA did not engage in an effort to comply with servicing compliance requirements.

- Day 11 Co-Borrower Call – 4 or 3.8% of the co-borrowers were not called:

  o Of this group initial contact with the co-borrower was not successful on 72 or 68.6% of the accounts
  o Where there was no initial co-borrower contact, no further calls were attempted on 9 or 12.5% of the accounts. Once again, this is a significant concern as it is imperative that borrowers are contacted to remedy delinquency and in these instances, PHEAA did not engage in an effort to comply with servicing compliance requirements.

The table below breaks down the issues identified by required due diligence event. Certain tests are indicated as "N/A" as they were not applicable due to factors such as the loan was never delinquent or became current at a point where delinquency servicing efforts were no longer necessary.

### Servicing Review Characteristics for Unacceptable Accounts

| | Day 1 Borrower Email | Day 5 Borrower Email | Day 8 Co-Borrower Email | Day 11 Borrower Email | Day 11 Co-Borrower Email | Day 26 Borrower Email | Day 26 Co-Borrower Email | Day 10 Borrower Letter | Day 10 Co-Borrower Letter | Day 11 Borrower Call | Borrower Contact Made Day 11? (Y/N) | If No Borr Contact, More Calls Made? (Y/N) | Day 11 Co-Borrower Call | Co-Borrower Contact Made Day 11? (Y/N) | If No Co-Borr Contact, More Calls Made? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Count** | | | | | | | | | | | | | | | |
| Fail: | 6 | 2 | 2 | 2 | 1 | 1 | 1 | 8 | 6 | 7 | 93 | 6 | 4 | 72 | 9 |
| Pass: | 77 | 29 | 7 | 31 | 9 | 6 | 6 | 85 | 62 | 84 | 1 | 87 | 65 | 3 | 63 |
| N/A: | 22 | 74 | 96 | 72 | 95 | 98 | 98 | 12 | 37 | 14 | 11 | 0 | 36 | 30 | 0 |
| **Grand Total:** | **105** | **105** | **105** | **105** | **105** | **105** | **105** | **105** | **105** | **105** | **93** | **105** | **105** | **105** | **72** |
| **Percentage** | | | | | | | | | | | | | | | |
| Fail: | 5.7% | 1.9% | 1.9% | 1.9% | 1.0% | 1.0% | 1.0% | 7.6% | 5.7% | 6.7% | 88.6% | 6.5% | 3.8% | 68.6% | 12.5% |
| Pass: | 73.3% | 27.6% | 6.7% | 29.5% | 8.6% | 5.7% | 5.7% | 81.0% | 59.0% | 80.0% | 1.0% | 93.5% | 61.9% | 2.9% | 87.5% |
| N/A: | 21.0% | 70.5% | 91.4% | 68.6% | 90.5% | 93.3% | 93.3% | 11.4% | 35.2% | 13.3% | 10.5% | 0.0% | 34.3% | 28.6% | 0.0% |
| **Grand Total:** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |

## Servicing Contract Compliance Review

A review of the PHEAA Servicing Contract along with accompanying documents was conducted to determine if PHEAA was, and remains in compliance with the provisions of the five documents listed below governing PHEAA's activities.  This section of the Report is focused on the standards of performance that could impact the performance of the trusts if compliance was not met. In summary:

- BPA identified 61 standards in the various agreements that met the criteria above. Of the 61 standards that were reviewed for testing, 34 require additional information to determine compliance. A written request has been submitted to PHEAA for the information needed to confirm compliance.

- Of the 27 that could be tested, 26 did not meet the compliance standard set forth in the agreements and are noted as Fails. These are shown in the Fail column in the table below. Of the Fails, 10 were a result of PHEAA not providing VCG with the required reports.

| Compliance Document | Pass | Fail | TBD | Total |
|---|---|---|---|---|
| Servicing Agreement | 1 | 14 | 32 | 47 |
| Servicing Guidelines | | 6 | 1 | 7 |
| Customer Service Schedule | | 3 | 1 | 4 |
| Required Reports Schedule | | 1 | | 1 |
| System Access Schedule | | 2 | | 2 |
| Total | 1 | 26 | 34 | 61 |

## Servicing Contract Compliance Review Result Table

| Compliance Document | Pass | Fail | TBD | Total |
|---|---|---|---|---|
| **Servicing Agreement** | **1** | **14** | **32** | **47** |
| 4.01 - Servicing Duties | | 1 | | 1 |
| 4.02 - Failed Service Levels: Notice and Cure | | | 2 | 2 |
| 4.04 - Custody Procedures | | 2 | 3 | 5 |
| 4.05 - Lost or Damaged Records | | | 2 | 2 |
| 4.07 - System Access | | 2 | 1 | 3 |
| 4.09 - Operations Meeting: Procedures Manual | | | 2 | 2 |
| 4.11 - Customer Service | | 1 | | 1 |
| 4.13 - Collections | | | 3 | 3 |
| 4.14 - Late Fees | | | 1 | 1 |
| 4.16 - Reports and Forms | | 1 | | 1 |
| 4.17 - Governmental Reporting | | | 1 | 1 |
| 4.18 - Reporting to Consumer Reporting Agencies | | | 2 | 2 |
| 4.19 - Data Error Correction; Account Adjustment | | | 1 | 1 |
| 5.06 - No Subcontractors | 1 | | | 1 |
| 5.07 - OFAC Check | | | 3 | 3 |
| 5.08 - FACT Act, PATRIOT Act and OFAC Check | | | 1 | 1 |
| 4.03 - Product Setup and Conversion (a) Credit Agreements | | | 1 | 1 |
| 7.03 - SAS 70 Audit | | 1 | 1 | 2 |
| 7.05 - Regulatory Audit | | | 1 | 1 |
| 7.06 - Financial and Other Information | | 2 | | 2 |
| 7.07 - Annual Statement as to Compliance | | 1 | | 1 |
| 7.08 - Annual Independent Public Accountant's Servicing Reports | | 1 | 1 | 2 |
| 7.09 - Cooperation with Audits; Follow-Up | | | 1 | 1 |
| 11.01 - Proprietary/ Confidential Information | | 1 | | 1 |
| 11.02 - Privacy | | | 1 | 1 |
| 11.03 - Security Program | | | 1 | 1 |
| 11.04 - Security Breach | | 1 | | 1 |
| 11.05 - Business Continuity and Site Disaster Recovery Plans | | | 3 | 3 |
| **Servicing Guidelines** | | **6** | **1** | **7** |
| Default Notifications | | 1 | 1 | 2 |
| Default Prevention Activities | | 3 | | 3 |
| Fraud/Forgery/Identity Theft | | 1 | | 1 |
| Read and Agreed dated 11/5/2008 | | 1 | | 1 |
| **Customer Service Schedule** | | **3** | **1** | **4** |
| 1. Call Monitoring | | | 1 | 1 |
| 5. Borrower Correspondence/ Complaints | | 3 | | 3 |
| **Required Reports Schedule** | | **1** | | **1** |
| Required Reports Schedule (3) - (6) | | 1 | | 1 |
| **System Access Schedule** | | **2** | | **2** |
| 4. FMC/FMER/TERI User Access Security Requirements | | 2 | | 2 |
| **Total** | **1** | **26** | **34** | **61** |

**Passed Compliance Standards**

PHEAA passed 1 of the 27 standards that could be tested. The detail of the passed compliance standard includes:

1. Section 5.06 No Subcontractors of the Servicing Agreement states with the exception of skip tracing services, PHEAA shall not utilize or engage a subcontractor to perform any Services under the Servicing Agreement without the prior written consent of FMC (VCG).

   - PHEAA advised it does not have subcontractors or third party vendors working the portfolio. The parties working on the portfolio were given the assignment by FMC or FMER and PHEAA has been instructed by FMC or FMER to work with those third parties.

**Failed Compliance Standards**

PHEAA has failed 26 of the 27 standards that were tested. The details of each failed compliance standard include:

1. Section 4.01 Servicing Duties of the Servicing Agreement states that PHEAA is required to provide and perform its services in full compliance with: the terms of the Servicing Agreement, including the Service Level Agreement, the Servicing Guidelines, the Program Manual, the terms and conditions of the Credit Agreements, and all federal and state laws and regulations.

   - As demonstrated in paragraphs 2 through 20 below, PHEAA has failed to comply with certain provisions of its Servicing Agreement, including the Service Level Agreement and the Servicing Guidelines. PHEAA has failed to comply with section 4.01 Servicing Duties of the Servicing Agreement.

2. Section 4.04 Custody Procedures of the Servicing Agreement states that PHEAA shall hold all Original Credit Agreements and related documents and shall retain each Credit Agreement and related documents until five (5) years after the earlier of (a) the date upon which the student loan evidenced by such Credit Agreement and related documents is paid in full, or (b) the date upon which the student loan is deconverted from PHEAA's servicing system.

   - PHEAA advised that deconversion is the change in loan servicer from PHEAA to another entity prior to charge off, which has not occurred on any loan.

   - PHEAA stated that all Original Credit Agreements were not on file as not all documents were sent to PHEAA for storage. It appears PHEAA did not have a method to check whether all accounts had appropriate documentation provided at the time the account was converted to PHEAA's system.

   - Upon receipt of loan documents, PHEAA had a procedure to notate the account on its system to indicate that the Promissory Note was missing. At that time, PHEAA would send a missing document list to FMER. FMER would send PHEAA the missing documents, and upon receipt of those missing documents, PHEAA did not log the new documents or update the student loan account on its system to state that the missing documents were now received. Without PHEAA updating its system to verify documents were received, PHEAA is without recourse in stating that they were not provided the Promissory Note.

   - PHEAA failed to maintain custody of all Original Credit Agreements and related documents as per its own admission. PHEAA has failed to comply with section 4.04 Custody Procedures of the Servicing Agreement.

3. Section 4.04 Custody Procedures of the Servicing Agreement requires PHEAA to create microfilm or electronic records of all Original Credit Agreements and related documents.

   - Since PHEAA indicated it does not have all of the Original Credit Agreements, it would not be able to make copies of such Original Credit Agreements. PHEAA has failed to comply with section 4.04 Custody Procedures of the Servicing Agreement.

4. Section 4.07 System Access of the Servicing Agreement prohibits PHEAA from granting system access to third parties without first receiving approval from VCG (formerly FMC).

   - PHEAA described its current system access procedure during the on-site visit and in its System Access Narrative letter dated September 25, 2015 (attached as Appendix C). PHEAA independently makes the decision to add users based on the user filling out a form called the AES System Access Form. PHEAA then unilaterally grants access to users based on functional need, as outlined on page 1 of its System Access Narrative. PHEAA has not requested permission from VCG or any third party to add or remove users.

   - PHEAA has provided system access to more than 178 individuals from various companies.

   - On page 2 of PHEAA's System Access Narrative, PHEAA stated it sent three reports to VCG since the onset of this review and identified one report to have contained 199 users which had access to PHEAA's system. However, BPA has recorded only two reports sent during the review:

     o Report 1 titled Compass Access to 122962 and dated 9/9/2015, contained 178 users.

       - The 178 individuals include: DCS Collectors (18); GOAL Staff (10); GOAL Auditing Access (14); NCO Staff (40); SIMM Collectors (29); Unknown Users/Company (67).

     o Report 2 titled Access to NCSLT and dated 9/14/2015, contained 111 users.

       - PHEAA has failed to disclose the name of the company for 37.6% of the individuals who are currently accessing the PHEAA system and NCSLT borrowers' personal identification information. On page 3 of the System Access Narrative, PHEAA explains that those users were mistakenly reported to VCG in error.

- PHEAA's failure to receive permission from VCG (formerly FMC) before giving system access to these users causes PHEAA to fail to comply with section 4.07 System Access of the Servicing Agreement.

5. Section 4 of the System Access Schedule prohibits PHEAA from adding or deleting users without receiving notification from VCG to do so.

   - On page 2 of PHEAA's System Access Narrative, PHEAA stated that users' accounts would be automatically deleted when non-use of the account existed for 365 days.

     - According to the second user access report dated 9/14/2015:
       - 8.4% of the users last accessed the system between September, October and December of 2014;
       - 53.9% of the users last accessed the system in 2015;
     - PHEAA has deleted users that reach 365 days of non-use

   - PHEAA has failed to comply with section 4 of the System Access Schedule by both adding and deleting users without receiving authorization from VCG to do so.

6. Section 4 of the System Access Schedule requires PHEAA to send VCG a user access report that lists who has system access to borrower information on a quarterly basis.

   - PHEAA has confirmed that these reports have never been sent to VCG. VCG has confirmed that these reports have never been received.

   - PHEAA has failed to comply with section 4 of the System Access Schedule.

7. Section 4.07 System Access of the Servicing Agreement requires PHEAA to comply with the requirements of the System Access Schedule.

   - PHEAA's failure to comply with section 4 of the System Access Schedule (see paragraphs 5 and 6 above) has caused PHEAA to fail in complying with section 4.07 System Access of the Servicing Agreement.

8. Section 5 of the Customer Service Schedule requires PHEAA to send VCG copies of escalated customer complaints from Borrowers and PHEAA's responses thereto on a weekly basis

   - PHEAA forwards escalated customer complaints to NCO. Depending on the nature of the complaint and the stage of the account (i.e. in repayment,

delinquency stage, charged-off, etc.), PHEAA may provide a response to the complaint or rely on NCO to make the response.

- PHEAA confirmed it has never sent escalated customer complaints to VCG. VCG has confirmed it has never received escalated customer complaints from PHEAA.

- PHEAA has failed to comply with section 5 of the Customer Service Schedule.

9. Section 5 of the Customer Service Schedule requires PHEAA to contact VCG immediately for complaints received from any regulatory body or federal or state agency.

- PHEAA forwards complaints received from any regulatory body or federal or state agency to NCO. Depending on the nature of the complaint and the stage of the account (i.e. in repayment, delinquency stage, charged-off, etc.), PHEAA may provide a response to the complaint or rely on NCO to make the response.

- PHEAA confirmed it has never sent complaints received from any regulatory body or federal or state agency to VCG. VCG has confirmed it has never received these types of complaints from PHEAA.

- PHEAA has failed to comply with section 5 of the Customer Service Schedule.

10. Section 4.11 Customer Service of the Servicing Agreement requires PHEAA to maintain compliance with the Customer Service Schedule.

- PHEAA's failure to comply with section 5 of the Customer Service Schedule (see paragraphs 8 and 9 above) has caused PHEAA to fail in complying with section 4.11 Customer Service of the Servicing Agreement.

11. Section 5. Borrower Correspondence and Complaints of the Customer Service Schedule states that PHEAA shall be responsible for handling all customer service complaints.

- As referenced in paragraphs 8 and 9, PHEAA sends complaints to NCO for handling. PHEAA has failed to comply with Section 5 Borrower Correspondence and Complaints of the Customer Service Schedule.

12. Section 3 through 6 of the Required Reports Schedule, PHEAA is required to send VCG various material reports on a monthly basis, including the weekly MR-01 Report, MR-50 Report, and the MR-53 Report, which detail things such as recent transactions, borrower account status, new defaults and recent charge offs.

- PHEAA stated these reports have not been sent to VCG. VCG it has not received these reports.

- PHEAA has failed to comply with sections 3 through 6 of the Required Reports Schedule.

13. Section 4.16 Reports and Forms of the Servicing Agreement requires PHEAA to promptly and routinely send VCG copies of all material reports, records, and other documents and data as required by the Servicing Guidelines or as otherwise required by this Agreement, including the reports set forth on the Required Reports Schedule.

- As referenced in paragraphs 6, 8, 9, 11, 13, 14, 15, 16, 17, and 18, PHEAA has failed to supply VCG with copies of all material reports, records, and other documents and data as required by the Servicing Guidelines or as otherwise required by this Agreement, including the reports set forth on the Required Reports Schedule. PHEAA has failed to comply with section 4.16 Reports and Forms of the Servicing Agreement.

14. Section 7.03 SAS 70 Audit of the Servicing Agreement requires PHEAA to engage an Independent CPA annually to conduct reviews of PHEAA's general controls. PHEAA is required to provide VCG with a copy of each report submitted by PHEAA's independent accountants within thirty (30) days of its receipt.

- PHEAA stated these reports have not been sent to VCG. VCG confirmed it has not received these reports.

- PHEAA has failed to comply with section 7.03 SAS 70 Audit of the Servicing Agreement.

15. Section 7.06 Financial and Other Information of the Servicing Agreement PHEAA is required to send VCG, within forty-five (45) days after the end of each of the first three quarters of each fiscal year, an unaudited financial statement of PHEAA for such quarter.

- PHEAA stated these reports have not been sent to VCG. VCG confirmed it has not received these reports.

- PHEAA has failed to comply with section 7.06 Financial and Other Information of the Servicing Agreement.

16. Section 7.06 Financial and Other Information of the Servicing Agreement requires PHEAA to provide VCG, within 120 days after the close of each fiscal year, a copy of an annual report as to PHEAA's obligations and activities during such fiscal year, and financial statements for such fiscal year. The annual report shall be

accompanied by an Independent Auditor's Report stating that the financial statements present fairly, in all material respects, PHEAA's net assets as of the years stated, and its changes in net assets and cash flows for the years then ended

- PHEAA stated these reports have not been sent to VCG. VCG confirmed it has not received these reports.

- PHEAA has failed to comply with section 7.06 Financial and Other Information of the Servicing Agreement.

17. Section 7.07 Annual Statement of Compliance of the Servicing Agreement requires PHEAA to send to VCG an annual report, signed by PHEAA's Chief Executive Officer ("CEO") or Executive Vice President ("EVP"), stating that (a) a review of PHEAA's activities, and PHEAA's Performance under the Servicing Agreement, for the previous twelve (12) months has been made under such CEO's or EVP's supervision and (b) to the best of such CEO's or EVP's knowledge, based on such review, PHEAA has or has caused to be performed all of its obligations under the Servicing Agreement throughout such year and that no default has occurred, or if such a default has occurred and is continuing, specifying each such event, the nature and status thereof and the steps necessary to remedy such affair.

- PHEAA stated these reports have not been sent to VCG. VCG confirmed it has not received these reports.

- PHEAA has failed to comply with section 7.07 Annual Statement of Compliance of the Servicing Agreement.

18. Section 7.08 Annual Independent Public Accountant's Servicing Reports of the Servicing Agreement requires PHEAA to send VCG an annual report regarding PHEAA's assessment of compliance with the its servicing criteria.

- PHEAA stated these reports have not been sent to VCG. VCG confirmed it has not received these reports.

- PHEAA has failed to comply with section 7.08 Annual Independent Public Accountant's Servicing Reports of the Servicing Agreement.

19. Section 11.01 Proprietary/Confidential Information of the Servicing Agreement requires PHEAA to keep all borrower information confidential, and not disclose, transfer, use, copy, or allow any employees or any third parties access to any such borrower information, except for those who have a need to know such borrower information in order for PHEAA to accomplish the requirements of the Servicing Agreement and who are individually bound by contractual obligations of confidentiality and limitation of use sufficient to give effect to this confidentiality provision.

- As discussed in paragraph 4, PHEAA has granted system access to more than 178 individuals without permission to do so by VCG. System access permits the user to receive and copy borrower information.

- As discussed in paragraphs 8 and 9, PHEAA routinely sends NCO borrower information for escalated and regulatory complaints. Such escalated and regulatory complaints are required to be sent to VCG, not NCO. Receipt of said complaints gives NCO unauthorized access to borrower information.

- PHEAA has failed to comply with section 11.01 Proprietary/Confidential Information of the Servicing Agreement.

20. Section 11.04 Security Breach of the Servicing Agreement requires PHEAA to, among other things, immediately notify VCG if there has been any unauthorized acquisition of or access to data that compromises the security, confidentiality, or integrity of "non-public personal information" maintained by or for PHEAA. PHEAA is further required to take measures to contain and control the incident to prevent further unauthorized access and remedy the circumstances that permitted such breach to occur.

- As described in paragraph 18, and further documented in paragraphs 4, 8, and 9, PHEAA has granted system access to more than 178 individuals without permission to do so by VCG, and PHEAA routinely sends NCO borrower information for escalated and regulatory complaints.

  o System access permits the user to receive and copy non-public personal information maintained by PHEAA.
  o Escalated and regulatory complaints contain non-public personal information maintained by PHEAA.

- PHEAA has failed to comply with section 11.04 Security Breach of the Servicing Agreement.

21. The read and agreed letter dated November 5, 2008 of the Servicing Guidelines states that all questions, inquiries, documents, claim packages of all kinds or other material relating to such Student Loans shall be sent directly to FMER, including but not limited to: a. Pre-claim files; b. Cosigner release requests; c. Forbearance extension requests; d. Administrative forbearance requests; e. Default claims; f. Bankruptcy claims; and g. Death claims.

- PHEAA stated that when FMER resigned all questions, inquiries, documents, claim packages of all kinds or other material relating to such Loans were sent, and still continue to be sent, to NCO.

- PHEAA has failed to comply with the read and agreed letter dated November 5, 2008 of the Servicing Guidelines.

22. The Fraud, Forgery, and Identity Theft Section of the Servicing Guidelines, as amended by the May 14, 2010 read and agreed letter, states that the Servicer must notify the Program Administrator's fraud department within 3 business days of receipt of any fraud claims, forgery, or identity theft claims, including trade line deletions.

- PHEAA stated fraud claims, forgery, or identity theft claims, including trade line deletions are sent to NCO. NCO is not the Program Administrator.

- PHEAA has failed to comply with the Fraud, Forgery, and Identity Theft Section of the Servicing Guidelines, as amended by the May 14, 2010 read and agreed letter.

23. The Default Notifications Section of the Servicing Guidelines, as amended by the July 27, 2009 read and agreed letter, states that default notifications must be submitted to FMER between the 180th and 210th day of delinquency, and that PHEAA shall submit a daily roster of all defaulted loans (the "Defaulted Loan Roster").

- PHEAA stated that when FMER resigned all default notices and claim packages were sent, and still continue to be sent, to NCO.

- PHEAA has failed to comply with the Default Notifications Section of the Servicing Guidelines, as amended by the July 27, 2009 read and agreed letter.

24. The Default Prevention Activities Section of the Servicing Guidelines, as amended by the July 27, 2009 read and agreed letter, states that PHEAA will send delinquency notifications to borrowers and co-borrowers via email, if it has been provided with such emails, at specified delinquency dates.

- As demonstrated in the Loan Review Results, PHEAA failed to send the required emails on multiple occasions.
- PHEAA has failed to comply with the Default Prevention Activities Section of the Servicing Guidelines, as amended by the July 27, 2009 read and agreed letter.

25. The Default Prevention Activities Section of the Servicing Guidelines, as amended by the July 27, 2009 read and agreed letter, states that PHEAA will mail delinquency notifications to borrowers and co-borrowers specified delinquency dates.

- As demonstrated in the Loan Review Results, PHEAA failed to mail the required letters on multiple occasions.

- PHEAA has failed to comply with the Default Prevention Activities Section of the Servicing Guidelines, as amended by the July 27, 2009 read and agreed letter.

26. The Default Prevention Activities Section of the Servicing Guidelines as amended by the July 27, 2009 read and agreed letter, states that PHEAA will begin dialing the borrower and co-borrower on the 11th day of delinquency and will continue until contact is made with a right party.

- As demonstrated in the Loan Review Results, PHEAA failed to dial the borrower and/or co-borrower on multiple occasions. PHEAA failed to continue dialing the borrower and/or co-borrower until contact was made.

- PHEAA has failed to comply with the Default Prevention Activities Section of the Servicing Guidelines as amended by the July 27, 2009 read and agreed letter

**Compliance Standards Under Review**

There are 34 of the 61 standards requiring additional information from PHEAA to determine compliance. The details of each compliance standard that is under review and the information that is being requested from PHEAA to determine compliance include:

1. Section 4.03(a) Product Setup and Conversion - Credit Agreements of the Servicing Agreement states that PHEAA shall promptly review promissory note or credit agreement forms that are proposed by FMC and/or Program Lender and accept such forms for purposes of product set-up and conversion.

   - To determine compliance with this standard, PHEAA has been asked to provide a sample of the promissory note or credit agreement forms that PHEAA received from FMC or program lender.

2. Section 4.04 Custody Procedures of the Servicing Agreement states that PHEAA shall maintain all Original Credit Agreements that have an original, wet signature in a fire resistant vault equipped with a fire suppression system which is connected to an alarm and a security locking system.

   - To determine compliance with this standard, PHEAA has been asked to provide a report identifying the active and charged off loans that have wet signatures on the Original Credit Agreements.

   - Once this report is provided, an on-site inspection of a sample of the wet signature agreements should be performed to determine
     - The accuracy of PHEAA's report
     - That the documents are stored in a fire resistant vault equipped with a fire suppression system which is connected to an alarm and a security locking system.

3. Section 4.04 Custody Procedures of the Servicing Agreement states that PHEAA shall maintain microfilm or electronic records onsite at Servicer's Servicing Center in Harrisburg, PA and at an off-site facility in a fire resistant vault equipped with (a) a fire suppression system which is connected to an alarm and (b) with a security locking system at least 100 miles away from the on-site facility used to house the Original Credit Agreements and related documents

   - To determine compliance with this standard, an inspection should take place of the onsite storage vault and off-site facility to verify maintenance and existence of files. While at each location, a sample of files should be reviewed to verify accuracy.

4. Section 4.04 Custody Procedures of the Servicing Agreement states that PHEAA shall provide FMC (VCG) 60 days advance notice of any change in the physical location of the Original Credit Agreements and related documents or any relocation of the PHEAA's servicing center.

   - To determine compliance with this standard, PHEAA has been asked to provide the address of the off-site storage facility, including all previous addresses since March 2009 and the dates of occupancy.

5. Section 4.05 Lost or Damaged Records of the Servicing Agreement states in the event that records or other data submitted to PHEAA for Servicing should be lost or damaged while in the possession, control, or custody of PHEAA or its agents, PHEAA shall pay the Owner's (VCG) expenses associated with such lost or damaged record or data, including but not limited to reasonable attorney's fees.

   - To determine compliance with this standard, PHEAA has been asked to provide
     - Policies and procedures regarding inbound document recording process and inventory management procedures for maintaining documents. A report illustrating the documents on file and the documents that are missing for each active and charged off loan

   - The Loan Review Sample has revealed that documents are missing from the loan files, but further review is needed to determine if those records were lost or damaged while in the possession of PHEAA or its agent.

6. Section 4.05 Lost or Damaged Records of the Servicing Agreement states that in the event that a Student Loan becomes uncollectible or unenforceable due to the loss or destruction of records or data in the possession, control, or custody of PHEAA or its agent then PHEAA shall, on demand, pay to the Owner (VCG) the principal balance (plus capitalized interest) and any unpaid interest due on any such Student Loan.

   - To determine compliance with this standard, PHEAA has been asked to provide policies and procedures regarding inbound document recording process and inventory management procedures for maintaining documents.

   - PHEAA has also been asked to provide a report listing active and charged off loans missing Original Credit Agreements.

   - Upon receipt of this report from PHEAA, a visit to the storage facility may be necessary to confirm accuracy.

7. Section 4.07 System Access of the Servicing Agreement states that PHEAA shall review the individual user access rights of PHEAA employees and other users no less frequently than every ninety (90) days.

- To determine compliance with this standard, PHEAA has been asked to confirm and provide
  - The frequency user access rights of PHEAA's employees are reviewed
  - The frequency reports are generated which memorialize PHEAA's review of the user access rights
  - To whom these reports are sent
  - Copies of the three most recent reports

8. Section 4.09 Operations Meeting; Procedures Manual of the Servicing Agreement states that PHEAA and FMC (VCG) shall create and maintain a procedures manual for all aspects of servicing which shall comply fully with the terms of the Servicing Agreement, the Service Level Agreement, the Servicing Guidelines, the terms and conditions of the Credit Agreements, and all applicable federal and state laws ("Program Manual").

   - To determine compliance with this standard, PHEAA has been asked to provide a copy of the Program Manual and all amendments.

9. Section 4.09 Operations Meeting; Procedures Manual of the Servicing Agreement states that the Program Manual shall be subject to the provisions of Section 11.01 confidentiality.

   - To determine compliance with this standard, PHEAA has been asked to provide a list of all entities to whom the Program Manual has been provided.

10. Section 1. Call Monitoring of the Customer Service Schedule states that PHEAA shall monitor on a monthly basis a minimum of 1% of the calls received per customer service representative for quality.

    - To determine compliance with this standard, PHEAA has been asked to provide three most recent reports PHEAA created memorializing its monitoring of the customer service representative calls.

11. Section 4.13 Collections of the Servicing Agreement states that all sums received by PHEAA with respect to any Student Loans, whether attributable to principal or interest shall be received in trust for the benefit of the Owner (VCG).

    - To determine compliance with this standard, PHEAA has been asked to provide a transaction level listing of all payments and reversals in a two month period and the related trustee report for these deposits. The information should include a summarized deposit and deduction report.

12. Section 4.13 Collections of the Servicing Agreement states that all funds received on behalf of Borrowers shall be deposited in a PHEAA-owned and maintained account that is a separate account in which funds are not commingled with PHEAA's non-collection account funds.

- To determine compliance with this standard, PHEAA has been asked to provide three most recent monthly bank statements of the PHEAA-owned account in which borrower funds are deposited.

13. Section 4.13 Collections of the Servicing Agreement states that within two (2) Business Days, all available funds from Student Loans shall be electronically transmitted to an account designated by FMC (VCG).

- To determine compliance with this standard, PHEAA has been asked to provide appropriate documents and bank statements that will demonstrate PHEAA's compliance with Section 4.13 of the Servicing Agreement states that within two (2) Business Days, all available funds from Student Loans shall be electronically transmitted to a pre-designated account.

14. Section 4.14 Late Fees of the Servicing Agreement states that Late Fees shall not be included in the amount of a claim if a default claim is submitted to the insurer.

- To determine compliance with this standard, PHEAA has been asked to confirm whether late fees are
  - Currently included in the charge off amounts
  - Have ever been included in the charge off amounts

15. Section 4.17 Governmental Reporting of the Servicing Agreement states that PHEAA shall provide reports on form 1098E and 1099 to borrowers and the U.S. Internal Revenue Service.

- To determine compliance with this standard, PHEAA has been asked to provide a report of all issued 1098E's and 1099's from 2014. The report should include borrower and loan identification information, amount reported to the IRS and outstanding balance on the account at the time the 1098E or 1099 was issued.

16. Section 4.18 Reporting to Consumer Reporting Agencies of the Servicing Agreement states that PHEAA shall correct any errors caused by the incorrect reporting of information to the Consumer Reporting Agencies, in a timely manner not to exceed thirty (30) days.

- To determine compliance with this standard, PHEAA has been asked to provide

- o Policies and procedures on the process of reporting and correcting information sent to the credit bureaus
- o All resolved complaints from the three most recent months that PHEAA received from borrowers regarding credit report inaccuracies and the actions taken by PHEAA to resolve inaccuracy

17. Section 4.18 Reporting to Consumer Reporting Agencies of the Servicing Agreement states that PHEAA shall report to all national Consumer Reporting Agencies, which are currently Experian, Equifax, and TransUnion

- To determine compliance with this standard, further review of a sample population will be tested.

18. Section 5.07 OFAC Check of the Servicing Agreement states that all PHEAA employees performing Services or supporting PHEAA activities under the Servicing Agreement, regardless of their location, shall be validated by PHEAA to not be on any list published and maintained by the U.S. Government of persons or entities with whom any U.S. person or entity is prohibited from conducting business.

- To determine compliance with this standard, PHEAA has been asked to provide
    - o Policies and procedures on checking employees on the prohibited list of persons or entities with whom business may be conducted in accordance with the Office of Foreign Assets Control
    - o Executive acknowledgment or certification that the PHEAA's OFAC policies and procedures are being followed

19. Section 5.07 OFAC Check of the Servicing Agreement states that PHEAA shall conduct periodic reviews, no less frequently than quarterly, of its employees through the OFAC check.

- To determine compliance with this standard, PHEAA has been asked to provide copies of the three most recent quarterly reports confirming the OFAC check is completed.

20. Section 5.07 OFAC Check of the Servicing Agreement states that PHEAA shall report to FMC (VCG) immediately if the name of any PHEAA employee performing the Services matches with the name of any person listed on any list published by the Government of the U. S. of persons or entities with whom any U. S. person or entity is prohibited from doing business.

- To determine compliance with this standard, PHEAA has been asked to provide a list of employees' names that have matched OFAC's list of prohibited persons or entities which business may be conducted since March 2009.

21. Section 5.08 FACT Act, PATRIOT Act and OFAC Check of the Servicing Agreement states that PHEAA's performance of its Servicing obligations shall include compliance with the requirements imposed on Owner and Insurer as users and furnishers of consumer report information under the Fair and Accurate Credit Transactions Act of 2003 and all regulations issued pursuant thereto, including timely and lawful response to any identity theft report received from any borrower or consumer reporting agency and the obligation to respond to a credit report reinvestigation request in accordance with the Identity Theft Procedures.

    - To determine compliance with this standard, PHEAA has been asked to provide
        o Policies and procedures on the process of reviewing and responding to identity theft claims
        o All resolved complaints from the three most recent months that PHEAA received from borrowers regarding identity theft and the resolution logs of actions taken by PHEAA to reach the resolution

22. Section 7.03 SAS 70 Audit of the Servicing Agreement states that PHEAA will engage, at its expense, an independent CPA firm that adheres to professional standards established by the American Institute of Certified Public Accountants (AICPA) to conduct reviews of PHEAA's general controls associated with PHEAA's facilities, as well as the controls associated with the Services and the programs used to provide the Services, including but not limited to controls over information technology and related processes. The independent CPA reviews shall be performed at such frequency and times as PHEAA shall determine, but shall be performed at least once annually.

    - To determine compliance with this standard, PHEAA has been asked to provide copies of each annual CPA report completed since 2009.

23. Section 7.05 Regulatory Audit of the Servicing Agreement states that within thirty (30) days of its receipt, PHEAA shall provide FMC (VCG) with a summary of any audit results performed by a federal or state regulator concerning the Services provided under the Servicing Agreement.

    - To determine compliance with this standard, PHEAA has been asked to confirm whether it has had any audits conducted by federal or state regulators concerning the Services provided under the Servicing Agreement. If yes,
        o Which entities conducted the audit(s)
        o When was/were the audit(s) conducted
        o Provide copies of the initial audit scope/notice sent to PHEAA by the entities
        o Provide copies of the final reports from the audit(s)

24. Section 7.08 Annual Independent Public Accountant's Servicing Reports of the Servicing Agreement states that PHEAA shall service and administer all Student Loans in accordance with all applicable requirements of the servicing criteria set forth in Item 1122(d) (the "Servicing Criteria") of Regulation AB (17 C.F.R. §§ 229.1100 - 229.1123) ("Regulation AB") promulgated by the Securities and Exchange Commission (the "SEC") under the Securities Act of 1934, as amended (the "Exchange Act").

- To determine compliance with this standard, PHEAA has been asked to provide policies, procedures, and appropriate documents, including reports of any outside party who conducted a review, demonstrating compliance with Section 7.08 Annual Independent Public Accountant's Servicing Reports of the Servicing Agreement.

25. Section 7.09 Cooperation with Audits; Follow-Up of the Servicing Agreement states that If any audit report establishes that PHEAA's performance of the Services is not in compliance with the terms of this Agreement, PHEAA shall submit to FMC (VCG) within thirty (30) days of its receipt of the relevant audit report a plan to improve PHEAA's performance to the level required by this Agreement.

- To determine compliance with this standard, PHEAA has been asked to confirm, since March 2009, whether any audit report established that PHEAA's performance of its Services under the terms of the Servicing Agreement to be non-compliant.

26. Section 11.02 Privacy of the Servicing Agreement states that PHEAA agrees that it will not sell, disclose, transfer, or rent any Confidential Information to any third party nor will it use any Confidential Information on behalf of any third party, without the express written permission of FMC (VCG) and the relevant Borrower.

- To determine compliance with this standard, PHEAA has been asked to provide PHEAA's privacy policy and a certificate of compliance to said policy.

27. Section 11.03 Security Program of the Servicing Agreement states that PHEAA shall implement and maintain an appropriate security program for Customer Information designed to meet the following Objectives, as defined below, of the Interagency Guidelines Establishing Standards for Safeguarding Customer Information pursuant to the authority of Section 501(b) of the Gramm-Leach-Bliley Act of 1999 ("Information Security Program"). "Objectives" means a program designed to (i) ensure the security and confidentiality of Customer Information (as defined below); (ii) protect against any anticipated threats or hazards to the security or integrity to Customer Information, and (iii) protect against unauthorized access to or use of Customer Information that could result in substantial harm or inconvenience to any "Customer".

- To determine compliance with this standard, PHEAA has been asked to provide its policies and procedures on PHEAA's information security. Include a report showing the procedures have been tested, last test completion date and results.

28. Section 11.05 Business Continuity and Site Disaster Recovery Plans of the Servicing Agreement states that PHEAA shall maintain and shall test at least once annually plans to continue business in the event of an interruption to its business or unavailability of any site from which Services are being performed (the "Disaster Recovery and Business Continuity Plans").

   - To determine compliance with this standard, PHEAA has been asked to provide annual report results on PHEAA's business continuity testing since 2009.

29. Section 11.05 Business Continuity and Site Disaster Recovery Plans of the Servicing Agreement states that PHEAA covenants and agrees that it shall create on a daily basis electronically stored backup data for all Student Loan data for the particular day.

   - To determine compliance with this standard, PHEAA has been asked to provide policies, procedures, and documents demonstrating PHEAA's compliance with creating daily electronically stored backup data for all Student Loan data for the particular day. (See Servicing Agreement Section11.05 Business Continuity and Site Disaster Recovery Plans of the Servicing Agreement)

30. Section 11.05 Business Continuity and Site Disaster Recovery Plans of the Servicing Agreement states that PHEAA shall test both its Disaster Recovery Plan and Business Continuity Plan on an annual basis and send its annual Overview of Business Recovery Exercise report to FMC (VCG).

   - To determine compliance with this standard, PHEAA has been asked to provide
     - o Annual report results on PHEAA's business continuity testing since 2009
     - o Annual report results on PHEAA's disaster recovery plan testing since 2009

31. Section Default Notifications of the Servicing Guidelines states that all default notification packages require submission of the Application, Credit Agreement, and Disclosure Statement.

   - To determine compliance with this standard, PHEAA has been asked to provide a report identifying the following

- A report illustrating the documents on file and the documents that are missing for each active and charged off loan For any missing Original Credit Agreement or disclosure statement, indicate whether the document was never received by PHEAA or the document was received but PHEAA currently does not have
- For any missing Original Credit Agreement or disclosure statement, indicate whether a request for the missing document was made, the date the request for the missing document was sent, to whom it was sent, and whether a response to the request was provided to PHEAA

## Compliance Standards Under Review – Self Reporting

There are three standards under review that require PHEAA to self-report. These three standards do not initiate until PHEAA fails to comply with the terms of the Agreement. Until testing is completed, these standards cannot be determined as pass or fail.

1. Section 4.02 Failed Service Levels: Notice and Cure of the Servicing Agreement states that PHEAA shall notify FMC (VCG) through the reports required by the Service Level Agreement of any failure to meet any Servicing standard set forth in the Service Level Agreement

2. Section 4.02 Failed Service Levels: Notice and Cure of the Servicing Agreement states that in the event that PHEAA shall fail to perform the same Servicing standard for thirty (30) days, then the Owner (VCG) shall be entitled to a reduction (or rebate if already paid) of two and one-half percent (2.5%) of the Servicing Fees. The Owner (VCG) shall continue to be entitled to a Fee Reduction for each subsequent consecutive month in which PHEAA shall fail to perform the same standard.

3. Section 4.19 Data Error Correction; Account Adjustment of the Servicing Agreement states that in the event that any data file transmitted to FMC or any Owner or any account contains a material error, PHEAA shall, within one (1) calendar day of discovery of such error, notify FMC (VCG) or the affected Owners of such error. PHEAA shall use best efforts to provide a corrected file as soon as possible but no later than three (3) calendar days.

Ex. 6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ESTHER HOFFMAN; SARAH DOUGLASS;
ANTHONY KIM; and IL KIM and DARIA
KIM, husband and wife and the marital
community comprised thereof, on behalf of
themselves and on behalf of others similarly
situated,

          Plaintiffs,

     vs.

TRANSWORLD SYSTEMS INCORPORATED;
PATENAUDE AND FELIX, A.P.C.;
MATTHEW CHEUNG, and the marital
community comprised of MATTHEW CHEUNG
and JANE DOE CHEUNG; National Collegiate
Student Loan Trust 2004-2; National Collegiate
Student Loan Trust 2005-2; National Collegiate
Student Loan Trust 2005-3; National Collegiate
Student Loan Trust 2006-1; National Collegiate
Student Loan Trust 2006-3; National Collegiate
Student Loan Trust 2007-4,

          Defendants.

Case No. C18-1132 TSZ

PLAINTIFFS' FIRST REQUESTS
FOR PRODUCTION OF
DOCUMENTS TO DEFENDANT
TRANSWORLD SYSTEMS
INCORPORATED



13.     "DOCUMENT" shall refer to all writings as defined in Fed. R. Civ. P. 34(a)(1)(A), however produced or reproduced or archived or stored, within your possession or subject to your control, of which you have knowledge or to which you now have or previously had access, including all electronically stored information.

14.     "ELECTRONICALLY STORED INFORMATION" ("ESI") shall include any information as defined by the Federal Rules of Civil Procedure and the case law construing and applying those rules. Plaintiffs request that ESI be processed and produced in a manner that preserves all metadata and that the parties confer regarding the production of metadata prior to the gathering and processing of ESI.

15.     "EMPLOYED" and "EMPLOYEE" shall include any person having regular, ongoing responsibilities for some aspect of your operations, whether the person is classified as an employee, independent contractor, or consultant.

16.     "P&F" means Patenaude & Felix, A.P.C., its attorneys, employees, managers, directors, officers, agents, partners, principals, consultants, advisors, representatives, or persons working on its behalf.

17.     "CHEUNG" means Matthew Cheung or persons working on his behalf.

18.     "NCSLTs" means collectively National Collegiate Student Loan Trust 2004-2; National Collegiate Student Loan Trust 2005-2; National Collegiate Student Loan Trust 2005-3; National Collegiate Student Loan Trust 2006-1; National Collegiate Student Loan Trust 2006-3; National Collegiate Student Loan Trust 2007-4.

19.     "IDENTIFY" when referring to a document or correspondence means to state:

PLAINTIFFS' FIRST REQUESTS FOR
PRODUCTION OF DOCUMENTS TO
TRANSWORLD SYSTEMS INCORPORATED - 5
(Case No. C18-1132 TSZ)



1708 Bellevue Avenue
Seattle, WA  98122
(206) 441-5444 FAX (206) 838-6346

1   RESPONSE:

2

3

4       REQUEST FOR PRODUCTION NO. 24:  Produce all documents concerning coverage

5   or reserving rights regarding any insurance agreement under which an insurance company may

6   be liable to satisfy all or part of a possible judgment against any Defendant, or to indemnify or

7   reimburse any Defendant for payments made to satisfy any possible judgment against any

8   Defendant.

9
        RESPONSE:
10

11

12

13

14
        REQUEST FOR PRODUCTION NO. 25:  Produce an original copy of "Schedule 1"
15
    that is mentioned on page 23 of Document No. 16-1 filed in this action.
16
        RESPONSE:
17

18

19

20

21      REQUEST FOR PRODUCTION NO. 26:  Produce an original copy of "Schedule 2"

22  that is mentioned on page 24 of Document No. 16-1 filed in this action.

23
        RESPONSE:
24

25

26                                              Berry&Beckett

27  PLAINTIFFS' FIRST REQUESTS FOR                1708 Bellevue Avenue
    PRODUCTION OF DOCUMENTS TO                    Seattle, WA  98122
    TRANSWORLD SYSTEMS INCORPORATED - 15      (206) 441-5444 FAX (206) 838-6346
    (Case No. C18-1132 TSZ)

REQUEST FOR PRODUCTION NO. 27:  Produce all documents related to the location of the "Schedule 1" that is mentioned on page 23 of Document No. 16-1, and "Schedule 2" that is mentioned on page 24 of Document No. 16-1 filed in this action.

RESPONSE:

REQUEST FOR PRODUCTION NO. 28:  Produce an original copy of the "Schedule 1" and "Schedule 2" that are mentioned on page 23 of Document No. 16-2 filed in this action.

RESPONSE:

REQUEST FOR PRODUCTION NO. 29:  Produce all documents related to the location of the "Schedule 1" and "Schedule 2" that are mentioned on page 23 of Document No. 16-2 filed in this action.

RESPONSE:

REQUEST FOR PRODUCTION NO. 30:  Produce any agreement with P&F that permitted P&F to provide legal services on behalf of the NCSLTs in actions to collect on debts from consumers.

RESPONSE:

Berry&Beckett
LLP
1708 Bellevue Avenue
Seattle, WA  98122
(206) 441-5444 FAX (206) 838-6346

Ex. 7

Ex. 7.1

1                                                    The Hon. Thomas S. Zilly

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| ESTHER HOFFMAN; SARAH DOUGLASS; ANTHONY KIM; and IL KIM and DARIA KIM, husband and wife and the marital community comprised thereof, on behalf of themselves and on behalf of others similarly situated,<br><br>                     Plaintiffs,<br><br>          vs.<br><br>TRANSWORLD SYSTEMS INCORPORATED; PATENAUDE AND FELIX, A.P.C.; MATTHEW CHEUNG, and the marital community comprised of MATTHEW CHEUNG and JANE DOE CHEUNG; National Collegiate Student Loan Trust 2004-2; National Collegiate Student Loan Trust 2005-2; National Collegiate Student Loan Trust 2005-3; National Collegiate Student Loan Trust 2006-1; National Collegiate Student Loan Trust 2006-3; National Collegiate Student Loan Trust 2007-4,<br><br>                     Defendants. | Case No. C18-1132 TSZ<br><br>PLAINTIFFS' FIRST INTERROGATORIES AND REQUEST FOR PRODUCTION TO DEFENDANT NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2 |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the following First

Set of Interrogatories and Requests for Production (the "Discovery Requests") are propounded

to you and your attorneys of record. These Interrogatories are intended to draw upon the

combined knowledge of you, your agents, and your attorneys.

Berry&Beckett
PLLP
1708 Bellevue Avenue
Seattle, WA 98122
(206) 441-5444 FAX (206) 838-6346

convenient access, generally in a computer; a collection of information that is organized so that it can easily be accessed, managed, and updated; or a structured set of data held in a computer.

12. "DATE" shall mean the exact day, month, and year if ascertainable or, if not, the best approximation, including any known relationship to other events.

13. "DEBT" means any alleged obligation to pay money arising out of any agreement or contract related to a student loan you have alleged was owned by you.

14. "DOCUMENT" shall refer to all writings as defined in Fed. R. Civ. P. 34(a)(1)(A), however produced or reproduced or archived or stored, within your possession or subject to your control, of which you have knowledge or to which you now have or previously had access, including all electronically stored information.

15. "ELECTRONICALLY STORED INFORMATION" ("ESI") shall include any information as defined by the Federal Rules of Civil Procedure and the case law construing and/or applying those rules. Plaintiffs request that ESI be processed and produced in a manner that preserves all metadata and that the parties confer regarding the production of metadata prior to the gathering and processing of ESI.

16. "EMPLOYED" and "EMPLOYEE" shall include any person having regular, ongoing responsibilities for some aspect of your operations, whether the person is classified as an employee, independent contractor, or consultant.

17. "P&F" means Patenaude & Felix, A.P.C., its attorneys, employees, managers, directors, officers, agents, partners, principals, consultants, advisors, representatives, or persons working on its behalf.

18. "CHEUNG" means Matthew Cheung or persons working on his behalf.

Berry&Beckett
LLP
1708 Bellevue Avenue
Seattle, WA 98122
(206) 441-5444 FAX (206) 838-6346

24.     "INDIVIDUAL," "PERSON," or "PERSONS" shall mean natural persons, proprietorships, sole proprietorships, corporations, nonprofit corporations, municipal corporations, local, state, federal or foreign governments or governmental agencies, political subdivisions, general or limited partnerships, business trusts, trusts, estates, clubs, groups, unincorporated associations, or other business or public organizations.

25.     "MEETING" shall mean any encounter between two or more persons during which a communication of any kind occurred and shall include, but not be limited to, formal gatherings, conversations, communication by electronic media, and telephone calls.

26.     "POLICY" or "POLICIES" shall mean each rule, procedure, training material, or directive, formal or informal, and each common understanding or course of conduct which was recognized as such by your present or former officers, agents, employees or other persons acting or purporting to act on your behalf, which was in effect at any time during the period covered by these Interrogatories and which includes any change of policy.

27.     "RELATING TO" or "REFERRING TO" (including other verb tenses of those terms) means describing, evidencing, constituting, reflecting, showing, comprising, considering, concerning, discussing, regarding, setting forth, studying, analyzing, commenting upon, recommending, alluding to, or mentioning, in whole or in part.

28.     "SCHEDULE 2" means the document referenced on page 4 of Exhibit A that is attached to these Discovery Requests.

29.     "YOU," "YOUR," means National Collegiate Student Loan Trust 2004-2 and your employees, executives, and board members. You and your **does not include** any other Defendant.

Berry&Beckett
LLP
1708 Bellevue Avenue
Seattle, WA  98122
(206) 441-5444 FAX (206) 838-6346

N.A., Turnstile Capital Management LLC, PNC Bank, N.A. or GE Money Undergraduate

Loan, The American Educational Services (AES), the Pennsylvania Higher Education

Assistance Agency (PHEAA), and The Education Resource Institute (TERI) as relates to this

Student Loan.

ANSWER:


REQUEST FOR PRODUCTION NO. 1: Provide a copy of Schedule 2 as it existed on

October 28, 2004.

RESPONSE:


REQUEST FOR PRODUCTION NO. 2: Provide all documents you referenced or relied

upon in responding to any Interrogatory.

RESPONSE:


REQUEST FOR PRODUCTION NO. 3: Provide all documents in your possession

custody and control relating to any of the Plaintiffs.

RESPONSE:


REQUEST FOR PRODUCTION NO. 4: Provide all documents identified in

Interrogatory No. 12 relating to any of the Plaintiffs' files, including custody, access, and

procedures for assuring that the records in the files are not tampered with.

RESPONSE:

Berry&Beckett
1708 Bellevue Avenue
Seattle, WA 98122
(206) 441-5444 FAX (206) 838-6346

Ex. 7.2

The Hon. Thomas S. Zilly

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ESTHER HOFFMAN; SARAH DOUGLASS;
ANTHONY KIM; and IL KIM and DARIA
KIM, husband and wife and the marital
community comprised thereof, on behalf of
themselves and on behalf of others similarly
situated,

                Plaintiffs,

      vs.

TRANSWORLD SYSTEMS INCORPORATED;
PATENAUDE AND FELIX, A.P.C.;
MATTHEW CHEUNG, and the marital
community comprised of MATTHEW CHEUNG
and JANE DOE CHEUNG; National Collegiate
Student Loan Trust 2004-2; National Collegiate
Student Loan Trust 2005-2; National Collegiate
Student Loan Trust 2005-3; National Collegiate
Student Loan Trust 2006-1; National Collegiate
Student Loan Trust 2006-3; National Collegiate
Student Loan Trust 2007-4,

                Defendants.

Case No. C18-1132 TSZ

PLAINTIFFS' FIRST
INTERROGATORIES AND
REQUEST FOR PRODUCTION TO
DEFENDANT NATIONAL
COLLEGIATE STUDENT LOAN
TRUST 2005-2

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the following First

Set of Interrogatories and Requests for Production (the "Discovery Requests") are propounded

to you and your attorneys of record. These Interrogatories are intended to draw upon the

combined knowledge of you, your agents, and your attorneys.

Berry&Beckett
PLLP
1708 Bellevue Avenue
Seattle, WA 98122
(206) 441-5444 FAX (206) 838-6346

convenient access, generally in a computer; a collection of information that is organized so that it can easily be accessed, managed, and updated; or a structured set of data held in a computer.

12.     "DATE" shall mean the exact day, month, and year if ascertainable or, if not, the best approximation, including any known relationship to other events.

13.     "DEBT" means any alleged obligation to pay money arising out of any agreement or contract related to a student loan you have alleged was owned by you.

14.     "DOCUMENT" shall refer to all writings as defined in Fed. R. Civ. P. 34(a)(1)(A), however produced or reproduced or archived or stored, within your possession or subject to your control, of which you have knowledge or to which you now have or previously had access, including all electronically stored information.

15.     "ELECTRONICALLY STORED INFORMATION" ("ESI") shall include any information as defined by the Federal Rules of Civil Procedure and the case law construing and/or applying those rules. Plaintiffs request that ESI be processed and produced in a manner that preserves all metadata and that the parties confer regarding the production of metadata prior to the gathering and processing of ESI.

16.     "EMPLOYED" and "EMPLOYEE" shall include any person having regular, ongoing responsibilities for some aspect of your operations, whether the person is classified as an employee, independent contractor, or consultant.

17.     "P&F" means Patenaude & Felix, A.P.C., its attorneys, employees, managers, directors, officers, agents, partners, principals, consultants, advisors, representatives, or persons working on its behalf.

18.     "CHEUNG" means Matthew Cheung or persons working on his behalf.

Berry&Beckett
1708 Bellevue Avenue
Seattle, WA  98122
(206) 441-5444 FAX (206) 838-6346

24.     "INDIVIDUAL," "PERSON," or "PERSONS" shall mean natural persons, proprietorships, sole proprietorships, corporations, nonprofit corporations, municipal corporations, local, state, federal or foreign governments or governmental agencies, political subdivisions, general or limited partnerships, business trusts, trusts, estates, clubs, groups, unincorporated associations, or other business or public organizations.

25.     "MEETING" shall mean any encounter between two or more persons during which a communication of any kind occurred and shall include, but not be limited to, formal gatherings, conversations, communication by electronic media, and telephone calls.

26.     "POLICY" or "POLICIES" shall mean each rule, procedure, training material, or directive, formal or informal, and each common understanding or course of conduct which was recognized as such by your present or former officers, agents, employees or other persons acting or purporting to act on your behalf, which was in effect at any time during the period covered by these Interrogatories and which includes any change of policy.

27.     "RELATING TO" or "REFERRING TO" (including other verb tenses of those terms) means describing, evidencing, constituting, reflecting, showing, comprising, considering, concerning, discussing, regarding, setting forth, studying, analyzing, commenting upon, recommending, alluding to, or mentioning, in whole or in part.

28.     "SCHEDULE 2" means the document referenced on page 1 of Exhibit A that is attached to these Discovery Requests.

29.     "YOU," "YOUR," means National Collegiate Student Loan Trust 2005-2 and your employees, executives, and board members. You and your **does not include** any other Defendant.

Berry&Beckett
LLP
1708 Bellevue Avenue
Seattle, WA  98122
(206) 441-5444 FAX (206) 838-6346

N.A., Turnstile Capital Management LLC, PNC Bank, N.A. or GE Money Undergraduate

Loan, The American Educational Services (AES), the Pennsylvania Higher Education

Assistance Agency (PHEAA), and The Education Resource Institute (TERI) as relates to this

Student Loan.

ANSWER:


REQUEST FOR PRODUCTION NO. 1: Provide a copy of Schedule 2 as it existed on

September 28, 2006.

RESPONSE:


REQUEST FOR PRODUCTION NO. 2: Provide all documents you referenced or relied

upon in responding to any Interrogatory.

RESPONSE:


REQUEST FOR PRODUCTION NO. 3: Provide all documents in your possession

custody and control relating to any of the Plaintiffs.

RESPONSE:


REQUEST FOR PRODUCTION NO. 4: Provide all documents identified in

Interrogatory No. 14 relating to any of the Plaintiffs' files, including custody, access, and

procedures for assuring that the records in the files are not tampered with.

RESPONSE:

PLAINTIFFS' FIRST INTERROGATORIES TO NCSLT
2005-2 - 13
(Case No. C18-1132 TSZ)

Berry&Beckett
1708 Bellevue Avenue
Seattle, WA 98122
(206) 441-5444 FAX (206) 838-6346

Ex. 7.3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ESTHER HOFFMAN; SARAH DOUGLASS;
ANTHONY KIM; and IL KIM and DARIA
KIM, husband and wife and the marital
community comprised thereof, on behalf of
themselves and on behalf of others similarly
situated,

               Plaintiffs,

    vs.

TRANSWORLD SYSTEMS INCORPORATED;
PATENAUDE AND FELIX, A.P.C.;
MATTHEW CHEUNG, and the marital
community comprised of MATTHEW CHEUNG
and JANE DOE CHEUNG; National Collegiate
Student Loan Trust 2004-2; National Collegiate
Student Loan Trust 2005-2; National Collegiate
Student Loan Trust 2005-3; National Collegiate
Student Loan Trust 2006-1; National Collegiate
Student Loan Trust 2006-3; National Collegiate
Student Loan Trust 2007-4,

               Defendants.

Case No. C18-1132 TSZ

PLAINTIFFS' FIRST
INTERROGATORIES AND
REQUEST FOR PRODUCTION TO
DEFENDANT NATIONAL
COLLEGIATE STUDENT LOAN
TRUST 2005-3

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the following First

Set of Interrogatories and Requests for Production (the "Discovery Requests") are propounded

to you and your attorneys of record. These Interrogatories are intended to draw upon the

combined knowledge of you, your agents, and your attorneys.

Berry&Beckett
1708 Bellevue Avenue
Seattle, WA 98122
(206) 441-5444 FAX (206) 838-6346

convenient access, generally in a computer; a collection of information that is organized so that it can easily be accessed, managed, and updated; or a structured set of data held in a computer.

12.    "DATE" shall mean the exact day, month, and year if ascertainable or, if not, the best approximation, including any known relationship to other events.

13.    "DEBT" means any alleged obligation to pay money arising out of any agreement or contract related to a student loan you have alleged was owned by you.

14.    "DOCUMENT" shall refer to all writings as defined in Fed. R. Civ. P. 34(a)(1)(A), however produced or reproduced or archived or stored, within your possession or subject to your control, of which you have knowledge or to which you now have or previously had access, including all electronically stored information.

15.    "ELECTRONICALLY STORED INFORMATION" ("ESI") shall include any information as defined by the Federal Rules of Civil Procedure and the case law construing and/or applying those rules. Plaintiffs request that ESI be processed and produced in a manner that preserves all metadata and that the parties confer regarding the production of metadata prior to the gathering and processing of ESI.

16.    "EMPLOYED" and "EMPLOYEE" shall include any person having regular, ongoing responsibilities for some aspect of your operations, whether the person is classified as an employee, independent contractor, or consultant.

17.    "P&F" means Patenaude & Felix, A.P.C., its attorneys, employees, managers, directors, officers, agents, partners, principals, consultants, advisors, representatives, or persons working on its behalf.

18.    "CHEUNG" means Matthew Cheung or persons working on his behalf.

Berry&Beckett
LLP

24.     "INDIVIDUAL," "PERSON," or "PERSONS" shall mean natural persons, proprietorships, sole proprietorships, corporations, nonprofit corporations, municipal corporations, local, state, federal or foreign governments or governmental agencies, political subdivisions, general or limited partnerships, business trusts, trusts, estates, clubs, groups, unincorporated associations, or other business or public organizations.

25.     "MEETING" shall mean any encounter between two or more persons during which a communication of any kind occurred and shall include, but not be limited to, formal gatherings, conversations, communication by electronic media, and telephone calls.

26.     "POLICY" or "POLICIES" shall mean each rule, procedure, training material, or directive, formal or informal, and each common understanding or course of conduct which was recognized as such by your present or former officers, agents, employees or other persons acting or purporting to act on your behalf, which was in effect at any time during the period covered by these Interrogatories and which includes any change of policy.

27.     "RELATING TO" or "REFERRING TO" (including other verb tenses of those terms) means describing, evidencing, constituting, reflecting, showing, comprising, considering, concerning, discussing, regarding, setting forth, studying, analyzing, commenting upon, recommending, alluding to, or mentioning, in whole or in part.

28.     "SCHEDULE 1" means the document referenced on page 5 of Exhibit A that is attached to these Discovery Requests.

29.     "YOU," "YOUR," means National Collegiate Student Loan Trust 2005-3 and your employees, executives, and board members. You and your **does not include** any other Defendant.

Berry&Beckett
1708 Bellevue Avenue
Seattle, WA  98122
(206) 441-5444 FAX (206) 838-6346

N.A., Turnstile Capital Management LLC, PNC Bank, N.A. or GE Money Undergraduate

Loan, The American Educational Services (AES), the Pennsylvania Higher Education

Assistance Agency (PHEAA), and The Education Resource Institute (TERI) as relates to this

Student Loan.

ANSWER:


REQUEST FOR PRODUCTION NO. 1: Provide a copy of Schedule 1 as it existed on

October 12, 2005.

RESPONSE:


REQUEST FOR PRODUCTION NO. 2: Provide all documents you referenced or relied

upon in responding to any Interrogatory.

RESPONSE:


REQUEST FOR PRODUCTION NO. 3: Provide all documents in your possession

custody and control relating to any of the Plaintiffs.

RESPONSE:


REQUEST FOR PRODUCTION NO. 4: Provide all documents identified in

Interrogatory No. 12 relating to any of the Plaintiffs' files, including custody, access, and

procedures for assuring that the records in the files are not tampered with.

RESPONSE:

PLAINTIFFS' FIRST INTERROGATORIES TO NCSLT
2005-3 - 13
(Case No. C18-1132 TSZ)

Berry&Beckett
1708 Bellevue Avenue
Seattle, WA 98122
(206) 441-5444 FAX (206) 838-6346

Ex. 7.4

1

2

3

4

5

6

UNITED STATES DISTRICT COURT

7

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

8

9  ESTHER HOFFMAN; SARAH DOUGLASS;
   ANTHONY KIM; and IL KIM and DARIA
   KIM, husband and wife and the marital       Case No. C18-1132 TSZ
10 community comprised thereof, on behalf of
   themselves and on behalf of others similarly  PLAINTIFFS' FIRST
11 situated,                                      INTERROGATORIES AND
                                                  REQUEST FOR PRODUCTION TO
12               Plaintiffs,                       DEFENDANT NATIONAL
                                                  COLLEGIATE STUDENT LOAN
13        vs.                                      TRUST 2006-1

14 TRANSWORLD SYSTEMS INCORPORATED;
   PATENAUDE AND FELIX, A.P.C.;
15 MATTHEW CHEUNG, and the marital
   community comprised of MATTHEW CHEUNG
16 and JANE DOE CHEUNG; National Collegiate
   Student Loan Trust 2004-2; National Collegiate
17 Student Loan Trust 2005-2; National Collegiate
   Student Loan Trust 2005-3; National Collegiate
18 Student Loan Trust 2006-1; National Collegiate
   Student Loan Trust 2006-3; National Collegiate
19 Student Loan Trust 2007-4,

20               Defendants.

21        Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the following First

22 Set of Interrogatories and Requests for Production (the "Discovery Requests") are propounded

23 to you and your attorneys of record. These Interrogatories are intended to draw upon the

24
   combined knowledge of you, your agents, and your attorneys.
25

26

27

Berry&Beckett
PLLP
1708 Bellevue Avenue
Seattle, WA  98122
(206) 441-5444 FAX (206) 838-6346

convenient access, generally in a computer; a collection of information that is organized so that it can easily be accessed, managed, and updated; or a structured set of data held in a computer.

12. "DATE" shall mean the exact day, month, and year if ascertainable or, if not, the best approximation, including any known relationship to other events.

13. "DEBT" means any alleged obligation to pay money arising out of any agreement or contract related to a student loan you have alleged was owned by you.

14. "DOCUMENT" shall refer to all writings as defined in Fed. R. Civ. P. 34(a)(1)(A), however produced or reproduced or archived or stored, within your possession or subject to your control, of which you have knowledge or to which you now have or previously had access, including all electronically stored information.

15. "ELECTRONICALLY STORED INFORMATION" ("ESI") shall include any information as defined by the Federal Rules of Civil Procedure and the case law construing and/or applying those rules. Plaintiffs request that ESI be processed and produced in a manner that preserves all metadata and that the parties confer regarding the production of metadata prior to the gathering and processing of ESI.

16. "EMPLOYED" and "EMPLOYEE" shall include any person having regular, ongoing responsibilities for some aspect of your operations, whether the person is classified as an employee, independent contractor, or consultant.

17. "P&F" means Patenaude & Felix, A.P.C., its attorneys, employees, managers, directors, officers, agents, partners, principals, consultants, advisors, representatives, or persons working on its behalf.

18. "CHEUNG" means Matthew Cheung or persons working on his behalf.

Berry&Beckett
1708 Bellevue Avenue
Seattle, WA 98122
(206) 441-5444 FAX (206) 838-6346

24.     "INDIVIDUAL," "PERSON," or "PERSONS" shall mean natural persons, proprietorships, sole proprietorships, corporations, nonprofit corporations, municipal corporations, local, state, federal or foreign governments or governmental agencies, political subdivisions, general or limited partnerships, business trusts, trusts, estates, clubs, groups, unincorporated associations, or other business or public organizations.

25.     "MEETING" shall mean any encounter between two or more persons during which a communication of any kind occurred and shall include, but not be limited to, formal gatherings, conversations, communication by electronic media, and telephone calls.

26.     "POLICY" or "POLICIES" shall mean each rule, procedure, training material, or directive, formal or informal, and each common understanding or course of conduct which was recognized as such by your present or former officers, agents, employees or other persons acting or purporting to act on your behalf, which was in effect at any time during the period covered by these Interrogatories and which includes any change of policy.

27.     "RELATING TO" or "REFERRING TO" (including other verb tenses of those terms) means describing, evidencing, constituting, reflecting, showing, comprising, considering, concerning, discussing, regarding, setting forth, studying, analyzing, commenting upon, recommending, alluding to, or mentioning, in whole or in part.

28.     "SCHEDULE 2" means the document referenced on page 4 of Exhibit A that is attached to these Discovery Requests.

29.     "YOU," "YOUR," means National Collegiate Student Loan Trust 2006-1 and your employees, executives, and board members. You and your **does not include** any other Defendant.

Berry&Beckett
LLP
1708 Bellevue Avenue
Seattle, WA 98122
(206) 441-5444 FAX (206) 838-6346

N.A., Turnstile Capital Management LLC, PNC Bank, N.A. or GE Money Undergraduate Loan, The American Educational Services (AES), the Pennsylvania Higher Education Assistance Agency (PHEAA), and The Education Resource Institute (TERI) as relates to this Student Loan.

ANSWER:


REQUEST FOR PRODUCTION NO. 1: Provide a copy of Schedule 2 as it existed on March 9, 2006.

RESPONSE:


REQUEST FOR PRODUCTION NO. 2: Provide all documents you referenced or relied upon in responding to any Interrogatory.

RESPONSE:


REQUEST FOR PRODUCTION NO. 3: Provide all documents in your possession custody and control relating to any of the Plaintiffs.

RESPONSE:


REQUEST FOR PRODUCTION NO. 4: Provide all documents identified in Interrogatory No. 12 relating to any of the Plaintiffs' files, including custody, access, and procedures for assuring that the records in the files are not tampered with.

RESPONSE:

PLAINTIFFS' FIRST INTERROGATORIES TO NCSLT
2006-1 - 13
(Case No. C18-1132 TSZ)

Berry&Beckett
1708 Bellevue Avenue
Seattle, WA 98122
(206) 441-5444 FAX (206) 838-6346

Ex. 7.5

The Hon. Thomas S. Zilly

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ESTHER HOFFMAN; SARAH DOUGLASS;
ANTHONY KIM; and IL KIM and DARIA
KIM, husband and wife and the marital
community comprised thereof, on behalf of
themselves and on behalf of others similarly
situated,

                    Plaintiffs,

          vs.

TRANSWORLD SYSTEMS INCORPORATED;
PATENAUDE AND FELIX, A.P.C.;
MATTHEW CHEUNG, and the marital
community comprised of MATTHEW CHEUNG
and JANE DOE CHEUNG; National Collegiate
Student Loan Trust 2004-2; National Collegiate
Student Loan Trust 2005-2; National Collegiate
Student Loan Trust 2005-3; National Collegiate
Student Loan Trust 2006-1; National Collegiate
Student Loan Trust 2006-3; National Collegiate
Student Loan Trust 2007-4,

                    Defendants.

Case No. C18-1132 TSZ

PLAINTIFFS' FIRST
INTERROGATORIES AND
REQUEST FOR PRODUCTION TO
DEFENDANT NATIONAL
COLLEGIATE STUDENT LOAN
TRUST 2006-3

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the following First

Set of Interrogatories and Requests for Production (the "Discovery Requests") are propounded

to you and your attorneys of record. These Interrogatories are intended to draw upon the

combined knowledge of you, your agents, and your attorneys.

Berry&Beckett
PLLP
1708 Bellevue Avenue
Seattle, WA 98122
(206) 441-5444 FAX (206) 838-6346

convenient access, generally in a computer; a collection of information that is organized so that it can easily be accessed, managed, and updated; or a structured set of data held in a computer.

12.    "DATE" shall mean the exact day, month, and year if ascertainable or, if not, the best approximation, including any known relationship to other events.

13.    "DEBT" means any alleged obligation to pay money arising out of any agreement or contract related to a student loan you have alleged was owned by you.

14.    "DOCUMENT" shall refer to all writings as defined in Fed. R. Civ. P. 34(a)(1)(A), however produced or reproduced or archived or stored, within your possession or subject to your control, of which you have knowledge or to which you now have or previously had access, including all electronically stored information.

15.    "ELECTRONICALLY STORED INFORMATION" ("ESI") shall include any information as defined by the Federal Rules of Civil Procedure and the case law construing and/or applying those rules. Plaintiffs request that ESI be processed and produced in a manner that preserves all metadata and that the parties confer regarding the production of metadata prior to the gathering and processing of ESI.

16.    "EMPLOYED" and "EMPLOYEE" shall include any person having regular, ongoing responsibilities for some aspect of your operations, whether the person is classified as an employee, independent contractor, or consultant.

17.    "P&F" means Patenaude & Felix, A.P.C., its attorneys, employees, managers, directors, officers, agents, partners, principals, consultants, advisors, representatives, or persons working on its behalf.

18.    "CHEUNG" means Matthew Cheung or persons working on his behalf.

Berry&Beckett
LLP
1708 Bellevue Avenue
Seattle, WA  98122
(206) 441-5444 FAX (206) 838-6346

24.     "INDIVIDUAL," "PERSON," or "PERSONS" shall mean natural persons, proprietorships, sole proprietorships, corporations, nonprofit corporations, municipal corporations, local, state, federal or foreign governments or governmental agencies, political subdivisions, general or limited partnerships, business trusts, trusts, estates, clubs, groups, unincorporated associations, or other business or public organizations.

25.     "MEETING" shall mean any encounter between two or more persons during which a communication of any kind occurred and shall include, but not be limited to, formal gatherings, conversations, communication by electronic media, and telephone calls.

26.     "POLICY" or "POLICIES" shall mean each rule, procedure, training material, or directive, formal or informal, and each common understanding or course of conduct which was recognized as such by your present or former officers, agents, employees or other persons acting or purporting to act on your behalf, which was in effect at any time during the period covered by these Interrogatories and which includes any change of policy.

27.     "RELATING TO" or "REFERRING TO" (including other verb tenses of those terms) means describing, evidencing, constituting, reflecting, showing, comprising, considering, concerning, discussing, regarding, setting forth, studying, analyzing, commenting upon, recommending, alluding to, or mentioning, in whole or in part.

28.     "SCHEDULE 1" means the document referenced on page 3 of Exhibit A that is attached to these Discovery Requests.

29.     "YOU," "YOUR," means National Collegiate Student Loan Trust 2006-3 and your employees, executives, and board members. You and your **<u>does not include</u>** any other Defendant.



1708 Bellevue Avenue
Seattle, WA  98122
(206) 441-5444 FAX (206) 838-6346

N.A., Turnstile Capital Management LLC, PNC Bank, N.A. or GE Money Undergraduate Loan, The American Educational Services (AES), the Pennsylvania Higher Education Assistance Agency (PHEAA), and The Education Resource Institute (TERI) as relates to this Student Loan.

ANSWER:

REQUEST FOR PRODUCTION NO. 1: Provide a copy of Schedule 1 as it existed on September 28, 2006.

RESPONSE:

REQUEST FOR PRODUCTION NO. 2: Provide all documents you referenced or relied upon in responding to any Interrogatory.

RESPONSE:

REQUEST FOR PRODUCTION NO. 3: Provide all documents in your possession custody and control relating to any of the Plaintiffs.

RESPONSE:

REQUEST FOR PRODUCTION NO. 4: Provide all documents identified in Interrogatory No. 12 relating to any of the Plaintiffs' files, including custody, access, and procedures for assuring that the records in the files are not tampered with.

RESPONSE:

Berry&Beckett
1708 Bellevue Avenue
Seattle, WA 98122
(206) 441-5444 FAX (206) 838-6346

Ex. 7.6

1          The Hon. Thomas S. Zilly

2

3

4

5

6                    UNITED STATES DISTRICT COURT
7                    WESTERN DISTRICT OF WASHINGTON
                              AT SEATTLE
8
    ESTHER HOFFMAN; SARAH DOUGLASS;
9   ANTHONY KIM; and IL KIM and DARIA            Case No. C18-1132 TSZ
    KIM, husband and wife and the marital
10  community comprised thereof, on behalf of    PLAINTIFFS' FIRST
    themselves and on behalf of others similarly INTERROGATORIES AND
11  situated,                                    REQUEST FOR PRODUCTION TO
                                                 DEFENDANT NATIONAL
12                 Plaintiffs,                    COLLEGIATE STUDENT LOAN
                                                 TRUST 2007-4
13          vs.

14  TRANSWORLD SYSTEMS INCORPORATED;
    PATENAUDE AND FELIX, A.P.C.;
15  MATTHEW CHEUNG, and the marital
    community comprised of MATTHEW CHEUNG
16  and JANE DOE CHEUNG; National Collegiate
    Student Loan Trust 2004-2; National Collegiate
17  Student Loan Trust 2005-2; National Collegiate
    Student Loan Trust 2005-3; National Collegiate
18  Student Loan Trust 2006-1; National Collegiate
    Student Loan Trust 2006-3; National Collegiate
19  Student Loan Trust 2007-4,

20                 Defendants.

21          Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the following First

22  Set of Interrogatories and Requests for Production (the "Discovery Requests") are propounded

23  to you and your attorneys of record. These Interrogatories are intended to draw upon the

24  combined knowledge of you, your agents, and your attorneys.

25

26

27
    PLAINTIFFS' FIRST INTERROGATORIES TO NCSLT
    2007-4 - 1
    (Case No. C18-1132 TSZ)

Berry&Beckett
1708 Bellevue Avenue
Seattle, WA  98122
(206) 441-5444 FAX (206) 838-6346

convenient access, generally in a computer; a collection of information that is organized so that it can easily be accessed, managed, and updated; or a structured set of data held in a computer.

12. "DATE" shall mean the exact day, month, and year if ascertainable or, if not, the best approximation, including any known relationship to other events.

13. "DEBT" means any alleged obligation to pay money arising out of any agreement or contract related to a student loan you have alleged was owned by you.

14. "DOCUMENT" shall refer to all writings as defined in Fed. R. Civ. P. 34(a)(1)(A), however produced or reproduced or archived or stored, within your possession or subject to your control, of which you have knowledge or to which you now have or previously had access, including all electronically stored information.

15. "ELECTRONICALLY STORED INFORMATION" ("ESI") shall include any information as defined by the Federal Rules of Civil Procedure and the case law construing and/or applying those rules. Plaintiffs request that ESI be processed and produced in a manner that preserves all metadata and that the parties confer regarding the production of metadata prior to the gathering and processing of ESI.

16. "EMPLOYED" and "EMPLOYEE" shall include any person having regular, ongoing responsibilities for some aspect of your operations, whether the person is classified as an employee, independent contractor, or consultant.

17. "P&F" means Patenaude & Felix, A.P.C., its attorneys, employees, managers, directors, officers, agents, partners, principals, consultants, advisors, representatives, or persons working on its behalf.

18. "CHEUNG" means Matthew Cheung or persons working on his behalf.

Berry&Beckett
1708 Bellevue Avenue
Seattle, WA 98122
(206) 441-5444 FAX (206) 838-6346

24.     "INDIVIDUAL," "PERSON," or "PERSONS" shall mean natural persons, proprietorships, sole proprietorships, corporations, nonprofit corporations, municipal corporations, local, state, federal or foreign governments or governmental agencies, political subdivisions, general or limited partnerships, business trusts, trusts, estates, clubs, groups, unincorporated associations, or other business or public organizations.

25.     "MEETING" shall mean any encounter between two or more persons during which a communication of any kind occurred and shall include, but not be limited to, formal gatherings, conversations, communication by electronic media, and telephone calls.

26.     "POLICY" or "POLICIES" shall mean each rule, procedure, training material, or directive, formal or informal, and each common understanding or course of conduct which was recognized as such by your present or former officers, agents, employees or other persons acting or purporting to act on your behalf, which was in effect at any time during the period covered by these Interrogatories and which includes any change of policy.

27.     "RELATING TO" or "REFERRING TO" (including other verb tenses of those terms) means describing, evidencing, constituting, reflecting, showing, comprising, considering, concerning, discussing, regarding, setting forth, studying, analyzing, commenting upon, recommending, alluding to, or mentioning, in whole or in part.

28.     "SCHEDULE 1" means the document referenced on page 1 of Exhibit A that is attached to these Discovery Requests.

29.     "YOU," "YOUR," means National Collegiate Student Loan Trust 2007-4 and your employees, executives, and board members. You and your **does not include** any other Defendant.

Berry&Beckett
LLP
1708 Bellevue Avenue
Seattle, WA  98122
(206) 441-5444 FAX (206) 838-6346

N.A., Turnstile Capital Management LLC, PNC Bank, N.A. or GE Money Undergraduate

Loan, The American Educational Services (AES), the Pennsylvania Higher Education

Assistance Agency (PHEAA), and The Education Resource Institute (TERI) as relates to this

Student Loan.

ANSWER:

REQUEST FOR PRODUCTION NO. 1: Provide a copy of Schedule 1 as it existed on

September 20, 2007.

RESPONSE:

REQUEST FOR PRODUCTION NO. 2: Provide all documents you referenced or relied

upon in responding to any Interrogatory.

RESPONSE:

REQUEST FOR PRODUCTION NO. 3: Provide all documents in your possession

custody and control relating to any of the Plaintiffs.

RESPONSE:

REQUEST FOR PRODUCTION NO. 4: Provide all documents identified in

Interrogatory No. 12 relating to any of the Plaintiffs' files, including custody, access, and

procedures for assuring that the records in the files are not tampered with.

RESPONSE:

Berry&Beckett
LLLP
1708 Bellevue Avenue
Seattle, WA 98122
(206) 441-5444 FAX (206) 838-6346

Ex. 8
FILED UNDER
SEAL

Ex. 9
FILED
UNDER
SEAL

Ex. 10
FILED
UNDER
SEAL

Ex. 11

1

2                                                          The Hon. Thomas S. Zilly

3

4

5

6                        UNITED STATES DISTRICT COURT
7                       WESTERN DISTRICT OF WASHINGTON
                                   AT SEATTLE
8

9    ESTHER HOFFMAN; SARAH DOUGLASS;
     ANTHONY KIM; and IL KIM and DARIA
10   KIM, husband and wife and the marital          Case No. C18-1132 TSZ
     community comprised thereof, on behalf of
11   themselves and on behalf of others similarly   PLAINTIFFS' FRCP 26(a)(2)(B)
     situated,                                      DISCLOSURE OF EXPERT
12                                                  WITNESS REPORT
                           Plaintiffs,
13
             vs.
14
     TRANSWORLD SYSTEMS INCORPORATED;
15   PATENAUDE AND FELIX, A.P.C.;
     MATTHEW CHEUNG, and the marital
16   community comprised of MATTHEW CHEUNG
     and JANE DOE CHEUNG; National Collegiate
17   Student Loan Trust 2004-2; National Collegiate
     Student Loan Trust 2005-2; National Collegiate
18   Student Loan Trust 2005-3; National Collegiate
     Student Loan Trust 2006-1; National Collegiate
19   Student Loan Trust 2006-3; National Collegiate
     Student Loan Trust 2007-4,
20
                           Defendants.
21
     TO: All Defendants and their counsel of record.
22
             Pursuant to FRCP 26(a)(2)(B) Plaintiffs produce the attached Expert Report of
23
     Mike Andrew whose testimony Plaintiffs may rely upon in this action. The attached
24
     report is in supplement to Plaintiffs' previous expert disclosures. Plaintiffs reserve the right
25
     to call rebuttal experts.
26

DATED this 14th day of March, 2022.

LEONARD LAW, PLLC

By: _/s/ Sam Leonard_
    Sam Leonard, WSBA #46498
    3614 California Ave. SW, #151
    Seattle, Washington 98116
    sam@seattledebtdefense.com

    *Attorney for Plaintiffs*

PLAINTIFFS' DISCLOSURE OF EXPERT WITNESS
REPORT - 2
(Case No. C18-1132 TSZ)

Leonard Law
3614 California Ave. SW, #151
Seattle, Washington 98116
Phone: 206-486-1176
Fax: 206-458-6028



**CyberSecurity Institute**
**14751 N. Kelsey St.**
**Suite 105 / PMB 162**
**Monroe, WA. 98272-1353**

March 14, 2022

This document is to provide a record of my examination and conclusions relating to metadata values associated with multiple Excel Spreadsheets. I have conducted a forensic process on two separate occasions to extract metadata directly from what was claimed to be original versions of Excel spreadsheets. The inspections were conducted remotely and the native spreadsheets were not examined – only the metadata from the presented spreadsheets was exported for examination. The first inspection was conducted to examine metadata associated with Excel spreadsheets produced by Transworld Systems Incorporated (TSI). The second was conducted of Excel spreadsheets produced by the National Collegiate Student Loan Trusts (TRUST). Over the course of our engagement my company has been paid total of $4,187.50 for analysis and consultation services. A true and accurate copy of my CV is attached to this report as **EXHIBIT A.** Copies of all documents I have reviewed are attached as **EXHIBIT B**.

In addition to the two remote inspections and metadata extractions performed, I have also been provided with documents which have presented context for the metadata values present in the examined spreadsheets. They are identified below.

In the course of my examination I have reviewed the following documents. The hash values recorded for the named XLS spreadsheets which were provided for inspection are documented in the Table. The file names and MD5 hash values in **RED** highlight the files examined during the two inspections which did not have hash values that matched; in other words, they represent multiple copies of files that have the same name but are not the original file. The hash value of a file is the file's digital fingerprint; if the files are identical the hash values will match, no matter how many times the file has been copied from one location to another. If the hashes don't match then the files are not the same regardless of having the same filename

| File Name **(X 2 inspections)** | **MD5 Hash** | Top =Remote inspection **X 2** | BEGBATES / ENDBATES |
| --- | --- | --- | --- |
| | | 2nd = hash provided by TSI | |
| | | 3rd = hash provided by TRUST | |
| Bank of America Final Roster.xls | 5320519A33ADC71329718E2553D9CDEF | | Not Applicable (Direct Remote Inspection) |
| | 43EE7246CAF33BD2EA01994A2C65E376 | | |
| | 8FD9C13AB4FFE4EF69EBAD88D77AD3B9 | | |
| 2005-2 Lender Payout Summary - FMC Master.xls | 3A107A9A5402AE853E7D13A1370BCAAD | | Not Applicable (Direct Remote Inspection) |
| | 3A107A9A5402AE853E7D13A1370BCAAD | | |
| | 3A107A9A5402AE853E7D13A1370BCCAD | | |
| LENDER_ROSTERS_ALL IN.xls | 27F7C615BE31D5C98C771D30FC0D69A0 | | Not Applicable (Direct Remote Inspection) |
| | BBBFA74A0226D57190237AD94CA5A781 | | |
| | E07164E5530F8422A1603FDF2CFB7998 | | |
| BANK_ONE_RECON_SUMMARY - Revised.xls | 067FADD9F120F4665181CC78367C7FC4 | | Not Applicable (Direct Remote Inspection) |
| | D00D1851DE8BA8F40FB399AAE76624B8 | | |
| | 04A1E9DF731E4A74FC48FCB0191F186D | | |
| Bank_of_America_Post_Sale.xls | E7E636B5B759BED1F95F326C332D13A4 | | Not Applicable (Direct Remote Inspection) |
| | E7E636B5B759BED1F95F326C332D13A4 | | |
| | E7E636B5B759BED1F95F326C332D13A4 | | |
| 20074_Lender Report - Post Sale- BANK OF AMERICA.xls | F017F61DFA36163A004E1DF42135D32A | | Not Applicable (Direct Remote Inspection) |
| | F017F61DFA36163A004E1DF42135D32A | | |

| | F017F61DFA36163A004E1DF42135D32A | |
|---|---|---|
| TSI_0007680.pdf | Not Applicable | TSI_0007680 - TSI_0007835 |
| TSI_0007836.pdf | Not Applicable | TSI_0007836 - TSI_0013454 |
| TSI_0013455.pdf | Not Applicable | TSI_0013455 - TSI_0013993 |
| TSI_0013994.pdf | Not Applicable | TSI_0013994 - TSI_0014827 |
| TSI_0014828.pdf | Not Applicable | TSI_0014828 - TSI_0018893 |
| TSI_0018894.pdf | Not Applicable | TSI_0018894 - TSI_0022007 |
| First_Schedules metadata.xls | | Not Applicable |
| Second_Schedules metadata.xls | | Not Applicable |
| Douglass 15-40570 MFD and Affd.pdf | | Not Provided |
| Douglass 15-40571 MFD and Affd.pdf | | Not Provided |
| Hoffman 13-33591 MFD and Affd.pdf | | Not Provided |
| Kim 14-51604 MFD and Affd.pdf | | Not Provided |
| Kim 14-51605 MFD and Affd.pdf | | Not Provided |
| Kim 14-51606 MFD and Affd.pdf | | Not Provided |
| Kim 14-51607 MFD and Affd.pdf | | Not Provided |
| Kim 14-51619 MFD and Affd.pdf | | Not Provided |

## Table Summary:

The table above is somewhat complicated and has numerous entries. To summarize and facilitate, the filenames listed in the table represent three distinct sources of information used in the analysis, as detailed below. The middle column – titled MD5 hash – represents key evidence and it is critical to understand what is represented there. Each of the values tied to a filename (three rows per file) represents a hash value for the file. The top row is the hash value recorded in the forensic inspection of the named spreadsheets, on two different occasions. This value is in Black font. The second and third rows represent the hash values for the files as provided by TSI and the TRUST, respectively. If the hash value in the row is Red this means the hashes provided by TSI and the TRUST do not match the hash values of the actual files which were inspected. To summarize:

- The first section – which is color coded green and red – represents the actual spreadsheets offered for inspection. These spreadsheets were claimed by TSI / TRUST to represent original copies of the named files. There are three entries, or rows, associated with each of these filenames. The rows document a record of the file hashes.

- The second section contains only two files, which were provided to me by Sam Leonard. These files are named, "*First_Schedules metadata.xls*", and "*Second_Schedules metadata.xls*." These two files contain data which was provided by defendants. Defendants claimed the records represent the actual metadata from original spreadsheets. The sources of these claimed metadata values were TSI (*First_Schedules metadata*) and the TRUST (*Second_Schedules metadata*). The 2nd and 3rd row digital fingerprint hash values in the first section of the table

were taken from these files as provided by TSI and the TRUST. As can be seen in the table entries, not only do some of the hashes provided not match the actual hash of the actual files inspected, in some cases the hashes from TSI do not even match the hashes from the TRUST for what are claimed to be the same (original) files.

To reiterate, there is a conflict even between both of the defendants; the TRUST claimed to have calculated hash values for the spreadsheets and they provided that data prior to the remote inspection. Those hash values are different for half of the spreadsheets than the values provided prior by TSI. That means that the files from TSI are not the same files as the files from the TRUST even though they are supposed to be copies of original spreadsheets. At the time of inspection the TRUST provided the same files TSI had provided for metadata analysis, even on the same USB thumb drive.

- The third section of files in the table are also file copies provided to me by Sam Leonard. These files contain information in reference to "Pool Supplement" files related to this matter. These documents were reviewed as part of the examination to gain context about the matter in relation to the spreadsheet metadata analysis.

In addition to the summary and details referenced above this report is divided into the following sections: FINDINGS, and CONCLUSIONS AND OPINIONS.

## FINDINGS

The examination of various files and records in the matter was conducted over an extended period, as evidence was made available for analysis. The process was conducted in two basic stages, first the metadata values claimed by TSI and the TRUST were analyzed from the provided files they made available, and second the remote inspections of actual spreadsheets was done on the two separate occasions. The Findings resulting from the first stage are specific to the claimed metadata values provided by TSI and the TRUST. In the course of my examination I analyzed a number of metadata fields which are part of the format for Microsoft XLS spreadsheets such as those in question here. The metadata fields maintain a record of key characteristics for the files, as recorded by the application and operating system. These metadata include dates and times, as well as usernames which are recorded in fields such as, *Created Date*, *Last Author, Last Saved*, and *Last Printed*. For the purposes of this report, the more notable observations and facts found in the metadata are documented as follows:

<u>**No Created Date:**</u> There is no Created Date recorded in the metadata for one of the files. This is an impossible condition under normal operational circumstances. The information provided by TSI shows the absence of a **Created** Date value for the spreadsheet named, "*Bank of America Final Roster.xls*." The spreadsheet obviously exists, has a last saved and last printed date, but no metadata record of when it was created. The associated value filed in the metadata field, as provided by TSI, is completely blank. Conversely, this same file metadata field provided by the TRUST for the exact same file shows a **Created** Date of July 9, 2021 at 1:07 pm. A file that had no creation date as claimed by TSI suddenly has a recorded creation date approximately 15 years after it was saved and printed, according to the TRUST. The absence of a created date for the TSI spreadsheet violates the rules of how an Excel .xls spreadsheet is constructed and designed and how the Operating system and application record internal metadata in an XLS file.

<u>**Created Date Metadata:**</u> It cannot be overstated how unusual it is to have an older Excel spreadsheet such as these that has a blank metadata field. It is common in some businesses to "strip out" metadata in newer Excel documents, but the format is different in newer Excel spreadsheets (.xlsx files) as opposed to the .xls files here. The file construction mandates a field to record whatever metadata is designed to be written internally to the file based on the file type. Each file type records different metadata field values according to the design. An older Excel spreadsheet such as the ones in question here are designed to record the date and time from the computer system at the time it is created. For a value to be missing from a field that is essential to the accurate and correct function of a commercial program like Excel is beyond unusual, it is inexplicable.

The equivalent analogy would be to take a calculator, enter 2 + 2, push ENTER, and have a blank screen as the result; not a Zero as a result, like it was a miscalculation, just simply blank. You would rightfully think the calculator was broken if that happened. A single Excel spreadsheet created by the Microsoft Office Excel program cannot realistically be simply "broken." If that were to happen then all spreadsheets created by that Excel program would also be broken, and therefore useless. The idea that the empty Created Date field is purely a function of the computing processes involved is simply not credible. This anomaly has yet to be explained for the document in question.

The 2021 creation date recorded for the TRUST's copy of the "*Bank of America Final Roster.xls*." spreadsheet has also been ignored as to how the discrepancy happened.  It is important to understand that the spreadsheet files maintained by the TRUST have never been examined; the TRUST simply provided the same TSI files for inspection at the time it took place.

**Remote Inspection:**  During both of the inspections conducted to extract metadata from spreadsheets provided to plaintiff, the same USB drive was used by defendants, containing all the same files accessed during the first inspection.  The process utilized by TSI and the TRUST involved presenting not only the exact same spreadsheets for examination, but also clearly used the exact same USB thumb drive to provide the files for access.  This is significant because this process prevented plaintiffs from examining whatever files were in use by the TRUST under the same filenames as the proposed Schedule files.  This frustrated the analysis and examination process.  Because the same files were used twice the hash values forensically extracted during the inspection are identical.  What is clear from a forensic standpoint is that whatever files were used to provide metadata prior to the inspection, these are not the same files as what was provided to inspect for half of the files.

**Significance of Hash Values:**  The MD5 Digest term deserves a brief explanation to understand its critical importance in identifying a file or body of data.  It is universally accepted in computing that to ensure integrity of data such as a file or document has been maintained, a calculation should be conducted on a file to create something known as a "Hash" of the data.  This hash value creates a unique identifier value for a file which can be used to ensure any copy made of an electronically stored document is exactly identical to the original, in every respect.  It is a matching hash value alone that makes an electronic copy of a file meet the "Best Evidence" mandate

Accordingly, a hash value for a file or document is considered to be a reliable "digital fingerprint" of the file and if any question arises about the matter then all that is needed for verification is to re-hash the data and compare the original and the copy; if the hash values are identical then the two files are identical.  Identical in every possible aspect, format, and content.  This concept is also universally accepted in legal proceedings as the only approved process available to ensure that a copy of ESI documents or data is identical to the original and admissible.  One of the accepted hash algorithm types used in the process described above is the "MD5 Digest" algorithm.  This MD5 hash algorithm was used by both defendants to validate the files, as it is the common method used when processing digital files.

The metadata provided by defendants included "MD5 Digest" hash values purportedly associated with each of the named original spreadsheets.  The provided hash values do not match the "picture" image substitute files produced by defendants.  Therefore it is presumed that the provided hash "digital fingerprint" values match the hash of the original files from which the image files were created.

**Pool Supplement File Dates:**  The last section of the files listed in the table at the beginning of this report list a number of pdf documents which were reviewed as part of the examination.  The purpose of this review was to gain an understanding of the dates and context recorded in these so called "Pool Supplement" documents, in relation to the available facts associated with the Excel spreadsheet evidence.   The relevant dates referenced in the language of the Pool Supplement documents was important as context.  Those dates are included in the table below.

| "Pool Supplement" Filename | Pool Supplement "effective" Date |
|---|---|
| Douglass 15-40570 MFD and Affd.pdf | September 28, 2006 |
| 2006-3 Pool Supplement - Bank of America | |
| Douglass 15-40571 MFD and Affd.pdf | September 28, 2006 |
| 2006-3 Pool Supplement - Bank of America | |
| Hoffman 13-33591 MFD and Affd.pdf | October 28, 2004 |
| Pool Supplement - Bank of America (2004-2) | |
| Kim 14-51604 MFD and Affd.pdf | June 09, 2005 |
| Pool Supplement - Bank One N.A. (2005-2) | |
| Kim 14-51605 MFD and Affd.pdf | June 09, 2005 |
| Pool Supplement - Bank One, N.A. (2005-2) - 6-9-2005 | |

| | |
|---|---|
| Kim 14-51606 MFD and Affd.pdf | October 12, 2005 |
| Pool Supplement - Bank One N.A. (2005-3) | |
| Kim 14-51607 MFD and Affd.pdf | March 09, 2006 |
| Pool Supplement - Bank One N.A. (2006-1) | |
| Kim 14-51619 MFD and Affd.pdf | September 20, 2007 |
| Pool Supplement (DTC Only) - Bank of America (2007-4) | |

## CONCLUSIONS AND OPINIONS

Examination of the records and files provided by TSI and the TRUST pivots around several critical evidence facts. The MD5 hash values provided by defendants prior to the remote inspection of the Excel spreadsheets were created and recorded by an automated process that is reliable and repeatable. This automated process is clear from the output files provided by defendants, who claimed that the metadata values produced represented metadata from original Excel spreadsheets, or from identical copies of the original Excel spreadsheets. If the copies were of an original file then the hash values would be identical no matter how many copies removed the file was from the original.

I can copy a file 100 times and the hash value for that file will never change if the file has not been changed by adding to it or deleting data from it. I will have 100 identical copies of the file and I could hash it 100 times and the process would come out with the exact same hash value 100 times. The fact that the hash values are not identical means that half of the spreadsheets have been modified from the original. This can only happen when something is done to change the file.

The named spreadsheet files listed in the table which are color coded **RED** cannot be copies of the original file due to facts that are clearly supported by the evidence:

- The files provided for inspection do not share an identical hash digital fingerprint with whichever files defendants used to try and represent the Schedule spreadsheets. The files have the same names as the originals but changes have been made, including some differences in how large the file is, compared to what was represented prior to the inspections.

- There are clearly attempts to hide or misrepresent the Created Date on at least one spreadsheet, with the field being completely blank according to TSI, and the Created Date being 2021 according to the TRUST.

- The metadata values for the spreadsheets overall are highly suspect in all regards due to the visible attempts to obfuscate metadata file values, along with the fact that neither TSI nor the TRUST have provided documents that match even each other's hash values for what are supposed to be identical copies of the same files much less the hash values that match the inspected documents.

- The TRUST did not provide the spreadsheets they have control over for inspection in response.

- The Pool Supplement documents have "effective" dates that are very specific and the proposed Schedule documents contain metadata dates that are clearly not what is claimed. It was my understanding that the Excel spreadsheets were supposed to be the Schedules referenced in the Pool Supplement documents. I compared the dates of the Pool Supplement which referenced the Schedules with the Last Written dates in the Excel spreadsheets. Comparing those dates it is my opinion that the Excel spreadsheets are not the Schedules that were referenced in the Pool Supplements.

As a result of this evidence there is simply no way to trust that the provided Excel spreadsheets represent the original files in anything other than filename. Based upon this evidence, and based upon my experience, knowledge, and training, it is my opinion that the Excel spreadsheets provided by TSI and the TRUST are not the "Schedules" referenced in the Pool Supplement documents.

The opinions expressed in this declaration are based on our training and experience and the analysis and information described in this report. These opinions are held and expressed by me to a reasonable degree of professional certainty on a more probable than not basis.


Michael W. Andrew – Vice President
CyberSecurity Institute

Dated:   March 14th, 2022


Cases in which I have provided testimony within the preceding 4 years:

**West Star Industries v. Hackett: CV-18-1636**

# EX. A

Mike Andrew - President of Training Services, Digital Forensic Examiner, Information Security Professional and Educator
mike.andrew@cybersecurityacademy.com



Mike has been an Information Technology professional for 22 years, and has been conducting training in forensic analysis and Information Security since 2003 for attorneys, various law enforcement agencies, and several colleges throughout the Pacific Northwest.  Mike is an instructor and Subject Matter Expert for the

Cyberterrorism Defense Initiative program for the Department of Homeland Security and FEMA, and has also provided course development as a Subject Matter Expert for the course titled

"Cyberterrorism First Responder," on behalf of the Criminal Justice Institute, University of Arkansas.  Among other professional certifications, Mike has earned the Certified Information Systems Security Professional (CISSP), Certified Information Systems Auditor (CISA), AccessData Certified Examiner (ACE), and a Digital Forensics Certified Practitioner (DFCP).  He is certified by the National Security Agency in INFOSEC Assessment Methodology (NSA-IAM), and is a Certified Instructor for CyberSecurity Institute, as well as a Certified Instructor for EC-Council's Certified Ethical Hacker (C|EH), Certified Incident Handler (C|IH), and Certified Hacking Forensic Investigator (CHFI).  Mike is also a Certified Open Source Professional Security Tester (OPST), and Open Source Professional Security Analyst (OPSA).  He is actively involved with developing and delivering training in digital forensics and information security to members of city, state, and federal government and law enforcement agencies throughout the United States, including the states of California, Colorado, Delaware, Florida, Georgia, Kansas, Maryland, Montana, Oregon, North Carolina, South Carolina, and Washington State.  Mike has also provided digital forensic training to U.S. military personnel located at Joint Base Lewis-McChord, to enable war-fighters to perform forensic analysis and provide real-time intelligence for the efforts in Afghanistan and Iraq.   He has performed work as a forensic analyst on cases at all levels - local, state, and federal.

Mike is currently a member of the Computer Information Systems Dept. Advisory Committee and Digital Forensics Committee at Edmonds Community College in Washington State. He is an officer and founding member of the Washington State chapter of HTCIA and is also a member of both the HTCC and the Institute of Computer Forensic Professionals. Working with Steve Hailey, Mike developed the CLE course "Computer Forensics For Attorneys."  Mike has attended and completed training from the E-Discovery Training Academy at Georgetown University Law Center.

In partnership with Steve Hailey, Mike recently developed and delivered training in conducting comprehensive digital forensic examinations to members of law enforcement for the Abu Dhabi, Ajman, Dubai, and Sharjah police departments in the United Arab Emirates.  During his numerous trips to the Middle East with Cybersecurity Institute, Mike also instructed members of the Federal Supreme Court in the U.A.E., the highest court in the U.A.E., regarding developments and considerations in U.S. law related to admissibility and examination of electronic evidence and expert witness testimony.

Mike and Steve's paper "Defining a Process Model for Forensic Analysis of Digital Devices and Storage Media" was published by the IEEE in 2007. In 2008, Mike co-authored and presented a paper entitled "A Case Study; Overcoming Anti-Forensic Methods Used on External Storage Drives" at the Annual

Scientific Meeting for the American Academy of Forensic Sciences in Denver, Colorado. The paper was co-authored with Steve Hailey. Mike is also co-author of the book
"Computer Forensics Core Competencies - Practical Skills for the Forensic Examiner."

Computer Forensics / Information Security Casework

Clarence Design v Syntronic  case 5:21-cv-3610-SI

Esteban v Wilkins   case 2-21-06995-6 SEA

WSBA v Diaz Luong Proceeding No. 18#P00006

WSBA v Diaz Luong Proceeding No. 18#00007

Kitzhaber v Avis, et al.

Bernethy v Lake Court Apartments, LLC case 18-2-13852-3 SEA

IHIF Commercial v City of Issaquah case 18-2-09258-2 SEA (18-2-093606-6 SEA)

Bremner v City of Monroe case NO 16-2-15197-31

West Star Industries v. Hackett  case CV-18-1636

Sherman v. Pfizer case 13-2-00930-3

Smith v. Snohomish County, et. al.  case 15-2-05222-3

USA v. Bettencourt and KPI   case 11-60142-HO

Lane Powell P.C. –  AstaReal Technologies

Hartwig v. Central Transport, LLC   case 14-2-12100-3

Alan Daigre v. EdCC, Et. Al. case CO7-1962 RSM 08/08

Le & Associates P.S. v. Diaz-Luong, Nguyen case 07-2-39131-2 SEA various

Fluke Corporation case Fluke08-0225 02/08

Bio-Therapeutic case DS08-0214 01/08

Barefoot Appraisal v. Zintsmaster, Harnish, Kent 11/07

Edmonds Com. College case Edcc091207 09/07

Edmonds Com. College case Edcc070507 07/07

Kinkela-Frye v. Gleiser 06/07

Logitech case Ltech042107 04/07

Benton County Sheriff's Dept case 07-04977 03/07

Edmonds Com. College case Edcc120601 12/06

JTaylor case JT091506 10/06

Edmonds Police Dept. case 060147 09/06

Garvey-Schubert-Barer case GSB082406 08/06

PNWUMC case UMC071206 07/06

Balboa Threadworks v. Stucky case 05-1157-JTM 06/06

Rich case ER041006 04/06

Zeiss case MZ031306 (Zeiss v. Zeiss) 03/06

Dept. of Vocational Resources – Redmond, WA 01/06

MAndres case 110405 11/05

City of Bonney Lake 10/05

Garvey-Schubert-Barer case GSB102403 10/05

City of Bellevue case COB050701 06/05

Estate of Brust 03/05

Skagit Count Sheriff's Office: Case 04-03217 10/04

City of Bonney Lake v. McDonough 08/04

Clover Lake Technical College CLTC16-0727
Numerous additional…

<u>Education and Technical Certifications</u>

ATA  Network Technology
Certified Information Systems Security Professional (CISSP)
Certified Information Systems Auditor (CISA)
Digital Forensics Certified Practitioner (DFCP)
National Security Agency Infosec Assessment Methodology (NSA-IAM)
OSSTMM Professional Security Tester (OPST)
OSSTMM Professional Security Analyst (OPSA)
 Certified Ethical Hacker (C | EH)
Certified EC-Council Instructor (CEI)
Certified Hacking Forensic Investigator (CHFI)
Certified Incident Handler (CIH)
Certified Data Recovery Expert (CDRE)
Security +
CyberSecurity Forensic Analyst (CSFA)
AccessData Certified Examiner (ACE)
CyberSecurity Institute Certified Instructor


<u>Digital Forensics/Information Security Training</u>

| Title | Vendor |
| --- | --- |
| AccessData Boot Camp | AccessData |
| AccessData Windows Forensics | AccessData |
| AccessData Internet Forensics | AccessData |
| Call Detail Records – Forensic Applications | Cellular Data Resources |
| Cellular Phone Forensics | Mobile Forensics Training |
| Certified Ethical Hacker | The Training Camp |
| E-Discovery | George Mason University  - E-Discovery Institute |
| Data Recovery | Scott Moulton – My Hard Drive Died |
| Computer Forensics Train The Trainer | Spokane Community College |
| Cybersecurity: Incident Handling & Response | Cyberterrorism Defense Analysis Center |
| Malware Analysis | SANS |
| Internet Forensics | AccessData |
| MySpace For Investigators | Inland Direct |
| Oxygen Mobile Device Forensics | Oxygen |
| Forensic Explorer Analysis | GetData |

<u>Information Technology Instruction / Teaching Experience</u>

| | |
| --- | --- |
| Certified Ethical Hacker | Introduction to Computer Forensics |
| Introduction to Security | Windows Advanced Server |
| Digital Forensics and the Law | Windows Networking - Command Line |

| | |
|---|---|
| Digital Forensics I | Packet Analysis and Network Forensics |
| Digital Forensics II | Use and Detection of Steganography |
| Introduction to Network Security | Securing Electronic Evidence at a Crime Scene |
| Host System Security | Triage of Forensic Evidence |
| Security Implementation I | Malware Analysis |
| Security Implementation II | Mobile Device Forensics |
| Designing Network Security | Computer Forensics Core Competencies |
| Computer Forensics Fundamentals | Comprehensive Cyberterrorism Defense |
| | |
| Computer Forensics for Attorneys | Incident Handling and Response |
| Cyberterrorism First Responder | CyberSecurity Prevention Deterrence and Response |
| Community CyberSecurity | CompTIA Security +  (for CSA) |
| Role of the EOC in Community CyberSecurity | Certified Information Systems Security Professional  (for CSA) |
| Comprehensive Cyberterrorism Defense | Cyberterrorism Defense, Incident Handling, and Response |

 Professional Speaking/Seminars

| **Title of Presentation** | **Audience / Host** |
|---|---|
| Computer Forensics | WA State Attorney General |
| Windows Registry Forensics | Information Systems Security Association |
| Carving Files From Packet Captures | Information Systems Security Association |
| Computer Forensics | Pacific Northwest License, Tax, and Fraud Association |
| Steganography | ISACA |
| U.S. Federal Law and Digital Evidence | U.A.E. Judiciary (Dubai, Abu Dhabi -U.A.E.) |
| Defining a Process Model for Forensic Analysis of Digital Devices and Storage Media | SADFE 2007  Seattle, Washington |
| Digital Devices and Storage Media | |
| A Case Study; Overcoming Anti-Forensic Methods Used on External Storage Drives | AAFS Denver, Colorado |
| Computer Forensics Fundamentals | Edmonds Community College/Public |
| Forensic Analysis of Mobile Devices | MORIC – New York State |
| Computer Forensics Fundamentals | Edmonds Community College/Public |
| Home Computer Security | Edmonds Community College/Public |
| Identity Theft – What You Need To Know | Edmonds Community College/Public |
| Computer Forensics & Cyber Crime | King County Bar Association |
| Computer Forensics – An Overview | The Boeing Company |
| Computer Forensics – An Overview | Clark County Community College |
| Computer Forensics – An Overview | Seattle Komputer Enthusiasts Group (KEG) |
| Computer Forensics – An Overview | Data Resource Management Association |
| Computer Forensics – An Overview | Association For Women In Computing |
| Cyber Forensics | Association of InfoTech Professionals |

| Cyber Forensics | Society of Competitive Information Professionals |
| Computer Forensics/Email Investigations | Association of InfoTech Professionals |
| Information Security – An Overview | City of Snohomish |
| Information Security – An Overview | Washington Alliance of Technology Workers |
| Computer Forensics | WA State Attorney General |
| Windows Registry Forensics | Information Systems Security Association |

Publications

A Case Study; Overcoming Anti-Forensic Methods Used on External Storage Drives
Computer Forensics Core Competencies
Computer Forensics for Attorneys
Defining a Process Model for Forensic Analysis of Digital Devices and Storage Media

Professional Affiliations

AGORA
An informal collective of government and business representatives dedicated to the exchange of information on cyber-crime and Internet security issues. Meetings are held every 3-4 months in the Seattle area.

High Technology Crime Investigation Association
The High Technology Crime Investigation Association (HTCIA) is designed to encourage, promote, aid and effect the voluntary interchange of data, information, experience, ideas and knowledge about methods, processes, and techniques relating to investigations and security in advanced technologies among its membership. I am a Founding Member and former President of the Washington State Chapter.

High Tech Crime Consortium
An organization with international membership restricted to law enforcement personnel, prosecutors and corporate investigators.

Digital Forensic Certification Board
The DFCB provides oversight and management of the Digital Forensic Certified Practitioner professional certification for members of law enforcement and attorneys who are active in working within the forensic and e-discovery fields. I am a Founding Member and former officer of the Board.

EX. B

# Exhibit B

# B.1

| From: | Braunstein, Andrew |
|---|---|
| To: | Sam Leonard; Casamento, Greg |
| Cc: | Guy Beckett (Work); amanda@nwclc.org; Christina Henry |
| Subject: | RE: Hoffman v. TSI |
| Date: | Monday, October 18, 2021 2:46:34 PM |
| Attachments: | image001.png |

Sam,

Yes, these six spreadsheets were produced in response to RFP No. 1 to each of the six Trusts. For clarity, the following document is responsive to Request No. 1 to each of the respective Trusts:

- NCSLT 2004-2: NCSLT_000396
- NCSLT 2005-2: NCSLT_000397
- NCSLT 2005-3: NCSLT_000398
- NCSLT 2006-1: NCSLT_000399
- NCSLT 2006-3: NCSLT_000400
- NCSLT 2007-4: NCSLT_000401

Regards,

**Andrew Braunstein**
646-217-7879 Direct
908-229-7683 Mobile
andrew.braunstein@lockelord.com

---

**From:** Sam Leonard <sam@seattledebtdefense.com>
**Sent:** Friday, October 15, 2021 6:22 PM
**To:** Braunstein, Andrew <Andrew.Braunstein@lockelord.com>; Casamento, Greg <GCasamento@lockelord.com>
**Cc:** Guy Beckett (Work) <gbeckett@beckettlaw.com>; amanda@nwclc.org; Christina Henry <chenry@hdm-legal.com>
**Subject:** RE: Hoffman v. TSI

**\*\* External Email -- Sender: sam@seattledebtdefense.com \*\***

Thanks Andrew. Please confirm that the excel spreadsheets were produced in response to Request for Production No. 1 to all trusts.

Sincerely,

Sam

Sam Leonard, *Attorney at Law*

Leonard Law
3614 California Ave SW, #151

Seattle, WA 98116
Ph. 206.486.1176
Fx. 206.458.6028
sam@seattledebtdefense.com
www.seattledebtdefense.com



**CONFIDENTIALITY NOTICE:**

This e-mail transmission may contain information that is protected by attorney-client, work product and/or other privileges. If you are not the intended recipient, you are hereby notified that any disclosure, or taking of any action in reliance on the contents, is strictly prohibited. If you have received this transmission in error, please contact me immediately and return the e-mail by choosing Reply (or the corresponding function on your mail system) and then deleting the e-mail. Thank you.

**From:** Braunstein, Andrew <Andrew.Braunstein@lockelord.com>
**Sent:** Thursday, October 14, 2021 5:08 PM
**To:** Sam Leonard <sam@seattledebtdefense.com>; Casamento, Greg <GCasamento@lockelord.com>
**Cc:** Guy Beckett (Work) <gbeckett@beckettlaw.com>; amanda@nwclc.org; Christina Henry <chenry@hdm-legal.com>
**Subject:** RE: Hoffman v. TSI

Sam,

The metadata for the spreadsheets as we received them, before the redactions were made, was produced in the ".dat" files included in the production.

Please let us know if you have additional questions.

Thanks,

**Andrew Braunstein**
646-217-7879 Direct
908-229-7683 Mobile
andrew.braunstein@lockelord.com

**From:** Sam Leonard <sam@seattledebtdefense.com>

**\*\* External Email -- Sender: sam@seattledebtdefense.com \*\***

Greg and Andrew,

Thank you for your latest production. I can see that the Excel spreadsheets provided by the Trusts have redactions. Since these documents have been altered from their original state, can you please provide the metadata from the original documents or direct me to where it was provided?

Thank you,

Sam

Sam Leonard, *Attorney at Law*

Leonard Law
3614 California Ave SW, #151
Seattle, WA 98116
Ph. 206.486.1176
Fx. 206.458.6028
sam@seattledebtdefense.com
www.seattledebtdefense.com



**CONFIDENTIALITY NOTICE:**

This e-mail transmission may contain information that is protected by attorney-client, work product and/or other privileges. If

you are not the intended recipient, you are hereby notified that any disclosure, or taking of any action in reliance on the contents, is strictly prohibited. If you have received this transmission in error, please contact me immediately and return the e-mail by choosing Reply (or the corresponding function on your mail system) and then deleting the e-mail.  Thank you.

Ex. 12

Mike Andrew - President of Training Services, Digital Forensic Examiner, Information Security Professional and Educator
mike.andrew@cybersecurityacademy.com



Mike has been an Information Technology professional for 22 years, and has been conducting training in forensic analysis and Information Security since 2003 for attorneys, various law enforcement agencies, and several colleges throughout the Pacific Northwest.  Mike is an instructor and Subject Matter Expert for the Cyberterrorism Defense Initiative program for the Department of Homeland Security and FEMA, and has also provided course development as a Subject Matter Expert for the course titled

"Cyberterrorism First Responder," on behalf of the Criminal Justice Institute, University of Arkansas.  Among other professional certifications, Mike has earned the Certified Information Systems Security Professional (CISSP), Certified Information Systems Auditor (CISA), AccessData Certified Examiner (ACE), and a Digital Forensics Certified Practitioner (DFCP).  He is certified by the National Security Agency in INFOSEC Assessment Methodology (NSA-IAM), and is a Certified Instructor for CyberSecurity Institute, as well as a Certified Instructor for EC-Council's Certified Ethical Hacker (C|EH), Certified Incident Handler (C|IH), and Certified Hacking Forensic Investigator (CHFI).  Mike is also a Certified Open Source Professional Security Tester (OPST), and Open Source Professional Security Analyst (OPSA).  He is actively involved with developing and delivering training in digital forensics and information security to members of city, state, and federal government and law enforcement agencies throughout the United States, including the states of California, Colorado, Delaware, Florida, Georgia, Kansas, Maryland, Montana, Oregon, North Carolina, South Carolina, and Washington State.  Mike has also provided digital forensic training to U.S. military personnel located at Joint Base Lewis-McChord, to enable war-fighters to perform forensic analysis and provide real-time intelligence for the efforts in Afghanistan and Iraq.   He has performed work as a forensic analyst on cases at all levels - local, state, and federal.

Mike is currently a member of the Computer Information Systems Dept. Advisory Committee and Digital Forensics Committee at Edmonds Community College in Washington State. He is an officer and founding member of the Washington State chapter of HTCIA and is also a member of both the HTCC and the Institute of Computer Forensic Professionals. Working with Steve Hailey, Mike developed the CLE course "Computer Forensics For Attorneys."  Mike has attended and completed training from the E-Discovery Training Academy at Georgetown University Law Center.

In partnership with Steve Hailey, Mike recently developed and delivered training in conducting comprehensive digital forensic examinations to members of law enforcement for the Abu Dhabi, Ajman, Dubai, and Sharjah police departments in the United Arab Emirates.  During his numerous trips to the Middle East with Cybersecurity Institute, Mike also instructed members of the Federal Supreme Court in the U.A.E., the highest court in the U.A.E., regarding developments and considerations in U.S. law related to admissibility and examination of electronic evidence and expert witness testimony.

Mike and Steve's paper "Defining a Process Model for Forensic Analysis of Digital Devices and Storage Media" was published by the IEEE in 2007. In 2008, Mike co-authored and presented a paper entitled "A Case Study; Overcoming Anti-Forensic Methods Used on External Storage Drives" at the Annual

Scientific Meeting for the American Academy of Forensic Sciences in Denver, Colorado. The paper was co-authored with Steve Hailey. Mike is also co-author of the book
"Computer Forensics Core Competencies - Practical Skills for the Forensic Examiner."

Computer Forensics / Information Security Casework

Clarence Design v Syntronic  case 5:21-cv-3610-SI

Esteban v Wilkins   case 2-21-06995-6 SEA

WSBA v Diaz Luong Proceeding No. 18#P00006

WSBA v Diaz Luong Proceeding No. 18#00007

Kitzhaber v Avis, et al.

Bernethy v Lake Court Apartments, LLC case 18-2-13852-3 SEA

IHIF Commercial v City of Issaquah case 18-2-09258-2 SEA (18-2-093606-6 SEA)

Bremner v City of Monroe case NO 16-2-15197-31

West Star Industries v. Hackett  case CV-18-1636

Sherman v. Pfizer case 13-2-00930-3

Smith v. Snohomish County, et. al.  case 15-2-05222-3

USA v. Bettencourt and KPI  case 11-60142-HO

Lane Powell P.C. –  AstaReal Technologies

Hartwig v. Central Transport, LLC  case 14-2-12100-3

Alan Daigre v. EdCC, Et. Al. case CO7-1962 RSM 08/08

Le & Associates P.S. v. Diaz-Luong, Nguyen case 07-2-39131-2 SEA various

Fluke Corporation case Fluke08-0225 02/08

Bio-Therapeutic case DS08-0214 01/08

Barefoot Appraisal v. Zintsmaster, Harnish, Kent 11/07

Edmonds Com. College case Edcc091207 09/07

Edmonds Com. College case Edcc070507 07/07

Kinkela-Frye v. Gleiser 06/07

Logitech case Ltech042107 04/07

Benton County Sheriff's Dept case 07-04977 03/07

Edmonds Com. College case Edcc120601 12/06

JTaylor case JT091506 10/06

Edmonds Police Dept. case 060147 09/06

Garvey-Schubert-Barer case GSB082406 08/06

PNWUMC case UMC071206 07/06

Balboa Threadworks v. Stucky case 05-1157-JTM 06/06

Rich case ER041006 04/06

Zeiss case MZ031306 (Zeiss v. Zeiss) 03/06

Dept. of Vocational Resources – Redmond, WA 01/06

MAndres case 110405 11/05

City of Bonney Lake 10/05

Garvey-Schubert-Barer case GSB102403 10/05

City of Bellevue case COB050701 06/05

Estate of Brust 03/05

Skagit Count Sheriff's Office: Case 04-03217 10/04

City of Bonney Lake v. McDonough 08/04

Clover Lake Technical College CLTC16-0727
Numerous additional…

Education and Technical Certifications

ATA  Network Technology
Certified Information Systems Security Professional (CISSP)
Certified Information Systems Auditor (CISA)
Digital Forensics Certified Practitioner (DFCP)
National Security Agency Infosec Assessment Methodology (NSA-IAM)
OSSTMM Professional Security Tester (OPST)
OSSTMM Professional Security Analyst (OPSA)
 Certified Ethical Hacker (C | EH)
Certified EC-Council Instructor (CEI)
Certified Hacking Forensic Investigator (CHFI)
Certified Incident Handler (CIH)
Certified Data Recovery Expert (CDRE)
Security +
CyberSecurity Forensic Analyst (CSFA)
AccessData Certified Examiner (ACE)
CyberSecurity Institute Certified Instructor


Digital Forensics/Information Security Training

| Title | Vendor |
| --- | --- |
| AccessData Boot Camp | AccessData |
| AccessData Windows Forensics | AccessData |
| AccessData Internet Forensics | AccessData |
| Call Detail Records – Forensic Applications | Cellular Data Resources |
| Cellular Phone Forensics | Mobile Forensics Training |
| Certified Ethical Hacker | The Training Camp |
| E-Discovery | George Mason University  - E-Discovery Institute |
| Data Recovery | Scott Moulton – My Hard Drive Died |
| Computer Forensics Train The Trainer | Spokane Community College |
| Cybersecurity: Incident Handling & Response | Cyberterrorism Defense Analysis Center |
| Malware Analysis | SANS |
| Internet Forensics | AccessData |
| MySpace For Investigators | Inland Direct |
| Oxygen Mobile Device Forensics | Oxygen |
| Forensic Explorer Analysis | GetData |

Information Technology Instruction / Teaching Experience

| | |
| --- | --- |
| Certified Ethical Hacker | Introduction to Computer Forensics |
| Introduction to Security | Windows Advanced Server |
| Digital Forensics and the Law | Windows Networking - Command Line |

Digital Forensics I                                 Packet Analysis and Network Forensics
Digital Forensics II                                Use and Detection of Steganography
Introduction to Network Security                    Securing Electronic Evidence at a Crime Scene
Host System Security                                Triage of Forensic Evidence
Security Implementation I                            Malware Analysis
Security Implementation II                           Mobile Device Forensics
Designing Network Security                           Computer Forensics Core Competencies
Computer Forensics Fundamentals                      Comprehensive Cyberterrorism Defense

Computer Forensics for Attorneys                     Incident Handling and Response
Cyberterrorism First Responder                       CyberSecurity Prevention Deterrence and
                                                     Response
Community CyberSecurity                              CompTIA Security +  (for CSA)
Role of the EOC in Community CyberSecurity           Certified    Information    Systems    Security
                                                     Professional  (for CSA)
Comprehensive Cyberterrorism Defense                 Cyberterrorism Defense, Incident Handling,
                                                     and Response

### Professional Speaking/Seminars

| Title of Presentation | Audience / Host |
| --- | --- |
| Computer Forensics | WA State Attorney General |
| Windows Registry Forensics | Information Systems Security Association |
| Carving Files From Packet Captures | Information Systems Security Association |
| Computer Forensics | Pacific Northwest License, Tax, and Fraud Association |
| Steganography | ISACA |
| U.S. Federal Law and Digital Evidence | U.A.E. Judiciary (Dubai, Abu Dhabi -U.A.E.) |
| Defining a Process Model for Forensic Analysis of Digital Devices and Storage Media | SADFE 2007  Seattle, Washington |
| Digital Devices and Storage Media | |
| A Case Study; Overcoming Anti-Forensic Methods Used on External Storage Drives | AAFS Denver, Colorado |
| Computer Forensics Fundamentals | Edmonds Community College/Public |
| Forensic Analysis of Mobile Devices | MORIC – New York State |
| Computer Forensics Fundamentals | Edmonds Community College/Public |
| Home Computer Security | Edmonds Community College/Public |
| Identity Theft – What You Need To Know | Edmonds Community College/Public |
| Computer Forensics & Cyber Crime | King County Bar Association |
| Computer Forensics – An Overview | The Boeing Company |
| Computer Forensics – An Overview | Clark County Community College |
| Computer Forensics – An Overview | Seattle Komputer Enthusiasts Group (KEG) |
| Computer Forensics – An Overview | Data Resource Management Association |
| Computer Forensics – An Overview | Association For Women In Computing |
| Cyber Forensics | Association of InfoTech Professionals |

| Cyber Forensics | Society of Competitive Information Professionals |
| Computer Forensics/Email Investigations | Association of InfoTech Professionals |
| Information Security – An Overview | City of Snohomish |
| Information Security – An Overview | Washington Alliance of Technology Workers |
| Computer Forensics | WA State Attorney General |
| Windows Registry Forensics | Information Systems Security Association |

Publications

A Case Study; Overcoming Anti-Forensic Methods Used on External Storage Drives
Computer Forensics Core Competencies
Computer Forensics for Attorneys
Defining a Process Model for Forensic Analysis of Digital Devices and Storage Media

Professional Affiliations

AGORA
An informal collective of government and business representatives dedicated to the exchange of information on cyber-crime and Internet security issues. Meetings are held every 3-4 months in the Seattle area.

High Technology Crime Investigation Association
The High Technology Crime Investigation Association (HTCIA) is designed to encourage, promote, aid and effect the voluntary interchange of data, information, experience, ideas and knowledge about methods, processes, and techniques relating to investigations and security in advanced technologies among its membership. I am a Founding Member and former President of the Washington State Chapter.

High Tech Crime Consortium
An organization with international membership restricted to law enforcement personnel, prosecutors and corporate investigators.

Digital Forensic Certification Board
The DFCB provides oversight and management of the Digital Forensic Certified Practitioner professional certification for members of law enforcement and attorneys who are active in working within the forensic and e-discovery fields. I am a Founding Member and former officer of the Board.

Ex. 13

1                UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF WASHINGTON

3                        AT SEATTLE

4    _____

5    ESTHER HOFFMAN; SARAH DOUGLASS;        )
     ANTHONY KIM; and IL KIM and DARIA
6    KIM, husband and wife, and the         )
     marital community comprised
7    thereof, on behalf of themselves       )
     and on behalf of others similarly
8    situated,                              )

9                        Plaintiffs,        ) C18-1132 TSZ

10        vs.                               )

11   TRANSWORLD SYSTEMS INCORPORATED;       )
     PATENAUDE AND FELIX, A.P.C.;
12   MATTHEW CHEUNG, and the marital        )
     community comprised of MATTHEW
13   CHEUNG and JANE DOE CHEUNG;            )
     National Collegiate Student Loan
14   Trust 2004-2; National Collegiate      )
     Student Loan Trust 2005-2;
15   National Collegiate Student Loan       )
     Trust 2005-3; National Collegiate
16   Student Loan Trust 2006-1;             )
     National Collegiate Student Loan
17   Trust 2006-3; National Collegiate      )
     Student Loan Trust 2007-4,
18                                          )

                         Defendants.
19   _____

20      REMOTE DEPOSITION UPON ORAL EXAMINATION OF

21                    SANDY GOLDSTEIN

22   _____

23                      9:30 a.m.
                      MAY 19, 2022
24                    (Via Zoom)

25    REPORTED BY:  ELEANOR J. MITCHELL, RPR, CCR 3006

═══════ MITCHELL REALTIME REPORTING ═══════

7829 Center Boulevard SE, Suite 247, Snoqualmie, Washington 98065
                     425.503.3645

1    [as read]:  An upgrade to the current version of

2    Windows with another version of Windows.

3         Would that change the modified date in system

4    metadata?

5              MR. ROSENBERG:  Object to form.

6    A.   Could it?

7    Q.   (BY MR. LEONARD.)  Let me strike that.

8         An upgrade to the current version of Windows

9    with another version of Windows, could that change the

10   modified date in a document?

11   A.   What do you mean by "a document"?

12   Q.   Sorry.  So let's do it again.  An upgrade to

13   the current version of Windows with another version of

14   Windows, could that alter a modified date in system

15   metadata?

16   A.   I'd have to go back and check.

17   Q.   So in your report you state [as read]:  Many

18   activities can trigger updates to the metadata modified

19   date field created in a Microsoft operating

20   environment.

21        What metadata modified date field are you

22   referencing in that statement?

23   A.   I'm referencing and giving examples and

24   following bullets.  These are commentaries that system

25   upgrades can change modified dates.  If we're grinding

1  into, Tell me if it's an external system or an

2  application internal, I would run the test and I would

3  get back and tell you.

4       I've seen it take on different forms.  But

5  until I run the test, I really wouldn't make -- or go

6  out on a limb making a general comment in trying to be

7  more specific than it was meant to be.

8       Q.  Okay.  I appreciate that.  My questions are

9  meant to elicit information based on the possibility

10  under any circumstances.  And so when I say could an

11  upgrade to the current version of Windows with another

12  version of Windows update the metadata modified field

13  in systems metadata, what I'm looking for is I'm just

14  looking for an answer that says yes, that's possible,

15  or no, that's not possible.  In any environment, in any

16  system.  And so I'm going to ask the question again

17  with that understanding, and you let me know if you can

18  answer.

19       So would an upgrade to the current version of

20  Windows with another version of Windows update the

21  metadata modified date field commonly referred to as

22  systems metadata?  Could it update that field?

23            MR. ROSENBERG:  Object to form.

24            MR. CASAMENTO:  Objection.

25            THE WITNESS:  I'll proceed, if --

1          MR. CASAMENTO:  Yes, you can answer.

2      A.   It's the same answer as I said:  In order --

3  in our profession, you've got to run the test.  You've

4  got to be looking at it.  I'm not going to go on the

5  record here and saying yeah or nay.

6          I can tell you that we know that operating

7  system upgrades can affect metadata.  You've now asked

8  the question a layer down.  I would want to run a test.

9  I would want to document it.  Right now that's --

10  remains my answer.

11      Q.   (BY MR. LEONARD.)  Okay.  That's fine.  So

12  what is your opinion in bullet 1 based off of?

13      A.   My opinion based on -- on bullet 1 is that

14  certain metadata I've seen after an operating upgrade

15  has changed, I could only speculate whether that was

16  internal or systems.  I really need to go back and take

17  a peek and be sure of that before I go on the record

18  and make a statement.

19      Q.   Okay.  Let's go to bullet 2.  Could copying or

20  moving a file from one location to another location in

21  a program -- in any program -- trigger updates to the

22  metadata modified date field created in a Microsoft

23  operating environment of the systems metadata?

24          MR. CASAMENTO:  Objection.

25          You can answer.

```
1                    MR. ROSENBERG:  Join.

2        A.   Copying or moving a file from one location to

3   another, depending on the program used -- so your

4   question is?  Can you repeat?

5        Q.   (BY MR. LEONARD.)  Yeah.  So you say -- and if

6   I'm misquoting you, let me know, or misstating what

7   you're communicating in your report.  As I understand

8   your report, it says copying or moving a file from one

9   location to another, depending on the program used,

10  could trigger updates to the metadata modified date

11  field created in a Microsoft operating environment.

12           Is that what you're saying?

13       A.   Yes.

14                MR. CASAMENTO:  Objection.

15                THE WITNESS:  Okay.  Sorry.

16                MR. CASAMENTO:  You can answer.  It's

17  okay.

18           You got that, Eleanor?

19                THE REPORTER:  Yes.

20                MR. CASAMENTO:  Thank you.

21       Q.   (BY MR. LEONARD.)  Is that a true statement?

22                MR. CASAMENTO:  Same objection.

23       A.   Everything in my report is true and correct.

24       Q.   (BY MR. LEONARD.)  I'm asking if that's a true

25  statement.
```

 1      A.   Yes.

 2           MR. CASAMENTO:   Note the objection.   Note

 3   the answer.   Thank you.

 4      Q.   (BY MR. LEONARD.)   Is that statement true if

 5   the modified date field that is being referenced in

 6   your report is pulled from the systems metadata?

 7           MR. CASAMENTO:   Objection.

 8      You can answer.

 9      A.   I would give you the same answer as in, one,

10   we'd conduct the test, and I'd be able to answer you.

11   Outside of testing it, having the example in hand, I

12   would need to look at the particular metadata that

13   changed to tell you where it came from.   I generally

14   don't -- haven't run enough scenarios where I have that

15   answer for you right now.

16      Q.   (BY MR. LEONARD.)   Okay.   Could you tell me

17   if, under the scenario we just discussed, the metadata

18   modified date field of internal metadata could change

19   in the circumstances you describe under bullet point 2

20   at the bottom of page 4?

21           MR. CASAMENTO:   Objection.

22      You can answer.

23      A.   I'm not sure I completely understand your

24   question.   I think -- I think you've asked it already,

25   but maybe I didn't hear it right.   Would you repeat,

1  please.

2      Q.   (BY MR. LEONARD.)  Yeah.  Actually I'll state

3  it a different way, so hopefully this makes it a little

4  bit simpler.

5          Could copying or moving a file from one

6  location to another, depending on the program, trigger

7  updates to the internal metadata modified date field

8  created in a Microsoft operating environment?

9              MR. CASAMENTO:  Objection.

10          You can answer.

11      A.   As I said earlier the differentiation between

12  internal and system, I'd have to run that test in order

13  to answer a question of that granularity.

14      Q.   (BY MR. LEONARD.)  So we've discussed system

15  metadata and internal metadata, correct?

16      A.   You have asked me if I understood what they

17  are, and you've asked me some questions about them.

18      Q.   Okay.  Is there another category of metadata

19  other than systems metadata and internal metadata?

20      A.   I don't recall.

21      Q.   You don't recall, or you don't know?

22      A.   Once again, I don't recall.

23      Q.   So if you can't tell me if the example listed

24  under bullet 2 would trigger an update to the metadata

25  modified date -- sorry, the system metadata modified

1   date field created in a Microsoft operating environment

2   without running the test, and if you can't tell me as

3   you sit here today that copying or moving a file from

4   one location to another, depending on the program used,

5   could trigger updates to the internal metadata modified

6   date field created in a Microsoft operating

7   environment, what is your opinion stated in bullet 2 on

8   the bottom of page 4 based on?

9            MR. CASAMENTO:  Objection.

10        You can answer.

11   A.   What is it based on?  It's based on many years

12   of experience and seeing the metadata field triggered.

13   Q.   (BY MR. LEONARD.)  But as you sit here today,

14   you can't tell me what has informed that experience?

15            MR. CASAMENTO:  Objection.

16   Q.   (BY MR. LEONARD.)  Is that correct?

17            MR. ROSENBERG:  Join.

18   A.   My -- my profession requires me to pay

19   attention to details.  It requires that I be exacting.

20   As you bring up, so rightly so, systems versus internal

21   things that we would have expected and hoped to see and

22   hope, we didn't.  And in order for me to answer this

23   question, I'd need to go back and do the work.

24        So I -- I answer in that regard.  Again, I

25   remind you that, you know, my job was to take a look at

1    somebody else's declaration and report and opine upon

2    it.  Clearly these bullets take place the next layer

3    down.  The granularity, I would go back and research

4    if -- if that became important or, the person who

5    published would need to go do that research.

6         Q.  (BY MR. LEONARD.)  Okay.  So is it a fair

7    statement to say that your opinions contained in your

8    report are based on your failing to have sufficient

9    knowledge to confirm or debunk the opinions of

10   Mr. Andrew in his report?

11              MR. CASAMENTO:  Objection.

12         You can answer.

13         A.  That -- that goes with a big no.

14         Q.  (BY MR. LEONARD.)  Okay.  So if your opinions

15   in your report aren't based on a lack of information in

16   Mr. Andrew's report, then why is it you can't answer if

17   copying or moving a file from one location to another,

18   depending on the program used, can trigger updates to

19   the system metadata modified date field created in a

20   Microsoft operating environment?

21              MR. CASAMENTO:  Objection.

22         You can answer.

23         A.  You just used a term "popping."  I -- I don't

24   know what that means.

25         Q.  (BY MR. LEONARD.)  Copying.

1     A.   Oh, copying.  I'm sorry.  I heard -- I

2  misheard you.  I'm glad I asked.  Copying or moving is

3  what you said.  On this side, it sounded like popping,

4  and I -- I was confused.

5     Q.   No problem.

6     A.   And I think -- I think I've answered it, which

7  is:  In order for me to be specific given the hundreds

8  and thousands and tens of thousands of combinations in

9  this science, I've got to go run the test.

10        And whether I ran that test last week or last

11  month or last year, if I don't run the test, if I don't

12  see it, I'm not going to recall tens of thousands,

13  hundreds of thousands, millions of combinations.

14        So I would need to go do that.  And that would

15  give me the comfort of making an unequivocal statement.

16  I'm not going to offer up guesses.  I think it's not

17  what I've been asked to do today.

18     Q.   Fair enough.  So is it accurate to say, then,

19  that your statements included in the paragraph at the

20  bottom of page 4 in your report that starts with "it is

21  well known" and continues onto page 5 with bullet

22  points is not unequivocal?

23         MR. CASAMENTO:  Objection.

24       You can answer.

25     A.   Can you please give me a definition of

1       A.    Okay.  So I think I heard two questions:  How

2   would I use it as it relates to metadata, and what are

3   some ways it may be used.

4       Q.    Yeah.

5       A.    I don't use FTK for metadata.

6       Q.    Okay.

7       A.    I have seen FTK reports.  I know that it can

8   capture certain information.  And I know there are

9   newer versions of FTK since I've used it that may offer

10  more functionality, but I do not have the knowledge to

11  tell you what that tool can do today and what it does

12  within metadata.

13      Q.    Okay.  Have you ever known an FTK report that

14  you have reviewed to contain inaccurate data?

15              MR. CASAMENTO:   Objection.

16          You can answer.

17      A.    In your definition, does "inaccurate" also

18  mean misleading?

19      Q.    (BY MR. LEONARD.)  Let's start with

20  misleading.  Have you ever known an FTK report to

21  include misleading data?

22      A.    The report, no.  But as people interpret that

23  information, yes.

24      Q.    Okay.  So if I used an FTK tool to extract

25  metadata from an xls file, do you think it could

1   extract the last modified date?

2       A.   Your sentence was if you use the tool?

3       Q.   That was a --

4       A.   So if I can throw out that part, and we're

5   just strictly talking about what the tool's

6   capabilities are --

7       Q.   Yeah.

8       A.   -- from the versions I'm familiar with, if the

9   image took place properly, if there were no errors in

10  making the image -- and yes, there can be errors -- or

11  if you're just using it for other purposes to view a

12  file -- and again, there are no errors, discrepancies,

13  other issues that block it -- it should produce

14  accurate information, as Mr. Andrews provided in his

15  report and Capsicum took no exception to the

16  information he provided, simply the interpretation.

17      Q.   Thank you.  Do you know, is FTK acknowledged

18  to be a reliable forensic tool in the industry that you

19  work in?

20      A.   I don't know that we ever got that definition

21  of reliable.  And if we did, could I get a repeat on

22  that, please?

23      Q.   How would you define reliable?

24      A.   You're asking me to define what you just asked

25  me?

1      Q.   Yeah.  No, I'm asking you to define the word

2  "reliable."

3      A.   Something that doesn't break.

4      Q.   So I'll use the word "trustworthy."  So I'm

5  sure that that may be complicated to understand what I

6  mean, and if you don't understand the definition of

7  trustworthy when I ask the question, just let me know.

8      A.   I don't --

9      Q.   I just --

10      A.   I don't know how I would compare a software

11  product to trustworthy.  I -- I view that more as a

12  personal attribute.

13      Q.   Okay.  That's fine.  We'll just leave it at

14  that.

15           Do you know if Mr. Halpin attended a metadata

16  extraction relating to the case?

17      A.   I -- I don't recall.

18      Q.   Okay.  Earlier you said that -- and if I

19  misquoting you or misstating what you just let me

20  know -- that you did not take exception to the

21  FTK report that Mr. Andrews generated -- Mr. Andrew.

22  Sorry.  Is that correct?

23           MR. CASAMENTO:  I'm going to object to

24  form.  Mischaracterizing.

25           But you can answer.

Ex. 14

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ESTHER HOFFMAN; SARAH DOUGLASS;
ANTHONY KIM; and IL KIM and DARIA
KIM, husband and wife and the marital
community comprised thereof, on behalf of
themselves and on behalf of others similarly
situated,

Plaintiffs,

vs.

TRANSWORLD SYSTEMS INCORPORATED;
PATENAUDE AND FELIX, A.P.C.;
MATTHEW CHEUNG, and the marital
community comprised of MATTHEW CHEUNG
and JANE DOE CHEUNG; National Collegiate
Student Loan Trust 2004-2; National Collegiate
Student Loan Trust 2005-2; National Collegiate
Student Loan Trust 2005-3; National Collegiate
Student Loan Trust 2006-1; National Collegiate
Student Loan Trust 2006-3; National Collegiate
Student Loan Trust 2007-4,

Defendants.

Case No. C18-1132 TSZ

PLAINTIFFS' SUPPLEMENT TO
DISCLOSURE OF EXPERT
WITNESS THAT MAY BE RELIED
UPON IN SUPPORT OF CLASS
CERTIFICATION

TO: All Defendants and their counsel of record.

Plaintiffs disclose Mike Andrew as an expert whose testimony may be relied upon in

support of their motion for class certification. Mr. Andrew is an information technology expert

who may be called to testify regarding the document storage procedures of the Defendants, the

authenticity of documents produced by Defendants in discovery, and the metadata in the

PLAINTIFFS' DISCLOSURE OF EXPERT WITNESS - 1
(Case No. C18-1132 TSZ)

Leonard Law
3614 California Ave. SW, #151
Seattle, Washington 98116
Phone: 206-486-1176
Fax: 206-458-6028

documents that Defendants claim to be the schedules of student loans that the NCSLTs claim to be entitled to collect upon. Additional areas of his testimony will depend on the inspection of the documents that the Defendants claim to be the schedules. Plaintiffs reserve the right to amend this disclosure to add experts to rebut expert testimony relied upon by any Defendant relating to class certification. Plaintiffs also reserve the right to supplement their expert witness disclosure with any expert who may be called to testify regarding issues other than class certification.

**February 4, 2022 – Supplement:**

Mike Andrew reviewed documents bates stamped P&F_0131-63, 301-333, 466-493, 1168-1199, 1565-1596, 1967-2001, 2355-2392, 2790-2822, the Excel Spreadsheets provided by TSIs and the NCSLTs that were remotely inspected  and those documents attached hereto as **Exhibit A** in forming his opinions contained in his declaration filed with the Court at Docket No. 237.

Attached hereto as **Exhibit B** is a copy of Mike Andrew's curriculum vitae. In the last four years, Mike Andrew has testified in the case of *Hackett Industries Inc. v. Richard Hackett et. al.*, Cs. No. CV-2018-1636, Kootenai County District Court, Idaho State.

To date, Plaintiffs have paid Mike Andrew $3,000 for his services.

DATED this 6th day of February, 2022.

LEONARD LAW, PLLC

By:  */s/ Sam Leonard*
    Sam Leonard, WSBA #46498
    3614 California Ave. SW, #151
    Seattle, Washington 98116
    sam@seattledebtdefense.com

*Attorney for Plaintiffs*

PLAINTIFFS' DISCLOSURE OF EXPERT WITNESS - 2
(Case No. C18-1132 TSZ)

Leonard Law
3614 California Ave. SW, #151
Seattle, Washington 98116
Phone: 206-486-1176
Fax: 206-458-6028

# Exhibit A

# A.1

| From: | Braunstein, Andrew |
|---|---|
| To: | Sam Leonard; Casamento, Greg |
| Cc: | Guy Beckett (Work); amanda@nwclc.org; Christina Henry |
| Subject: | RE: Hoffman v. TSI |
| Date: | Monday, October 18, 2021 2:46:34 PM |
| Attachments: | image001.png |

Sam,

Yes, these six spreadsheets were produced in response to RFP No. 1 to each of the six Trusts. For clarity, the following document is responsive to Request No. 1 to each of the respective Trusts:

- NCSLT 2004-2: NCSLT_000396
- NCSLT 2005-2: NCSLT_000397
- NCSLT 2005-3: NCSLT_000398
- NCSLT 2006-1: NCSLT_000399
- NCSLT 2006-3: NCSLT_000400
- NCSLT 2007-4: NCSLT_000401

Regards,

**Andrew Braunstein**
646-217-7879 Direct
908-229-7683 Mobile
andrew.braunstein@lockelord.com

---

**From:** Sam Leonard <sam@seattledebtdefense.com>
**Sent:** Friday, October 15, 2021 6:22 PM
**To:** Braunstein, Andrew <Andrew.Braunstein@lockelord.com>; Casamento, Greg <GCasamento@lockelord.com>
**Cc:** Guy Beckett (Work) <gbeckett@beckettlaw.com>; amanda@nwclc.org; Christina Henry <chenry@hdm-legal.com>
**Subject:** RE: Hoffman v. TSI

** External Email -- Sender: sam@seattledebtdefense.com **

Thanks Andrew. Please confirm that the excel spreadsheets were produced in response to Request for Production No. 1 to all trusts.

Sincerely,

Sam

Sam Leonard, *Attorney at Law*

Leonard Law
3614 California Ave SW, #151

Seattle, WA 98116
Ph. 206.486.1176
Fx. 206.458.6028
sam@seattledebtdefense.com
www.seattledebtdefense.com



**CONFIDENTIALITY NOTICE:**

This e-mail transmission may contain information that is protected by attorney-client, work product and/or other privileges. If you are not the intended recipient, you are hereby notified that any disclosure, or taking of any action in reliance on the contents, is strictly prohibited. If you have received this transmission in error, please contact me immediately and return the e-mail by choosing Reply (or the corresponding function on your mail system) and then deleting the e-mail.  Thank you.

**From:** Braunstein, Andrew <Andrew.Braunstein@lockelord.com>
**Sent:** Thursday, October 14, 2021 5:08 PM
**To:** Sam Leonard <sam@seattledebtdefense.com>; Casamento, Greg <GCasamento@lockelord.com>
**Cc:** Guy Beckett (Work) <gbeckett@beckettlaw.com>; amanda@nwclc.org; Christina Henry <chenry@hdm-legal.com>
**Subject:** RE: Hoffman v. TSI

Sam,

The metadata for the spreadsheets as we received them, before the redactions were made, was produced in the ".dat" files included in the production.

Please let us know if you have additional questions.

Thanks,

**Andrew Braunstein**
646-217-7879 Direct
908-229-7683 Mobile
andrew.braunstein@lockelord.com

**From:** Sam Leonard <sam@seattledebtdefense.com>

**Sent:** Thursday, October 14, 2021 4:54 PM
**To:** Casamento, Greg <GCasamento@lockelord.com>; Braunstein, Andrew <Andrew.Braunstein@lockelord.com>
**Cc:** Guy Beckett (Work) <gbeckett@beckettlaw.com>; amanda@nwclc.org; Christina Henry <chenry@hdm-legal.com>
**Subject:** Hoffman v. TSI

**\*\* External Email -- Sender: sam@seattledebtdefense.com \*\***

Greg and Andrew,

Thank you for your latest production. I can see that the Excel spreadsheets provided by the Trusts have redactions. Since these documents have been altered from their original state, can you please provide the metadata from the original documents or direct me to where it was provided?

Thank you,

Sam

Sam Leonard, *Attorney at Law*

Leonard Law
3614 California Ave SW, #151
Seattle, WA 98116
Ph. 206.486.1176
Fx. 206.458.6028
sam@seattledebtdefense.com
www.seattledebtdefense.com



**CONFIDENTIALITY NOTICE:**

This e-mail transmission may contain information that is protected by attorney-client, work product and/or other privileges. If

you are not the intended recipient, you are hereby notified that any disclosure, or taking of any action in reliance on the contents, is strictly prohibited. If you have received this transmission in error, please contact me immediately and return the e-mail by choosing Reply (or the corresponding function on your mail system) and then deleting the e-mail.  Thank you.

Ex. 15

The Deposition of

# MICHAEL ANDREW

In the Matter of

# ESTHER HOFFMAN, ET AL

vs

# TRANSWORLD SYSTEMS, INC., ET AL

Taken On

# JUNE 24, 2022



1            UNITED STATES DISTRICT COURT

2           WESTERN DISTRICT OF WASHINGTON

3                    AT SEATTLE

4  ESTHER HOFFMAN, SARAH
   DOUGLASS, ANTHONY KIM, IL
5  KIM, AND DARIA KIM, ON
   BEHALF OF THEMSELVES AND
6  ON BEHALF OF OTHERS
   SIMILARLY SITUATED
7
   VERSUS                     NO. 2:18-cv-01132 TSZ
8
   TRANSWORLD SYSTEMS,
9  INCORPORATED, ET AL

10

11 *********************************************************

12

13            DEPOSITION OF MICHAEL ANDREW

14

15 The deposition of MICHAEL ANDREW appearing remotely

16 via videoconference from Monroe, Washington was

17 taken in the above entitled cause, pursuant to the

18 following stipulation, before Deborah Villien,

19 Certified Court Reporter, appearing remotely from

20 Lafayette, Louisiana, on the 24th day of June 2022,

21 beginning at 11:09 a.m.

22

23

24

25

1  BY MR. SHARTLE:

2      Q.    You keep saying it's dated --

3      A.    That's what I stated.

4      Q.    You keep stating that the document was

5  modified.  Let's talk about that for a second.  The

6  date modified, could it be changed by how a document

7  is saved in the system?

8      A.    How it is saved in the system?

9      Q.    Yes, sir.

10      A.    Can you be more specific?

11      Q.    I'm trying to be very general, because I

12  don't know IT stuff.

13      A.    Okay.

14      Q.    I mean, a document can be saved to a

15  desktop, can it not?

16      A.    It can.

17      Q.    And will that change the date modified,

18  or could it change the date modified?

19      A.    No.

20      Q.    It won't?

21      A.    No.

22      Q.    So is there -- the date modified cannot

23  in any way be altered based upon how a document is

24  saved?

25              MR. LEONARD:  Object to the form.

1    A.    Okay.  The only time a document is saved

2  is if it has been modified.  And if it has been

3  modified, then the last modified date will change.

4  If you modify a file in any way, shape, or form, it

5  requires a save process to take place.  That save

6  process will have a date and time associated with

7  that, and that will be stamped both internally on

8  the internal metadata for the file, as well as it

9  will be stamped on the system metadata related to

10  the file.

11  BY MR. SHARTLE:

12    Q.    I think you just said, if I understood,

13  that if a document is saved, it could change the

14  date modified?

15    A.    No, I did not.

16    Q.    Okay.  I'm sorry.  You'll have to break

17  it down for me then.

18    A.    Sure, you bet.  I understand.

19    Q.    I'm just trying to understand if a

20  document is e-mail to me, and then I save that

21  document to my system, without changing the content

22  of the document in any way, the information that's

23  visible to the eye, can that, depending upon how I

24  save the document, change the date modified?

25    A.    Not if --

1          MR. LEONARD:  Object to form.

2     A.    -- you save it in the same format that it

3 was sent.

4 BY MR. SHARTLE:

5     Q.    That's not what I'm asking, though.  Is

6 it possible that could be in some way changed based

7 upon how you save it that would not alter the

8 content of the document?

9     A.    If it is kept in the original format, it

10 will not be modified.  If you save it into a

11 different format, for example, if you save it to a

12 PDF, or some other format, and you change the file,

13 then you have modified the file.

14     Q.    Okay.  And you know nothing about how --

15 because you testified at the beginning today that

16 you know about how the TSI saves documents, do you?

17     A.    It doesn't matter.

18          MR. LEONARD:  Object to the form.

19     A.    It doesn't matter.

20 BY MR. SHARTLE:

21     Q.    No, that's what I'm asking you.  You know

22 nothing about that, do you?

23     A.    I'm telling you it's irrelevant.  I don't

24 need to know anything about it.  I'm sorry.

25     Q.    I appreciate that you think it's not

1 relevant, okay.

2     A.    No, it's not.  Factually it's not

3 relevant.

4     Q.    I got that.  I just want to qualify,

5 though, you testified earlier that you knew nothing

6 about the document storage procedures of the

7 defendants, correct?

8              MR. LEONARD:  Object to the form.

9     A.    With all due respect, I am going to

10 expand upon my answer because you are misconstruing

11 and misrepresenting what's taking place here.  So

12 let me clarify that from a forensic standpoint.

13 This is going to take a minute.  We have to get a

14 little bit technical.  But you have put it to a

15 place where this is necessary.  So that's what I'm

16 going to do.

17              There are two sets of metadata tied to a

18 file.  You have system metadata that has to do with

19 things that happened to the file as a whole,

20 operations that the system takes upon the file as a

21 whole, like creating it, accessing it, or if the

22 file has been changed in some way and modified,

23 that's your system metadata.

24              You also have internal metadata for a

25 particular file type.  In this case, it's Excel

1  spreadsheets.  The internal metadata tracks what a

2  user or the system, how it's interacted with the

3  file in a very specific way.  For example, the last

4  time it was printed, the last time it was saved, who

5  the username, the author, was for that file, who the

6  last author was for that file.

7            The combination of the two of these with

8  the files in question, which are Excel spreadsheets,

9  showed that the file has not been modified since a

10  particular date.  So what I'm telling you is that

11  everything that you're speculating upon is

12  irrelevant because the internal metadata for the

13  Excel spreadsheet, which is called the last saved

14  date, is in agreement with the system metadata last

15  modified date.  And what that means is it means that

16  nothing has happened to that file at the system

17  level, such as saving that to a different format,

18  that would have modified that since the date that's

19  stamped.  So both of the dates on all these files

20  agree.

21            So what that tells you is that nothing in

22  the interactions with this file, nothing in the

23  transfer of this file, nothing -- nothing has

24  modified that file.  Because if it had, then you

25  would have the last modified date different on the

1  system metadata, and the internal metadata, the last

2  saved date which corresponds with that, would have

3  changed.  Any time you modify a file, you have to

4  save the file.

5       So this is when you talk about -- you

6  asked the question is there anything -- if I save

7  that file, would it ever change the last modified

8  date?  That is very misleading and it just shows

9  really what you're trying to do is you're trying to

10  break down this process, and look like something

11  could've happened but the evidence clearly shows did

12  not happen.

13       The last saved date and the last modified

14  dates are in agreement for all the files in

15  question.

16  BY MR. SHARTLE:

17       Q.   But I wasn't asking you --

18       A.   Excuse me.  Excuse me.  That means that

19  nothing that happened to that file in transfer, in

20  transmission, in copying from one place to another,

21  nothing that happened to that file changed the last

22  modified date.  Otherwise the last modified date

23  would be different from the internal last saved date

24  in the metadata side of the file.  So your questions

25  are all misleading, and the evidence clearly shows